1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ALTO LITIGATION, PC
  Bahram Seyedin-Noor (Bar No. 203244)
  bahram@altolit.com
  Bryan Ketroser (Bar No. 239105)
  bryan@altolit.com
  Joshua A. Korr (Bar No. 304577)
  josh@altolit.com
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 779-2586
Facsimile: (415) 306-8744

Attorneys for Plaintiff,
Ariel Abittan

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ARIEL ABITTAN,<br><br>                PLAINTIFF,<br><br>      v.<br><br>LILY CHAO (A/K/A TIFFANY CHEN, A/K/A YUTING CHEN), DAMIEN DING (A/K/A DAMIEN LEUNG, A/K/A TAO DING), TEMUJIN LABS INC. (A DELAWARE CORPORATION), AND TEMUJIN LABS INC. (A CAYMAN CORPORATION),<br><br>               DEFENDANTS,<br><br>     and<br><br>EIAN LABS INC.,<br><br>        NOMINAL DEFENDANT. | Case No.<br><br>**COMPLAINT FOR:**<br><br>(1) **BREACH OF FIDUCIARY DUTY**<br>(2) **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>(3) **FRAUDULENT INDUCEMENT**<br>(4) **UNJUST ENRICHMENT**<br>(5) **ACCOUNTING**<br>(6) **CIVIL RICO (18 U.S.C. § 1962(c))**<br>(7) **CIVIL RICO (18 U.S.C. § 1962(d))**<br>(8) **FRAUD**<br>(9) **BREACH OF CONTRACT**<br>(10) **CONVERSION**<br>(11) **UNJUST ENRICHMENT**<br>(12) **DEFAMATION**<br>(13) **ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff ARIEL ABITTAN ("Plaintiff"), by and through the undersigned counsel, hereby files and serves this Complaint for Breach of Fiduciary Duty (Derivative), Aiding and Abetting Breach of Fiduciary Duty (Derivative), Fraudulent Inducement (Derivative), Unjust Enrichment (Derivative), Accounting (Derivative), Civil Violations of the Racketeer Influenced and Corrupt Organizations Act, Fraud, Breach of Contract, Conversion, Unjust Enrichment, Defamation, and Accounting against LILY CHAO (A/K/A TIFFANY CHEN, A/K/A YUTING CHEN), DAMIEN DING (A/K/A DAMIEN LEUNG, A/K/A TAO DING), TEMUJIN LABS INC. (DELAWARE), and TEMUJIN LABS INC. (CAYMAN) (collectively, "Defendants"), and EIAN LABS INC. ("Nominal Defendant").

## NATURE OF THE ACTION AND OVERVIEW

1.    This case arises from a multi-year fraudulent conspiracy orchestrated by Lily Chao (a/k/a Tiffany Chen, a/k/a Yuting Chen) ("Chao"), her husband (or perhaps brother-in-law) Damien Ding (a/k/a Damien Leung, a/k/a Tao Ding) ("Ding"), the numerous entities they control, including Temujin Labs Inc. (Delaware) and Temujin Labs Inc. (Cayman) (together, "Temujin"), and a coterie of Chinese nationals that played straw-man roles in their fraudulent deals.

2.    Defendants' conspiracy flies under the banner of a fintech company called Findora, which was founded by Plaintiff, Ding, and Chao in 2018.  Plaintiff and investors that he brought to the table invested millions of dollars in the company, primarily via two entities:  Juniper Ventures Partners, LLC ("JVP" or "Juniper") and Juniper Ventures Incorporated ("JVI").  Plaintiff also personally assembled a highly-esteemed team of cryptographers from Stanford University's Cryptography Ph.D. program to build Findora's state of the art blockchain technology.

3.    Unfortunately, Ding, Chao, and their co-conspirators co-opted the company for their scheme and used it to embezzle tens of millions of dollars on the false promise of a legitimate Findora token offering.  In the process, Ding and Chao defrauded Plaintiff out of more than $6,000,000, stole an additional $1,200,000 from Plaintiff's friends and family, and defamed Plaintiff to countless individuals.

4.    Most brazenly, Defendants fraudulently induced Plaintiff to sign an intellectual property sale agreement on behalf of Nominal Defendant Eian Labs Inc. ("Eian") (then known to

the public as Findora), which divested Eian of tens of millions of dollars of intellectual property for the paltry sum of $300,000.  Defendants took advantage of their fiduciary relationship with Eian, as well as their personal relationship with Plaintiff, to defraud him into signing documentation in connection with the transaction, falsely claiming that it was merely a corporate formality that would <u>preserve</u> the rights of Eian shareholders, when in reality it stripped Eian—which had been obtaining investments at valuations above $50,000,000—of nearly all of its assets.

5.     In October 2020, the Stanford cryptographers, including Findora CEO Charles Lu ("Lu") and CTO/Chief Scientist Benjamin Fisch ("Fisch"), uncovered new information regarding Ding and Chao's misconduct.  Thereafter, and based on a variety of grievances, Lu and Fisch and more than a dozen other employees from the engineering team – essentially the entire company – resigned.

6.     In a last-ditch attempt at damage control so that they could complete their fraudulent scheme, Ding and Chao filed a specious lawsuit against Plaintiff, Lu, and Fisch in California state court through the entity to which they diverted Eian's assets:  Temujin.

7.     Meanwhile, Defendants continue to solicit investments under the same Findora name (now referring to Temujin rather than Eian), luring unsuspecting investors through references to the lofty credentials of a long-gone engineering team that Plaintiff himself established.  According to recent announcements, Findora has been accepting presales for a massive unlawful token offering that violates state and federal securities laws, all on the back of intellectual property stolen from Eian.  The offering is set to take place on December 28, 2020.

8.     Plaintiff files this lawsuit in order to:  (a) recover Plaintiff's direct damages due to Defendants' fraudulent and unlawful conduct; (b) recover for Eian those damages suffered by Eian, and those assets stolen from Eian, due to Defendants' fraudulent and unlawful conduct; and (c) prevent Defendants from destroying the valuable intellectual property that is rightfully Eian's, or using that intellectual property to commit fraud, through an irreversible, fraudulent token offering.

9. Plaintiff's investigation into the matters, identities, and entities discussed in this complaint is ongoing. Plaintiff reserves the right to update these allegations as additional facts become known.

## JURISDICTION AND VENUE

10. This Court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332.

11. The amount in controversy between the parties exceeds $75,000.00.

12. This Court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331.

13. This Court has subject matter jurisdiction as to Counts Six and Seven pursuant to 18 U.S.C. §§ 1962 and 1964.

14. This Court possess supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to the remaining causes of action.

15. Personal jurisdiction is proper as to Defendant Lily Chao because: (1) Defendant Chao purposefully availed herself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Chao's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

16. Personal jurisdiction is proper as to Defendant Damien Ding because: (1) Defendant Ding purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Ding's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

17. Personal jurisdiction is proper as to Defendant Temujin Labs Inc. (Delaware) because: (1) Defendant Temujin Labs Inc. purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Temujin Labs Inc.'s contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

18. Personal jurisdiction is proper as to Defendant Temujin Labs Inc. (Cayman) because: (1) Defendant Temujin Labs Inc. purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Temujin Labs Inc.'s

1  contacts with the State of California; and (3) the assertion of personal jurisdiction comports with

2  fair play and substantial justice.

3      19.     Personal jurisdiction is proper as to Nominal Defendant Eian Labs Inc. because:

4  (1) Nominal Defendant Eian Labs Inc. purposely availed itself of the benefits of the State of

5  California; (2) the controversy is related to and arises out of Nominal Defendant Eian Labs Inc.'s

6  contacts with the State of California; and (3) the assertion of personal jurisdiction comports with

7  fair play and substantial justice.

8      20.     Venue is proper in this jurisdiction pursuant to 28 U.S. Code § 1391 because a

9  substantial part of the events giving rise to the claims occurred in the Northern District of

10 California.  Defendants conducted business in California and engaged in many of the acts alleged

11 in the course of that business.

12                                    **PARTIES**

13     21.     Plaintiff Ariel Abittan is an individual residing in Lawrence, New York.  Plaintiff is

14 a shareholder of, and continuously has been a shareholder of, Eian Labs Inc. since at least

15 September 13, 2018, and throughout the wrongdoing alleged herein.  Plaintiff also is a member of

16 Juniper Venture Partners, LLC ("Juniper"), which is a shareholder of Eian.  Plaintiff is the co-

17 founder of Findora.

18     22.     Defendant Chao is an individual residing in Atherton, California.  She is the co-

19 leader of a RICO conspiracy that has engaged in repeated acts of wire fraud.

20     23.     Defendant Ding is an individual residing in Atherton, California.  He is the co-

21 leader of a RICO conspiracy that has engaged in repeated acts of wire fraud.

22     24.     Defendant Temujin Labs Inc. (Delaware) is a Delaware Corporation with its

23 principal place of business in Santa Clara County, California that purports to do business under the

24 stolen name "Findora."  It is wholly owned by Defendant Temujin Labs Inc. (Cayman).

25     25.     Defendant Temujin Labs Inc. (Cayman) is a foreign company organized under the

26 laws of the Cayman Islands with its principal place of business in Santa Clara County, California

27 that purports to do business under the stolen name "Findora."

28

26.     Nominal Defendant Eian Labs Inc. (f/k/a Porepsus Labs Inc.) is a Delaware Corporation doing business in California.  Eian is the rightful owner of the Findora brand and associated intellectual property.

## SUBSTANTIVE ALLEGATIONS

### A.     Plaintiff Meets Ding and Chao Online Through a Shared Interest in High-End Luxury Watches, Which Leads to a Business Partnership

27.     In or around May of 2016, Plaintiff was looking for a particular high-end luxury watch online.  Plaintiff came across a listing that Ding had posted for the watch on The Rolex Forums under the username "oneplustwo," and began discussions with Ding regarding the watch.

28.     Plaintiff, Ding, and Chao (who claimed to be married to Ding and who at that time was going by the name Tiffany Chen) then began transacting in watches on a regular basis between 2016 and 2019.

29.     The watches consisted of high-end models of brands like Patek Philippe and Richard Mille, which sell for as much as $2,000,000.

30.     The parties reached an agreement that the business would work as follows.  First, either Plaintiff or Ding or Chao would identify a high-end watch that could be acquired from retailers and then resold at a higher price.  Then Plaintiff would contribute 50% of the cost of the watch and Ding and Chao would contribute the other 50%.  Finally, Plaintiff and Ding would work together to resell the watch at a profit.  Plaintiff and Ding/Chao operated as 50/50 partners in the watch business.

31.     To purchase the watches, Plaintiff would wire money from his business entity, RealTime NY, LLC ("RealTime"), to Wells Fargo bank accounts in the name of Yuting Chen and Tao Ding.  Sometimes, Ding and Chao would actually pay for their portion of the watches, but as detailed further below, on other occasions, Ding and Chao misused Plaintiff's own credit cards to pay their share.  As a result of these transactions, Plaintiff currently co-owns twenty-four luxury watches with Ding and Chao.  The total amount of principal that Plaintiff invested in these watches was $1,139,270.

32.     As stated above, Plaintiff, Ding, and Chao's agreement was that when either Plaintiff or Ding/Chao sold a watch, the parties would split the proceeds evenly.  However, Ding and Chao did not turn over to Plaintiff the profits associated with several watches that they should have.  Instead, in May 2019, Ding and Chao claimed that they had invested the sale proceeds for these watches—including Plaintiff's 50% share of those profits—into a separate business consisting of multiple entities that Plaintiff, Ding, and Chao had begun working on in December 2017.  In other words, Ding and Chao diverted Plaintiff's money without his prior consent.

33.     The principal value of the inventory that Ding and Chao diverted to the new business is $2,278,540, of which Plaintiff invested $1,139,270.  Ding and Chao either possess or have sold this inventory without remitting any funds to Plaintiff.

34.     The present value of the unsold watches is approximately five times greater than the principal value of those watches.  Accordingly, Plaintiff's 50% interest in these watches exceeds $5,700,000.

**B.     Ding and Chao Lure Plaintiff Into a Relationship of Trust**

35.     Through the watch business, Plaintiff developed a relationship of trust with Ding and Chao.  In addition to having wired millions of dollars to one another without incident between May 2016 and December 2017, Plaintiff began traveling to Atherton, California to meet with Ding and Chao starting in January 2017, and continuing through the end of 2019.

36.     During these trips, Plaintiff stayed either in what he understood to be Ding and Chao's primary residence in Atherton, or at other luxury homes and apartments in Atherton that they claimed to own.  Later, Plaintiff would discover that Ding and Chao's apparent primary residence in Atherton, California is owned by an entity named Nessco Investments, LLC ("Nessco"), which is managed by Yi Chung Yang.

37.     Ding and Chao routinely claimed to have access to significant familial wealth and made great displays of their money.  By way of example, in one instance, Chao brought Plaintiff car shopping and purchased two high-end luxury vehicles, one of which was a Rolls-Royce.

1   There were approximately five such vehicles in the driveway of the Atherton house at any given

2   time, including a Bentley, a Tesla, and others.

3          38.     Chao even had a chauffeur, whose name she said was Jianrong Wang.  On various

4   occasions, Chao had Wang drive Plaintiff to various destinations in and around Atherton.  Because

5   Wang did not speak English, Plaintiff would communicate with him through a translation

6   application on Plaintiff's mobile phone.

7          39.     Chao repeatedly touted her supposed connections with the Chinese business elite.

8   She claimed to be friends with the wife of Jack Ma, the Chinese business magnate who founded

9   Alibaba Group, and to have a close personal relationship (and continued meetings) with Tencent

10  CEO Ma Huateng (whom Chao claimed she met when was "still a poor guy").  Chao also made

11  regular references to lavish trips with "famous guys" and "famous people in Blockchain industry."

12         40.     Chao also told Plaintiff that Ding had attended Harvard as an undergraduate but

13  that he had been kicked out for getting into a fist-fight.  On information and belief, this was not

14  true.

15         41.     Chao further cultivated a special relationship of apparent trust and confidence with

16  Plaintiff by disclosing highly personal details in text messages, including details relating to her

17  health, marital issues she claimed to be having, and her prior romantic relationships.  On

18  information and belief, many of these personal revelations were not true and were made solely to

19  make Plaintiff believe that he and Chao had a close personal relationship that extended beyond

20  business.  In retrospect, this was an integral part of Defendants' fraudulent scheme.

21     **C.     Plaintiff, Ding and Chao Start Work on a Fintech Blockchain Venture as**
22             **Equal Partners**

23         42.     By December 2017, Ding and Plaintiff were speaking several times a day for hours

24  at a time regarding the watch business.  These conversations included discussions regarding the

25  potential use of blockchain for secure and anonymous watch transactions.  To develop and pursue

26  that business opportunity, Plaintiff, Ding, and Chao started an entity called **Project Revolution**

27  **Fund**.

28

43.     By January 2018, the discussions between Plaintiff, Ding, and Chao had expanded to a wider use case aimed at creating reliable blockchain financial infrastructure with privacy-protecting transparency for use across myriad industries.  Plaintiff, Ding, and Chao formed **Juniper Ventures Inc.** to spearhead that business.

44.     JVI was incorporated in Delaware pursuant to a January 22, 2018 investment agreement whereby Plaintiff and Guanghua Liang, as "Founders," each were to contribute $50,000 to purchase 1,000,0000 shares of the company, respectively.  Plaintiff contributed the $50,000 and someone else contributed $50,000.

45.     Ding and Chao represented that JVI was <u>their</u> venture with Plaintiff.  They did not explain what role Liang was to play or why he was listed as co-founder.  Rather, Ding and Chao presented the investment agreement to Plaintiff to sign and had him wire $50,000 to JVI's Chase bank account.  Plaintiff has never met, seen, or spoken with Liang.

46.     Chao obviously understood the inconsistency between, on the one hand, claiming to Plaintiff that she and Ding were Plaintiff's business partners while, on the other hand, making sure that her name did not appear on any of the governing documents for the entities that she and Ding created for the blockchain business.  Chao's explanation to Plaintiff was that she needed to maintain her own privacy, and to keep her true identity and connection to their businesses a secret to project a certain image and identity that fit with her view of Silicon Valley culture.

**D.     Plaintiff, Ding, Chao, and Others Form Additional Entities to Own and Operate the Public-Facing Company Findora**

47.     Though JVI was the initial entity formed to spearhead the blockchain business, Plaintiff, Ding, and Chao also formed two other entities that also played a significant role in the venture.

48.     First, Plaintiff, Ding, and Chao founded **Juniper Ventures Partners, LLC** ("Juniper" or "JVP").  On paper, Juniper was formed as an equal partnership between Plaintiff and an entity called **Fourhair LLC** ("Fourhair"), each of whom was to contribute $1,000.  Ding and Chao referred to Juniper at all times as an equal venture between themselves and Plaintiff.

49.     Second, Plaintiff, Ding, and Chao founded a Delaware Corporation called **Porepsus Labs Inc.**  672,000 shares of Porepsus common stock were issued to Juniper, and 176,471 shares were issued to an entity called **Lakeside Garden Heritage LLC** ("Lakeside"). Ding and Chao represented that Lakeside was an entity owned by Jack Ma's wife.  Chao also repeatedly confirmed to Plaintiff, starting at least as far back as September 13, 2018, that Plaintiff personally owned shares in Porepsus.

50.     The purpose of Porepsus was to serve as the operating entity that would develop and run the blockchain business.  However, Juniper funded salaries, office equipment, leases, and everything else for the venture's second entity.

51.     In October 2018, Porepsus changed its name to **Eian Labs Inc.**

52.     Plaintiff is informed and believes, and thereon alleges, that Eian held the rights to all of the intellectual property associated with the blockchain business.  Eian also owned rights to the name Findora, which was (and remains) the public-facing name for the venture.

**E.     Chao Utilizes Fake Identities and Requires Plaintiff to do the Same**

53.     At the beginning of her business dealings with Plaintiff, Chao went by the name Tiffany Chen.  However, upon founding the blockchain business, Chao explained to Plaintiff that she would go by the name "Lily Chao."  Plaintiff is informed and believes that Chao's true last name is Chen and that her true first name may be Yuting.

54.     Chao also insisted that Plaintiff hold himself out to the public as "Mark Graber." Chao explained to Plaintiff that it was "too early" for investors and employees to know their true identities.  Chao also forced Plaintiff to change his name on his LinkedIn profile to Mark Graber and to conceal his true identity in public forums.  When Plaintiff protested, Chao told him that this was how things worked in Silicon Valley and that Plaintiff needed to follow her instructions to succeed.

55.     Chao also routinely lied to Findora investors and employees about her relationship with Ding, claiming that Ding was her brother-in-law and not her husband.  Chao told Plaintiff that this was necessary due to Silicon Valley culture frowning on husband/wife relationships at

1    work.  Because Plaintiff's wife also worked for Findora, Chao required Plaintiff to hide his

2    relationship with his wife.

3         56.    Plaintiff ultimately demanded to go by his real name at Findora and revealed his

4    marital relationship with his wife to Findora employees.  Ding and Chao would not do the same.

5         57.    Chao told Plaintiff that it was important to project an image of success.

6    Accordingly, Chao leased a Ferrari for Plaintiff to drive when visiting Silicon Valley and told him

7    that he needed to live in one of her luxury properties, but Plaintiff typically stayed in a regular

8    apartment or at a hotel when he came to Atherton, and only used the Ferrari one time.

9         58.    Ding and Chao also provided Plaintiff with a removable subscriber identity module

10   (commonly known as a "SIM card"), and required Plaintiff to use a phone with that SIM card for

11   business purposes.  Ding held the credentials to the information on the phone at all times.

12        **F.      Plaintiff Diligently Works to Make Findora a Success**

13        59.    Plaintiff actively worked to make Findora a success from its founding until July

14   2019.  Plaintiff would fly from his New York home to Atherton to work on the venture multiple

15   times per month.

16        60.    In January and February of 2018, Plaintiff began hiring employees.  Findora

17   heavily recruited Stanford Ph.D.'s, particularly those affiliated with the Stanford cryptography

18   department.  Plaintiff handled all aspects of hiring and negotiating with employees.

19        61.    By December 2018, Findora had hired:

20        •    Charles Lu as CEO;

21        •    Benjamin Fisch as CTO/Chief Scientist;

22        •    John Powers (who had previously run the Stanford Endowment Fund);

23        •    Dan Boneh (the head of Stanford's cryptography Ph.D. program); and

24        •    several other key, well-pedigreed hires.

25        62.    Plaintiff also had operational responsibilities and was involved in the creation of at

26   least one white paper, which is a common component of blockchain companies.  Plaintiff also was

27   involved in fundraising and investor pitches.

28

63.     Notwithstanding Plaintiff's contributions to Findora's hiring and operations, Ding and Chao made it clear that they were in charge.  Plaintiff effectively was Chao's "right hand man."

64.     By March 2019, Findora had built an operating demo, had a contract with the Chinese government, was actively pitching its product to funds as use cases, was just six months from a test net, and had completed several white papers.  Plaintiff was involved in much of this, getting weekly and sometimes daily summaries on the engineering team's progress.

**G.     Relying on Ding and Chao's Promises, Plaintiff Raises Money for Findora**

65.     Ding and Chao consistently represented that they had secured or were securing investments in Findora from major players in China.  For example, Chao touted a potential investment from Jack Ma's wife, going so far as to claim that Ma's wife was concerned with Plaintiff's availability on weekends given that Plaintiff observes the Sabbath.

66.     Chao also spent $70,000 on a lavish investor trip for the early investors in TRON Foundation (an entity dedicated to building infrastructure for a decentralized Internet), and claimed as a result of the trip that they were going to invest $230,000,000 in tokens, and that it was a "done deal."  Chao refused to show Plaintiff the paperwork, however.

67.     Later, Chao touted her progress on a $50,000,000 investment, but again refused to show Plaintiff or anyone else the paperwork.  Plaintiff relied upon Chao's representation that she had already raised substantial amounts of money in reaching out to his own family and friends network to raise funds.

68.     Chao also claimed to be close to closing a deal with Tencent CEO Ma Huateng to lead an investment round.

69.     In July 2018, at Ding and Chao's request, Plaintiff began raising funds for the venture through his network of wealthy family friends.  He did this in reliance on Ding and Chao's numerous misrepresentations.

70.     Plaintiff ultimately secured $1,200,000 in investments for Findora from five private investors.  These investments took the form of Simple Agreements for Future Tokens ("SAFTs").

71.      Pursuant to the SAFTs, the investors wired $1,200,000 into Juniper, which was then transferred to Eian.  The investors were promised that if Eian had an initial coin offering ("ICO"), then their money would be converted to coins at a 70% discount to the token price.  If Eian did not have an ICO, then they would receive their money back within 90 days.

72.      Findora did not issue a token within 90 days, but each of the investors decided to roll their investments into future equity or token offerings.

73.      Of course, the investors were not willing to wait forever.  Eventually, the investors demanded their money back.

74.      Responding to investor pressure, in March 2019, Chao flew to New York to appease the investors.  She and Plaintiff met with three of the investors and Chao offered them a new deal in an effort to buy time, which included a promise to return their investment with a 25% annualized return if Findora did not issue a token.  To convince the investors to hold out for an equity or token offering, Chao presented the investors with a term sheet showing a $10,000,000 incoming investment from China Orient Group, at a $60,000,000 valuation.

**H.      Chao Convinces Plaintiff to Open Credit Cards for Use in the Venture**

75.      Starting in early 2018, Chao directed Plaintiff to open multiple credit card accounts for the business to be used for the venture and to have numerous cards issued to her and other individuals under those accounts.  Chao also demanded that Plaintiff issue her a credit card under his private business account for RealTime.

76.      As she did in connection with corporate paperwork, Chao told Plaintiff that for privacy reasons, she did not want to give out her own personal identifying information to credit card companies.  She also stated that she and Ding used to have an American Express Black Card, but when she and Ding refused to disclose certain financials in response to a financial review request from American Express, they were cut off.  Chao promised Plaintiff that the cards only would be used for business purposes, and that she would reimburse him for all of the expenditures on the cards.

77.     Relying on Chao's promises, Plaintiff opened an American Express credit card account for use in connection with Project Revolution.  Plaintiff also opened a Chase credit card account for use in connection with Juniper.  Through these primary accounts, Chao directed Plaintiff to obtain individual credit cards in the names of Chao, Lu, Fisch, and many others.  All of these cards were ultimately linked to Plaintiff's personal account.

78.     Chao represented to Plaintiff that the cards in Lu, Fisch, and others' names would be distributed to those individuals for their business use.  However, on information and belief, Chao herself kept and used each of the cards many times without informing these employees of the charges incurred in their name.

79.     Chao racked up hundreds of thousands of dollars in charges on the credit cards, the vast majority of which was <u>not</u> for Findora business.  The charges included, but were not limited to:

- A piano for her children;
- School tuition;
- Gifts from Saks Fifth Avenue and other designer shops;
- A trip to Las Vegas;
- Fine wines;
- Doctors' offices;
- High-end restaurants;
- Taobao.com (a Chinese online shopping website);
- Costco;
- Airline tickets;
- Luxury hotels; and
- Ding and Chao's half of the investments for certain watches.

80.     On one occasion, Ding called American Express, fraudulently claiming to be Plaintiff, and requested that American Express increase the account's credit limit.  Ding provided financial documents to support his request, which Plaintiff has demanded but has never seen.

81.     Ding and Chao also attempted to have Plaintiff open an American Express Black Card with a limitless credit line for their use.  This effort entailed attempting to engage in transactions at a high enough volume on Plaintiff's credit cards, and making enough payments to that account, to receive an invitation from American Express Black.  Chao even suggested such extremes measures as buying a house with a credit card (which turned out to be impossible).  Fortunately, Ding and Chao's attempt failed, else they likely would have incurred additional millions in debt under Plaintiff's name before being caught.

82.     Any time the cards accrued benefit points, Chao demanded that Plaintiff transfer them to her.

### I.     Plaintiff Demands the Return of Investor Funds and Chao Stops Paying the Credit Cards

83.     In April 2019, Plaintiff demanded that Ding and Chao return money to the investors.  At first, Chao agreed and requested that Plaintiff send her wiring information.  But Chao never sent the money.  Instead, Ding questioned Plaintiff's loyalty, asking Plaintiff whether Plaintiff represented Findora or the investors.

84.     Ding and Chao later told Plaintiff that he didn't have "the stomach" to be the co-founder of a successful company if he could not handle investor complaints, and that if the investors wanted to sue, to let them sue.  According to Ding, "by the time they get through in court, we'll be so big it won't matter."  Plaintiff understood through conversations with Ding and Chao that their glib approach to litigation was driven in part by the security and insulation they felt as a result of not having their names on anything.

85.     At the same time that Plaintiff demanded investor repayment, Chao stopped paying the bills for the credit cards that she had directed Plaintiff to open for Juniper, Project Revolution and RealTime.  The outstanding balance on the cards was approximately $637,000.  This was Chao's first time being late on payments and she assured Plaintiff that she would make the payments soon.

86.     On May 13, 2019, Plaintiff and his father (on behalf of investors), flew to California to meet with Ding and Chao and resolve both issues.  Ding and Chao blew them off. Knowing that Plaintiff and his father were flying back to New York the same day, Chao did not show up to meet with them as scheduled.  Instead—and in what would become a pattern—Chao met them on the sidewalk outside of a restaurant for ten minutes before they had to leave for their flight home.  Chao assured Plaintiff and his father that she would take care of everything, and purported to make a payment toward the credit card balance.  However, the payment was rejected.

**J.      Ding and Chao Tell Plaintiff They Are Converting Findora to a Cayman Entity to Protect Investors, When in Reality They Transfer Findora's Assets to a New Entity that Ding and Chao, but Not Findora's Investors, Control**

87.     On July 2, 2019, Plaintiff again flew from New York to California.  The following day, July 3, 2019, Plaintiff met with Chao and/or Ding twice.

88.     The first meeting was in the early afternoon.  Plaintiff asked to meet with Chao at 11:00 a.m.  Chao agreed.  However, although the meeting concerned Findora business and happened on a workday, Chao asked Plaintiff to meet her in the parking lot of a Menlo Park Safeway grocery store, explaining that she did not want to talk in the Findora office because "Charles [Lu, Findora's then-CEO] is a gossipe [sic]."  Chao did not arrive at the parking lot until approximately 12:15 p.m.

89.     Chao told Plaintiff that Findora needed to be converted to a Cayman entity, explaining that this was being done to minimize any potential liability to investors in connection with Findora's anticipated coin sale.  However, Chao did not provide Plaintiff with the paperwork at that time.

90.     Instead, Chao asked what time Plaintiff needed to go to the airport.  Since Plaintiff had a flight back to New York scheduled for 9:45 p.m. out of San Francisco International Airport, he informed Chao that he would need to leave between 7:30 p.m. and 8:00 p.m.  Accordingly, Chao said she would meet him again at about 7:00 p.m.

91.     Ding and Chao did not meet with Plaintiff until approximately 7:45 p.m.  In a detached garage that was used as an office conference room, Chao gave Plaintiff the paperwork

1    and insisted that he sign it. Chao represented that Plaintiff's equity interest as a founder and

2    owner of the company—i.e., his interest in Findora and its intellectual property—would remain

3    unchanged in this transaction, as would the interests of the other Findora investors.

4         92.      Plaintiff attempted to ask questions about the documents he was being forced to

5    sign, but Chao created a hostile environment and got upset at the questions Plaintiff asked. Chao

6    insisted that Plaintiff take her at her word that this document was to consummate a transaction that

7    would maintain his equity interest as a founder and owner. She insisted that he sign the

8    documents and contended that anything less would be a "betrayal of trust." Believing Chao's

9    representations and under duress (in part because he was about to miss a flight home to his family,

10   right before the Fourth of July holiday), Plaintiff signed the paperwork.

11        93.      The paperwork had signature lines for Lu, Fisch, and others. However, Chao

12   instructed Plaintiff not to discuss the agreement with Lu or Fisch under any circumstances.

13        94.      Chao assured Plaintiff that Chao would send Plaintiff electronic copies of the

14   documents. She did not do so.

15        95.      Plaintiff subsequently learned that the papers he signed purported to authorize

16   transfer of all of Findora's assets to a new company called Temujin, for a paltry $300,000.

17   Findora's assets were worth far more than $300,000, and Plaintiff never would have signed the

18   paperwork had he known the truth of its purported effect.

19        96.      Following this fraudulent transaction, Chao repeatedly represented to Plaintiff in

20   phone calls, emails, and texts, that he continued to have a significant equity interest in Findora and

21   the intellectual property underlying it. For example, she continued to agree in writing that he was

22   a major owner and co-founder of Findora.

23        **K.**      **Ding and Chao Quietly Shut Plaintiff Out of His Own Company**

24        97.      After fraudulently inducing Plaintiff into signing the July 3, 2019 paperwork, Ding

25   and Chao quickly set to work shutting Plaintiff out of his own company.

26        98.      In or about the first week of July 2019, Ding and Chao caused Temujin to enter into

27   a written employment contract with Lu to serve as Temujin's (rather than Eian's) Chief Executive

1  Officer.  At around the same time, they caused Fisch to enter into a written consulting agreement

2  with Temujin.

3         99.      In mid-July 2019, Ding and Chao caused a new Findora website to be put up.

4  Plaintiff noticed that he was not on the new website, and asked Chao more than once to fix the

5  issue.  Chao brushed him off by insisting it was just a draft website that would be updated in due

6  time.

7        100.     At about the same time, Ding and Chao cut off Plaintiff's access to his Eian email

8  account.  Again, Plaintiff informed Chao.  Again, Chao brushed him off.

9        101.     Unbeknownst to Plaintiff at the time, and according to a complaint recently filed by

10  Temujin in California Superior Court, on August 10, 2019, "the Board of Directors of Eian

11  unanimously approved of the sale of 'substantially all of [Eian's] assets' to Temujin," and on

12  August 13, 2019, "Eian's shareholders unanimously approved of the intellectual property sale."

13  Plaintiff has never seen either document.  Plaintiff did not sign any Findora-related documents on

14  either of these dates.

15        102.     The same complaint states that "[o]n July 3, 2019, by unanimous action of its

16  members, JVP (acting as a shareholder of Eian) authorized Eian to sell 'all of its assets' to

17  Temujin," and that "[b]oth of JVP's members at that time, [Plaintiff] and Fourhair LLC approved

18  of the proposed sale."  Presumably, this is referring to the materials that Chao handed Plaintiff to

19  sign on July 3, 2019, stating that they were to protect Plaintiff and the other investors in the event

20  of a coin sale.  Plaintiff has no way of confirming because, again, Chao never provided a copy of

21  the documents as she had promised.

22      **L.**      **Chao Continues to Deceive Plaintiff Regarding the Credit Cards**

23        103.     As the Temujin transactions were happening, Plaintiff continued to demand

24  payment of his credit debt, but Chao continued to string him along.

25        104.     On July 10, 2019, Chao promised in a text message that her sister Selena would

26  make an $85,000 payment that same day.  No payment ever came.

27

28

105.    On July 28, 2019, Chao promised again that she would transmit money that same day.  Again, no payment ever came.

106.    In August 2019, Plaintiff learned of a lawsuit in New York relating to his approximately $365,622.60 outstanding credit card debt on the Project Revolution Fund American Express account.  Plaintiff texted Chao immediately.  Chao responded that it was her priority and that she would make things right.  Plaintiff sent Chao his bank account wiring information and a screenshot showing his credit rating dropping by more than 150 points.  Chao brushed Plaintiff off and told him not to bother her.

107.    Plaintiff continued to demand payment on the credit card debt through December 2019.  Chao promised Plaintiff that she would arrange to have the debt paid by December 31, 2019.  Plaintiff relied on those representations in agreeing to make full payment to American Express by that date.  Specifically, Plaintiff hired Chesky Monk to negotiate a payment agreement with Chase to dispose of the then $637,000 in credit card debt and resolve the lawsuit against Plaintiff pertaining to that debt.

108.    Plaintiff, however, had no intention of honoring her promise.   Instead, she asked Plaintiff to fly to California to meet with her on December 29 in order to meet with a "rich" and "powerful" friend who was supposedly an experienced investor who had made hundreds of millions of dollars and was going to take care of it.

109.    Plaintiff flew to the Bay Area and was instructed to meet Chao at a restaurant called Dim Sum King in Daly City.  Ding and Chao's whole family were there, including Selena Chen, and the supposedly powerful businessman, named Yang Ying.  Chao presented Plaintiff with a separation agreement whereby he would be paid $190,000 in exchange for separating from the business.  The counter-signatory on the separation agreement was to be Xilei Wang, whom Plaintiff had never heard of.  Plaintiff refused to sign the agreement and told Chao to pay him back either using some of the money from the $50,000,000 investment she claimed she had secured, or by taking out a loan.

110.    Because Chao never paid off the debt by December 31, 2019 as she had promised, Plaintiff was unable to pay American Express.  Plaintiff's father ultimately paid off Plaintiff's $183,982.21 debt to American Express, thus disposing of the RealTime-related debt litigation. However, Plaintiff was later served with a New York complaint by American Express regarding the $365,622.60 outstanding balance on the Project Revolution Fund account.  That action remains pending and the $85,552.31 debt on the Chase Account for Juniper remains unresolved.  In addition, Plaintiff incurred approximately $23,000 in business expenditures (like Plaintiff's flights and hotel stays for Findora work) that have not been reimbursed as promised.

**M.    Ding and Chao Try to Hide Plaintiff's Concerns From Findora Employees**

111.    From January through July 2020, Plaintiff and his father continued to exchange messages with Chao.  Chao would continually promise to pay back Plaintiff's credit card debt and to repay the investors, and she continually touted supposed great news about the company.  Ding and Chao also repeatedly admonished Plaintiff not to share information with anyone at Findora, particularly Charles Lu and Ben Fisch.  Chao ultimately blocked messages from Plaintiff, but continued to take messages and have phone calls with Plaintiff's father.

112.    Meanwhile, and unbeknownst to Plaintiff at the time, Ding and Chao were defaming Plaintiff to Findora, Lu, Fisch, and others.  Chao told Lu and Fisch that Plaintiff had made false promises to investors, and that his departure from Findora and sporadic subsequent appearances were no cause for alarm.  Chao also told investors and employees that Plaintiff was not a major owner of Findora and that Plaintiff was lying to them when he claimed to be a founder.

113.    In September 2020, employee dissatisfaction at Findora escalated due to concerns over lack of transparency and increasing (accurate) beliefs that Ding and Chao were engaged in misconduct.

114.    At the same time, Plaintiff's father called Chao and demanded that she call Plaintiff to work things out.  Plaintiff's father suggested that, if she did not, Plaintiff would have no recourse aside from litigation.

**N.**     **Chao Embezzles Findora Funds to Third Parties**

115.     On information and belief, Chao directed members of Findora's team in China to wire significant sums of money to an e-commerce company called Xipin Group ("Xipin").  U.S. management that they were not aware of any legitimate purpose for these transactions.  Neither Plaintiff, who is a founder of Eian (d/b/a Findora), nor Findora's U.S. CEO at the time, were aware of any legitimate purpose for these transfers.

116.     On information and belief Chao controls Xipin either directly or indirectly.  The Xipin website contains some overlap with current Findora employees, including Paul Sherer – who is listed as Chief Strategy Officer under the alias Paul Xie.[1]

117.     Plaintiff is informed and believes and thereon alleges that Chao raised millions of dollars on behalf of Findora in private financings, which she then transferred to a personal Bynance account.  Chao did not seek authorization from Temujin's CEO or from Plaintiff for the unauthorized transfer.

118.     Plaintiff is informed and believes and thereon alleges that Chao also directed Powerscale Capital Management LLC ("Powerscale") to invest $5,000,000 in Xipin.  Although Juniper is the majority owner of Powerscale, Chao and Powerscale never informed Plaintiff of this transaction, which he learned about from third parties.  Plaintiff never authorized this transaction and is not aware of Juniper having authorized it.

**O.**     **Defendants Pursue an Unlawful Initial Coin Offering**

119.     Ultimately, the majority of the Findora engineering team, including its Chief Executive Officer and Chief Technology Officer all resigned as a result of concerns about how Findora was being run.

120.     After the cryptographers quit Findora, Ding and Chao installed Jianrong Wang— their driver who speaks not a word of English—as the supposed "CEO" of Temujin, a purported multi-hundred-million-dollar company.  Ding and Chao have continued conducting so-called "ask me anything" sessions ("AMAs") under the Findora brand on the Telegram messaging application

---

[1] https://mp.weixin.qq.com/s/k6XLrUAY4G_GWi0xCz6eBQ

1   and elsewhere, and have been using the platform to solicit token investments in the United States

2   and Asia.  The solicitations are riddled with fraud, including fraudulent representations that

3   Findora continues to have a functioning and well-pedigreed engineering team and that Chao, the

4   face of the brand, is a legitimate businesswoman.

5        121.    On information and belief, none of the high-profile investors that Ding and Chao

6   are touting in connection with the current token offering have any clue about any of the afore-

7   mentioned misconduct related to Temujin.

8        122.    Indeed, Findora is currently engaged in a massive ongoing unauthorized token

9   offering that violates federal and state securities laws and is replete with misrepresentations.

10  Findora makes these representations using its primary English-language Telegram account,

11  @findoraen.  Findora repeatedly has admonished users that the @findoraen account is the only

12  official English-language source of Findora information on Telegram, and that they should

13  subscribe to that channel for all important updates.  Findora also maintains a Chinese and Russian

14  telegram account which it is using for similar purposes in connection with the token offering.

15       123.    Potential investors have been drawn in primarily by Findora's repeated

16  representations regarding the Stanford team that built and operated its technology infrastructure.

17  One potential investor summed up this widely echoed sentiment, remarking that it was a "hall of

18  fame team" that made Findora "more appealing."

19       124.    Eventually, however, certain investors caught wind of the fact that the key Stanford

20  cryptographers like Lu, Fisch, and Benedikt Bunz had resigned from the company, raising

21  concern.

22       125.    One potential investor asked: "What about the resignation of findora's three

23  Stanford founders."  The operator of the @findoraen account replied:  "We don't have 3 Stanford

24  founders on resignation."  In reality, more than a dozen members of the engineering team

25  (including the Stanford co-founders) had departed Findora.

26       126.    Another potential investor responded:  "someone claims that they have left the

27  team."  The owner of @findoraen replied: "Two cofounders Stanford phd students."  Of course, as

28

Defendants' own filing in California state court (discussed below) revealed, these individuals were not just students, but were in fact the CEO and CTO/Chief Scientist of the company.  The response does not mention the fact that the vast majority of Findora employees, including these co-founders and the majority of the engineering team had quit.

127.    A potential investor replied: "student? lol."  The owner of @findoraen replied: "John Powers, Stanford MBA and former CEO SMS, passed away this year unfortunately.  He is a class act and we remember him for ever! [sic]  We have Paul Sherer, Stanford MBA and executive on FiNDORA [sic] FOUNDATION.  He is active and healthy."  This was a non-sequitur meant to deceive investors into thinking that despite the departures of the most essential Findora employees, the truly important individuals from Stanford remained.

128.    A potential investor responded:  "I suggest official announcement from the team to calm investors down as many are claiming now core members of FINDORA quite [sic] the project."  A Findora representative responded:  "Not true.  And we will.  We don't really want to make an announcement too soon.  Let's have this rumor fly for a while [sic]: it's a strong PR to draw attention."  This was blatantly false given that the CEO, CTO and Chief Scientist, and engineering team had departed, yet Findora representatives have repeatedly told investors that these individuals were not part of the "core" team.

129.    The owner of @findoraen then reminded investors that the two Stanford Ph.D.'s previously mentioned were just students, before stating:  "We have real engineering teams of engineers and cryptographers and application developers"—as if to cast the departure of the most important Findora employees as two summer interns leaving while the remainder of the team remained intact.

130.    In another mid-December 2020 Telegram thread, one potential investor stated:  "I am ready to purchase option D but you have no [sic] clarified who the co founders [sic] are?"  A Findora representative responded by pointing the investor to info.findora.org.  The potential investor responded:  "But when looking at other findora sources [d]ifferent co founders [sic] come up which is very confusing[.]  I am interest [sic] in the project just wanted to clarify this before

buying.  Findora co-founders (and Stanford cryptographers), Ben Fisch and Benedikt Bunz, together with Alan." A Findora representative responded:  "thanks for your concerning [sic] our team and our team have [sic] been updating and re-construction [sic]."  As described above, this response was false and misleading.

131.    The potential investor responded: "So the other guys are they still there in the team or not[,] Ben F and Benedikt[?]"  Chao responded directly:  "I think if you want to build the best projects,you [sic] need to find the best person and the best team members.so [sic] team members upgrade [sic] to the best one.  They [referring to Ben and Benedikt] are PHD students.their [sic] priority should be their research.☺ they are not with Findora."  This was false and misleading for the same reason that the Findora representative's statements above were false and misleading.

132.    At no point have the operators of the Findora Telegram account made any mention of the <u>reason</u> why Lu, Fisch, Bunz, and others left.  Instead, they sought to create a false narrative that the reason these employees left was to focus on their studies at Stanford.  They have also allowed another false (and inconsistent) narrative to propagate the feed, which is that the real reason Lu, Fisch, and others left Findora was to found a competing company, as detailed in the specious complaint Defendant Temujin filed against Plaintiff, Lu, and Fisch in Santa Clara County.

133.    Many other potential investors have also been concerned.  One asked:  "What happened to the stanford crypto guys like Ben en [sic] benedict?"  Another asked:  "What has changed since the Stanford people left[?]"  And these are just a small sampling of a continuing dialogue on the @findoraen telegram account.[2]  Findora never revealed the truth to these potential investors either and simply sought to perpetuate the falsehood that Findora was a legitimate company with an all-star team of highly respected and honest cryptographers.

134.    On top of the foregoing material lies and omissions, Temujin's coin offering is based on the improper use of stolen Eian intellectual property, which threatens to immediately and

---

[2] Defendants' fraud has become apparent to the outside world, as a recent Chinese-language exposé revealed.  *See* https://fdhdtcuzqg5elz7fa3omssakmq-adwhj77lcyoafdy-zhuanlan-zhihu-com.translate.goog/p/337834014.

1    completely destroy the value of that intellectual property if it is allowed to occur.  For example, if

2    Eian's intellectual property rights to the Findora brand itself are connected with a fraudulent

3    offering, then the brand will be irreparably tarnished and rendered useless.  Further, if the

4    technology at the heart of Findora is not extricated prior to any unlawful ICO, then it may prove

5    impossible to return that intellectual property to Eian—let alone in a timely enough fashion for

6    Eian to make legitimate use of that technology while it remains state of the art—because Temujin

7    will be destroyed by the fraud and all of its assets will be subject to seizure by the government and

8    defrauded investors.

9                    **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

10        135.    Plaintiff is bringing this action, in part, as a derivative action on behalf of Eian, to

11   redress the wrongful conduct by Defendants alleged in this Complaint.

12        136.    Plaintiff is a shareholder of, and continuously has been a shareholder of, Eian since

13   at least September 13, 2018, and throughout the wrongdoing alleged herein.

14        137.    This action is not a collusive one to confer jurisdiction that the Court would

15   otherwise lack.

16        138.    Plaintiff will adequately and fairly represent the interests of Eian and its

17   shareholders in enforcing and prosecuting their rights, and has retained counsel experienced in

18   litigating derivative actions.

19        139.    As a result of the facts set forth herein, which are incorporated by reference,

20   Plaintiff did not make a pre-suit demand on Eian's Board of Directors.

21        140.    On information and belief, the only present directors of Eian are Plaintiff and Chao.

22   Chao is incapable of independently and disinterestedly considering a demand to commence and

23   prosecute this action because she knowingly and improperly siphoned Eian's assets to herself, and

24   to Temujin, an entity that she and Ding controlled for their own benefit.  Chao faces a substantial

25   likelihood of liability for such misconduct, as well as for the other misconduct alleged in this

26   Complaint.

27

28

141.     Accordingly, there is not a disinterested and independent majority of Eian directors that could evaluate a litigation demand.

## COUNT ONE

### Breach of Fiduciary Duty

### (Against Chao)

### (Derivatively on Behalf of Eian Labs, Inc.)

142.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 141 of this Complaint as though fully set forth herein and alleges the following cause of action.

143.     Chao, by virtue of her role as a director of Eian, owed Eian the highest fiduciary obligations of fidelity, trust, loyalty and due care, and was required to control and operate Eian in a fair, just, and equitable manner, to exercise due care and diligence in the management and administration of Eian's affairs and in the use and preservation of its property and assets, and to act in furtherance of Eian's best interests and not her own.

144.     To discharge these duties, Chao was required to act lawfully in conducting the business of Eian, to act with the utmost integrity as to the dissemination of information about Eian, and to refrain from committing acts of waste or conversion of corporate assets, mismanagement, self-dealing, and gross-negligence.

145.     Chao breached her fiduciary duties by, among other things, engaging in self-dealing and the conversion of corporate assets for her own personal benefit, and for the benefit of a third-party entity that she owned or controlled (Temujin), to the detriment and loss of Eian, and by acting with disloyalty and faithlessness as set forth in the allegations above.

146.     As a direct and proximate result of Chao's breaches of fiduciary duty described herein, Eian sustained serious injury and damages for which relief is sought herein, according to proof.

147.     As a result of Chao's breaches of fiduciary duty, Eian has sustained damages in an amount to be proven at trial.

148.    In engaging in the foregoing conduct, Chao acted with malice, oppression, and fraud, warranting an award of punitive damages in an amount to be proven at trial.

## COUNT TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Temujin (Delaware), Temujin (Cayman), and Ding)

### (Derivatively on Behalf of Eian Labs, Inc.)

149.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 148 of this Complaint as though fully set forth herein and alleges the following cause of action.

150.    Since their incorporation, and at all relevant times, the Temujin Defendants and Ding knew that Defendant Chao was a fiduciary to Eian, who thus owed Eian fiduciary duties.

151.    Despite such knowledge, the Temujin Defendants and Ding nevertheless aided and abetted, induced, encouraged, and assisted Defendant Chao in breaching her fiduciary duties to Eian by, among other things, conspiring and actively working with Defendant Chao to obtain, and actually obtaining, Eian's corporate assets for a woefully inadequate price.  The Temujin Defendants and Ding understood that this transaction—in which Defendant Temujin (Cayman) purported to receive all of Eian's intellectual property—constituted corporate waste of Eian's assets, and was an undisclosed (by Defendant Chao) self-interested transaction, in violation of Defendant Chao's fiduciary duties owed to Eian and its shareholders.

152.    The Eian intellectual property that the Temujin Defendants purportedly received as a result of Defendant Chao's aforementioned breaches of fiduciary duties and the Temujin Defendants and Ding's aiding and abetting of same, is the same intellectual property that forms the basis for the Initial Coin Offering that Temujin currently is advertising.

153.    As a direct and proximate result of the Temujin Defendants and Ding's aiding and abetting of the foregoing breaches of fiduciary duties, Plaintiff has been harmed in an amount to be determined at trial, and will continue to be harmed until appropriate injunctive relief is granted.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT THREE

### Fraudulent Inducement

### (Against All Defendants)

### (Derivatively on Behalf of Eian Labs, Inc.)

154.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 153 of this Complaint as though fully set forth herein and alleges the following cause of action.

155.    As detailed above, Defendants Ding and Chao, acting in their own capacities and on behalf of Temujin, made repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding the contents and legal effect of the paperwork they insisted he sign on behalf of Eian to effectuate the intellectual property sale from Eian to Temujin, including that this was a corporate re-organization that would protect Eian shareholders' rights, not one that would divest them of all of their equity in valuable intellectual property without adequate consideration. Defendants Ding and Chao specifically engineered the meeting to ensure that Plaintiff had mere minutes to review the paperwork before leaving to catch a flight across the country, immediately before a holiday.

156.    Ding and Chao's representations were false.  In reality, the purpose of the intellectual property sale agreement was to divest Eian of tens or hundreds of millions of dollars in valuable intellectual property for the paltry amount of $300,000.

157.    When Defendants made these representations and omissions, they knew that they were false.  These representations and omissions were made with the intent to defraud and deceive.

158.    Plaintiff, in his capacity as a board member of Eian (and member of Juniper, itself a shareholder of Eian), reasonably relied on fellow board member Chao's (as well as the other Defendants') misrepresentations and omissions, and such reliance was justifiable.

159.     As a result of Defendants' fraudulent misrepresentations and omissions, Eian has been damaged in an amount to be proven at trial.

160.     Further, as a result of Defendants' fraudulent misrepresentations and omissions Eian is entitled to rescission of the purported sale of Eian's intellectual property and other assets to Temujin.

161.     In doing the acts alleged herein, Defendants acted with oppression, fraud, and malice, and Eian is entitled to punitive damages.

**COUNT FOUR**

**Unjust Enrichment**

**(Against All Defendants)**

**(Derivatively on Behalf of Eian Labs Inc.)**

162.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 161 of this Complaint as though fully set forth herein and alleges the following cause of action.

163.     As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of Nominal Defendant and many others, in the form of unjustified payments and transfers of Eian's assets and property including, but not limited to the intellectual property transferred pursuant to the intellectual property sale.

164.     As a result of these unjustified payments and transfers of Nominal Defendant's assets and property, Defendants are thereby required to make restitution.

165.     Accordingly, Nominal Defendant is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

**COUNT FIVE**

**Accounting**

**(Against All Defendants)**

**(Derivatively on Behalf of Eian Labs Inc.)**

166.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 165 of this Complaint as though fully set forth herein and alleges the following cause of action.

167.   Defendants have committed various frauds and breaches of fiduciary duty, described more fully in Counts One through Four.  These acts have damaged Eian and unlawfully enriched Defendants.

168.   Plaintiff cannot determine the amount Eian is owed without an accounting, however, because Defendants have exclusive custody over the books, records, and accounts that show the assets and profits derived from the intellectual property that Defendants misappropriated from Eian.  Accordingly, Plaintiff and Eian are entitled to an accounting.

## COUNT SIX

### Civil Violations of the

### Racketeer Influenced and Corrupt Organization Act

### (18 U.S.C. § 1962(c))

### (Against All Defendants)

169.   Plaintiff hereby incorporates the allegations of paragraphs 1 through 168 of this Complaint as though fully set forth herein and alleges the following cause of action.

170.   Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

171.   Defendants Ding, Chao, Temujin (Delaware), and Temujin (Cayman) formed an association-in-fact, whose joint and common purpose was to generate profits by defrauding investors and business partners out of assets.  All Defendants received misappropriated monies and intellectual property at various points throughout the period from May 2016 to the present, including but not limited to those referenced in paragraphs 30, 31, 32, 44, 45, 71, 78, 79, 80, 82, 92, and 95.

172.   Defendants exercised control over the numerous related individuals and entities that their enterprise consists of.  Ding and Chao ultimately controlled and managed the operations of the entire association-in-fact and personally directed the day-to-day operations of its related entities as described above.

173.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce.  The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in New York, California, and elsewhere.

174.    Defendants, Guanghua Liang, Jianrong Wang, Fourhair, Lakeside, Yang Ying, Selena Chen, Nessco, Yi Chung Yang, and Xilei Wang were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

175.    Ding and Chao formed a scheme to defraud Plaintiff of his assets whereby they induced Plaintiff to invest money in JVI, sign documents purporting to transfer intellectual property from Eian to Temujin for inadequate consideration, invest in transactions for high-end luxury watches, and solicit investments from Plaintiff's family and friends.

176.    In furtherance of this scheme, Ding and Chao used or caused to be used interstate wire communications in violation of 18 U.S.C. § 1343.  Defendants initiated and received multiple transfers of Plaintiff and investor funds across state lines via the use of wires including but not limited to the transfers referenced in paragraphs 30, 31, 32, 44, 45, 71, 78, 79, 80, 82, 92, and 95. Ding and Chao, and others, also communicated materially false statements and deceitfully omitted material facts to Plaintiff and others via the use of wires including but not limited to the communications and omissions referenced in paragraphs 31, 39, 41, 45, 55, 65–69, 71, 75–78, 80, 83, 86, 104–108, 119, and 122–133.  Each of these wire communications, omissions, and transfers of Plaintiff and investor assets satisfies the transmission "by means of wire, radio, or television communication" element for wire fraud.

177.    In furtherance of this scheme to defraud, Ding and Chao used or caused to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341.  Ding and Chao initiated and received multiple transfers of funds across state lines via the use of the

mails, including but not limited to the transfers referenced in paragraphs 30, 31, 32, 44, 45, 71, 78, 79, 80, 82, 92, and 95.  Each of these transfers of Plaintiff and investor assets to out-of-state entities satisfies the "use of the mail" element for mail fraud.

178.   In furtherance of this scheme to defraud Plaintiff of his money or property having a value of $5,000 or more, Defendants initiated and received multiple transfers that caused Plaintiff's funds (as well as the funds of others) to travel or be transported in interstate commerce in violation of 18 U.S.C §§ 2314 and 2315, including but not limited to the transfers referenced in paragraphs 30, 31, 32, 44, 45, 71, 78, 79, 80, 82, 92, and 95.

179.   By reason of Ding and Chao's violation of 18 U.S.C. § 1962(c), Plaintiff suffered injury in an amount to be determined at trial.

180.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages.

181.   In bringing this action, Plaintiff has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

182.   Plaintiff additionally seeks the return/restitution of any assets from Defendants' entities or subsidiary entities or other alter ego entities controlled by Defendants that received misappropriated funds, including entities that were dissolved and had their assets disbursed by Defendants and/or the entities they control.

## COUNT SEVEN

### Conspiracy to Commit Civil Violations of the
### Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(d))
### (Against All Defendants)

183.   Plaintiff hereby incorporates the allegations of paragraph 1 through 182 of this Complaint as though fully set forth herein and alleges the following cause of action.

184.   Defendants each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18

U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 169 to 182 above.

185.    By reason of violation of 18 U.S.C. § 1962(d) committed by Ding and Chao, Plaintiff suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

186.    Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to treble damages.

187.    In bringing this action, Plaintiff has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## COUNT EIGHT

### Fraud

### (Against All Defendants)

188.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 187 of this Complaint as though fully set forth herein and alleges the following cause of action.

189.    As detailed above, Defendants Ding and Chao, acting in their own capacities and on behalf of Temujin in certain instances made repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding:

a.    credit card expenditures on Plaintiff's cards, including that Chao would reimburse Plaintiff for all expenditures on these cards; the cards would be used entirely for business purposes; and that cards issued for Lu, Fisch and others would be used by those individuals;

b.    the watch business, including that Plaintiff would be paid 50% of all proceeds from watches; that Plaintiff would have a say in the sale or transfer of any watch; and that Plaintiff would have access to the watches at all times;

c.    use of funds that Plaintiff invested in JVP and JVI, including that these funds would be used for proper business purposes;

d.    that Chao was on the brink of closing deals to raise hundreds of millions of dollars for Findora from a variety of well-known individuals and entities including Jack Ma's wife, Ma Huateng, and Tencent, the early investors in TRON, Perfect World, and others "famous guys";

e.    that Plaintiff's investors would be repaid within ninety days of their investment and that their investments were secure;

1

         f.       that the transfer of Eian's assets to Temujin would not affect Plaintiff's or other investors' ownership rights in Findora in any way.

2

3         190.     These representations were false.  In fact:  (1) Ding and Chao always planned to

4 rack up hefty expenditures for both business and personal purposes on Plaintiff's credit cards and

5 leave Plaintiff stuck with the tab, and Ding and Chao never intended to give credit cards to Lu,

6 Fisch, or others; (2) Ding and Chao always planned to misappropriate the remainder of the watch

7 inventory for their own benefit and deprive Plaintiff of his share of proceeds and inventory; (3)

8 Ding and Chao always planned to siphon the money from the JVP and JVI investments to their

9 own benefit knowing that they would later seek to divest Plaintiff of all of his valuable interest in

10 those entities; (4) Ding and Chao were not close to closing deals worth hundreds of millions of

11 dollars with major players, but instead, were using those narratives to create a façade of success

12 that they could use to perpetuate their multiple frauds on Plaintiff and others; (5) Ding and Chao

13 never planned to repay the investors or provide any of the valuable consideration they had

14 promises, and instead, solely planned to convert the investors' money for their own uses; (6) the

15 intellectual property transaction between Eian and Temujin was not simply a paper transaction that

16 would preserve all of Plaintiff's and other investors' rights.

17        191.     When Defendants made these representations and omissions, they knew that they

18 were false.  These representations and omissions were made with the intent to defraud and

19 deceive.

20        192.     Plaintiff's reliance on Defendants' misrepresentations and omissions was

21 justifiable.

22        193.     As a result of Defendants' fraudulent misrepresentations and omissions, Plaintiff

23 has been damaged in an amount to be proven at trial.

24        194.     In doing the acts alleged herein, Defendants acted with oppression, fraud, and

25 malice, and Plaintiff is entitled to punitive damages.

26

27

28

1

2

3

**COUNT NINE**

**Breach of Contract**

**(Against Ding and Chao)**

4      195.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 194 of this

5    Complaint as though fully set forth herein and alleges the following cause of action.

6      196.    Plaintiff, Ding, and Chao entered into an agreement ("Watch Agreement") to jointly

7    acquire, own, and split the proceeds of high-end luxury watches in 2016.

8      197.    Plaintiff performed or substantially performed all of his obligations under the Watch

9    Agreement.

10      198.    Ding and Chao breached the Watch Agreement by:

11
- failing to pay Plaintiff his share of the proceeds of several watch sales;

12

13
- failing to contribute their share of the cost to acquire certain watches, and instead purchasing those watches using Plaintiff's assets; and

14

15
- converting the remaining watches for their own benefit without compensating Plaintiff.

16      199.    As a direct and proximate result of Ding and Chao's breaches of the Watch

17    Agreement, Plaintiff has suffered damages in an amount to be proven at trial.

18

19

20

**COUNT TEN**

**Conversion**

**(Against All Defendants)**

21      200.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 199 of this

22    Complaint as though fully set forth herein and alleges the following cause of action.

23      201.    Defendants substantially interfered with the Plaintiff's property interest in twenty-

24    four luxury watches for their own use and benefit by selling certain watches without Plaintiff's

25    consent and by depriving him of access to the remainder of the watch business inventory.

26

27

28

202.    Defendants also substantially interfered with Plaintiff's property interest in the sum of $637,000 by using that money for their own use and benefit without repaying Plaintiff and without his consent.

203.    Defendants also substantially interfered with Plaintiff's property interest in $50,000 that he invested in JVI by using that money for their own use and benefit without Plaintiff's consent.

204.    As a direct and proximate result of Defendants' conversion of Plaintiff's assets, Plaintiff has incurred damages in an amount to be proven at trial.

205.    In engaging in the foregoing conduct, Defendants acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

206.    By reason of the unlawful conversion of Plaintiff's property, Plaintiff is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and  money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

## COUNT ELEVEN

### Unjust Enrichment

### (Against All Defendants)

207.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 206 of this Complaint as though fully set forth herein and alleges the following cause of action.

208.     As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of Plaintiff and many others, in the form of unjustified benefits, payments, and transfers of Plaintiff's assets and property including, but not limited to:

       a.    $50,000 in assets that Plaintiff invested in JVI;

       b.    $637,000 in assets as a result of unreimbursed credit card expenditures; and

       c.    Twenty-four luxury watches worth approximately $5,700,000 (Plaintiff's 50% interest).

209.    As a result of these unjustified payments and transfers of Plaintiff's assets and property, Defendants are thereby required to make restitution.

210.    Accordingly, Plaintiff is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

<u>**COUNT TWELVE**</u>

**Defamation**

**(Against Ding and Chao)**

211.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 210 of this Complaint as though fully set forth herein and alleges the following cause of action.

212.    Defendants Ding and Chao made numerous false statements of purported fact regarding Plaintiff to Findora employees, including Lu, Fisch, Adam Goldberg and others, as well as to Findora investors.  Ding and Chao's false statements included oral and text message statements to these individuals that Plaintiff had misled the investors he brought to the table and made promises to them that he was not authorized to make, so he was truly to blame for the problems with those investors.  Ding and Chao also falsely told Findora employees that Plaintiff's complaints about credit card issues were false, and that Plaintiff was the one who had made the charges at issue, not Chao.  Ding and Chao also told both employees and investors that Plaintiff was not a partial owner or co-founder of Findora, and that Plaintiff was lying when he claimed to be either.

213.    Ding and Chao made these false statements about Plaintiff intentionally to control Findora employees and investors in an attempt cover up their illegitimate conduct.

214.    As a result, Plaintiff's reputation has been damaged in an amount to be proven at trial.

## **COUNT THIRTEEN**

### **Accounting**

### **(Against All Defendants)**

215.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 214 of this Complaint as though fully set forth herein and alleges the following cause of action.

216.    Plaintiff's partnership with Ding and Chao both through the watch business (including the Watch Agreement) and through Juniper, JVI, Project Revolution, and Eian entitle Plaintiff to complete information regarding the status of his interests in those partnerships and entities.  Plaintiff's right extends to information about Temujin, which wrongfully acquired the bulk of its assets from Eian via fraud.

217.    Defendants have committed various breaches of contract, as well as tortious and fraudulent acts, described more fully in Counts Six through Twelve.  These acts have damaged the Plaintiff and unlawfully enriched Defendants.

218.    Plaintiff cannot determine the amount he is owed without an accounting, however, because Defendants have exclusive custody over the books, records, and accounts that show the status of all of the remaining and sold watch inventory and the assets and profits derived from the intellectual property that Defendants misappropriated from Eian.  Accordingly, Plaintiff is entitled to an accounting.

### **PRAYER FOR RELIEF**

219.    WHEREFORE, Plaintiff, on behalf of himself and derivatively on behalf of Nominal Defendant Eian, requests judgment as follows:

> a.    That Defendants, and all other persons acting in active concert or privately or in participation with Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;
>
> b.    That Plaintiff and/or Nominal Defendant receive such other injunctive relief as they may request and the Court may deem just and proper;
>
> c.    That Defendants be required to account for all gains, profits, and advantages derived from their acts of conversion and other violations of law;

d.   That all gains, profits and advantages derived by Defendants from acts of conversion and other violations of law be deemed to be in constructive trust for the benefit of Plaintiff;

e.   For an order rescinding the intellectual property sale agreement and enjoining Defendants' unlawful token offering;

f.   For an order requiring Defendants to disgorge profits earned from their unlawful conduct;

g.   For an award of restitution, unjust enrichment, actual damages, statutory damages, and compensatory damages according to proof at trial;

h.   For punitive and exemplary damages according to proof at trial;

i.   For attorneys' fees, costs of suit, and prejudgment and post judgment interest, as provided under applicable law; and

j.   For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated:  December 24, 2020                    ALTO LITIGATION, PC

By: */s/ Baharam Seyedin-Noor*
     Bahram Seyedin-Noor

Attorneys for Plaintiff,
Ariel Abittan