# EXHIBIT A

Constantine P. Economides (*pro hac vice*)
Brianna K. Pierce (CBN 336906)
ROCHE FREEDMAN LLP
1 SE Third Avenue, Suite 250
Miami, Florida 33131
Tel: (305) 971-5943
Email: ceconomides@rochefreedman.com
        bpierce@rochefreedman.com

Joseph M. Delich (*pro hac vice*)
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, NY 10016
Tel: (646) 970-7541
Email: jdelich@rochefreedman.com

*Counsel for Abittan,*
*Ariel Abittan*

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/3/2021 10:49 PM
Reviewed By: R. Walker
Case #20CV372622
Envelope: 7599686**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA

TEMUJIN LABS, INC.,
                    Plaintiff,
            vs.
ARIEL ABITTAN, BENJAMIN FISCH,
CHARLES LU, and Does 1-10, inclusive,
                    Defendants.

_____

–

ARIEL ABITTAN,
                    Cross-Complainant,
            vs.

YUTING CHEN (A/K/A TIFFANY CHEN,
A/K/A LILY CHAO), TAO DING (A/K/A
DAMIEN DING A/K/A DAMIEN LEUNG),
GUANGHUA LIANG, YANG YANG, ALEX
WANG,  SELENA CHEN, JIANRONG
WANG, XILEI WANG, YI CHUNG YANG,
JUNIPER VENTURES INCORPORATED,
PROJECT REVOLUTION FUND INC.,
JUNIPER VENTURE HOLDINGS LLC,
JUNIPER VENTURE PARTNERS LLC, EIAN
LABS INC. (F/K/A POREPSUS INC.),
FOURHAIR LLC, LAKESIDE GARDEN
HERITAGE LLC,  POWERSCALE CAPITAL

CASE NO. 20CV372622

Judge:      Hon. Sunil R. Kulkarni
Action Filed:   November 6, 2020

**CROSS-COMPLAINT FOR
DECLARATORY JUDGMENT,
BREACH OF PARTNERSHIP
AGREEMENT, CONVERSION,
BREACH OF FIDUCIARY DUTY,
AIDING AND ABETTING,
FRAUDULENT INDUCEMENT,
UNJUST ENRICHMENT,
ACCOUNTING, RICO
VIOLATION (18 U.S.C. § 1962(c)),
CONSPIRACY TO COMMIT
RICO VIOLATION (18 U.S.C. §
1962(d)), FRAUD, BREACH OF
CONTRACT, AND DEFAMATION**

1
2
3
4
5

MANAGEMENT LLC, POWERSCALE
CAPITAL FUND LP, BLACK COBBLE
RIDESHARE FUNDING LLC, TEMUJIN
LABS INC. (DELAWARE), TEMUJIN LABS
INC. (CAYMAN), NESSCO INVESTMENTS,
LLC, FINDORA FOUNDATION LTD.,
DISCREET LABS LTD., and Does 1-100,
inclusive,

6

Cross-Defendants.

7

8
9

Abittan ARIEL ABITTAN ("Cross-Complainant" or "Abittan"), by and through the
undersigned counsel, alleges as follows:

10
11
12

1.     Temujin Labs Inc. (Delaware) ("Temujin DE") filed a complaint against Abittan
seeking declaratory relief and damages for civil conspiracy, tortious interference with contract, and
trade secret misappropriation. A copy of the complaint is attached as Exhibit A.

13
14

2.     Abittan has demurred to the complaint and, though no answer has been filed, denies
any liability to Temujin DE.

15
16
17
18
19
20
21
22
23
24
25

3.     This cross-complaint arises from a multi-year fraudulent conspiracy orchestrated by
Yuting Chen (a/k/a Tiffany Chen, a/k/a Lily Chao) ("Chen"); her husband Tao Ding (a/k/a Damien
Ding, a/k/a Damien Leung) ("Ding"); the numerous entities they control, including Juniper
Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper
Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden
Heritage LLC, Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble
Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco
Investments, LLC, Findora Foundation Ltd., and Discreet Labs Ltd.; and a coterie of Chinese
nationals that played straw-person roles in Chen and Ding's unlawful conduct, including Guanghua
Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang
(collectively, "Cross-Defendants").

26
27

4.     Cross-Defendants' conspiracy flies under the banner of a cryptocurrency and

28

- 2 -

blockchain project currently known to the public as Findora.[1] Findora was founded by Abittan, Chen, and Ding as part of an oral and/or implied partnership formed in 2018 (the "Partnership").

5.      Prior to and throughout the Partnership, Chen and Ding inspired both Abittan's loyalty and his deference, first through a watch business that required Abittan to wire millions of dollars to Chen and Ding without any written contracts and, second, through promises of unicorn-like success if Abittan followed Chen and Ding's business advice without question. And once Chen and Ding knew they had Abittan's full trust, they weaponized it to steal the Partnership's novel blockchain project—Findora—and millions of dollars from investors and Abittan. In the process, Ding and Chen defamed Abittan to countless individuals, incurred over $600,000 of debt on Abittan's personal credit, converted millions of dollars' worth of watches, and stole an additional $1,200,000 from Abittan's friends and family.

6.      As part of their fraudulent scheme, Chen and Ding relied on misdirection and anonymity. While reassuring Abittan that he had an interest in all aspects of Findora, Chen and Ding fraudulently formed at least thirteen (13) entities through a series of forged contracts, false filings, and misrepresentations about ownership. They created a web of shell companies that become so unwieldy that Chen and Ding had to back date documents so that the chronology of entities would make temporal sense. They repeatedly lied about the purposes, functions, and compositions of discrete entities in their corporate web.

7.      Then, in a final attempt to coopt Findora, Chen and Ding fraudulently induced Abittan to sign a single-page document that, at the time, Chen and Ding falsely claimed was a corporate formality to preserve the rights of Findora's shareholders.  Chen and Ding now contend that this single-page document represents Abittan's consent to transfer the Findora name and intellectual property from Eian Labs Inc.—the corporate entity of which Abittan believed he was at least a 39.6% beneficial owner—to a newly-created Cayman Islands entity, Temujin Labs Inc.

---

[1] The intellectual property underlying Findora was previously known as Eian. For simplicity (and because there is also an entity named Eian Labs Inc.), all references to the intellectual property itself (also referred to as "blockchain technology" or the "coin") will use the current "Findora" name.

- 3 -

(Cayman)—in which Abittan has no stake. In essence, Chen and Ding claim that Abittan knowingly consented to the sale of his entire technology company—believed to be valued at over $50,000,000—via a one-page document in exchange for **absolutely nothing**.

8. In reality, however, Chen and Ding had concocted the document as a poorly conceived attempt to legitimize their theft of Abittan's ownership interest in Findora. But Chen and Ding were ultimately hoisted by their own petard. After years of misdirection and corporate tricks, Chen and Ding's tactics began to surface when they pushed Abittan out of Findora and denied the existence of the Partnership.

9. Critically, Findora's employees, consultants, and advisors subsequently observed, and responded to, Chen's and Ding's obvious misconduct. In late 2020, Stanford cryptographers, including Findora CEO Charles Lu ("Lu"), CTO/Chief Scientist Benjamin Fisch ("Fisch"), globally renowned consultant Franklin Fu ("Fu"), and numerous other employees from the engineering team (essentially the entire company) resigned. Another well-known cryptologist, Paul Scherer, went so far as to send a cease-and-desist letter to Findora, warning them not to associate his name with the project.

10. In sum, and as detailed below, Chen and Ding are con artists. Using charisma and lavish displays of wealth, they lure in optimistic individuals who are acting in good faith. Chen and Ding then misrepresent, misdirect, and deceive. They say whatever is necessary to induce others to provide money or other resources. To cover their tracks, they use fake names, straw-persons, and other lies about their relationships and identities. They hide their assets, even their home, using shell corporations. They have even refused to include their names on court filings. They undertake these manipulative actions to prevent accountability to their victims, including Abittan.

11. Abittan files this lawsuit in order to: (a) recover Abittan's direct damages due to Cross-Defendants' fraudulent and unlawful conduct; (b) obtain a declaration of Abittan's rights in Findora; (c) prevent Cross-Defendants from destroying, disposing of, or unlawfully using Findora's valuable intellectual property; and (d) prevent Cross-Defendants from continuing to harm Abittan.

- 4 -

1    12.    Abittan's investigation into the matters, identities, and entities discussed in this

2    complaint is ongoing. Abittan reserves the right to update these allegations as additional facts

3    become known.

4                                    **PARTIES**

5    13.    Cross-Complainant Ariel Abittan is an individual residing in Lawrence, New York.

6    In addition to—or in the alternative to—the discrete roles and interests set forth below, Abittan has

7    a 50% interest in the Partnership formed with Ding and Chen in January 2018 and has an ownership

8    interest of up to 50% in Findora.[2] According to corporate formation documents created by or on

9    behalf of Ding and Chen—purportedly for the purpose of effectuating the Partnership's interests—

10   Abittan is a shareholder of, and continuously has been a shareholder of, Juniper Ventures

11   Incorporated since January 24, 2018. Abittan is the President and a director of Project Revolution

12   Inc. Abittan is also a member of Juniper Venture Partners, LLC, which is a shareholder of Eian

13   Labs Inc (f/k/a Porepsus Inc.). Upon information and belief, as a shareholder of JVI, Abittan is also

14   a manager of Fourhair LLC, which is a member of Juniper Venture Partners LLC, which (as

15   detailed above) is a shareholder of Eian. Abittan is also a member of Juniper Venture Holdings LLC,

16   which was formed for the purpose of creating Powerscale Capital Management LLC with John

17   Powers. Abittan is also a partner in an oral and/or implied partnership with Chen and Ding formed

18   for the purpose of reselling ultra-luxury watches (the "Watch Partnership"). Abittan is the co-

19   founder of Findora.

20   14.    Cross-Complainant is informed and believes and, on that basis, alleges that Cross-

21   Defendant Chen is an individual residing in Atherton, California. Since 2016, Chen has been known

22   to Abittan by at least three names (Yuting Chen, Tiffany Chen, and Lily Chao), but Abittan is

23   informed and believes and, on that basis, alleges that Yuting Chen is Cross-Defendant Chen's true

24   name. Chen is the coleader of a fraudulent association-in-fact enterprise that has used Juniper

25   Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper

26   _____

27   [2] *See* Corp. Code § 16202.

28                                    - 5 -

Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

15.    Cross-Complainant is informed and believes and, on that basis, alleges that Cross-Defendant Ding is an individual residing in Atherton, California. Since 2016, Ding has been known to Abittan by at least three names (Tao Ding, Damien Ding, and Damien Leung) but Cross-Complainant is informed and believes and, on that basis, alleges that Damien Ding is Cross-Defendant Ding's true name. Ding is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., and the agents known as Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang and Yi Chung Yang, to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

16.    Cross-Defendant Juniper Ventures Incorporated ("JVI") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that JVI is controlled by Ding and Chen and that JVI is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

17.    Cross-Defendant Project Revolution Fund Inc. ("Project Revolution") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis,

- 6 -

alleges that Project Revolution is controlled by Ding and Chen and that Project Revolution is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

18.     Cross-Defendant Juniper Venture Holdings LLC ("JV Holdings") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that JV Holdings is controlled by Ding and Chen and that JV Holdings is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

19.     Cross-Defendant Juniper Venture Partners LLC ("JV Partners") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that JV Partners is controlled by Ding and Chen and that JV Partners is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

20.     Cross-Defendant Eian Labs Inc. (f/k/a Porepsus Labs Inc.) ("Eian") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that Eian is controlled by Ding and Chen and that Eian a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

21.     Cross-Defendant Fourhair LLC ("Fourhair") is a limited liability company formed under the laws of Nevada. Abittan is informed and believes and, on that basis, alleges that Fourhair is controlled by Ding and Chen and that Fourhair is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

22.     Cross-Defendant Lakeside Garden Heritage LLC ("Lakeside") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Lakeside is controlled by Ding and Chen and that Lakeside is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

23.     Cross-Defendant Powerscale Capital Management LLC ("Powerscale Capital") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Powerscale Capital is controlled by Ding and Chen and that Powerscale Capital is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

- 7 -

24.     Cross-Defendant Powerscale Capital Fund LP ("Powerscale Fund") is a foreign company organized under the laws of the Cayman Islands. Abittan is informed and believes and, on that basis, alleges that Powerscale Fund is controlled by Ding and Chen and that Powerscale Fund is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

25.     Cross-Defendant Powerscale Black Cobble Rideshare Funding LLC ("Black Cobble") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Black Cobble is controlled by Ding and Chen and that Black Cobble is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

26.     Cross-Defendant Temujin Labs Inc. (Delaware) ("Temujin DE") is a corporation organized and existing under the laws of Delaware with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin DE is controlled by Ding and Chen and that Temujin DE is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

27.     Cross-Defendant Temujin Labs Inc. (Cayman) is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin Cayman is controlled by Ding and Chen and that Temujin Cayman is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

28.     Cross-Defendant Nessco Investments, LLC ("Nessco") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Nessco is controlled by Ding and Chen and that Nessco is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Nessco is the shell company that holds 69 Isabella Ave.—the house in which Ding and Chen's criminal enterprise operated.

29.     Cross-Defendant Findora Foundation Ltd. ("Findora Foundation") is a foreign company organized under the laws of the Cayman Islands with its principal place of business in

- 8 -

Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Findora Foundation is controlled by Ding and Chen and that Findora Foundation is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

30.    Cross-Defendant Discreet Labs Ltd. ("Discreet Labs") is a limited partnership formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Discreet Labs is controlled by Ding and Chen and that Discreet Labs is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

31.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Guanghua Liang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Guanghua Liang is the agent of Ding and Chen and that Guanghua Liang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

32.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Yang Yang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Yang Yang is the agent of Ding and Chen and that Yang Yang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

33.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Alex Wang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Alex Wang is the agent of Ding and Chen and that Alex Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

34.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Selena Chen is an individual residing in Atherton, California. Abittan is informed and believes and, on that basis, alleges that Selena Chen is the agent of Ding and Chen and that Selena Chen is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Selena Chen is the sister of Yuting Chen and executed many documents as part of the criminal scheme.

- 9 -

35.     Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Jianrong Wang is an individual residing in Atherton, California. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the agent of Ding and Chen and that Jianrong Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the driver of Chen and Ding, that he lives at 69 Isabella Ave—the house in which Ding and Chen's criminal enterprise operated—and that he has executed many corporate documents as part of the criminal scheme.

36.     Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Xilei Wang is an individual residing in China. Abittan is informed and believes and, on that basis, alleges that Xilei Wang is the agent of Ding and Chen and that Xilei Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Xilei Wang has executed many corporate documents as part of the criminal scheme.

37.     Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Yi Chung Yang is an individual residing in Hong Kong with a home in Atherton, CA. Abittan is informed and believes and, on that basis, alleges that Yi Chung Yang is the owner of Nessco Investments LLC. Abittan is informed and believes that Yi Chung Yang is the agent of Ding and Chen and that Yi Chung Yang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

38.     Cross-Complainant does not know the true names and capacities of cross-defendants sued in this Cross-Complaint as Doe 1 through Doe 100, inclusive, and therefore sues these cross-defendants by fictitious names under Section 474 of the California Code of Civil Procedure. To the extent that Tiffany Chen, Yuting Chen, Lily Chao, Damien Ding, Tao Ding, Damien Leung, Guanghua Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang are not the people Abittan interacted with as fully described in this cross-complaint, or to the extent any such name(s) refer to multiple persons, then such person(s) are included in Does 1 through Does 100, inclusive, sued herein. Cross-Complainant will amend

- 10 -

this Cross-Complaint to allege the true names and capacities of Doe 1 through Doe 100, inclusive, when ascertained. Cross-Complainant is informed and believes, and on that basis alleges, that each of the cross-defendants named herein as Doe 1 through Doe 100, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Cross-Complaint.

## SUBSTANTIVE ALLEGATIONS

**A.** **Abittan Meets Ding and Chen Online Through a Shared Interest in High-End Luxury Watches, Which Leads to a Business Partnership**

39.     In or around May of 2016, Abittan was looking online for a particular high-end luxury watch and came across a listing that Ding, under the username "oneplustwo," had posted for the watch on The Rolex Forums. Abittan then began discussions with Ding regarding the watch.

40.     Abittan, Ding, and Chen (who claimed to be married to Ding and who at that time was going by the name Tiffany Chen) then began transacting in watches on a regular basis between 2016 and 2019.

41.     The watches consisted of high-end models of brands like Patek Philippe and Richard Mille, which can currently sell for as much as $2,500,000.

42.     The parties reached an oral partnership agreement that would work as follows. First, either Abittan or Ding or Chen would identify a high-end watch that could be acquired from retailers and then resold at a higher price. Then Abittan would contribute 50% of the cost of the watch and Ding/Chen would contribute the other 50%. Finally, Abittan and Ding would work together to resell the watch at a profit. Abittan and Ding/Chen operated as 50/50 partners in the watch business.

43.     To purchase the watches, Abittan would wire money from his business entity, RealTime NY, LLC ("RealTime"), to Wells Fargo bank accounts in the name of Yuting Chen and Tao Ding. Sometimes, Ding and Chen would pay for their portion of the watches, but as detailed further below, on other occasions, Ding and Chen misused Abittan's own credit cards to pay their share. As a result of these transactions, Abittan currently co-owns twenty-four luxury watches with Ding and Chen. The total amount of principal that Abittan invested in these watches was $1,139,270.

- 11 -

44.     The present value of the unsold watches is nearly eight times greater than the principal value of those watches. Accordingly, Abittan's 50% interest in these watches exceeds $8,000,000.

**B.   Ding and Chen Lure Abittan into a Relationship of Trust**

45.     Through the watch business, Abittan developed a relationship of trust with Ding and Chen. Starting in January 2017, Abittan began traveling to Atherton, California to meet with Ding and Chen. During these trips, Abittan stayed in what Ding and Chen consistently claimed to be their primary residence at 69 Isabella Ave. Atherton, CA 94027 ("69 Isabella Ave.").

46.     During this time period—between May 2016 and December 2017—the parties wired millions of dollars to one another without incident.

47.     Ding and Chen routinely claimed to have access to significant familial wealth and made great displays of their money. In one instance, Chen brought Abittan car shopping and purchased two high-end luxury vehicles, one of which was a Rolls-Royce. There were approximately five such vehicles in the driveway of 69 Isabella Ave. at any given time, including multiple Bentleys, a Ferrari, and Mercedes.

48.     Chen even had a chauffeur, whose name Chen said was Jianrong Wang. On various occasions, Chen had Wang drive Abittan to destinations in and around Atherton. Because Wang did not speak English, Abittan would communicate with him through a translation application on Abittan's mobile phone.

49.     Chen repeatedly touted her supposed connections with the Chinese business elite. She claimed to be friends with Zhang Ying—the wife of Chinese billionaire and Alibaba founder, Jack Ma. Chen also claimed to have a close personal and professional relationship with Ma Huateng, founder of the seventh most valuable company in the world, Tencent. Chen bragged about meeting Mr. Huateng while he was "still a poor guy." Chen also made regular references to lavish trips with other celebrities and "famous people" in the blockchain industry.

50.     Chen told Abittan that Ding had attended Harvard as an undergraduate but that he had been kicked out for getting into a fist-fight.

- 12 -

51.     Chen further cultivated a special relationship of apparent trust and confidence with Abittan by disclosing highly personal details in text messages, including details relating to her health, marital issues, and prior romantic relationships. On information and belief, many of these personal revelations were not true and were made solely to make Abittan believe that he and Chen had a close personal relationship that extended beyond business.

52.     In retrospect, Chen's and Ding's stories and displays of grandeur were an integral part of Cross-Defendants' fraudulent scheme.

**C. <u>The Abittan-Ding/Chen Partnership is Formed While Ding and Chen Lay the Foundation for Misidentification</u>**

53.     By December 2017, Ding and Abittan were speaking several times a day for hours. These conversations included discussions regarding the potential use of blockchain for secure and anonymous watch transactions, as well as (ironically) fraud prevention.

54.     By January 2018, the discussions between Abittan, Ding, and Chen had expanded to a wider use case aimed at creating reliable blockchain financial infrastructure with privacy protecting transparency for use across myriad industries. From these discussions, Abittan, Ding and Chen formed the oral and/or implied Partnership to create blockchain technology.

55.     On January 22, 2018, the Partnership formed Juniper Ventures Incorporated ("JVI") to spearhead that business. Ding and Chen, however, refused to identify themselves on the incorporation documents; instead, Chen and Ding presented Abittan with an investment agreement, naming Abittan and Guanghua Liang ("Liang")—a strawman appointed by Ding and Chen to help hide their involvement—as "Founders" of JVI. Abittan and Liang were required to make a $50,000 capital contribution in exchange for 1,000,000 shares in JVI. Abittan thereafter wired $50,000 to a Chase bank account in the name of JVI.

56.     Ding and Chen always represented that JVI was their venture with Abittan as equal partners. They did not explain what role Liang was to play or why he was listed as co-founder. Abittan has never met, seen, or spoken with Liang.

- 13 -

57.     Chen obviously understood the inconsistency between, on the one hand, claiming to Abittan that she and Ding were Abittan's business partners while, on the other hand, making sure that her name did not appear on any of the governing documents for the entities that she and Ding created for the blockchain business. Chen's explanation to Abittan was that, to project a certain image and identity that fit with her view of Silicon Valley culture, she needed to maintain her own privacy and to keep her true identity and connection to their businesses a secret.

58.     Chen also insisted that Abittan hold himself out to the public as "Mark Graber." Chen explained to Abittan that it was "too early" for investors and employees to know their true identities. Chen also asked Abittan to change his name on his LinkedIn profile to Mark Graber and to conceal his true identity in public forums. When Abittan protested, Chen told him that this was how things worked in Silicon Valley and that, to succeed, Abittan needed to follow her instructions.

59.     Chen and Ding's use of hidden identities persisted throughout their partnership with Abittan (and still to this day). Chen routinely lied to Findora investors and employees about her relationship with Ding, claiming that Ding was her brother-in-law and not her husband. Chen told Abittan that this subterfuge was necessary due to Silicon Valley culture frowning on husband/wife relationships at work. Because Abittan's wife also worked for Findora, Chen wanted Abittan to hide his relationship with his wife.

60.     Abittan ultimately demanded to go by his real name at Findora and revealed his marital relationship with his wife to Findora employees. Ding and Chen would not do the same.

61.     Chen and Ding told Abittan that it was important to project an image of success. Accordingly, Chen leased a Ferrari for Abittan to drive when visiting Silicon Valley and told him that he needed to live in one of her luxury properties.

62.     Ding and Chen also provided Abittan with a removable subscriber identity module (commonly known as a "SIM card") and required Abittan to use a phone with that SIM card for business purposes. Upon information and belief, Ding and Chen provided the SIM card to Abittan as another test of their control.

- 14 -

**D.  Ding and Chen Create Two Public-Facing Entities to Act for the Partnership**

63.    In January and February of 2018, Abittan began hiring employees for the Findora project. Abittan heavily recruited Stanford Ph.Ds., particularly those affiliated with the Stanford cryptography department.

64.    Just before Abittan's most important recruit—Stanford's John Powers—agreed to join the Partnership's blockchain project, Ding and Chen convinced Abittan that, to limit potential liability, they needed to keep the business separate from the tech (often juxtaposed as "the fund" and "the coin").

65.    Consequently, on April 13, 2018, Abittan incorporated Project Revolution as incorporator. From incorporation, and at all times, Abittan served as President and Chief Executive Officer ("CEO") of Project Revolution.

66.    Ding and Chen referred to Project Revolution as the "fund" because it was the public-facing entity of the Partnership that, *inter alia*, paid salaries, entered employee contracts, and executed leases related to Findora.

67.    Shortly after creating the fund, on July 19, 2018, Ding formed a second public-facing entity called Eian. Although the articles of incorporation reflect Abittan as the incorporator, Abittan did not sign or receive copies of that document. After the fact, Ding eventually informed Abittan that Ding had formed Eian to act as the public-facing "coin side" of the Partnership.

68.    Chen confirmed that this dual fund/coin structure would allow Abittan, Ding, and Chen to retain 100% ownership of the Findora tech, while giving employees equity in the business.

**E.  Findora is Developed by the Cryptologists Consulting with Project Revolution**

69.    Once Project Revolution and Eian were in place, Ding and Chen required high-level employees to sign two separate but seemingly related agreements.

70.    The first was a consulting agreement with the "fund"—Project Revolution—under which the consultant earned a reasonable salary in exchange for specific services rendered, such as the development of the cryptography library or creation of Findora's open-source component. Project Revolution retained exclusive ownership of all work product arising from the consulting

- 15 -

agreements, which included pre-signed and undated Assignment of Copyright and Assignment of Patent Application exhibits.

71.     The second agreement was an advisor agreement with Eian, under which the same consultant (now called an advisor) would receive equity in "the coin" as compensation for the unspecific service of advising the company from time to time.

72.     On information and belief, Ding and Chen used this two-agreement system to facilitate their fraud. When it behooved them, they could attempt to structure one entity as effectively insolvent, with the other entity owning Findora's lucrative technology. Therefore, they could induce sophisticated cryptologists into creating multi-million-dollar blockchain technology (Findora) in exchange for modest salaries and the promise of equity, yet they could also ensure that the equity was in a company worth nothing and owning nothing.

**F.   Abittan Devotes Time, Energy, and Money into Attracting Investors**

73.     While unaware of Chen and Ding's fraudulent corporate structure and overall unlawful scheme, Abittan continued to work on Findora.

74.     Abittan would fly from his New York home to Atherton multiple times per month to work on the venture.

75.     In addition to spearheading the recruitment of an elite team of cryptologists, Abittan also had operational responsibilities and was involved in the creation of at least one white paper, which is a common component of blockchain companies. Abittan also was involved in fundraising and investor pitches.

76.     During the same period, Ding and Chen consistently represented that they had secured or were securing investments in Findora from major players in China. For example, Chen touted a potential investment from Jack Ma's wife, going so far as to claim that Ma's wife was concerned with Abittan's availability on weekends given that Abittan observes the Sabbath.

77.     Chen also spent $70,000 on a lavish investor trip for the early investors in TRON Foundation (an entity dedicated to building infrastructure for a decentralized Internet). Chen

- 16 -

claimed that, as a result of the trip, the investors were going to invest $230,000,000 in tokens and that it was a "done deal." However, Chen refused to show Abittan the paperwork.

78.     Chen also claimed to be close to closing a deal with Tencent CEO Ma Huateng to lead an investment round.

79.     Later, Chen touted her progress on a $50,000,000 investment.

80.     Nonetheless, in July 2018, relying on Chen's representation that she had already raised substantial amounts of money, Abittan sought to raise funds from his own network of family and friends. Abittan ultimately secured $1,200,000 in investments for Findora from five private investors. These investments took the form of Simple Agreements for Future Tokens ("SAFTs") between the investor and JVI.

81.     Pursuant to the SAFTS, the investors wired $1,200,000 into JVI's Chase bank account. In exchange for investing in JVI, the investors were promised that, if Eian—the company everyone believed held the rights to Findora's blockchain technology—had an initial coin offering ("ICO"), then their money would be converted to coins at a 70% discount to the token price. If Eian did not have an ICO, then they would receive their money back within 90 days.

82.     Findora did not issue a token within 90 days, but each of the investors decided to roll their investments into future equity or token offerings. Of course, the investors were not willing to wait forever. Eventually, the investors demanded their money back.

83.     In March 2019, responding to investor pressure, Chen flew to New York to appease the investors. She and Abittan met with three of the investors, and in an effort to buy time, Chen offered them a new deal, including a promise to return their investment with a 25% annualized return if Eian did not issue a token. To convince the investors to hold out for an equity or token offering, Chen presented the investors with a term sheet showing a $10,000,000 incoming investment from China Orient Group, at a $60,000,000 valuation for Findora.

84.     By that time, Abittan and Chen could point to concrete accomplishments related to Findora. The consultants under contract with Project Revolution had built an operating demo, were actively pitching Findora to funds as use cases, and had completed several white papers. Findora

- 17 -

was just six months away from a test net. Abittan was involved in much of those accomplishments, getting weekly and sometimes daily summaries on the engineering team's progress.

**G. As Abittan Diligently Works to Make Findora a Success, Ding and Chen Take Advantage of Abittan's Trust**

85.     Starting in early 2018, Chen directed Abittan to open multiple credit card accounts, with multiple cards issued to her and other individuals, to be used for Findora. At the outset, Chen promised Abittan that the cards would be used only for business purposes, and therefore, all expenses would be reimbursed by the Partnership.

86.     As a result of her promises, Chen obtained a credit card linked to Abittan's business account for RealTime, which was the entity previously used to wire money back and forth between Abittan, Ding, and Chen during the watch transactions.

87.     Chen soon thereafter demanded that Abittan open a Chase credit card for JVI and an American Express credit card for Project Revolution—both of which Chen promised would be used exclusively in connection with Findora. Upon information and belief, Chen and Ding then used Abittan's personal information to obtain individual credit cards in the names of Chen, Lu, Fisch, John Powers, Xu Fen Xe, Selina Chen, Ravi Chiruvolu, Eliana Abittan, and Fiona Zhang. Chen and Ding ultimately linked these cards to Abittan's personal credit.

88.     Chen represented to Abittan that the cards in Lu, Fisch, and others' names would be distributed to those individuals for business use. However, on information and belief, Chen kept and used each of the cards many times without informing these employees of the charges incurred in their names.

89.     Eventually, Chen (and her agents) began using the cards for her and Ding's personal benefit. Chen explained this—as she did in connection with corporate paperwork—by telling Abittan that, for privacy reasons, she did not want to give out her own personal identifying information to credit card companies. She also stated that needed the card because she and Ding used to have an American Express Black Card but were cutoff when they refused to disclose certain

- 18 -

financials in response to a financial review request from American Express. Chen promised that she would pay the personal expenses off each month.

90.    Chen, Ding, and their agents, racked up hundreds of thousands of dollars in credit card charges, the vast majority of which were not for Findora business. The charges included, but were not limited to:

• A piano for her children;

• School tuition;

• Gifts from Saks Fifth Avenue and other designer shops;

• A trip to Las Vegas;

• Fine wines;

• Doctors' offices;

• High-end restaurants;

• Taobao.com (a Chinese online shopping website);

• Costco;

• Airline tickets;

• Luxury hotels; and

• Ding and Chen's half of the investments for certain watches.

91.    On one occasion, Ding called American Express, fraudulently claiming to be Abittan, and requested that American Express increase the account's credit limit. Ding provided financial documents to support his request, which Abittan has demanded but has never seen.

92.    Ding and Chen also attempted to have Abittan open an American Express Black Card with a limitless credit line for their use. This effort entailed attempting to engage in transactions at a high enough volume on Abittan's credit cards, and making enough payments to that account, to receive an invitation from American Express Black. Chen even suggested such extreme measures as buying a house with a credit card (which turned out to be impossible). Fortunately, Ding and Chen's attempt failed; otherwise, they likely would have incurred additional millions in debt under Abittan's name before being caught.

- 19 -

1

2

**H. Abittan Demands the Return of Investor Funds and Chen Stops Paying the Credit Cards**

3        93.      In April 2019, Abittan demanded that Ding and Chen return money to the investors.

4   At first, Chen agreed and requested that Abittan send her wiring information. But Chen never sent

5   the money. Instead, Ding questioned Abittan's loyalty, asking Abittan whether he represented

6   Findora or the investors.

7        94.      Ding and Chen later told Abittan that he didn't have "the stomach" to be the

8   cofounder of a successful company if he could not handle investor complaints. Ding and Chen also

9   stated that, if the investors wanted to sue, let them sue. According to Ding, "by the time they get

10  through in court, we'll be so big it won't matter." Abittan understood through conversations with

11  Ding and Chen that their glib approach to litigation was driven in part by the security and insulation

12  they felt as a result of omitting their true names on corporate documents and in conjunction with

13  owning assets.

14       95.      At the same time that Abittan demanded investor repayment, Chen stopped paying

15  the bills for the credit cards that she had obtained in Abittan's name. The outstanding balance on

16  the cards was approximately $637,000. Chen had not previously been late on those credit card

17  payments, and she assured Abittan that she would make the payments soon.

18       96.      On May 13, 2019, Abittan and his father (on behalf of investors), flew to California

19  to meet with Ding and Chen and resolve the investor and credit card issues. Ding and Chen blew

20  them off. Knowing that Abittan and his father were flying back to New York the same day, Chen

21  did not show up to meet with them as scheduled. Instead—and in what would become a pattern—

22  Chen met them for ten minutes on the sidewalk outside of a restaurant, before they had to leave for

23  their flight home. Chen assured Abittan and his father that she would take care of everything and

24  purported to make a payment toward the credit card balance. However, the payment was rejected.

25

26

27

28

- 20 -

**I.    As a Ruse to Coopt Findora, Ding and Chen Tell Abittan They Must Transfer Eian's Assets to a Cayman Entity to Protect Investors**

97.    On July 2, 2019, Abittan again flew from New York to California. The following day, July 3, 2019, Abittan met with Chen and/or Ding twice.

98.    The first meeting was in the early afternoon. Abittan asked to meet with Chen at 11:00 a.m. Chen agreed. Although the meeting concerned Findora business and happened on a workday, Chen asked Abittan to meet her in the parking lot of a Menlo Park Safeway grocery store, explaining that she did not want to talk in the Findora office because "Charles [Lu, Findora's then-CEO] is a gossipe [sic]." Chen did not arrive at the parking lot until approximately 12:15 p.m.

99.    Chen told Abittan that Eian needed to be converted to a Cayman entity, explaining that the conversion would minimize any potential liability to investors in connection with Eian's anticipated coin sale. However, Chen did not provide Abittan with any paperwork at that time.

100.    Instead, Chen asked what time Abittan needed to go to the airport. Since Abittan had a flight back to New York scheduled for 9:45 p.m. out of San Francisco International Airport, he informed Chen that he would need to leave between 7:30 p.m. and 8:00 p.m. Accordingly, Chen said she would meet him again at about 7:00 p.m.

101.    Ding and Chen did not meet with Abittan until approximately 7:45 p.m. In a detached garage that was used as an office conference room, Chen gave Abittan a document and insisted that he sign it. Chen represented that the paperwork would not change Abittan's equity interest as a founder and owner of Findora. She also represented that the interests of the other Findora investors would not change.

102.    Abittan asked questions about the documents, but Chen created a hostile environment and got upset at the questions. Chen insisted that Abittan take her at her word that this document was to consummate a transaction that would maintain his equity interest as a founder and owner. She insisted that he sign the documents and contended that anything less would be a "betrayal of trust." Believing Chen's representations, Abittan signed the paperwork.

103.    The paperwork had signature lines for Lu, Fisch, and others. However, Chen instructed Abittan not to discuss the agreement with Lu or Fisch under any circumstances.

104.    Chen assured Abittan that Chen would send Abittan electronic copies of the documents. She did not do so.

105.    Following this fraudulent transaction, Chen repeatedly represented to Abittan in phone calls, emails, and texts, that he continued to have a significant equity interest in Findora. For example, she continued to agree in writing that he was a major owner and co-founder of Findora.

**J.    Ding and Chen Quietly Shut Abittan Out of His Own Company, While Defrauding Abittan as to the Credit Card Debt**

106.    After fraudulently inducing Abittan into signing the July 3, 2019 paperwork, Ding and Chen set to work shutting Abittan out of his own company.

107.    In or about the first week of July 2019, Ding and Chen caused Temujin Cayman to enter into a written employment contract with Lu to serve as Temujin Cayman's (rather than Eian's) Chief Executive Officer. At around the same time, they caused Fisch to enter into a written consulting agreement with Temujin Cayman.

108.    In mid-July 2019, Ding and Chen caused a new Findora website to be put up. Abittan noticed that he was not on the new website, and asked Chen more than once to fix the issue. Chen brushed him off by insisting it was just a draft website that would be updated in due time.

109.    At about the same time, Ding and Chen cut off Abittan's access to his Eian email account. Again, Abittan informed Chen, and Chen brushed him off.

110.    As the Temujin Cayman transactions were happening, Abittan continued to demand payment of his credit debt, but Chen continued to string him along.

111.    On July 10, 2019, Chen promised in a text message that her sister Selena would make an $85,000 payment that same day. No payment ever came.

112.    On July 28, 2019, Chen promised again that she would transmit money that same day. Again, no payment ever came.

- 22 -

113.    In August 2019, Abittan learned of a lawsuit in New York relating to the $365,622.60 outstanding credit card debt on the Project Revolution Fund American Express account. Abittan texted Chen immediately. Chen responded that it was her priority and that she would make things right. Abittan sent Chen his bank account wiring information and a screenshot showing his credit rating dropping by more than 150 points. Chen brushed Abittan off and told him not to bother her.

114.    Abittan continued to demand payment on the credit card debt through December 2019. Chen promised Abittan that she would arrange to have the debt paid by December 31, 2019. Relying on those representations, Abittan agreed to make full payment to American Express by that date. Specifically, Abittan hired Chesky Monk to negotiate a payment agreement with American Express to dispose of the debt and resolve the lawsuit against Abittan pertaining to that debt.

115.    Chen, however, had no intention of honoring her promise. Instead, she asked Abittan to fly to California to meet with her and a "rich" and "powerful" friend who was supposedly an experienced investor worth hundreds of millions of dollars. According to Chen, that friend was going to somehow take care of the credit card debt in conjunction with an investment into Findora.

116.    On December 29, 2019, Abittan flew to the Bay Area and was instructed to meet Chen at a restaurant called Dim Sum King in Daly City. Ding and Chen's whole family were there, including Selena Chen, and the supposedly powerful businessman, named Yang Yang. Chen presented Abittan with a separation agreement whereby Abittan would be paid $190,000 in exchange for separating from Eian. The counter-signatory on the separation agreement was to be Xilei Wang—a strawperson whom Chen and Ding had previously entrusted to act as their agent. Abittan refused to sign the agreement and told Chen to pay him back the credit card debt either using some of the money from the $50,000,000 investment she claimed she had secured or by taking out a loan.

117.    Ultimately, Chen did not pay the American Express debt by December 31, 2019 as promised. Abittan was forced to make a payment of $183,982.21 so that his ongoing business RealTime would remain in good standing. Abittan was later served with a New York complaint by

- 23 -

American Express regarding a $365,622.60 outstanding balance on the Project Revolution account. That action remains pending. Likewise, the $85,552.31 debt on the Chase credit card for JVI remains unresolved. In addition, Abittan incurred approximately $23,000 in business expenditures (like Abittan's flights and hotel stays for Findora work) that have not been reimbursed as promised.

118.     Chen and Ding also eliminated Abittan's rightful access to the business, while lying to Findora's executives and employees about Abittan's absence. Defaming Abittan, Chen told Lu and Fisch that Abittan had made false promises to investors and that his departure from Findora and sporadic subsequent appearances were no cause for alarm. Chen falsely told investors and employees that Abittan was not a major owner of Findora and that Abittan was lying when he claimed to be a founder.

119.     Meanwhile—in text messages with Abittan and his father from January through June 2020—Ding and Chen made additional misrepresentations. They repeatedly admonished Abittan not to share information with anyone at Findora, particularly with Lu and Fisch. On information and belief, Ding and Chen knew that they had made materially misleading and inconsistent statements to Abittan, on the one hand, and to Lu and Fisch on the other hand. Therefore, communications between Abittan, Lu, and Fisch were likely to reveal Ding and Chen's misconduct and fraud. Chen ultimately blocked messages from Abittan but continued to take messages and have phone calls with Abittan's father.

120.     By September 2020, employee dissatisfaction at Findora had escalated due to concerns over a lack of transparency and (accurate) beliefs that Ding and Chen were engaging in misconduct.

121.     Ultimately, as a result of concerns about how Findora was being run, the majority of the Findora engineering team, including its Chief Executive Officer and Chief Technology Officer, resigned.

122.     At the same time, Abittan's father called Chen and demanded that she call Abittan to work things out. Abittan's father suggested that, if she did not, Abittan would have no recourse aside from litigation.

- 24 -

**K. Abittan Begins to Discover the Extent of the Fraudulent and Illicit Conduct by Chen, Ding, and Their Co-Conspirators**

123.    Abittan subsequently discovered that Chen, Ding, and their Co-Conspirators had engaged in ongoing illicit, fraudulent, and racketeering conduct, ultimately harming Abittan. Abittan discovered these facts through an ongoing investigation into Chen and Ding, speaking with former Findora executives and employees, and reviewing documents filed in this litigation and the related federal litigation.[3]

i.    Fraudulent Documents

124.    Chen had fraudulently induced Abittan to sign documents that Chen and Ding (and their co-conspirators) then used to purportedly transfer Eian's assets—which are not identified with specificity, but which Chen and Ding led everyone to believe meant Findora's name and blockchain technology—to a new company called Temujin Labs Inc. But—in addition to the fraudulent inducement—the documents were sloppy and inconsistent. On July 2, 2019, Chen and Ding created two entities with identical names: (1) Temujin Labs Inc. in Delaware ("Temujin DE"); and (2) Temujin Labs Inc. in the Cayman Islands ("Temujin Cayman").

125.    Chen and Ding have now produced a "Unanimous Action of Members" ("UAM"), dated July 3, 2019, stating that Eian owed $300,000 to Temujin Labs Inc. but lacked "sufficient assets" to repay that debt. The document then purports to authorize Eian to sell its assets to Temujin Labs Inc. for $1 and a discharge of the $300,000 debt. Cross-Defendants have not explained the following inconsistencies:

- In federal filings, the defendants have repeatedly stated that Temujin Delaware and Temujin Cayman are distinct entities (*see* Temujin DE's Motion to Dismiss at 12) yet the UAM does not specify which Temujin Labs Inc. was owed the $300,000 debt from Eian.

---

[3] The related federal litigation was filed by Abittan against Chen, Ding, Temujin DE and Temujin Cayman in the Northern District of California, 5:20-CV-09340-NC (the "Federal Action").

- 25 -

- It is unclear how or why, on July 3, 2019, Eian owed $300,000 to an entity formed one day prior on July 2, 2019.

- It is unclear why Temujin Labs Inc. would pay consideration of $300,001 to purchase Eian's assets, where the UAM states that Eian "has no sufficient assets to repay the [$300,000] Debt" to Temujin Labs Inc. Nor does the UAM identify the assets being sold with any specificity. In other words, the UAM states that Temujin Labs Inc. is providing $300,001 in exchange for nothing.

- On its face, the UAM purports to be signed by 2 members of Juniper Venture Partners LLC (Eian Labs' majority owner): (1) Fourhair LLC; and (2) Ariel M. Abittan. The signatory for Fourhair LLC was Guanghua Liang as CEO. But Ding and Chen have never introduced Abittan to Guanghua Liang or otherwise confirmed that person's identity;

- There is no text showing that the first page with substantive provisions was actually affixed to the signature page. Both pages lack page numbers, and the signature page lacks any text other than the date and signature blocks.

- Cross-Defendants have not produced an original copy of the UAM.

- The UAM states that "Eian Labs is authorized to enter into a settlement and mutual release agreement as well as asset purchase agreement with the Creditor, the forms of which are set forth on Exhibit A attached here to." However, counsel for Temujin Cayman, Temujin DE, Chen, and Ding filed with the federal court a copy excluding the referenced "Exhibit A" and have never produced another copy with the Exhibit A.

- On its face—and without the missing "Exhibit A"—the UAM is not a sales agreement and does not effect a transaction between Temujin Labs Inc. and Eian. Rather, it authorizes a transaction pursuant to other papers.

126.    Furthermore, in lieu of the missing "Exhibit A"—which should be a settlement and mutual release agreement and asset purchase agreement—Temujin DE filed in the Federal Action

- 26 -

an "Intellectual Property Sale Agreement" ("IPSA") between Eian as seller and Temujin Cayman as purchaser. That document contradicts the "UAM" in multiple ways:

- The IPSA is dated August 12, 2019, without any explanation as to why it was not attached to the UAM or as to the inconsistent dates.

- The metadata of the IPSA indicates that it was actually drafted on December 17, 2020, more than one year **after** it was purportedly executed.

- The IPSA lists assets that Eian is selling, whereas the UAM stated that Eian lacked sufficient assets to pay a $300,000 debt to Temujin Cayman.

- Contrary to the UAM, the IPSA does not refer to any debt owed by Eian to Temujin Cayman (or Temujin DE); instead it states that Temujin Cayman would pay $300,000 to Eian in exchange for Eian's assets, contrary to the UAM's statement that Eian lacked assets.

ii.   Obfuscating True Identities, Concealing Assets, and Evading Service of Process

127.    Throughout this multi-year scheme, Plaintiff was lulled into trusting Chen and Ding by their grandiose displays of wealth and plausible (but likely false) relationships with China's most elite businesspeople.

128.    Since litigation began, however, Plaintiff continues to uncover the extent of Chen and Ding's malfeasance, including their intentional use of false names to purportedly avoid detection by the Chinese government and service of process. In the related federal litigation, for example, Chen and Ding have attempted to restrict their counsel from using their names in any filings (even in routine stipulations), and they have suggested that Plaintiff has confusion as to their identities.

129.    But this case is **not** one of mistaken identity. Plaintiff spent thousands of hours working alongside Defendants to buy and sell high-value watches, seek and obtain millions of dollars from investors, recruit prestigious cryptographers, and build a successful fintech company. Hundreds of these hours were spent face-to-face—most frequently at Defendants' house located at

- 27 -

69 Isabella Ave.—with numerous witnesses present, including employees and Defendants' own children.

130.    Until their relationship soured in 2020, Ding and Chao frequently invited Abittan to their home, 69 Isabella Ave—a house worth nearly $25,000,000. On approximately twenty (20) separate occasions, Abittan spent the night at 69 Isabella Ave., and sometimes brought his wife and children. Each time Abittan visited, Ding and Chen were present at their home, which they shared with their two young children; Chen's sister, Selena Chen; and their long-time driver, Jianrong Wang. Ding and Chen's children attended Sacred Hearts Schools, Atherton, located just one mile from 69 Isabella Ave. At all times, Ding and Chen held 69 Isabella Ave. out as their primary residence, always referring to it as their house when speaking with Abittan.

131.    Ding and Chen frequently hosted work sessions at their house, during which time Chen referred to 69 Isabella Ave. as "the Clubhouse." In reality, the Clubhouse was just another display of wealth that lured Abittan and others into trusting in Chen and Ding's representations of business acumen and connections. The Clubhouse was a central tool in their fraudulent scheme to convince numerous sophisticated people into working for substantially less than they bargained for and signing away rights to Findora in exchange for equity in an empty company, Eian.

132.    Despite Abittan's close relationship with Chen and Ding, they have since contended in the Federal Action that he suffers from a confusion of identities—a confusion that exists, if at all, as a direct result of Ding and Chen's misidentification tactics. And yet, while hiding from litigation by Abittan, Chen and Ding acted as the "principal client representatives" of Temujin DE to file specious litigation against Abittan and others in this court. Upon information and belief, Temujin DE serves no other purpose, other than acting as the plaintiff in this meritless litigation. Specifically, Abittan has never entered into any contracts with Temujin DE and, by their own admission, Temujin DE has never had any interest in Findora.

133.    Abittan has subsequently discovered that 69 Isabella Ave. is owned by Nessco, which is managed by Yi Chung Yang. Chen and Ding have attempted to evade service of process in the Federal Action by arguing that 69 Isabella Ave. is owned by Nessco, and therefore, cannot

- 28 -

be their primary residence. But this argument only highlights the central role that 69 Isabella Ave. and Nessco play in Chen and Ding's fraudulent scheme. In short, Nessco provides Chen and Ding cover to run their criminal enterprise out of a mansion that is a manifestation of their purported business success. By bringing employees and investors to 69 Isabella Ave., Chen and Ding were able to immediately elicit trust from good faith investors and employees who reasonably believed that anyone with a $25,000,000 home has the wherewithal and connections to make Findora a success. Now that Chen and Ding face liability for their fraud, they have refused to acknowledge that they have ever lived at or had a connection to that property.

134.    For the avoidance of doubt, the following is a picture of Chen, with whom Abittan interacted in person for hundreds of hours:



- 29 -

135.     For the avoidance of doubt, the following is a picture of Ding, with whom Abittan interacted in person for hundreds of hours:



iii.     Creating Sham Entities to Fake Investors and Aid in the Fraudulent Scheme

136.     On September 18, 2018, Ding created at least four new entities to aid in his and Chen's theft of Findora: JV Partners, JV Holdings, Fourhair and Lakeside.

137.     Specifically, upon information and belief, Ding simultaneously created Fourhair to co-own JV Partners with Abittan, and then used JV Partners and Lakeside to further remove Abittan from Eian by backdating share purchase agreements so that Abittan was not a direct shareholder in Eian, despite the Partnership terms of co-ownership. Ding told Abittan that Lakeside was Jack Ma's

- 30 -

wife's entity and that Fourhair was owned by a Chinese investor. In reality, Fourhair, Lakeside, JV Partners, and JV Holdings were created by Ding and Chen to serve as shell companies in their criminal enterprise.

138.    Upon information and belief, JV Holdings was also used to retroactively legitimize Powerscale Capital. The mission of Powerscale Capital—which was formed on August 2, 2018 and thereafter registered with the Securities Exchange Commission ("SEC") —was to serve Findora as an investment adviser, focusing on an endowment style investment program. The "owners" of Powerscale Capital, according to the fund formation documents filed with the SEC, are John Powers and JV Holdings. And yet, the term sheet with John Powers says that his co-owner is JuniperVC—a reference to the Partnership between Abittan and Ding/Chen. The term sheet also references the cancellation of an employee contract with JuniperVC, but, upon information and belief, John Powers only had an employee contract with Project Revolution. The interchanging use of entity names further highlights the fraudulent tactics of Ding and Chen.

139.    Abittan also discovered that Ding and Chen tried to alter the ownership interests in JV Partners in order to finalize pushing Abittan out of Findora. Upon information and belief, Ding and Chen forged Abittan's signature on a document titled "Amendment No. 1 to Operating Agreement" ("Amendment"). The Amendment purported to admit a new majority member to JV Partners—Yang Yang—for a $4,000 capital contribution. In essence, Abittan was purportedly diluting his interest in JV Partners from 50% to 33.3%, in exchange for nothing.

140.    Upon information and belief, there are at least three other entities that Ding and Chen formed, which have been used as part of Ding and Chen's scheme, specifically: (1) Black Cobble Rideshare Funding LLC, which Ding had Abittan form as the sole member; (2) Powerscale Capital Fund LP, which was formed in the Cayman Islands in connection with Powerscale Capital Management LLC; and (3) Smart Investment Fund LLC, which was purportedly formed in connection with a trademark application by Ding and Chen's driver, Jianrong Wang using an Eian email address. Upon information and belief, these entities were formed and utilized by Ding and

- 31 -

Chen as shells created for the purpose of hiding Ding and Chen's identities and assets to avoid the consequences of their fraud.

        iv.  <u>Lying to Investors and Current and Former Findora Employees While Denying Abittan's Role in Findora</u>

141.    Ding and Chen lied to anyone and everyone in order to continue and hide their fraud. After they shut Abittan out of Findora, took away his access to his emails, and removed him from the Findora website, Ding and Chen (or one of their agents) reported Abittan's LinkedIn profile—which identified Abittan as the Founder and President of Findora—for containing "inaccurate information." As a result of Ding and Chen's false report, LinkedIn removed the Findora information and titles from Abittan's profile.

142.    As Abittan's hires began leaving in droves, investors started asking questions.

143.    One potential investor asked: "What about the resignation of Findora's three Stanford founders." The operator of the @findoraen account replied: "We don't have 3 Stanford founders on resignation." In reality, more than a dozen members of the engineering team (including the Stanford co-founders) had departed Findora.

144.    Another potential investor responded: "someone claims that they have left the team." The owner of @findoraen replied: "Two cofounders Stanford phd students." Of course, as Cross-Defendants' own judicial admissions reveal, these individuals were not just students, but were in fact the CEO and CTO/Chief Scientist of the company. The response does not mention the fact that the vast majority of Findora employees, including these co-founders and the majority of the engineering team had quit because of Chen and Ding's obvious fraudulent conduct.

145.    A potential investor replied: "student? lol." The owner of @findoraen replied: "John Powers, Stanford MBA and former CEO SMS, passed away this year unfortunately. He is a class act and we remember him for ever! [sic] We have Paul Scherer, Stanford MBA and executive on iNDORA [sic] FOUNDATION. He is active and healthy." This was a non-sequitur meant to deceive investors into thinking that despite the departures of the most essential Findora employees, the truly important individuals from Stanford remained.

- 32 -

146.     A potential investor responded: "I suggest official announcement from the team to calm investors down as many are claiming now core members of FINDORA quite [sic] the project." A Findora representative responded: "Not true. And we will. We don't really want to make an announcement too soon. Let's have this rumor fly for a while [sic]: it's a strong PR to draw attention." This was blatantly false given that the CEO, CTO and Chief Scientist, and engineering team had departed, yet Findora representatives have repeatedly told investors that these individuals were not part of the "core" team.

147.     The owner of @findoraen then reminded investors that the two Stanford Ph.D.'s previously mentioned were just students, before stating: "We have real engineering teams of engineers and cryptographers and application developers"—as if to cast the departure of the most important Findora employees as two summer interns leaving while the remainder of the team remained intact.

148.     In another mid-December 2020 Telegram thread, one potential investor stated: "I am ready to purchase option D but you have no [sic] clarified who the co founders [sic] are?" A Findora representative responded by pointing the investor to info.findora.org. The potential investor responded: "But when looking at other findora sources [d]ifferent co founders [sic] come up which is very confusing[.] I am interest [sic] in the project just wanted to clarify this before buying. Findora co-founders (and Stanford cryptographers), Ben Fisch and Benedikt Bunz, together with Alan." A Findora representative responded: "thanks for your concerning [sic] our team and our team have [sic] been updating and re-construction [sic]." As described above, this response was false and misleading.

149.     The potential investor responded: "So the other guys are they still there in the team or not[,] Ben F and Benedikt[?]" Chen responded directly: "I think if you want to build the best projects,you [sic] need to find the best person and the best team members.so [sic] team members upgrade [sic] to the best one. They [referring to Ben and Benedikt] are PHD students.their [sic] priority should be their research.J they are not with Findora." This was false and misleading for the same reason that the Findora representative's statements above were false and misleading.

- 33 -

150.    At no point have the operators of the Findora Telegram account made any mention of the reason why Lu, Fisch, Bunz, and others left. Instead, they sought to create a false narrative that the reason these employees left was to focus on their studies at Stanford. They have also allowed another false (and inconsistent) narrative to propagate the feed, which is that the real reason Lu, Fisch, and others left Findora was to found a competing company, as detailed in the specious complaint Defendant Temujin filed against Abittan, Lu, and Fisch in Santa Clara County.

151.    Many other potential investors have also been concerned. One asked: "What happened to the stanford crypto guys like Ben en [sic] benedict?" Another asked: "What has changed since the Stanford people left[?]" And these are just a small sampling of a continuing dialogue on the @findoraen telegram account.[4] Findora never revealed the truth to these potential investors either and simply sought to perpetuate the falsehood that Findora was a legitimate company with an all-star team of highly respected and honest cryptographers.

152.    Anytime any person questioned why Abittan or other employees left Findora, Ding and Chen (or one of their agents) deleted the question and blocked the user from the Telegram channel.

153.    In addition to lying to investors, Chen and Ding embezzled investor money.

154.    On information and belief, Chen directed members of Findora's team in China to wire significant sums of money to an e-commerce company called Xipin Group ("Xipin"). U.S. management that they were not aware of any legitimate purpose for these transactions. Neither Abittan nor anyone else to Abittan's knowledge was aware of any legitimate purpose for these transfers.

155.    On information and belief Chen controls Xipin either directly or indirectly. The Xipin website contains some overlap with prior Findora employees, including Paul Scherer – who is listed as Chief Strategy Officer under the alias Paul Xie. [5]

---

[4] Defendants' fraud has become apparent to the outside world, as a recent Chinese-language exposé revealed. See https://fdhdtcuzqg5elz7fa3omssakmq-adwhj77lcyoafdy-zhuanlan-zhihucom.translate.goog/p/337834014.
[5] https://mp.weixin.qq.com/s/k6XLrUAY4G_GWi0xCz6eBQ

156.   Abittan is informed and believes and thereon alleges that Chen raised millions of dollars on behalf of Findora in private financings, which she then transferred to a personal Binance account. Chen did not seek authorization from Temujin's CEO or from Abittan for the unauthorized transfer.

157.   Abittan is informed and believes and thereon alleges that Chen also directed Powerscale to invest $5,000,000 in Xipin. Although JV Holdings (or JuniperVC) is the majority owner of Powerscale, Chen and Powerscale never informed Abittan of this transaction, which he learned about from third parties. Abittan never authorized this transaction and is not aware of JVI, JV Holdings, or Juniper VC having authorized it.

### v.   Obtaining a Covid PPP Loan for Temujin DE

158.   Chen and Ding also used their sham entities to steal money from the government during the Covid 19 crisis by improperly and fraudulently applying for a Paycheck Protection Program ("PPP") loan.

159.   On April 11, 2020, Temujin DE applied for and received a PPP loan in the amount of $383,637.

160.   On March 31, 2021, Temujin DE applied for and received a PPP loan in the amount of $208,370.

161.   Upon information and belief, Temujin DE did not and could not have legitimately qualified for either PPP loan. Upon information and belief, Temujin DE did not have any employees and did not have a 25% reduction in gross receipts. Therefore, the money was not necessary for Temujin DE's continued operation.

### ALTER EGO / COMMON ENTERPRISE LIABILITY

162.   As detailed above, Chen and Ding created at least the following entities as part of their fraudulent scheme to steal Findora and embezzle millions from Abittan and other investors (referred to hereafter as the "Common Enterprise Entities"):

   a.   JVI

   b.   Project Revolution

- 35 -

c. Eian

d. Powerscale

e. JV Holdings

f. JV Partners

g. Lakeside Garden

h. Fourhair

i. Temujin DE

j. Temujin Cayman

k. Smart Investment Fund

l. Powerscale Capital Fund

m. Black Cobble Rideshare Funding

n. Nessco

163.    Despite using strawpersons, including, but not limited to, Guanghua Liang, Yang Yang, Jianrong Wang, Xilei Wang,  Selena Chen, Yi Chung Yang, and Alex Wang (who Ding even admitted to Abittan was not a real person) (the "Common Enterprise Agents") to effectuate their fraud, Ding and Chen controlled the Common Enterprise Entities.

164.    Upon information and belief, Chen and Ding's common enterprise used only one bank account in the name of JVI and two credit cards in JVI's and Project Revolution's names. The entities all commingled employees, officers, directors, and office space, including use of 69 Isabelle Ave. Investors sent money only to JVI, which was used to pay salaries of Project Revolution employees, in exchange for equity in Eian. None of the Common Enterprise Entities maintained corporate formalities, and upon information and belief, nearly all failed to take any steps to finalize corporate formation, such as issuing shares or executing an operating agreement. Ding and Chen repeatedly asked employees to sign contracts with multiple organizations and would often identify one entity in a contract that gave rights to a second, seemingly unrelated, entity. Ding once told Abittan that the various entities were for "internal" use only, and that no one would ever know

- 36 -

about the formation of the shells. The Common Enterprise Entities that were known, however, were all referred to colloquially as Findora. And above all, Chen and Ding controlled everything.

165.    The Common Enterprise Entities identified herein have such a unity of interest with the Partnership that their separateness has ceased and holding only the Common Enterprise Entities liable will result in injustice. The Common Enterprise Entities were a mere tool or business conduit of Chen and Ding while acting as Abittan's partners. Specifically, co-mingling of funds occurred; diversion of partnership profits to individuals or other entities occurred. The Common Enterprise Entities were inadequately capitalized. There was a failure to keep appropriate corporate records. And there was a failure to keep personal or other entity assets separate. There were representations made that the Common Enterprise Entities and the Partnership were one and the same and that they were all backed by Ding and Chen as partners with Abittan.

166.    In sum, the Common Enterprise Entities and the Partnership are a single business enterprise because they are not operated as separate entities but instead they pool their resources to achieve common goals—Findora. The Common Enterprise Entities and the Partnership had common employees, offices, centralized accounting, payment for the wages of the other entity's employees and the use of the same business name. In addition, employees of one entity provided services to the other entities, funds were transferred between the companies without sufficient documentation and profits and losses were shifted between the companies in a manner that is not properly documented.

167.    Moreover, Ding and Chen used the Common Enterprise Entities as a sham to perpetrate fraud. The Common Enterprise Entities existed simply to defraud Abittan, employees, investors, and other people by inducing them into contracts where misrepresentations were made which were material, which caused that person to enter into the contract on the basis of the misrepresentation, and which caused damage to that person.

168.    Chen and Ding caused the Common Enterprise Agents to form the Common Enterprise Entities for the express purpose of defrauding Abittan and others. At all times material to this cause of action, the Common Enterprise Agents were a principal, agent, and/or employee of

- 37 -

Chen and Ding, and were at such times, acting within the full course, scope, and authority of their positions with Chen and Ding, therefore imputing liability for their negligent and wrongful acts and resulting damages as outlined herein under, *inter alia*, the principles of respondeat superior, the law of agency, and/or the law of California.

169.    To treat each of these entities as separate—and to treat the Common Enterprise Agents separate from Chen and Ding—would result in injustice. Moreover, to allow Chen and Ding to use the corporate structure that they put into place for the precise reason of obfuscating their identities and avoiding the consequences of their fraud would be rewarding Chen and Ding's wrongdoing and bad faith conduct.

170.    Accordingly, the Common Enterprise Agents and the Common Enterprise Entities acting in concert with Ding and Chen should be held jointly and severally liable with Ding and Chen for the damages occasioned by Ding and Chen's fraudulent activities as general partners of the Abittan/Ding-Chen Partnership.

## FIRST CAUSE OF ACTION – Declaratory Judgment

### (Against All Cross-Defendants)

171.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

172.    An actual controversy has arisen and now exists between Abittan and Cross-Defendants concerning their respective rights to Findora.

173.    Abittan contends that each and every contract relating to Findora from January 2018 through present is the result of fraud, that all such contracts are void, and that Findora—both the business and the technology—is the property of a general partnership between Abittan, Ding and Chen, in which Abittan has a fifty-percent (50%) interest.

174.    Alternatively, and to the extent any other valid and binding corporate structures and entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

175.    Cross-Defendants dispute these contentions and contend that Abittan has no interest in Findora.

- 38 -

176.    A judicial declaration is necessary and appropriate at this time under the circumstances to establish all parties' respective rights to Findora.

### SECOND CAUSE OF ACTION – Breach of Partnership Agreement

### (Against All Cross-Defendants)

177.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

178.    At all times mentioned in this complaint, Abittan, Ding, and Chen entered into an oral partnership for the purpose of creating the fintech company and blockchain technology currently known as Findora. *See* Corp. Code § 16202.

179.    Pursuant to the terms of that partnership agreement, Abittan, on the one hand, and Ding/Chen, on the other hand, were respectively entitled to a 50% interest in the business and technology known as Findora.

180.    Abittan performed all conditions, covenants, and promises required to be performed by him in accordance with the partnership agreement except those excused by the actions of Cross-Defendants.

181.    Ding and Chen materially breached the partnership agreement by repudiating the existence of the partnership, denying Abittan's interest in the partnership, using the assets acquired by the partnership for their own use, and funneling the technology and business of Findora away from the partnership and into the Common Enterprise Entities using the Common Enterprise Agents.

182.    As a direct and proximate result of Cross-Defendants breaches and defaults, Abittan has been damaged in a sum according to proof at trial.

### THIRD CAUSE OF ACTION – Conversion

### (Against All Cross-Defendants)

183.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

- 39 -

184.    Findora is an asset of the Partnership formed by Abittan and Ding/Chen. Alternatively, and to the extent any other valid and binding corporate structures and entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

185.    Abittan was a partner and/or otherwise maintained a 50% interest at the time Findora began, and he was instrumental in the retainment of the cryptologists who turned the idea into the blockchain technology it is today. As such, he was in possession or had the right to immediate possession of an interest in Findora.

186.    Plaintiff is informed and believes and, on that basis, alleges that Findora has a value greater than $50,000,000.

187.    On or about July 3, 2019, Cross-Defendants' fraudulent UAM and IPSA purported to transfer Findora away from the Partnership—and/or from any other entities that were validly created and owned rights to Findora—to Temujin Cayman, one of the Common Enterprise Entities outside the reach of Abittan, for the sole purpose of converting Abittan's ownership and possessory interests in Findora and converting the property to Cross-Defendants' own use.

188.    Moreover, Ding and Chen substantially interfered with Abittan's property interest in twenty-four luxury watches for their own use and benefit by selling certain watches without Abittan's consent and by depriving him of access to the remainder of the watch business inventory.

189.    Ding and Chen also substantially interfered with Abittan's property interest in the sum of $637,000 by using that money for their own use and benefit without repaying Abittan and without his consent.

190.    Ding and Chen also substantially interfered with Abittan's property interest in $50,000 that he invested in JVI by using that money for their own use and benefit without Abittan's consent.

191.    As a direct and proximate result of Ding and Chen's conversion of Abittan's assets and interests, Abittan has incurred damages in an amount to be proven at trial.

192.    In engaging in the foregoing conduct, Ding and Chen acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

- 40 -

193.    By reason of the unlawful conversion of Abittan's property and interests, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION – Breach of Fiduciary Duty

### (Against Chen and Ding)

194.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

195.    At all relevant times, Chen and Ding, by virtue of their partnership and their conduct, had a fiduciary relationship with Abittan; owed Abittan the highest fiduciary obligations of fidelity, trust, loyalty, and due care; were required to control and operate their activities with Abittan in a fair, just, and equitable manner; and had duties to act in furtherance of Abittan's interests.

196.    To discharge these duties, Chen and Ding were required to act lawfully in conducting activities with Abittan, to act with the utmost integrity as to the dissemination of information to Abittan, and to refrain from committing acts of waste or conversion, mismanagement, self-dealing, and/or gross negligence and causing damages to Abittan or otherwise harming, impeding, or violating Abittan's interests or rights.

197.    Chen and Ding breached their fiduciary duties by, among other things, engaging in self-dealing and the conversion of corporate assets for their own personal benefit, and for the benefit of the Common Enterprise Entities that they controlled and by acting with disloyalty and faithlessness, as set forth in the allegations above, causing damages to Abittan.

198.    As a direct and proximate result of Chen's and Ding's breaches of fiduciary duty described herein, Abittan sustained serious injury and damages for which relief is sought herein, according to proof.

199.    In engaging in the foregoing conduct, Chen and Ding acted with malice, oppression, and fraud, warranting an award of punitive damages in an amount to be proven at trial.

- 41 -

**FIFT CAUSE OF ACTION - Aiding and Abetting Breach of Fiduciary Duty**

**(Against the Common Enterprise Agents and Common Enterprise Entities)**

200.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

201.    At all relevant times, the Common Enterprise Agents and Common Enterprise Entities knew that Ding and Chen were fiduciaries of Abittan and, therefore, that Ding and Chen owed Abittan fiduciary duties.

202.    Despite such knowledge, the Common Enterprise Agents and Common Enterprise Entities nevertheless aided and abetted, induced, encouraged, and assisted Ding and Chen in breaching their fiduciary duties to Abittan, by, among other things, conspiring and actively working with Ding and Chen to obtain Abittan's rights and interests in Findora in exchange for no or inadequate consideration.

203.    The Common Enterprise Agents and Common Enterprise Entities understood that these activities involved undisclosed (by Ding and Chen) self-interested transactions, in violation of Ding's and Chen's fiduciary duties owed to Abittan.

204.    As a direct and proximate result of the Common Enterprise Agents' and Common Enterprise Entities' aiding and abetting of the foregoing breaches of fiduciary duties, Abittan has been harmed in an amount to be determined at trial and will continue to be harmed until appropriate injunctive relief is granted.

**SIXTH CAUSE OF ACTION - Fraudulent Inducement**

**(Against All Cross-Defendants)**

205.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

206.    As detailed above, Cross-Defendants Ding and Chen, acting directly and through the Common Enterprise Agents and Common Enterprise Entities and/or other agents, made repeated false and fraudulent misrepresentations and omissions to Abittan regarding the contents and legal effect of the paperwork they insisted he sign on behalf of the Common Enterprise Entities

- 42 -

to form multiple corporate entities. They then used those entities to steal Findora and millions of dollars from Abittan. Specifically, Ding and Chen represented that all corporate entities formed after the partnership began would preserve the 50/50 interests of the Partnership, and that the Common Enterprise Entities were merely being used as conduits for the Partnership. Ding and Chen represented that they were not undertaking activities that would diminish Abittan's 50% interest in Findora and that they were not asking Abittan to sign documents or undertake activities that would diminish Abittan's 50% interest in Findora. Accordingly, in reliance on Chen and Ding's false representations, Abittan signed corporate documents.

207.    Ding and Chen's representations were false. In reality, the purpose of the sham companies and asset transfer documents and agreements was to divest Abittan of millions of dollars in valuable intellectual property, in exchange for zero consideration.

208.    When Ding and Chen made these material representations and omissions, they knew that the representations were false or misleading and that they had a duty to disclose the omissions and the truth to Abittan. These representations and omissions were made with the intent to defraud and deceive.

209.    Abittan reasonably relied on the material misrepresentations and omissions by his partners Chen and Ding, and such reliance was justifiable.

210.    As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

211.    Further, as a result of Cross-Defendants' fraudulent misrepresentations and Ding's and Chen's fraudulent misrepresentations and omissions, Abittan—on his own behalf and/or as partner in the Partnership—is entitled to rescission of the purported corporate documents executed in furtherance of Chen and Ding's fraudulent scheme, including the purported sale of Eian's intellectual property and other assets to Temujin Cayman.

212.    In doing the acts alleged herein, Cross-Defendants acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

- 43 -

1   **SEVENTH CAUSE OF ACTION - Unjust Enrichment**

2   **(Against All Cross-Defendants)**

3   213.   Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

4   Complaint as though fully set forth herein and alleges the following cause of action.

5   214.   As a result of their wrongful conduct, Cross-Defendants have been unjustly enriched

6   at the expense of Abittan, in the form of unjustified benefits, payments, and transfers of Abittan's

7   assets and property including, but not limited to:

8   a. $50,000 in assets that Abittan invested in JVI;

9   b. $637,000 in assets as a result of unreimbursed credit card expenditures; and

10   c. Twenty-four luxury watches worth approximately $8,000,000 (Abittan's 50% interest).

11   d. the business and technology known as Findora

12   215.   As a result of these unjustified payments and transfers of Abittan's assets and

13   property, Cross-Defendants are thereby required to make restitution.

14   216.   Accordingly, Abittan is entitled to disgorgement by Cross-Defendants of all monies

15   assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

16   **EIGHTH CAUSE OF ACTION - Accounting**

17   **(Against All Cross-Defendants)**

18   217.   Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

19   Complaint as though fully set forth herein and alleges the following cause of action.

20   218.   Abittan's partnership with Ding and Chen both through the watch business

21   (including the Watch Agreement) and through the Common Enterprise Entities entitle Abittan to

22   complete information regarding the status of his interests in those partnerships and entities.

23   219.   As described throughout this complaint, Cross-Defendants have committed various

24   fraudulent and tortious acts and breaches of fiduciary duties. These acts have damaged Abittan and

25   unlawfully enriched Cross-Defendants.

26   220.   Abittan cannot determine the amount he is owed without an accounting, however,

27   because Cross-Defendants have exclusive custody over the books, records, and accounts that show

- 44 -

28

the status of all of the remaining and sold watch inventory and the assets and profits derived from the intellectual property that Cross-Defendants misappropriated from Abittan and/or the Partnership. Accordingly, Abittan is entitled to an accounting.

**NINTH CAUSE OF ACTION - Civil Violations of the**

**Racketeer Influenced and Corrupt Organization Act**

**(18 U.S.C. § 1962(c))**

**(Against All Cross-Defendants)**

221.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

222.    Each Cross-Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

223.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners, Eian, Fourhair, Lakeside, Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE, Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang, formed an association-in-fact, whose joint and common purpose was to defraud investors, business partners, Findora's executives and employees, and third parties. All Cross-Defendants received misappropriated monies and intellectual property, including but in no way limited to those referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

224.    Cross-Defendants exercised control over the numerous related individuals and entities that their enterprise consists of. Ding and Chen ultimately controlled and managed the operations of the entire association-in-fact and personally directed the day-to-day operations of its related entities as described above.

225.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce. The interstate nexus includes but is

- 45 -

1  not limited to the transfer of funds to multiple persons and entities in New York, California, and

2  elsewhere.

3      226.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners,

4  Eian, Fourhair, Lakeside,  Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE,

5  Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex

6  Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang were each associated with

7  the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct

8  of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18

9  U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

10     227.    Ding and Chen formed a scheme to defraud Abittan of his assets whereby they

11 induced Abittan to invest money in JVI, sign documents purporting to transfer intellectual property

12 from Eian to Temujin for inadequate consideration, invest in transactions for high-end luxury

13 watches, and solicit investments from Abittan's family and friends.

14     228.    In furtherance of this scheme, Ding and Chen used or caused to be used interstate

15 wire communications in violation of 18 U.S.C. § 1343. Cross-Defendants initiated and received

16 multiple transfers of Abittan and investor funds across state lines via the use of wires including but

17 in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113,

18 117, 124-26, 153-57, and 159-60. Ding and Chen, and others, also communicated materially false

19 statements and deceitfully omitted material facts to Abittan and others via the use of wires including

20 but in no way limited to the communications and omissions referenced in paragraphs 42- 44, 49,

21 55, 67, 72, 77, 79, 83, 89, 92, 95, 108, 111, 113, 124, and 136-61.

22     229.    . Each of these wire communications, omissions, and transfers of Abittan and

23 investor assets satisfies the transmission "by means of wire, radio, or television communication"

24 element for wire fraud.

25     230.    In furtherance of this scheme to defraud, Ding and Chen used or caused to be used

26 the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341. Ding

27 and Chen initiated and received multiple transfers of funds across state lines via the use of the mails,

- 46 -

including but not limited to the transfers referenced in paragraphs 5, 7, 42. 43, 44, 55, 80, 81, 90, 126, 127, 154, and 157. Each of these transfers of Abittan and investor assets to out-of-state entities satisfies the "use of the mail" element for mail fraud.

231.    In furtherance of this scheme to defraud Abittan of his money or property having a value of $5,000 or more, Cross-Defendants initiated and received multiple transfers that caused Abittan's funds (as well as the funds of others) to travel or be transported in interstate commerce in violation of 18 U.S.C §§ 2314 and 2315, including but in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

232.    By reason of Ding and Chen's violation of 18 U.S.C. § 1962(c), Abittan suffered injury in an amount to be determined at trial.

233.    Pursuant to 18 U.S.C. § 1964(c), Abittan is entitled to treble damages.

234.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

235.    Abittan additionally seeks the return/restitution of any assets from Cross-Defendants' entities or subsidiary entities or other alter ego entities controlled by Cross-Defendants that received misappropriated funds, including entities that were dissolved and had their assets disbursed by Cross-Defendants and/or the entities they control.

**TENTH CAUSE OF ACTION**

**Conspiracy to Commit Civil Violations of the**

**Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. § 1962(d))**

**(Against All Cross-Defendants)**

236.    Abittan hereby incorporates the allegations of paragraph 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

237.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners, Eian, Fourhair, Lakeside,  Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE, Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex

- 47 -

Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 169 to 182 above.

238.    By reason of violation of 18 U.S.C. § 1962(d) committed by Cross-Defendants, Abittan suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

239.    Pursuant to 18 U.S.C. § 1962(c), Abittan is entitled to treble damages.

240.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## ELEVENTH CAUSE OF ACTION - Fraud

### (Against All Cross-Defendants)

241.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

242.    As detailed above, Ding and Chen, acting in their own capacities and on behalf of the Common Enterprise Entities in certain instances made repeated false and fraudulent misrepresentations and omissions to Abittan regarding:

a.  credit card expenditures on Abittan's cards, including that the cards would be used for business purposes; that if they were used for personal purposes, that Chen would reimburse Abittan for all expenditures on these cards; and that cards issued for Lu, Fisch and others would be used by those individuals;

b.  the watch business, including that Abittan would be paid 50% of all proceeds from watches; that Abittan would have a say in the sale or transfer of any watch; and that Abittan would have access to the watches at all times;

c.  use of funds that Abittan invested in the partnership via the JVI Chase account, including that these funds would be used for proper business purposes;

- 48 -

d.  that Chen was on the brink of closing deals to raise hundreds of millions of dollars for Findora from a variety of well-known individuals and entities including Jack Ma's wife, Ma Huateng, Perfect World, and others "famous guys";

e.   that Abittan's investors would be repaid within ninety days of their investment and that their investments were secure;

f.  that the transfer of Eian's assets to Temujin would not affect Abittan's or other investors' ownership rights in Findora in any way;

g.  that all (known) entities were part of and consistent with the Partnership in which Abittan always had a 50% interest; and

h.  that any and all actual or apparent authority that Ding or Chen possessed (or represented as possessing) to act for or on behalf of Abittan was used by Ding or Chen in good faith and in a permissible scope with full knowledge of and approval by Abittan;

i.  that any and all conduct by Ding and Chen in conjunction with Abittan or Findora was consistent with, and not adverse to, Abittan's interests, rights, property, and investments.

243.   These representations were false. In fact:

a.   Ding and Chen always planned to rack up hefty expenditures for both business and personal purposes on Abittan's credit cards and leave Abittan stuck with the tab, and Ding and Chen always intended to retain the credit cards authorized for other Findora team members;

b.  Ding and Chen always planned to misappropriate the remainder of the watch inventory for their own benefit and deprive Abittan of his share of proceeds and inventory;

c.  Ding and Chen always planned to siphon the money from the JVI Chase account to their own benefit knowing that they would later seek to divest Abittan of all of his valuable interest in Findora and the Partnership;

- 49 -

d.  Ding and Chen were not close to closing deals worth hundreds of millions of dollars with major players, but instead, were using those narratives to create a façade of success that they could use to perpetuate their multiple frauds on Abittan and others;

e.  Ding and Chen never planned to repay the investors or provide any of the valuable consideration they had promises, and instead, solely planned to convert the investors' money for their own uses;

f.  the intellectual property transaction between Eian and Temujin was not a paper transaction that would preserve all of Abittan's and other investors' rights;

g.  Ding and Chen formed companies for the purpose of fraudulently, improperly, and/or unjustifiably separating Abittan from Findora.

244.  When Ding and Chen made these representations and omissions, they knew that they were false. These representations and omissions were made with the intent to defraud and deceive.

245.  Abittan's reliance on Ding and Chen's misrepresentations and omissions was justifiable.

246.  As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

247.  In doing the acts alleged herein, Ding and Chen acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

**TWELFTH CAUSE OF ACTION  - Breach of Contract**

**(Against Ding and Chen)**

248.  Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

249.  Abittan, Ding, and Chen entered into an agreement ("Watch Agreement") to jointly acquire, own, and split the proceeds of high-end luxury watches in 2016.

250.  Abittan performed or substantially performed all of his obligations under the Watch Agreement.

- 50 -

251.  Ding and Chen breached the Watch Agreement by:

    a.  failing to pay Abittan his share of the proceeds of several watch sales;

    b.  failing to contribute their share of the cost to acquire certain watches, and instead purchasing those watches using Abittan's assets; and

    c.  converting the remaining watches for their own benefit without compensating Abittan.

252.  As a direct and proximate result of Ding and Chen's breaches of the Watch Agreement, Abittan has suffered damages in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION - Defamation

### (Against Ding and Chen)

253.  Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

254.  Cross-Defendants Ding and Chen made numerous false statements of purported fact regarding Abittan to Findora employees, including Lu, Fisch, Adam Goldberg and others, as well as to Findora investors, and online. Ding and Chen's false statements included oral and text message statements to these individuals that Abittan had misled the investors he brought to the table and made promises to them that he was not authorized to make, so he was truly to blame for the problems with those investors. Ding and Chen also falsely told Findora employees that Abittan's complaints about credit card issues were false, and that Abittan was the one who had made the charges at issue, not Chen. Ding and Chen also told both employees and investors that Abittan was not a partial owner or co-founder of Findora, and that Abittan was lying when he claimed to be either. Ding and Chen also told LinkedIn that Abittan was providing "inaccurate information" by listing himself as a co-founder and owner of Findora.

255.  Ding and Chen made these false statements about Abittan intentionally to control Findora employees and investors in an attempt cover up their illegitimate conduct.

256.  As a result, Abittan's reputation has been damaged in an amount to be proven at trial.

1

## PRAYER FOR RELIEF

2   WHEREFORE, Abittan requests judgment as follows:

3   a.  That Cross-Defendants, and all other persons acting in active concert or privately or in

4       participation with Cross-Defendants, be temporarily, preliminarily, and permanently

5       enjoined from the wrongful acts and conduct set forth above;

6   b.  That Abittan receive such other injunctive relief as they may request and the Court may

7       deem just and proper;

8   c.  That Cross-Defendants be required to account for all gains, profits, and advantages

9       derived from their acts of conversion and other violations of law;

10  d.  That all gains, profits and advantages derived by Cross-Defendants from acts of

11      conversion and other violations of law be deemed to be in constructive trust for the

12      benefit of Abittan;

13  e.  For an order rescinding the corporate formation documents of each Common Enterprise

14      Entity and intellectual property sale agreement;

15  f.  For an order requiring Cross-Defendants to disgorge profits earned from their unlawful

16      conduct;

17  g.  For an award of restitution, unjust enrichment, actual damages, statutory damages, and

18      compensatory damages according to proof at trial;

19  h.  For punitive and exemplary damages according to proof at trial;

20  i.  For attorneys' fees, costs of suit, and prejudgment and post judgment interest, as

21      provided under applicable law; and

22  j.  For such other and further relief as the Court deems just and proper.

23

24

## DEMAND FOR JURY TRIAL

25  Abittan hereby demands a trial by jury.

26

27

28

- 52 -

1    Dated: November 3, 2021                          **ROCHE FREEDMAN LLP**

2                                                     */s/ Constantine P. Economides*

3                                                     Constantine P. Economides (*pro hac vice*)
                                                      Brianna K. Pierce (CBN 336906)

4                                                     ROCHE FREEDMAN LLP
                                                      1 SE Third Avenue, Suite 250

5                                                     Miami, Florida 33131
                                                      Tel: (305) 971-5943

6                                                     Email: ceconomides@rochefreedman.com
                                                              bpierce@rochefreedman.com

7

8                                                     Joseph M. Delich (*pro hac vice*)
                                                      ROCHE FREEDMAN LLP

9                                                     99 Park Avenue, Suite 1910
                                                      New York, NY 10016

10                                                    Tel: (646) 970-7541
                                                      Email: jdelich@rochefreedman.com

11

12

13                                                    *Counsel for Cross-Complainant,*
                                                      *Ariel Abittan*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                    - 53 -

# EXHIBIT A

1  TYLER NEWBY (CSB No. 205790)
   tnewby@fenwick.com
2  JENNIFER BRETAN (CSB No. 233475)
   jbretan@fenwick.com
3  CASEY O'NEILL (CSB No. 264406)
   coneill@fenwick.com
4  JOSHUA PARR (CSB No. 318549)
   jparr@fenwick.com
5  FENWICK & WEST LLP
   555 California Street, 12th Floor
6  San Francisco, CA 94104
   Telephone: 415.875.2300
7  Facsimile: 415.281.1350

8  FELIX LEE (CSB No. 197084)
   flee@fenwick.com
9  FENWICK & WEST LLP
   801 California Street
10 Mountain View, CA 94041
   Telephone: 650.988.8500
11 Facsimile: 650.938.5200

12 Attorneys for Plaintiff
   Temujin Labs Inc.

13

E-FILED
11/6/2020 12:16 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372622
Reviewed By: R. Walker

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

14        SUPERIOR COURT OF THE STATE OF CALIFORNIA

15              COUNTY OF SANTA CLARA

16 TEMUJIN LABS INC.,

17            Plaintiff,

18       v.

19 ARIEL ABITTAN, BENJAMIN FISCH,
   CHARLES LU, and DOES 1-10,
20 inclusive,

21            Defendants.

22

23

24

25

**Case No.: 20CV372622**

**COMPLAINT FOR DECLARATORY RELIEF, CIVIL CONSPIRACY, TORTIOUS INTERFERENCE, BREACH OF CONTRACT, TRADE SECRET MISAPPROPRIATION UNDER CAL. CIV. CODE §§ 3426 ET SEQ., VIOLATION OF CAL. PENAL CODE 502(C), CONVERSION, BREACH OF FIDUCIARY DUTY, AND DAMAGES AND INJUNCTIVE RELIEF**

**[DEMAND FOR JURY TRIAL]**

26       Plaintiff Temujin Labs Inc. ("Temujin" or the "Company") hereby alleges for its

27 Complaint against defendants Ariel Abittan, Benjamin Fisch, and Charles Lu as follows, upon

28 information and belief:

**NATURE OF THE CASE**

This case arises in the high technology space.  Plaintiff Temujin Labs Inc. (also known as "Findora") is a successful financial technology company founded at Stanford University. Defendants are (1) an investor in an unrelated company, (2) a former consultant to the Company, and (3) a former employee.  Dissatisfied with their ability to share in Temujin's financial and operational successes, Defendants have banded together to obstruct the Company's progress while preparing to launch competing ventures.  In recent weeks, they have conspired to (a) assert a frivolous and false claim of ownership of the Company, (b) misappropriate Company trade secrets, (c) usurp and interfere with control of and access to the Company's assets, such as social media accounts, and (d) interfere with and obstruct Company relationships with investors and business partners.  Temujin is entitled to immediate injunctive relief redressing these wrongs and monetary and exemplary damages.

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Temujin Labs Inc. (Delaware) ("Temujin DE") is a Delaware corporation registered with the California Secretary of State and doing business in Santa Clara County under the name "Findora."  It is wholly owned by Temujin Labs Inc. (Cayman) ("Temujin Cayman" and together with Temujin DE, "Temujin" or the "Company"), a foreign company organized under the laws of the Cayman Islands.

2.      Defendant Ariel Abittan resides in Lawrence, New York and is a shareholder of a Delaware limited liability company called Juniper Venture Partners LLC ("JVP").  JVP is the majority shareholder of Eian Labs Inc. ("Eian") (formerly known as Porepsus Labs Inc), a Delaware corporation.  Neither Mr. Abittan, nor JVP, nor Eian holds any shares of Temujin.

3.      Defendant Benjamin Fisch is a former consultant to Temujin who resides in Menlo Park, California.  Mr. Fisch worked with Temujin pursuant to a Consulting Agreement and parallel advisory agreement, effective July 5, 2019.  He has since ended his consulting relationship with Temujin.

4.      Defendant Charles Lu is the former Chief Executive Officer ("CEO") of Temujin. Mr. Lu first joined Temujin on July 5, 2019.  He has since resigned from Temujin.  Temujin is

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

informed, believes, and thereon alleges that Mr. Lu is a resident of California, but is uncertain where he resides.

5.      Defendant Does 1 through 10, inclusive, are sued herein under fictitious names because their true names, capacities, and the extent of their involvement are unknown to Temujin at this time.  When their true names, capacities, and the extent of their involvement are ascertained, Temujin will amend this Complaint.  Temujin is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and for damages suffered by Temujin.

6.      Temujin is informed, believes, and thereon alleges that Mr. Abittan, Mr. Fisch, and Mr. Lu, (collectively, "Defendants") are each an adult residing or doing business in the state of California.

7.      Venue is proper in the County of Santa Clara because various contracts that are the subjects of this action were entered into in this county and many of the wrongful acts alleged herein occurred in this county.

## TEMUJIN AND ITS BUSINESS

8.      Temujin Cayman was incorporated in July 2019 under the laws of the Cayman Islands.

9.      Temujin DE was incorporated in July 2019 in the state of Delaware.

10.     Temujin develops software products that carry the "Findora" brand name.  One such product is the Findora Ledger.  The Findora Ledger is an online and digital transactional system.  Put simply, the Findora Ledger facilitates online transaction processing in a way that is auditable—through a public and decentralized process—but also confidential.  Because it is auditable, and yet does not sacrifice user privacy, the Findora Ledger represents a significant advancement in the digital transaction processing space.

11.     The Findora Ledger relies on blockchain-based technology.  The term "blockchain," in this context, means that transactions are verified in a decentralized manner by market participants who run software that confirms and records the transactions.  Blocks of verified transactions are periodically added to a ledger, and hence the term blockchain developed

to describe the ledger.

12.     Temujin acquired the intellectual property underpinning the Findora Ledger from Eian pursuant to an Intellectual Property Sale Agreement dated August 12, 2019 (the "IP Sale Agreement").

13.     Eian is a defunct Delaware corporation that is no longer in good standing with the Delaware Secretary of State.  Temujin is informed, believes, and thereon alleges that Eian is jointly owned by two shareholders: JVP and Lakeside Garden Heritage LLC ("Lakeside").

14.     Under the IP Sale Agreement and in exchange for consideration in the amount of $300,000, Eian sold all of its intellectual property to Temujin.  The IP Sale Agreement describes the "Acquired Assets," which became the property of Temujin pursuant to the agreement, as follows:

> All intellectual property rights that are owned by [Eian], including but not limited to all knowhow, software in both source and object code forms, drawings, designs, technology, ideas, processes, formulas, compositions, data, techniques, improvements, inventions (whether patentable or not), works of authorship, mask works, trade secrets, domain names, URLs, web sites, unique names, logos used or proposed to be used in the business, business and product development plans, market studies, financial projections, customer lists, and all other information and items relating to the business of Eian Labs, Inc., as well as any precursors, derivatives, modifications, and improvements to the same, and any related materials (including but not limited to documentation, designs, algorithms, notes, etc. related thereto).

15.     Further, the IP Sale Agreement provides that "each party consents to the personal and exclusive jurisdiction and venue of" federal or state courts located in Santa Clara County, California.

16.     Temujin is informed, believes, and thereon alleges that at the time of the negotiation and execution of the IP Sale Agreement, JVP had only two shareholders (Fourhair LLC and Defendant Ariel Abittan), and that Guanghua Liang was manager of JVP.

17.     The IP Sale Agreement was unanimously approved by Eian's Board of Directors as well as its shareholders.  Further, the IP Sale Agreement was unanimously approved by JVP's members, including Mr. Abittan.

18.     On July 3, 2019, by unanimous action of its members, JVP (acting as a shareholder

Fenwick & West LLP
Attorneys At Law
Mountain View

of Eian) authorized Eian to sell "all of its assets" to Temujin. Both of JVP's members at that time, Mr. Abittan and Fourhair LLC approved of the proposed sale.

19.     On August 10, 2019, the Board of Directors of Eian unanimously approved of the sale of "substantially all of [Eian's] assets" to Temujin.

20.     On August 13, 2019, Eian's shareholders unanimously approved of the intellectual property sale.

21.     Eian does not own any shares of Temujin DE or Temujin Cayman.

## **DEFENDANTS' INTERFERENCE WITH TEMUJIN'S BUSINESS**

22.     Despite the above transactional history – and without basis – Defendant Ariel Abittan in recent weeks has represented to co-founders and current and former employees of Temujin, including Defendants Benjamin Fisch and Charles Lu, that Mr. Abittan is the rightful owner of Temujin and/or its intellectual property, ostensibly by virtue of his stake in JVP and/or Eian.

23.     On or about October 15, 2020, Mr. Abittan represented to Temujin and its counsel that he was a majority shareholder of Temujin by virtue of his stake in Eian.

24.     Upon information and belief, Mr. Abittan has made similar representations regarding his supposed interest in Temujin and/or its intellectual property to several current and former employees, advisors, affiliates, and investors of Temujin for the purpose of obstructing Temujin from conducting its business.

25.     On or about October 21, 2020, several founders, employees, and consultants of Temujin, including Defendants Charles Lu and Benjamin Fisch and Temujin advisors Dan Boneh, Balaji Srinivasan and Rosario Gennaro, resigned from the Company.

26.     Upon information and belief, the employees and advisors who resigned on or about October 21, 2020 from their roles with Temujin were encouraged to do so by Mr. Abittan's false assertions of ownership of Temjuin and his other false and misleading representations.

27.     Temujin is informed, believes, and thereon alleges that, since the mass resignation, or in anticipation of the same, Mr. Abittan, Mr. Lu, and Mr. Fisch have acted in concert to obstruct the continued operation of Temujin's business in several ways, including but not limited

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

to the following:

    a.  Obstructing Temujin's access to its social media accounts by improperly withholding the credentials to those accounts from Temujin;

    b.  Attempting to open source and/or benefit from open-sourcing Temujin's confidential and proprietary source code;

    c.  Interfering with Temujin's relationships with its advisors, business partners, and investors; and

    d.  Soliciting Temujin employees to resign from Temujin.

### THEFT OF COMPANY SOCIAL MEDIA ACCOUNTS

28.    Temujin maintains certain social media accounts that it uses in connection with its business. Among them are: Twitter (https://twitter.com/findoraorg); YouTube (https://www.youtube.com/channel/UCkhY3HZViowhJC4UWxfqpJw); Medium (https://medium.com/@findora); Telegram (https://t.me/findoranetwork); and Discord (https://discord.gg/2wrgyEn) (collectively, the "Social Media Accounts"). Upon information and belief, Defendant Charles Lu is in sole possession of the credentials to access each of the Social Media Accounts and/or may have changed the access credentials in anticipation of his resignation.

29.    Since resigning from Temujin, Mr. Lu has refused to provide the credentials to access the Social Media Accounts to any current Temujin employee, despite the Company demanding multiple times that he return the credentials in order to restore Temujin's access to its accounts and despite promises that the credentials would be forthcoming.

30.    Rather than provide Temujin the credentials to access the Social Media Accounts, Mr. Lu claims to have taken steps to escrow the credentials with an attorney. Mr. Lu claims his actions are justified because he believes Ariel Abittan is the controlling shareholder of Temujin. In reality, however, Mr. Lu appears to be acting in concert with both Mr. Abittan and Defendant Benjamin Fisch to obstruct Temujin's ability to operate and to deny it the ability to access its Social Media Accounts, including by delay in providing Temujin with the access credentials.

### MISAPPROPRIATION AND PUBLIC DISCLOSURE OF COMPANY SOURCE CODE

31.    On information and belief, the actions of Mr. Abittan and Mr. Lu are the

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

culmination of a months-long scheme formulated jointly by all three Defendants.  Since as early as August 2020, Defendant Benjamin Fisch had proposed "open sourcing" (making available to the public through a permissive open source license) Findora source code, including the Findora Ledger and a related "Zei cryptography library" – all of which are proprietary Company software and data, that is, trade secrets.

32.     On or about August of 2020, Mr. Fisch was engaged in discussions at Findora to open source the Company's Zei cryptography library.  The Company's Board of Directors explicitly cautioned Mr. Fisch not to open source any of the Company's code or intellectual property without Board approval.  Temujin's Board never approved releasing the Company's code to open source.

33.     Despite the fact that Mr. Fisch was told to refrain from open sourcing Temujin source code, he has attempted to do just that.

34.     Specifically, Mr. Fisch has attempted to open source Temujin's proprietary source code, including the Findora Ledger and Zei cryptography library software, by publishing it online under the pretext of a regulatory disclosure.  Supposedly pursuant to export compliance regulations, on September 15, 2020, Mr. Fisch posted the code online pursuant to a highly permissive Massachusetts Institute of Technology ("MIT") license.  Upon information and belief, Mr. Fisch did so in a manner that does not suggest any bona fide regulatory disclosure purpose, but rather, suggests it was done to make the code accessible to Messrs. Fisch, Lu, Abittan and their conspirators known and unknown, who have sought to misappropriate, misuse, and capitalize on the code, which comprises Temujin's most valuable trade secrets, following these individuals' October 2020 defection from the Company.

35.     In publishing Temujin code in the manner he did, Mr. Fisch acted without authorization and with knowledge that doing so would risk diminishing the commercial value of the Findora Ledger and Zei cryptography library.

**INTERFERENCE WITH COMPANY BUSINESS AND INVESTOR RELATIONSHIPS**

36.     Messrs. Abittan, Fisch and Lu have also acted in concert to interfere with Temujin's business relationships.  Reportedly, Defendants jointly contacted one of Temujin's

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

advisors and made representations concerning Mr. Abittan's illegitimate claim to ownership of either Temujin or its intellectual property by virtue of his ownership interest in Eian, in an attempt to discourage the advisor from advising Temujin further.

37.     Temujin also understands that Messrs. Abittan, Fisch and Lu have attempted to contact at least two other advisors to Temujin in similar attempts to disrupt Temujin advisory relationships.

38.     Upon information and belief, Messrs. Abittan, Fisch, and Lu have had similar communications with other advisors or business partners of Temujin.

39.     Upon information and belief, Defendants also have jointly contacted certain of Temujin's investors, in what is believed to be an attempt to disrupt the relationship between Temujin and those investors.

40.     In each of these communications, Defendants have falsely stated and/or implied that Mr. Abittan is the actual owner of Temujin.

## FOSTERING INTERNAL DISSENT AT COMPANY

41.     Finally, upon information and belief, Messrs. Abittan, Fisch, and Lu have communicated with and continue to communicate with current and former Temujin employees regarding Mr. Abittan's supposed ownership of Temujin and/or its intellectual property in an effort to sow distrust among Temujin employees, diminish morale, and obstruct Temujin's ability to conduct its business.

42.     Upon information and belief, through these communications, Defendants have solicited several current employees to disrupt and/or defect from the Company, encouraging employees to abandon Temujin and work with Defendants to leverage and/or cause delay to the development of Temujin's proprietary software code in an effort to compete with Temujin.

43.     As a consequence of the foregoing actions by Defendants, Temujin has been damaged, including economically and tangibly.  Among other costs incurred, Temujin's business operations have been disrupted and delayed, it has been forced to incur significant attorneys' fees and others costs to combat Defendants' efforts, and it has suffered and/or will suffer lost business opportunities.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

### **FIRST CAUSE OF ACTION**

(Declaratory Relief – All Defendants)

44.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

45.     Through the above-described actions, Defendants, acting in concert, seek to usurp control of Temujin's source codes.

46.     Those codes are Temujin's property exclusively.

47.     Temujin is entitled to and seeks declaratory relief confirming that the source codes to its cryptography library and its ledger are, in fact, the exclusive property of Temujin and that neither Defendants nor any third parties are entitled to use those codes.

### **SECOND CAUSE OF ACTION**

(Civil Conspiracy – All Defendants)

48.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

49.     Through the above-described actions, Defendants, acting in concert through knowing and mutual agreement, formed a conspiracy and conspired.

50.     The purpose of the conspiracy was, in sum, to disrupt and interfere with Temujin's business operations for the sake of damaging Temujin, permitting Defendants to pursue competing ventures, and enriching Defendants unjustly.

51.     Defendants' operation of the conspiracy, through acts such as (a) publicizing Temujin's source codes without authorization, (b) fomenting dissent internally at Temujin, (c) interfering with Temujin's advisory, business, investor, and other relationships, and (d) refusing to hand over access credentials to Temujin's social media accounts, have damaged and continue to damage Temujin.

52.     As such, each Defendant is liable to Temujin on the basis of civil conspiracy, as a joint tortfeasor for all damages ensuing from the wrongs, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**THIRD CAUSE OF ACTION**

(Tortious Interference with Contract – All Defendants)

53.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

54.     Prior to the above-described actions by Defendants, Temujin had entered into numerous valid contracts with third parties, including advisors, investors, employees, and consultants.

55.     Defendants knew of the existence of those contracts.

56.     Defendants have carried out intentional, tortious acts, including false statements that Mr. Abittan owns Temjuin, designed to induce a breach or disruption of Temujin's contractual relationships.

57.     Those acts have disrupted or attempted to disrupt and/or caused actual breaches of Temujin's contractual relationships.

58.     Absent Defendants' interference, Temujin's contracts would have been performed.

59.     As a result of Defendants' interference, Temujin has been damaged, including economically and tangibly.

60.     As such, Defendants are liable to Temujin for tortious interference.

**FOURTH CAUSE OF ACTION**

(Breach of Contract – Charles Lu)

61.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

62.     On or about July 1, 2019, Temujin and Defendant Charles Lu entered into a written employment contract, whereby Mr. Lu would serve as Temujin's CEO.

63.     Among other contractual obligations Mr. Lu agree to, the employment contract stated: "During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company."

64.     The contract further stated: "You will not assist any other person or organization in

competing with the Company or in preparing to engage in competition with the business or proposed business of the Company."

65.     Temujin performed under the contract in all material respects.

66.     Through the above-described actions, Mr. Lu breached the contract, and specifically, the quoted provisions of the contract prohibiting Mr. Lu from preparing to engage in, engaging in, and assisting others to engage in activity competitive with Temujin.

67.     Mr. Lu's breaches have resulted in damage to Temujin.

**FIFTH CAUSE OF ACTION**

(Breach of Contract – Charles Lu)

68.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

69.     On or about December 1, 2019, Temujin and Defendant Charles Lu entered into a written contract titled, "Employee Invention Assignment and Confidentiality Agreement."

70.     Among other contractual obligations Mr. Lu agreed to, the contract stated: "I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment . . . that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by me for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "Assigned Inventions"), will be the sole and exclusive property of the Company."

71.     The contract further stated: "Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information."

72.     The contract further stated: "During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete

1   with, or involve preparation to compete with, the current or future business of the Company; or

2   (iii) would otherwise conflict with the Company's interests or could cause a disruption of its

3   operations or prospects."

4       73.    The contract further stated: "During my employment with the Company and for a

5   one (1) year period thereafter, I will not directly or indirectly solicit away employees or

6   consultants of the Company for my own benefit or for the benefit of any other person or entity,

7   nor will I encourage or assist others to do so."

8       74.    Temujin performed under the contract in all material respects.

9       75.    Through the above-described actions, Mr. Lu breached the contract, and

10   specifically, the quoted provisions of the contract confirming that work and inventions on behalf

11   of Temujin are Temujin's exclusive property, requiring Mr. Lu to return Temujin's property upon

12   his termination, and prohibiting Mr. Lu from competing with or soliciting employees from

13   Temujin.

14       76.    Mr. Lu's breaches have resulted in damage to Temujin.

15   **SIXTH CAUSE OF ACTION**

16   (Breach of Contract – Benjamin Fisch)

17       77.    Temujin reiterates and incorporates by reference the foregoing allegations in

18   Paragraphs 1 to 43.

19       78.    On or about July 5, 2019, Temujin and Defendant Benjamin Fisch entered into a

20   written contract titled, "Consulting Agreement," whereby Mr. Fisch would serve as a consultant

21   to Temujin.

22       79.    Among other contractual obligations Mr. Fisch agree to, the contract stated:

23   "Consultant agrees that during the term of this Agreement and thereafter it will not use or permit

24   the use of Client's Confidential Information in any manner or for any purpose not expressly set

25   forth in this Agreement, will hold such Confidential Information in confidence and protect it from

26   unauthorized use and disclosure . . . ."

27       80.    The contract further stated: "Consultant agrees that during the Term of this

28   Agreement, Consultant will not, without Client's express written consent, either directly or

Fenwick & West LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

indirectly engage in any employment or business activity that is competitive with, or would otherwise conflict with the Services rendered to, or that would otherwise interfere with the business of, the Client."

81.     The contract further stated: "Consultant agrees that during the Term of this Agreement, and for one year thereafter, Consultant will not either directly or indirectly, solicit or attempt to solicit any employee, independent contractor, or consultant of Client to terminate his, her or its relationship with Client in order to become an employee, consultant, or independent contractor to or for any other person or entity."

82.     Temujin performed under the contract in all material respects.

83.     Through the above-described actions, Mr. Fisch breached the contract, and specifically, the quoted provisions prohibiting Mr. Fisch from disclosing Temujin's proprietary information without authorization and from competing with or soliciting employees from Temujin.

84.     Mr. Fisch's breaches have resulted in damage to Temujin.

## SEVENTH CAUSE OF ACTION

(Breach of Contract – Benjamin Fisch)

85.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

86.     On or about July 5, 2019, Temujin and Defendant Benjamin Fisch entered into a written contract in the form of a letter agreement confirming and describing Mr. Fisch's role as an advisor to Temujin.

87.     Among other contractual obligations Mr. Fisch agree to, the contract stated: "All . . . knowledge, information and materials acquired [from or concerning Temujin], the existence, terms and conditions of this letter agreement, and all Designs and Materials, are and will be the trade secrets and confidential and proprietary information of the Company.  [ . . . ]  You agree to hold all such Confidential Information in strict confidence, not to disclose it to others or use it in any way, commercially or otherwise (including without limitation lecturing upon or publishing articles concerning Confidential Information), except in performing your obligations under this

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

letter agreement, and not to allow any unauthorized person access to it."

88.     The contract further stated: "You hereby represent that the obligations contemplated hereby do not, in any way, conflict with any other agreement and/or commitment on your part. You agree to inform the Company promptly and in writing if any such conflict arises."

89.     The contract further stated: "During the term in which you provide services to the Company pursuant to this letter agreement and for one year thereafter, you will not directly or indirectly solicit away any employees or consultants of the Company for your benefit or for the benefit of any other person or entity."

90.     Temujin performed under the contract in all material respects.

91.     Through the above-described actions, Mr. Fisch breached the contract, and specifically, the quoted provisions prohibiting Mr. Fisch from disclosing Temujin's proprietary information without authorization and from competing with or soliciting employees from Temujin.

92.     Mr. Fisch's breaches have resulted in damage to Temujin.

## EIGHTH CAUSE OF ACTION

(Trade Secret Misappropriation, Cal. Civ. Code §§ 3426, *et seq.* – All Defendants)

93.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

94.     Temujin's source codes and other technical, confidential and proprietary information related to Temujin's business are Temujin's "trade secrets" within the meaning of the Uniform Trade Secrets Act enacted in California Civil Code §§ 3426-3426.11.  Such information derives actual and potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

95.     Temujin has made reasonable efforts to maintain and protect the secrecy of such trade secrets, including by establishing clear and strict access and rights management to its password protected repositories and implementing a fine-grained rights delegation of access only to those for whom access is necessary and essential, and otherwise ensuring that such information

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

is password protected and restricted and that any employees or consultants with access to such information are bound by appropriate confidentiality and invention assignment agreements.

96.     Upon information and belief, Defendants, acting in concert, have misappropriated Temujin's source codes and other trade secrets by using and/or disclosing them without Temujin's authorization or consent and/or by permitting third parties to use the trade secrets without Temujin's authorization or consent.

97.     Defendants' misappropriation of Temujin's trade secrets has caused and will continue to cause Temujin substantial injury, including but not limited to lost profits and the diminution in value of its trade secrets.  In addition, Defendants have been unjustly enriched by their misappropriation of Temujin's trade secrets.

98.     Temujin is entitled to recover its actual damages from Defendants' misappropriation and/or to recover for Defendants' unjust enrichment resulting from the misappropriation.

99.     Temujin also is entitled to preliminary and permanent injunctive relief restraining Defendants' improper use and/or disclosure of Temujin's trade secrets.

100.    Defendants' misappropriation of Temujin's trade secrets is willful and malicious, and accordingly, Temujin is entitled to an award of exemplary damages and reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION

(California Penal Code § 502(c) – Charles Lu)

101.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

102.    California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), at California Penal Code Section 502(c), permits one who "suffers damage or loss by reason of a violation" of the Section to bring a private civil action.  Cal. Penal Code § 502(e)(1).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

103.    Section 502(c) states as follows:

> . . . . any person who commits any of the following acts is guilty of a public offense:
>
> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.
>
> [ . . . ]
>
> (3) Knowingly and without permission uses or causes to be used computer services.
>
> (4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.
>
> (5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.
>
> [ . . . ]
>
> (7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

104.    Temujin's Social Media Accounts and the access credentials thereto constitute "computer services," as well as a "computer, computer system, or computer network," as defined in California Penal Code Section 502(a).

105.    By knowingly and without permission accessing Temujin's Social Media Accounts, upon information and belief modifying access credentials to the accounts, usurping control over those accounts, and in denying and/or delaying Temujin access to those accounts by withholding credentials, Defendant Charles Lu violated each of the foregoing provisions.

106.    As a result, Temujin has been damaged, for which Mr. Lu is liable under Section 502(c).

## **TENTH CAUSE OF ACTION**

(Conversion – Charles Lu)

107.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

COMPLAINT                                      16                            CASE NO:

108.     Temujin is and always has been the rightful owner and sole party with the exclusive right to possession of its Social Media Accounts, and the access credentials thereto, which accounts were created in Temujin's name for its benefit.

109.     Defendant Lu, by declining to return to Temujin the access credentials to those accounts, has wrongfully and actively converted property belonging to Temujin.

110.     As a result, Temujin has been damaged, for which Mr. Lu is liable.

## ELEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Charles Lu)

111.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

112.     By virtue of his prior role as CEO of Temujin, Defendant Charles Lu owed Temujin and its shareholders the fiduciary duties of good faith, loyalty and care.

113.     Through the above-described activities, including the retention of access credentials for Temujin's Social Media Accounts following his departure from Temujin, Mr. Lu breached his fiduciary duties to Temujin and its shareholders.

114.     Mr. Lu's fiduciary breaches have proximately caused Temujin and its shareholders damage, for which Mr. Lu is liable.

## PRAYER FOR RELIEF

WHEREFORE, Temujin requests entry of judgment in its favor against Defendants Ariel Abittan, Benjamin Fisch, and Charles Lu, and Does 1 through 10, inclusive, as follows:

1.     For declaratory relief, stating and confirming that the source codes to Temujin's cryptography library and its ledger are, in fact, the exclusive property of Temujin and that neither Defendants nor any third parties are entitled to use those codes;

2.     For preliminary and permanent injunctive relief, and/or an order of specific performance, restraining and enjoining Defendants and any third parties associated with Defendants from accessing or using Temujin's source codes for any commercial purpose;

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

3.      For compensatory, special, incidental and consequential damages according to proof;

4.      For exemplary and punitive damages to the extent permitted by law;

5.      For recovery of the unjust enrichment obtained by Defendants as a result of their wrongful conduct;

6.      For an award of prejudgment interest, the costs of suit, and reasonable attorneys' fees, to the extent permitted by contract or by operation of law; and

7.      For such other and further relief as the Court may deem just and proper.


DATED:  November 6, 2020                    FENWICK & WEST LLP


                                            By:  _____
                                                 Jennifer C. Bretan

                                            Attorneys for Plaintiff
                                            Temujin Labs Inc.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

COMPLAINT                          18                    CASE NO:

1

### **DEMAND FOR JURY TRIAL**

2     Plaintiff demands a trial by jury on all jury triable claims and issues in this action.

3

4    DATED:  November 6, 2020          FENWICK & WEST LLP

5

6                     By: _____

7                           Jennifer C. Bretan

8                     Attorneys for Plaintiff
Temujin Labs Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**PROOF OF SERVICE**

I, Brianna K. Pierce, declare under penalty of perjury under the laws of the State of California, that the following is true and correct:

I am an attorney of the firm Roche Freedman LLP, counsel of record for Cross-Complainant Ariel Abittan, located in the City of Santa Monica and County of Los Angeles, State of California. I am over the age of eighteen (18) years, and not a party to the within-entitled action.  My business address is 1158 26th Street, Suite 175, Santa Monica, CA 90403.

I caused to be served the following documents:

1.  Ariel Abittan's Cross-Complaint for Declaratory Judgment, Breach of Partnership Agreement, Conversion, Breach of Fiduciary Duty, Aiding and Abetting, Fraudulent Inducement, Unjust Enrichment, Accounting, Rico Violation (18 U.S.C. § 1962(C)), Conspiracy to Commit Rico Violation (18 U.S.C. § 1962(D)), Fraud, Breach of Contract, and Defamation

I caused the above documents to be served as follows:

☑ I emailed said documents on November 3, to each of the recipients, as indicated below, following the ordinary business practice and after obtaining consent to receive service in such manner. (Indicated on the attached address list by an [E] next to the address.)

Executed on November 3, 2021, at Santa Monica, California

*/s/ Brianna K. Pierce*
Brianna K. Pierce

- 1 -

CASE NO. 20CV09340-NC

1

**SERVICE LIST**

2

Key:                        [E] Delivery by Email

3

     [E]        Jennifer C. Bretan

4
                Tyler Newby
                Casey O'Neill

5
                Fenwick & West LLP
                555 California Street, 12th Floor

6
                San Francisco, CA 94104
                Telephone: (415) 875-2300

7
                jbretan@fenwick.com
                tnewby@fenwick.com

8
                coneill@fenwick.com

9

10
     [E]        Felix Lee
                Fenwick & West LLP

11
                801 California Street
                Mountain View, CA 94041

12
                Telephone: (650) 988-8500
                Facsimile: (650) 938-5200

13
                flee@fenwick.com

14
     [E]        Edward Han

15
                Kevin J. White
                Paul Hastings, LLP

16
                1117 S. California Avenue
                Palo Alto, CA 94304

17
                Telephone: (650) 320-1813
                Facsimile: (650) 320-1900

18
                edwardhan@paulhastings.com
                kevinwhite@paulhastings.com

19

20

21

22

23

24

25

26

27

28

- 2 -