# EXHIBIT A

Constantine P. Economides (*pro hac vice*)
(Florida Bar No. 118177)
Brianna K. Pierce (CA Bar No. 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Tel: (305) 851-5997
Email: ceconomides@rochefreedman.com
        bpierce@rochefreedman.com

*Counsel for Plaintiff,*
*Ariel Abittan*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

ARIEL ABITTAN,
                    Plaintiff,
        vs.

YUTING CHEN (A/K/A TIFFANY CHEN,
A/K/A LILY CHAO), TAO DING (A/K/A
DAMIEN DING A/K/A DAMIEN LEUNG),
TEMUJIN LABS INC. (CAYMAN), and
Does 1-100, inclusive,

                    Defendants.

Case No. 5:20-CV-09340-NC


**AMENDED COMPLAINT**

Date:    February 23, 2022

Judge:   Hon. Nathanael Cousins

Plaintiff ARIEL ABITTAN ("Plaintiff" or "Abittan"), by and through the undersigned counsel, alleges as follows:

1.      This Complaint arises from a multi-year fraudulent conspiracy orchestrated by Yuting Chen (a/k/a Tiffany Chen, a/k/a Lily Chao) ("Chen"); her husband Tao Ding (a/k/a Damien Ding, a/k/a Damien Leung) ("Ding"); the numerous entities they control, including Temujin Labs Inc. (Cayman) ("Temujin Cayman"; collectively, with Chen and Ding, "Defendants"), Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC, Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Nessco Investments, LLC, Findora Foundation Ltd., and Discreet Labs Ltd.; and a coterie of Chinese nationals that played straw-

person roles in Chen and Ding's unlawful conduct, including Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang.

2. Defendants' conspiracy flies under the banner of a cryptocurrency and blockchain project currently known to the public as Findora.[1] Findora was founded by Abittan, Chen, and Ding as part of an oral and/or implied partnership formed in 2018 (the "Partnership").

3. Prior to and throughout the Partnership, Chen and Ding inspired both Abittan's loyalty and his deference, first through a watch business that required Abittan to wire millions of dollars to Chen and Ding without any written contracts and, second, through promises of unicorn-like success if Abittan followed Chen and Ding's business advice without question. And once Chen and Ding knew they had Abittan's full trust, they weaponized it to steal the Partnership's novel blockchain project—Findora—and millions of dollars from investors and Abittan. In the process, Ding and Chen defamed Abittan to countless individuals, incurred over $600,000 of debt on Abittan's personal credit, converted millions of dollars' worth of watches, and stole an additional $1,200,000 from Abittan's friends and family.

4. As part of their fraudulent scheme, Chen and Ding relied on misdirection and anonymity. While reassuring Abittan that he had an interest in all aspects of Findora, Chen and Ding fraudulently formed at least thirteen (13) entities through a series of forged contracts, false filings, and misrepresentations about ownership. They created a web of shell companies that become so unwieldy that Chen and Ding had to back date documents so that the chronology of entities would make temporal sense. They repeatedly lied about the purposes, functions, and compositions of discrete entities in their corporate web.

5. Then, in a final attempt to coopt Findora, Chen and Ding fraudulently induced Abittan to sign a single-page document that, at the time, Chen and Ding falsely claimed was a corporate formality to preserve the rights of Findora's shareholders.  Chen and Ding now contend that this single-page document represents Abittan's consent to transfer the Findora name and

---

[1] The intellectual property underlying Findora was previously known as Eian. For simplicity (and because there is also an entity named Eian Labs Inc.), all references to the intellectual property itself (also referred to as "blockchain technology" or the "coin") will use the current "Findora" name.

intellectual property from Eian Labs Inc.—the corporate entity of which Abittan believed he was at least a 39.6% beneficial owner—to a newly-created Cayman Islands entity, Temujin Labs Inc. (Cayman)—in which Abittan has no stake. In essence, Chen and Ding claim that Abittan knowingly consented to the sale of his entire technology company—believed to be valued at over $50,000,000—via a one-page document in exchange for **absolutely nothing**.

6.      In reality, however, Chen and Ding had concocted the document as a poorly conceived attempt to legitimize their theft of Abittan's ownership interest in Findora. But Chen and Ding were ultimately hoisted by their own petard. After years of misdirection and corporate tricks, Chen and Ding's tactics began to surface when they pushed Abittan out of Findora and denied the existence of the Partnership.

7.      Critically, Findora's employees, consultants, and advisors subsequently observed, and responded to, Chen's and Ding's obvious misconduct. In late 2020, Stanford cryptographers, including Findora CEO Charles Lu ("Lu"), CTO/Chief Scientist Benjamin Fisch ("Fisch"), globally renowned consultant Franklin Fu ("Fu"), and numerous other employees from the engineering team (essentially the entire company) resigned. Another well-known cryptologist, Paul Scherer, went so far as to send a cease-and-desist letter to Findora, warning them not to associate his name with the project.

8.      In sum, and as detailed below, Chen and Ding are con artists. Using charisma and lavish displays of wealth, they lure in optimistic individuals who are acting in good faith. Chen and Ding then misrepresent, misdirect, and deceive. They say whatever is necessary to induce others to provide money or other resources. To cover their tracks, they use fake names, straw-persons, and other lies about their relationships and identities. They hide their assets, even their home, using shell corporations. They have even refused to include their names on court filings. They undertake these manipulative actions to prevent accountability to their victims, including Abittan.

9.      Abittan files this lawsuit in order to: (a) recover Abittan's direct damages due to Defendants' fraudulent and unlawful conduct; (b) obtain a declaration of Abittan's rights in Findora;

1    (c) prevent Defendants from destroying, disposing of, or unlawfully using Findora's valuable

2    intellectual property; and (d) prevent Defendants from continuing to harm Abittan.

3          10.    Abittan's investigation into the matters, identities, and entities discussed in this

4    Complaint is ongoing. Abittan reserves the right to update these allegations as additional facts

5    become known.

6                                    **PARTIES**

7          11.    Plaintiff Ariel Abittan is an individual residing in Lawrence, New York. In addition

8    to—or in the alternative to—the discrete roles and interests set forth below, Abittan has a 50%

9    interest in the Partnership formed with Ding and Chen in January 2018 and has an ownership

10   interest of up to 50% in Findora.[2] According to corporate formation documents created by or on

11   behalf of Ding and Chen—purportedly for the purpose of effectuating the Partnership's interests—

12   Abittan is a shareholder of, and continuously has been a shareholder of, Juniper Ventures

13   Incorporated since January 24, 2018. Abittan is the President and a director of Project Revolution

14   Inc. Abittan is also a member of Juniper Venture Partners, LLC, which is a shareholder of Eian

15   Labs Inc (f/k/a Porepsus Inc.). Upon information and belief, as a shareholder of JVI, Abittan is also

16   a manager of Fourhair LLC, which is a member of Juniper Venture Partners LLC, which (as

17   detailed above) is a shareholder of Eian. Abittan is also a member of Juniper Venture Holdings LLC,

18   which was formed for the purpose of creating Powerscale Capital Management LLC with John

19   Powers. Abittan is also a partner in an oral and/or implied partnership with Chen and Ding formed

20   for the purpose of reselling ultra-luxury watches (the "Watch Partnership"). Abittan is the co-

21   founder of Findora.

22         12.    Plaintiff is informed and believes and, on that basis, alleges that Defendant Chen is

23   an individual residing in Atherton, California. Since 2016, Chen has been known to Abittan by at

24   least three names (Yuting Chen, Tiffany Chen, and Lily Chao), but Abittan is informed and believes

25   and, on that basis, alleges that Yuting Chen is Defendant Chen's true name. Chen is the coleader

26

27   [2] *See* Corp. Code § 16202.

28
                                    - 4 -

of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

13.     Plaintiff is informed and believes and, on that basis, alleges that Defendant Ding is an individual residing in Atherton, California. Since 2016, Ding has been known to Abittan by at least three names (Tao Ding, Damien Ding, and Damien Leung) but Plaintiff is informed and believes and, on that basis, alleges that Damien Ding is Defendant Ding's true name. Ding is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., and the agents known as Guanghua Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang and Yi Chung Yang, to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

14.     Defendant Temujin Labs Inc. (Cayman) is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin Cayman is controlled by Ding and Chen and that Temujin Cayman is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

15.     Plaintiff does not know the true names and capacities of defendants sued in this complaint as Doe 1 through Doe 100, inclusive, and therefore sues these defendants by

- 5 -

fictitious names under Section 474 of the California Code of Civil Procedure. To the extent that Tiffany Chen, Yuting Chen, Lily Chao, Damien Ding, Tao Ding, Damien Leung are not the people Abittan interacted with as fully described in this Complaint, or to the extent any such name(s) refer to multiple persons, then such person(s) are included in Does 1 through Does 100, inclusive, sued herein. Plaintiff will amend this Complaint to allege the true names and capacities of Doe 1 through Doe 100, inclusive, when ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named herein as Doe 1 through Doe 100, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

## SUBSTANTIVE ALLEGATIONS

A.  **Abittan Meets Ding and Chen Online Through a Shared Interest in High-End Luxury Watches, Which Leads to a Business Partnership**

16.     In or around May of 2016, Abittan was looking online for a particular high-end luxury watch and came across a listing that Ding, under the username "oneplustwo," had posted for the watch on The Rolex Forums. Abittan then began discussions with Ding regarding the watch.

17.     Abittan, Ding, and Chen (who claimed to be married to Ding and who at that time was going by the name Tiffany Chen) then began transacting in watches on a regular basis between 2016 and 2019.

18.     The watches consisted of high-end models of brands like Patek Philippe and Richard Mille, which can currently sell for as much as $2,500,000.

19.     The parties reached an oral partnership agreement that would work as follows. First, either Abittan or Ding or Chen would identify a high-end watch that could be acquired from retailers and then resold at a higher price. Then Abittan would contribute 50% of the cost of the watch and Ding/Chen would contribute the other 50%. Finally, Abittan and Ding would work together to resell the watch at a profit. Abittan and Ding/Chen operated as 50/50 partners in the watch business.

20.     To purchase the watches, Abittan would wire money from his business entity, RealTime NY, LLC ("RealTime"), to Wells Fargo bank accounts in the name of Yuting Chen and Tao Ding. Sometimes, Ding and Chen would pay for their portion of the watches, but as detailed

- 6 -

further below, on other occasions, Ding and Chen misused Abittan's own credit cards to pay their share. As a result of these transactions, Abittan currently co-owns twenty-four luxury watches with Ding and Chen. The total amount of principal that Abittan invested in these watches was $1,139,270.

21.    The present value of the unsold watches is nearly eight times greater than the principal value of those watches. Accordingly, Abittan's 50% interest in these watches exceeds $8,000,000.

**B.    Ding and Chen Lure Abittan into a Relationship of Trust**

22.    Through the watch business, Abittan developed a relationship of trust with Ding and Chen. Starting in January 2017, Abittan began traveling to Atherton, California to meet with Ding and Chen. During these trips, Abittan stayed in what Ding and Chen consistently claimed to be their primary residence at 69 Isabella Ave. Atherton, CA 94027 ("69 Isabella Ave.").

23.    During this time period—between May 2016 and December 2017—the parties wired millions of dollars to one another without incident.

24.    Ding and Chen routinely claimed to have access to significant familial wealth and made great displays of their money. In one instance, Chen brought Abittan car shopping and purchased two high-end luxury vehicles, one of which was a Rolls-Royce. There were approximately five such vehicles in the driveway of 69 Isabella Ave. at any given time, including multiple Bentleys, a Ferrari, and Mercedes.

25.    Chen even had a chauffeur, whose name Chen said was Jianrong Wang. On various occasions, Chen had Wang drive Abittan to destinations in and around Atherton. Because Wang did not speak English, Abittan would communicate with him through a translation application on Abittan's mobile phone.

26.    Chen repeatedly touted her supposed connections with the Chinese business elite. She claimed to be friends with Zhang Ying—the wife of Chinese billionaire and Alibaba founder, Jack Ma. Chen also claimed to have a close personal and professional relationship with Ma Huateng, founder of the seventh most valuable company in the world, Tencent. Chen bragged about meeting

- 7 -

Mr. Huateng while he was "still a poor guy." Chen also made regular references to lavish trips with other celebrities and "famous people" in the blockchain industry.

27.     Chen told Abittan that Ding had attended Harvard as an undergraduate but that he had been kicked out for getting into a fist-fight.

28.     Chen further cultivated a special relationship of apparent trust and confidence with Abittan by disclosing highly personal details in text messages, including details relating to her health, marital issues, and prior romantic relationships. On information and belief, many of these personal revelations were not true and were made solely to make Abittan believe that he and Chen had a close personal relationship that extended beyond business.

29.     In retrospect, Chen's and Ding's stories and displays of grandeur were an integral part of Defendants' fraudulent scheme.

**C.**     **The Abittan-Ding/Chen Partnership is Formed While Ding and Chen Lay the Foundation for Misidentification**

30.     By December 2017, Ding and Abittan were speaking several times a day for hours. These conversations included discussions regarding the potential use of blockchain for secure and anonymous watch transactions, as well as (ironically) fraud prevention.

31.     By January 2018, the discussions between Abittan, Ding, and Chen had expanded to a wider use case aimed at creating reliable blockchain financial infrastructure with privacy protecting transparency for use across myriad industries. From these discussions, Abittan, Ding and Chen formed the oral and/or implied Partnership to create blockchain technology.

32.     On January 22, 2018, the Partnership formed Juniper Ventures Incorporated ("JVI") to spearhead that business. Ding and Chen, however, refused to identify themselves on the incorporation documents; instead, Chen and Ding presented Abittan with an investment agreement, naming Abittan and Guanghua Liang ("Liang")—a strawman appointed by Ding and Chen to help hide their involvement—as "Founders" of JVI. Abittan and Liang were required to make a $50,000 capital contribution in exchange for 1,000,000 shares in JVI. Abittan thereafter wired $50,000 to a Chase bank account in the name of JVI.

33.     Ding and Chen always represented that JVI was their venture with Abittan as equal partners. They did not explain what role Liang was to play or why he was listed as co-founder. Abittan has never met, seen, or spoken with Liang.

34.     Chen obviously understood the inconsistency between, on the one hand, claiming to Abittan that she and Ding were Abittan's business partners while, on the other hand, making sure that her name did not appear on any of the governing documents for the entities that she and Ding created for the blockchain business. Chen's explanation to Abittan was that, to project a certain image and identity that fit with her view of Silicon Valley culture, she needed to maintain her own privacy and to keep her true identity and connection to their businesses a secret.

35.     Chen also insisted that Abittan hold himself out to the public as "Mark Graber." Chen explained to Abittan that it was "too early" for investors and employees to know their true identities. Chen also asked Abittan to change his name on his LinkedIn profile to Mark Graber and to conceal his true identity in public forums. When Abittan protested, Chen told him that this was how things worked in Silicon Valley and that, to succeed, Abittan needed to follow her instructions.

36.     Chen and Ding's use of hidden identities persisted throughout their partnership with Abittan (and still to this day). Chen routinely lied to Findora investors and employees about her relationship with Ding, claiming that Ding was her brother-in-law and not her husband. Chen told Abittan that this subterfuge was necessary due to Silicon Valley culture frowning on husband/wife relationships at work. Because Abittan's wife also worked for Findora, Chen wanted Abittan to hide his relationship with his wife.

37.     Abittan ultimately demanded to go by his real name at Findora and revealed his marital relationship with his wife to Findora employees. Ding and Chen would not do the same.

38.     Chen and Ding told Abittan that it was important to project an image of success. Accordingly, Chen leased a Ferrari for Abittan to drive when visiting Silicon Valley and told him that he needed to live in one of her luxury properties.

39.     Ding and Chen also provided Abittan with a removable subscriber identity module (commonly known as a "SIM card") and required Abittan to use a phone with that SIM card for

business purposes. Upon information and belief, Ding and Chen provided the SIM card to Abittan as another test of their control.

**D.     Ding and Chen Create Two Public-Facing Entities to Act for the Partnership**

40.     In January and February of 2018, Abittan began hiring employees for the Findora project. Abittan heavily recruited Stanford Ph.Ds., particularly those affiliated with the Stanford cryptography department.

41.     Just before Abittan's most important recruit—Stanford's John Powers—agreed to join the Partnership's blockchain project, Ding and Chen convinced Abittan that, to limit potential liability, they needed to keep the business separate from the tech (often juxtaposed as "the fund" and "the coin").

42.     Consequently, on April 13, 2018, Abittan incorporated Project Revolution as incorporator. From incorporation, and at all times, Abittan served as President and Chief Executive Officer ("CEO") of Project Revolution.

43.     Ding and Chen referred to Project Revolution as the "fund" because it was the public-facing entity of the Partnership that, *inter alia*, paid salaries, entered employee contracts, and executed leases related to Findora.

44.     Shortly after creating the fund, on July 19, 2018, Ding formed a second public-facing entity called Eian. Although the articles of incorporation reflect Abittan as the incorporator, Abittan did not sign or receive copies of that document. After the fact, Ding eventually informed Abittan that Ding had formed Eian to act as the public-facing "coin side" of the Partnership.

45.     Chen confirmed that this dual fund/coin structure would allow Abittan, Ding, and Chen to retain 100% ownership of the Findora tech, while giving employees equity in the business.

**E.     Findora is Developed by the Cryptologists Consulting with Project Revolution**

46.     Once Project Revolution and Eian were in place, Ding and Chen required high-level employees to sign two separate but seemingly related agreements.

47.     The first was a consulting agreement with the "fund"—Project Revolution—under which the consultant earned a reasonable salary in exchange for specific services rendered, such as

the development of the cryptography library or creation of Findora's open-source component. Project Revolution retained exclusive ownership of all work product arising from the consulting agreements, which included pre-signed and undated Assignment of Copyright and Assignment of Patent Application exhibits.

48.     The second agreement was an advisor agreement with Eian, under which the same consultant (now called an advisor) would receive equity in "the coin" as compensation for the unspecific service of advising the company from time to time.

49.     On information and belief, Ding and Chen used this two-agreement system to facilitate their fraud. When it behooved them, they could attempt to structure one entity as effectively insolvent, with the other entity owning Findora's lucrative technology. Therefore, they could induce sophisticated cryptologists into creating multi-million-dollar blockchain technology (Findora) in exchange for modest salaries and the promise of equity, yet they could also ensure that the equity was in a company worth nothing and owning nothing.

F.     <u>Abittan Devotes Time, Energy, and Money into Attracting Investors</u>

50.     While unaware of Chen and Ding's fraudulent corporate structure and overall unlawful scheme, Abittan continued to work on Findora.

51.     Abittan would fly from his New York home to Atherton multiple times per month to work on the venture.

52.     In addition to spearheading the recruitment of an elite team of cryptologists, Abittan also had operational responsibilities and was involved in the creation of at least one white paper, which is a common component of blockchain companies. Abittan also was involved in fundraising and investor pitches.

53.     During the same period, Ding and Chen consistently represented that they had secured or were securing investments in Findora from major players in China. For example, Chen touted a potential investment from Jack Ma's wife, going so far as to claim that Ma's wife was concerned with Abittan's availability on weekends given that Abittan observes the Sabbath.

54.     Chen also spent $70,000 on a lavish investor trip for the early investors in TRON Foundation (an entity dedicated to building infrastructure for a decentralized Internet). Chen claimed that, as a result of the trip, the investors were going to invest $230,000,000 in tokens and that it was a "done deal." However, Chen refused to show Abittan the paperwork.

55.     Chen also claimed to be close to closing a deal with Tencent CEO Ma Huateng to lead an investment round.

56.     Later, Chen touted her progress on a $50,000,000 investment.

57.     Nonetheless, in July 2018, relying on Chen's representation that she had already raised substantial amounts of money, Abittan sought to raise funds from his own network of family and friends. Abittan ultimately secured $1,200,000 in investments for Findora from five private investors. These investments took the form of Simple Agreements for Future Tokens ("SAFTs") between the investor and JVI.

58.     Pursuant to the SAFTs, the investors wired $1,200,000 into JVI's Chase bank account. In exchange for investing in JVI, the investors were promised that, if Eian—the company everyone believed held the rights to Findora's blockchain technology—had an initial coin offering ("ICO"), then their money would be converted to coins at a 70% discount to the token price. If Eian did not have an ICO, then they would receive their money back within 90 days.

59.     Findora did not issue a token within 90 days, but each of the investors decided to roll their investments into future equity or token offerings. Of course, the investors were not willing to wait forever. Eventually, the investors demanded their money back.

60.     In March 2019, responding to investor pressure, Chen flew to New York to appease the investors. She and Abittan met with three of the investors, and in an effort to buy time, Chen offered them a new deal, including a promise to return their investment with a 25% annualized return if Eian did not issue a token. To convince the investors to hold out for an equity or token offering, Chen presented the investors with a term sheet showing a $10,000,000 incoming investment from China Orient Group, at a $60,000,000 valuation for Findora.

- 12 -

61.     By that time, Abittan and Chen could point to concrete accomplishments related to Findora. The consultants under contract with Project Revolution had built an operating demo, were actively pitching Findora to funds as use cases, and had completed several white papers. Findora was just six months away from a test net. Abittan was involved in much of those accomplishments, getting weekly and sometimes daily summaries on the engineering team's progress.

**G.      As Abittan Diligently Works to Make Findora a Success, Ding and Chen Take Advantage of Abittan's Trust**

62.     Starting in early 2018, Chen directed Abittan to open multiple credit card accounts, with multiple cards issued to her and other individuals, to be used for Findora. At the outset, Chen promised Abittan that the cards would be used only for business purposes, and therefore, all expenses would be reimbursed by the Partnership.

63.     As a result of her promises, Chen obtained a credit card linked to Abittan's business account for RealTime, which was the entity previously used to wire money back and forth between Abittan, Ding, and Chen during the watch transactions.

64.     Chen soon thereafter demanded that Abittan open a Chase credit card for JVI and an American Express credit card for Project Revolution—both of which Chen promised would be used exclusively in connection with Findora. Upon information and belief, Chen and Ding then used Abittan's personal information to obtain individual credit cards in the names of Chen, Lu, Fisch, John Powers, Xu Fen Xe, Selina Chen, Ravi Chiruvolu, Eliana Abittan, and Fiona Zhang. Chen and Ding ultimately linked these cards to Abittan's personal credit.

65.     Chen represented to Abittan that the cards in Lu, Fisch, and others' names would be distributed to those individuals for business use. However, on information and belief, Chen kept and used each of the cards many times without informing these employees of the charges incurred in their names.

66.     Eventually, Chen (and her agents) began using the cards for her and Ding's personal benefit. Chen explained this—as she did in connection with corporate paperwork—by telling Abittan that, for privacy reasons, she did not want to give out her own personal identifying information to credit card companies. She also stated that needed the card because she and Ding

used to have an American Express Black Card but were cutoff when they refused to disclose certain financials in response to a financial review request from American Express. Chen promised that she would pay the personal expenses off each month.

67.    Chen, Ding, and their agents, racked up hundreds of thousands of dollars in credit card charges, the vast majority of which were not for Findora business. The charges included, but were not limited to:

• A piano for her children;

• School tuition;

• Gifts from Saks Fifth Avenue and other designer shops;

• A trip to Las Vegas;

• Fine wines;

• Doctors' offices;

• High-end restaurants;

• Taobao.com (a Chinese online shopping website);

• Costco;

• Airline tickets;

• Luxury hotels; and

• Ding and Chen's half of the investments for certain watches.

68.    On one occasion, Ding called American Express, fraudulently claiming to be Abittan, and requested that American Express increase the account's credit limit. Ding provided financial documents to support his request, which Abittan has demanded but has never seen.

69.    Ding and Chen also attempted to have Abittan open an American Express Black Card with a limitless credit line for their use. This effort entailed attempting to engage in transactions at a high enough volume on Abittan's credit cards, and making enough payments to that account, to receive an invitation from American Express Black. Chen even suggested such extreme measures as buying a house with a credit card (which turned out to be impossible).

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

Fortunately, Ding and Chen's attempt failed; otherwise, they likely would have incurred additional millions in debt under Abittan's name before being caught.

**H.**     **Abittan Demands the Return of Investor Funds and Chen Stops Paying the Credit Cards**

70.     In April 2019, Abittan demanded that Ding and Chen return money to the investors. At first, Chen agreed and requested that Abittan send her wiring information. But Chen never sent the money. Instead, Ding questioned Abittan's loyalty, asking Abittan whether he represented Findora or the investors.

71.     Ding and Chen later told Abittan that he didn't have "the stomach" to be the cofounder of a successful company if he could not handle investor complaints. Ding and Chen also stated that, if the investors wanted to sue, let them sue. According to Ding, "by the time they get through in court, we'll be so big it won't matter." Abittan understood through conversations with Ding and Chen that their glib approach to litigation was driven in part by the security and insulation they felt as a result of omitting their true names on corporate documents and in conjunction with owning assets.

72.     At the same time that Abittan demanded investor repayment, Chen stopped paying the bills for the credit cards that she had obtained in Abittan's name. The outstanding balance on the cards was approximately $637,000. Chen had not previously been late on those credit card payments, and she assured Abittan that she would make the payments soon.

73.     On May 13, 2019, Abittan and his father (on behalf of investors), flew to California to meet with Ding and Chen and resolve the investor and credit card issues. Ding and Chen blew them off. Knowing that Abittan and his father were flying back to New York the same day, Chen did not show up to meet with them as scheduled. Instead—and in what would become a pattern— Chen met them for ten minutes on the sidewalk outside of a restaurant, before they had to leave for their flight home. Chen assured Abittan and his father that she would take care of everything and purported to make a payment toward the credit card balance. However, the payment was rejected.

I.    **As a Ruse to Coopt Findora, Ding and Chen Tell Abittan They Must Transfer Eian's Assets to a Cayman Entity to Protect Investors**

74.    On July 2, 2019, Abittan again flew from New York to California. The following day, July 3, 2019, Abittan met with Chen and/or Ding twice.

75.    The first meeting was in the early afternoon. Abittan asked to meet with Chen at 11:00 a.m. Chen agreed. Although the meeting concerned Findora business and happened on a workday, Chen asked Abittan to meet her in the parking lot of a Menlo Park Safeway grocery store, explaining that she did not want to talk in the Findora office because "Charles [Lu, Findora's then-CEO] is a gossipe [sic]." Chen did not arrive at the parking lot until approximately 12:15 p.m.

76.    Chen told Abittan that Eian needed to be converted to a Cayman entity, explaining that the conversion would minimize any potential liability to investors in connection with Eian's anticipated coin sale. However, Chen did not provide Abittan with any paperwork at that time.

77.    Instead, Chen asked what time Abittan needed to go to the airport. Since Abittan had a flight back to New York scheduled for 9:45 p.m. out of San Francisco International Airport, he informed Chen that he would need to leave between 7:30 p.m. and 8:00 p.m. Accordingly, Chen said she would meet him again at about 7:00 p.m.

78.    Ding and Chen did not meet with Abittan until approximately 7:45 p.m. In a detached garage that was used as an office conference room, Chen gave Abittan a document and insisted that he sign it. Chen represented that the paperwork would not change Abittan's equity interest as a founder and owner of Findora. She also represented that the interests of the other Findora investors would not change.

79.    Abittan asked questions about the documents, but Chen created a hostile environment and got upset at the questions. Chen insisted that Abittan take her at her word that this document was to consummate a transaction that would maintain his equity interest as a founder and owner. She insisted that he sign the documents and contended that anything less would be a "betrayal of trust." Believing Chen's representations, Abittan signed the paperwork.

80.    The paperwork had signature lines for Lu, Fisch, and others. However, Chen instructed Abittan not to discuss the agreement with Lu or Fisch under any circumstances.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

81.     Chen assured Abittan that Chen would send Abittan electronic copies of the documents. She did not do so.

82.     Following this fraudulent transaction, Chen repeatedly represented to Abittan in phone calls, emails, and texts, that he continued to have a significant equity interest in Findora. For example, she continued to agree in writing that he was a major owner and co-founder of Findora.

**J.      Ding and Chen Quietly Shut Abittan Out of His Own Company, While Defrauding Abittan as to the Credit Card Debt**

83.     After fraudulently inducing Abittan into signing the July 3, 2019 paperwork, Ding and Chen set to work shutting Abittan out of his own company.

84.     In or about the first week of July 2019, Ding and Chen caused Temujin Cayman to enter into a written employment contract with Lu to serve as Temujin Cayman's (rather than Eian's) Chief Executive Officer. At around the same time, they caused Fisch to enter into a written consulting agreement with Temujin Cayman.

85.     In mid-July 2019, Ding and Chen caused a new Findora website to be put up. Abittan noticed that he was not on the new website, and asked Chen more than once to fix the issue. Chen brushed him off by insisting it was just a draft website that would be updated in due time.

86.     At about the same time, Ding and Chen cut off Abittan's access to his Eian email account. Again, Abittan informed Chen, and Chen brushed him off.

87.     As the Temujin Cayman transactions were happening, Abittan continued to demand payment of his credit debt, but Chen continued to string him along.

88.     On July 10, 2019, Chen promised in a text message that her sister Selena would make an $85,000 payment that same day. No payment ever came.

89.     On July 28, 2019, Chen promised again that she would transmit money that same day. Again, no payment ever came.

90.     In August 2019, Abittan learned of a lawsuit in New York relating to the $365,622.60 outstanding credit card debt on the Project Revolution Fund American Express account. Abittan texted Chen immediately. Chen responded that it was her priority and that she would make things right. Abittan sent Chen his bank account wiring information and a screenshot

- 17 -

showing his credit rating dropping by more than 150 points. Chen brushed Abittan off and told him not to bother her.

91.     Abittan continued to demand payment on the credit card debt through December 2019. Chen promised Abittan that she would arrange to have the debt paid by December 31, 2019. Relying on those representations, Abittan agreed to make full payment to American Express by that date. Specifically, Abittan hired Chesky Monk to negotiate a payment agreement with American Express to dispose of the debt and resolve the lawsuit against Abittan pertaining to that debt.

92.     Chen, however, had no intention of honoring her promise. Instead, she asked Abittan to fly to California to meet with her and a "rich" and "powerful" friend who was supposedly an experienced investor worth hundreds of millions of dollars. According to Chen, that friend was going to somehow take care of the credit card debt in conjunction with an investment into Findora.

93.     On December 29, 2019, Abittan flew to the Bay Area and was instructed to meet Chen at a restaurant called Dim Sum King in Daly City. Ding and Chen's whole family were there, including Selena Chen, and the supposedly powerful businessman, named Yang Yang. Chen presented Abittan with a separation agreement whereby Abittan would be paid $190,000 in exchange for separating from Eian. The counter-signatory on the separation agreement was to be Xilei Wang—a strawperson whom Chen and Ding had previously entrusted to act as their agent. Abittan refused to sign the agreement and told Chen to pay him back the credit card debt either using some of the money from the $50,000,000 investment she claimed she had secured or by taking out a loan.

94.     Ultimately, Chen did not pay the American Express debt by December 31, 2019 as promised. Abittan was forced to make a payment of $183,982.21 so that his ongoing business RealTime would remain in good standing. Abittan was later served with a New York complaint by American Express regarding a $365,622.60 outstanding balance on the Project Revolution account. That action remains pending. Likewise, the $85,552.31 debt on the Chase credit card for JVI remains unresolved. In addition, Abittan incurred approximately $23,000 in business expenditures (like Abittan's flights and hotel stays for Findora work) that have not been reimbursed as promised.

95.     Chen and Ding also eliminated Abittan's rightful access to the business, while lying to Findora's executives and employees about Abittan's absence. Defaming Abittan, Chen told Lu and Fisch that Abittan had made false promises to investors and that his departure from Findora and sporadic subsequent appearances were no cause for alarm. Chen falsely told investors and employees that Abittan was not a major owner of Findora and that Abittan was lying when he claimed to be a founder.

96.     Meanwhile—in text messages with Abittan and his father from January through June 2020—Ding and Chen made additional misrepresentations. They repeatedly admonished Abittan not to share information with anyone at Findora, particularly with Lu and Fisch. On information and belief, Ding and Chen knew that they had made materially misleading and inconsistent statements to Abittan, on the one hand, and to Lu and Fisch on the other hand. Therefore, communications between Abittan, Lu, and Fisch were likely to reveal Ding and Chen's misconduct and fraud. Chen ultimately blocked messages from Abittan but continued to take messages and have phone calls with Abittan's father.

97.     By September 2020, employee dissatisfaction at Findora had escalated due to concerns over a lack of transparency and (accurate) beliefs that Ding and Chen were engaging in misconduct.

98.     Ultimately, as a result of concerns about how Findora was being run, the majority of the Findora engineering team, including its Chief Executive Officer and Chief Technology Officer, resigned.

99.     At the same time, Abittan's father called Chen and demanded that she call Abittan to work things out. Abittan's father suggested that, if she did not, Abittan would have no recourse aside from litigation.

**K.     Abittan Begins to Discover the Extent of the Fraudulent and Illicit Conduct by Chen, Ding, and Their Co-Conspirators**

100.     Abittan subsequently discovered that Chen, Ding, and their Co-Conspirators had engaged in ongoing illicit, fraudulent, and racketeering conduct, ultimately harming Abittan.

- 19 -

1  Abittan discovered these facts through an ongoing investigation into Chen and Ding, speaking with

2  former Findora executives and employees, and reviewing documents filed in this litigation.

3                      i.   Fraudulent Documents

4          101.    Chen had fraudulently induced Abittan to sign documents that Chen and Ding (and

5  their co-conspirators) then used to purportedly transfer Eian's assets—which are not identified with

6  specificity, but which Chen and Ding led everyone to believe meant Findora's name and blockchain

7  technology—to a new company called Temujin Labs Inc. But—in addition to the fraudulent

8  inducement—the documents were sloppy and inconsistent. On July 2, 2019, Chen and Ding created

9  two entities with identical names: (1) Temujin Labs Inc. in Delaware ("Temujin DE"); and (2)

10 Temujin Labs Inc. in the Cayman Islands ("Temujin Cayman").

11         102.    Chen and Ding have now produced a "Unanimous Action of Members" ("UAM"),

12 dated July 3, 2019, stating that Eian owed $300,000 to Temujin Labs Inc. but lacked "sufficient

13 assets" to repay that debt. The document then purports to authorize Eian to sell its assets to Temujin

14 Labs Inc. for $1 and a discharge of the $300,000 debt. Defendants have not explained the following

15 inconsistencies:

16     •   In federal filings, the defendants have repeatedly stated that Temujin Delaware and

17         Temujin Cayman are distinct entities (*see* Temujin DE's Motion to Dismiss at 12)

18         yet the UAM does not specify which Temujin Labs Inc. was owed the $300,000

19         debt from Eian.

20     •   It is unclear how or why, on July 3, 2019, Eian owed $300,000 to an entity formed

21         one day prior on July 2, 2019.

22     •   It is unclear why Temujin Labs Inc. would pay consideration of $300,001 to

23         purchase Eian's assets, where the UAM states that Eian "has no sufficient assets to

24         repay the [$300,000] Debt" to Temujin Labs Inc. Nor does the UAM identify the

25         assets being sold with any specificity. In other words, the UAM states that Temujin

26         Labs Inc. is providing $300,001 in exchange for nothing.

27

28
                                   - 20 -

- On its face, the UAM purports to be signed by 2 members of Juniper Venture Partners LLC (Eian Labs' majority owner): (1) Fourhair LLC; and (2) Ariel M. Abittan. The signatory for Fourhair LLC was Guanghua Liang as CEO. But Ding and Chen have never introduced Abittan to Guanghua Liang or otherwise confirmed that person's identity;

- There is no text showing that the first page with substantive provisions was actually affixed to the signature page. Both pages lack page numbers, and the signature page lacks any text other than the date and signature blocks.

- Defendants have not produced an original copy of the UAM.

- The UAM states that "Eian Labs is authorized to enter into a settlement and mutual release agreement as well as asset purchase agreement with the Creditor, the forms of which are set forth on Exhibit A attached here to." However, counsel for Temujin Cayman, Temujin DE, Chen, and Ding filed with the federal court a copy excluding the referenced "Exhibit A" and have never produced another copy with the Exhibit A.

- On its face—and without the missing "Exhibit A"—the UAM is not a sales agreement and does not effect a transaction between Temujin Labs Inc. and Eian. Rather, it authorizes a transaction pursuant to other papers.

103.    Furthermore, in lieu of the missing "Exhibit A"—which should be a settlement and mutual release agreement and asset purchase agreement—Temujin DE filed in the Federal Action an "Intellectual Property Sale Agreement" ("IPSA") between Eian as seller and Temujin Cayman as purchaser. That document contradicts the "UAM" in multiple ways:

- The IPSA is dated August 12, 2019, without any explanation as to why it was not attached to the UAM or as to the inconsistent dates.

- The metadata of the IPSA indicates that it was actually drafted on December 17, 2020, more than one year **after** it was purportedly executed.

- 21 -

- The IPSA lists assets that Eian is selling, whereas the UAM stated that Eian lacked sufficient assets to pay a $300,000 debt to Temujin Cayman.

- Contrary to the UAM, the IPSA does not refer to any debt owed by Eian to Temujin Cayman (or Temujin DE); instead it states that Temujin Cayman would pay $300,000 to Eian in exchange for Eian's assets, contrary to the UAM's statement that Eian lacked assets.

    ii.  <u>Obfuscating True Identities, Concealing Assets, and Evading Service of Process</u>

104.    Throughout this multi-year scheme, Plaintiff was lulled into trusting Chen and Ding by their grandiose displays of wealth and plausible (but likely false) relationships with China's most elite businesspeople.

105.    Since litigation began, however, Plaintiff continues to uncover the extent of Chen and Ding's malfeasance, including their intentional use of false names to purportedly avoid detection by the Chinese government and service of process. In the related federal litigation, for example, Chen and Ding have attempted to restrict their counsel from using their names in any filings (even in routine stipulations), and they have suggested that Plaintiff has confusion as to their identities.

106.    But this case is **not** one of mistaken identity. Plaintiff spent thousands of hours working alongside Defendants to buy and sell high-value watches, seek and obtain millions of dollars from investors, recruit prestigious cryptographers, and build a successful fintech company. Hundreds of these hours were spent face-to-face—most frequently at Defendants' house located at 69 Isabella Ave.—with numerous witnesses present, including employees and Defendants' own children.

107.    Until their relationship soured in 2020, Ding and Chen frequently invited Abittan to their home, 69 Isabella Ave—a house worth nearly $25,000,000. On approximately twenty (20) separate occasions, Abittan spent the night at 69 Isabella Ave., and sometimes brought his wife and children. Each time Abittan visited, Ding and Chen were present at their home, which they shared with their two young children; Chen's sister, Selena Chen; and their long-time driver, Jianrong

Wang. Ding and Chen's children attended Sacred Hearts Schools, Atherton, located just one mile from 69 Isabella Ave. At all times, Ding and Chen held 69 Isabella Ave. out as their primary residence, always referring to it as their house when speaking with Abittan.

108.    Ding and Chen frequently hosted work sessions at their house, during which time Chen referred to 69 Isabella Ave. as "the Clubhouse." In reality, the Clubhouse was just another display of wealth that lured Abittan and others into trusting in Chen and Ding's representations of business acumen and connections. The Clubhouse was a central tool in their fraudulent scheme to convince numerous sophisticated people into working for substantially less than they bargained for and signing away rights to Findora in exchange for equity in an empty company, Eian.

109.    Despite Abittan's close relationship with Chen and Ding, they have since contended in this action that he suffers from a confusion of identities—a confusion that exists, if at all, as a direct result of Ding and Chen's misidentification tactics. And yet, while hiding from litigation by Abittan, Chen and Ding acted as the "principal client representatives" of Temujin DE to file specious litigation against Abittan and others in this court. Upon information and belief, Temujin DE serves no other purpose, other than acting as the plaintiff in this meritless litigation. Specifically, Abittan has never entered into any contracts with Temujin DE and, by their own admission, Temujin DE has never had any interest in Findora.

110.    Abittan has subsequently discovered that 69 Isabella Ave. is owned by Nessco, which is managed by Yi Chung Yang. Chen and Ding have attempted to evade service of process in the Federal Action by arguing that 69 Isabella Ave. is owned by Nessco, and therefore, cannot be their primary residence. But this argument only highlights the central role that 69 Isabella Ave. and Nessco play in Chen and Ding's fraudulent scheme. In short, Nessco provides Chen and Ding cover to run their criminal enterprise out of a mansion that is a manifestation of their purported business success. By bringing employees and investors to 69 Isabella Ave., Chen and Ding were able to immediately elicit trust from good faith investors and employees who reasonably believed that anyone with a $25,000,000 home has the wherewithal and connections to make Findora a

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

success. Now that Chen and Ding face liability for their fraud, they have refused to acknowledge that they have ever lived at or had a connection to that property.

111.    For the avoidance of doubt, the following is a picture of Chen, with whom Abittan interacted in person for hundreds of hours:



112.    For the avoidance of doubt, the following is a picture of Ding, with whom Abittan interacted in person for hundreds of hours:

- 24 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19        iii.    Creating Sham Entities to Fake Investors and Aid in the Fraudulent Scheme

20        113.    On September 18, 2018, Ding created at least four new entities to aid in his and

21  Chen's theft of Findora: JV Partners, JV Holdings, Fourhair and Lakeside.

22        114.    Specifically, upon information and belief, Ding simultaneously created Fourhair to

23  co-own JV Partners with Abittan, and then used JV Partners and Lakeside to further remove Abittan

24  from Eian by backdating share purchase agreements so that Abittan was not a direct shareholder in

25  Eian, despite the Partnership terms of co-ownership. Ding told Abittan that Lakeside was Jack Ma's

26  wife's entity and that Fourhair was owned by a Chinese investor. In reality, Fourhair, Lakeside, JV

27

28

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

Partners, and JV Holdings were created by Ding and Chen to serve as shell companies in their criminal enterprise.

115.    Upon information and belief, JV Holdings was also used to retroactively legitimize Powerscale Capital. The mission of Powerscale Capital—which was formed on August 2, 2018 and thereafter registered with the Securities Exchange Commission ("SEC") —was to serve Findora as an investment adviser, focusing on an endowment style investment program. The "owners" of Powerscale Capital, according to the fund formation documents filed with the SEC, are John Powers and JV Holdings. And yet, the term sheet with John Powers says that his co-owner is JuniperVC—a reference to the Partnership between Abittan and Ding/Chen. The term sheet also references the cancellation of an employee contract with JuniperVC, but, upon information and belief, John Powers only had an employee contract with Project Revolution. The interchanging use of entity names further highlights the fraudulent tactics of Ding and Chen.

116.    Abittan also discovered that Ding and Chen tried to alter the ownership interests in JV Partners in order to finalize pushing Abittan out of Findora. Upon information and belief, Ding and Chen forged Abittan's signature on a document titled "Amendment No. 1 to Operating Agreement" ("Amendment"). The Amendment purported to admit a new majority member to JV Partners—Yang Yang—for a $4,000 capital contribution. In essence, Abittan was purportedly diluting his interest in JV Partners from 50% to 33.3%, in exchange for nothing.

117.    Upon information and belief, there are at least three other entities that Ding and Chen formed, which have been used as part of Ding and Chen's scheme, specifically: (1) Black Cobble Rideshare Funding LLC, which Ding had Abittan form as the sole member; (2) Powerscale Capital Fund LP, which was formed in the Cayman Islands in connection with Powerscale Capital Management LLC; and (3) Smart Investment Fund LLC, which was purportedly formed in connection with a trademark application by Ding and Chen's driver, Jianrong Wang using an Eian email address. Upon information and belief, these entities were formed and utilized by Ding and Chen as shells created for the purpose of hiding Ding and Chen's identities and assets to avoid the consequences of their fraud.

- 26 -

iv.   Lying to Investors and Current and Former Findora Employees While Denying Abittan's Role in Findora

118.    Ding and Chen lied to anyone and everyone in order to continue and hide their fraud. After they shut Abittan out of Findora, took away his access to his emails, and removed him from the Findora website, Ding and Chen (or one of their agents) reported Abittan's LinkedIn profile— which identified Abittan as the Founder and President of Findora—for containing "inaccurate information." As a result of Ding and Chen's false report, LinkedIn removed the Findora information and titles from Abittan's profile.

119.    As Abittan's hires began leaving in droves, investors started asking questions.

120.    One potential investor asked: "What about the resignation of Findora's three Stanford founders." The operator of the @findoraen account replied: "We don't have 3 Stanford founders on resignation." In reality, more than a dozen members of the engineering team (including the Stanford co-founders) had departed Findora.

121.    Another potential investor responded: "someone claims that they have left the team." The owner of @findoraen replied: "Two cofounders Stanford phd students." Of course, as Defendants' own judicial admissions reveal, these individuals were not just students, but were in fact the CEO and CTO/Chief Scientist of the company. The response does not mention the fact that the vast majority of Findora employees, including these co-founders and the majority of the engineering team had quit because of Chen and Ding's obvious fraudulent conduct.

122.    A potential investor replied: "student? lol." The owner of @findoraen replied: "John Powers, Stanford MBA and former CEO SMS, passed away this year unfortunately. He is a class act and we remember him for ever! [sic] We have Paul Scherer, Stanford MBA and executive on iNDORA [sic] FOUNDATION. He is active and healthy." This was a non-sequitur meant to deceive investors into thinking that despite the departures of the most essential Findora employees, the truly important individuals from Stanford remained.

123.    A potential investor responded: "I suggest official announcement from the team to calm investors down as many are claiming now core members of FINDORA quite [sic] the project." A Findora representative responded: "Not true. And we will. We don't really want to make an

- 27 -

announcement too soon. Let's have this rumor fly for a while [sic]: it's a strong PR to draw attention." This was blatantly false given that the CEO, CTO and Chief Scientist, and engineering team had departed, yet Findora representatives have repeatedly told investors that these individuals were not part of the "core" team.

124.    The owner of @findoraen then reminded investors that the two Stanford Ph.D.'s previously mentioned were just students, before stating: "We have real engineering teams of engineers and cryptographers and application developers"—as if to cast the departure of the most important Findora employees as two summer interns leaving while the remainder of the team remained intact.

125.    In another mid-December 2020 Telegram thread, one potential investor stated: "I am ready to purchase option D but you have no [sic] clarified who the co founders [sic] are?" A Findora representative responded by pointing the investor to info.findora.org. The potential investor responded: "But when looking at other findora sources [d]ifferent co founders [sic] come up which is very confusing[.] I am interest [sic] in the project just wanted to clarify this before buying. Findora co-founders (and Stanford cryptographers), Ben Fisch and Benedikt Bunz, together with Alan." A Findora representative responded: "thanks for your concerning [sic] our team and our team have [sic] been updating and re-construction [sic]." As described above, this response was false and misleading.

126.    The potential investor responded: "So the other guys are they still there in the team or not[,] Ben F and Benedikt[?]" Chen responded directly: "I think if you want to build the best projects,you [sic] need to find the best person and the best team members.so [sic] team members upgrade [sic] to the best one. They [referring to Ben and Benedikt] are PHD students.their [sic] priority should be their research.J they are not with Findora." This was false and misleading for the same reason that the Findora representative's statements above were false and misleading.

127.    At no point have the operators of the Findora Telegram account made any mention of the reason why Lu, Fisch, Bunz, and others left. Instead, they sought to create a false narrative that the reason these employees left was to focus on their studies at Stanford. They have also

- 28 -

allowed another false (and inconsistent) narrative to propagate the feed, which is that the real reason Lu, Fisch, and others left Findora was to found a competing company, as detailed in the specious complaint Defendant Temujin filed against Abittan, Lu, and Fisch in Santa Clara County.

128.    Many other potential investors have also been concerned. One asked: "What happened to the stanford crypto guys like Ben en [sic] benedict?" Another asked: "What has changed since the Stanford people left[?]" And these are just a small sampling of a continuing dialogue on the @findoraen telegram account.[3] Findora never revealed the truth to these potential investors either and simply sought to perpetuate the falsehood that Findora was a legitimate company with an all-star team of highly respected and honest cryptographers.

129.    Anytime any person questioned why Abittan or other employees left Findora, Ding and Chen (or one of their agents) deleted the question and blocked the user from the Telegram channel.

130.    In addition to lying to investors, Chen and Ding embezzled investor money.

131.    On information and belief, Chen directed members of Findora's team in China to wire significant sums of money to an e-commerce company called Xipin Group ("Xipin"). U.S. management that they were not aware of any legitimate purpose for these transactions. Neither Abittan nor anyone else to Abittan's knowledge was aware of any legitimate purpose for these transfers.

132.    On information and belief Chen controls Xipin either directly or indirectly. The Xipin website contains some overlap with prior Findora employees, including Paul Scherer – who is listed as Chief Strategy Officer under the alias Paul Xie. [4]

133.    Abittan is informed and believes and thereon alleges that Chen raised millions of dollars on behalf of Findora in private financings, which she then transferred to a personal Binance account. Chen did not seek authorization from Temujin's CEO or from Abittan for the unauthorized transfer.

---

[3] Defendants' fraud has become apparent to the outside world, as a recent Chinese-language exposé revealed. See https://fdhdtcuzqg5elz7fa3omssakmq-adwhj77lcyoafdy-zhuanlan-zhihucom.translate.goog/p/337834014.
[4] https://mp.weixin.qq.com/s/k6XLrUAY4G_GWi0xCz6eBQ

134.    Abittan is informed and believes and thereon alleges that Chen also directed Powerscale to invest $5,000,000 in Xipin. Although JV Holdings (or JuniperVC) is the majority owner of Powerscale, Chen and Powerscale never informed Abittan of this transaction, which he learned about from third parties. Abittan never authorized this transaction and is not aware of JVI, JV Holdings, or Juniper VC having authorized it.

v.    <u>Obtaining a Covid PPP Loan for Temujin DE</u>

135.    Chen and Ding also used their sham entities to steal money from the government during the Covid 19 crisis by improperly and fraudulently applying for a Paycheck Protection Program ("PPP") loan.

136.    On April 11, 2020, Temujin DE applied for and received a PPP loan in the amount of $383,637.

137.    On March 31, 2021, Temujin DE applied for and received a PPP loan in the amount of $208,370.

138.    Upon information and belief, Temujin DE did not and could not have legitimately qualified for either PPP loan. Upon information and belief, Temujin DE did not have any employees and did not have a 25% reduction in gross receipts. Therefore, the money was not necessary for Temujin DE's continued operation.

**ALTER EGO / COMMON ENTERPRISE LIABILITY**

139.    As detailed above, Chen and Ding created at least the following entities as part of their fraudulent scheme to steal Findora and embezzle millions from Abittan and other investors (referred to hereafter as the "Common Enterprise Entities"):

    a.    JVI

    b.    Project Revolution

    c.    Eian

    d.    Powerscale

    e.    JV Holdings

    f.    JV Partners

- 30 -

1     g. Lakeside Garden

2     h. Fourhair

3     i. Temujin DE

4     j. Temujin Cayman

5     k. Smart Investment Fund

6     l. Powerscale Capital Fund

7     m. Black Cobble Rideshare Funding

8     n. Nessco

9       140. Despite using strawpersons, including, but not limited to, Guanghua Liang, Yang Yang, Jianrong Wang, Xilei Wang, Selena Chen, Yi Chung Yang, and Alex Wang (who Ding even admitted to Abittan was not a real person) (the "Common Enterprise Agents") to effectuate their fraud, Ding and Chen controlled the Common Enterprise Entities.

       141. Upon information and belief, Chen and Ding's common enterprise used only one bank account in the name of JVI and two credit cards in JVI's and Project Revolution's names. The entities all commingled employees, officers, directors, and office space, including use of 69 Isabelle Ave. Investors sent money only to JVI, which was used to pay salaries of Project Revolution employees, in exchange for equity in Eian. None of the Common Enterprise Entities maintained corporate formalities, and upon information and belief, nearly all failed to take any steps to finalize corporate formation, such as issuing shares or executing an operating agreement. Ding and Chen repeatedly asked employees to sign contracts with multiple organizations and would often identify one entity in a contract that gave rights to a second, seemingly unrelated, entity. Ding once told Abittan that the various entities were for "internal" use only, and that no one would ever know about the formation of the shells. The Common Enterprise Entities that were known, however, were all referred to colloquially as Findora. And above all, Chen and Ding controlled everything.

       142. The Common Enterprise Entities identified herein have such a unity of interest with the Partnership that their separateness has ceased and holding only the Common Enterprise Entities liable will result in injustice. The Common Enterprise Entities were a mere tool or business conduit

of Chen and Ding while acting as Abittan's partners. Specifically, co-mingling of funds occurred; diversion of partnership profits to individuals or other entities occurred. The Common Enterprise Entities were inadequately capitalized. There was a failure to keep appropriate corporate records. And there was a failure to keep personal or other entity assets separate. There were representations made that the Common Enterprise Entities and the Partnership were one and the same and that they were all backed by Ding and Chen as partners with Abittan.

143. In sum, the Common Enterprise Entities and the Partnership are a single business enterprise because they are not operated as separate entities but instead they pool their resources to achieve common goals—Findora. The Common Enterprise Entities and the Partnership had common employees, offices, centralized accounting, payment for the wages of the other entity's employees and the use of the same business name. In addition, employees of one entity provided services to the other entities, funds were transferred between the companies without sufficient documentation and profits and losses were shifted between the companies in a manner that is not properly documented.

144. Moreover, Ding and Chen used the Common Enterprise Entities as a sham to perpetrate fraud. The Common Enterprise Entities existed simply to defraud Abittan, employees, investors, and other people by inducing them into contracts where misrepresentations were made which were material, which caused that person to enter into the contract on the basis of the misrepresentation, and which caused damage to that person.

145. Chen and Ding caused the Common Enterprise Agents to form the Common Enterprise Entities for the express purpose of defrauding Abittan and others. At all times material to this cause of action, the Common Enterprise Agents were a principal, agent, and/or employee of Chen and Ding, and were at such times, acting within the full course, scope, and authority of their positions with Chen and Ding, therefore imputing liability for their negligent and wrongful acts and resulting damages as outlined herein under, *inter alia*, the principles of respondeat superior, the law of agency, and/or the law of California.

146.    To treat each of these entities as separate—and to treat the Common Enterprise Agents separate from Chen and Ding—would result in injustice. Moreover, to allow Chen and Ding to use the corporate structure that they put into place for the precise reason of obfuscating their identities and avoiding the consequences of their fraud would be rewarding Chen and Ding's wrongdoing and bad faith conduct.

147.    Accordingly, the Common Enterprise Agents and the Common Enterprise Entities acting in concert with Ding and Chen should be held jointly and severally liable with Ding and Chen for the damages occasioned by Ding and Chen's fraudulent activities as general partners of the Abittan/Ding-Chen Partnership.

### FIRST CAUSE OF ACTION – Declaratory Judgment
### (Against All Defendants)

148.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

149.    An actual controversy has arisen and now exists between Abittan and Defendants concerning their respective rights to Findora.

150.    Abittan contends that each and every contract relating to Findora from January 2018 through present is the result of fraud, that all such contracts are void, and that Findora—both the business and the technology—is the property of a general partnership between Abittan, Ding and Chen, in which Abittan has a fifty-percent (50%) interest.

151.    Alternatively, and to the extent any other valid and binding corporate structures and entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

152.    Defendants dispute these contentions and contend that Abittan has no interest in Findora.

153.    A judicial declaration is necessary and appropriate at this time under the circumstances to establish all parties' respective rights to Findora.

- 33 -

**SECOND CAUSE OF ACTION – Breach of Partnership Agreement**
**(Against Chen and Ding)**

154.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

155.    At all times mentioned in this complaint, Abittan, Ding, and Chen entered into an oral partnership for the purpose of creating the fintech company and blockchain technology currently known as Findora. *See* Corp. Code § 16202.

156.    Pursuant to the terms of that partnership agreement, Abittan, on the one hand, and Ding/Chen, on the other hand, were respectively entitled to a 50% interest in the business and technology known as Findora.

157.    Abittan performed all conditions, covenants, and promises required to be performed by him in accordance with the partnership agreement except those excused by the actions of Defendants.

158.    Ding and Chen materially breached the partnership agreement by repudiating the existence of the partnership, denying Abittan's interest in the partnership, using the assets acquired by the partnership for their own use, and funneling the technology and business of Findora away from the partnership and into the Common Enterprise Entities using the Common Enterprise Agents.

159.    As a direct and proximate result of Defendants breaches and defaults, Abittan has been damaged in a sum according to proof at trial.

**THIRD CAUSE OF ACTION – Conversion**
**(Against All Defendants)**

160.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

161.    Findora is an asset of the Partnership formed by Abittan and Ding/Chen. Alternatively, and to the extent any other valid and binding corporate structures and entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

162.    Abittan was a partner and/or otherwise maintained a 50% interest at the time Findora began, and he was instrumental in the retainment of the cryptologists who turned the idea into the

- 34 -

blockchain technology it is today. As such, he was in possession or had the right to immediate possession of an interest in Findora.

163.    Plaintiff is informed and believes and, on that basis, alleges that Findora has a value greater than $50,000,000.

164.    On or about July 3, 2019, Defendants' fraudulent UAM and IPSA purported to transfer Findora away from the Partnership—and/or from any other entities that were validly created and owned rights to Findora—to Temujin Cayman, one of the Common Enterprise Entities outside the reach of Abittan, for the sole purpose of converting Abittan's ownership and possessory interests in Findora and converting the property to Defendants' own use.

165.    Moreover, Ding and Chen substantially interfered with Abittan's property interest in twenty-four luxury watches for their own use and benefit by selling certain watches without Abittan's consent and by depriving him of access to the remainder of the watch business inventory.

166.     Ding and Chen also substantially interfered with Abittan's property interest in the sum of $637,000 by using that money for their own use and benefit without repaying Abittan and without his consent.

167.     Ding and Chen also substantially interfered with Abittan's property interest in $50,000 that he invested in JVI by using that money for their own use and benefit without Abittan's consent.

168.    As a direct and proximate result of Defendants' conversion of Abittan's assets and interests, Abittan has incurred damages in an amount to be proven at trial.

169.    In engaging in the foregoing conduct, Defendants acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

170.    By reason of the unlawful conversion of Abittan's property and interests, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION – Breach of Fiduciary Duty**
**(Against Chen and Ding)**

171.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

172.    At all relevant times, Chen and Ding, by virtue of their partnership and their conduct, had a fiduciary relationship with Abittan; owed Abittan the highest fiduciary obligations of fidelity, trust, loyalty, and due care; were required to control and operate their activities with Abittan in a fair, just, and equitable manner; and had duties to act in furtherance of Abittan's interests.

173.    To discharge these duties, Chen and Ding were required to act lawfully in conducting activities with Abittan, to act with the utmost integrity as to the dissemination of information to Abittan, and to refrain from committing acts of waste or conversion, mismanagement, self-dealing, and/or gross negligence and causing damages to Abittan or otherwise harming, impeding, or violating Abittan's interests or rights.

174.    Chen and Ding breached their fiduciary duties by, among other things, engaging in self-dealing and the conversion of corporate assets for their own personal benefit, and for the benefit of the Common Enterprise Entities that they controlled and by acting with disloyalty and faithlessness, as set forth in the allegations above, causing damages to Abittan.

175.    As a direct and proximate result of Chen's and Ding's breaches of fiduciary duty described herein, Abittan sustained serious injury and damages for which relief is sought herein, according to proof.

176.    In engaging in the foregoing conduct, Chen and Ding acted with malice, oppression, and fraud, warranting an award of punitive damages in an amount to be proven at trial.

**FIFT CAUSE OF ACTION - Aiding and Abetting Breach of Fiduciary Duty**
**(Against Temujin Cayman)**

177.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

178.    At all relevant times, Temujin Cayman knew that Ding and Chen were fiduciaries of Abittan and, therefore, that Ding and Chen owed Abittan fiduciary duties.

- 36 -

179.   Despite such knowledge, Temujin Cayman nevertheless aided and abetted, induced, encouraged, and assisted Ding and Chen in breaching their fiduciary duties to Abittan, by, among other things, conspiring and actively working with Ding and Chen to obtain Abittan's rights and interests in Findora in exchange for no or inadequate consideration.

180.   Temujin Cayman understood that these activities involved undisclosed (by Ding and Chen) self-interested transactions, in violation of Ding's and Chen's fiduciary duties owed to Abittan.

181.   As a direct and proximate result of Temujin Cayman's aiding and abetting of the foregoing breaches of fiduciary duties, Abittan has been harmed in an amount to be determined at trial and will continue to be harmed until appropriate injunctive relief is granted.

**SIXTH CAUSE OF ACTION - Fraudulent Inducement**
**(Against All Defendants)**

182.   Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

183.   As detailed above, Defendants Ding and Chen, acting directly and through the Common Enterprise Agents and Common Enterprise Entities and/or other agents, made repeated false and fraudulent misrepresentations and omissions to Abittan regarding the contents and legal effect of the paperwork they insisted he sign on behalf of the Common Enterprise Entities to form multiple corporate entities. They then used those entities to steal Findora and millions of dollars from Abittan. Specifically, Ding and Chen represented that all corporate entities formed after the partnership began would preserve the 50/50 interests of the Partnership, and that the Common Enterprise Entities were merely being used as conduits for the Partnership. Ding and Chen represented that they were not undertaking activities that would diminish Abittan's 50% interest in Findora and that they were not asking Abittan to sign documents or undertake activities that would diminish Abittan's 50% interest in Findora. Accordingly, in reliance on Chen and Ding's false representations, Abittan signed corporate documents.

- 37 -

184.    Ding and Chen's representations were false. In reality, the purpose of the sham companies and asset transfer documents and agreements was to divest Abittan of millions of dollars in valuable intellectual property, in exchange for zero consideration.

185.    When Ding and Chen made these material representations and omissions, they knew that the representations were false or misleading and that they had a duty to disclose the omissions and the truth to Abittan. These representations and omissions were made with the intent to defraud and deceive.

186.    Abittan reasonably relied on the material misrepresentations and omissions by his partners Chen and Ding, and such reliance was justifiable.

187.    As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

188.    Further, as a result of Defendants' fraudulent misrepresentations and Ding's and Chen's fraudulent misrepresentations and omissions, Abittan—on his own behalf and/or as partner in the Partnership—is entitled to rescission of the purported corporate documents executed in furtherance of Chen and Ding's fraudulent scheme, including the purported sale of Eian's intellectual property and other assets to Temujin Cayman.

189.    In doing the acts alleged herein, Defendants acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

### SEVENTH CAUSE OF ACTION - Unjust Enrichment
### (Against All Defendants)

190.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

191.    As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of Abittan, in the form of unjustified benefits, payments, and transfers of Abittan's assets and property including, but not limited to:

a. $50,000 in assets that Abittan invested in JVI;

b. $637,000 in assets as a result of unreimbursed credit card expenditures; and

c. Twenty-four luxury watches worth approximately $8,000,000 (Abittan's 50% interest).

- 38 -

d. the business and technology known as Findora

192.   As a result of these unjustified payments and transfers of Abittan's assets and property, Defendants are thereby required to make restitution.

193.   Accordingly, Abittan is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

## EIGHTH CAUSE OF ACTION - Accounting
### (Against All Defendants)

194.   Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

195.   Abittan's partnership with Ding and Chen both through the watch business (including the Watch Agreement) and through the Common Enterprise Entities entitle Abittan to complete information regarding the status of his interests in those partnerships and entities.

196.   As described throughout this complaint, Defendants have committed various fraudulent and tortious acts and breaches of fiduciary duties. These acts have damaged Abittan and unlawfully enriched Defendants.

197.   Abittan cannot determine the amount he is owed without an accounting, however, because Defendants have exclusive custody over the books, records, and accounts that show the status of all of the remaining and sold watch inventory and the assets and profits derived from the intellectual property that Defendants misappropriated from Abittan and/or the Partnership. Accordingly, Abittan is entitled to an accounting.

## NINTH CAUSE OF ACTION - Civil Violations of the
### Racketeer Influenced and Corrupt Organization Act
### (18 U.S.C. § 1962(c))
### (Against All Defendants)

198.   Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

199.   Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

- 39 -

200.    Defendants Ding, Chen and Temujin Cayman, formed an association-in-fact, whose joint and common purpose was to defraud investors, business partners, Findora's executives and employees, and third parties. All Defendants received misappropriated monies and intellectual property, including but in no way limited to those referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

201.    Defendants exercised control over the numerous related individuals and entities that their enterprise consists of. Ding and Chen ultimately controlled and managed the operations of the entire association-in-fact and personally directed the day-to-day operations of its related entities as described above.

202.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce. The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in New York, California, and elsewhere.

203.    Defendants Ding, Chen, and Temujin Cayman were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

204.    Ding and Chen formed a scheme to defraud Abittan of his assets whereby they induced Abittan to invest money in JVI, sign documents purporting to transfer intellectual property from Eian to Temujin Cayman for inadequate consideration, invest in transactions for high-end luxury watches, and solicit investments from Abittan's family and friends.

205.    In furtherance of this scheme, Ding and Chen used or caused to be used interstate wire communications in violation of 18 U.S.C. § 1343. Defendants initiated and received multiple transfers of Abittan and investor funds across state lines via the use of wires including but in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60. Ding and Chen, and others, also communicated materially false

- 40 -

statements and deceitfully omitted material facts to Abittan and others via the use of wires including but in no way limited to the communications and omissions referenced in paragraphs 42- 44, 49, 55, 67, 72, 77, 79, 83, 89, 92, 95, 108, 111, 113, 124, and 136-61.

206.    . Each of these wire communications, omissions, and transfers of Abittan and investor assets satisfies the transmission "by means of wire, radio, or television communication" element for wire fraud.

207.    In furtherance of this scheme to defraud, Ding and Chen used or caused to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341. Ding and Chen initiated and received multiple transfers of funds across state lines via the use of the mails, including but not limited to the transfers referenced in paragraphs 5, 7, 42. 43, 44, 55, 80, 81, 90, 126, 127, 154, and 157. Each of these transfers of Abittan and investor assets to out-of-state entities satisfies the "use of the mail" element for mail fraud.

208.    In furtherance of this scheme to defraud Abittan of his money or property having a value of $5,000 or more, Defendants initiated and received multiple transfers that caused Abittan's funds (as well as the funds of others) to travel or be transported in interstate commerce in violation of 18 U.S.C §§ 2314 and 2315, including but in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

209.    By reason of Ding and Chen's violation of 18 U.S.C. § 1962(c), Abittan suffered injury in an amount to be determined at trial.

210.    Pursuant to 18 U.S.C. § 1964(c), Abittan is entitled to treble damages.

211.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

212.    Abittan additionally seeks the return/restitution of any assets from Defendants' entities or subsidiary entities or other alter ego entities controlled by Defendants that received misappropriated funds, including entities that were dissolved and had their assets disbursed by Defendants and/or the entities they control.

- 41 -

**TENTH CAUSE OF ACTION**
**Conspiracy to Commit Civil Violations of the**
**Racketeer Influenced and Corrupt Organizations Act**
**(18 U.S.C. § 1962(d))**
**(Against All Defendants)**

213.    Abittan hereby incorporates the allegations of paragraph 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

214.    Defendants Ding, Chen, and Temujin Cayman each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 169 to 182 above.

215.    By reason of violation of 18 U.S.C. § 1962(d) committed by Defendants, Abittan suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

216.    Pursuant to 18 U.S.C. § 1962(c), Abittan is entitled to treble damages.

217.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**ELEVENTH CAUSE OF ACTION - Fraud**
**(Against All Defendants)**

218.    Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

219.    As detailed above, Ding and Chen, acting in their own capacities and on behalf of the Common Enterprise Entities in certain instances, made repeated false and fraudulent misrepresentations and omissions to Abittan regarding:

     a.   credit card expenditures on Abittan's cards, including that the cards would be used for business purposes; that if they were used for personal purposes, that Chen would reimburse Abittan for all expenditures on these cards; and that cards issued for Lu, Fisch and others would be used by those individuals;

- 42 -

b.  the watch business, including that Abittan would be paid 50% of all proceeds from watches; that Abittan would have a say in the sale or transfer of any watch; and that Abittan would have access to the watches at all times;

c.  use of funds that Abittan invested in the partnership via the JVI Chase account, including that these funds would be used for proper business purposes;

d.  that Chen was on the brink of closing deals to raise hundreds of millions of dollars for Findora from a variety of well-known individuals and entities including Jack Ma's wife, Ma Huateng, Perfect World, and others "famous guys";

e.  that Abittan's investors would be repaid within ninety days of their investment and that their investments were secure;

f.  that the transfer of Eian's assets to Temujin would not affect Abittan's or other investors' ownership rights in Findora in any way;

g.  that all (known) entities were part of and consistent with the Partnership in which Abittan always had a 50% interest; and

h.  that any and all actual or apparent authority that Ding or Chen possessed (or represented as possessing) to act for or on behalf of Abittan was used by Ding or Chen in good faith and in a permissible scope with full knowledge of and approval by Abittan;

i.  that any and all conduct by Ding and Chen in conjunction with Abittan or Findora was consistent with, and not adverse to, Abittan's interests, rights, property, and investments.

220.  These representations were false. In fact:

a.  Ding and Chen always planned to rack up hefty expenditures for both business and personal purposes on Abittan's credit cards and leave Abittan stuck with the tab, and Ding and Chen always intended to retain the credit cards authorized for other Findora team members;

- 43 -

    b.  Ding and Chen always planned to misappropriate the remainder of the watch inventory for their own benefit and deprive Abittan of his share of proceeds and inventory;

    c.  Ding and Chen always planned to siphon the money from the JVI Chase account to their own benefit knowing that they would later seek to divest Abittan of all of his valuable interest in Findora and the Partnership;

    d.  Ding and Chen were not close to closing deals worth hundreds of millions of dollars with major players, but instead, were using those narratives to create a façade of success that they could use to perpetuate their multiple frauds on Abittan and others;

    e.  Ding and Chen never planned to repay the investors or provide any of the valuable consideration they had promises, and instead, solely planned to convert the investors' money for their own uses;

    f.  the intellectual property transaction between Eian and Temujin was not a paper transaction that would preserve all of Abittan's and other investors' rights;

    g.  Ding and Chen formed companies for the purpose of fraudulently, improperly, and/or unjustifiably separating Abittan from Findora.

221.    When Ding and Chen made these representations and omissions, they knew that they were false. These representations and omissions were made with the intent to defraud and deceive.

222.    Abittan's reliance on Ding and Chen's misrepresentations and omissions was justifiable.

223.    As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

224.    In doing the acts alleged herein, Ding and Chen acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

**TWELFTH CAUSE OF ACTION  - Breach of Contract**
**(Against Ding and Chen)**

225.   Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

226.   Abittan, Ding, and Chen entered into an agreement ("Watch Agreement") to jointly acquire, own, and split the proceeds of high-end luxury watches in 2016.

227.   Abittan performed or substantially performed all of his obligations under the Watch Agreement.

228.   Ding and Chen breached the Watch Agreement by:

   a.   failing to pay Abittan his share of the proceeds of several watch sales;

   b.   failing to contribute their share of the cost to acquire certain watches, and instead purchasing those watches using Abittan's assets; and

   c.   converting the remaining watches for their own benefit without compensating Abittan.

229.   As a direct and proximate result of Ding and Chen's breaches of the Watch Agreement, Abittan has suffered damages in an amount to be proven at trial.

**THIRTEENTH CAUSE OF ACTION - Defamation**
**(Against Ding and Chen)**

230.   Abittan hereby incorporates the allegations of paragraphs 1 through 147 of this Complaint as though fully set forth herein and alleges the following cause of action.

231.   Defendants Ding and Chen made numerous false statements of purported fact regarding Abittan to Findora employees, including Lu, Fisch, Adam Goldberg and others, as well as to Findora investors, and online. Ding and Chen's false statements included oral and text message statements to these individuals that Abittan had misled the investors he brought to the table and made promises to them that he was not authorized to make, so he was truly to blame for the problems with those investors. Ding and Chen also falsely told Findora employees that Abittan's complaints about credit card issues were false, and that Abittan was the one who had made the charges at issue, not Chen. Ding and Chen also told both employees and investors that

- 45 -

Abittan was not a partial owner or co-founder of Findora, and that Abittan was lying when he claimed to be either. Ding and Chen also told LinkedIn that Abittan was providing "inaccurate information" by listing himself as a co-founder and owner of Findora.

232.   Ding and Chen made these false statements about Abittan intentionally to control Findora employees and investors in an attempt cover up their illegitimate conduct.

233.   As a result, Abittan's reputation has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Abittan requests judgment as follows:

a.   That Defendants, and all other persons acting in active concert or privately or in participation with Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;

b.   That Abittan receive such other injunctive relief as they may request and the Court may deem just and proper;

c.   That Defendants be required to account for all gains, profits, and advantages derived from their acts of conversion and other violations of law;

d.   That all gains, profits and advantages derived by Defendants from acts of conversion and other violations of law be deemed to be in constructive trust for the benefit of Abittan;

e.   For an order rescinding the corporate formation documents of each Common Enterprise Entity and intellectual property sale agreement;

f.   For an order requiring Defendants to disgorge profits earned from their unlawful conduct;

g.   For an award of restitution, unjust enrichment, actual damages, statutory damages, and compensatory damages according to proof at trial;

h.   For punitive and exemplary damages according to proof at trial;

- 46 -

i.  For attorneys' fees, costs of suit, and prejudgment and post judgment interest, as provided under applicable law; and

j.  For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Abittan hereby demands a trial by jury.

Dated: February 23, 2022

**ROCHE FREEDMAN LLP**

*/s/ Constantine P. Economides*

Constantine P. Economides (*pro hac vice*)
Brianna K. Pierce (CBN 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Tel: (305) 851-5997
Email: ceconomides@rochefreedman.com
        bpierce@rochefreedman.com

*Counsel for Plaintiff,*
*Ariel Abittan*

- 47 -