1   Constantine P. Economides (*pro hac vice*)
    (Florida Bar No. 118177)
2   Brianna K. Pierce (CA Bar No. 336906)
    ROCHE FREEDMAN LLP
3   1 SE 3rd Avenue, Suite 1240
    Miami, FL 33131
4   Tel: (305) 851-5997
    Email: ceconomides@rochefreedman.com
5           bpierce@rochefreedman.com

6   *Counsel for Plaintiff,*
    *Ariel Abittan*

7

8                   **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
9                        **SAN JOSE DIVISION**

10  ARIEL ABITTAN,                          Case No. 5:20-CV-09340-NC
                        Plaintiff,
11          vs.                             **AMENDED COMPLAINT**

12  LILY CHAO (a/k/a TIFFANY CHEN, a/k/a    Date:    June 3, 2022
    YUTING CHEN), DAMIEN DING (a/k/a
13  DAMON LEUNG, a/k/a DAMIEN RAY           Judge:   Hon. Nathanael Cousins
    DONOVAN, a/k/a TAO DING), YUTING
14  CHEN,TEMUJIN LABS INC. (a Cayman
    Islands corporation), and Does 1-100,
15  inclusive,

16                      Defendants.

17

18          Plaintiff ARIEL ABITTAN ("Plaintiff" or "Abittan"), by and through the undersigned

19  counsel, alleges as follows:

20          1.      This Complaint arises from Lily Chao's (a/k/a Tiffany Chen, a/k/a Yuting Chen)

21  ("Chao") and Damien Ding's (a/k/a Damon Leung, a/k/a Tao Ding, a/k/a Damien Ray Donovan)

22  ("Ding") use of a vast network of domestic and foreign entities—including Temujin Labs Inc. (a

23  Cayman Islands corporation) ("Temujin Cayman")—and individuals—including Yuting Chen

24  ("Chen") (collectively, "Defendants")—to actively orchestrate, engage in, and carry out an

25  extensive pattern of fraud and racketeering activities which caused significant damage to Abittan.

26          2.      In 2016, Abittan started buying luxury watches from a man whom Abittan met

27  online. Shortly thereafter, the man invited Abittan to his home in Atherton CA, where Abittan met

28

the man's wife and children. By 2017, Abittan and the man and woman had entered into a partnership to acquire and sell luxury watches, splitting the cost of each watch and the profit from each sale as 50/50 partners (the "Partnership"). By 2018, the Partnership's business had expanded significantly to the development of a public blockchain aimed at improving security and efficiency in financial systems using cutting edge techniques in cryptography and distributed systems. This blockchain project is currently known to the public as Findora (the "Blockchain Project" or "Findora").

3.     At different times and in different contexts, Abittan's male partner publicly used the names Damien Ding, Damon Leung, and Damien Ray Donovan, while Abittan's female partner publicly used the names Lily Chao and Tiffany Chen.[1]

---

[1]     In addition to the foregoing publicly-used names, Ding and Chao privately directed Abittan—for years—to wire or deposit monies owed to Ding and Chao into bank accounts using the names Tao Ding and Yuting Chen. Ding used a mailing and billing address associated with Tao Ding as his own and was observed using a Zoom account with the name Tao Ding. Similarly, Chao instructed Abittan to mail her packages to an address associated with Yuting Chen. Ding and Chao also claimed to own a house and an apartment leased under the name Yuting Chen. Chao and Ding never identified Tao Ding as a separate person from Ding and never identified Yuting Chen as separate person from Chao. Nor did Abittan ever meet (or conduct business with) a second man or second woman using the names Tao Ding or Yuting Chen. Consequently, Abittan believes that his male business partner has a legal name and/or aliases of Tao Ding, Damien Ding, Damon Leung, and Damien Ray Donovan and that his female business partner has a legal name and/or aliases of Lily Chao, Tiffany Chen, and Yuting Chen.

 On July 9, 2021, however, a person named Yuting Chen ("Chen") (collectively, with Chao, Ding, and Temujin Cayman, "Defendants") filed a separate lawsuit (*Yuting Chen v. Ariel Abittan, et. al.*, District Court of Northern California, Case No. 21-cv-09393) (the "Related Federal Action") to assert claims against Abittan related to the same luxury watch partnership at issue herein. It appears that the named defendant in this action (Chao) and the named plaintiff in the Related Federal Action (Chen) are asserting that Chen is a different person than (rather than an alias of) Chao, that Chen is the person who engaged in the watch business with Abittan, and that Chao is a third-party with no connection to the watch transactions described in either action. Yet, Chen and Chao have refused to state those precise facts under oath via a declaration or produce evidence that identifies Chen as the woman with whom Abittan conducted business. Nor has any party explained why—if Chao's inclusion in this litigation is based on mistaken identity and Chao has no connection to Abittan or the Partnership—Chao would appear in this action and defend against

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

4.    Prior to and throughout the Partnership, Chao and Ding inspired Abittan's loyalty and his deference, first, through continuous displays of wealth, status, and business connections, and, second, through promises that Abittan would enjoy the same level of success if he followed their business advice. And once Chao and Ding knew they had Abittan's full trust, they weaponized it to steal numerous jointly-owned watches, the Blockchain Project, and millions of dollars from Abittan. In the process, Chao and Ding defamed Abittan to countless individuals, incurred over $600,000 of debt on Abittan's personal credit, and stole an additional $1,200,000 from Abittan's friends and family.

5.    As part of their fraudulent scheme, Chao and Ding relied on misdirection and anonymity. While reassuring Abittan that he had an interest in all assets owned by the Partnership— as well as an interest in affiliated entities purportedly created as corporate formalities to protect the Partnership's interest—Chao and Ding fraudulently formed at least thirteen (13) entities through a series of forged contracts, false filings, and misrepresentations about ownership. They created a web of shell companies that become so unwieldy that Chao and Ding had to back date documents so that the chronology of entities would make temporal sense. They repeatedly lied about the purposes, functions, and compositions of discrete entities in their corporate web.

6.    Then, in a final attempt to coopt the Blockchain Project, Chao and Ding, on behalf of Temujin Cayman—an entity they caused to be created one day prior—fraudulently induced Abittan to sign a single-page document that, at the time, Chao and Ding falsely claimed was a corporate formality. Chao and Ding now contend that this single-page document represents Abittan's consent to transfer the Blockchain Project from Eian Labs Inc.—the corporate entity of which Abittan was at least a 39.6% beneficial owner—to Temujin Cayman—in which Abittan purportedly has no stake—for zero consideration. In essence, Chao and Ding claim that Abittan

---

Abittan's claims, rather than immediately resolve the mistaken identity issue. No party has a *legitimate* basis to obfuscate the legal names and identities of the woman and man who partnered with Abittan and repeatedly invited Abittan into their home.

Irrespective of the foregoing, Abittan was engaged in one partnership with one woman and one man between 2017 and 2020. For the purposes of this complaint, the woman is referred to as Chao and the man is referred to as Ding. Abittan reserves the right to seek leave to amend the complaint to conform to any new names or aliases that properly identify these individuals.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

1  knowingly consented to the sale of the entire Blockchain Project—believed to be valued at over
2  $50,000,000—via a one-page document in exchange for **absolutely nothing**.

3        7.     In reality, however, Chao and Ding had concocted the document as a poorly
4  conceived attempt to legitimize their theft of Abittan's ownership interest in the Blockchain Project.
5  But Chao and Ding were ultimately hoisted by their own petard. After years of misdirection and
6  corporate tricks, Chao's and Ding's tactics began to surface when they wrongfully forced Abittan
7  out of the Blockchain Project and denied the existence of the Partnership.

8        8.     Critically, employees, consultants, and advisors associated with the Blockchain
9  Project subsequently observed, and responded to, Chao's and Ding's obvious misconduct. In late
10 2020, Stanford cryptographers, including Charles Lu ("Lu"), Benjamin Fisch ("Fisch"), Franklin
11 Fu ("Fu"), and numerous other employees from the engineering team resigned.

12       9.     In sum, and as detailed below, Chao and Ding are con artists. Using charisma and
13 lavish displays of wealth, they lure in optimistic individuals who are acting in good faith. Chao and
14 Ding then misrepresent, misdirect, and deceive. They say whatever is necessary to induce others to
15 provide money or other resources. To cover their tracks, they use fake names, straw-persons, and
16 other lies about their relationships and identities. They hide their assets, even their home, using
17 shell corporations and agents. They have even refused to include their names on court filings. They
18 undertake these manipulative actions to prevent accountability to their victims, including Abittan.

19      10.    Abittan files this lawsuit in order to: (a) recover Abittan's direct damages due to
20 Defendants' fraudulent and unlawful conduct; (b) obtain a declaration of Abittan's rights in the
21 Blockchain Project; (c) prevent Defendants from destroying, disposing of, or unlawfully using the
22 Blockchain Project's valuable intellectual property; and (d) prevent Defendants from continuing to
23 harm Abittan.

24      11.    Abittan's investigation into the matters, identities, and entities discussed in this
25 Complaint is ongoing. Abittan reserves the right to update these allegations as additional facts
26 become known.

- 4 -

**PARTIES**

12.     Plaintiff Ariel Abittan is an individual residing in Lawrence, New York. Abittan has a 50% interest in the Partnership formed with Chao and Ding in 2017.[3] Abittan has an ownership interest of up to 50% in the Blockchain Project (currently known as Findora) he co-founded with Chao and Ding. According to corporate formation documents created by or on behalf of Chao and Ding—purportedly for the purpose of effectuating the Partnership's interests—Abittan is a shareholder of, and continuously has been a shareholder of, Juniper Ventures Incorporated since January 24, 2018. Abittan is the President and a director of Project Revolution Inc. Abittan is also a member of Juniper Venture Partners, LLC, which is a shareholder of Eian Labs Inc (f/k/a Porepsus Labs Inc.). Upon information and belief, as a shareholder of JVI, Abittan is also a manager of Fourhair LLC, which is a member of Juniper Venture Partners LLC, which (as detailed above) is a shareholder of Eian. Abittan is also a member of Juniper Venture Holdings LLC, which was formed for the purpose of creating Powerscale Capital Management LLC with John Powers.

13.     Plaintiff is informed and believes and, on that basis, alleges that Defendant Lily Chao (a/k/a Tiffany Chen, a/k/a Yuting Chen) is an individual residing in Atherton, California. Upon information and belief, Chao is married to Defendant Ding, and together, Chao and Ding hold a 50% interest in the Partnership formed with Abittan in 2017. Chao co-founded the Blockchain Project (currently known as Findora) with Abittan and Ding. Chao is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Labs Inc.), Fourhair LLC, Lakeside Garden Heritage LLC, Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Findora Foundation Ltd., Discreet Labs Ltd., Guanghua Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang, and Xilei Wang to commit numerous unlawful acts for the purpose of stealing millions of dollars from Abittan and other

---

[3] *See* Corp. Code § 16202.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

investors. Chao is a general manager of each of the foregoing entities, and, together with Ding, exerts complete control over each entity. Chao is the Chairman of Temujin Cayman.

14.     Plaintiff is informed and believes and, on that basis, alleges that Defendant Ding is an individual residing in Atherton, California. Upon information and belief, Ding is married to Defendant Chao, and together, Ding and Chao hold a 50% interest in the Partnership formed with Abittan in 2017. Ding co-founded the Blockchain Project (currently known as Findora) with Abittan and Chao. Ding is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Labs Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Findora Foundation Ltd., Discreet Labs Ltd., Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, and Jianrong Wang to commit numerous unlawful acts for the purpose of stealing millions of dollars from Abittan and other investors. Ding is a general manager of each of the foregoing entities and, together with Chao, exerts complete control over each entity. Ding is the Chief Operating Officer of Temujin Cayman.

15.     Defendant Temujin Labs Inc. (a Cayman Islands corporation) is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County, California. Temujin Cayman purports to do business under the stolen name "Findora" and "Findora Foundation." Abittan is informed and believes and, on that basis, alleges that Temujin Cayman is controlled by Chao and Ding—both of whom act as general managers of Temujin Cayman—and that Temujin Cayman is a culpable member of Chao and Ding's fraudulent association-in-fact enterprise.

16.     Plaintiff is informed and believes and, on that basis, alleges the following regarding the identify of Defendant Yuting Chen. As stated above, Plaintiff alleges that Chao has purposefully obfuscated her identity as a means of perpetuating fraudulent and unlawful conduct. *See* ¶ 3, n.1. For years, Chao directed Abittan to wire or deposit monies owed to Ding and Chao into a bank

account using the name Yuting Chen. Similarly, Chao instructed Abittan to mail her packages to an address associated with the name Yuting Chen. Chao (and Ding) also claimed to own a house and an apartment leased under the name Yuting Chen. At the same time, Chao had demonstrated her proclivity for using aliases—having asked Abittan to refer to her by the names Lily Chao and Tiffany Chen, in different contexts. While engaging in that conduct, Chao never identified Yuting Chen as separate person from Chao. Nor did Abittan ever meet (or conduct business with) a second woman using the name Yuting Chen. Abittan's only known experience with a "Yuting Chen" was based on Chao's (and Ding's) references to that name, as set forth above. Consequently, Abittan believes that his female business partner's legal name(s) and aliases include: Yuting Chen, Tiffany Chen, and Lily Chao.

17.     Nonetheless, the defendant sued as "Lily Chao" in this action and the plaintiff suing as "Yuting Chen" in the Related Federal Action have taken the position that they are separate individuals who conducted business with Abittan. On information and belief, the individual who is separate from Lily Chao and using the name "Yuting Chen" has coordinated with and continues to coordinate with Lily Chao and Damien Ding in the unlawful conduct alleged herein and causing harm to Abittan. Accordingly, Yuting Chen is included herein as a separate named defendant.

18.     On information and belief, Yuting Chen is an individual residing in Atherton, California.

19.     All claims asserted against Chen (and as to all Defendants) relate back to the date of the original complaint in this action. *See* Fed. R. Civ. P. 15(c)(1)(C).

20.     Plaintiff does not know the true names and capacities of defendants sued in this complaint as Doe 1 through Doe 100, inclusive, and therefore sues these defendants by fictitious names under Section 474 of the California Code of Civil Procedure. To the extent that Tiffany Chen, Yuting Chen, Lily Chao, Damien Ding, Tao Ding, Damon Leung, and Damien Ray Donovan are not the people Abittan interacted with as fully described in this Complaint, or to the extent any such name(s) refer to multiple persons, then such person(s) are included in Does 1 through Does 100, inclusive, sued herein. Plaintiff will amend this Complaint to allege the true

names and capacities of Doe 1 through Doe 100, inclusive, when ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named herein as Doe 1 through Doe 100, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

**RELEVANT NON-PARTIES**

21.     Relevant non-party Juniper Ventures Incorporated ("JVI") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that JVI is controlled by Ding and Chao and that JVI is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

22.     Relevant non-party Project Revolution Fund Inc. ("Project Revolution") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that Project Revolution is controlled by Ding and Chao and that Project Revolution is a culpable member of Ding's and Chao's fraudulent association-in-fact enterprise.

23.     Relevant non-party Juniper Venture Holdings LLC ("JV Holdings") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that JV Holdings is controlled by Ding and Chao and that JV Holdings is a culpable member of Ding's and Chao's fraudulent association-in-fact enterprise.

24.     Relevant non-party Juniper Venture Partners LLC ("JV Partners") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that JV Partners is controlled by Ding and Chao and that JV Partners is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

25.     Relevant non-party Eian Labs Inc. (f/k/a Porepsus Labs Inc.) ("Eian") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that Eian is controlled by Ding and Chao and that Eian a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

26.     Relevant non-party Fourhair LLC ("Fourhair") is a limited liability company formed under the laws of Nevada. Abittan is informed and believes and, on that basis, alleges that Fourhair

is controlled by Ding and Chao and that Fourhair is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

27.     Relevant non-party Lakeside Garden Heritage LLC ("Lakeside") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Lakeside is controlled by Ding and Chao and that Lakeside is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

28.     Relevant non-party Powerscale Capital Management LLC ("Powerscale Capital") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Powerscale Capital is controlled by Ding and Chao and that Powerscale Capital is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

29.     Relevant non-party Powerscale Capital Fund LP ("Powerscale Fund") is a foreign company organized under the laws of the Cayman Islands. Abittan is informed and believes and, on that basis, alleges that Powerscale Fund is controlled by Ding and Chao and that Powerscale Fund is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

30.     Relevant non-party Powerscale Black Cobble Rideshare Funding LLC ("Black Cobble") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Black Cobble is controlled by Ding and Chao and that Black Cobble is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

31.     Relevant non-party Temujin Labs Inc. (Delaware) ("Temujin Delaware") is a corporation organized and existing under the laws of Delaware with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin Delaware is controlled by Ding and Chao and that Temujin Delaware is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

32.     Relevant non-party Temujin Labs Inc. (Cayman) is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County,

California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin Cayman is controlled by Ding and Chao and that Temujin Cayman is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

33.     Relevant non-party Findora Foundation Ltd. ("Findora Foundation") is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Findora Foundation is controlled by Ding and Chao and that Findora Foundation is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

34.     Relevant non-party Discreet Labs Ltd. ("Discreet Labs") is a limited partnership formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Discreet Labs is controlled by Ding and Chao and that Discreet Labs is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

35.     Abittan is informed and believes and, on that basis, alleges that Relevant non-party Guanghua Liang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Guanghua Liang is the agent of Ding and Chao and that Guanghua Liang is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

36.     Abittan is informed and believes and, on that basis, alleges that Relevant non-party Yang Yang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Yang Yang is the agent of Ding and Chao and that Yang Yang is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

37.     Abittan is informed and believes and, on that basis, alleges that Relevant non-party Alex Wang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Alex Wang is the agent of Ding and Chao and that Alex Wang is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise.

38.     Abittan is informed and believes and, on that basis, alleges that Relevant non-party Selena Chen is an individual residing in Atherton, California. Abittan is informed and believes and,

on that basis, alleges that Selena Chen is the agent of Ding and Chao and that Selena Chen is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Selena Chen is the sister of Yuting Chen and executed many documents as part of the criminal scheme.

39.    Abittan is informed and believes and, on that basis, alleges that Relevant non-party Jianrong Wang is an individual residing in Atherton, California. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the agent of Ding and Chao and that Jianrong Wang is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the driver of Chen and Ding, that he lives at 69 Isabella Ave—the house in which Ding and Chao's criminal enterprise operated—and that he has executed many corporate documents as part of the criminal scheme.

40.    Abittan is informed and believes and, on that basis, alleges that Relevant non-party Xilei Wang is an individual residing in China. Abittan is informed and believes and, on that basis, alleges that Xilei Wang is the agent of Ding and Chao and that Xilei Wang is a culpable member of Ding and Chao's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Xilei Wang has executed many corporate documents as part of the criminal scheme.

## SUBSTANTIVE ALLEGATIONS

### A.    Ding and Chao Quickly Identify Abittan as a Viable Mark

41.    In 2016, Abittan was twenty-five-years old and new to the business world. He was a hard worker with big aspirations and an obvious eagerness to succeed. As part of his first entrepreneurial endeavor, Abittan began buying and selling ultra-luxury watches from and to individuals he met locally (in New York), on internet forums, or in chat communities.

42.    On July 7, 2016, while searching for watches on the Rolex Forum, Abittan responded to a listing for a Patek Philippe 5712/1a—a watch valued at approximately $30,000— posted by Ding under the username "oneplustwo." Ding and Abittan exchanged a few emails, and

Abittan agreed to buy the watch from Ding, wiring the full cost of the watch to an account Ding provided. In concluding the deal, Abittan wrote, "I hope this is the start to much more business."

43.     Ding immediately sensed both Abittan's eagerness to succeed and willingness to trust. In other words, Ding quickly identified Abittan as an easy mark. Shortly thereafter, Ding invited Abittan to his home in Atherton, California under the guise of discussing a bigger business relationship. Indeed, Ding was so insistent that he booked and paid for Abittan's round-trip flight.

44.     On January 23, 2017, Abittan flew to San Francisco, and after approximately eight hours together, Abittan flew back to New York. During this brief visit, Ding introduced Abittan to Ding's wife, Chao (who at the time was using the name Tiffany Chen). Despite what Ding had suggested, Abittan, Ding, and Chao never discussed a grand new business plan.

45.     In reality, the true purpose of this trip (and dozens of subsequent trips) was to convince Abittan that Ding and Chao were extremely wealthy, successful, and well-connected individuals who could turn Abittan's dreams into a reality. From the moment Abittan arrived until the moment he left, Ding and Chao took deliberate steps to appear legitimate, confident, and successful. Ding and Chao showed Abittan their cars (worth at least $400,000); gave Abittan a tour of their $25,000,000 home, located at 69 Isabella Ave. Atherton, CA 94027 ("69 Isabella Ave."); and showered Abittan in designer gifts, such as Chanel shoes and a Prada purse for Abittan's wife.

46.     Ding and Chao never missed an opportunity to manipulate Abittan into believing that, if he followed their lead, he would soon be as successful as them. During his visits, Ding and Chao took Abittan around Atherton—one of the wealthiest areas in the United States—pointing out *eight* houses they purportedly owned or bought for family members. Ding detailed plans to tear down their home and build a new mega-mansion across 69 Isabella Ave. and the adjoining lot, 70 Isabella Ave. (which, of course, Ding and Chao claimed to already own).

47.     Chao and Ding routinely claimed to have access to significant familial wealth and made great displays of their money. Chao bragged to Abittan about meeting a "family partner" who had over 10 billion dollars in the United States. In one instance, Chao brought Abittan car shopping and purchased two high-end luxury vehicles, one of which was a Rolls Royce. There were

- 12 -

1  approximately five such vehicles in the driveway of 69 Isabella Ave. at any given time, including

2  multiple Bentleys, a Ferrari, and a Mercedes.

3      48.    Chao had a chauffeur, whose name Chao said was Jianrong Wang. On various

4  occasions, Chao instructed Jianrong Wang to drive Abittan to destinations in and around Atherton.

5  Because Wang did not speak English, Abittan would communicate with him through a translation

6  application on Abittan's mobile phone.

7      49.    Chao constantly touted her supposed connections with the Chinese business elite.

8  She claimed to be friends with Zhang Ying—the wife of Chinese billionaire and Alibaba founder,

9  Jack Ma. Chao also claimed to have a close personal and professional relationship with Ma

10  Huateng—founder of Tencent, the seventh most valuable company in the world. Chao bragged

11  about meeting Ma Huateng while he was "still a poor guy." Chao also made regular references to

12  lavish trips with other celebrities and "famous people" in the blockchain industry.

13      50.    Chao told Abittan that Ding had attended Harvard as an undergraduate but that he

14  had been kicked out for getting into a fist-fight.

15      51.    Chao further cultivated a special relationship of apparent trust and confidence with

16  Abittan by disclosing highly personal details in text messages, including details relating to her

17  health, marital issues, and prior romantic relationships. On information and belief, many of these

18  personal revelations were not true and were made solely to make Abittan believe that he and Chao

19  had a close personal relationship that extended beyond business.

20      52.    In retrospect, Chao's and Ding's stories and displays of grandeur were the

21  foundation of Defendants' fraudulent scheme. Chao and Ding used various principles of

22  persuasion—including preying on Abittan's open desire to become a successful entrepreneur and

23  manipulating Abittan's trusting personality—to lure Abittan into a business relationship that gave

24  Chao and Ding all the power and access necessary to steal whatever they could from Abittan—first,

25  watches, and eventually, a rightful share of an entire blockchain business Abittan co-founded.

26

27

28

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

**B.**     <u>**Chao and Ding Invite Abittan into Partnership**</u>

53.     For eight months after Abittan's first visit to Atherton, Abittan continued to purchase watches from Ding without issue. Ding used this time to build Abittan's confidence in their relationship and to give Abittan a taste of success. Then, in August of 2017, Ding took the next step in his and Chao's fraudulent scheme and asked Abittan to "partner" on a specific watch. Abittan immediately accepted Ding's proposal.

54.     Accordingly, Abittan and Ding entered into an oral and/or implied partnership to acquire and resell certain luxury watches. The Partnership worked as follows. First, either Abittan or Ding would identify a high-end watch that could be acquired and then resold at a higher price. Abittan and Ding would each contribute 50% of the cost of the watch. Then, either Abittan or Ding would locate a buyer for the watch. Upon the ultimate sale, Abittan and Ding shared equally in the profit. In sum, Abittan and Ding operated as 50/50 partners.

55.     In or around November of 2017, Ding's wife, Chao, began communicating with Abittan via text message about various watch transactions. In conjunction with Chao's involvement, Chao and Ding did not seek to alter the financial aspects of the Partnership: at all times, Chao and Ding shared one 50% interest in the Partnership with Abittan possessing the other 50% interest. Aside from Abittan, Chao, and Ding, there were no other partners in the Partnership.

56.     For many months, the Partnership operated without issue. Abittan and Ding/Chao invested equally and work together to sell the watches and divide the profits. In hindsight, the seamlessness of these first few months built Abittan's trust in Ding and Chao – a trust that Ding and Chao weaponized to defraud Abittan.

**C.**     <u>**Ding and Chao Plant the Seed of Extraordinary Success and the Partnership Founds the Blockchain Project**</u>

57.     Once the Partnership was formed, Abittan, Ding, and, eventually, Chao were speaking several times a day, often for hours, on the phone and through text messages. The partners routinely discussed the evolution of the Partnership.

- 14 -

58.     Indeed, on September 7, 2017 (the same day that Abittan paid his share of the first Partnership watch), Ding suggested that the Partnership should create a "watch fund." In essence, Ding and Abittan—as 50/50 partners—would collect money from investors and buy watches with high appreciation values. The Partnership would hold the watches to sell at the opportune time, thereby generating generous returns for investors. Ding told Abittan that, if he followed Ding's business plan, their watch fund would be worth $10,000,000 within a year.

59.     By December of 2017, Abittan's, Ding's, and (by then) Chao's conversations about the watch fund had evolved into a new business idea for the Partnership—the creation of a public blockchain for secure and anonymous watch transactions with specific fraud prevention measures aimed at curbing the sale of counterfeit goods. Ding and Chao claimed that this watch blockchain could be even more lucrative and successful than the watch fund.

60.     On January 16, 2018, Abittan flew to Atherton, CA to discuss the Partnership's blockchain idea. Over the next three days, the partners discussed and, ultimately, agreed that focusing on the watch industry was too narrowminded. By January 18, 2018, the Partnership's business idea had evolved to the creation of reliable blockchain financial infrastructure with privacy protection for use across myriad industries: the foundation of the Blockchain Project.

61.     During this visit, Chao and Ding convinced Abittan that, on February 5, 2018, the Partnership should (and could) launch an initial coin offering ("ICO")—an offering of cryptocurrency in conjunction with a blockchain project. Chao analogized the Partnership to a separate cryptocurrency company that had recently earned $390 million in two hours after its ICO.

**D. Chao and Ding Lay the Foundation for Anonymity While Testing Abittan's Deference**

62.     Abittan was grateful, eager, and excited about the Blockchain Project. On numerous occasions, Abittan expressed that he was willing to do "anything" for the Partnership's new venture. Chao and Ding, therefore, sought to exploit Abittan's eagerness. In addition to curating images of their own success and business acumen, Chao and Ding utilized common tools of fraud—such as manufacturing time crunches and instilling a sense of herd mentality—to distract Abittan throughout the formal creation of the Blockchain Project.

- 15 -

63.     For example, once the Partnership agreed to found the Blockchain Project, Chao and Ding repeatedly assured Abittan that their "lawyer" was drafting the documents necessary to memorialize their partnership interests and formalize the Blockchain Project. Ding and Chao promised that Ding, Chao, and Abittan were going to meet with Ding and Chao's lawyer prior to the end of Abittan's trip, but the meeting never took place. Over the next few days, Ding and Chao were simultaneously texting Abittan about "urgent" information needed to finalize the incorporation documents. And once Abittan received those documents after days or weeks of delay, Chao's and Ding's names were absent.

64.     Specifically, on or about January 22, 2018, the Partnership formed Juniper Ventures Incorporated ("JVI") as a formal entity to spearhead the formation of the Blockchain Project. Chao and Ding, however, refused to identify themselves on the incorporation documents; instead, Chao and Ding presented Abittan with an investment agreement, naming Abittan and Guanghua Liang ("Liang")—a strawman appointed by Chao and Ding to help hide their involvement and purportedly protect their famous and wealthy family members in China—as "Founders" of JVI. Chao and Ding always represented that JVI was their venture with Abittan as equal partners, and that Liang was merely being used for paperwork purposes. Abittan has never met, seen, or spoken with Liang. Abittan and Liang were required to make a $50,000 capital contribution in exchange for 1,000,000 shares in JVI. Abittan thereafter wired $50,000 to a Chase bank account in the name of JVI. Chao—not Liang—wired $50,000 into the JVI account for her and Ding's interest. Liang did not wire any money into JVI.

65.     Chao obviously understood the inconsistency between, on the one hand, claiming to Abittan that she and Ding were Abittan's business partners while, on the other hand, making sure that her name did not appear on any of the governing documents for the entities that she and Ding created for the blockchain business. Chao's explanation to Abittan was that, to project a certain image and identity that fit with her view of Silicon Valley culture, she needed to maintain her own privacy and to keep her true identity and connection to their businesses a secret.

66.     Chao also insisted that Abittan hold himself out to the public as "Mark Graber." Chao explained to Abittan that it was "too early" for investors and employees to know their true identities. Chao also asked Abittan to change his name on his LinkedIn profile to Mark Graber and to conceal his true identity in public forums. When Abittan protested, Chao told him that this was how things worked in Silicon Valley and that, to succeed, Abittan needed to follow her instructions.

67.     Chao and Ding's use of hidden identities persisted throughout their partnership with Abittan (and still to this day). Chao routinely lied to Findora investors and employees about her relationship with Ding, claiming that Ding was her brother-in-law and not her husband. Chao told Abittan that this subterfuge was necessary due to Silicon Valley culture frowning on husband/wife relationships at work. Because Abittan's wife also worked for Findora, Chao wanted Abittan to hide his relationship with his wife.

68.     Abittan ultimately demanded to go by his real name at Findora and revealed his marital relationship with his wife to Findora employees. Chao and Ding would not do the same.

69.     Chao and Ding told Abittan that it was important to project an image of success. Accordingly, Chao leased a Ferrari for Abittan to drive when visiting Silicon Valley and told him that he needed to live in one of her luxury properties.

70.     Chao and Ding also provided Abittan with a removable subscriber identity module (commonly known as a "SIM card") and required Abittan to use a phone with that SIM card for business purposes. Upon information and belief, Chao and Ding provided the SIM card to Abittan as another test of their control.

**E.      Chao and Ding Create Two Public-Facing Entities to Act for the Partnership**

71.     In January and February of 2018, Abittan began hiring employees for the Blockchain Project. Abittan heavily recruited Stanford Ph.Ds., particularly those affiliated with the Stanford cryptography department.

72.     Just before Abittan's most important recruit—Stanford's John Powers—agreed to join the Partnership's Blockchain Project, Chao and Ding convinced Abittan that, to limit potential

- 17 -

liability, they needed to keep the business separate from the tech (often juxtaposed as "the fund" and "the coin").

73.     Consequently, on April 13, 2018, Abittan incorporated Project Revolution as incorporator. From incorporation, and at all times, Abittan served as President and Chief Executive Officer ("CEO") of Project Revolution.

74.     Chao and Ding referred to Project Revolution as the "fund" because it was the public-facing entity of the Partnership that, *inter alia*, paid salaries, entered employee contracts, and executed leases related to Findora.

75.     Shortly after creating the fund, on July 19, 2018, Ding formed a second public-facing entity called Eian. Although the articles of incorporation reflect Abittan as the incorporator, Abittan did not sign or receive copies of that document. After the fact, Ding eventually informed Abittan that Ding had formed Eian to act as the public-facing "coin side" of the Partnership.

76.     Chao confirmed that this dual fund/coin structure would allow Abittan, Ding, and Chao to retain 100% ownership of the Findora tech, while giving employees equity in the business.

**F.     Findora is Developed by the Cryptologists Consulting with Project Revolution**

77.     Once Project Revolution and Eian were in place, Chao and Ding required high-level employees to sign two separate but seemingly related agreements.

78.     The first was a consulting agreement with the "fund"—Project Revolution—under which the consultant earned a reasonable salary in exchange for specific services rendered, such as the development of the cryptography library or creation of Findora's open-source component. Project Revolution retained exclusive ownership of all work product arising from the consulting agreements, which included pre-signed and undated Assignment of Copyright and Assignment of Patent Application exhibits.

79.     The second agreement was an advisor agreement with Eian, under which the same consultant (now called an advisor) would receive equity in "the coin" as compensation for the unspecific service of advising the company from time to time.

- 18 -

80.     On information and belief—and unbeknownst to Abittan—Chao and Ding used this two-agreement system to facilitate their fraud. When it behooved them, they could attempt to structure one entity as effectively insolvent, with the other entity owning Findora's lucrative technology. Therefore, they could induce sophisticated cryptologists into creating multi-million-dollar blockchain technology (Findora) in exchange for modest salaries and the promise of equity, yet they could also ensure that the equity was in a company worth nothing and owning nothing.

**G.     Abittan Devotes Time, Energy, and Money into Attracting Investors**

81.     While unaware of Chao and Ding's fraudulent corporate structure and overall unlawful scheme, Abittan continued to work on Findora.

82.     Abittan would fly from his New York home to Atherton multiple times per month to work on the venture.

83.     In addition to spearheading the recruitment of an elite team of cryptologists, Abittan also had operational responsibilities and was involved in the creation of at least one white paper, which is a common component of blockchain companies. Abittan also was involved in fundraising and investor pitches.

84.     During the same period, Chao and Ding consistently represented that they had secured or were securing investments in Findora from major players in China. For example, Chao touted a potential investment from Jack Ma's wife, going so far as to claim that Ma's wife was concerned with Abittan's availability on weekends given that Abittan observes the Sabbath.

85.     Chao also spent $70,000 on a lavish investor trip for the early investors in TRON Foundation (an entity dedicated to building infrastructure for a decentralized Internet). Chao claimed that, as a result of the trip, the investors were going to invest $230,000,000 in tokens and that it was a "done deal." However, Chao refused to show Abittan the paperwork.

86.     Chao also claimed to be close to closing a deal with Tencent CEO Ma Huateng to lead an investment round.

87.     Later, Chao touted her progress on a $50,000,000 investment.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

88.     Nonetheless, in July 2018, relying on Chao's representation that she had already raised substantial amounts of money, Abittan sought to raise funds from his own network of family and friends. Abittan ultimately secured $1,200,000 in investments for Findora from five private investors. These investments took the form of Simple Agreements for Future Tokens ("SAFTs") between the investors and JVI.

89.     Pursuant to the SAFTs, the investors wired $1,200,000 into JVI's Chase bank account. In exchange for investing in JVI, the investors were promised that, if Eian—the company everyone believed held the rights to Findora's blockchain technology—had an initial coin offering ("ICO"), then their money would be converted to coins at a 70% discount to the token price. If Eian did not have an ICO, then they would receive their money back within 90 days.

90.     Findora did not issue a token within 90 days, but each of the investors decided to roll their investments into future equity or token offerings. Of course, the investors were not willing to wait forever. Eventually, the investors demanded their money back.

91.     In March 2019, responding to investor pressure, Chao flew to New York to appease the investors. She and Abittan met with three of the investors, and in an effort to buy time, Chao offered them a new deal, including a promise to return their investment with a 25% annualized return if Eian did not issue a token. To convince the investors to hold out for an equity or token offering, Chao presented the investors with a term sheet showing a $10,000,000 incoming investment from China Orient Group, at a $60,000,000 valuation for Findora.

92.     By that time, Abittan and Chao could point to concrete accomplishments related to Findora. The consultants under contract with Project Revolution had built an operating demo, were actively pitching Findora to funds as use cases, and had completed several white papers. Findora was just six months away from a test net. Abittan was involved in much of those accomplishments, getting weekly and sometimes daily summaries on the engineering team's progress.

//

//

//

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

**H.** **As Abittan Diligently Works to Make Findora a Success, Chao and Ding Take Advantage of Abittan's Trust**

93.     Starting in early 2018, Chao directed Abittan to open multiple credit card accounts, with multiple cards issued to her and other individuals, to be used for Findora. At the outset, Chao promised Abittan that the cards would be used only for business purposes and, therefore, that all expenses would be reimbursed by the Partnership.

94.     As a result of her promises, Chao obtained a credit card linked to Abittan's business account for RealTime, which was the entity previously used to wire money back and forth between Abittan, Ding, and Chao during the watch transactions.

95.     Shortly thereafter, Chao and Ding began to misuse the credit cards linked to Abittan's business account. While Ding and Chao initially paid their share of Partnership watch costs directly, Ding and Chao began using the cards to pay their share of the costs. Ding and Chao promised to pay off the balance of Abittan's credit card but ultimately reneged on this promise.

96.     Soon thereafter, Chao demanded that Abittan open a Chase credit card for JVI and an American Express credit card for Project Revolution—both of which Chao promised would be used exclusively in connection with Findora. Upon information and belief, Chao and Ding then used Abittan's personal information to obtain individual credit cards in the names of Chao, Lu, Fisch, John Powers, Xu Fen Xe, Selina Chao, Ravi Chiruvolu, Eliana Abittan, and Fiona Zhang. Chao and Ding ultimately linked these cards to Abittan's personal credit.

97.     Chao represented to Abittan that the cards in Lu's, Fisch's, and others' names would be distributed to those individuals for business use. However, on information and belief, Chao kept and used each of the cards many times without informing these employees of the charges incurred in their names.

98.     Eventually, Chao (and her agents) began using the cards for her and Ding's personal benefit. Chao explained this—as she did in connection with corporate paperwork—by telling Abittan that, for privacy reasons, she did not want to give out her own personal identifying information to credit card companies. She also stated that needed the card because she and Ding

- 21 -

used to have an American Express Black Card but were cutoff when they refused to disclose certain financials in response to a financial review request from American Express. Chao promised that she would pay the personal expenses off each month.

99.     Chao, Ding, and their agents racked up hundreds of thousands of dollars in credit card charges, the vast majority of which were not for Findora business. The charges included, but were not limited to:

• A piano for Chao's children;

• School tuition;

• Gifts from Saks Fifth Avenue and other designer shops;

• A trip to Las Vegas;

• Fine wines;

• Doctors' offices;

• High-end restaurants;

• Taobao.com (a Chinese online shopping website);

• Costco;

• Airline tickets;

• Luxury hotels; and

• Chao's and Ding's half of the investments for certain watches.

100.     On one occasion, Ding called American Express, fraudulently claiming to be Abittan, and requested that American Express increase the account's credit limit. Ding provided financial documents to support his request, which Abittan has demanded but has never seen.

101.     Chao and Ding also attempted to have Abittan open an American Express Black Card with a limitless credit line for their use. This effort entailed attempting to engage in transactions at a high enough volume on Abittan's credit cards and making enough payments to that account to receive an invitation from American Express Black. Chao even suggested such extreme measures as buying a house with a credit card (which turned out to be impossible).

1  Fortunately, Chao and Ding's attempt failed; otherwise, they likely would have incurred additional

2  millions in debt under Abittan's name before being caught.

3  **I.      Abittan Demands the Return of Investor Funds and Chao Stops Paying the Credit**

4         **Cards**

5         102.    In April 2019, Abittan demanded that Chao and Ding return money to the investors.

6  At first, Chao agreed and requested that Abittan send her wiring information. But Chao never sent

7  the money. Instead, Ding questioned Abittan's loyalty, asking Abittan whether he represented

8  Findora or the investors.

9         103.    Chao and Ding later told Abittan that he didn't have "the stomach" to be the

10 cofounder of a successful company if he could not handle investor complaints. Chao and Ding also

11 stated that, if the investors wanted to sue, let them sue. According to Ding, "by the time they get

12 through in court, we'll be so big it won't matter." Abittan understood through conversations with

13 Chao and Ding that their glib approach to litigation was driven in part by the security and insulation

14 they felt as a result of omitting their true names on corporate documents and in conjunction with

15 owning assets.

16        104.    At the same time that Abittan demanded investor repayment, Chao stopped paying

17 the bills for the credit cards that she had obtained in Abittan's name. The outstanding balance on

18 the cards was approximately $637,000. Chao had not previously been late on those credit card

19 payments, and she assured Abittan that she would make the payments soon.

20        105.    On May 13, 2019, Abittan and his father (on behalf of investors), flew to California

21 to meet with Chao and Ding and resolve the investor and credit card issues. Chao and Ding blew

22 them off. Knowing that Abittan and his father were flying back to New York the same day, Chao

23 did not show up to meet with them as scheduled. Instead—and in what would become a pattern—

24 Chao met them for ten minutes on the sidewalk outside of a restaurant, before they had to leave for

25 their flight home. Chao assured Abittan and his father that she would take care of everything and

26 purported to make a payment toward the credit card balance. However, the payment was rejected.

27

28

**J.      As a Ruse to Coopt Findora, Chao and Ding Tell Abittan They Must Transfer Eian's Assets to a Cayman Entity to Protect Investors**

106.    On July 2, 2019, Abittan again flew from New York to California. The following day, July 3, 2019, Abittan met with Chao and Ding.

107.    The first meeting was in the early afternoon. Abittan asked to meet with Chao at 11:00 a.m. Chao agreed. Although the meeting concerned Findora business and happened on a workday, Chao asked Abittan to meet her in the parking lot of a Menlo Park Safeway grocery store, explaining that she did not want to talk in Findora's office because "Charles [Lu, Findora's then-CEO] is a gossipe [sic]." Chao did not arrive at the parking lot until approximately 12:15 p.m.

108.    Chao—in her capacity as Abittan's partner and/or in her capacity as the general manager and Chairman of each formal entity created in relation to the Blockchain Project, including Temujin Cayman—told Abittan that Eian needed to be converted to a Cayman Islands entity, explaining that the conversion would minimize any potential liability to investors in connection with Eian's anticipated coin sale. However, Chao did not provide Abittan with any paperwork at that time.

109.    Instead, Chao asked what time Abittan needed to go to the airport. Since Abittan had a flight back to New York scheduled for 9:45 p.m. out of San Francisco International Airport, he informed Chao that he would need to leave between 7:30 p.m. and 8:00 p.m. Accordingly, Chao said she would meet him again at about 7:00 p.m.

110.    Chao and Ding did not meet with Abittan until approximately 7:45 p.m. In a detached garage that was used as an office conference room, Chao gave Abittan a document and insisted that he sign it. Chao—in her capacity as Abittan's partner and/or in her capacity as the general manager and Chairman of each formal entity created in relation to the Blockchain Project, including Temujin Cayman—represented that the paperwork would not change Abittan's equity interest as a founder and owner of the Blockchain Project (i.e. Findora). She also represented that the interests of the other Findora investors would not change.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

111.   Abittan asked questions about the documents, but Chao created a hostile environment and got upset at the questions. Chao insisted that Abittan take her at her word that this document was to consummate a transaction that would maintain his equity interest as a founder and owner. She insisted that he sign the documents and contended that anything less would be a "betrayal of trust." Believing Chao's representations, Abittan signed the paperwork.

112.   The paperwork had signature lines for Lu, Fisch, and others. However, Chao instructed Abittan not to discuss the agreement with Lu or Fisch under any circumstances.

113.   Chao assured Abittan that Chao would send Abittan electronic copies of the documents. She did not do so.

114.   Despite the promises of its general managers and officers to maintain and preserve all equity interests in Temujin Cayan, Abittan never received any writing memorializing his ownership interest in Temujin Cayman.

115.   Despite Temujin Cayman's failure to memorialize Abittan's equity, Chao and Ding—in their capacities as Abittan's partners and/or as the general managers and officers of Temujin Cayman—repeatedly represented to Abittan in phone calls, emails, and texts, that he continued to have a significant equity interest in Findora. For example, Chao continued to agree in writing that Abittan was a major owner and co-founder of Findora.

**K.     The Blockchain Project Continues Without Disruption Under Temujin Cayman**

116.   As detailed above, following the fraudulent transfer, Chao and Ding—acting as Abittan's partners and/or as the general managers and officers of Project Revolution, Eian, and Temujin Cayman—represented to Abittan and others that nothing substantive changed after the purported transfer of the Blockchain Project to Temujin Cayman. Indeed, changed other than the exclusion of Abittan.

117.   For example, as described above (*see supra,* Section F), Chao and Ding, in their capacity as general managers and officers of Temujin Cayman and Temujin Cayman's subsidiary, Temujin Delaware, continued to require individuals to use the two-agreement employment/equity system that originally related to Eian and Project Revolution. Following the IP Sale Agreement,

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

individuals began earning salaries from Temujin Delaware (rather than Project Revolution) and receiving equity in Temujin Cayman (instead of Eian).

118.    Aside from Abittan, the entire Findora team transferred to Temujin Cayman and Temujin Delaware. The continuation of Findora was so seamless that the corporate change went undisclosed to employees, consultants, and advisors associated with the Blockchain Project for months. When, for example, one individual noticed the change—nearly three months later— Benjamin Fisch (the CTO of Temujin) responded: "Findora is simply a rebranding of Eian. We hadn't done any PR on Eian so it was safe to change the name, and Findora is a much better name than Eian. We should have notified you!"

119.    In September of 2020—more than a year after the purported IP Sale Agreement— one engineer wrote to Chao: "Since my current contract was signed with Project Revolution fund [sic] and Eian Labs, and I don't have an explicit contract with Temujin Labs, I'd appreciate a letter stating that I have been a contractor for Temujin Labs since X and state the relation between Project Revolution Fund, Eian Labs and Temujin Labs."

120.    There was no substantive difference between Eian, Project Revolution, and the new Temujin entities. The general managers, officers, directors, employees, consultants, and advisors remained the same. The assets, purpose, and business plan remained the same. Indeed, the only change was the exclusion of Abittan and the usurpation of his interests in the Blockchain Project.

121.    In sum, Temujin Cayman was the mere continuation of Eian and Project Revolution. Temujin Cayman, and its wholly owned subsidiary Temujin Delaware, are essentially the same business as Eian/Project Revolution, run by the same people, creating the same product, under a new brand name. Temujin Cayman continued, without change or interruption, the Blockchain Project. At all relevant times, Temujin Cayman and Eian/Project Revolution have maintained such a unity of interests that treating them as separate entities only serves to unjustly exclude Abittan and steal his interests in the Blockchain Project.

//

//

- 26 -

1   **L.      Chao and Ding Quietly Shut Abittan Out of His Own Company, While Defrauding**

2   **Abittan as to the Credit Card Debt**

3          122.    After fraudulently inducing Abittan into signing the July 3, 2019 paperwork, Chao

4   and Ding set to work shutting Abittan out of his own company.

5          123.    In or about the first week of July 2019, Chao and Ding caused Temujin Cayman to

6   enter into a written employment contract with Lu to serve as Temujin Cayman's (rather than Eian's)

7   Chief Executive Officer. At around the same time, they caused Fisch to enter into a written

8   consulting agreement with Temujin Cayman.

9          124.    In mid-July 2019, Chao and Ding caused a new Findora website to be put up. Abittan

10  noticed that he was not on the new website and asked Chao more than once to fix the issue. Chao

11  brushed him off by insisting it was just a draft website that would be updated in due time.

12         125.    At about the same time, Chao and Ding cut off Abittan's access to his Eian email

13  account. Again, Abittan informed Chao, and Chao brushed him off.

14         126.    As the Temujin Cayman transactions were happening, Abittan continued to demand

15  payment of his credit debt, but Chao continued to string him along.

16         127.    On July 10, 2019, Chao promised in a text message that her sister Selena would

17  make an $85,000 payment that same day. No payment ever came.

18         128.    On July 28, 2019, Chao promised again that she would transmit money that same

19  day. Again, no payment ever came.

20         129.    In August 2019, Abittan learned of a lawsuit in New York relating to the

21  $365,622.60 outstanding credit card debt on the Project Revolution Fund American Express

22  account. Abittan texted Chao immediately. Chao responded that it was her priority and that she

23  would make things right. Abittan sent Chao his bank account wiring information and a screenshot

24  showing his credit rating dropping by more than 150 points. Chao brushed Abittan off and told him

25  not to bother her.

26         130.    Abittan continued to demand payment on the credit card debt through December

27  2019. Chao promised Abittan that she would arrange to have the debt paid by December 31, 2019.

28

- 27 -

Relying on those representations, Abittan agreed to make full payment to American Express by that date. Specifically, Abittan hired Chesky Monk to negotiate a payment agreement with American Express to dispose of the debt and resolve the lawsuit against Abittan pertaining to that debt.

131.    Chao, however, had no intention of honoring her promise. Instead, she asked Abittan to fly to California to meet with her and a "rich" and "powerful" friend who was supposedly an experienced investor worth hundreds of millions of dollars. According to Chao, that friend was going to somehow take care of the credit card debt in conjunction with an investment into Findora.

132.    On December 29, 2019, Abittan flew to the Bay Area and was instructed to meet Chao at a restaurant called Dim Sum King in Daly City. Chao and Ding's whole family were there, including Selena Chen, and the supposedly powerful businessman, named Yang Yang. Chao presented Abittan with a separation agreement whereby Abittan would be paid $190,000 in exchange for separating from Eian. The counter-signatory on the separation agreement was to be Xilei Wang—a strawperson whom Chao and Ding had previously entrusted to act as their agent. Abittan refused to sign the agreement and told Chao to pay him back the credit card debt either using some of the money from the $50,000,000 investment she claimed she had secured or by taking out a loan.

133.    Ultimately, Chao did not pay the American Express debt by December 31, 2019 as promised. Abittan was forced to make a payment of $183,982.21 so that his ongoing business RealTime would remain in good standing. Abittan was later served with a New York complaint by American Express regarding a $365,622.60 outstanding balance on the Project Revolution account. That action remains pending. Likewise, the $85,552.31 debt on the Chase credit card for JVI remains unresolved. In addition, Abittan incurred approximately $23,000 in business expenditures (like Abittan's flights and hotel stays for Findora work) that have not been reimbursed as promised.

134.    Chao and Ding also eliminated Abittan's rightful access to the business, while lying to Findora's executives and employees about Abittan's absence. Defaming Abittan, Chao told Lu and Fisch that Abittan had made false promises to investors and that his departure from Findora and sporadic subsequent appearances were no cause for alarm. Chao falsely told investors and

- 28 -

1   employees that Abittan was not a major owner of Findora and that Abittan was lying when he

2   claimed to be a founder.

3       135.    Meanwhile—in text messages with Abittan and his father from January through

4   June 2020—Chao and Ding made additional misrepresentations. They repeatedly admonished

5   Abittan not to share information with anyone at Findora, particularly with Lu and Fisch. On

6   information and belief, Chao and Ding knew that they had made materially misleading and

7   inconsistent statements to Abittan, on the one hand, and to Lu and Fisch on the other hand.

8   Therefore, communications between Abittan, Lu, and Fisch were likely to reveal Chao's and Ding's

9   misconduct and fraud. Chao ultimately blocked messages from Abittan but continued to take

10  messages and have phone calls with Abittan's father.

11      136.    By September 2020, employee dissatisfaction at Findora had escalated due to

12  concerns over a lack of transparency and (accurate) beliefs that Chao and Ding were engaging in

13  misconduct.

14      137.    Ultimately, as a result of concerns about how Findora was being run, the majority

15  of the Blockchain Project engineering team, including its Chief Executive Officer and Chief

16  Technology Officer, resigned.

17      138.    At the same time, Abittan's father called Chao and demanded that she call Abittan

18  to work things out. Abittan's father suggested that, if she did not, Abittan would have no recourse

19  aside from litigation.

20  **M.    Abittan Begins to Discover the Extent of the Fraudulent and Illicit Conduct by Chao,**

21          **Ding, and Their Co-Conspirators**

22      139.    Abittan subsequently discovered that Chao, Ding, and their Co-Conspirators had

23  engaged in ongoing illicit, fraudulent, and racketeering conduct, ultimately harming Abittan.

24  Abittan discovered these facts through an ongoing investigation into Chao and Ding, speaking with

25  former Findora executives and employees, and reviewing documents filed in litigation.

26  //

27  //

28
AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

1

                              i.   Fraudulent Documents

2          140.   Chao had fraudulently induced Abittan to sign documents that Chao and Ding (and

3   their co-conspirators) then used to purportedly transfer Eian's assets—which are not identified with

4   specificity, but which Chao and Ding led everyone to believe meant Findora's name and blockchain

5   technology—to a new company called Temujin Labs Inc. But—in addition to the fraudulent

6   inducement—the documents were sloppy and inconsistent. On July 2, 2019, Chao and Ding created

7   two entities with identical names: (1) Temujin Labs Inc. in Delaware ("Temujin Delaware"); and

8   (2) Temujin Labs Inc. in the Cayman Islands ("Temujin Cayman").

9          141.   Chao and Ding have now produced a "Unanimous Action of Members" ("UAM"),

10  dated July 3, 2019, stating that Eian owed $300,000 to Temujin Labs Inc. but lacked "sufficient

11  assets" to repay that debt. The document then purports to authorize Eian to sell its assets to Temujin

12  Labs Inc. for $1 and a discharge of the $300,000 debt. Defendants have not explained the following

13  inconsistencies:

14      •   In federal filings, the defendants have repeatedly stated that Temujin Delaware and

15          Temujin Cayman are distinct entities (*see* Temujin Delaware's Motion to Dismiss

16          at 12) yet the UAM does not specify which Temujin Labs Inc. was owed the

17          $300,000 debt from Eian.

18      •   It is unclear how or why, on July 3, 2019, Eian owed $300,000 to an entity formed

19          one day prior on July 2, 2019.

20      •   It is unclear why Temujin Labs Inc. would pay consideration of $300,001 to

21          purchase Eian's assets, where the UAM states that Eian "has no sufficient assets to

22          repay the [$300,000] Debt" to Temujin Labs Inc. Nor does the UAM identify the

23          assets being sold with any specificity. In other words, the UAM states that Temujin

24          Labs Inc. is providing $300,001 in exchange for nothing.

25      •   On its face, the UAM purports to be signed by 2 members of Juniper Venture

26          Partners LLC (Eian Labs' majority owner): (1) Fourhair LLC; and (2) Ariel M.

27          Abittan. The signatory for Fourhair LLC was Guanghua Liang as CEO. But Chao

28

                                        - 30 -

1    and Ding have never introduced Abittan to Guanghua Liang or otherwise confirmed

2    that person's identity;

3    • There is no text showing that the first page with substantive provisions was actually

4    affixed to the signature page. Both pages lack page numbers, and the signature page

5    lacks any text other than the date and signature blocks;

6    • Defendants have not produced an original copy of the UAM;

7    • The UAM states that "Eian Labs is authorized to enter into a settlement and mutual

8    release agreement as well as asset purchase agreement with the Creditor, the forms

9    of which are set forth on Exhibit A attached here to." However, counsel for Temujin

10   Cayman, Temujin Delaware, Chao, and Ding filed with the federal court a copy

11   excluding the referenced "Exhibit A" and have never produced another copy with

12   the Exhibit A; and

13   • On its face—and without the missing "Exhibit A"—the UAM is not a sales

14   agreement and does not effect a transaction between Temujin Labs Inc. and Eian.

15   Rather, it authorizes a transaction pursuant to other papers.

16   142.    Furthermore, in lieu of the missing "Exhibit A"—which should be a settlement and

17   mutual release agreement and asset purchase agreement—Temujin Delaware filed in the Federal

18   Action an "Intellectual Property Sale Agreement" ("IPSA") between Eian as seller and Temujin

19   Cayman as purchaser. That document contradicts the "UAM" in multiple ways:

20   • The IPSA is dated August 12, 2019, without any explanation as to why it was not

21   attached to the UAM or as to the inconsistent dates;

22   • The metadata of the IPSA indicates that it was actually drafted on December 17, 2020,

23   more than one year **after** it was purportedly executed;

24   • The IPSA lists assets that Eian is selling, whereas the UAM stated that Eian lacked

25   sufficient assets to pay a $300,000 debt to Temujin Cayman;

26   • Contrary to the UAM, the IPSA does not refer to any debt owed by Eian to Temujin

27   Cayman (or Temujin Delaware); instead it states that Temujin Cayman would pay

28

- 31 -

$300,000 to Eian in exchange for Eian's assets, contrary to the UAM's statement that Eian lacked assets.

    ii.  <u>Obfuscating True Identities, Concealing Assets, and Evading Service of Process</u>

143.    Throughout this multi-year scheme, Plaintiff was lulled into trusting Chao and Ding by their grandiose displays of wealth and plausible (but likely false) relationships with China's most elite businesspeople.

144.    Since litigation began, however, Plaintiff continues to uncover the extent of Chao and Ding's malfeasance, including their intentional use of false names to purportedly avoid detection by the Chinese government and service of process. For example, Chao and Ding have attempted to restrict their counsel from using their names in court filings (even in routine stipulations), and they have suggested that Plaintiff has confusion as to their identities.

145.    But Plaintiff spent thousands of hours working with Defendants to buy and sell high-value watches, to seek and obtain millions of dollars from investors, to recruit prestigious cryptographers, and to build a successful fintech company. Hundreds of these hours were spent face-to-face—most frequently at Defendants' house located at 69 Isabella Ave.—with numerous witnesses present, including employees and Defendants' own children.

146.    Until their relationship soured in 2020, Chao and Ding frequently invited Abittan to their home, 69 Isabella Ave—a house worth nearly $25,000,000. On approximately twenty (20) separate occasions, Abittan spent the night at 69 Isabella Ave., and sometimes brought his wife and children. Each time Abittan visited, Chao and Ding were present at their home, which they shared with their two young children; Chao's sister, Selena Chen; and their long-time driver, Jianrong Wang. Chao's and Ding's children attended Sacred Hearts Schools, Atherton, located just one mile from 69 Isabella Ave. At all times, Chao and Ding held 69 Isabella Ave. out as their primary residence, always referring to it as their house when speaking with Abittan.

147.    Chao and Ding frequently hosted work sessions at their house, during which time Chao referred to 69 Isabella Ave. as "the Clubhouse." In reality, the Clubhouse was just another display of wealth that lured Abittan and others into trusting in Chao's and Ding's representations

of business acumen and connections. The Clubhouse was a central tool in their fraudulent scheme to convince numerous sophisticated people into working for substantially less than they bargained for and signing away rights to Findora in exchange for equity in an empty company, Eian.

148.    Despite Abittan's close relationship with Chao and Ding, they have since contended in this action that he suffers from a confusion of identities—a confusion that exists, if at all, as a direct result of Chao's and Ding's misidentification tactics. And yet, while hiding from litigation by Abittan, Chao and Ding acted as the "principal client representatives" of Temujin Delaware to file specious litigation against Abittan and others in California state court. Upon information and belief, Temujin Delaware serves no other purpose, other than acting as the plaintiff in that meritless litigation. Specifically, Abittan has never entered into any contracts with Temujin Delaware, and by its own admission, Temujin Delaware has never had any interest in Findora. Yet Chao and Ding have caused Temujin Delaware to sue Abittan in state court.

149.    Furthermore, on December 3, 2021, a person by the name of Yuting Chen initiated the Related Federal Action against Abittan—as well as Abittan's father, mother, wife, siblings, mother-in-law, and father-in-law—for causes of action in relation to Chao's, Ding's, and Abittan's luxury watch transactions. As alleged above (*see* ¶¶ 16, 17), Abittan knows "Yuting Chen" only as a name used by Chao on bank accounts, mailing addresses, and leases.

150.    On information and belief, a separate person by the name of Yuting Chen has been coordinating with Chao and Ding to engage in the conduct alleged herein. Yuting Chen has assisted Chao and Ding to use Yuting Chen's identity to defraud Abittan (and others), conceal assets, and obfuscate the ability for Abittan (and others) to find Chao's identity's or pursue appropriate remedies for Chao's and Ding's unlawful conduct.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

151.   For the avoidance of doubt, the following is a picture of Chao, with whom Abittan interacted in person for hundreds of hours:



152.   For the avoidance of doubt, the following is a picture of Ding, with whom Abittan interacted in person for hundreds of hours:



AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

153.    Abittan does not have a picture of Yuting Chen. On information and belief, Abittan alleges that Yuting Chen is a separate individual who knowingly took part in Chao's and Ding's fraudulent and unlawful conduct that damaged and continues to damage Abittan. Abittan bases this allegation on, *inter alia*, the various ways Chao has used the "Yuting Chen" name; the fact that Chao made misrepresentations to Abittan that wrongfully induced Abittan to wire or deposit money into a bank account under the name "Yuting Chen"; and that Abittan faces a lawsuit by Yuting Chen (the Related Federal Action) despite never having knowingly met or conducted business with another person (other than Chao) associated with that name.

iii.    Creating Sham Entities to Fake Investors and Aid in the Fraudulent Scheme

154.    On September 18, 2018, Ding created at least four new entities to aid in his and Chao's theft of Findora: JV Partners, JV Holdings, Fourhair and Lakeside.

155.    Specifically, upon information and belief, Ding simultaneously created Fourhair to co-own JV Partners with Abittan, and then used JV Partners and Lakeside to further remove Abittan from Eian by backdating share purchase agreements so that Abittan was not a direct shareholder in Eian, despite the Partnership terms of co-ownership. Ding told Abittan that Lakeside was Jack Ma's wife's entity and that Fourhair was owned by a Chinese investor. In reality, Fourhair, Lakeside, JV Partners, and JV Holdings were created by Chao and Ding to serve as shell companies in their criminal enterprise and to facilitate their tortious conduct and breaches against Abittan.

156.    Upon information and belief, JV Holdings was also used to retroactively legitimize Powerscale Capital. The mission of Powerscale Capital—which was formed on August 2, 2018 and thereafter registered with the Securities Exchange Commission ("SEC") —was to serve Findora as an investment adviser, focusing on an endowment style investment program. The "owners" of Powerscale Capital, according to the fund formation documents filed with the SEC, are John Powers and JV Holdings. And yet, the term sheet with John Powers says that his co-owner is JuniperVC—a reference to the Partnership between Abittan and Ding/Chao. The term sheet also references the cancellation of an employee contract with JuniperVC, but, upon information and

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

1  belief, John Powers only had an employee contract with Project Revolution. The interchanging use

2  of entity names further highlights the fraudulent tactics of Chao and Ding.

3       157.    Abittan also discovered that Chao and Ding tried to alter the ownership interests in

4  JV Partners in order to finalize pushing Abittan out of Findora. Upon information and belief, Chao

5  and Ding forged Abittan's signature on a document titled "Amendment No. 1 to Operating

6  Agreement" ("Amendment"). The Amendment purported to admit a new majority member to JV

7  Partners—Yang Yang—for a $4,000 capital contribution. In essence, the Amendment purports to

8  dilute Abittan's interest in JV Partners from 50% to 33.3%, in exchange for nothing.

9       158.    Upon information and belief, there are at least three other entities that Chao and

10 Ding formed, which have been used as part of Chao and Ding's scheme, specifically: (1) Black

11 Cobble Rideshare Funding LLC, which Ding had Abittan form as the sole member; (2) Powerscale

12 Capital Fund LP, which was formed in the Cayman Islands in connection with Powerscale Capital

13 Management LLC; and (3) Smart Investment Fund LLC, which was purportedly formed in

14 connection with a trademark application by Chao's and Ding's driver, Jianrong Wang using an Eian

15 email address. Upon information and belief, these entities were formed and utilized by Chao and

16 Ding as shells created for the purpose of hiding Chao's and Ding's identities and assets to avoid

17 the consequences of their fraud.

18               iv.  Lying to Investors and Current and Former Findora Employees While Denying

19                    Abittan's Role in Findora

20      159.    Chao and Ding lied to anyone and everyone in order to continue and hide their fraud.

21 After they shut Abittan out of Findora, took away his access to his emails, and removed him from

22 the Findora website, Chao and Ding (or one of their agents) reported Abittan's LinkedIn profile—

23 which identified Abittan as the Founder and President of Findora—for containing "inaccurate

24 information." As a result of Chao and Ding's false report, LinkedIn removed the Findora

25 information and titles from Abittan's profile.

26      160.    As Abittan's hires began leaving in droves, investors started asking questions.

27

28

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

161.   One potential investor asked: "What about the resignation of Findora's three Stanford founders." The operator of the @findoraen account replied: "We don't have 3 Stanford founders on resignation." In reality, more than a dozen members of the engineering team (including the Stanford co-founders) had departed Findora.

162.   Another potential investor responded: "someone claims that they have left the team." The owner of @findoraen replied: "Two cofounders Stanford phd students." Of course, as Defendants' own judicial admissions reveal, these individuals were not just students, but were in fact the CEO and CTO/Chief Scientist of the company. The response does not mention the fact that the vast majority of Findora employees, including these co-founders and the majority of the engineering team had quit because of Chao and Ding's obvious fraudulent conduct.

163.   A potential investor replied: "student? lol." The owner of @findoraen replied: "John Powers, Stanford MBA and former CEO SMS, passed away this year unfortunately. He is a class act and we remember him for ever! [sic] We have Paul Scherer, Stanford MBA and executive on iNDORA [sic] FOUNDATION. He is active and healthy." This was a non-sequitur meant to deceive investors into thinking that, despite the departures of the most essential Findora employees, the truly important individuals from Stanford remained.

164.   A potential investor responded: "I suggest official announcement from the team to calm investors down as many are claiming now core members of FINDORA quite [sic] the project." A Findora representative responded: "Not true. And we will. We don't really want to make an announcement too soon. Let's have this rumor fly for a while [sic]: it's a strong PR to draw attention." This was blatantly false given that the CEO, CTO and Chief Scientist, and engineering team had departed, yet Findora representatives have repeatedly told investors that these individuals were not part of the "core" team.

165.   The owner of @findoraen then reminded investors that the two Stanford Ph.D.'s previously mentioned were just students, before stating: "We have real engineering teams of engineers and cryptographers and application developers"—as if to cast the departure of the most

- 37 -

1   important Findora employees as two summer interns leaving while the remainder of the team
2   remained intact.

3          166.    In another mid-December 2020 Telegram thread, one potential investor stated: "I
4   am ready to purchase option D but you have no [sic] clarified who the co founders [sic] are?" A
5   Findora representative responded by pointing the investor to info.findora.org. The potential
6   investor responded: "But when looking at other findora sources [d]ifferent co founders [sic] come
7   up which is very confusing[.] I am interest [sic] in the project just wanted to clarify this before
8   buying. Findora co-founders (and Stanford cryptographers), Ben Fisch and Benedikt Bunz, together
9   with Alan." A Findora representative responded: "thanks for your concerning [sic] our team and
10  our team have [sic] been updating and re-construction [sic]." As described above, this response was
11  false and misleading.

12         167.    The potential investor responded: "So the other guys are they still there in the team
13  or not[,] Ben F and Benedikt[?]" Chao responded directly: "I think if you want to build the best
14  projects,you [sic] need to find the best person and the best team members.so [sic] team members
15  upgrade [sic] to the best one. They [referring to Ben and Benedikt] are PHD students.their [sic]
16  priority should be their research.J they are not with Findora." This was false and misleading for the
17  same reason that the Findora representative's statements above were false and misleading.

18         168.    The operators of the Findora Telegram account sought to create a false narrative that
19  the reason these employees left was to focus on their studies at Stanford. They have also allowed
20  another false (and inconsistent) narrative to propagate the feed, which is that the real reason Lu,
21  Fisch, and others left Findora was to found a competing company, as detailed in the specious
22  complaint Defendant Temujin filed against Abittan, Lu, and Fisch in Santa Clara County.

23         169.    Many other potential investors have also been concerned. One asked: "What
24  happened to the stanford crypto guys like Ben en [sic] benedict?" Another asked: "What has
25  changed since the Stanford people left[?]" And these are just a small sampling of a continuing
26  dialogue on the @findoraen telegram account.[5] Findora never revealed the truth to these potential

_____
[5] Defendants' fraud has become apparent to the outside world, as a recent Chinese-language

investors either and simply sought to perpetuate the falsehood that Findora was a legitimate company with an all-star team of highly respected and honest cryptographers.

170.     Anytime any person questioned why Abittan or other employees left Findora, Chao and Ding (or one of their agents) deleted the question and blocked the user from the Telegram channel.

171.     In addition to lying to investors, Chao and Ding embezzled investor money.

172.     On information and belief, Chao directed members of Findora's team in China to wire significant sums of money to an e-commerce company called Xipin Group ("Xipin"). U.S. management that they were not aware of any legitimate purpose for these transactions. Neither Abittan nor anyone else to Abittan's knowledge was aware of any legitimate purpose for these transfers.

173.     On information and belief Chao controls Xipin either directly or indirectly. The Xipin website contains some overlap with prior Findora employees, including Paul Scherer – who is listed as Chief Strategy Officer under the alias Paul Xie. [6]

174.     Abittan is informed and believes and thereon alleges that Chao raised millions of dollars on behalf of Findora in private financings, which she then transferred to a personal Binance account. Chao did not seek authorization from Temujin's CEO or from Abittan for the unauthorized transfer.

175.     Abittan is informed and believes and thereon alleges that Chao also directed Powerscale to invest $5,000,000 in Xipin. Although JV Holdings (or JuniperVC) is the majority owner of Powerscale, Chao and Powerscale never informed Abittan of this transaction, which he learned about from third parties. Abittan never authorized this transaction and is not aware of JVI, JV Holdings, or Juniper VC having authorized it.

//

//

_____

exposé revealed. See https://fdhdtcuzqg5elz7fa3omssakmq-adwhj77lcyoafdy-zhuanlan-zhihucom.translate.goog/p/337834014.
[6] https://mp.weixin.qq.com/s/k6XLrUAY4G_GWi0xCz6eBQ

1

v.    Obtaining a Covid PPP Loan for Temujin Delaware

2   176.   Chao and Ding also used their sham entities to steal money from the government

3   during the Covid 19 crisis by improperly and fraudulently applying for a Paycheck Protection

4   Program ("PPP") loan.

5   177.   On April 11, 2020, Temujin Delaware applied for and received a PPP loan in the

6   amount of $383,637.

7   178.   On March 31, 2021, Temujin Delaware applied for and received a PPP loan in the

8   amount of $208,370.

9   179.   Upon information and belief, Temujin Delaware did not and could not have

10   legitimately qualified for either PPP loan. Upon information and belief, Temujin Delaware did not

11   have any employees and did not have a 25% reduction in gross receipts. Therefore, the money was

12   not necessary for Temujin Delaware's continued operation.

13

vi.    Using Abittan's Credit Cards to Pay Chao's and Ding's Share of Partnership

14

Expenses

15   180.   Once Abittan and Ding (and/or Chao) agreed to partner on a particular watch,

16   Abittan always wired or deposited his 50% of the cost to Ding or Chao. On many occasions, Abittan

17   also simultaneously prepaid the profits from an anticipated sale. Ding and Chao never sent a watch

18   to Abittan prior to receiving Abittan's share of the costs.

19   181.   Ding and Chao initially paid their share of costs directly; however, as detailed above,

20   Ding and Chao eventually began misusing Abittan's credit cards to pay their share of the costs.

21   Ding and Chao promised to pay off the balance of Abittan's credit card but ultimately reneged on

22   this promise.

23   182.   If Abittan sold a Partnership watch (and had not already pre-paid Ding and Chao's

24   profits), Abittan always sent Ding and Chao's share of the profits upon collection of the funds from

25   the ultimate buyer.

26   183.   By contrast, each time Ding and Chao claimed to sell a Partnership watch, Ding and

27   Chao failed to distribute Abittan's share of the proceeds. Instead, Ding and Chao elected to

28

- 40 -

"rollover" Abittan's profits into a new Partnership watch. Abittan never saw these new watches. Nor did Abittan ever collect the proceeds from the sales of any such watches. Indeed, over the course of the Partnership, Abittan never received *any* incoming payment from Ding or Chao for profits earned from a luxury watch sale.

184.    Moreover, in May 2019, Ding and Chao claimed that they had invested the sale proceeds for certain watches—including Plaintiff's 50% share of those profits—into a separate business consisting of multiple entities that Plaintiff, Ding, and Chao had begun working on in December 2017. In other words, Ding and Chao diverted Plaintiff's money without his prior consent.

185.    There are approximately twenty-four unaccounted for watches—or, in the alterative, the costs of, or profits from, these watches—in which Abittan has at least a 50% ownership interest. The total amount of principal that Abittan invested in these watches is approximately $1,139,270.

186.    The present value of the unaccounted-for watches is nearly eight times greater than the principal value of those watches. Accordingly, Abittan's 50% interest in these watches exceeds $8,000,000.

## **ALTER EGO / COMMON ENTERPRISE LIABILITY**

187.    As detailed above, Chao and Ding created at least the following entities as part of their fraudulent scheme to steal Findora and embezzle millions from Abittan and other investors (referred to hereafter as the "Common Enterprise Entities"):

          a.   JVI

          b.   Project Revolution

          c.   Eian

          d.   Powerscale

          e.   JV Holdings

          f.   JV Partners

          g.   Lakeside Garden

          h.   Fourhair

- 41 -

i.   Temujin Delaware

j.   Temujin Cayman

k.   Smart Investment Fund

l.   Powerscale Capital Fund

m.  Black Cobble Rideshare Funding

188.   Despite using strawpersons, including, but not limited to, Guanghua Liang, Yang Yang, Jianrong Wang, Xilei Wang,  Selena Chen, and Alex Wang (who Ding even admitted to Abittan was not a real person) (the "Common Enterprise Agents") to effectuate their fraud, Chao and Ding controlled the Common Enterprise Entities.

189.   Upon information and belief, Chao and Ding's common enterprise used only one bank account in the name of JVI and two credit cards in JVI's and Project Revolution's names. The entities all commingled employees, officers, directors, and office space, including use of 69 Isabella Ave., which is leased to "Yuting Chen."  Investors sent money only to JVI, which was used to pay salaries of Project Revolution employees, in exchange for equity in Eian. None of the Common Enterprise Entities maintained corporate formalities, and upon information and belief, nearly all failed to take any steps to finalize corporate formation, such as issuing shares or executing an operating agreement. Chao and Ding repeatedly asked employees to sign contracts with multiple organizations and would often identify one entity in a contract that gave rights to a second, seemingly unrelated, entity. Ding once told Abittan that the various entities were for "internal" use only, and that no one would ever know about the formation of the shells. The Common Enterprise Entities that were known, however, were all referred to colloquially as Findora. And above all, Chao and Ding controlled everything.

190.   The Common Enterprise Entities identified herein have such a unity of interest with Chao and Ding (and their co-conspirators) that their separateness has ceased and holding only the Common Enterprise Entities liable will result in injustice. The Common Enterprise Entities were a mere tool or business conduit of Chao and Ding while acting as Abittan's partners. Specifically, co-mingling of funds occurred, and diversion of Partnership profits to individuals or other entities

- 42 -

occurred. The Common Enterprise Entities were inadequately capitalized. There was a failure to keep appropriate corporate records.  And there was a failure to keep personal or other entity assets separate. There were representations made that the Common Enterprise Entities were one and the same and that they were all backed by Chao and Ding.

191.   In sum, the Common Enterprise Entities, as controlled by Chao and Ding, are a single business enterprise because they are not operated as separate entities but instead they pool their resources to achieve common goals—Findora. The Common Enterprise Entities had common employees, offices, centralized accounting, payment for the wages of the other entity's employees and the use of the same business name. Employees of one entity provided services to the other entities. Funds were transferred between the companies without sufficient documentation. Profits and losses were shifted between the companies in a manner that is not properly documented.

192.   Moreover, Chao and Ding used the Common Enterprise Entities as a sham to perpetrate fraud. The Common Enterprise Entities existed simply to defraud Abittan, employees, investors, and other people by inducing them into contracts where misrepresentations were made which were material, which caused that person to enter into the contract on the basis of the misrepresentation, and which caused damage to that person.

193.   Chao and Ding caused the Common Enterprise Agents to form the Common Enterprise Entities for the express purpose of defrauding Abittan and others. At all times material to this cause of action, the Common Enterprise Agents were a principal, agent, and/or employee of Chao and Ding, and were at such times, acting within the full course, scope, and authority of their positions with Chao and Ding, therefore imputing liability for their negligent and wrongful acts and resulting damages as outlined herein under, *inter alia*, the principles of respondeat superior, the law of agency, the laws of California, and/or the laws of the United States.

194.   To treat each of these entities as separate—and to treat the Common Enterprise Agents separate from Chao and Ding—would result in injustice. Moreover, to allow Chao and Ding to use the corporate structure that they put into place for the precise reason of obfuscating their

1 identities and avoiding the consequences of their fraud would be rewarding Chao and Ding's

2 wrongdoing and bad faith conduct.

3     195. Accordingly, the Common Enterprise Agents and the Common Enterprise Entities

4 acting in concert with Chao and Ding should be held jointly and severally liable with Chao and

5 Ding for the damages occasioned by Chao and Ding's fraudulent activities.

6 **FIRST CAUSE OF ACTION**

7 **Declaratory Judgment**

8 **(Against All Defendants)**

9     196. Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this

10 Complaint as though fully set forth herein and alleges the following cause of action.

11     197. An actual controversy has arisen and now exists between Abittan and Defendants

12 concerning their respective rights to the Blockchain Project.

13     198. Abittan contends that each and every contract relating to the Blockchain Project

14 from January 2018 through present is the result of fraud, perpetrated by Chao and Ding,

15 individually and/or as the general managers and officers acting on behalf of the Common Enterprise

16 Entities, including Temujin Cayman; that all such contracts are void, and that the Blockchain

17 Project—both the business and the technology—is the property of a general partnership between

18 Abittan, Chao, and Ding, in which Abittan has a fifty-percent (50%) interest.

19     199. Alternatively, and to the extent any other valid and binding corporate structures and

20 entities were created, exist, and own rights to the Blockchain Project, Abittan has up to a 50%

21 interest.

22     200. Defendants dispute these contentions and contend that Abittan has no interest in the

23 Blockchain Project.

24     201. A judicial declaration is necessary and appropriate at this time under the

25 circumstances to establish all parties' respective rights to the Blockchain Project.

26

27

28

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SECOND CAUSE OF ACTION

**Breach of Partnership Agreement**

**(Against Chao and Ding)**

202.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

203.    On or around August of 2017, Abittan, Ding, and Chao entered into a valid oral and/or implied partnership agreement to buy and sell luxury watches. *See* Corp. Code § 16202. By January of 2018, the Partnership's primary business purpose had evolved to the formation and creation of the Blockchain Project.

204.    Pursuant to the terms of the partnership agreement, Abittan owns 50% of the Partnership. Ding and Chao, collectively, own the other 50% of the Partnership. By their express oral terms, and/or implied by their conduct, Abittan and Ding/Chao, respectively, agreed to contribute 50% of the Partnership's expenses (such as the cost of a luxury watch), and, eventually, to make an initial investment of $50,000 in the Blockchain Project. Abittan and Ding/Chao each had a 50% interest in the Partnership's assets, profits, and losses.

205.    The essential terms of the oral and/or implied partnership agreement were acknowledged and affirmed by Ding and Chao and Abittan through, *inter alia*, the formation of a Juniper Ventures Incorporated, which retained Abittan's and Ding/Chao's (albeit through an agent of Ding and Chao's choosing) 50% interest in the Partnership's Blockchain Project. The Partnership was further acknowledged and affirmed by Ding/Chao's and Abittan's mutual performance under the Partnership agreement, including their respective contributions of $50,000 into the Blockchain Project, the payment of 50% of watch costs, and the remittance and acceptance of 50% of watch profits.

206.    Abittan performed all conditions, covenants, and promises required to be performed by him in accordance with the partnership agreement except those excused by the actions of Defendants.

207.     Chao and Ding materially breached the partnership agreement by, among other things, repudiating the existence of the Partnership; denying Abittan's interest in the Partnership's assets, including dozens of luxury watches and the Blockchain Project; depriving Abittan of his ownership share in the Partnership and the past, present, and future proceeds therefrom; obstructing Abittan's right to equally manage and conduct the Partnership's business; using the assets acquired by the Partnership for their own use; and funneling Partnership assets, including the Blockchain Project, away from the Partnership through the use of shell companies and sham documents.

208.     Ding and Chao have further breached the partnership agreement by failing to provide Abittan with an accurate accounting of the financial affairs of the Partnership.

209.     As a direct and proximate result of Chao's and Dings breaches of the partnership agreement, Abittan has been damaged in a sum according to proof at trial.

### **THIRD CAUSE OF ACTION**

**Breach of Partnership Agreement**

**(Against Temujin Cayman, Chao, and Ding)**

210.     Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

211.     Alternatively, or additionally, Abittan has an ownership interest in the Blockchain Project pursuant to an oral and/or implied partnership agreement entered into by Abittan and Temujin Cayman.

212.     On or around July 3, 2019, Abittan and Temujin Cayman—acting through its general managers and officers, Chao and Ding—entered into a valid oral and/or implied partnership agreement to develop the Blockchain Project in the Cayman Islands, rather than domestically. Pursuant to Abittan and Temujin Cayman's partnership terms, Abittan had up to a 50% interest in the partnership and the partnership's assets, including the Blockchain Project.

213.     The essential terms of the oral and/or implied partnership agreement were acknowledged and affirmed by Temujin Cayman and Abittan by, *inter alia*, performing the acts and engaging in the conduct of continuing to develop the Blockchain Project together for months

after Temujin Cayman's formation. Aside from this partnership interest, Abittan received no other compensation for combining his efforts and resources to develop the Blockchain Project with Temujin Cayman. The partnership was further acknowledged, affirmed, and manifested by Abittan's publicly-known title—Founder and President of the Blockchain Project.

214.    Abittan performed all conditions, covenants, and promises required to be performed by him in accordance with the partnership agreement except those excused by the actions of Defendants.

215.    Temujin Cayman, and Ding and Chao, in their capacities as the general managers and officers of Temujin Cayman, materially breached the partnership agreement by, among other things, repudiating the existence of the partnership; denying Abittan's interest, role, and involvement in the Blockchain Project; depriving Abittan of his ownership share in the partnership and the past, present, and future proceeds therefrom; obstructing Abittan's right to equally manage and conduct the partnership's business; and using the assets developed by the partnership for their own use and benefit.

216.    Temujin Cayman and Ding and Chao, in their capacities as the general managers and officers of Temujin Cayman, have further breached the partnership agreement by failing to provide Abittan with an accurate accounting of the financial affairs of the partnership.

217.    As a direct and proximate result of the breaches committed by Temujin Cayman, and Ding and Chao, in their capacities as the general managers and officers of Temujin Cayman, Abittan has been damaged in a sum according to proof at trial.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Chao and Ding)

218.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

219.    As alleged above, Abittan and Ding and Chao entered into an oral and/or implied partnership, first, to buy and sell luxury watches and, second, to create the Blockchain Project as a

- 47 -

1    business for commercial purposes.

2    220.    As partners in the Partnership, Chao and Ding, at all relevant times, owed Abittan

3    the fiduciary duties of disclosure, loyalty, and care. Pursuant to such fiduciary duties, Chao and

4    Ding were required to act in the utmost good faith towards Abittan and to avoid acts and omissions

5    adverse to Abittan. Chao and Ding were, further, required to act lawfully in conducting activities

6    with Abittan, to act with the utmost integrity as to the dissemination of information to Abittan, and

7    to refrain from committing acts of waste or conversion, mismanagement, self-dealing, and/or gross

8    negligence and causing damages to Abittan or otherwise harming, impeding, or violating Abittan's

9    interests or rights.

10    221.    By virtue of this fiduciary relationship, Abittan reposed trust and confidence in the

11    integrity of Chao and Ding. Abittan relied on Chao and Ding to preserve, promote, and advance the

12    best interests of the Partnership. Chao and Ding invited and accepted Abittan's trust, confidence,

13    and reliance. Abittan provided no cause for Chao or Ding to act in any manner inconsistent with

14    this fiduciary relationship.

15    222.    Chao and Ding have willfully and intentionally breached their fiduciary duties to

16    Abittan, including the duties of disclosure, loyalty, and care, by, among other things:

17        a.    fraudulently inducing Abittan into forming or being associated with shell companies

18            that Chao and Ding claimed were legitimate subsidiary entities of the Partnership;

19        b.    orchestrating the sale of Partnership assets away from the Partnership for zero

20            consideration;

21        c.    concealing the purpose of the sale of Partnership assets to the Common Enterprise

22            Entities of which Chao and Ding were the general managers and officers;

23        d.    self-dealing by using Abittan's credit cards to pay their share of Partnership

24            expenses,

25        e.    fraudulently benefitting from the sale of Partnership assets without disclosing their

26            conflicts of interest;

27        f.    retaining possession of Partnership assets for their own benefit; and

28

- 48 -

g. falsifying books and records to dilute Abittan's interest in the Partnership's assets and to divert, for their personal benefit, Abittan's share in the profits from the Partnership.

223. Chao and Ding intended to induce Abittan to rely on their fiduciary relationship, and in reasonable reliance thereon, Abittan was induced to and did continue his fidelity.

224. As a direct and proximate result of Chao's and Ding's breaches of fiduciary duties described herein, Abittan sustained serious injury and damages for which relief is sought herein, according to proof.

225. The aforementioned conduct was intentional on the part of Chao and Ding for the purpose of depriving Abittan of property and legal rights and otherwise cause injuryIn engaging in the foregoing conduct, Chen and Ding acted with malice, oppression, and fraud, warranting an award of punitive damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Temujin Cayman)

226. Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

227. As alleged above, Abittan and Ding and Chao entered into an oral and/or implied partnership, first, to buy and sell luxury watches and, second, to create the Blockchain Project as a business for commercial purposes.

228. From (and prior to) to incorporation, Temujin Cayman—controlled by general managers and officers, Chao and Ding—was aware of the Partnership. At all relevant times, Temujin Cayman (through its agents) knew that Chao and Ding were Abittan's partners and, as such, that Chao and Ding had a fiduciary relationship with Abittan, pursuant to which, Chao and Ding owed Abittan fiduciary duties, including the duties of disclosure, loyalty, and care.

229. Despite such knowledge, Temujin Cayman materially aided and abetted Chao and Ding to breach their fiduciary duties by, among other things:

- 49 -

a.  conspiring and actively working with Chao and Ding to obtain Abittan's rights and interests in Partnership assets, including the Blockchain Project, in exchange for no, or inadequate, consideration;

b.  knowingly participating in Chao's and Ding's wrongdoing by facilitating fraudulent transfers and self-dealing;

c.  falsifying books and records, such as the purported loan from Eian Labs Inc., to create the appearance of a valid sale of the Partnership's assets;

d.  creating false legal documents, including the IP Sale Agreement

e.  making fraudulent misrepresentations to Abittan about the purpose and effect of Temujin Cayman's purported purchase of the Blockchain Project;

f.  fraudulently inducing Abittan, via representations made by its general managers and officers, into signing the UAM;

g.  refusing—despite representations made by Temujin Cayman's general managers and officers, Chao and Ding—to preserve Abittan's interests in the Partnership Assets via the issuance of shares in Temujin Cayman;

h.  removing Abittan's name from books and records to falsely portray to those doing business with Abittan, or the Partnership and its affiliates, that Abittan was never a founder of the Blockchain Project or affiliated with the Partnership;

i.  instructing Temujin Cayman's (and its subsidiaries' and affiliates') employees to remove Abittan as a connection on LinkedIn to delegitimize Abittan's claims of ownership in the Partnership assets, including the Blockchain Project

j.  condoning and directing its subsidiary, for Chao's and Ding's benefit, to improperly and fraudulently apply for a PPP loan

230.    Temujin Cayman knew of Chao's and Ding's breaches of fiduciary duties arising out of the Partnership and actively participated by assisting Ding and Chao as described above.

- 50 -

231.   As a direct and proximate cause of Temujin Cayman knowingly furnishing substantial and material assistance to Chao and Ding, Chao and Ding were able to breach their fiduciary duties to Abittan.

232.   As a direct and proximate result of Chao's, Ding's, and Temujin Cayman's wrongful acts, Abittan has suffered consequential damages and foreseeable special damages of lost profits and lost business opportunities that Ding, Chao, and Temujin Cayman were aware their misconduct would directly and foreseeably cause Abittan to suffer.

## SIXTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Yuting Chen)

233.   Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

234.   Yuting Chen has represented, through counsel, that she was engaged in a watch business with Abittan. However, at all relevant times, Abittan was engaged in one watch partnership, and his partners were Chao and Ding. If Abittan has unknowingly transacted business with Yuting Chen, Abittan alleges, on information and belief, that Chen's sole involvement was to aid and abet Chao's and Ding's wrongful conduct.

235.   At all times relevant, Abittan and Chao and Ding were partners in the Partnership. From approximately August of 2017 through March of 2018, the Partnership's primary business was buying and selling luxury watches.

236.   On information and belief, at all relevant times, Chen knew that Chao and Ding were Abittan's partners and, as such, that Chao and Ding had a fiduciary relationship with Abittan, pursuant to which, Chao and Ding owed fiduciary duties, including the duties of disclosure, loyalty, and care, to Abittan.

237.   On information and belief, Chen, despite such knowledge, materially aided and abetted Chao and Ding to breach their fiduciary duties by, among other things:

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

a.  conspiring and actively working with Chao and Ding to obtain Abittan's rights and interests in Partnership assets, specifically dozens of luxury watches;

b.  knowingly participating in Chao's and Ding's wrongdoing by fraudulently transacting business with Abittan on behalf of Chao and Ding without identifying herself as a separate individual;

c.  facilitating fraudulent transfers and self-dealing by allowing Chao and Ding to use her personal bank accounts and mailing address to convert Abittan's property and legal interests;

d.  aiding Chao's and Ding's fraudulent scheme by renting a $25,000,000 home at 69 Isabella Ave. for Chao and Ding to use as a tool of manipulation;

e.  retaining Partnership profits, owed to Abittan, in her personal accounts; and

f.  using Abittan's credit cards to pay for Chao's and Ding's share of Partnership watches without paying off the credit card balance.

238.   On information and belief, Chen knew of Chao's and Ding's breaches of fiduciary duties arising out of the Partnership and actively participated by assisting Ding and Chao as described above.

239.   As a direct and proximate cause of Chen knowingly furnishing substantial and material assistance to Chao and Ding, Chao and Ding were able to breach their fiduciary duties to Abittan.

240.   As a direct and proximate result of Chao's, Ding's, and Chen's wrongful acts, Abittan has suffered consequential damages and foreseeable special damages of lost profits and lost business opportunities that Ding, Chao, and Chen were aware their misconduct would directly and foreseeably cause Abittan to suffer.

//

//

//

//

- 52 -

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Temujin Cayman, Ding, and Chao)

241.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

242.    Alternatively, or additionally, Abittan has an ownership interest in the Blockchain Project pursuant to an oral and/or implied partnership agreement entered into by Abittan and Temujin Cayman.

243.    As partners in the partnership, Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, at all relevant times, owed Abittan the fiduciary duties of disclosure, loyalty, and care. Pursuant to such fiduciary duties, Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, were required to act in the utmost good faith towards Abittan and to avoid acts and omissions adverse to Abittan. Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, were, further, required to act lawfully in conducting activities with Abittan, to act with the utmost integrity as to the dissemination of information to Abittan, and to refrain from committing acts of waste or conversion, mismanagement, self-dealing, and/or gross negligence and causing damages to Abittan or otherwise harming, impeding, or violating Abittan's interests or rights.

244.    By virtue of this fiduciary relationship, Abittan reposed trust and confidence in the integrity of Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman. Abittan relied on Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, to preserve, promote, and advance the best interests of the partnership. Temujin Cayman, and Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, invited and accepted Abittan's trust, confidence, and reliance. Abittan provided no cause for Temujin Cayman, and Chao and Ding, in their

capacities as general managers and officers of Temujin Cayman, to act in any manner inconsistent with this fiduciary relationship.

245.   Temujin Cayman, through Chao and Ding, in their capacities as general managers and officers of Temujin Cayman, has willfully and intentionally breached their fiduciary duties to Abittan, including the duties of disclosure, loyalty, and care, by, among other things:

a.   fraudulently inducing Abittan to dilute his interest in the Blockchain Project then failing to memorialize Abittan's ownership interest in the Blockchain Project in writing and in accordance with their partnership agreement

b.   facilitating fraudulent transfers and self-dealing;

c.   falsifying books and records, such as the purported loan from Eian Labs Inc., to create the appearance of a valid sale of the Partnership's assets;

d.   creating false legal documents, including the IP Sale Agreement and UAM

e.   making fraudulent misrepresentations to Abittan about the purpose and effect of the IP Sale Agreement and UAM;

f.   removing Abittan's name from books and records to falsely portray to those doing business with Abittan and Temujin Cayman and its subsidiaries and affiliates, that Abittan was never a founder of the Blockchain Project or affiliated with the Partnership;

g.   instructing Temujin Cayman's (and its subsidiaries' and affiliates') employees to remove Abittan as a connection on LinkedIn to delegitimize Abittan's claims of ownership in the Partnership assets, including the Blockchain Project; and

h.   directing its subsidiary, Temujin Delaware, to file a specious lawsuit against Abittan in an effort to legitimatize Temujin Cayman's theft of Abittan's partnership interest and interest in the Blockchain Project.

246.   Temujin Cayman intended to induce Abittan to rely on their fiduciary relationship, and in reasonable reliance thereon, Abittan was induced to and did continue his fidelity.

247.     As a direct and proximate result of Temujin Cayman's breaches of fiduciary duties described herein, Abittan sustained serious injury and damages for which relief is sought herein, according to proof.

248.     The aforementioned conduct was intentional on the part of Temujin Cayman, and Ding and Chao, in their capacity as general managers and officers of Temujin Cayman, for the purpose of depriving Abittan of property and legal rights and otherwise cause injury, and was despicable conduct that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

### Conversion

### (Against Chao and Ding)

249.     Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

250.     As a partner in the Partnership, Abittan owned, possessed, and/or was entitled, at the time of conversion, to immediate possession of his share of the Partnership's personal property and assets—including dozens of luxury watches and the Blockchain Project—profits in a sum capable of identification, and all income derived therefrom.

251.     Chao and Ding, individually and/or in their capacity as general managers and officers of Temujin Cayman, have intentionally taken possession of, transferred, and/or prevented Abittan from having access to the Partnership's personal property, profits, and/or assets, for a significant period of time.

252.     As a partner in the Partnership and/or in his individual capacity, Abittan owned, possessed, and/or was entitled, at the time of conversion, to immediate possession of the sum of approximately $637,000, which Chao and Ding incurred on Abittan's Partnership and personal credit cards.

//

//

253.   Chao and Ding have intentionally taken possession of, transferred, and/or prevented Abittan from having access to the sum of approximately $637,000 for a significant period of time by refusing to payoff the credit card balance.

254.   Abittan did not consent to Chao's or Ding's actions.

255.   As a direct and proximate result of the conversion by Chao and Ding, Abittan has suffered damage and lost profits in a sum capable of identification and in an amount according to proof within the jurisdiction of this Court.

256.   The conduct of Chao and Ding was a substantial factor in causing Abittan's harm.

257.   The aforementioned conduct was intentional on the part of Chao and Ding

258.   By reason of the unlawful conversion of Abittan's property and interests, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

259.   The aforementioned conduct was intentional on the part of Chao and Ding to deprive Abittan of property and legal rights and otherwise cause injury, and was despicable conduct that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

## <u>NINTH CAUSE OF ACTION</u>

### Conversion

### (Against Temujin Cayman)

260.   Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

261.   Alternatively, or additionally, as alleged above, Abittan has an ownership interest in the Blockchain Project pursuant to an oral and/or implied partnership agreement entered into by Abittan and Temujin Cayman.

262.   As a partner in the Abittan/Temujin Cayman partnership, Abittan owned, possessed, and/or was entitled, at the time of conversion, to immediate possession of his share of the

partnership's personal property, assets, and profits in a sum capable of identification, including his specialized and proprietary knowledge, and all income derived therefrom.

263.    Temujin Cayman, through Ding and Chao, in their capacities as general managers and officers of Temujin Cayman, has intentionally taken possession of, transferred, and/or prevented Abittan from having access to the partnership's personal property, profits, and/or assets, for a significant period of time.

264.    Abittan did not consent to Temujin Cayman's, or Ding's or Chao's, actions.

265.    As a direct and proximate result of the conversion by Temujin Cayman, Abittan has suffered damage and lost profits in a sum capable of identification in an amount according to proof within the jurisdiction of this Court.

266.    The conduct of Temujin Cayman was a substantial factor in causing Abittan's harm.

267.    The aforementioned conduct was intentional on the part of Temujin Cayman.

268.    By reason of the unlawful conversion of Abittan's property and interests, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

269.    The aforementioned conduct was intentional on the part of Temujin Cayman to deprive Abittan of property and legal rights and otherwise cause injury, and was despicable conduct that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

**TENTH CAUSE OF ACTION**

**Conversion**

**(Against Yuting Chen)**

270.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

//

//

- 57 -

271.     As detailed above, Abittan was engaged in one Partnership that bought and sold luxury watches, and his partners were Chao and Ding. If Abittan unknowingly transacted business with Yuting Chen, then Chen is additionally, or alternatively, in possession of Abittan's property.

272.     As a partner in the Partnership, Abittan owned, possessed, and/or was entitled, at the time of conversion, to immediate possession of his share of the Partnership's personal property, assets, and profits in a sum capable of identification, including those sums attributable to the acquisition and disposition of luxury watches, and all income derived therefrom.

273.     Chen has intentionally taken possession of, transferred, and/or prevented Abittan from having access to the Partnership's luxury watches, profits, and/or assets, for a significant period of time.

274.     Abittan did not consent to Chen's actions.

275.     As a direct and proximate result of the conversion by Chen, Abittan has suffered damage and lost profits in a sum capable of identification in an amount according to proof within the jurisdiction of this Court.

276.     The conduct of Chen was a substantial factor in causing Abittan's harm.

277.     The aforementioned conduct was intentional on the part of Chen.

278.     By reason of the unlawful conversion of Abittan's property, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

279.     The aforementioned conduct was intentional on the part of Chao and Ding to deprive Abittan of property and legal rights and otherwise cause injury, and was despicable conduct that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

//

//

//

**ELEVENTH CAUSE OF ACTION**

**Fraudulent Inducement**

**(Against Chao and Ding)**

280.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

281.    Beginning as early as January 2017, Chao and Ding falsely claimed that, whenever Chao and Ding conducted business in the United States, their anonymity was necessary to protect their families. Chao and Ding fraudulently concealed and omitted their true identities from all documents related to the Partnership, the Blockchain Project, and the luxury watches.

282.    Additionally, as specifically detailed above, Chao and Ding, at numerous times throughout the Partnership, made fraudulent misrepresentations and omissions to Abittan regarding the contents and legal effect of paperwork that Chao and Ding, at the time, claimed was necessary to effectuate the Partnership's business plan, protect the partners' ownership interests in the Partnership's assets (primarily the Blockchain Project), and insulate the partners from liability and negative tax consequences.

283.    Specifically, Chao and Ding falsely represented that all corporate entities formed after the Partnership began would preserve the 50/50 interests of the Partnership and that the Common Enterprise Entities were merely being used as conduits for the Partnership, without depriving Abittan of his interest. Chao and Ding further represented that their interests were being preserved via an agent in each entity because they were from a successful family in China and did not want their name on publicly filed documents. On the specific times detailed throughout this complaint, Chao and Ding represented that Abittan's interests in the Partnership and Partnership's assets was preserved in any new entity. Chao and Ding represented that they were not undertaking activities that would diminish Abittan's 50% interest in the Blockchain Project and that they were not asking Abittan to sign documents or undertake activities that would diminish Abittan's 50% interest in the Blockchain Project.

- 59 -

284.    When Chao and Ding made the foregoing material representations, concealments, and omissions, Chao and Ding knew that they were false and/or misleading and that they had a duty to disclose the omissions and the truth to Abittan.

285.    Chao's and Ding's false representations, concealments, and omissions were made with the specific intent of defrauding Abittan and inducing him into signing corporate documents with agents and strawpersons that made it easier for Chao and Ding to steal Abittan's property and rights, while making it exponentially harder for Abittan to hold Chao and Ding responsible for their tortious actions.

286.    In reliance on Chao's and Ding's false representations, concealments, and omissions, Abittan was induced to create numerous sham entities with unknown agents whom, to this day, Abittan has never met. Abittan was further induced to sign sham corporate documents, such as the UAM, that purportedly diluted Abittan's Partnership interest in the Blockchain Project to zero in exchange for no consideration. In taking the foregoing actions, Abittan reasonably relied on the material misrepresentations, concealments, and omissions by his partners, Chao and Ding, and such reliance was justifiable.

287.    As a result of Chao's and Ding's fraudulent misrepresentations, concealments, and omissions, Abittan has been damaged in an amount to be proven at trial.

288.    Further, as a result of Chao's and Ding's fraudulent misrepresentations, concealments, and omissions, Abittan—on his own behalf and/or as partner in the Partnership—is entitled to rescission of the purported corporate documents executed in furtherance of Chao and Ding's fraudulent scheme, including the IP Sale Agreement and the UAM.

289.    The aforementioned conduct was intentional on the part of Chao and Ding to deprive Abittan of property and legal rights and otherwise cause injury, and was despicable conduct that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his rights, so as to justify an award of exemplary and punitive damages.

//

//

- 60 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TWELFTH CAUSE OF ACTION

### Fraudulent Inducement

### (Against Chao, Ding, and Temujin Cayman)

290.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

291.    Alternatively, or additionally, on our about July 3, 2019, Temujin Cayman, through its general managers and officers, Chao and Ding—falsely claimed that, in order to protect Abittan's and others' rights in the Blockchain Project prior to an impending ICO, the entire Blockchain Project had to be transferred to Temujin Cayman. Temujin Cayman, through its agents, falsely claimed that Abittan's interest in the Blockchain Project would not be diminished by the transfer. Temujin Cayman (through Chao and Ding) represented that the transfer of assets via the IP Sale Agreement and UAM would not diminish Abittan's (or anyone else's) interest in the Blockchain Project and that Temujin Cayman was not asking Abittan to sign documents or undertake activities that would diminish his interests in the Blockchain Project.

292.    When Temujin Cayman (via Chao and Ding) made the foregoing material representations, concealments, and omissions, Temujin Cayman knew that they were false and/or misleading and that they had a duty to disclose the omissions and the truth to Abittan.

293.    Temujin Cayman's false representations, concealments, and omissions were made with the specific intent of defrauding Abittan and inducing him into signing fraudulent corporate documents—which themselves included fraudulent statements (such as the existence of a loan between Eian Labs Inc. and Temujin Cayman)—that allowed Temujin Cayman to steal Abittan's interests in the Blockchain Project.

294.    In reliance on Temujin Cayman's false representations, concealments, and omissions, Abittan was induced to sign sham corporate documents, such as the UAM and IP Sale Agreement, that diluted Abittan's interest in the Blockchain Project to zero in exchange for no consideration. In taking the foregoing actions, Abittan reasonably relied on the material

1    misrepresentations, concealments, and omissions by Temujin Cayman (via Chao and Ding), and

2    such reliance was justifiable.

3        295.    As a result of Temujin Cayman's fraudulent misrepresentations, concealments, and

4    omissions, Abittan has been damaged in an amount to be proven at trial.

5        296.    Further, as a result of Temujin Cayman's fraudulent misrepresentations,

6    concealments, and omissions, Abittan—on his own behalf and/or as partner—is entitled to

7    rescission of the purported corporate documents executed in furtherance of Temujin Cayman's

8    fraudulent scheme, including the IP Sale Agreement and the UAM.

9        297.    The aforementioned conduct was intentional on the part of Temujin Cayman to

10   deprive Abittan of property and legal rights and otherwise cause injury, and was despicable conduct

11   that subjected Abittan to cruel and unjust hardship and oppression in conscious disregard of his

12   rights, so as to justify an award of exemplary and punitive damages.

13                          **THIRTEENTH CAUSE OF ACTION**

14                                **Breach of Contract**

15                             **(Against Temujin Cayman)**

16       298.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this

17   Complaint as though fully set forth herein and alleges the following cause of action.

18       299.    Additionally, or in the alterative, Abittan and Temujin Cayman (through its general

19   mangers and officers, Chao and Ding) entered into an oral and/or implied agreement whereby

20   Abittan agreed to the sale of the Blockchain Project from Eian Labs Inc. to Temujin Cayman, and,

21   in exchange, Temujin Cayman agreed to issue shares to Abittan equal to the value of Abittan's

22   existing interest (whether direct or indirect) in the Blockchain Project.

23       300.    Abittan performed or substantially performed all of his obligations under the

24   agreement by executing the UAM.

25       301.    Temujin Cayman breached the agreement by failing to issue shares to Abittan equal

26   to the value of Abittan's existing interest (whether direct or indirect) in the Blockchain Project.

27

28

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

1    302.    As a direct and proximate result of Temujin Cayman's breach, Abittan has suffered

2    damages in an amount to be proven at trial.

3                                **FOURTEENTH  CAUSE OF ACTION**

4                                           **Fraud**

5                                  **(Against Chao and Ding)**

6    303.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this

7    Complaint as though fully set forth herein and alleges the following cause of action.

8    304.    As detailed above, Chao and Ding, acting in their own capacities and on behalf of

9    the Common Enterprise Entities in certain instances, made repeated false and fraudulent

10   misrepresentations and omissions to Abittan regarding:

11          a.   credit card expenditures on Abittan's cards, including that the cards would be used

12               for business purposes; that if they were used for personal purposes, that Chao would

13               reimburse Abittan for all expenditures on these cards; and that cards issued for Lu,

14               Fisch and others would be used by those individuals;

15          b.   the watch business, including that Abittan would be paid 50% of all proceeds from

16               watches; that Abittan would have a say in the sale or transfer of any watch; and that

17               Abittan would have access to the watches at all times;

18          c.   use of funds that Abittan invested in the Partnership via the JVI Chase account,

19               including that these funds would be used for proper business purposes;

20          d.   that Chao was on the brink of closing deals to raise hundreds of millions of dollars

21               for Findora from a variety of well-known individuals and entities including Jack

22               Ma's wife, Ma Huateng, Perfect World, and others "famous guys";

23          e.    that Abittan's investors would be repaid within ninety days of their investment and

24               that their investments were secure;

25          f.   that the transfer of Eian's assets to Temujin would not affect Abittan's or other

26               investors' ownership rights in Findora in any way;

27

28
                                            - 63 -

g.  that all (known) entities were part of and consistent with the Partnership in which Abittan always had a 50% interest; and

h.  that any and all actual or apparent authority that Ding or Chao possessed (or represented as possessing) to act for or on behalf of Abittan was used by Ding or Chao in good faith and in a permissible scope with full knowledge of and approval by Abittan;

i.  that any and all conduct by Chao and Ding in conjunction with Abittan or Findora was consistent with, and not adverse to, Abittan's interests, rights, property, and investments.

305.  These representations were false. In fact:

a.   Chao and Ding always planned to rack up hefty expenditures for both business and personal purposes on Abittan's credit cards and leave Abittan stuck with the tab, and Chao and Ding always intended to retain the credit cards authorized for other Findora team members;

b.  Chao and Ding always planned to misappropriate the remainder of the watch inventory for their own benefit and deprive Abittan of his share of proceeds and inventory;

c.  Chao and Ding always planned to siphon the money from the JVI Chase account to their own benefit knowing that they would later seek to divest Abittan of all of his valuable interest in Findora and the Partnership;

d.  Chao and Ding were not close to closing deals worth hundreds of millions of dollars with major players, but instead, were using those narratives to create a façade of success that they could use to perpetuate their multiple frauds on Abittan and others;

e.  Chao and Ding never planned to repay the investors or provide any of the valuable consideration they had promises, and instead, solely planned to convert the investors' money for their own uses;

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

f.  the intellectual property transaction between Eian and Temujin was not a paper transaction that would preserve all of Abittan's and other investors' rights;

g.  Chao and Ding formed companies for the purpose of fraudulently, improperly, and/or unjustifiably separating Abittan from Findora.

306.  When Chao and Ding made these representations and omissions, they knew that they were false. These representations and omissions were made with the intent to defraud and deceive.

307.  Abittan's reliance on Chao and Ding's misrepresentations and omissions was justifiable.

308.  As a result of Chao and Ding's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

309.  In doing the acts alleged herein, Chao and Ding acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

**FIFTEENTH CAUSE OF ACTION**

**Fraud**

**(Against Chao and Ding and Temujin Cayman)**

310.  Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

311.  As detailed above, Temujin Cayman, through its general managers and officers, Chao and Ding, made repeated false and fraudulent misrepresentations and omissions to Abittan regarding:

a.  that the transfer of Eian's assets to Temujin would not affect Abittan's or other investors' ownership rights in Findora in any way;

b.  that any and all conduct by Chao and Ding in conjunction with Abittan or Findora was consistent with, and not adverse to, Abittan's interests, rights, property, and investments.

312.  These representations were false. In fact:

- 65 -

1        a.   the intellectual property transaction between Eian and Temujin was not a paper

2           transaction that would preserve all of Abittan's and other investors' rights;

3        b.   Chao and Ding formed companies for the purpose of fraudulently, improperly,

4           and/or unjustifiably separating Abittan from Findora.

5     313.   When Chao and Ding made these representations and omissions either individually

6 or on behalf of Temujin Cayman, they knew that the representations were false. These

7 representations and omissions were made with the intent to defraud and deceive.

8     314.   Abittan's reliance on Chao's and Ding's and Temujin Cayman's misrepresentations

9 and omissions was justifiable.

10    315.   As a result of Chao's and Ding's and Temujin Cayman's fraudulent

11 misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

12    316.   In doing the acts alleged herein, Chao and Ding and Temujin Cayman acted with

13 oppression, fraud, and malice, and Abittan is entitled to punitive damages.

14 **SIXTEENTH CAUSE OF ACTION**

15 **Defamation**

16 **(Against Chao and Ding)**

17    317.   Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this

18 Complaint as though fully set forth herein and alleges the following cause of action.

19    318.   Chao and/or Ding made numerous false, unprivileged statements of purported fact

20 regarding Abittan to individuals associated with the Blockchain Project—including Charles Lu,

21 Benjamin Fisch, Adam Goldberg and other Temujin Cayman (or its affiliates or subsidiaries)

22 employees, consultants, advisors, and investors—and, on at least one occasion, to individual(s)

23 employed by LinkedIn..

24    319.   Specifically, Chao and/or Ding, falsely and without privilege, stated to one or more

25 of the foregoing individuals, via oral and/or written statements, either in person, through text

26 message, or online, that:

27        a.   Abittan was not an owner or co-founder of the Blockchain Project;

28

- 66 -

    b.   Abittan was lying when he claimed to be an owner or co-founder of the Blockchain Project and that Abittan was providing "inaccurate information" by listing himself as a co-founder and owner of the Blockchain Project);

    c.   Abittan lied to and misled investors in the Blockchain Project by making unauthorized promises;

    d.   Abittan was at fault for investors' failure to collect a return on their investments;

    e.   Abittan was in a massive amount of debt for which Abittan was solely responsible;

    f.   Abittan lied about Chao's and Ding's use of his credit cards;

    g.   Abittan lied about Chao's and Ding's refusal to pay back money that they owed; and

    h.   Abittan threatened Ding and/or Chao.

320.    Each of Chao's and/or Ding's statements constitutes a false and unprivileged publication that exposed Abittan to hatred, contempt, ridicule, or obloquy, and/or which caused him to be shunned or avoided, and/or which had a tendency to injure him in his occupation.

321.    Each of Chao's and/or Ding's statements of purported fact are provably false.

322.    Chao and/or Ding made these false statements about Abittan intentionally to control Findora employees and investors in an attempt cover up their illegitimate conduct.

323.    As a result, Abittan's reputation has been damaged in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION

**Civil Violations of the Racketeer Influenced and Corrupt Organization Act**

**(18 U.S.C. § 1962(c))**

**(Against Chao and Ding and Does 1-100)**

324.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

325.    At all relevant times, Chao and Ding and DOES 1-100 (collectively, the "RICO Operation Defendants") are and were persons within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1962(c).

326.   The Enterprise consisted of Temujin Cayman, Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Labs Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Findora Foundation Ltd., and Discreet Labs Ltd.

327.   At all relevant times, the Enterprise constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and 1962(c). At all relevant times the Enterprise was engaged in, and involved in activities affecting, interstate commerce within the meaning of 18 U.S.C. § 1961. The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in New York, California, and elsewhere.

328.   At all relevant times, the RICO Operation Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as an ongoing organization with the common purposes of, among other things:

   a.   creating and perpetuating the artifice of legitimate companies;

   b.   inducing Abittan and others to invest time, effort, and money into the Enterprise, for the ultimate benefit of the RICO Operation Defendants, while requiring Abittan and others to receive compensation for their services in the form of equity in a separate insolvent Enterprise entity – all with the intent to fraudulently siphon off funds and assets into other members of the Enterprise;

   c.   receiving and using the proceeds of the racketeering activities perpetrated through the conduct of the Enterprise for the benefit of Chao and Ding and their co-conspirators;

   d.   concealing the manner and extent of those illegal transfers and Chao's and Ding's continued management, control, and domination of each member of the Enterprise;

   e.   condoning and directing Temujin Delaware, an Enterprise entity to improperly and fraudulently apply for a PPP loan for Chao's and Ding's benefit,

- 68 -

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

f.  defrauding Abittan and other investors, executives, employees, and third parties and receiving misappropriated monies and intellectual property, including but in no way limited to those referenced in paragraphs 45, 49, 54, 58, 62, 63, 64, 78-80, 84-87, 88, 89, 91, 98-99, 108, 115, 132, 133, 135, 141, 153, 172, 145, 145, 180-84.

329.   Defendants exercised control over the numerous related individuals and entities that their enterprise consists of. Chao and Ding ultimately controlled and managed the operations of the entire association-in-fact and personally directed the day-to-day operations of its related entities as described above.

330.   Defendants Ding, Chao, and Temujin Cayman were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

331.   Chao and Ding formed a scheme to defraud Abittan of his assets whereby they induced Abittan to invest money in JVI, sign documents purporting to transfer intellectual property from Eian to Temujin Cayman for inadequate consideration, invest in transactions for high-end luxury watches, and solicit investments from Abittan's family and friends.

332.   In furtherance of this scheme, Chao and Ding used or caused to be used interstate wire communications in violation of 18 U.S.C. § 1343. Defendants initiated and received multiple transfers of Abittan and investor funds across state lines via the use of wires including but in no way limited to the transfers referenced in paragraphs 54, 64, 78-80, 89, 94, 98-99, 141, 153, 157, 172, 180-8.

*333.*   Chao and Ding, and others, also communicated materially false statements and deceitfully omitted material facts to Abittan and others via the use of wires including but in no way limited to the communications and omissions referenced in paragraphs 45, 49, 54, 58, 62, 63, 64, 78-80, 84-87, 88, 89, 91, 98-99, 108, 115, 132, 133, 135, 141, 153, 172, 180-84.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

334.    Each of these wire communications, omissions, and transfers of Abittan and investor assets satisfies the transmission "by means of wire, radio, or television communication" element for wire fraud.

335.    In furtherance of this scheme to defraud, Chao and Ding used or caused to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341. Chao and Ding initiated and received multiple transfers of funds across state lines via the use of the mails, including but not limited to the transfers referenced in paragraphs 54, 64, 78-80, 89, 94, 98-99, 141, 153, 157, 172, 180-8. Each of these transfers of Abittan and investor assets to out-of-state entities satisfies the "use of the mail" element for mail fraud.

336.    In furtherance of this scheme to defraud Abittan of his money or property having a value of $5,000 or more, Chao and Ding initiated and received multiple transfers that caused Abittan's funds (as well as the funds of others) to travel or be transported in interstate commerce in violation of 18 U.S.C §§ 2314 and 2315, including but in no way limited to the transfers referenced in paragraphs 54, 64, 78-80, 89, 94, 98-99, 141, 153, 157, 172, 180-8.

337.    By reason of Chao and Ding's violation of 18 U.S.C. § 1962(c), Abittan suffered injury in an amount to be determined at trial.

338.    Pursuant to 18 U.S.C. § 1964(c), Abittan is entitled to treble damages.

339.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

340.    Abittan additionally seeks the return/restitution of any assets from Defendants' entities or subsidiary entities, or other alter ego entities controlled by Defendants that received misappropriated funds, including entities that were dissolved and had their assets disbursed by Defendants and/or the entities they control.

//

//

//

//

**EIGHTEENTH CAUSE OF ACTION**

**Conspiracy to Commit Civil Violations of the**

**Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. § 1962(d))**

**(Against Against Chao, Ding, Temujin Cayman, and Does 1-100)**

341.    Abittan hereby incorporates the allegations of paragraph 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

342.    Defendants Ding, Chao, and Temujin Cayman each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 169 to 182 above.

343.    By reason of violation of 18 U.S.C. § 1962(d) committed by Defendants, Abittan suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

344.    Pursuant to 18 U.S.C. § 1962(c), Abittan is entitled to treble damages.

345.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**NINETEENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(Against All Defendants)**

346.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

347.    As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of Abittan, in the form of unjustified benefits, payments, and transfers of Abittan's assets and property including, but not limited to:

a. $50,000 in assets that Abittan invested in JVI;

b. $637,000 in assets as a result of unreimbursed credit card expenditures; and

- 71 -

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

c. Twenty-four luxury watches worth approximately $8,000,000 (Abittan's 50% interest).

d. the business and technology known as Findora

348.   As a result of these unjustified payments and transfers of Abittan's assets and property, Defendants are thereby required to make restitution.

349.   Accordingly, Abittan is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

350.   This count is brought in the alternative to the contractual and tort claims of Abittan, to the extent that it is determined that he does not have remedies in contract or tort.

351.   On information and belief, the monies owed but not paid to Abittan from his Partnership with Chao and Ding have instead been paid to Chao and Ding for their personal benefit, either directly, or in their capacity as general managers and officers of Temujin Cayman, to fund other investment opportunities and/or for their personal benefit and to the exclusion and detriment of Abittan.

352.   Alternatively, or additionally, on information and belief, the monies owed but not paid to Abittan from his Partnership, specifically with respect to the luxury watch costs, profits, and inventory, have instead been paid to or retained by Chen for her personal benefit and to the exclusion and detriment of Abittan.

353.   Abittan contributed his knowledge and expertise to the Partnership, which is directly responsible for the financial successes of the Partnership and/or its successor, Temujin Cayman—all of which resulted in huge profits that ultimately benefitted Chao and Ding and/or Temujin Cayman. Abittan personally took on debt to benefit the Partnership and consistently deferred his compensation from the Partnership in order to allow the Partnership to grow at a faster pace.  Abittan and Chao and Ding agreed that, in exchange for Abittan's sweat equity, Abittan would have up to a 50% interest in the Blockchain Project and other Partnership assets.

354.   Alternatively, or additionally, Abittan contributed his time, knowledge, and expertise to the Partnership, which is directly responsible for the Partnership's watch inventory,

profits, and growth—all of which resulted in huge profits that ultimately benefitted Chen and/or Chao and Ding and/or Temujin Cayman.

355.    Abittan has therefore conferred benefits upon Chao, Ding, and Temujin Cayman and they have accepted those benefits.

356.    Alternatively, or additionally, Abittan has therefore conferred benefits upon Chen and she has accepted those benefits.

357.    Abittan has continually conferred benefits on Chao, Ding, and Temujin Cayman since his partner's share of the profits from the sale of the Partnership assets to Temujin Cayman has been used by the Defendants named in this Count for their benefit to the exclusion of Abittan.

358.    Alternatively, or additionally, Abittan has continually conferred benefits on Chen since his share of the costs of and/or profits from the sale of the Partnership watches and/or the retained watch inventory has been used by Chen for her benefit to the exclusion of Abittan.

359.    Chao, Ding, and Temujin Cayman have knowledge of the benefits conferred upon them by Abittan.

360.    Alternatively, or additionally, Chen has knowledge of the benefits conferred upon her by Abittan.

361.    Chao, Ding, and Temujin Cayman have accepted or retained the benefits conferred upon them by Abittan.

362.    Alternatively, or additionally, Chen has accepted or retained the benefits conferred upon her by Abittan.

363.    The circumstances are such that it would be inequitable for Chao, Ding, and Temujin Cayman to retain the benefits conferred upon them by Abittan without paying fair value to Abittan for all the benefits he conferred upon them.

364.    Alternatively, or additionally, the circumstances are such that it would be inequitable for Chen to retain the benefits conferred upon her by Abittan without paying fair value to Abittan for all the benefits he conferred upon her.

AMENDED COMPLAINT
CASE NO. 5:20-CV-09340-NC

365.    All conditions precedent to the bringing of this action have been performed, have occurred, or have been waived.

### TWENTIETH CAUSE OF ACTION

### Accounting

### (Against Chao and Ding)

366.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

367.    At all relevant times, Abittan has been a partner in the Partnership with Chao and Ding. Abittan's partnership with Chao and Ding entitles Abittan to complete information regarding the status of his interests in the Partnership.

368.    As described throughout this complaint, Chao and Ding have committed various fraudulent and tortious acts and breaches of fiduciary duties. These acts have damaged Abittan and unlawfully enriched Chao and Ding.

369.    Abittan cannot determine the amount he is owed without an accounting because Chao and Ding have exclusive custody over the books, records, and accounts that show the status of all the remaining and sold watch inventory and the assets and profits derived from the Blockchain Project that Chao and Ding misappropriated from Abittan and/or the Partnership. Accordingly, Abittan is entitled to an accounting.

### TWENTY-FIRST CAUSE OF ACTION

### Accounting

### (Against Temujin Cayman)

370.    Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

371.    Additionally, or alternatively, since July 3, 2019, Abittan has been in an oral and/or implied partnership with Temujin Cayman. Abittan's partnership with Temujin Cayman entitles Abittan to complete information regarding the status of his interests in the partnership.

- 74 -

372.   As described throughout this complaint, Temujin Cayman has committed various fraudulent and tortious acts and breaches of fiduciary duties. These acts have damaged Abittan and unlawfully enriched Temujin Cayman.

373.   Abittan cannot determine the amount he is owed without an accounting because Chao and Ding have exclusive custody over the books, records, and accounts that show the status of all the remaining and sold watch inventory and the assets and profits derived from the Blockchain Project that Chao and Ding misappropriated from Abittan and/or the Partnership. Accordingly, Abittan is entitled to an accounting.

### TWENTY-SECOND CAUSE OF ACTION

### Accounting

### (Against Yuting Chen)

374.   Abittan hereby incorporates the allegations of paragraphs 1 through 195 of this Complaint as though fully set forth herein and alleges the following cause of action.

375.   Additionally, or alternatively, to the extent Abittan was partnering on watch transactions with Yuting Chen, Abittan is entitled to complete information regarding the status of his interests in the luxury watches he purportedly co-owns with Yuting Chen.

376.   As described throughout this complaint, Yuting Chen has committed various fraudulent and tortious acts. These acts have damaged Abittan and unlawfully enriched Chen.

377.   Abittan cannot determine the amount he is owed without an accounting because Chen has exclusive custody over the books, records, and accounts that show the status of all of the remaining and sold watch inventory and the assets and profits derived from any purported sale. Accordingly, Abittan is entitled to an accounting.

### PRAYER FOR RELIEF

WHEREFORE, Abittan requests judgment as follows:

a.   That Defendants, and all other persons acting in active concert or privately or in participation with Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;

- 75 -

b.  That Abittan receive such other injunctive relief as they may request and the Court may deem just and proper;

c.  That Defendants be required to account for all gains, profits, and advantages derived from their acts of conversion and other violations of law;

d.  That all gains, profits and advantages derived by Defendants from acts of conversion and other violations of law be deemed to be in constructive trust for the benefit of Abittan;

e.  For an order rescinding the corporate formation documents of each Common Enterprise Entity and intellectual property sale agreement;

f.  For an order requiring Defendants to disgorge profits earned from their unlawful conduct;

g.  For an award of restitution, unjust enrichment, actual damages, statutory damages, and compensatory damages according to proof at trial;

h.  For punitive and exemplary damages according to proof at trial;

i.  For attorneys' fees, costs of suit, and prejudgment and post judgment interest, as provided under applicable law; and

j.  For such other and further relief as the Court deems just and proper.


### DEMAND FOR JURY TRIAL

Abittan hereby demands a trial by jury.

Dated: June 3, 2022

**ROCHE FREEDMAN LLP**
*/s/ Constantine P. Economides*
Constantine P. Economides (*pro hac vice*)
Brianna K. Pierce (CBN 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Tel: (305) 851-5997
Email: ceconomides@rochefreedman.com
         bpierce@rochefreedman.com

*Counsel for Plaintiff,*
*Ariel Abittan*

- 76 -