# Attachment

Craig A. Hansen (SBN 209622)
  Email: craig@hansenlawfirm.net
Philip E. Yeager (SBN 265939)
  Email: phil@hansenlawfirm.net
Collin D. Greene (SBN 326548)
  Email: collin@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1150
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Jingjing Ye (Admitted Pro Hac Vice)
YE & ASSOCIATES, PLLC
3400 N. Central Expy, #500
Plano, TX 75080

Attorneys for Temujin Labs Inc., a Delaware
Corporation, Temujin Labs Inc., a Cayman Islands
Corporation, Lily Chao, Damien Ding, and
Discreet Labs Ltd.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| TEMUJIN LABS INC., a Delaware corporation and TEMUJIN LABS INC., a Cayman Islands corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARIEL ABITTAN, BENJAMIN FISCH, CHARLES LU, and DOES 1-10, inclusive, Defendants.<br><br><br><br>Defendants. | Case No.: 20CV372622<br><br>**TEMUJIN LABS INC., A DELAWARE CORPORATION, TEMUJIN LABS INC., A CAYMAN ISLANDS CORPORATION, LILY CHAO, DAMIEN DING, AND DISCREET LABS LTD.'S NOTICE OF MOTION AND MOTION TO DISQUALIFY ROCHE FREEDMAN LLP, AND TO STAY, AND TO CLARIFY, THE COURT'S AUGUST 22, 2022 ORDER**<br><br>[Memorandum of Points and Authorities; Request for Judicial Notice; Declarations of Craig A. Hansen and Lily Chao filed concurrently herewith]<br><br>Date:      October 27, 2022<br>Time:      1:30 PM<br>Dept.:     1<br>Judge:    Hon. Sunil Kulkarni |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 27, 2022 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the Superior Court for the State of California in the County of Santa Clara, Department 1, located at 191 North First Street San Jose, CA 95113, Temujin Labs Inc., a Delaware Corporation, Temujin Labs Inc., a Cayman Islands Corporation, Lily Chao, Damien Ding, and Discreet Labs Ltd. ("Moving Parties") will, and hereby do, move the Court pursuant to California Code of Civil Procedure Section 128(a)(5) for:

    (1) An order disqualifying Roche Freedman LLP from further representation in this matter;

    (2) An order staying enforcement of, and clarifying, this Court's August 22, 2022 Order Concerning (1) Defendant and Cross-Complainant Ariel Abittan's Motion to Compel Deposition Testimony; (2) Defendants and Cross-Complainants Benjamin Fisch's and Charles Lu's Motion to Compel Discovery, Order Concerning Defendant and Cross-Complainant Frank Fu's Motion to Compel Production of Identity Information; and

    (3) An order requiring Roche Freedman LLP to return and/or destroy any confidential documents produced to it by the Moving Parties.

The Motion will be made on the basis that on August 26, 2022, the website Crypto Leaks published a series of explosive videos of Kyle Roche ("Roche"), a founding partner of Roche Freedman, in which he admits to misusing the legal system for the purpose of unlawfully advancing the commercial interests of Ava Labs ("Ava") – a for-profit company that promotes the Avalanche blockchain and AVAX Crypto and in which he had an enormous financial stake – by suing Ava's competitors and others in the crypto industry, as well as carrying out the personal vendettas of Ava's CEO, Emin Gun Sirer.  The Temujin entities ("Temujin") and Discreet Labs Ltd. ("Discreet Labs") operate in the same blockchain technology and software development space as Ava Labs.  As such, given the revelations about Roche and his firm, there is a real concern that Roche Freedman will use confidential business and trade secret information of Temujin and Discreet Labs to their detriment and for Roche Freedman's personal gain, and possibly take actions to harm the individual cross-defendants, one of whom is a co-founder of the

1    Findora blockchain, by revealing their highly confidential Chinese legal names to others.

2    Therefore, the Court should disqualify Roche Freedman LLP to prevent such an occurrence.

3        The Motion will be based upon this Notice of Motion, the attached Memorandum of

4    Points and Authorities, the accompanying declarations of Craig A. Hansen and Lily Chao and

5    exhibits thereto, the pleadings, papers, and records on file in this action, any matters of which the

6    Court may take judicial notice, and any further evidence or argument that the Court may receive

7    at or before the hearing on this matter.

8    DATED:  September 21, 2022          HANSEN LAW FIRM, P.C.

9

10

11                                       By: _____
                                             CRAIG A. HANSEN
12
                                         Attorneys for Temujin Labs Inc., a Delaware
13                                       Corporation, Temujin Labs Inc., a Cayman
                                         Islands Corporation, Lily Chao, Damien Ding,
14                                       and Discreet Labs Ltd.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

NOTICE OF MOTION AND MOTION TO                    2                    CASE NO. 20CV372622
DISQUALIFY ROCHE FREEDMAN LLP

Craig A. Hansen (SBN 209622)
   Email: craig@hansenlawfirm.net
Philip E. Yeager (SBN 265939)
   Email: phil@hansenlawfirm.net
Collin D. Greene (SBN 326548)
   Email: collin@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1150
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Jingjing Ye (Admitted Pro Hac Vice)
YE & ASSOCIATES, PLLC
3400 N. Central Expy, #500
Plano, TX 75080

Attorneys for Temujin Labs Inc., a Delaware
Corporation, Temujin Labs Inc., a Cayman Islands
Corporation, Lily Chao, Damien Ding, and
Discreet Labs Ltd.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| TEMUJIN LABS INC., a Delaware corporation and TEMUJIN LABS INC., a Cayman Islands corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>ARIEL ABITTAN, BENJAMIN FISCH, CHARLES LU, and DOES 1-10, inclusive, Defendants.<br><br><br>    Defendants. | Case No.: 20CV372622<br><br>**TEMUJIN LABS INC., A DELAWARE CORPORATION, TEMUJIN LABS INC., A CAYMAN ISLANDS CORPORATION, LILY CHAO, DAMIEN DING, AND DISCREET LABS LTD.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISQUALIFY ROCHE FREEDMAN LLP, AND TO STAY, AND TO CLARIFY, THE COURT'S AUGUST 22, 2022 ORDER**<br><br>Date:  October 27, 2022<br>Time:  1:30 PM<br>Dept.:  1<br>Judge:  Hon. Sunil Kulkarni |

# TABLE OF CONTENTS

                                                                            **Page**

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

I.      INTRODUCTION ...............................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................3

        A.      The Crypto Leaks Report ...............................................................3

        B.      Roche Freedman LLP's Ownership Ava Tokens .....................................5

        C.      Various Law Firms Move to Disqualify Roche Freedman LLP.............................6

III.    ARGUMENT .......................................................................................................7

        A.      Legal Standard - Motions to Disqualify...........................................................7

        B.      Kyle Roche, Name Partner and Founder of Roche Freedman LLP, Violated
                the Ethical Rules of New York and California, and Such Conduct Must Be
                Imputed to Roche Freedman LLP ..........................................................7

                1.      Lawyers Practicing in CA are Subject to California's Rules of
                        Professional Conduct ...........................................................8

                2.      Kyle Roche Admits to Conduct that Violates NY and CA Rules of
                        Professional Conduct 1.7 .......................................................9

                3.      Kyle Roche Admits to Conduct that Violates NY and CA Rules of
                        Professional Conduct 8.4 .......................................................9

                4       Kyle Roche's Violations Must Be Imputed to Roche Freedman LLP.......10

        C.      The Imputation of the Conflict of Interest Necessitates Roche Freedman Being
                Disqualified From Participating Further in This Case Because the Danger is
                Too Great as to Temujin and its Founder and Consultant ...................................11

                1.      Temujin's Highly Sensitive Business Information and Trade Secrets
                        Are Not Safe ......................................................................11

                2.      Lily Chao and Damien Ding Fear What Roche Freedman May Do with
                        Their Identification Information ................................................12

        D.      Ariel Abittan Would Not Be Unduly Prejudiced by Roche Freedman LLP's
                Disqualification..........................................................................12

        E.      Roche Freedman LLP Must Return All Confidential Documents Produced In
                This Action................................................................................13

        F.      This Court Should Stay its August 22 Discovery Order........................................13

        G.      The Moving Parties Request Clarification of the Court's August 22, 2022
                Discovery Order..........................................................................13

IV.     CONCLUSION...........................................................................................................14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Complex Asbestos Litig., 232 Cal.App.3d 572 (1991)* ................................................. 7

**Statutes**

Cal. Civ. Pro. Code § 128(a)(5) ................................................................................ 7

**Other Authorities**

California Rule of Court 9.40(f) ................................................................................. 8

California Rule of Professional Conduct 1.0 ................................................................ 8

California Rule of Professional Conduct 1.7(b) ......................................................... 8-9

California Rule of Professional Conduct 8.4(c) ......................................................... 9-10

California Rule of Professional Conduct 1.10 .............................................................. 10

NY Rule of Professional Conduct 1.7(a)(2) ................................................................. 9

NY Rule of Professional Conduct 8.4(c) .................................................................... 10

NY Rule of Professional Conduct 1.10........................................................................ 10

Weil & Brown, The Rutter Group, California Practice Guide: Civil Procedure Before Trial, (June 2022), § 9:406.6, § 10:373.5 ................................................................................. 7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Temujin Labs Inc., a Delaware Corporation ("Temujin Delaware"), Temujin Labs Inc., a Cayman Islands Corporation, Lily Chao, Damien Ding, and Discreet Labs Ltd. (collectively, "Moving Parties") bring this motion to disqualify Roche Freedman LLP ("Roche Freedman") from further representation in this matter, and to stay, and clarify, the Court's August 22, 2022 Order.

On August 26, 2022, the website Crypto Leaks published a series of explosive videos of Kyle Roche ("Roche"), a founding partner of Roche Freedman, in which he admits to misusing the legal system for the purpose of unlawfully advancing the commercial interests of Ava Labs ("Ava") – a for-profit company that promotes the Avalanche blockchain and AVAX Crypto and in which he had an enormous financial stake – by suing Ava's competitors and others in the crypto industry, as well as carrying out the personal vendettas of Ava's CEO, Emin Gun Sirer. Roche admitted his business plan is to never settle cases, regardless of his purported clients' interests.  Rather, the plan is to take cases to trial and have the cases decided by juries who Roche describes as "idiots."  By doing so, Roche's professed intent is to harm others in the crypto space and direct the attention of government regulators away from Ava and instead to other crypto businesses.  In these video recordings, Roche admits to serious conflicts of interest, illicit motivations, and an unlawful course of conduct in litigating his firm's cases.  He admittedly utilizes the litigation process to gain confidential information from the companies he sues and apparently misuses it for Ava's benefit.

In the wake of this bombshell story, various law firms in different cases moved to disqualify Roche Freedman from further participation in the cases, including in the action *David Leibowitz, et al. v. Ifinex Inc., et al.*, US District Court for the Southern District of New York, Case No. 1:19-cv-09236-KPF (the "Tether Lawsuit"), and in *Ira Keliman, as the Personal Representative of the Estate of David Kleiman v. Craig Wright*, US Court of Appeals for the Eleventh Circuit, Case No. 22-11150-GG.  In responding to these matters, Roche does not deny that he made the now notorious statements (which would be difficult to do as they were captured

on video).  Instead, Roche insists that he made the statements while he was intoxicated and they were not true.  But Roche's self-professed dishonesty is no defense to his admitted wrongdoing, which is imputed to the other members of his firm.

This Motion embraces and echoes the sound reasoning of the motions to disqualify brought in these other matters.  The Temujin entities ("Temujin") and Discreet Labs Ltd. ("Discreet Labs") operate in the same blockchain technology and software development space as Ava Labs.  As such, given the revelations about Roche and his firm, there is a real concern that Roche Freedman will use confidential business and trade secret information of Temujin and Discreet Labs to their detriment and for Roche Freedman's personal gain, and possibly take actions to harm the individual cross-defendants, one of whom is a co-founder of the Findora blockchain, by revealing their highly confidential Chinese legal names to others.  Thus, the Court should disqualify Roche Freedman.

There will be no undue prejudice as to Ariel Abittan ("Abittan") by the disqualification of Roche Freedman because (1) there is a hold on discovery in this matter pending a mediation between the parties; (2) the case is relatively early on in its development (it is still not at issue); and (3) since Abittan is claiming an ownership interest in the intellectual property of the Temujin entities, and if Roche Freedman is using information to potentially harm the Temujin entities that occupy the same blockchain technology and software development space, it actually behooves Abittan to obtain new counsel to protect his alleged interest.

Upon this Court determining Roche Freedman must be disqualified, the Court should also order Roche Freedman to return or destroy all confidential documents of the Moving Parties that have been produced in this matter and certify the same.  Moreover, pending the Court's determination of this motion, the Court should stay its August 22, 2022 Order Concerning (1) Defendant and Cross-Complainant Ariel Abittan's Motion to Compel Deposition Testimony; (2) Defendants and Cross-Complainants Benjamin Fisch's and Charles Lu's Motion to Compel Discovery, Order Concerning Defendant and Cross-Complainant Frank Fu's Motion to Compel Production of Identity Information (the "August 22 Discovery Order").  Indeed, nothing in the existing Protective Orders prevents counsel for other defendants in the related matters from

1   sharing materials or information they obtain through the August 22 Discovery Order with Roche

2   Freedman, with whom they share a unity of interest and have obviously been collaborating.

3          Further, Lily Chao and Damien Ding also request that the Court clarify whether they must

4   provide their Chinese character names, or whether the English language versions of their names

5   are sufficient for discovery purposes.  Chao and Ding assert that only the latter is potentially

6   relevant or necessary for litigation purposes here in the United States.  They request that the

7   Court clarify its August 22 Discovery Order to address this pressing concern.

8   **II.     FACTUAL BACKGROUND**

9          **A.     The Crypto Leaks Report**

10          Crypto Leaks describes itself as consisting of "diehard blockchain enthusiasts" that

11  "contribute[s] to the task of nudging our industry towards a brighter, more honest future."[1]  It

12  encourages individuals with a "compelling inside story that needs to be told" to "become a

13  whistleblower for Crypto Leaks," and states that, "If we are able to collect enough evidence, we

14  will create a case investigation around the story."[2]  That is exactly what Crypto Leaks did when it

15  published an explosive story on August 26, 2022 entitled "Ava Labs (Avalanche) attacks Solana

16  & cons SEC in evil conspiracy with bought law firm, Roche Freedman."[3]

17          The Crypto Leaks story includes various short video clips apparently captured in the

18  London home of Norwegian investor, Christen Ager-Hanssen.[4]  In these video clips, Roche

19  admits to conduct that violates his fundamental ethical duties as an attorney.  Specifically, Roche

20  admits that he has a massive financial interest in Ava – around a point on AVAX – the Avalanche

21  blockchain's tokens – and Ava's stock (one percent of the company), which amounted to about a

22  third of what Kevin Sekniqi, the co-founder and current COO of Ava, has.[5]  Roche states that he

23  thinks litigation is an underused tool by everyone and confirms that he uses it as a strategic

24  _____

25  [1] Crypto Leaks, https://cryptoleaks.info/about (last accessed September 19, 2022).

    [2] Crypto Leaks, https://cryptoleaks.info/whistleblowers (last accessed September 19, 2022).

26  [3] *See* Moving Parties' Request for Judicial Notice; Crypto Leaks, https://cryptoleaks.info/case-no-3 (last accessed
    September 19, 2022).

27  [4] *See* Moving Parties' Request for Judicial Notice; Crypto Leaks Youtube,
    https://www.youtube.com/watch?v=ARAzGsVWNGQ&t=307s (last accessed September 19, 2022); see also Hansen
28  Decl. Ex. 4 (Dkt. 232-1, Declaration of Kyle Roche).

    [5] Crypto Leaks, https://cryptoleaks.info/case-no-3 (last accessed September 19, 2022).

instrument to support Ava.[6]  He states he was Ava's "crypto expert in the beginning as well," and that because he sues "half of the companies in this space," he knows where the market is going, is "one of the top 10 people in the world" who are knowledgeable about crypto, and that he's "seen the insides of every single crypto company."[7]  Roche indicates that he is the reason Ava has not been sued yet and that he deals "with making sure that the SEC and the CFTC have other magnets to go after."[8]  He states that, "litigation can be a tool to competition," and that since Emin Gun Sirer, founder and CEO of Ava (who Roche affectionately refers to as "Gun"), "signed [Roche] up, [Roche has] ensured that there's no such thing as regulation for what they want to do."[9]

Roche goes on to state that he "took down one of Gun's biggest archnemeses – the guy who claimed to be Satoshi, Craig Wright."[10]  The Crypto Leaks story explains that Mr. Wright claims to be part of a small team that invented Bitcoin.[11]  Roche states that he "took him down," and that "Gun loved that."[12]  These comments were apparently made in reference to Roche's representation of parties litigating against Craig Wright in the U.S. District Court for the Southern District of Florida, Case No. 18-cv-80176-BLOOM/Reinhart.  That case resulted in a final judgement against Mr. Wright in the amount of $100,000,000.00 plus $43,132,492.48 in prejudgment interest (Plaintiff Ira Kleiman has since appealed that judgment).[13]

The setting of the videos changes at some point, but Roche continues to reveal his wanton abuse of the litigation process.  He states that when he brings a lawsuit, he does not care about settling:

> I don't fucking care about settling. I'm… this is like… I do, like…I'm just a crazy motherfucker and I have resources and I will take you to the end. And taking you to the end will be…it won't be a nuisance settlement. It will be, I've got a piece of paper that says I own your company now.  That is power, and that is what I think is a tool that has not been unlocked by very many.[14]

Mr. Roche states that Ava does not file lawsuits against its competitors because Ava has him do

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] Hansen Decl. Exs. 12-13 (Dkt. Nos. 889 & 892).
[14] Crypto Leaks, https://cryptoleaks.info/case-no-3 (last accessed September 19, 2022).

that on behalf of the class.[15]  Mr. Roche further indicates that judges and juries do not understand the blockchain space and he can influence them.[16]  He describes the jury system as "10 idiots" that "control the flow of all the money that happens in American class actions…like, every case."[17]

**B.    Roche Freedman LLP's Ownership of Ava Tokens**

In an effort to control fallout, Mr. Sirer (or "Gun"), CEO of Ava, issued a statement on August 29, 2022 denying the allegations in the Crypto Leaks story.[18]  On September 13, 2022, Mr. Sirer updated his statement, asserting in part that Roche "will no longer act as counsel to Ava Labs or the Avalanche Foundation," and that Roche's "equity interest in Ava Labs also will end."[19]  However, it is unclear from this statement whether Roche continues to hold Ava's tokens, and it mentions nothing about the other partners of Roche Freedman that apparently hold a significant amount of Ava's tokens.

On March 2, 2022, Jason Cyrulnik, a former Roche Freedman partner who was ousted from the firm, filed counterclaims in a Federal action brought against him by Roche and other partners and the law firm Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP) alleging that the counterclaim defendants schemed to "illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the Firm's clients that [redacted] had suddenly appreciated exponentially to more than $250 million."[20]  The Corrected Answer to Plaintiff's Amended Complaint and Counterclaims also attaches a redacted Memorandum of Understanding, dated December 26, 2019, between the founding partners of Roche Freedman, with the following provision:[21]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *See* Request for Judicial Notice, Hansen Decl. Ex. 18 (https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752).
[19] *Id.*
[20] *See* Request for Judicial Notice, Hansen Decl. Exs. 10-11 (Dkt. Nos. 73, 96).
[21] *Id.*

B.          ███████ *Tokens*

The Founding Partners understand that Roche Freedman LLP represents ██████████████ a startup company that plans to distribute a certain amount of Digital Assets (the "Tokens") as part of its plans of building a new platform for decentralized assets and applications.  In exchange for legal services, ████████ has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019.  A copy of the ████████████████ retention agreement is attached to this MOU as Exhibit B. Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its ████████ Tokens according to the following breakdown:

| | |
|---|---|
| Jason Cyrulnik | 25% |
| Velvel Freedman | 32% |
| Amos Friedland | 5% |
| Nathan Holcomb | 5% |
| Edward Normand | 5% |
| Kyle Roche | 28% |

Thus, it appears that Roche Freedman continues to hold substantial interest in Ava, even if it is true that Mr. Roche is ending his personal equity interest in Ava.

### C.    Various Law Firms Move to Disqualify Roche Freedman LLP

Since Crypto Leaks published its exposé, various law firms in different cases have also moved to disqualify Roche Freedman from further participation in their cases.  Mr. Roche voluntarily moved on August 31, 2022 to withdraw as one of the attorneys for the proposed class in the action *David Leibowitz, et al. v. Ifinex Inc., et al.*, US District Court for the Southern District of New York, Case No. 1:19-cv-09236-KPF (the "Tether Lawsuit").[22]  In response to that motion, the "B/T Defendants," Bittrex, Inc., and Poloniex LLC filed requests seeking to terminate Roche Freedman as counsel in that case.[23]  Further, several plaintiffs filed a request to remove Roche Freedman as interim co-lead counsel.[24] The defendants raise their concern that highly sensitive, confidential information the defendants have provided in the lawsuit is being misused and ask that upon termination Roche Freedman return or destroy any such documents/information and confirm they have not shared any such documents/information with Ava or any other third

---

[22] *See* Request for Judicial Notice, Hansen Decl. Ex. 1 (Dkt. No. 229).
[23] *See* Request for Judicial Notice, Hansen Decl. Exs. 2-3 (Dkt. Nos. 230 & 231).
[24] *See* Request for Judicial Notice, Hansen Decl. Ex. 7 (Dkt. No. 235).

party.[25]  In response to the defendants' requests to disqualify Roche Freedman, Roche Freedman

denies any wrongdoing.[26]  Notably, Mr. Roche executed a declaration in support of Roche

Freedman's Reply in which he states, "While the published videos are carefully edited and

spliced to remove context and paint me in the worst possible light, the fact remains that my

actions and words were inexcusable."[27]  The Court in that matter issued an order requiring a

hearing on October 3, 2022 to "discuss the substance of the recently-submitted letters regarding

Roche Freedman LLP, and any other relevant matters."[28]

Not surprisingly, in *Ira Keliman, as the Personal Representative of the Estate of David*

*Kleiman v. Craig Wright*, US Court of Appeals for the Eleventh Circuit, Case No. 22-11150-GG,

Mr. Wright has similarly moved to disqualify Roche Freedman.[29]

## III.    ARGUMENT

### A.    Legal Standard - Motions to Disqualify

Section 128(a)(5) of the California Code of Civil Procedure states that a court has inherent

power "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all

other persons in any manner connected with a judicial proceeding before it, in every matter

pertaining thereto."  This includes the power to disqualify counsel in appropriate cases.[30]

> …the issue ultimately involves a conflict between the clients' right to
> counsel of their choice and the need to maintain ethical standards of professional
> responsibility. The paramount concern, though, must be the preservation of public
> trust in the scrupulous administration of justice and the integrity of the bar. The
> recognized and important right to counsel of one's choosing must yield to
> considerations of ethics that run to the very integrity of our judicial process.[31]

### B.    Kyle Roche, Name Partner and Founder of Roche Freedman LLP, Violated the Ethical Rules of New York and California, and Such Conduct Must Be Imputed to Roche Freedman LLP

In the Crypto Leaks videos, Mr. Roche admits to a serious conflict of interest, a course of

illegal conduct, and a fraud on the court in every case in which he participates.  In so doing, he

---

[25] *See* Request for Judicial Notice, Hansen Decl. Exs. 2-3 (Dkt. Nos. 230 & 231).
[26] *See* Request for Judicial Notice, Hansen Decl. Ex. 4 (Dkt. No. 232).
[27] *See* Request for Judicial Notice, Hansen Decl. Ex. 4 (Dkt. No. 232-1).
[28] *See* Request for Judicial Notice, Hansen Decl. Ex. 9 (Dtk. No. 237).
[29] *See* Request for Judicial Notice, Hansen Decl. Ex. 14 (Motion to Disqualify).
[30] Weil & Brown, The Rutter Group, California Practice Guide: Civil Procedure Before Trial, (June 2022), § 9:406.6 (citing *In re Complex Asbestos Litig.*, 232 Cal.App.3d 572, 575 (1991)).
[31] *In re Complex Asbestos Litig.*, 232 Cal.App.3d at 586.

has violated the ethical rules that govern lawyers in New York (where he is licensed) and California, and such conduct must be imputed to Roche Freedman itself.

### 1. Lawyers Practicing in CA are Subject to California's Rules of Professional Conduct

The California Rules of Professional Conduct, adopted by the Board of Trustees of the State Bar of California and approved by the Supreme Court of California, are intended to protect the public, the courts, and the legal profession; protect the integrity of the legal system; and promote the administration of justice and confidence in the legal profession.[32] "These rules together with any standards adopted by the Board of Trustees pursuant to these rules shall be binding upon all lawyers."[33] Further, any out-of-state attorney that is admitted to practice in a California court may only do so on the same terms as a local attorney, and is subject to the same professional standards and sanctions and to the jurisdiction of California courts.[34]

The Moving Parties are not aware of Roche's personal involvement in this litigation, but the attorneys of Roche Freedman that are involved are subject to the California Rules of Professional Conduct.

### 2. Kyle Roche Admits to Conduct that Violates NY and CA Rules of Professional Conduct 1.7

NY Rule of Professional Conduct 1.7(a)(2) prohibits representation of a client when "there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." CA's counterpart Rule of Professional Conduct 1.7(b) states, "A lawyer shall not, without informed written consent* from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person,* or by the lawyer's own interests."

By Roche admitting that he will not settle cases and instead insists on taking cases to trial

---

[32] California Rule of Professional Conduct 1.0.
[33] *Id.*
[34] California Rule of Court 9.40(f).

to extract a larger settlement to benefit his firm, or settles for good publicity for Roche Freedman, he is admitting to putting his own interests in front of his other clients.  Mr. Wright makes the same argument in his Motion to Disqualify Roche Freedman, and highlights a disturbing occurrence: "Indeed, in this case, after multiple mediations, settlement offers were made, which Roche and his Firm made public by breaching mediation confidentiality rules, then rejected."[35] This is worryingly similar to what Roche Freedman did in the case *Yuting Chen v. Ariel Abittan, et al.*, US District Court for the Northern District of California, Case No. 5:21-cv-09393-NC: Roche Freedman filed an Amended Answer with six declarations which <u>improperly revealed inadmissible confidential settlement communications with Yuting Chen's counsel</u>.[36]  Such conduct appears to conform to Roche's admissions of the unlawful motives and methods by which Roche Freedman does its business.  The videos indicate that Roche and his firm are engaged in a pattern of secretly representing Ava and its CEO's interests by using straw plaintiffs to conceal the real parties in interest.  Mr. Wright argues in his motion, "After Roche's on-camera admissions, there is a sound basis for concluding that in attempting to 'take down' Gun's arch-nemesis, Dr. Craig Wright, Roche has been acting for the benefit of Ava and Gun, who were undisclosed interested parties."[37]  The Moving Parties are concerned similar behavior may be motivating Roche Freedman in this case.  Indeed, Roche apparently implied that he shared discovery obtained in Roche Freedman's actions against other companies in the crypto space and distracted government regulators from Ava by feeding them information about these other companies. Roche's behavior violates both NY and CA Rule 1.7.

### 3.     Kyle Roche Admits to Conduct that Violates NY and CA Rules of Professional Conduct 8.4

NY Rule of Professional Conduct Rule 8.4(c) bars attorneys from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation," and 8.4(d) prohibits "conduct that is

---

[35] *See* Request for Judicial Notice, Hansen Decl. Ex. 14 (Motion to Disqualify, at 16).
[36] *See* Chao and Ding's Request for Judicial Notice, and the Decl. of Philip Yeager Exhibits 6-9 (submitted in relation to the Motions Regarding the Identities of Lily Chao and Damien Ding). The Court in that case denied the Motion to Strike brought by the Plaintiff, holding that "The attachments to the Answer may be inadmissible, but the Court finds it is premature to reach that conclusion on the present record."
[37] *See* Request for Judicial Notice, Hansen Decl. Ex. 14 (Motion to Disqualify, at 17).

prejudicial to the administration of justice." Similarly, CA Rule of Professional Conduct Rule 8.4(c) and (d) state that it is misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or to engage in conduct that is prejudicial to the administration of justice.

Roche admits to bringing lawsuits as a pretext for improper purposes on behalf of undisclosed clients hiding behind the curtain. Further, he indicates that judges and juries do not understand the blockchain space such that he can influence them, and describes the jury system as "10 idiots" that "control the flow of all the money" in civil cases. Such admissions violate both NY and CA Rule 8.4.

### 4.      Kyle Roche's Violations Must Be Imputed to Roche Freedman LLP

NY Rule of Professional Conduct Rule 1.10 states that, "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9…" Similarly, CA Rule of Professional Conduct Rule 1.10 states, "While lawyers are associated in a firm,* none of them shall knowingly* represent a client when any one of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9…"

Roche has already moved to withdraw from the Tether Lawsuit, and Roche Freedman claims that it has taken "appropriate steps to avoid any appearance of impropriety."[38] Roche Freedman further claims that it "removed Mr. Roche from its class action practice group, screened him from [1:19-cv-09236-KPF], and Mr. Roche will not receive any portion of the proceeds from this litigation."[39] The defendants understandably do not believe such representations are enough to dispel their concerns given the bombshell admissions Roche made.

Similarly, the Moving Parties have serious concerns regarding Roche's admissions as to how his firm conducts litigation. Notably, it does not appear that Roche Freedman denies that many of its partners have significant ownership interests in Ava. **Indeed, the other name partner, Velvel Freedman, appears to have a greater interest in Ava's tokens than Roche** (32% versus 28%). Additionally, while the Moving Parties have no information that the two

---

[38] *See* Request for Judicial Notice, Hansen Decl. Ex. 8 (Dkt. 236, at page 1).
[39] *Id.*

1   attorneys that have appeared in this case, Constantine Economides and Brianna Pierce, were

2   personally involved in Roche's conduct, Roche is a founder and named partner of the firm, and

3   sets the tone for those below him.  Further, Mr. Economides has appeared in both cases in which

4   counsel recently sought to disqualify Roche Freedman.  Given the rules and conduct at issue,

5   Roche's violations must be imputed to his entire firm.

6      **C.    The Imputation of the Conflict of Interest Necessitates Roche Freedman Being Disqualified From Participating Further in This Case Because the Danger is Too Great as to Temujin and its Founder and Consultant**

7

8          Considering Mr. Roche's admitted pattern in which he conducts his firm's business, the

9   Moving Parties are extremely concerned about producing confidential information and trade

10  secrets that could potentially be used by Ava/Roche Freedman to their detriment.

11      **1.    Temujin's Highly Sensitive Business Information and Trade Secrets Are Not Safe**

12

13         The Temujin entities are the original developer of the Findora cryptocurrency and are

14  engaged in blockchain technology.  The Temujin entities' First Amended Complaint in this action

15  alleges that Defendants misappropriated the Temujin entities' trade secrets and interfered with

16  and obstructed Plaintiffs' relationships with investors and business partners.  Defendants seek

17  discovery as to these allegations.  As such, there is highly sensitive intellectual property related to

18  the Temujin entities' work that will be subject to Attorney's Eyes Only designations in the

19  stipulated protective order entered into in this case.

20         Meanwhile, the Temujin entities occupy the same blockchain technology and software

21  development space as Ava.  Given the admissions from Mr. Roche that he has operated as

22  essentially an arm of Ava to destroy others in the crypto space and the imputation of Roche's

23  conflict of interest to Roche Freedman, Temujin and Discreet Labs find themselves presented

24  with the prospect of turning over their most valuable intellectual property to another company in

25  the same space.  That prospect is unacceptable.  Roche's admissions give cause to believe that

26  Roche Freedman may even be using Abittan as a straw person to gain such inside information.

27  Moreover, Roche implies that he turns over information to government regulators to distract them

28  from Ava.  Roche Freedman must be disqualified to ensure the integrity of the litigation and

1   discovery process.

2       **2.    Lily Chao and Damien Ding Fear What Roche Freedman May Do with
            Their Identification Information**

3

4       Lily Chao and Damien Ding previously made their position clear that they legitimately

5   fear that if certain identification information is disclosed to Defendants or their counsel, they

6   and/or their families and Chinese contacts, could potentially be subjected to criminal prosecution

7   and persecution, and interference with business and property interests, in the Peoples Republic of

8   China due to their involvement in the crypto industry, which is banned and being severely

9   cracked down on in that country.  The revelations about Roche Freedman only intensify that fear.

10  Indeed, as stated above, Roche indicates he fed information to government regulators to distract

11  them from Ava and hurt Ava's competition.  Roche Freedman could do the same here in an

12  attempt to destroy the Temujin entities and harm one of their founders and one of their advisors.

13  Roche Freedman cannot be trusted with such information.

14      **D.    Ariel Abittan Would Not Be Unduly Prejudiced by Roche Freedman LLP's
            Disqualification**

15

16      Abittan would not suffer undue prejudice from Roche Freedman being disqualified in this

17  matter.  For one, there is a hold on discovery in this matter pending a mediation between the

18  parties.  Second, the case is relatively early on in its development, and is still not even at issue.

19  Finally, disqualification could actually benefit Abittan.  Abittan is claiming an ownership interest

20  in the intellectual property of the Temujin entities.  As such, the commercial success of the

21  Temujin entities is tied to Abittan's own alleged interest.  But if Roche Freedman is using

22  information to potentially harm the Temujin entities that occupy the same space as Ava, that is

23  detrimental to Abittan.  Therefore, there is no prejudice as to Abittan if Roche Freedman is

24  disqualified (and it may even be in his interest).

25      **E.    Roche Freedman LLP Must Return All Confidential Documents Produced In
            This Action**

26

27      Temujin Delaware produced over 11,000 documents and 37,000 pages of documents to

28  Roche Freedman in this matter in April 2022.  The documents contain confidential business

---

information of the Temujin entities.  Upon disqualification, this Court should order Roche Freedman to return or destroy all such documents in its possession, and confirm to the Court that is has done so.

**F.      This Court Should Stay its August 22 Discovery Order**

The Court should suspend its August 22, 2022 Discovery Order pending a hearing on this Motion.  That order requires Lily Chao and Damien Ding to provide verified, Code-compliant responses to certain discovery requests propounded by Frank Fu and Benjamin Fisch by September 21, 2022.  Given the importance of this Motion, the Court should relieve Temujin Delaware, Chao, and Ding from producing the information/documents to Abittan's counsel.  Nor should they forced to produce this information/documents to the other counsel who are permitted under the stipulated protective orders entered into in this case and Case No. 21CV375422 to exchange documents and information with Roche Freedman.  Further, there is obviously a significant amount of cooperation between Fisch, Lu, Fu, and Abittan and their counsel, the extent of which has yet to be revealed.  Therefore, the Court should stay its August 22 Discovery Order pending resolution of this Motion.

**G.      The Moving Parties Request Clarification of the Court's August 22, 2022 Discovery Order**

While the Motion to Disqualify is pending, the Moving Parties also seek clarification from the Court regarding its August 22 Discovery Order.  Specifically, Chao, Ding, and Temujin Labs Inc., A Delaware Corporation ("Temujin Delaware") request that the Court clarify whether those parties must provide the Chinese character names of Chao and Ding, or whether the official English language versions of their names (i.e., the ones that one would utilize on a driver's license) are sufficient for discovery purposes.  Chao and Ding assert that only the latter is potentially relevant or necessary for litigation purposes here in the United States.

In its August 22 Discovery Order, the Court states,

There is good cause for the discovery of Ms. Chao's and Mr. Ding's identities and aliases. First, parties' identities are the subject of standard form interrogatories and would be relevant to any court case, including this one. Moreover, Cross-Complainants allege that Ms. Chao and Mr. Ding disguised their identities in order to mislead a number of people in ways that are directly relevant

to these actions. So discovery of Ms. Chao's and Mr. Ding's identities is doubly justified here. Finally, identity-related discovery is relevant to mediation, in particular, since it would impede settlement discussions for parties not to know who they are negotiating with and whether they are likely to be able to enforce any settlement that may be offered by those unknown persons as a practical matter.

Chao and Ding understand that the Court determined that with respect to the Court's last point in the above paragraph, "These concerns are not alleviated by Ms. Chao's and Mr. Ding's argument that a judgment entered against them using their pseudonyms would be legally enforceable if breached, or by their offer to provide their legal names to the Court *in camera*." Chao and Ding further understand they are under an obligation to produce, pursuant to Form Interrogatory No. 2.1, their "name[s]," "every name [they] have used in the past," and "the dates [they] used each name." However, Chao and Ding assert that the English language versions of their birth names, such as those that would appear in a state government-issued identification, are sufficient for whatever permissible purposes the opposing parties may use them in litigation *here in the United States*. Indeed, the Chinese character names would be of little use for litigation in this Court. Moreover, while Chao and Ding fear any potential revelation of their legal names to Chinese government authorities due to their involvement in the crypto industry, it is the potential revelation of their Chinese character names that poses a greater threat to them. Given the threats by Lu, Fisch, and Abittan, detailed in the declaration provided by Lily Chao, they fear how the knowledge of their Chinese character names could be weaponized against them.[40]

Therefore, Chao and Ding seek clarity from the Court regarding whether they must produce their Chinese character names, or whether the Court's order is limited to their official English language names (i.e., the name that one would utilize on one driver's license) for discovery purposes.

## IV.    CONCLUSION

For the reasons set out above, the Moving Parties respectfully ask that the Court (1) disqualify Roche Freedman LLP from any further representation in this matter; (2) order Roche Freedman LLP to return or destroy all confidential documents of the Moving Parties that have

---

[40] *See* Declaration of Lily Chao.

1   been produced in this matter; (3) suspend its August 22 Discovery Order; and (4) clarify the

2   August 22 Discovery Order regarding what information must be produced.

3

4   DATED:  September 21, 2022          HANSEN LAW FIRM, P.C.

5

6

7                                      By: _____
                                           CRAIG A. HANSEN
8
                                           Attorneys for Temujin Labs Inc., a Delaware
9                                          Corporation, Temujin Labs Inc., a Cayman
                                           Islands Corporation, Lily Chao, Damien Ding,
10                                         and Discreet Labs Ltd.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | Craig A. Hansen (SBN 209622)
  |   Email: craig@hansenlawfirm.net
2 | Philip E. Yeager (SBN 265939)
  |   Email: phil@hansenlawfirm.net
3 | Collin D. Greene (SBN 326548)
  |   Email: collin@hansenlawfirm.net
4 | HANSEN LAW FIRM, P.C.
5 | 75 E. Santa Clara Street, Suite 1150
  | San Jose, CA 95113-1837
6 | Telephone: (408) 715 7980
  | Facsimile: (408) 715 7001
7 |
8 | Jingjing Ye (Admitted Pro Hac Vice)
  | YE & ASSOCIATES, PLLC
9 | 3400 N. Central Expy, #500
  | Plano, TX 75080
10 |
  | Attorneys for Temujin Labs Inc., a Delaware
11 | Corporation, Temujin Labs Inc., a Cayman Islands
  | Corporation, Lily Chao, Damien Ding, and
12 | Discreet Labs Ltd.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| TEMUJIN LABS INC., a Delaware corporation and TEMUJIN LABS INC., a Cayman Islands corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARIEL ABITTAN, BENJAMIN FISCH, CHARLES LU, and DOES 1-10, inclusive, Defendants.<br><br><br><br>Defendants. | Case No.: 20CV372622<br><br>**TEMUJIN LABS INC., A DELAWARE CORPORATION, TEMUJIN LABS INC., A CAYMAN ISLANDS CORPORATION, LILY CHAO, DAMIEN DING, AND DISCREET LABS LTD.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISQUALIFY ROCHE FREEDMAN LLP, AND TO STAY, AND TO CLARIFY, THE COURT'S AUGUST 22, 2022 ORDER**<br><br>Date:      October 27, 2022<br>Time:      1:30 PM<br>Dept.:     1<br>Judge:     Hon. Sunil Kulkarni |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to California Rule of Court 3.1306(c) and Evidence Code §§ 452(d) and 453, Temujin Labs Inc., a Delaware Corporation, Temujin Labs Inc., a Cayman Islands Corporation, Lily Chao, Damien Ding, and Discreet Labs Ltd. (collectively, "Moving Parties") hereby request that this Court take judicial notice of the following records from the U.S. District Court for the Southern District of New York at Case No. 1:19-cv-09236-KPF (See Referenced Exhibits Attached to Declaration of Craig A. Hansen ¶¶ 2-10):

Exhibit 1: Kyle Roche's Notice of Motion to Withdraw (Dkt. 229);

Exhibit 2: Letter from Debevoise & Plimpton LLP (Dkt. 230);

Exhibit 3: Letter from Law Offices of McNaul Ebel Nawrot & Helgren (Dkt. 231);

Exhibit 4: Letter from Roche Freedman LLP (Dkt. 232) with its supporting declarations (Dkt. Nos. 232-1 – 232-6);

Exhibit 5: Letter from Debevoise & Plimpton LLP (Dkt. 233);

Exhibit 6: Letter from Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP (Dkt. 234);

Exhibit 7: Letter from Kirby McInerney LLP and Radice Law Firm, P.C. (Dkt. 235);

Exhibit 8: Letter from Roche Freedman LLP (Dkt. 236); and

Exhibit 9: Order from United States District Judge Katherine Polk Failla (Dkt. 237).

Further, the Moving Parties hereby request that this Court take judicial notice of the following records from the U.S. District Court for the Southern District of New York at Case No. 1:21-cv-01746-JGK (See Referenced Exhibits Attached to Declaration of Craig A. Hansen ¶¶ 11-12):

Exhibit 10: Defendant's Corrected Answer to Plaintiff's Amended Complaint and Counterclaims (Dkt. 73); and

Exhibit 11: Answer to Counterclaim (Dkt. 96).

Further, the Moving Parties hereby request that this Court take judicial notice of the following records from the U.S. District Court for the Southern District of Florida at Case No. 18-cv-80176-BLOOM/Reinhart (See Referenced Exhibits Attached to Declaration of Craig A. Hansen ¶¶ 13-

14):

Exhibit 12: Amended Final Judgment (Dkt. 889); and

Exhibit 13: Notice of Appeal (Dkt 892).

Further, the Moving Parties hereby request that this Court take judicial notice of the following records from the U.S. Court of Appeals for the Eleventh Circuit at Case No. 22-11150-GG, L.T. Case No. 9:18-cv-80176-BB (See Referenced Exhibit Attached to Declaration of Craig A. Hansen ¶ 15):

Exhibit 14: Craig Wright's Motion to Disqualify Roche Freedman LLP, filed September 6, 2022.

These court records are requested to be noticed pursuant to Evidence Code § 452(d) which allows for judicial notice: "Records of (1) any court of this state; or (2) any court record of the United States or of any state of the United States." **Exhibits 1-14** are such records.

The pleadings in **Exhibits 1-14** are relevant to the Motion brought by the Moving Parties because: (1) they show parties in other cases have moved to disqualify Roche Freedman LLP on similar grounds and the underlying context in which those motions are made; (2) they show Roche Freedman LLP's response to those motions, including a declaration from Kyle Roche in which he admits that he made the statements form the basis of this Motion; and (3) they contain judicial admissions from Roche Freedman LLP regarding its ownership interest in a certain crypto company.  Therefore, the documents demonstrate there is ample support for the Moving Parties' assertion that Roche Freedman itself must be disqualified from further representation in this matter.

Based on the foregoing, the Moving Parties respectfully request that the Court take judicial notice of these pleadings and the contents thereof.

Additionally, pursuant to Evidence Code § 451(c), the Moving Parties hereby request that this Court take judicial notice of the 2021 California Rules of Professional Conduct, attached as **Exhibit 15**.  Pursuant to Evidence Code § 451(c), judicial notice shall be taken of "Rules of professional conduct for members of the bar adopted pursuant to Section 6076 of the Business and Professions Code and rules of practice and procedure for the courts of this state adopted by

the Judicial Council."  The 2021 California Rules of Professional Conduct were adopted by the Board of Trustees of the State Bar of California and approved by the Supreme Court of California pursuant to Business and Professions Code sections 6076 and 6077 (see Rule 1.0).  As such, the 2021 California Rules of Professional Conduct constitute a record that shall be judicially noticed pursuant to Evidence Code § 451(c).

Further, pursuant to California Rule of Court 3.1306(c) and Evidence Code §§ 452(c) and 453, the Moving Parties hereby request that this Court take judicial notice of the NYSBA NY Rules of Professional Conduct (2021), attached as **Exhibit 16**.  These Rules of Professional Conduct regulate the practice of law by attorneys in these jurisdictions and are relevant to this Motion.  The New York Rules of Professional Conduct were adopted by the Appellate Divisions of the New York State Supreme Court.  Pursuant to Evidence Code § 452(c), judicial notice may be taken of "Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States."  The NYSBA NY Rules of Professional Conduct (2021) constitute such a record. The Based on the foregoing, the Moving Parties respectfully request that the Court take judicial notice of these Rules of Professional Conduct.

Finally, pursuant to California Rule of Court 3.1306(c) Evidence Code §§ 310(b), 452(g), 452(h), 453, and 454, Moving Parties request that this Court take judicial notice of the following facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy:

(1) The website Crypto Leaks published 25 videos depicting Kyle Roche making various statements available at https://cryptoleaks.info/case-no-3.

(2) Kyle Roche responded to the Crypto Leaks story on August 29, 2022 by providing a written statement on the website Medium.com, available at https://medium.com/@kyleroche/my-response-b691563c255b, and attached to Craig Hansen's Declaration as **Exhibit 17**.

(3) On August 29, 2022, Christen Ager-Hanssen was interviewed regarding the Crypto Leaks story and confirmed he was the individual in the videos speaking with Mr. Kyle Roche, denied any conspiracy on his part to "intoxicate" Mr. Roche, and stated he was

1    not even aware the conversations were being recorded.  The interview is available at

2    https://www.youtube.com/watch?v=ARAzGsVWNGQ&t=307s.

3    (4) Emin Gun Sirer responded to the Crypto Leaks story on August 29, 2022 by providing

4    a written statement (updated on September 13, 2022) on the website Medium.com,

5    available at https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-

6    ef2005da752, and attached to Craig Hansen's Declaration as **Exhibit 18**.

7    The videos depicting Kyle Roche, his and Mr. Sirer's responses to those videos, and Mr.

8    Ager-Hanssen's response to Mr. Roche are relevant to this Motion because they underpin the

9    Moving Parties bases for moving to disqualify Roche Freedman LLP in this action.  Kyle Roche

10   has already admitted that he made the statements in the videos.  See Declaration of Craig Hansen,

11   Exhibit 4 (Dkt. 232-1, Declaration of Kyle Roche).  Mr. Ager-Hanssen's response to Mr. Roche's

12   August 29, 2022 written statement contradicts assertions Mr. Roche makes regarding the

13   circumstances in which Mr. Roche made the statements in the videos.  As such, these videos and

14   statements are highly relevant to this Motion.

15   Based on the foregoing, the Moving Parties respectfully request that the Court take

16   judicial notice of these videos and statements that Mr. Roche makes in them.

17

18   Date:  September 21, 2022              HANSEN LAW FIRM, P.C.

19

20   _____

21   CRAIG ALAN HANSEN
     Attorneys for Temujin Labs Inc., a Delaware

22   Corporation, Temujin Labs Inc., a Cayman
     Islands Corporation, Lily Chao, Damien

23   Ding, and Discreet Labs Ltd.

24

25

26

27

28

Craig A. Hansen (SBN 209622)
 Email: craig@hansenlawfirm.net
Philip E. Yeager (SBN 265939)
 Email: phil@hansenlawfirm.net
Collin D. Greene (SBN 326548)
 Email: collin@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1150
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Jingjing Ye (Admitted Pro Hac Vice)
YE & ASSOCIATES, PLLC
3400 N. Central Expy, #500
Plano, TX 75080

Attorneys for Temujin Labs Inc., a Delaware
Corporation, Temujin Labs Inc., a Cayman Islands
Corporation, Lily Chao, Damien Ding, and
Discreet Labs Ltd.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| TEMUJIN LABS INC., a Delaware corporation and TEMUJIN LABS INC., a Cayman Islands corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ARIEL ABITTAN, BENJAMIN FISCH, CHARLES LU, and DOES 1-10, inclusive, Defendants.<br><br>Defendants. | Case No.: 21CV375422<br><br>**DECLARATION OF CRAIG A. HANSEN IN SUPPORT OF TEMUJIN LABS INC., A DELAWARE CORPORATION, TEMUJIN LABS INC., A CAYMAN ISLANDS CORPORATION, LILY CHAO, DAMIEN DING, AND DISCREET LABS LTD.'S MOTION TO DISQUALIFY ROCHE FREEDMAN LLP, AND TO STAY, AND TO CLARIFY, THE COURT'S AUGUST 22, 2022 ORDER**<br><br>Date:      October 27, 2022<br>Time:      1:30 PM<br>Dept.:      1<br>Judge:      Hon. Sunil Kulkarni |

1       I, Craig A. Hansen, declare as follows:

2           1.      I am the managing attorney of the Hansen Law Firm P.C., counsel for Temujin

3   Labs Inc., a Delaware Corporation, Temujin Labs Inc., a Cayman Islands Corporation, Lily Chao,

4   Damien Ding, and Discreet Labs Ltd. (collectively, the "Moving Parties"). I have personal

5   knowledge of the matters stated in this Declaration and, if called upon as a witness, would

6   competently testify to them.

7           2.      A true and accurate copy of Kyle Roche's Notice of Motion to Withdraw (Dkt.

8   229) in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern District of New

9   York is attached hereto as **Exhibit 1**.

10          3.      A true and accurate copy of a Letter from Debevoise & Plimpton LLP (Dkt. 230)

11  in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern District of New York

12  is attached hereto as **Exhibit 2**.

13          4.      A true and accurate copy of a Letter from Law Offices of McNaul Ebel Nawrot &

14  Helgren (Dkt. 231) in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern

15  District of New York is attached hereto as **Exhibit 3**.

16          5.      A true and accurate copy of a Letter from Roche Freedman LLP (Dkt. 232) with

17  its supporting declarations (Dkt. Nos. 232-1 – 232-6) in Case No. 1:19-cv-09236-KPF in the U.S.

18  District Court for the Southern District of New York is attached hereto as **Exhibit 4**.

19          6.      A true and accurate copy of a Letter from Debevoise & Plimpton LLP (Dkt. 233)

20  in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern District of New York

21  is attached hereto as **Exhibit 5**.

22          7.      A true and accurate copy of a Letter from Selendy Gay Elsberg PLLC and

23  Schneider Wallace Cottrell Konecky LLP (Dkt. 234) in Case No. 1:19-cv-09236-KPF in the U.S.

24  District Court for the Southern District of New York is attached hereto as **Exhibit 6**.

25          8.      A true and accurate copy of a Letter from Kirby McInerney LLP and Radice Law

26  Firm, P.C. (Dkt. 235) in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern

27  District of New York is attached hereto as **Exhibit 7**.

28

9.      A true and accurate copy of a Letter from Roche Freedman LLP (Dkt. 236) in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern District of New York is attached hereto as **Exhibit 8**.

10.      A true and accurate copy of the Order from United States District Judge Katherine Polk Failla (Dkt. 237) in Case No. 1:19-cv-09236-KPF in the U.S. District Court for the Southern District of New York is attached hereto as **Exhibit 9**.

11.      A true and accurate copy of the Defendant's Corrected Answer to Plaintiff's Amended Complaint and Counterclaims (Dkt. 73) in Case No. 1:21-cv-01746-JGK in the U.S. District Court for the Southern District of New York is attached hereto as **Exhibit 10**.

12.      A true and accurate copy of the Answer to Counterclaim (Dkt. 96) in Case No. 1:21-cv-01746-JGK in the U.S. District Court for the Southern District of New York is attached hereto as **Exhibit 11**.

13.      A true and accurate copy of the Amended Final Judgment (Dkt. 889) in Case No. 18-cv-80176-BLOOM/Reinhart in the U.S. District Court for the Southern District of Florida is attached hereto as **Exhibit 12**.

14.      A true and accurate copy of the Notice of Appeal (Dkt 892) in Case No. 18-cv-80176-BLOOM/Reinhart in the U.S. District Court for the Southern District of Florida is attached hereto as **Exhibit 13**.

15.      A true and accurate copy of Craig Wright's Motion to Disqualify Roche Freedman LLP, filed September 6, 2022 in Case No. 22-11150-GG (L.T. Case No. 9:18-cv-80176-BB) in the U.S. Court of Appeals for the Eleventh Circuit is attached hereto as **Exhibit 14**.

16.      A true and accurate copy of the 2021 California Rules of Professional Conduct are attached hereto as **Exhibit 15**.

17.      A true and accurate copy of the NYSBA NY Rules of Professional Conduct (2021) are attached hereto as **Exhibit 16**.

18.      A true and accurate copy of Kyle Roche's August 29, 2022 Statement on Medium.com, available at https://medium.com/@kyleroche/my-response-b691563c255b, is attached hereto as **Exhibit 17**.

19.     A true and accurate copy of Emin Gun Sirer's August 29, 2022 Statement on Medium.com (and updated on September 13, 2022), available at https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752, is attached hereto as **Exhibit 18**.

I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct, and that this Declaration was signed in San Jose, California on September 21, 2022.

_____

Craig A. Hansen

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID LEIBOWITZ, BENJAMIN LEIBOWITZ, JASON LEIBOWITZ, AARON LEIBOWITZ, and PINCHAS GOLDSHTEIN,<br><br>    Plaintiffs,<br><br>v.<br><br>IFINEX INC., BFXNA INC., BFXWW INC., TETHER HOLDINGS LIMITED, TETHER OPERATIONS LIMITED, TETHER LIMITED, TETHER INTERNATIONAL LIMITED, DIGFINEX INC., PHILIP G. POTTER, GIANCARLO DEVASINI, LUDOVICUS JAN VAN DER VELDE, REGINALD FOWLER, CRYPTO CAPITAL CORP., and GLOBAL TRADE SOLUTIONS AG,<br><br>    Defendants. | CASE NO. 1:19-cv-09236-KPF |

**NOTICE OF MOTION TO WITHDRAW AS COUNSEL**

PLEASE TAKE NOTICE that Kyle W. Roche, Esq. of Roche Freedman, LLP ("RF") respectfully moves the Court pursuant to Local Rule 1.4 to withdraw as one of the attorneys for the Proposed Class. Mr. Roche is no longer involved in RF's class action practice. Accordingly, pursuant to Local Rule 1.4, Mr. Roche respectfully requests to no longer receive docketing notifications *via* the ECF system. Mr. Roche also asks that the Court approve this withdrawal.

DATED: August 31, 2022          Respectfully Submitted,


**ROCHE FREEDMAN LLP**


*/s/ Kyle W. Roche*
Kyle W. Roche
99 Park Avenue, 19th Floor
New York, NY 10016

kyle@rochefreedman.com

*Interim Lead Counsel and Attorneys for Plaintiffs and the Proposed Class*

SO ORDERED this _____ day of _____, 2022.

_____

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on August 31, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Kyle W. Roche*
Kyle W. Roche

# EXHIBIT 2



**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

August 31, 2022

BY ECF AND EMAIL

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

***Re:  In re Tether and Bitfinex Crypto Asset Litigation*, No. 19 Civ. 9236 (S.D.N.Y.)**

Dear Judge Failla:

We represent the B/T Defendants in the above-referenced matter and write in response to Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney.  (Dkt No. 229.)  Mr. Roche's motion comes immediately following the public disclosure of a series of videos of Mr. Roche suggesting that he and his law firm are misusing the litigation process.  Mr. Roche apparently has an enormous stake in a crypto company called Ava Labs, Inc., files class action lawsuits against companies in the crypto space for the purpose of harming competitors of Ava Labs, and uses market intelligence gathered through the discovery process for the benefit of Ava Labs. The videos also show Mr. Roche making several disparaging remarks about juries, class members, and the class-action process in the United States.[1]

Mr. Roche's statements raise grave concerns for the B/T Defendants regarding the motivations behind filing this lawsuit, the purpose for which certain discovery has been sought, and whether the highly sensitive, confidential information the B/T Defendants have provided is being misused.  That Mr. Roche, who initially claimed that his comments were taken out of context, has now announced that he "is no longer involved" in his firm's class action practice further heightens those concerns.

The B/T Defendants' concerns are not addressed by Mr. Roche's individual withdrawal as counsel of record in this matter.  Accordingly, the B/T Defendants respectfully request that Mr. Roche's firm, Roche Freedman LLP, be terminated as counsel in this case, and that Mr. Roche and Roche Freedman LLP certify to this Court that they (*i*) have returned or destroyed all documents and information produced by Defendants in this lawsuit and (*ii*) have not shared any such documents or information with Ava Labs or any other third party.

---

[1]  *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman*, Crypto Leaks (Aug. 26, 2022), available at https://cryptoleaks.info/case-no-3 [https://perma.cc/N433-63SC].

The Honorable Katherine Polk Failla          2                    August 31, 2022

## I.     The Kyle Roche Video.

Mr. Roche's withdrawal motion comes on the heels of a high profile investigative exposé published by the Crypto Leaks website on August 26, 2022 that includes a series of video clips in which Mr. Roche, a founding partner of the Roche Freedman firm, makes a number of highly disturbing comments about his significant financial interest in Ava Labs and his misuse of class action litigation.  Among other things, Mr. Roche states that:

- He personally owns approximately 1% of the Avalanche tokens ("AVAX") issued by Ava Labs, as well as 1% of the equity in Ava Labs.   (That interest is worth tens of millions, if not hundreds of millions of dollars:  the market capitalization of AVAX tokens is currently $5.7 billion and has been as high as $30 billion in the past year.)

- He uses litigation as "a strategic instrument to support Ava Labs," which he states is "a completely different way than being a lawyer."   Litigation, according to Mr. Roche, is "a fantastic tool to competition."

- Ava Labs does not file complaints against its competitors, but instead "they have me do that on behalf of the class."

- By filing lawsuits against competitors of Ava Labs, Mr. Roche "deal[s] with making sure that . . . the SEC and the CFTC have other magnets to go after," thereby protecting Ava Labs from regulatory scrutiny.

Mr. Roche's statements also give rise to a serious concern that he may be abusing the discovery process and misusing information that he learns through litigation.  He states that he is Ava Lab's "crypto expert" because he "*sue[s] half the companies in the space*" and "know[s] where this market is going" because he has "*seen the insides of every single crypto company*."   These concerns resonate strongly in this case, where Plaintiffs have served a number of document requests seeking information that has no apparent link to the claims and defenses in this lawsuit. For example, Plaintiffs have sought documents related to numerous entities and individuals with whom the B/T Defendants have business relations, as well as all documents related to the B/T Defendants' investments in other crypto companies, their efforts to raise equity and to obtain loans, and a wide array of financial information unrelated to the issues raised by Plaintiffs' complaint.

More broadly, Mr. Roche disparages the putative class members whom he seeks to represent – and to whom he and his firm owe a fiduciary duty – as "100,000 idiots out there" and dismissively refers to juries as "10 idiots" who "control the flow of all the money that happens in American class actions."

Mr. Roche has publicly confirmed that the recordings are genuine.  He claims that he was "exploit[ed]" using "leading questions," and that his statements were taken out of context.[2]

## II.     Mr. Roche's Motion to Withdraw Does Not Adequately Address the Concerns Raised by the Kyle Roche Video.

In his Motion to Withdraw, Mr. Roche states that he "is no longer involved in [Roche Freedman's] class action practice."  (Dkt. No. 229 at 1.)  That is an extraordinary statement given that Mr. Roche is a founder of Roche Freedman LLP and the "class action practice" represents the vast majority of his firm's work.  Such a drastic step is inconsistent with Mr. Roche's suggestion that his videotaped statements were taken out of context, and it validates the serious concerns caused by those statements.  Indeed, it heightens those concerns.

The individual withdrawal of Mr. Roche, however, does little if anything to address the serious issues regarding the potential misuse of discovery and class action lawsuits generally.  Even if he is no longer counsel of record, he would still have access to discovery materials, would retain the ability to direct the conduct of other lawyers at his firm, and would profit from any potential recovery in this lawsuit.  Moreover, any conflict of interest impacting Mr. Roche is imputed to his entire firm.  And, in fact, it appears that other lawyers at Roche Freedman who have entered appearances in this litigation – including Devin "Vevel" Freedman, Amos Friedland, and Edward Normand – may also own substantial amounts of AVAX tokens and have similar involvement with Ava Labs.[3]

Accordingly, the B/T Defendants respectfully request that, in response to Mr. Roche's motion to withdraw, the Court order that the entire firm of Roche Freedman LLP be terminated as counsel in this case.  Such a removal would not prejudice Plaintiffs, as they would remain represented by two other large and experienced firms:  Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP.

In order to protect the highly sensitive information that Defendants have produced in discovery, the B/T Defendants also respectfully request that the Court issue an order requiring Mr. Roche and Roche Freedman LLP to certify that they (*i*) have returned or destroyed all documents and information produced by Defendants in this lawsuit and (*ii*) have not shared any such documents or information with Ava Labs or any other third party.  The documents produced by the B/T Defendants and other parties in this litigation are highly sensitive, as they include not only confidential, competitively sensitive information about Defendants' businesses but also information that, if disclosed, would threatens the privacy and security of Defendants and their

---

[2]    *See* Kyle Roche, *My Response*, MEDIUM (Aug. 29, 2022), available at https://medium.com/@kyleroche/my-response-b691563c255b [https://perma.cc/WH2G-ZD8B].

[3]    Crypto Leaks (@CryptoLeaksInfo), TWITTER (Aug. 29, 2022, 5:44 A.M.), https://twitter.com/CryptoLeaksInfo/status/1564187241949298688.

The Honorable Katherine Polk Failla          4                    August 31, 2022

customers.  The Court has already recognized the importance of protecting information about cryptocurrencies and related accounts and wallets.  (Dkt. No. 195.)

*    *    *

We thank the Court for its consideration.


Respectfully submitted,

/s/ Elliot Greenfield

# EXHIBIT 3

LAW OFFICES OF

MᴄNᴀᴜʟ Eʙᴇʟ Nᴀᴡʀᴏᴛ & Hᴇʟɢʀᴇɴ
A Pʀᴏғᴇssɪᴏɴᴀʟ Lɪᴍɪᴛᴇᴅ Lɪᴀʙɪʟɪᴛʏ Cᴏᴍᴘᴀɴʏ

600 UNIVERSITY STREET, SUITE 2700
SEATTLE, WASHINGTON 98101-3143
Tᴇʟᴇᴘʜᴏɴᴇ: (206) 467-1816
Fᴀᴄsɪᴍɪʟᴇ: (206) 624-5128

Gʀᴇɢᴏʀʏ J. Hᴏʟʟᴏɴ                                               E-ᴍᴀɪʟ: GHᴏʟʟᴏɴ@MᴄNᴀᴜʟ.ᴄᴏᴍ
                                                                           Direct (206) 389-9348

Tɪᴍᴏᴛʜʏ B. Fɪᴛᴢɢᴇʀᴀʟᴅ                                            E-ᴍᴀɪʟ: TFɪᴛᴢɢᴇʀᴀʟᴅ@MᴄNᴀᴜʟ.ᴄᴏᴍ
                                                                           Direct (206) 389-9338

September 1, 2022

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

> Re: **In re Tether and Bitfinex Crypto Asset Litigation**
> **No. 19 Civ. 9236 (S.D.N.Y.)**

Dear Judge Failla:

Together with O'Melveny & Myers, we represent Defendant Bittrex, Inc. in the referenced matter. Defendant Poloniex LLC, represented by Nelson Mullins, also joins in this letter (Bittrex and Poloniex are collectively "the Exchange Defendants"). We write to join in the requests made by the B/T Defendants in responding to Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney (Dkt. No. 229) – namely, (1) that Roche Freedman LLP be terminated as counsel in this case, and (2) that both Mr. Roche and Roche Freedman LLP certify, in connection with their termination, that they have returned or destroyed all documents and information produced by the Exchange Defendants and that they have not shared any of those documents or information with any third party.

In the video recordings released by Crypto Leaks, Mr. Roche states that "litigation is an underused tool," and confirms that he has used class action litigation as a "strategic instrument" to support non-party Ava Labs, a cryptocurrency company in which he and other Roche Freedman attorneys maintain a substantial interest. He states that he has used litigation against other participants in the cryptocurrency space to further the interests of Ava Labs. He goes on to state that he is Ava Labs' "crypto expert . . . because I sue half the companies in the space" and brags that he has "seen in the insides of every single crypto company." Mr. Roche describes himself in one of the videos as a "crazy mother****er" who will "take you to the end" to get a

The Honorable Katherine Polk Failla
September 1, 2022
Page 2

piece of paper saying "I own your company now," and describes that "power" as "a tool that has not been unlocked by many."

Mr. Roche's statements raise troubling questions about his firm's use of the discovery process in this matter. As the Court is aware, Plaintiffs amended their complaint in June 2020 to add the Exchange Defendants. *See* Dkt. No. 114. The Amended Complaint relies heavily on allegations that the B/T Defendants owned or controlled certain accounts on the Exchange Defendants' platforms, including specifically the "1AA6" account on Bittrex and the "1J1d" account on Poloniex, incorrectly describing those accounts as the "Bitfinex deposit address(es)." *Id.* at ¶ 207. In response to those allegations, the Exchange Defendants provided Mr. Roche and his colleagues conclusive evidence, including a sworn declaration from the actual holder of the supposed "Bitfinex deposit address(es)," that the accounts in question are not and never have been owned or controlled by the B/T Defendants; instead, they have always been exclusively owned and controlled by a foreign arbitrage trader who has no relation to the B/T Defendants. The Exchange Defendants have identified that trader, provided sworn testimony from him about his arbitrage activities, and produced documents proving that the relevant accounts are—contrary to the allegations in the Amended Complaint—not owned or controlled by the B/T Defendants.

Notwithstanding the arbitrage trader's sworn testimony about his trading, Plaintiffs say that they cannot yet re-evaluate their claims against the Exchange Defendants because "[f]ull discovery, from all Defendants, is needed to test the assertions in the Anonymous Declaration." Plaintiffs say that such discovery must include "documents and deposition testimony not only from the declarant, but also from the Exchange Defendants, Bitfinex, and their affiliates." Dkt. No. 181 at 2.

The Exchange Defendants have worked diligently in preparing a substantial production of documents to Plaintiffs.[1] Mr. Roche's recent statements raise serious concerns about the intent behind such discovery and how it will be used. While the Exchange Defendants appreciate that a protective order has been entered in this matter and that attorneys can be expected to comply with such orders, Mr. Roche's statements make clear that he has already used confidential materials produced in litigation for improper purposes. Moreover, the Court previously recognized that the protective order is not sufficient protection for certain information Defendants have produced. *See* Dkt. No. 195. Under the circumstances, simply accommodating Mr. Roche's withdrawal is not sufficient. He remains a member of Roche Freedman, and it must be assumed that, just as the actions he described in the recently released videos benefited Mr. Roche, his firm, and Ava Labs, any further access by Roche Freedman to the highly confidential materials produced in this matter may be subject to similar misuse.

For the above reasons, the Exchange Defendants respectfully join in the B/T Defendants' requests that (1) Roche Freedman LLP be terminated as counsel in the matter, and (2) Roche

---

[1] Plaintiffs originally proposed nearly 300 search terms to each of the Exchange Defendants, many of which related to broad aspects of the cryptocurrency industry but did not appear related to any of the claims or defenses in this matter.

The Honorable Katherine Polk Failla
September 1, 2022
Page 3


Freedman LLP be required to certify that is has destroyed all documents produced by the Defendants in this matter, and that no such materials remain in the possession, custody, or control of any principals, agents, or employees of the firm.

      Given these revelations, the Exchanges Defendants reserve the right to pursue additional relief as they obtain more information.


                          Respectfully,


                          Gregory J. Hollon
                          Timothy B. Fitzgerald

GJH/TBF:ln

# EXHIBIT 4



September 2, 2022

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *In re Tether and Bitfinex Crypto Asset Litigation,* **19 Civ. 9236 (S.D.N.Y.)**

Dear Judge Failla:

We write in response to Defendants' August 31, 2020 letters asking the Court to disqualify Roche Freedman LLP ("Firm") as co-lead counsel for Plaintiffs based on statements made by Kyle Roche. We respectfully submit the Court should deny Defendants' request.

### A. **RELEVANT BACKGROUND**

On January 27, 2022, Mr. Roche attended a meeting in London to facilitate a potential venture capitalist investment. Mr. Roche believed he was attending that meeting to pursue the interests of a technology start-up initiative. But it now appears the meeting was actually a set up orchestrated by a defendant in a different class action the Firm is pursing. Roche Decl. ¶ 2.

Unfortunately, at that meeting, Mr. Roche made untrue statements apparently intended to impress the participants at the meeting. He also made inappropriate remarks disparaging jurors and class members.

As demonstrated below, the statements with which Defendants take issue are not just false, they are *demonstrably* false. Nonetheless, to protect against even the appearance of impropriety, and to avoid unnecessary distraction from the merits of this case, Mr. Roche has withdrawn from this case and the Firm has removed him from its entire class action practice. Mr. Roche has also been screened from the Firm's class actions (this case included). Finally, to ensure there is no optical concern whatsoever, Mr. Roche has also forfeited any financial interest in this litigation.

It's no surprise, however, that Defendants are using it as a litigation tactic to disqualify the entire Firm. The Firm has one of the leading litigation practice groups in this space, understands the technology exceptionally well, originated the case theory, was retained by every single client in this action, and drafted and filed the original complaint.

The Honorable Katherine Polk Failla
September 2, 2022
Page 2 of 5

## B. **THE STATEMENTS**

1. **The Firm did not use this litigation as a strategic instrument to support Ava Labs, did not file this action at Ava Labs' request, and any interest in Ava Labs or AVAX tokens doesn't present a conflict.**

The notion that Roche Freedman decided to pursue this case in order to further the interests of Ava Labs is plainly false. First and foremost, the Firm's retention in this case by the three original named plaintiffs - Jason Liebowitz, Benjamin Liebowitz and Aaron Liebowitz - pre-dates Ava Lab's retention of the Firm. Indeed, when the Firm filed the 95-page complaint in this matter, Ava Labs had only been a Firm client for a matter of days. Moreover, at that time, Ava Labs was a relatively unknown start up and the AVAX crypto-asset was not existent. The idea, therefore, that the Firm filed this case for Ava Labs, is both impossible, nonsensical, and untrue.

In fact, shortly after this incident unfolded, Ava Labs' CEO issued a statement confirming that "[n]either I, nor anyone else at Ava Labs ever directed Roche in his selection of cases."[1]

Further, Defendants' suggestion that a disqualifying conflict of interest exists owing to the fact that some Roche Freedman lawyers own AVAX tokens, or have a personal equity interest in Ava Labs, is meritless. The result of this lawsuit would not have any particularized effect on Ava Labs or the AVAX crypto-asset. Ava Labs and AVAX do not compete with the Exchange Defendants, Tether, Bitfinex, or USDT. In fact, Tether and Bitfinex leverage the AVAX ecosystem and support its efforts.[2] And the Exchange Defendants facilitate the sale of AVAX on their platforms.

But even if Defendants are competitors of Ava Labs or AVAX (they are not), it does not create a disqualifying conflict here. Lawyers that sue Microsoft on behalf of a class do not need to disclose that they hold shares in Apple. That's because "the mere existence of financial or business interests does not warrant disqualification." *Power Play 1 LLC v. Norfolk Tide Baseball Club, LLC,* No. 17CV4831, 2017 WL 5312193, at *4 (S.D.N.Y. Nov. 13, 2017). "Rather, there must be a 'significant risk' that these interests will 'adversely affect[ ]' the lawyer's exercise of professional judgment on behalf of the client." *Id*. (citing N.Y. Rule of Prof'l Conduct 1.7(a)(2) (finding that even though a lawyer's financial arrangement simply seemed "unseemly," the movant failed to explain how the lawyer's "financial and business interests . . . would impair his professional judgment or how it was adverse to Defendants' interests"). Defendants have done nothing to show such a "significant risk" exists in this case.

None of the co-lead counsel in this case is pursuing this litigation for any collateral purpose, and there is no basis for that assertion beyond Mr. Roche's improper and false statements (which themselves don't even specifically reference this case).

---

[1] https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752.
[2] https://medium.com/avalancheavax/tether-token-usdt-launches-on-avalanche-baf5a313f1a7.

**2. There could not have been, and has not been, any sharing of confidential discovery material.**

Defendants' letter also voices a "concern" that Mr. Roche may be "misusing information that he learns through litigation" including information produced in this case. First and foremost, Mr. Roche and the Firm can confirm that no confidential discovery material has ever been shared with Ava Labs (or any third party). Roche Decl. ¶ 5. Nor would we ever do that.

Importantly, Mr. Roche's comments do not actually include a statement that he shared confidential discovery materials and he's explained that is not what he meant. The actual statement was:

> because I sue half the companies in the space, I know where the market is going, I believe, better than one of the top ten people in the world. I've seen the insides of every crypto company [video cuts mid-sentence].

Mr. Roche's declaration explains that what he intended to convey was that due to the numerous suits he has filed in this space, dozens of whistleblowers and other insiders have sent him information that has proved useful in pursuing class action claims. Roche Decl. ¶ 6.

**3. Mr. Roche's comments do not reflect the Firm's beliefs about jurors, class members, or class actions.**

The inappropriate comments Mr. Roche made regarding (i) jurors and class members, and (ii) his approach to class actions and intention on how and why to resolve them, do not reflect the view of the Firm or any of the other 24 other lawyers practicing at the Firm. Indeed, Mr. Roche only made these comments under the influence of alcohol.

Nonetheless, these statements are one of the reasons he has promptly withdrawn from this case, from the Firm's other class actions, and has been screened from them.

In sum, none of the alleged factual impropriety that Defendants frame as the foundation for their request to disqualify the Firm has actually occurred, and any optical issue should be cured based on Mr. Roche's withdrawal, screening, and forfeiture.

**C. DEFENDANTS' PURPORTED CONCERNS ABOUT THE DISCOVERY PROCESS DO NOT SUPPORT THE FIRM'S DISQUALIFICATION**

In support of their request to terminate the Firm as co-lead counsel, Defendants argue that Mr. Roche's statements "raise grave concerns . . . regarding the motivations behind filing this lawsuit for which discovery has been sought, and whether the highly sensitive, confidential information the B/T Defendants have provided is being misused." This claim cannot be squared with Defendants' later recognition in their letter that Plaintiffs in this action are also represented by two other law firms. In other words, even crediting Defendants' argument that Mr. Roche's statements raise concerns about the motives for initiating this lawsuit, the complaint was also

signed by two other law firms who have conducted a good faith inquiry into the merits of this case and the claims have already withstood a motion to dismiss.

The same is true of Plaintiffs' discovery requests, which Defendants characterize as having "no apparent link to the claims and defenses in this lawsuit." Obviously Plaintiffs' disagree, but more importantly, those discovery requests were reviewed and approved by the two other law firms that Defendants' have already told the Court should remain in the case. We appreciate that Mr. Roche's statements and the ensuing publicity have created a regrettable distraction, but they do not provide a basis for *the Firm's* disqualification.

Moreover, to the extent Defendants intend to create a distraction or spend further time on this issue, the Firm's removal from this action will not prevent them from pursuing these efforts.

### D. THE FIRM'S STATUS AS CO-COUNSEL BENEFITS THE CLASS

#### 1. RF's continued participation in this case is in the best interests of the class.

Roche Freedman's participation as co-lead counsel will continue to benefit the proposed class. The Firm's lawyers who would remain working on the case include the principal lawyers who helped formulate the original complaint, *i.e.*, Vel Freedman and Joseph Delich. In addition to those two attorneys, many of the lawyers from the Firm that would remain on this case have the most institutional knowledge of the facts and law underlying the case. Their contribution of many thousands of hours on the case to date have been invaluable and their removal from the case would be detrimental to the class's interest.

Finally, these same attorneys are those working on the Firm's many other crypto-related cases and class actions. All of these facts thus stand to continue to benefit the named Plaintiffs and the proposed class. The Court carefully appointed three firms to represent the named Plaintiffs, considering their respective resources and areas of expertise, and those rationales continue to counsel in favor of the three-firm team that has been working effectively to date.

#### 2. The named plaintiffs request the Firm remain as co-lead counsel.

The named Plaintiffs request that the Firm remain as co-lead counsel. This is reflected in their attached affidavits. Jason Leibowitz Decl.; Benjamin Leibowitz Decl.; Aaron Leibowitz Decl.; Matt Script Decl.; Pinchas Goldshtein Decl.

Having conceived of and filed the lawsuit, the Firm has the original and closest relationships with the named Plaintiffs. These Plaintiffs understand the relevant facts, have reviewed the videos, read both letters from Defendants, and are adamant the Firm remain on the case. They all state that they do not believe or see how they, or the class, would benefit from removing the Firm's crypto-related expertise from the current team of lawyers that have been diligently prosecuting the case.

The Honorable Katherine Polk Failla
September 2, 2022
Page 5 of 5

Moreover, they have all signed declarations stating that they "have never heard or seen anything that would in anyway support the concerns raised by the Defendants." and that "RF has only ever been concerned about the best interests of the class."

These individuals have already dedicated a substantial amount of their time and energy to the case, and they intend to remain as lead Plaintiffs. Accordingly, we respectfully submit that their views are entitled to significant weight and their opinions should be considered by the Court.

\* \* \* \* \*

We note that what is in the best interests of the proposed class in this case overlaps with what the Firm believes is fair and equitable under the circumstances. In speaking as he did, Mr. Roche engaged in a serious lapse of judgment. However, the extreme remedy of disqualifying the entire Firm, which would have the effect of punishing all of the Firm's lawyers for Mr. Roche's lapse in judgment (which amounts to statements that were either untrue or misunderstood), seems disproportionate and unwarranted.

Finally, to the extent the Court is considering a formal request to disqualify Roche Freedman from this matter, we respectfully request that the Court first schedule a conference to address these issues and allow the Firm to submit additional evidence to address any specific concerns that the Court may have.

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*

Devin "Vel" Freedman
Edward Normand
Joseph M. Delich
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
vel@rochefreedman.com
tnormand@rochefreedman.com
jdelich@ rochefreedman.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Tether and Bitfinex Crypto Asset
Litigation

Case No. 19 Civ. 9236 (KPF)

I, Kyle Roche, declare as follows:

1.      I am a partner at Roche Freedman LLP ("Firm").

2.      I have reviewed the videos referenced by the Defendants in this action. Those videos were illegally taken without my knowledge or consent during meetings that occurred in in London on January 27, 2022. I was invited to London under the false pretense of pitching a venture capital investment, but I now understand that the real reason I was brought there was through a scheme that was executed by a defendant in a different lawsuit the Firm recently filed. The purpose of this scheme was to surreptitiously obtain comprising recordings of me.

3.      I deeply regret making many of the statements I made during these meetings as they are not only inconsistent with the manner in which I have practiced law, but also because some of the statements were false.

4.      The Firm has never filed a class action at the direction of or for the benefit of another Firm client. This case is no exception. The sole reason we filed this action was for the benefit of the named plaintiffs in this action and the other members of the class. We filed the action at the direction of the named plaintiffs. We have not shared any confidential information from this lawsuit with any third party, including other clients of the firm.

5.      I have never disclosed or used, for any collateral purpose, any confidential information from any lawsuit—including this lawsuit. Indeed, at the time the recordings took place (January 27, 2022), there had been no confidential documents produced by any party.

6.      The statement I made in one of the video recordings was: "because I sue half the companies in the space, I know where the market is going, I believe, better than one of the top ten people in the world. I've seen the insides of every crypto company [video cuts]." What I intended to convey was that due to the numerous suits I've filed in this space, many whistleblowers and other insiders send information that has proved valuable in pursuing class action claims.

7.      None of the co-lead counsel in this matter have served any discovery requests for any purpose collateral to the prosecution of the claims in this case. All of the initial discovery requests were derived from information contained in the Amended Complaint or sourced from publicly available material, including foreign documents and were solely intended to obtain information material to the claims and defenses in this matter.

8.      The comments I made regarding the nature of jury trials, jurors, and absent class members have nothing to do with the Firm's views and are not even representative of my own personal views. My comments in the video were highly inappropriate, made while I was intoxicated, and I deeply regret my statements.

9.      While the published videos are carefully edited and spliced to remove context and paint me in the worst possible light, the fact remains that my actions and words were inexcusable. I have spent years helping build the Firm's crypto-asset practice, and I'm ashamed that my conduct called into question the excellent work the attorneys at the Firm have done pursuing the interests of class members across numerous and innovative class actions in the space.

10.     I have withdrawn from this case, been screened from the matter, and will not receive any financial interest in this action.

11.     I respectfully request that this Court accept my motion to withdraw but that it not terminate the Firm as Co-Lead Counsel. The expertise of the other attorneys working on this matter from the Firm will continue to add significant value to the Proposed Class.

12.     I declare under penalty of perjury that the foregoing is true and correct.


Dated September 2, 2022


Kyle W. Roche

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

### Declaration of Aaron Leibowitz

I, Aaron Leibowitz, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complain (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

Aaron Leibowitz (Sep 1, 2022 21:40 EDT)

Aaron Leibowitz

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

### Declaration of Benjamin Leibowitz

I, Benjamin Leibowitz, based on my personal knowledge, declare as follows:

1. I am a named plaintiff in this case.

2. I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3. Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4. I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5. I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6. I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7. In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8. I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complain (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9. I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

_Benjamin Leibowitz_
Benjamin Leibowitz (Sep 1, 2022 21:17 EDT)
Benjamin Leibowitz

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

## Declaration of Jason Leibowitz

I, Jason Leibowitz, based on my personal knowledge, declare as follows:

1.        I am a named plaintiff in this case.

2.        I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.        Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.        I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.        I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.        I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.        In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.        I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complain (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9.        I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

Jason Leibowitz (Sep 1, 2022 20:51 EDT)

Jason Leibowitz

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

### <u>Declaration of Matthew Script</u>

I, Matthew Script, based on my personal knowledge, declare as follows:

1. I am a named plaintiff in this case.

2. I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3. Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4. I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5. I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6. I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7. In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8. I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities. Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

9. I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That

would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

      10.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

Matthew Script (Sep 1, 2022 20:31 EDT)

Matthew Script

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

**Declaration of Pinchas Goldshtein**

I, Pinchas Goldshtein, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in calls with Mr. Freedman who provides me with updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities. Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

9.      I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That

would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

10.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022



Pinchas Goldshtein

# EXHIBIT 5



**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

September 2, 2022

<u>BY ECF AND EMAIL</u>

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

*Re:* ***In re Tether and Bitfinex Crypto Asset Litigation***, No. 19 Civ. 9236 (S.D.N.Y.)

Dear Judge Failla:

We represent the B/T Defendants in the above-referenced matter and write in response to Roche Freedman's September 2, 2022 filing regarding Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney. (Dkt No. 232.)

While we appreciate that Mr. Roche and his firm have sought to address the issues raised in the B/T Defendants' August 31 letter to the Court (Dkt. No. 230), the evolving explanations they have offered regarding his videotaped statements – which implicate both Mr. Roche and the Roche Freedman law firm – offer little comfort with respect to the grave concerns raised by those statements.

Mr. Roche first claimed that his statements were taken "out of context" and/or were somehow elicited from him "using leading questions."[1] Notwithstanding that initial response, Mr. Roche then took the extraordinary step of withdrawing entirely from his firm's class action practice.

In its September 2 letter, Roche Freedman states that Mr. Roche's statements are "demonstrably false" but offers no such demonstration. That the initial complaint in this case was filed prior to when Roche Freedman reports it commenced a formal attorney-client relationship with Ava Labs says nothing about how it has conducted the lawsuit since that time, including potential misuse of the discovery process.[2] Beyond that, Roche Freedman relies on its own denials.

---

[1]  Kyle Roche, *My Response*, MEDIUM (Aug. 29, 2022), available at https://medium.com/@kyleroche/my-response-b691563c255b [https://perma.cc/WH2G-ZD8B].

[2]  Notably, Mr. Roche stated on video that his firm and Ava Labs launched their businesses together at the same time in the same co-working space, he already knew the CEO of Ava Labs, and he received a percentage of the AVAX token supply in September 2019, prior to the commencement of this action.

The Honorable Katherine Polk Failla      2          September 2, 2022

In his affidavit, Mr. Roche himself states only that "some of the statements were false."  The videos published on the Crypto Leaks website, however, do not show merely a discrete set of questionable statements but a comprehensive description of how Mr. Roche and his law firm abuse the class action process and discovery.

Importantly, the B/T Defendants expressed a serious and valid concern that the discovery process is being misused based on Mr. Roche's statement that he serves as Ava Lab's "crypto expert" and "know[s] where this market is going" because he "sue[s] half the companies in the space" and has "seen the insides of every single crypto company."[3]  In his affidavit, relied on by Roche Freedman, Mr. Roche offers only the implausible explanation that he was not referring to information gained in discovery but to other information purportedly provided to him outside of litigation by "whistleblowers and other insiders."

Roche Freedman's assertion that Defendants have raised Mr. Roche's statements with the Court as a "litigation tactic" suggests that it fails to fully understand the egregious nature of those statements or the seriousness of the concerns they raise.

Respectfully submitted,

/s/ Elliot Greenfield

---

[3]   *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm*, Roche Freedman, CRYPTO LEAKS (Aug. 26, 2022), available at https://cryptoleaks.info/case-no-3 [https://perma.cc/N433-63SC].

# EXHIBIT 6





September 2, 2022

**Via ECF and E-mail**

The Honorable Katherine Polk Failla
U.S. District Court Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007

Re: *In re Tether and Bitfinex Crypto Asset Litigation*, 19-cv-09236 (KPF)

Dear Judge Failla:

Selendy Gay Elsberg PLLC ("Selendy Gay Elsberg") and Schneider Wallace Cottrell Konecky LLP ("Schneider Wallace") write in their capacity as interim class counsel, and specifically not on behalf of the named plaintiffs, in response to the letter dated September 2, 2022, by Roche Freedman LLP ("Roche Freedman"), ECF No. 232. The named plaintiffs have all reviewed this letter and stated that they disagree with its content and recommendation; in short, the named plaintiffs express a strong preference that Roche Freedman remain in the case.[1] Undersigned counsel nevertheless believe they have a duty to the Court and the putative class to inform the Court of their views. *See* Fed. R. Civ. P. 23(g)(3) (stating interim class counsel is appointed to "act on behalf of a putative class.").

As explained below, Selendy Gay Elsberg and Schneider Wallace believe that Roche Freedman's continued involvement in the litigation is not in the best interests of the class. Accordingly, we respectfully request that the Court terminate Roche Freedman's status as interim co-lead counsel. Selendy Gay Elsberg and Schneider Wallace are ready and willing to continue representing the class as interim co-lead counsel.

Selendy Gay Elsberg and Schneider Wallace became aware of video recordings of Kyle Roche, a founding partner of Roche Freedman, when they were published online on August 26, 2022.[2] In the recordings, Mr. Roche makes statements regarding the blockchain industry and his approach to class action litigation. On August 31, 2022, Mr. Roche (though not Roche Freedman) filed a motion to withdraw as counsel. ECF No. 229. Later that day, the B/T Defendants submitted

---

[1] Selendy Gay Elsberg and Schneider Wallace were not aware of the affidavits of the class representatives until they were filed as exhibits to Roche Freedman's letter. *See* ECF Nos. 232-2–232-6. Although Selendy Gay Elsberg and Schneider Wallace respect the opinions expressed in those affidavits, they believe their duty as interim class counsel is to "the interests of the class" as a whole. *See* Fed. R. Civ. P. 23(g)(4).

[2] *See Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman*, CRYPTO LEAKS (Aug. 26, 2022), *available at* https://cryptoleaks.info/case-no-3.

a letter asking the Court to terminate Roche Freedman as counsel for the class. ECF No. 230. The Exchange Defendants filed a letter on September 1, joining this request. ECF No. 231.[3]

Given the content of the recordings—and the fact that Mr. Roche, in an August 29, 2022 public response, did not deny the recordings' authenticity[4]—Selendy Gay Elsberg and Schneider Wallace asked Roche Freedman to withdraw as counsel to protect the interests of the class. Roche Freedman declined to withdraw.

Selendy Gay Elsberg and Schneider Wallace are not able to evaluate the credibility of Roche Freedman's statements concerning Ava Labs, AVAX tokens, or Mr. Roche's position at his firm or his financial interest in this litigation. However, Roche Freedman's continued involvement as counsel in the case is contrary to the best interests of the class. Roche Freedman's continued representation of the class would likely spawn significant discovery and motion practice as to the veracity and/or import of the allegations. These issues are likely to unnecessarily distract from the merits of this dispute, and can be avoided by the removal of Roche Freedman as class counsel.

Selendy Gay Elsberg and Schneider Wallace are both experienced and capable class counsel, with expertise in litigation concerning digital assets, and will continue to prosecute this action on behalf of the class as interim co-lead counsel. For example, Selendy Gay Elsberg has been appointed as co-lead counsel in numerous class actions in this district where the plaintiffs' allegations involve the technical details of dozens of different crypto-assets.

To protect the interests of the putative class, we respectfully request that the Court terminate Roche Freedman's appointment as interim co-lead counsel.

---

[3] Selendy Gay Elsberg and Schneider Wallace disagree with Defendants' claims that Plaintiffs have sought "information that has no apparent link to the claims and defenses in this lawsuit," ECF No. 230 at 2, or which "related to broad aspects of the cryptocurrency industry but did not appear related to any of the claims or defenses in this matter," ECF No. 231 at 2 n.1. Rather than air that dispute here, Plaintiffs will continue to meet and confer with Defendants in an effort to resolve any remaining discovery issues without Court intervention. *See* ECF No. 228 at 2.

[4] https://medium.com/@kyleroche/my-response-b691563c255b

Respectfully submitted,

/s/ Caitlin Halligan
Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
SELENDY GAY ELSBERG PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com

/s/ Todd M. Schneider
Todd M. Schneider (*pro hac vice*)
Jason H. Kim (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com

*Interim Lead Counsel and Attorneys for Plaintiffs and the Proposed Class*

# EXHIBIT 7



**KM** **KIRBY** McINERNEY            **RADICE LAW FIRM**

**VIA ECF AND E-MAIL**

September 5, 2022

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *In re Tether and Bitfinex Crypto Asset Litig.*,
              No. 19 Civ. 9236 (S.D.N.Y.)

Dear Judge Failla:

      We represent plaintiffs Eric Young, Adam Kurtz, and David Crystal ("Kirby-Radice Plaintiffs") in the above-referenced action. These Kirby-Radice Plaintiffs, our clients, are passive members of the putative class alleged in the operative complaint.[1] We respectfully submit that recent events involving the named partner of Roche Freedman LLP ("Roche Freedman") are and will likely continue to be detrimental to Kirby-Radice Plaintiffs and the putative class. The focus of the litigation should remain on prosecuting claims relating to Defendants' alleged manipulation and protecting the interests of members of the putative class. Because the stewardship over the litigation is in jeopardy, we respectfully submit that Roche Freedman be removed as interim co-lead counsel and that the law firms of Kirby McInerney LLP ("Kirby") and Radice Law Firm, P.C. ("Radice") be substituted as lead counsel to protect the interests of our clients and the putative class.

      **The adequacy (or not) of interim lead counsel has harmed the prospects of the claims of the putative class.** Without recounting all the details of the current leadership crisis, which have been amply recounted in other filings,[2] suffice that Mr. Kyle Roche and his firm have been implicated in conduct that appears to negatively implicate the way that they have approached this and other cryptocurrency litigation. *See* ECF No. 232-1. Leaving aside the truth or any other ramifications of Mr. Roche's statements, this situation is an enormous distraction for the case.

---

[1] *See* ECF No. 114 at 103 (defining the class as "All persons or entities that purchased or otherwise acquired cryptocommodities (including Bitcoin, Bitcoin Cash, Ethereum, Ethereum Classic, Litecoin, Monero, Dash and ZCash) or cryptocommodity Futures, in the United States or its territories at any time from February 17, 2015 through the present and were injured thereby.").

[2] On August 31, 2022, Kyle Roche filed a motion to withdraw from this litigation and represented that his colleagues from the law firm of Roche Freedman LLP would remain available to prosecute claims on behalf of the putative class. *See* ECF Nos. 229, 232. On August 31 and September 1, 2022, Defendants requested that this Court order the entire firm of Roche Freedman LLP be terminated as counsel given Mr. Roche's alleged "misus[e] [of] the litigation process" and "disparaging remarks about juries, class members, and the class-action process in the United States." *See* ECF Nos. 230, 231.

Defendants have weighed in, stating that the discovery process may have been "misuse[d]," demanding the removal of Roche Freedman. ECF No. 230 at 3. Roche Freedman filed a response in opposition which annexed nearly identical declarations from the Named-Plaintiffs[3] that assert that the class "will be prejudiced" if Roche Freedman is terminated as counsel because the "claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities." *See* ECF Nos. 232-2-6. Each Plaintiff further declared that having Selendy Gay Elsberg PLLC ("Selendy Gay") and Schneider Wallace Cottrell Konecky LLP ("Schneider Wallace") remain co-lead counsel in the case does "not address [their] significant concerns that terminating [Roche Freedman] would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice." *See id*. For their part, Selendy Gay and Schneider Wallace take a contrary position to the Named-Plaintiffs and, like Defendants, support Roche Freedman's removal. *See* ECF No. 234.

**The current situation creates a serious problem for discovery and class certification.** Going forward, the problems created by the current situation are likely to linger. This is especially true if Roche Freedman stays in the case. The adequacy of class counsel under Rule 23(g)(2)[4] will remain the focus of this litigation, and that fact remains even if Kyle Roche is screened off from his firm's involvement in the litigation. Likewise, in ruling on discovery disputes, the Court may be asked not only to evaluate the proportionality of a challenged request but may also have to weigh in on the issues of whether the discovery had ulterior and improper motives, a concern raised by Defendants' recent submissions. *See* ECF No. 230 at 3, 231 at 2.

**For the benefit of the putative class, the Court should remove Roche Freedman and appoint Kirby and Radice as interim lead counsel.** Unless Roche Freedman is removed as interim co-lead counsel, the inquiry into the adequacy of lead counsel's representation in this and other litigations will prejudice the rights of the putative class.[5] To avoid a sideshow about the adequacy of counsel or the motives and use of litigation and discovery, a new leadership structure is necessary. With Kirby and Radice leading the litigation the leadership structure will be protected from accusation of bias or mismanagement. That is, appointing Kirby and Radice would provide guardrails against additional fallout from the recent disclosures relating to Roche Freedman and ensure that the putative class has adequate representation going forward.[6]

As the Court is aware, the law firms of Kirby and Radice sought to be appointed interim co-lead counsel at the outset of this litigation. Following oral argument on the interim lead counsel motion, the Court acknowledged that the appointment of Roche Cyrulnik Freedman LLP (n/k/a

---

[3] "Named-Plaintiffs" are Aaron Leibowitz, Benjamin Leibowitz, Jason Leibowitz, Matthew Script, and Pinchas Goldshtein. *See* ECF No. 114.

[4] Fed. R. Civ. P. 23(g)(2) "When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class."

[5] Undersigned counsel has spoken with the three Kirby-Radice Plaintiffs, and all explicitly support this proposal.

[6] Since the appointment of interim co-lead counsel, Kirby and Radice have monitored the litigation, but they have not otherwise been involved in the litigation.

Roche Freedman)[7] and its subsequently selected co-counsel, Selendy Gay and Schneider Wallace, over competing applicants was a "very difficult decision."[8] We respectfully submit that the Court should reconsider its prior decision in light of the recent events.

If appointed interim co-lead counsel, Kirby and Radice would devote the resources necessary to ensure that the interests of putative class members are appropriately protected and pursued in a professional and effective manner. As set forth in our initial application, Kirby and Radice have significant expertise in complex antitrust and commodity manipulation cases and have already committed substantial resources to develop original allegations that identified and demonstrated the alleged manipulation of Bitcoin and Bitcoin Futures. *See* ECF No. 75 at 6-8. Our extensive pre-suit investigation included econometric analyses of Bitcoin blockchain, specific crypto-currency wallets, and order flow to identify alleged manipulation, which underscores our ability to address the concerns articulated by Named-Plaintiffs surrounding the potential termination of Roche Freedman from this litigation.

**Selendy Gay and Schneider Wallace leading the litigation will not solve the current problem.** We also respectfully submit that the problem with the leadership structure is not solved simply by removing Roche Freedman without adding additional counsel free of any of the issues created by the Roche Freedman revelations. The reasons for this are three-fold.

The first reason is practical. By Named-Plaintiffs' own admission, neither Selendy Gay nor Scheider Wallace have the subject matter expertise in crypto-currency to prosecute this case. *See e.g.*, ECF Nos. 232-2 at 10, 232-4 at 10. In contrast Kirby and Radice have demonstrated extensive knowledge and expertise in identifying crypto-currency manipulation, including overseeing experts in the development of a proprietary algorithm and identifying, for the first time, specific dates of Defendants' manipulation of Bitcoin. *See* ECF No. 75 at 6-8.[9]

Second and relatedly, Selendy Gay and Schneider Wallace only represent the Named-Plaintiffs in connection with their joint representation with Roche Freedman. *See* ECF Nos. 232-2-6 at ¶ 2 (noting retainment of Roche Freedman LLP). Roche Freedman added Selendy Gay and Schneider Wallace to its proposed leadership structure to bolster its team's litigation bona fides after the initial complaint was filed and as the leadership of the litigation was contested. *See* ECF Nos. 58, 77, 78. While reputable firms to be sure, this shortcoming is significant because the Named-Plaintiffs that they do represent have now taken a position that Roche Freedman must stay in the case as co-lead counsel, a position which is contrary to Selendy Gay's and Schneider Wallace's position that Roche Freedman must go. *See* ECF No. 234 at 2 (requesting "that the

---

[7] *See* ECF No. 97 (appointing Roche Cyrulnik Freedman LLP). Notably, Roche Cyrulnik Freedman LLP had a partnership fallout and is currently engaged in litigation with former named-partner Jason Cyrulnik. *See generally Roche Freedman LLP v. Jason Cyrulnik*, 21 Civ. 01746 (S.D.N.Y.).

[8] *See* ECF No. 96, Transcript at 54:6-7 ("You've made my decision very difficult, which is a testament to all of your abilities, and I thank you for that.").

[9] *See generally* ECF No. 75; *see also Young, et al. v. iFinex, Inc., et al.*, 20 Civ. 00169 (S.D.N.Y.), ECF Nos. 25 (Memorandum of Law in Support of Motion to Appoint Kirby McInerney LLP and the Radice Law Firm, P.C. as Interim Lead Counsel), 26 (résumés of Kirby McInerney LLP and Radice Law Firm, P.C. detailing extensive financial fraud and antitrust expertise including *In re LIBOR-Based Financial Instruments Antitrust Litig.*, No. 11 MD 2262 (S.D.N.Y.) and *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 789 (S.D.N.Y.)).

Court terminate Roche Freedman's appointment as interim co-lead counsel"). This conflict with their own clients is untenable. In contrast, Kirby and Radice directly represent clients, the Kirby-Radice Plaintiffs, who have explicitly supported the removal of Roche Freedman. These Kirby-Radice Plaintiffs are ready to substitute in as plaintiffs in the litigation as necessary to protect the interest of the putative class.

Third, having Selendy Gay and Schneider Wallace alone as leaders may not solve the discovery or Rule 23(g) distractions that currently exist. This is because they are in the unfortunate position of having worked with Roche Freedman for the last few years, and Defendants may seek to make their collective participation in the litigation an issue.[10]

None of this is to denigrate the contribution of Selendy Gay and Schneider Wallace to this case. They certainly have valuable experience and we hope that, distanced from Roche Freedman, they can continue to be part of the litigation either as part of, or under, the leadership structure of Kirby and Radice.

\*   \*   \*

In sum, this case unfortunately has been stalled by a sideshow. The interests of the putative class are imperiled if (i) Roche Freedman is not removed as interim co-lead counsel and (ii) untainted counsel do not take over the leadership structure at least to protect the case from any imputation of impropriety from the Roche Freedman disclosures. Here, the Court can proactively manage the risk of future fallout by addressing this problem through the appointment of additional interim co-lead counsel well in advance of any class certification or settlement approval process. *See generally In re Am. Express Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221, 2015 WL 4645240, at \*12 (E.D.N.Y. Aug. 4, 2015) (denying final approval, removing one lead counsel, and ordering to show cause why remaining interim class counsel should continue in their capacities). Accordingly, for the foregoing reasons, we respectfully submit that Kirby and Radice are uniquely qualified to protect the interests of the putative class in this litigation as interim co-lead counsel.

Finally, we appreciate that this Court already has expressed concerns regarding the pace of this litigation. We respectfully submit that our firms are prepared to commit the resources necessary to litigate this case with the minimal possible disruption to the current litigation schedule.

We appreciate this Court's attention to this matter.

---

[10] Defendants' suggestion that the interests of the putative class remain adequately protected by Selendy Gay and Schneider Wallace would best not be taken at face value. In other contexts, courts have found that permitting defendants to dictate the outcome of the lead plaintiff process is analogous to "permitting defendants to police the adequacy of class representatives and their counsel is like 'permitting a fox . . . to take charge of the chicken house.'" *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012) (quoting *Eggleston v. Chi. Journeymen Plumbers' Local Union*, 657 F.2d 890, 895 (7th Cir.1981); *Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007) (finding defendants' "sudden concern for the best interests of the class is as ironic as it is unconvincing"); *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533, 2012 WL 3205062, at \*17 (S.D.N.Y. Aug. 8, 2012).

Respectfully Submitted,

/s/ *David E. Kovel*
David E. Kovel
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Email: dkovel@kmllp.com

/s/ *John Radice*
John Radice
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, New Jersey 08540
Telephone: (646) 245-8502
E-mail: jradice@radicelawfirm.com

cc: All counsel of record (via ECF)

# EXHIBIT 8



September 6, 2022

<u>**VIA ECF**</u>

The Honorable Katherine Polk Failla
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     <u>***In re Tether and Bitfinex Crypto Asset Litigation***</u><u>**, 19 Civ. 9236 (S.D.N.Y.)**</u>

Dear Judge Failla:

We write in reply to Defendants' further additional letter arguing that, despite the strong objection of all five named Plaintiffs, the Court remove Roche Freedman LLP ("Firm") as co-lead counsel in this matter.

Defendants' initial letter sought the extraordinary remedy of disqualification based solely on a series of spliced video recordings of a single lawyer who has since sworn those statements were false or misinterpreted.

In addition to Mr. Roche's sworn testimony, the Firm's response marshalled facts that demonstrate the statements are either (i) false, (ii) spun by Defendants to imply something not stated, or (iii) do not provide cause to disqualify the entire Firm. Specifically, the Firm submitted a signed pleading stating unequivocally that the initiation of this matter had nothing to do with any relationship between the Firm and Ava Labs, and that Plaintiffs' retention of the Firm pre-dates any work the Firm did for Ava Labs.[1] Discovery was not, and could not have been, abused because no discovery was produced before the video statements were made. Moreover, while Defendants argue the statements imply discovery abuse occurred, the actual recorded statements *never even mention discovery*, much less that Mr. Roche used it for an improper purpose; the statements refer to whistleblower submissions. The Firm's co-counsel, moreover, approved all discovery requests and likewise deny any wrongdoing. Finally, whether any lawyer in this action (on either side) holds an unrelated cryptoasset is both factually and legally irrelevant.

The Firm also took appropriate steps to avoid any appearance of impropriety. The Firm removed Mr. Roche from its class action practice group, screened him from this case, and Mr. Roche will not receive any portion of the proceeds from this litigation. That should be the end of it. In fact, while other movants stand to benefit from the Firm's removal, the five named plaintiffs who actually retained the Firm and stand to lose the most if deprived of their counsel of choice, all

---

[1] While it should not be necessary to go further than this, the Firm's partners can prove unequivocally that they began preparing this suit long before they ever met Ava Labs.

99 Park Ave., Suite 1910, New York, NY 10016   |   (t) 646.350.0527 (f) 646.392.8842   |   www.rochefreedman.com

The Honorable Katherine Polk Failla
September 6, 2022
Page 2 of 5

oppose the Firm's disqualification, and all "express a strong preference that Roche Freedman remain in the case." DE 234.

Under these circumstances, Defendants' continued insistence that the Firm be removed, despite their inability to show any concrete wrongdoing, demonstrates that the Defendants' request is a litigation tactic intended to remove Plaintiffs' preferred counsel—the firm responsible for originating this case, and the firm with the most cryptoasset litigation experience. The inequity Defendants seek, through this gamesmanship, is particularly sharp given the evidence that the videoclips were the apparent result of efforts by defendants in another class action who are seeking to deter the Firm from prosecuting cryptocurrency cases, and who may have now escalated to threats of violence.[2]

Below, the Firm further addresses and refutes each of the main arguments seeking its disqualification.

*First*, Defendants request directly implicates the well-established law that strongly disfavors strategic motions to disqualify opposing counsel. *Scantek Medical, Inc. v. Sabella*, 693 F. Supp. 2d 235, 238 (S.D.N.Y. 2008) ("In view of their potential for abuse as a tactical device, motions to disqualify opposing counsel are subject to particularly strict scrutiny.") (collecting authority). Defendants actions demonstrate this is a tactic. For example, consistent with the irrelevance of such facts, they have expressed no intent to inquire into co-lead counsel's personal cryptoasset holdings at all. And while all three co-lead counsel helped draft the amended complaint and authorized every discovery request, Defendants only seek to remove this Firm, *i.e.*, the firm that investigated, developed, pursued, and filed the case, and the firm with by far the most experience in the crypto-asset space. Such disqualification efforts are improper. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012) ("It is in a defendant's best interests to object to class counsel who are, in fact, best suited to protect the class [so] . . . new class counsel [] will more readily compromise the claims . . . It is this presumption of strategic behavior by class action defendants that has convinced courts to preclude, or severely limit, their ability to raise alleged ethical violations in the context of class certification."). Consequently, "except in rare cases, ethical issues regarding attorneys are properly dealt with in professional disciplinary bodies rather than by motions to disqualify counsel, which are subject to abuse." *Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 358 (S.D.N.Y. 2000), *on reconsideration*, 2000 WL 1016649 (S.D. N.Y. 2000).

To be clear, while Mr. Roche's statements were improper, Defendants have failed to show any evidence that the Firm's attorneys remaining on the case have done anything questionable. On this record, the reasonable inference is that Defendants' continued pursuit of disqualification is because they stand to benefit from it. In short, Defendants wrongly impugn the Firm's motives and

---

[2] In the last several days the Firm has heard these defendants may intend physical harm against Mr. Roche. While it is difficult to verify the severity of this threat, whether someone in fact possesses such an intent, or simply wants Mr. Roche to believe they do, the Firm has contacted law enforcement about the matter.

The Honorable Katherine Polk Failla
September 6, 2022
Page 3 of 5

actions while they would have the Court ignore their own motives in making those accusations—which the law accounts for in strongly disfavoring the relief they seek.

*Second*, Defense counsel argues there has been discovery abuse, but that argument collapses under scrutiny. Mr. Roche never said he shared confidential discovery materials. That is an inference Defendants are urging the Court to make from comments in the video that, Mr. Roche has explained, simply referred to whistleblower/insider submissions. Mr. Roche has now sworn he did not share confidential discovery, the timeline demonstrates such sharing was impossible, the Firm has signed a pleading under Rule 11 that no such discovery was shared, the alleged recipient has likewise denied receiving it,[3] and co-counsel agrees that no improper discovery was sought. Defense counsel nevertheless urges the Court to ignore the facts, timeline, and sworn testimony, construe Mr. Roche's statements in the worst possible way, impute that conduct to the entire Firm, and then disqualify the Firm for it. That is unreasonable.

*Third*, the Firm brought this suit because we concluded, as other analysts in the crypto-asset space had concluded (without appreciating or analyzing the applicable law), that Tether was not fully backed and that Defendants were manipulating prices. Defendants have already tried and failed to show that the allegations based on these conclusions are wrong as a matter of law. The Firm did not bring suit to try to affect the price of any crypto-asset, and the supposed prospect that the prosecution of the lawsuit could have such an effect could implicate any lawyer holding crypto-assets. Nor are Plaintiffs entitled to discovery to determine whether any such motivations are at play. The relevant question, from either an ethical or optical perspective, is whether counsel is mounting non-frivolous claims and defenses and whether counsel is representing the best interests of the class. Any other rule would require Courts supervising class actions to mandate full and frank disclosure of class counsel's assets, and then require that Court—presumably by hiring experts—to determine whether the resolution of the case could affect those assets to such a degree that counsel should be conflicted out of the representation. That has never been the law.

*Fourth*, although we respect our co-counsel's submission, and remain amenable to continuing the good work the firms have done together over the past two years, both the solution they propose and the rationales underlying it are incorrect. Removal of this Firm would not avoid potential discovery disputes, as Defendants reserve the right to take issue with the origins and prosecution of this claim regardless. The proper way to address an argument that co-lead counsel are seeking discovery for the wrong reasons is not to remove this Firm, but for co-lead counsel collectively to show that any such argument is baseless—that the requested discovery is relevant, that no counsel has ever breached the confidentiality order in this case and that there is no reasonable basis for somehow presupposing an officer of the court intends to do so.

In addition, contrary to what seems to be implicit in our co-counsel's submission, their clients are the named Plaintiffs—not absent class members. These Plaintiffs, the ones who have overseen the day-to-day conduct of this litigation for the past three years, "have all reviewed [co-

---

[3] https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752 ("We do not receive materials or information from him").

The Honorable Katherine Polk Failla
September 6, 2022
Page 4 of 5

counsel's] letter and stated that they disagree with its content and recommendation; in short, the named plaintiffs express a strong preference that Roche Freedman remain in the case." DE 234. Under these circumstances, it is incorrect for co-counsel to suggest that our Firm's continued involvement is not in the best interest of the proposed class.

Inasmuch as our co-counsel mean to suggest that the named Plaintiffs are making an ill-informed decision, or one that should simply be disregarded, we disagree. Our co-counsel are understandably upset with the optics of the video statements, but, as detailed above and in our earlier letter, the Firm has addressed those optics. Removing the Firm is not necessary to address any optical issue. In fact, while removing the Firm would inure to co-counsel's financial benefit, it would harm the class and override the named Plaintiff's' express preference. Our co-counsel does not adequately account for these facts in their submission, and they fail to address at all the optical issue they run the risk of raising themselves.[4] They also discount some of the named plaintiffs' statements that they do not feel comfortable continuing acting as a fiduciary to the class without this Firm's continued involvement.

*Fifth*, Defendants' proposed removal would, in multiple respects, send the wrong message. The following is indisputable: someone carefully orchestrated the meetings, statements, and circumstances to record Mr. Roche making compromising statements. Someone then edited the video recordings to feature the statements prompting these submissions, released the edited recordings to the general public on a website along with a story that went far further than the actual statements, and within five minutes of that release, a named defendant in a class action the Firm has brought Tweeted that the video recordings had been released. It is telling that every other story on the website involves those same defendants, that historic postings and registrations demonstrate collaboration between the site and those defendants, and that the release was made less than two weeks before a scheduled oral argument on the motion to dismiss in that class action.

These actions were clearly taken to hurt Mr. Roche, discredit his good work in the cryptocurrency space, and thereby obtain an advantage against the classes we represent in this space. While we do not condone Mr. Roche's statements, we do submit that to afford these Defendants the relief they seek would effectively signal that any and all parties could benefit from targeting opposing counsel and their firms through underhanded means. We respectfully submit that is not good precedent to set or conduct to incentivize.

In this case, in sum, the demanding legal standards for disqualifying the Firm have not been met. Defendants have not even met their initial, burden-shifting showing that any Firm attorney improperly shared any confidential information in this case with any third party. *See Kassis v. Teacher's Ins. & Annuity Ass'n*, 717 N.E.2d 674, 677-78 (N.Y. 1999) (applying this threshold requirement with respect to a firm attorney's alleged acquisition of confidential client information

---

[4] In the absence of any concrete suggestion that the Firm's continued involvement would somehow hurt the case, we believe the message on requests like Defendants' here should be that co-lead counsel in class actions should focus their resources towards prosecuting and winning the case.

The Honorable Katherine Polk Failla
September 6, 2022
Page 5 of 5

at a former law firm). Nor have Defendants shown that any Firm attorney disclosed any confidential information with any third party. In addition, where Mr. Roche has withdrawn from the matter and the Firm has set up an ethical wall preventing his participation, disqualification is not necessary, because there is no evidence that any Firm attorney intends to use any confidential information in this case in any improper respect. *See, e.g.*, *TI Payments LLC v. New U Life Corp.*, Case No. 19-cv-01816-APG-DJA, 2021 WL 139989, at *9-11 (D. Nev. Jan. 14, 2021) (under the "high standard" to be met, finding not "necessary" the disqualification of law firm for individual lawyer's possession of information from prior client on the conditions that the lawyer withdraws from the case, the firm screens the lawyer, and the lawyer will not share in any fees). In such circumstances, "no one should be punished through disqualification." *State Compensation Ins. Fund v. Drobot*, No. SACV 13-956 AG (CWx), 2014 WL 12579808, at *10 (C.D. Cal. July 11, 2014). The "Court's focus must be forward, not backward," and there is "no reason to believe the outcome of this case will be affected if [the Firm] continues to represent Plaintiff[s]." *Drobot*, 2014 WL 12579808, at *10. The ethical wall the Firm has put in place resolves any concerns with any appearance of impropriety going forward and thereby gives the requisite weight to the precept that a "party's entitlement to be represented in ongoing litigation by counsel of his or her own choosing is a valued right which should not be abridged absent a clear showing—on which the party seeking disqualification bears the burden—that counsel's removal is warranted." *Total Asset Recovery Servs., LLC v. Huddleston Capital Partners VIII LLC*, No. 1:21-CV-2466-ALC, 2022 WL 1125924, at *1 (S.D.N.Y. Apr. 15, 2022) (quotations omitted). This a proposed class action, to be sure, but as to the Court-appointed lead Plaintiffs, it remains true here that "[d]isqualification denies a party's right to representation by the attorney of its choice." *Id.* (quotations omitted). Finally, for all of these reasons, no submission remotely meets the standard of showing that the Firm's disqualification is "absolutely necessary" under the circumstances. 6 *Newberg & Rubenstein on Class Actions* § 19:13 (6th ed. June 2022 update) (quotations omitted).

For the foregoing reasons we respectfully request that the Court deny Defendants' request or, in the alternative, schedule a conference so that the Firm has an opportunity to address these issues in more detail including any concerns that Your Honor may have.

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*
Devin "Vel" Freedman
Edward Normand
Joseph M. Delich
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
vel@rochefreedman.com
tnormand@rochefreedman.com
jdelich@rochefreedman.com

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

TETHER AND BITFINEX CRYPTO ASSET
LITIGATION

19 Civ. 9236 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

The Court is in receipt of the parties' various letters discussing Roche
Freedman LLP's continued participation in this case. (Dkt. #230-236).
Accordingly, the parties are hereby **ORDERED** to attend an in-person hearing
on **October 3, 2022, at 3:30 p.m**. in Courtroom 618 of the Thurgood Marshall
Courthouse, 40 Foley Square, New York, New York 10007. The parties shall
come prepared to discuss the substance of the recently-submitted letters
regarding Roche Freedman LLP, and any other relevant matters.

To the extent feasible, the Court will consider providing a hybrid option
for participation for parties with conflicts on this date. Further, if a party
wishes to be heard but cannot attend the October 3, 2022 hearing, it should
submit a letter on the docket ahead of the hearing, not to exceed three pages in
length.

SO ORDERED.

Dated: September 8, 2022
New York, New York

KATHERINE POLK FAILLA
United States District Judge

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP, | Case No. 1:21-cv-01746-JGK |
| Plaintiff, | |
| v. | **DEFENDANT'S CORRECTED ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIMS** |
| JASON CYRULNIK, | |
| Defendant. | |

JASON CYRULNIK,

           Counterclaim-Plaintiff,

    v.

ROCHE CYRULNIK FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN,
AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND,

           Counterclaim-Defendants.

## <u>ANSWER</u>

Defendant Jason Cyrulnik, by and through his undersigned attorneys, Kasowitz Benson Torres LLP, hereby answers the amended complaint (the "Amended Complaint") filed by Plaintiff Roche Cyrulnik Freedman LLP ("RCF") as follows:

1.      Cyrulnik denies the allegations of Paragraph 1.

2.      Cyrulnik admits the allegations of Paragraph 2.

3.      Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and otherwise denies the allegations of Paragraph 3.

4.      Cyrulnik admits that he signed the MOU, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 4.

5.      Cyrulnik denies the allegations of Paragraph 5, other than to admit that RCF's scheme to remove him for "cause" and take the extremely valuable assets belonging to him are improper, null and void, and states that RCF's lawsuit is without merit.

6.      Cyrulnik denies the allegations of Paragraph 6.

7.      Cyrulnik admits the allegations of Paragraph 7.

8.      Cyrulnik admits the allegations of Paragraph 8.

9.      Cyrulnik states that Paragraph 9 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 9.

10.     Cyrulnik states that Paragraph 10 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 10.

11.     Cyrulnik states that Paragraph 11 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 11.

12.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and otherwise denies the allegations of Paragraph 12.

13.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13, and otherwise denies the allegations of Paragraph 13.

14.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14, admits that RCF was given Tokens by the START UP, a portion of which Tokens were earmarked for and guaranteed to Cyrulnik in connection with the MOU, and otherwise denies the allegations of Paragraph 14.

2

15.     Cyrulnik admits that Roche and Freedman approached Cyrulnik about joining RF and that Roche and Freedman negotiated an agreement to have Cyrulnik join together with them as the three named partners of RCF, that Edward Normand, Amos Friedland, and Nathan Holcomb would join RCF as founding partners, and states that he is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and therefore denies them.

16.     Cyrulnik states that the allegation that the prospective partners discussed and agreed to "a variety of things" is vague and ambiguous, admits that he and the other Founding Partners negotiated the terms of the MOU, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 16.

17.     Cyrulnik admits that he and the other Founding Partners executed the MOU, which memorialized portions of the agreement reached, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 17.

18.     Cyrulnik refers to the MOU for its contents, admits that a long-form partnership agreement had not yet been executed at the time Counterclaim-Defendants executed their scheme, and otherwise denies the allegations of Paragraph 18.

19.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 19.

20.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 20.

21.     Cyrulnik admits that Roche sent an email on July 22, 2020, refers to that email for its contents, and otherwise denies the allegations of Paragraph 21.

22. Cyrulnik admits that the Tokens substantially increased in value to be worth millions of dollars at the beginning of 2021 and that five of RCF's seven equity partners conspired to improperly remove him without cause in an effort to steal his valuable assets, including his allocation of the Tokens, and otherwise denies the allegations of Paragraph 22.

23. Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 23.

24. Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 24.

25. Cyrulnik refers to the MOU for its contents, states that he is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the "understanding" of the other Founding Partners, and otherwise denies the allegations of Paragraph 25.

26. Cyrulnik refers to the MOU for its contents, states that he is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the "understanding" of the other Founding Partners other than to deny that the allegations comport with the other Founding Partners' verbal statements, and otherwise denies the allegations of Paragraph 26.

27. Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 27.

28. Cyrulnik denies the allegations of Paragraph 28.

29. Cyrulnik denies the allegations of Paragraph 29.

30. Cyrulnik denies the allegations of Paragraph 30.

31. Cyrulnik denies the allegations of Paragraph 31.

32.     Cyrulnik admits that he and Roche discussed concerns over Freedman's abuse of RCF's compensation system, and that his conversations concerning those concerns were civilized, and otherwise denies the allegations of Paragraph 32.

33.     Cyrulnik denies the allegations of Paragraph 33.

34.     Cyrulnik denies the allegations of Paragraph 34.

35.     Cyrulnik denies the allegations of Paragraph 35.

36.     Cyrulnik admits that Roche sent an email on July 22, 2020 and refers to the email for its contents.

37.     Cyrulnik admits that Freedman sent an email on July 27, 2020 and refers to that email for its contents.

38.     Cyrulnik denies the allegations of Paragraph 38.

39.     Cyrulnik denies the allegations of Paragraph 39.

40.     Cyrulnik denies the allegations of Paragraph 40.

41.     Cyrulnik denies the allegations of Paragraph 41.

42.     Cyrulnik denies the allegations of Paragraph 42.

43.     Cyrulnik denies the allegations of Paragraph 43.

44.     Cyrulnik denies the allegations of Paragraph 44.

45.     Cyrulnik denies the allegations of Paragraph 45.

46.     Cyrulnik denies the allegations of Paragraph 46.

47.     Cyrulnik denies the allegations of Paragraph 47.

48.     Cyrulnik denies the allegations of Paragraph 48.

49.     Cyrulnik denies the allegations of Paragraph 49.

50.     Cyrulnik denies the allegations of Paragraph 50.

51.     Cyrulnik denies the allegations of Paragraph 51.

52.     Cyrulnik denies the allegations of Paragraph 52.

53.     Cyrulnik denies the allegations of Paragraph 53.

54.     Cyrulnik denies the allegations of Paragraph 54.

55.     Cyrulnik denies the allegations of Paragraph 55.

56.     Cyrulnik denies the allegations of Paragraph 56.

57.     Cyrulnik admits that Katherine Eskovitz sent an email, refers to that email and the related chain of emails for their contents, and otherwise denies the allegations of Paragraph 57.

58.     Cyrulnik denies the allegations of Paragraph 58.

59.     Cyrulnik denies the allegations of Paragraph 59.

60.     Cyrulnik denies the allegations of Paragraph 60.

61.     Cyrulnik denies the allegations of Paragraph 61.

62.     Cyrulnik denies the allegations of Paragraph 62.

63.     Cyrulnik denies the allegations of Paragraph 63.

64.     Cyrulnik denies the allegations of Paragraph 64.

65.     Cyrulnik admits, upon information and belief, that Roche, Freedman, Friedland, Holcomb, and Normand held a secret meeting without informing two of RCF's seven equity partners, including Cyrulnik, to vote in an attempt to improperly remove Cyrulnik and steal his assets on or about February 10, 2021, and otherwise denies the allegations of Paragraph 65.

66.     Cyrulnik admits, upon information and belief, that Roche, Freedman, Friedland, Holcomb, and Normand held a secret meeting without informing two of the RCF's seven equity partners, including Cyrulnik, to vote in an attempt to improperly remove Cyrulnik and steal his assets on or about February 10, 2021, and otherwise denies the allegations of Paragraph 66.

67. Cyrulnik admits that Roche sent an email on February 12, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 67.

68. Cyrulnik admits that he spoke with Roche, Freedman, and Normand on February 12, 2021, admits that he demanded that RCF retract its improper notice and commit to remitting to him everything owed to him under his agreements with RCF and the Conspiring Partners, and otherwise denies the allegations of Paragraph 68.

69. Cyrulnik admits that he has identified the Counterclaim-Defendants' attempted removal for cause as pretextual and that the Conspiring Partners perpetrated their scheme in an effort to steal Cyrulnik's assets including to "recapture" his share of the Tokens, which "exponentially rose in value" during the weeks prior to the attempt, and otherwise denies the allegations of Paragraph 69.

70. Cyrulnik admits that he has disputed RCF's and the Conspiring Partners' improper attempt to remove him in violation of the parties' agreements, which attempt was and is null and void, and that Marc Kasowitz, Cyrulnik's counsel, sent an email to counsel for RCF, refers to that email for its contents, and otherwise denies the allegations of Paragraph 70.

71. Cyrulnik admits that the Counterclaim-Defendants improperly cut his access to his email account as well as the client files, electronic systems, bank accounts, and health insurance abruptly at various points throughout February 2021, admits that his counsel sent an email to RCF on or about February 26, 2021, refers to the email for its contents, and otherwise denies the allegations of Paragraph 71.

72. Cyrulnik admits that his counsel sent an email to RCF on or about February 26, 2021, refers to the email for its contents, and otherwise denies the allegations of Paragraph 72.

73.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 73, and otherwise denies the allegations of Paragraph 73.

74.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 74, and otherwise denies the allegations of Paragraph 74.

75.     Cyrulnik admits that RCF's counsel sent an email to Cyrulnik's counsel on or about March 24, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 75.

76.     Cyrulnik admits that his counsel sent an email to RCF's counsel on or about March 26, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 76.

77.     Cyrulnik states that Paragraph 77 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 77.

78.     Cyrulnik denies the allegations of Paragraph 78.

79.     Cyrulnik denies the allegations of Paragraph 79.

80.     Cyrulnik denies the allegations of Paragraph 80.

81.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81, and otherwise denies the allegations of Paragraph 81.

82.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 82, and otherwise denies the allegations of Paragraph 82.

83.     Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 82 as if fully set forth herein.

84.     Cyrulnik states that Paragraph 84 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 84.

85.     Cyrulnik states that Paragraph 85 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 85.

86.     Cyrulnik states that Paragraph 86 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 86.

87.     Cyrulnik admits that he is an equity partner of RCF and disputes that he was removed from RCF for cause, and otherwise denies the allegations of Paragraph 87.

88.     Cyrulnik states that Paragraph 88 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 88.

89.     Cyrulnik states that Paragraph 89 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 89, and states that RCF is entitled to no relief whatsoever.

90.     Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 89 as if fully set forth herein.

91.     Cyrulnik states that Paragraph 91 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 91.

92.     Cyrulnik states that Paragraph 92 contains legal conclusions to which no response is required.

93.     Cyrulnik states that Paragraph 93 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 93.

94.     Cyrulnik states that Paragraph 94 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 94.

95.     Cyrulnik states that Paragraph 95 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 95.

96.     Cyrulnik denies the allegations of Paragraph 96.

97.     Cyrulnik states that Paragraph 97 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 97.

98.     Cyrulnik states that Paragraph 98 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 98, and states that RCF is entitled to no relief whatsoever.

99.     Cyrulnik states that Paragraph 99 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 99, and states that RCF is entitled to no relief whatsoever.

100.    Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 99 as if fully set forth herein.

101.    Cyrulnik admits that he originated certain clients as a partner of RCF, states that Paragraph 101 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 101.

102.    Cyrulnik states that Paragraph 102 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 102.

103.    Cyrulnik states that the Paragraph 103 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 103.

104.    Cyrulnik states that Paragraph 104 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 104.

105.    Cyrulnik denies the allegations of Paragraph 105.

106.    Cyrulnik states that Paragraph 106 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 106.

107.     Cyrulnik states that Paragraph 107 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 107, and states that RCF is entitled to no relief whatsoever.

108.     Cyrulnik states that Paragraph 108 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 108, and states that RCF is entitled to no relief whatsoever.

To the extent a response is required, Cyrulnik denies each allegation contained in the "WHEREFORE" clause of the Amended Complaint and states that RCF is entitled to no relief whatsoever.

## **AFFIRMATIVE DEFENSES**

By alleging the Affirmative Defenses set forth below, Cyrulnik does not agree or concede that he bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

### FIRST AFFIRMATIVE DEFENSE

RCF has failed to plead an entitlement to the relief it seeks.

### SECOND AFFIRMATIVE DEFENSE

RCF's claims fail, in whole or in part, to state a cause of action for which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, by RCF's failure to satisfy conditions precedent.

11

## FOURTH AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, by RCF's fraudulent conduct.

## FIFTH AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, because none of the alleged acts or omissions by Cyrulnik were the proximate cause or the actual cause of the injuries or damages allegedly sustained by RCF.

## SIXTH AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, because any injuries or damages allegedly sustained by RCF were the result of intervening or supervening events, factors, occurrences, or conditions, not proximately caused by Cyrulnik and for which Cyrulnik is not liable.

## SEVENTH AFFIRMATIVE DEFENSE

RCF has not sustained any legally cognizable damages or injuries caused by any matter alleged against Cyrulnik in the Amended Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent that RCF suffered any damages (which Cyrulnik denies), any such damages must be reduced as a result of RCF's failure to take reasonable steps to mitigate damages.

## NINTH AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, under the doctrines of waiver, laches, equitable estoppel, and unclean hands.

## TENTH AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, by documentary evidence.

<u>RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES AND RIGHTS</u>

Cyrulnik gives notice that he intends to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserve his right to amend this Answer to assert any such defenses.

## **COUNTERCLAIMS**

Counterclaim-Plaintiff Jason Cyrulnik, for his counterclaims against counterclaim-defendants Kyle Roche, Devin Freedman, Amos Friedland, Nathan Holcomb and Edward Normand (the "Conspiring Partners") and Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP) ("RCF" or the "Firm" and, together with the Conspiring Partners, "Counterclaim-Defendants"), upon knowledge as to Cyrulnik and otherwise upon information and belief, alleges as follows:

## **INTRODUCTION**

1.      This action arises from a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the Firm's clients that ████████ had suddenly appreciated exponentially to more than $250 million.  The Firm's governing agreement expressly prohibits the removal of a Founding Partner without cause, so Roche and Freedman, together with certain other partners they secretly recruited to their scheme and to whom they agreed to provide a share of Cyrulnik's assets, concocted an absurd and purely pretextual "cause" — their principal claim that Cyrulnik had raised his voice during two telephone conversations months earlier — and then, jeopardizing Cyrulnik's ability to represent his clients in active ongoing litigation, they cut

13

his access to the Firm's client files, emails, electronic systems and bank accounts, and terminated his and his family's access to the Firm's health insurance.

2.      What makes Counterclaim-Defendants' greedy and unlawful scheme even more egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who had spent months recruiting and convincing Cyrulnik, a highly accomplished lawyer with a long-standing, robust and growing practice, to leave his equity partnership at a prominent national law firm to transform their fledgling firm into a stable and respected litigation practice. They convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Counterclaim-Defendants are now trying to steal.

3.      Roche, who graduated law school in 2016, and Freedman, who graduated in 2012, had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF"). Counterclaim-Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm focusing on cryptocurrency and other specialized practice areas. Shortly thereafter, realizing that they needed an experienced lawyer with an established and successful practice and cash flow to fund the firm's operations and help procure lead counsel appointments in their class-action cases, they approached Cyrulnik about his leaving BSF to join them and co-found RCF. After fifteen years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to found a law firm with Roche and Freedman in January 2020. As the Conspiring Partners knew, in doing so, Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing lucrative offers to join other national law firms. As the Conspiring Partners also knew, Cyrulnik

did so in reliance on the negotiated and unambiguous terms of the new Firm's governing agreement that provided him with fixed, guaranteed, and significant equity interests in the new Firm's contingency and alternative fee matters, with substantial financial upside.

4.      Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases and core client base, and his practice, which Counterclaim-Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

5.      Then, in late ██████ 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and ████████████████ in ██████ 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

6.      Notwithstanding months of reaffirming their admiration for Cyrulnik and his enormous contributions to the Firm's success, the Conspiring Partners seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the cryptocurrency and keep it for themselves.  To circumvent the threshold hurdle of their scheme – that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency – Roche and Freedman manufactured transparently false grounds to remove him for "cause."  Alleging that Cyrulnik raised his voice on two phone calls concerning certain questionable actions Roche and Freedman (and two other partners) had taken that threatened to endanger the Firm, the Conspiring Partners claimed that Cyrulnik suddenly somehow lost the guaranteed equity and cryptocurrency interests expressly granted to him by the parties' agreement.  They then invited

handpicked partners – the other Conspiring Partners – to a secret meeting, excluding anyone they knew would not participate in their improper scheme. At the secret meeting, the Conspiring Partners held a self-serving "vote" to "remove" him from the Firm. They then took the position that Cyrulnik was no longer entitled to the cryptocurrency and other interests expressly granted to him by the parties' agreement – even though nothing in the agreement provides for such a forfeiture.

7.      Counterclaim-Defendants compounded their egregious misconduct by seeking to pressure clients to stay with them rather than continue to have Cyrulnik represent them. That scheme failed miserably: a mass exodus of those clients ensued, as they wanted Cyrulnik to lead their litigations. At the same time, the Firm's other equity partner, Paul Fattaruso, rebuffed Counterclaim-Defendants' requests to continue working with them in the wake of the scheme they had perpetrated.

8.      Counterclaim-Defendants' unconscionable misconduct is in flagrant violation of their contractual, fiduciary, and ethical duties to Cyrulnik and their professional responsibilities to the Firm's clients. Cyrulnik's conduct was consistently exemplary, in contrast to several Conspiring Partners (whose missteps Cyrulnik was addressing in the very discussions about which they now complain and seek to use as the purported basis for their scheme), including with respect to Roche's lax attitude toward billing practices and timekeeping and Freedman's problematic referral-fee arrangements with other firms.

9.      Accordingly, Cyrulnik brings these claims seeking, among other things, dissolution of the Firm and distribution of its assets in accordance with Florida law and the parties' unambiguous governing agreement, and recovery of the damages Counterclaim-Defendants' egregious conduct has caused.

## THE PARTIES

10.     Counterclaim-Plaintiff Jason Cyrulnik is a citizen of New Jersey and a co-founding named equity partner of RCF.

11.     Counterclaim-Defendant RCF is a Florida limited liability partnership, with offices in Miami, Florida and New York, New York.

12.     Counterclaim-Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

13.     Counterclaim-Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

14.     Counterclaim-Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

15.     Counterclaim-Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

16.     Counterclaim-Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

## JURISDICTION

17.     This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees, and costs.

18.     Cyrulnik is filing his counterclaims in accordance with and pursuant to the Court's ruling that "[g]iven the intertwined nature of the jurisdictional question with the merits, '[t]he Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims.'" (ECF No. 56 at 13).

17

19.     The Court has personal jurisdiction because Counterclaim-Defendant RCF has an office in this District in which the Conspiring Partners regularly practice, RCF and the Conspiring Partners regularly conduct business in this District, and RCF (at the direction of the Conspiring Partners) has availed itself of this forum by bringing suit here.

## FACTS

**I.    COUNTERCLAIM-DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FORGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

### A.    Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF

20.     Cyrulnik graduated Yale Law School in 2004 and joined BSF.  With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

21.     Cyrulnik rose through the ranks quickly.  He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

22.     Cyrulnik's steadfast commitment to clients generated a substantial following and client base.  He has been leading bet-the-company litigations for a growing base of core clients for many years.  He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

23.     He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly.  He mentored associates, brought in partners in to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

24.     Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters.  In 2019, Cyrulnik was recruited aggressively by several major national law

18

firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

**B.** **Roche And Freedman Recruit Cyrulnik To Join RCF**

25.     In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP.  Roche was a third-year associate who had extensive expertise in the cryptocurrency space.  Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel.  Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

26.     Cyrulnik had interacted with both Roche and Freedman at BSF.  Indeed, Freedman regularly sought advice from Cyrulnik about how to manage cases, legal strategy, and general guidance as Freedman embarked on his new venture in 2019.

27.     During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman.  Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate platform (in quality and size) to service his growing client base, which was his top priority.

28.     Freedman would not take no for an answer.  He continued to press over the course of several months, ultimately bringing Roche into the conversation.  The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many clients' needs.  In exchange for his agreement to leave BSF to co-found a firm with them, Roche and Freedman promised Cyrulnik significant stakes in what they described as their high-upside contingency work and in

19

certain assets that they had secured. The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue and stability that would help finance Roche and Freedman's contingency and alternative fee arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

29.     After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to co-found the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

C.     **The Parties Negotiate And Execute The MOU**

30.     On December 27, 2019, RCF's Founding Partners — named partners Cyrulnik, Roche and Freedman, together with Counterclaim-Defendants Friedland, Holcomb and Normand (as defined in the MOU) — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

31.     Section II of the MOU sets forth the partners' equity positions in the Firm. In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%). Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies for revenue earned through hourly and contingency matters. Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

32.     Section IV of the MOU lists a series of "assets" (most of which were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)), excludes those assets from the Compensation Model, and instead sets

20

forth the agreed-upon fixed allocations of those assets to the Founding Partners in different formulas and percentages that varied by asset.

33.     One of the key assets allocated in the MOU was cryptocurrency (referred to as "Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the "Startup Client"), had agreed to convey to the Firm.  The MOU expressly granted each of the Founding Partners a fixed allocation of the Tokens (which was to be ███ of all Tokens issued by the Startup Client), as follows:  Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and Normand, Friedland, and Holcomb, 5% each.

34.     Section VI of the MOU addresses the management of the Firm.  In particular, the parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

35.     The MOU has two separate provisions governing the departure of a partner from the Firm.  The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who voluntarily elects to withdraw from the Firm within 18 months would have his or her compensation limited to the amount to which he or she would have been entitled under the Compensation Model, and would return his or her equity in the Firm to the other equity partners.

36.     The second, Section VI(G), entitled "Partner Removal," expressly provides that a "Founding Partner cannot be removed without cause."  That section also provides that, even if cause arose for the removal of a Founding Partner, that removal would require an affirmative vote of at least two-thirds of the Firm's equity partners.  In stark contrast to the voluntary withdrawal provision, however, such an involuntary removal (for "cause") does *not* result in the forfeiture of any compensation, interests, or assets owed or allocated to the Founding Partner under the MOU.

37.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter," attached as Exhibit B).  Given his reputation, seniority, and equity stake in the new Firm, Cyrulnik was the natural choice for the "first-named" partner.  But Roche — consumed with securing that recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be listed as the first named partner at RCF.  The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model.  Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

38.     In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

    a.     27% of the Firm's equity, which could not be diminished at any time without his consent;

    b.     25% of the cryptocurrency Tokens from the Startup Client;

    c.     a 25% interest in a specified contingency matter; and

    d.     an $850,000 cash payment from Roche (to be paid in specified installments).

39.     In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

## II.     CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

40.     Cyrulnik's many clients all elected to follow him from BSF to RCF.  During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice.  Specifically, Cyrulnik was

singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

41. As Freedman stated at the end-of-year partner's meeting in January 2021 (just a few weeks before orchestrating the scheme to try and steal Cyrulnik's assets), and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

42. Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions. Cyrulnik also devoted tireless efforts to managing the Firm, including overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease. Roche and Freedman, separately and together, and as recently as January 2021 (just a few weeks before effectuating the scheme to try and steal Cyrulnik's assets), told Cyrulnik how much they enjoyed working with him to build the Firm, that they could not have built the Firm without him, that his contributions were instrumental to the Firm's success, and that his performance and accomplishments were remarkable. Normand told Cyrulnik in or about December 2020 (less than eight weeks before participating in the scheme to try and steal his assets) that Cyrulnik was "the leader" of the Firm.

43. While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections. Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they maintained would bring enormous revenue to the Firm over time. That was particularly

applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

### III. THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD

44. The Named Partners met regularly to discuss the Firm's administration matters. Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements. Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success, and that they could not have accomplished what they had without Cyrulnik. Freedman actually remarked to Cyrulnik during an in-person meeting in the Firm's Florida office on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running the Firm (referring to Freedman's effort to enrich himself at the Firm's expense through referral arrangements and other "discounts" he would apply to the Firm's revenue but not his own take on that revenue).

45. With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues. Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings and his responsibilities as counsel representing class clients; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense. Roche and Freedman were content to downplay such problems, or to delay resolution of the matter "for another day." With respect to these issues, Cyrulnik expressed the view that it was important for

24

the Firm to address these issues promptly and definitively to ensure that the Firm was complying

with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try

to ensure that the partners would do so.

## IV. CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM'S LONG-TERM SUSTAINABILITY

46. As the senior member of the group meeting regularly to administer the Firm,

Cyrulnik addressed serious concerns that had come to his attention regarding, among other

things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation

Model.

### A. Cyrulnik Asks Roche To Fix His Lax Approach To Time Keeping

47. First, in or about April 2020, Cyrulnik was reviewing time record reports from the

Firm's billing system and learned that Roche had not recorded the hours he had worked on client

matters for months. Cyrulnik reached out to Roche and asked him to remedy that serious

deficiency, stressing the importance of being honest and accurate with respect to client billing.

Roche apologized and told Cyrulnik that he had messed up and that he would take care of it.

Roche stated that he was hiring his mother to try and "reconstruct" his time by scrolling through

his emails and guesstimating time entries. Cyrulnik was not comfortable with Roche's approach

and reminded Roche that he needed to ensure that he was keeping accurate time records. Roche

exhibited a similar immature and inappropriate attitude toward client bills. Roche boasted to

Cyrulnik about his desire to "pound the lodestar" on his class-action contingency matters, stating

that he wanted to hire more associates and staff attorneys to work on his contingency matters so

that he could position himself to obtain a better percentage of fee awards being split with the

Firm's co-counsel in class matters. Cyrulnik was concerned about Roche's approach and again

told Roche that he needed to take his obligations to clients and class representations seriously.

25

Freedman told Cyrulnik that his concerns about Roche were not unfounded, but that Freedman would keep Roche in line. Specifically, Freedman told Cyrulnik that Roche was dishonest, explaining that Roche was the kind of person "who will lie to your face and then beg for forgiveness if he's caught" – but Freedman stressed that he uniquely knew how to "control" Roche, and that Freedman could get Roche to do "anything I want him to do."

**B.     Cyrulnik Seeks To Correct Freedman's Efforts To Engage In Self-Dealing**

48.     Second, Freedman engaged in self-dealing by manipulating the Firm's Compensation Model to enrich himself at the Firm's expense. Specifically, Freedman struck a deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to pay Schall a 20% referral fee in connection with Freedman's desire to apply for lead counsel appointments in securities class actions. Instead of paying that referral fee out of Freedman's origination credit, moreover, Freedman demanded the Firm absorb that referral fee. Freedman's non-economic, "pay to play" origination strategy put the Firm in an unsustainable financial position; namely, the Firm was paying as much as 50% of all client revenue from Freedman's clients merely to "originate" the matters, and then paying the attorneys who worked on the case as much as 45% of the remaining revenue pursuant to the Compensation Model. In other words, after paying associates and partners their shares, virtually nothing would be left to cover Firm expenses and pay partnership distributions. Incongruously, Freedman's referral scheme was not only objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting himself. When partner Katherine Eskovitz sought a similar arrangement for a matter she was suggesting the Firm take on (and pay her husband a large referral fee), Freedman rejected her proposal as a "money grab," a non-starter, and wholly unacceptable. Freedman and Roche both called Cyrulnik and told him that Eskovitz was a "liability" and "a problem" who was just trying to exploit the Firm, and proceeded to blame Cyrulnik for supporting making an

26

offer to Eskovitz back in 2019. Freedman's excessive focus on enriching himself at the expense of the Firm's long-term sustainability was deeply concerning, as was his response. Freedman told Cyrulnik that Freedman's objective in life was simple: "I don't want to just be rich; I want to be super rich." Cyrulnik and Roche both discussed their concerns about Freedman's approach to compensation, but Roche assured Cyrulnik that he knew Freedman well, and that although Freedman often acted "immature" and was fixated on short-term financial upside, Roche was committed to ensuring that the concerns Cyrulnik identified would be remedied.

## V. THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM THE STARTUP CLIENT

49.     Cyrulnik's many stable clients and billable hour matters substantially funded the Firm's operations and many of the Firm's alternate fee arrangement representations of other clients.

50.     For example, as discussed above, the Firm was retained by the Startup Client, which planned to distribute digital cryptocurrency assets in the form of Tokens and build a platform of decentralized assets and applications. The purpose of the representation was to assist the Startup Client and its officers during the growth and development of their business.

51.     Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all Tokens issued by the Startup Client in connection with all future distributions.

52.     Under the engagement letter, the Firm would receive a flat percentage of all Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any Token Distribution." Further, under the engagement letter, the Tokens functioned as a non-refundable advance, meaning "any unused portion of the Billable Hour Advance will expire on the fourth anniversary of this agreement's execution."

53.     Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

54.     At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be.  Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

55.     In ███████ 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors.  The sale ascribed real value to the Tokens.  More importantly though, it validated the Startup Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

**VI.    ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION**

56.     Roche understood that addressing the Firm's sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik.  Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm and that Freedman was out for himself too much.  To that end, Roche and Cyrulnik had worked for months to clarify the formulas used to calculate credits in the Compensation Model to try and protect against future exploitation of it, in an effort to disincentivize the practices that were problematic and in which Freedman in particular was engaged.  But when Roche presented the updates to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him.

57. In ███ 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that. But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long and hard to fashion. When Cyrulnik asked Roche what happened after the call, Roche admitted to Cyrulnik that Roche was "scared" of Freedman because Freedman "sometimes acts irrationally" and is selfish. Roche told Cyrulnik that Roche had concluded it was not "worth it" to stand up to Freedman. Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants." Cyrulnik told Roche that the Firm needed to be more principled and that problems need to be addressed rather than ignored. He told both Roche and Freedman that he believed it was critical to the Firm's success that they look beyond their own individual interests to address any vulnerabilities in the formula applications for compensation to ensure that the Firm was sustaining itself and doing so fairly.

58. Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates. Roche uniquely understood how the Startup Client's ███ 2020 Token sale foreshadowed their enormous potential value, and sensed an opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens. To that end, Roche wrote to Cyrulnik following the meeting with Freedman about fixing the Firm's formulas: "I agree with the economics of the proposed formula comp. change," but then shockingly told Cyrulnik that, in order for Roche to vote consistent with what he believed was best for the Firm, Cyrulnik needed to buy his support by agreeing to pay Roche 40% of Cyrulnik's Tokens (10% of

29

the total Tokens): "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU." The request came out of left field.

59. Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands. He flatly rejected any such change to his Token stake and explained that acting in the best interests of the Firm and making decisions designed to protect its long-term sustainability was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was unjust and unethical. As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

## VII. THE PARTNERS COMPLETE 2020 AND PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS

60. Although there were a couple of important issues that had arisen over the course of the first year of the Firm's operations on which the partners had expressed different views (and with respect to which decisions proceeded by split votes), the partnership was generally very functional and friendly. The partners consistently touted the collegiality of the Firm in discussions with potential lateral candidates. Throughout January 2021 (in the few weeks prior to the scheme at issue in this lawsuit), the partners continued to interact as they had in the past. Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, 2021, and they discussed many Firm planning issues.

61. Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

62. Counterclaim-Defendant Friedland reached out to Cyrulnik on January 2, 2021: "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

30

63. On January 22, 2021, less than three weeks before their bad-faith "removal" ploy, Freedman was arranging to ensure that the Firm's bank accounts at Chase Bank were corrected to finally ensure that Cyrulnik was listed as a registered owner – something that Freedman was required to do when the Firm was first formed one year prior, but had delayed due to the pandemic and the requirement that the owners be present together at a Chase branch to update the accounts in person. Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York the following week (less than *two weeks* before the illegal "removal" scheme) in light of a family conflict Freedman had to navigate that day.

64. ███████, the value of the Tokens exploded.

## VIII. COUNTERCLAIM-DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF TO TRY AND MISAPPROPRIATE HIS INTERESTS IN THE FIRM'S VALUABLE ASSETS

65. In ███████ 2020, the Tokens began trading publicly for the first time. Between ███████ 2020 and ███████ 2020, the price of the Tokens remained relatively stable.

66. In ███████ 2021, however, the Tokens experienced a precipitous rise in value. Between ███████ 2021 and ███████ 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between ███████ 2021, and ███████ 2021. The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in ███ 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the ███ days leading up to Cyrulnik's purported "removal" for cause.

67. Below is a chart of the Tokens' price between ███████ and the day of the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm:



68.     As the chart shows, as of ████████ 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than ██ per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million.  But that was not enough for Roche and Freedman, the latter of whom had previously remarked that his goal in life was to be "super rich."

69.     Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters.  With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

70.     Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with Friedland, Holcomb and Normand, convened a secret meeting on or about

February 10, 2021, without even informing two of the Firm's seven equity partners, to concoct the pretext for his removal.  Cyrulnik was not informed of the meeting, and was not given the opportunity to address whatever false allegations the Conspiring Partners had decided to use as a pretext for the "removal" – neither at the meeting nor at any other time prior to his purported (and unlawful) "removal."

71.     Also excluded from the covert meeting was equity partner Paul Fattaruso, who was the *only* partner at the Firm who regularly worked with Cyrulnik on running the Firm's core matters while the other partners focused primarily on the Firm's contingency work (and small billable matters).  Fattaruso was deliberately and unjustifiably excluded so that the Conspiring Partners could falsely mischaracterize the vote to oust Cyrulnik as "unanimous," when in fact, they did not even include two of the Firm's seven equity partners (constituting almost 30% of the Firm's equity votes).

72.     The secret meeting not only breached the fiduciary duties owed by the Conspiring Partners to Cyrulnik, but directly breached the MOU.  As the Firm's co-chairperson, only Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting of those meetings."  Cyrulnik's right to initiate and conduct Firm meetings could not be altered without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik, which of course never happened.

73.     Two days after the meeting, on February 12, 2021, the Conspiring Partners sent Cyrulnik an email informing him that he was "removed," which email was riddled with errors, misstatements, and mischaracterizations, purporting to remove Cyrulnik from the Firm for

"cause." The fictitious bases set forth in the email had not even occurred, much less constituted proper "cause" as required.

## IX. COUNTERCLAIM-DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS

### A. Counterclaim-Defendants Indisputably Lacked "Cause" To Expel Cyrulnik

74. Counterclaim-Defendants indisputably lacked anything close to "cause" — which, under applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of his job — to remove Cyrulnik.

75. Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from associate to partner to equity partner as quickly as anyone in BSF's history. All of the Firm's equity partners, including all of the Conspiring Partners, had worked for years at BSF with Cyrulnik. He had never before had any complaints lodged against him for any improper interactions with any colleague — associate, partner, or otherwise. Cyrulnik is highly respected by scores of colleagues with whom he works and has worked. Because there was no record of misconduct and, of course, no actual misconduct, the Conspiring Partners had no substance upon which to base their pretextual removal for cause. Instead, they contrived a removal email that not only was false and devoid of substance, but failed to describe any actual cause.

76. For example, Counterclaim-Defendants' purported "removal" email asserts that Cyrulnik screamed, "spoke over" other partners, refused to listen, and was antagonistic at meetings. Setting aside that "screaming" cannot and does not constitute cause, it in any event mischaracterizes two instances of disagreement about Firm decisions throughout *14 months* of Cyrulnik's tenure. For example, in July 2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on Cyrulnik and coordinated matching e-mails, alleging

34

Cyrulnik had "screamed" at them, accompanied by a misleading account of events. These emails were a misguided effort to pressure Cyrulnik into conceding financial rights. When Roche and Freedman realized that Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

77.    The other allegations in the email are equally misguided. The email vaguely asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other founding partners." Yet, it provides no context or support for these accusations (because they are false). And the email includes a vague and nebulous accusation that Cyrulnik created "unsustainable environments for associates," which is completely false. To the contrary, Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who has spoken ill of him or working for him.

78.    As the removal email evidences, the actions by the Conspiring Partners are about one thing only: greed. They had no problem working with Cyrulnik at BSF — actively recruiting him to leave his hard-earned position and lead the Firm — and no problem working with Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue base) until ▮▮▮ days before his removal when his assets skyrocketed in value and the Tokens suddenly appreciated to more than $60 million in value. Then, without any precipitating incident, the Conspiring Partners felt compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an opportunity for him to respond to their pretextual and baseless allegations.

79.    Following their wrongful attempted removal of Cyrulnik, the Conspiring Partners have stopped at nothing in their quest to defame him. In a truly cynical effort, the Conspiring Partners attempted to exploit the legal community's rightful concerns over diversity and

35

inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit themselves — *i.e.*, five white males. Cyrulnik has never expressed anything other than outright support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Conspiring Partners are manifestly false.

80. Accordingly, after receiving the Conspiring Partners' email on February 12, 2021, Cyrulnik expressly placed the Conspiring Partners on notice that their purported removal was "in bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

**B.    The Conspiring Partners Breached The MOU By Denying Cyrulnik The Compensation They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause**

81. The Conspiring Partners' scheme suffered from many fatal flaws, including the threshold problem that, even where partners have grounds for removing a Founding Partner for cause (there were none here) and the proper procedures for doing so were followed (again not the case here), such a removal would not impact Cyrulnik's core compensation rights under the MOU in any event.

82. In Section VI of the MOU ("Firm Management"), the MOU addressed two different instances where a Founding Partner would depart from the Firm. The partner could withdraw voluntarily under Section VI(C), or under limited circumstances could be removed involuntarily for cause under Section VI(G).

83. In their complaint, the Conspiring Partners intentionally sought to conflate the provisions in a misguided attempt to treat their improper and *involuntary* removal as Cyrulnik deciding to "withdraw" from the Firm. In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an

36

involuntary removal and voluntary withdrawal separately, and the intent of the parties (including the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily agreed to change their economics).

84. The MOU unambiguously provides for certain ramifications in the event of voluntary withdrawal. It unequivocally does *not* set forth those ramifications for involuntarily removal, and Counterclaim-Defendants' attempt to do so is baseless and improper.

## X. THE CONSPIRING PARTNERS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS

85. Since perpetrating their scheme and purporting to remove Cyrulnik as a partner, the Conspiring Partners have egregiously breached their duties to and badly mistreated the Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik. Despite the Conspiring Partners' extreme efforts to keep the Firm's clients at RCF, every single client that Cyrulnik brought to the Firm left the Firm and remained with Cyrulnik.

### A. The Conspiring Partners Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets

86. After sending Cyrulnik their "removal" email, the Conspiring Partners tried to pressure him to agree to sign a confidential mediation and binding arbitration agreement to facilitate an "amicable" re-division of his assets and rights under the MOU. After calling out the Conspiring Partners' improper scheme, Cyrulnik told the Conspiring Partners that a necessary predicate for any discussion about splitting the Firm was their commitment to provide him all of the compensation he is owed under the MOU.

87. On February 19, Roche sent Cyrulnik a proposal in which he proposed that Cyrulnik give the Conspiring Partners 75% of his Tokens. Through his counsel, Cyrulnik told the Conspiring Partners that, if they did not commit to providing Cyrulnik everything to which

37

he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens,
Cyrulnik would be forced to commence litigation.  The Conspiring Partners' counsel stated that
his clients were looking to resolve the matter, and that he would speak with them and revert on
Sunday morning, February 28, 2021.

88.     Having forestalled litigation through that stall tactic, the Conspiring Partners
rushed to prepare their own anticipatory pleading and rushed into court, in the hope that
publicizing a false narrative would force Cyrulnik to give them what they wanted and would
enable the Conspiring Partners to keep Cyrulnik's clients.  Without providing any further
response to Cyrulnik, the Counterclaim-Defendants filed a declaratory relief lawsuit in this Court
on the night of Saturday, February 27, 2021 (a day before the scheduled call between their
counsel and Cyrulnik's counsel, pursuant to Counterclaim-Defendants' counsel's request).

89.     Concurrent with their late-night filing, the Conspiring Partners suddenly cut
Cyrulnik's access to client files without notice.  At the time, Cyrulnik was lead counsel on many
active matters with a number of court hearings and depositions scheduled the next business day
and throughout the ensuing week, and the Conspiring Partners' actions materially hindered
Cyrulnik's ability to work on these matters – as the Conspiring Partners intended all along, as
further leverage to force Cyrulnik to give up his rights.  Cyrulnik rejected the Conspiring
Partners' extortionate actions, and demanded that his access to client files be restored so that he
could continue representing and protecting the interests of his clients – clients who, at the time,
remained Firm clients to whom each of the Conspiring Partners owed fiduciary duties.
Ultimately, the Conspiring Partners agreed to provide Cyrulnik access to his clients' files –
although only after he was forced to scramble and waste significant time and effort to protect
client interests.

38

**B.     The Conspiring Partners Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Choosing Cyrulnik**

90.     Faced with the imminent prospect of losing most of their core clients and revenue, the Conspiring Partners sought to leverage deadlines in active matters to pressure clients to execute new engagement letters with the Firm or else be left without adequate staffing for their matters on virtually no notice at all.  Indeed, in many cases, the Counterclaim-Defendants' letters to clients demanded responses within just a few business *hours*.

91.     When the clients informed the Firm that they wanted Cyrulnik to lead their matters but expected an appropriate and non-prejudicial transition of their active matters, the Firm scrambled to punish those clients by rapidly removing the associates who had been staffed on those cases for months – with imminent deadlines fast approaching and against the request and recommendation of the other Firm partner who had been running the cases with Cyrulnik (and who remained at the Firm at the time).

92.     The Counterclaim-Defendants also enlisted newly hired partner, Eric Rosen, to send harassing letters to clients, in which Rosen threatened to file notices of withdrawal in less than two days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to continue handling your matter."  Cyrulnik continued to field daily phone calls for weeks from clients who were receiving Rosen's emails threatening to prejudice their cases by filing withdrawal notices in their active cases.

93.     Even after the Conspiring Partners resigned themselves to the fact that Cyrulnik's clients had no interest in being represented by RCF unless Cyrulnik was leading their cases, they sought to harm those clients by generating and demanding payment of inaccurate and improper invoices, and refusing to remit client funds that did not belong to them.  Specifically, the Conspiring Partners drafted invoices for those clients without the input or oversight of any of the

39

partners who oversaw the matter, and demanded that Cyrulnik sign off on them without review. When Cyrulnik told the Conspiring Partners that client invoicing needed to be done carefully and properly and that he needed access to Firm timekeeping and recording systems to perform his customary review of pre-bills before they were sent out to clients, the Conspiring Partners refused.

94.     Cyrulnik's counsel called out Counterclaim-Defendants' attempt to mistreat clients:

> Any effort to send bills to clients without the lead partner overseeing those matters reviewing them is obviously improper. Client bills need to be reviewed before they are sent out, as clients reasonably expect to happen. The fact that these clients declined to have your clients represent them going forward does not change that. If you want to treat clients properly and fairly, we have offered a process for doing so. If your clients desire to punish clients for declining to be represented by the kinds of people you represent, we strongly oppose such efforts and will obviously not facilitate them. We have proposed a mechanism for dealing with invoicing; if you refuse to approach that effort in a manner consistent with your clients' duties to their former clients and to mine, we will address that in court.

95.     Confronted with this reality, Counterclaim-Defendants then partially backtracked, demanding that Cyrulnik send "corrections" to the invoices based on guesswork and memory alone, without access to the firm timekeeping systems, calendars and records or to the lawyers whose time was being listed on the bills, and that he do so within two business days. The Conspiring Partners also demanded that Cyrulnik send them entries for the time *he* worked on all matters in January and February so that they could include those entries on the improper invoices, which would enable them to give clients the false impression that Cyrulnik had signed off on the invoices and the work being billed. Although it was against Cyrulnik's own financial interests, he declined to participate in the Conspiring Partners' effort to bill clients without

40

customary and proper review of the invoices to ensure accuracy and that clients were being treated fairly and honestly.

96.     *To this day*, despite multiple requests and demands, the Conspiring Partners continue to block Cyrulnik's access to the billing systems needed to send out proper invoices, causing substantial harm to Cyrulnik.

97.     Astonishingly, in its Amended Complaint, RCF somehow tries to turn these facts on their head, alleging that *Cyrulnik* breached his duties to the Firm by not participating in its plan to send out invoices without customary and requisite review, to bill clients for unauthorized work, and to create the false impression for clients that the invoices had been properly reviewed and approved – when it is the Conspiring Partners who have unilaterally and improperly blocked Cyrulnik's access to the records necessary to ensure that the Conspiring Partners do not send out false or fraudulent invoices.  The Conspiring Partners then feign ignorance in their Amended Complaint as to why the many clients they so badly mistreated – and whose cases the Conspiring Partners endangered through their bad-faith, retaliatory conduct – apparently did not pay the invoices that RCF sent.

**C.     The Conspiring Partners Cause the Firm To Disseminate
         <u>False Tax Forms In An Effort To Further Their Scheme.</u>**

98.     Recognizing that their scheme had been exposed, the Conspiring Partners scrambled to devise a backup plan for stealing Cyrulnik's assets in mid-2021.

99.     Specifically, they secretly directed the Firm's accountant to withhold Cyrulnik's Form K-1 – the tax form utilized by partners in lieu of a Form W-2 – and then issued him a falsified W-2 form, claiming that Cyrulnik – the Firm's largest equity holder at 27% – would suddenly and retroactively being recharacterized as an *employee* of the Firm.

100.     Upset that Fattaruso declined to support their scheme, the Conspiring Partners then denied Fattaruso's status as an equity partner and falsified his tax forms, seeking to punish him for being honest and refusing to endorse their unethical and illegal behavior.

101.     The Conspiring Partners then reallocated to themselves Cyrulnik's allocated expenses in connection with starting the Firm and its operations, and on information and belief, filed false tax returns with the federal and local authorities claiming deductions to which they were not entitled and mischaracterizing income received by individual partners.

102.     The Conspiring Partners then used Cyrulnik's funds to keep the Firm afloat in the face of the mass exodus of clients and refused to remit large amounts of compensation owed to Cyrulnik for months.  Then, in April 2021, Counterclaim-Defendants finally, and belatedly, sent a portion of the amounts owed but improperly withheld the rest of Cyrulnik's assets (and continue to do so to this day).  In violation of the express provisions of the MOU and the controlling Florida statutes governing the partnership, the Conspiring Partners sought to obscure their misconduct by withholding from Cyrulnik basic information about the Firm's accounts and revenues in which he held substantial interests, never paying him the rest of his formula compensation or any of the equity distributions owed to him, and misappropriating the other assets given to him under the MOU, including his Tokens and his 25% interest ███ ███████████████████████ in a $100 million jury award, with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision).

### COUNT 1
### (Dissolution pursuant to Florida Statutes § 620.8801)

103.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 102 herein.

104. Cyrulnik seeks judicial dissolution of RCF pursuant to Florida Statutes §§ 620.8405 and 620.8801.

105. RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

106. Counterclaim-Defendants breached the MOU by purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The purported "cause" cited by Counterclaim-Defendants is plainly insufficient as a matter of law, indisputably pretextual, in bad faith and based on lies and mischaracterizations of the events. Accordingly, the Conspiring Partners lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU and is ultra vires and void *ab initio*. Accordingly, Cyrulnik remains a Founding Partner and Co-Chairperson of RCF.

107. Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

108. By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, the economic purpose of the partnership has been unreasonably frustrated by the actions of the Conspiring Partners, and likely will continue to be unreasonably frustrated, within the meaning of Florida Statutes § 620.8801(5)(a).

109. By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Conspiring Partners, within the meaning of Florida Statutes § 620.8801(5)(b).

43

110. By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practical to carry on the activities of the limited liability partnership in conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

111. Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

112. By reason thereof, Cyrulnik respectfully requests that this Court enter a judgment dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just and proper.

## COUNT 2
### (Buyout under Florida Statutes § 620.8701 in the Alternative)

113. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 112 herein.

114. RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

115. Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-Chairperson of RCF.

116. Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

44

117.     Should judicial dissolution be found inappropriate or inequitable, in the alternative, the Conspiring Partners' actions to expel Cyrulnik from RCF entitle him to a buyout pursuant to Florida Statutes § 620.8701.

118.     Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

119.     By reason thereof, in the alternative to dissolution, Cyrulnik respectfully requests that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and proper.

## **COUNT 3**
### **(Accounting Pursuant to Florida Statutes §§ 620.8403 and 620.1407)**

120.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 119 herein.

121.     The Conspiring Partners have taken control of RCF, have unlawfully excluded Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused to allow Cyrulnik any say in the operation of RCF, and have otherwise abused their status as partners of the Firm.

122.     An accounting of the assets, profits, and losses of RCF is necessary and appropriate at this time.

123.     Florida Statutes § 620.8403 requires a limited liability partnership to provide its current (and former) partners access to the Firm's records that are required to be kept by all limited liability partnerships.  Florida Statutes § 620.1407 affords a current (and former) partner

the right to inspect and copy and "records maintained by the limited liability partnership regarding the limited partnership's activities and financial condition."

124.    Cyrulnik has been denied access to RCF's books and records notwithstanding numerous requests for access to the Firm's financial records and accounts.

125.    By reason thereof, Cyrulnik demands judgment in his favor, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present; find and determine the amount due to Cyrulnik from RCF; and enter a judgment or decree in favor of Cyrulnik for his compensatory damages, prejudgment interest, cost, and such further relief as this Court deems just and proper.

**COUNT 4**
**(Breach of Contract)**
**(Against the Conspiring Partners)**

126.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 125 herein.

127.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

128.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

129.    Cyrulnik has fully performed and is ready, willing, and able to continue to perform his obligations under the MOU and the Side Letter.

130.    The Conspiring Partners breached the MOU by, among other things, purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The "cause" cited by Counterclaim-Defendants was indisputably pretextual, in bad faith, based on Counterclaim-Defendants' lies and mischaracterizations of the events, and in any case did not rise to the level of "cause" under the law. Accordingly, the Conspiring Partners did not have the

46

authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU.

131.    Even if the Conspiring Partners had "cause" to expel Cyrulnik from the Firm, the Conspiring Partners further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU, including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity.  Although the MOU limits the ability of a partner who has *withdrawn* from the Firm to retain his equity, it does not provide any such limitation on a partner who was *removed*.  Accordingly, by citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Conspiring Partners have breached their obligations under the MOU.

132.    Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

133.    The Conspiring Partners unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

134.    Conspiring Partners Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

47

135.     The Conspiring Partners also breached the MOU by not performing multiple obligations set forth therein and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

136.     The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

137.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**COUNT 5**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against the Conspiring Partners)**

138.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 137 herein.

139.     The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

140.     The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

141.     Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

142.     The Conspiring Partners breached this implied covenant by, among other things, taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik,

48

and/or denying Cyrulnik's entitlement to his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity, and by denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

143.     The Conspiring Partners also breached the covenant of good faith and fair dealing by not performing multiple obligations set forth therein in the MOU and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

144.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**COUNT 6**
**(Breach of Fiduciary Duty)**
**(Against the Conspiring Partners)**

145.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 144 herein.

146.     As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik. These duties include the duties of care and loyalty.

147.     The Conspiring Partners breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation

Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

148.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## COUNT 7
### (Conversion)

149.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 148 herein.

150.     Counterclaim-Defendants knowingly and intentionally converted Cyrulnik's specific and identifiable membership interest in RCF and his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

151.     Counterclaim-Defendants, without authority, deprived Cyrulnik of such membership interest and substantial equity interest for their own use.

152.     Counterclaim-Defendants' deprivation of Cyrulnik's partnership and equity interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

153.     Counterclaim-Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests.  Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

154.     As a direct and proximate result of Counterclaim-Defendants' conversion, Cyrulnik has suffered damages.

155.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## COUNT 8
**(Unjust Enrichment)**

156.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 155 herein.

157.     Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Conspiring Partners.

158.     Counterclaim-Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik.  Indeed, Counterclaim-Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

159.     The circumstances are such that it would be inequitable for Counterclaim-Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

160.     Cyrulnik is entitled to damages as a result of Counterclaim-Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Counterclaim-Defendants from Cyrulnik.

161.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

### COUNT 9
**(Promissory Estoppel)**
**(Against the Conspiring Partners)**

162.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 161 herein.

163.     The Conspiring Partners made a clear and unambiguous promise to pay Cyrulnik certain amounts and to remit to him interests in many assets – including but not limited to 25% ▮▮▮▮▮▮ of all Tokens issued by the Startup Client (which value has exceeded $400 million) and 27% of RCF's profits including from its contingency interests in various litigations – and to impart to him certain control rights, along with several other assets the parties listed.  They did so to induce Cyrulnik to give up his long-standing equity partnership and other lucrative opportunities and leverage his reputation, experience, and substantial practice to co-found RCF.

164.     Conspiring Partners Roche and Freedman made a clear and unambiguous promise to pay Cyrulnik the amounts set forth in the Side Letter, including 25% of their interest in ▮ ▮▮▮▮▮▮ a $100 million jury award with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision), and an

52

$850,000 cash payment to induce Cyrulnik to allow Roche to list his name before Cyrulnik's and proceed with co-founding the Firm as RCF.

165.     Cyrulnik reasonably and foreseeably relied on the foregoing promises the Conspiring Partners made by, among other things, leaving his lucrative practice at BSF, foregoing the opportunity to work at various other law firms, and spending the next year servicing clients at RCF.

166.     The Conspiring Partners caused unconscionable injury to Cyrulnik by breaking those promises, misappropriating the foregoing assets for their own benefit, and refusing to remit his assets or honor the guaranteed rights he had been promised.

167.     The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

168.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## COUNT 10
### (Civil Conspiracy)
### (Against the Conspiring Partners)

169.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 168 herein.

170.     The Conspiring Partners are parties to a civil conspiracy.

171.     The Conspiring Partners conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial

rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

172.    Each of the Conspiring Partners committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

173.    As a direct and proximate result of the Conspiring Partners' civil conspiracy, Cyrulnik has suffered damages.

174.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, and awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Cyrulnik demands a judgment against Counterclaim-Defendants:

(a)     on Count One, dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; and ordering judicial

supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF;

(b)     on Count Two, in the alternative to dissolution, awarding Cyrulnik the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870;

(c)     on Count Three, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present, as well as the amount due to Cyrulnik from RCF;

(d)     on Counts Four through Six and Nine through Ten, against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of the Tokens and other assets owed to him);

(e)     on Counts Five through Ten, awarding Cyrulnik punitive damages;

(f)     on Counts Four through Ten, prejudgment and post-judgment interest at the maximum possible rate;

(g)     Cyrulnik's costs in the prosecution of this action, including reasonable attorneys' fees; and

(h)     such other and further relief as is just and proper.

Dated: New York, New York
       February 25, 2022

KASOWITZ BENSON TORRES LLP

By: _/s/ Marc E. Kasowitz_____
    Marc E. Kasowitz
    Gavin D. Schryver
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800
Email: mkasowitz@kasowitz.com
      gschryver@kasowitz.com

*Attorneys for Defendant/Counterclaim-Plaintiff*
*Jason Cyrulnik*

EXHIBIT A

### Memorandum of Understanding
December 26, 2019

This Memorandum of Understanding ("MOU") is dated as of December 26, 2019, and establishes the intent to form a partnership between Jason Cyrulnik, Velvel Freedman, Amos Friedland, Nathan Holcomb, Edward Normand, and Kyle Roche (together, the "Founding Partners").

## I. PURPOSE

This MOU sets out the basic terms upon which the Founding Partners will enter into a definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-orientated law firm to be named Roche Cyrulnik Freedman LLP (the "Firm") that is it be branded and marketed as "RCF".

The terms of this MOU are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the "Partnership Agreement") to be negotiated and to be made effective on or around January 1, 2020.

It is mutually agreed upon and understood by and among the Founding Partners that the Founding Partners agree to work together and co-operate in good faith and to fully participate to develop the Firm and to work towards the finalization of the Partnership Agreement.

## II. EQUITY IN THE FIRM

The Founding Partners understand that equity in Roche Freedman LLP is currently split 50/50 between Kyle Roche and Velvel Freedman. After execution of the Partnership Agreement, and effective January 2020, the equity division in the Firm will be the following:

> Jason Cyrulnik – 27%
> Velvel Freedman – 24%
> Amos Friedland – 10%
> Nathan Holcomb – 10 %
> Edward Normand – 10 %
> Kyle Roche – 19 %

The allotment of equity to additional partners, anticipated to include at least Paul Fattaruso, will be made by the Equity Committee in accordance with the procedures specified below. The Founding Partners understand that at the Firm meeting at the end of 2020, the Founding Partners will sit down to review their contributions to the Firm and discuss whether any equity revisions amongst the six of them should be made.

## III. DISTRIBUTION OF FIRM REVENUE

The Founding Partners understand that the Firm will distribute revenue to its partners according to the Firm's Partnership Compensation Model (attached as Exhibit C).

The Firm will endeavor to distribute revenue to its partners based on this Model on at least a semi-annual basis.

The Founding Partners shall take the following draws (1/12 every month) against their expected formula compensation:

- Jason – 300k
- Vel – 300k
- Kyle – 300k
- Amos – 420k
- Nathan – 300k
- Ted – 420k

These draws are not final, and draws may be adjusted going forward.

## IV.    ASSIGNMENT AND EXCLUSION OF ROCHE FREEDMAN LLP ASSETS AND RIGHTS

The Founding Partners understand that Kyle Roche and Velvel Freedman formed a law firm called Roche Freedman LLP in August 2019.  Roche Freedman LLP will be merged into the Firm in January 2020.  Not all rights and assets of the Roche Freedman LLP will be shared according to the equity percentages of the Firm in January 2020.  An exhaustive list of assets that will not be shared pro-rata will be prepared in connection with the Partnership Agreement, but the list of core assets being excluded or not divided according to the Firm's equity allocations is set forth below, along with a description of how they are excluded from the assignment (the "Excluded Assets").



*B.* ██████ *Tokens*

The Founding Partners understand that Roche Freedman LLP represents ████████████ a startup company that plans to distribute a certain amount of Digital Assets (the "Tokens") as part of its plans of building a new platform for decentralized assets and applications. In exchange for legal services, ████████ has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019. A copy of the ████████████████████ retention agreement is attached to this MOU as Exhibit B. Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its ████████ Tokens according to the following breakdown:

| | |
|---|---|
| Jason Cyrulnik | 25% |
| Velvel Freedman | 32% |
| Amos Friedland | 5% |
| Nathan Holcomb | 5% |
| Edward Normand | 5% |
| Kyle Roche | 28% |

The Founding Partners understand that Kyle Roche will be the Originating Attorney ████████ ████ (i.e., he will have 100% of the Origination Credit) and any further consideration ████████ ████████ for the Firm's services will be subject to the Firm's Partnership Compensation Model.

The Founding Partners further understand that notwithstanding the fact that all Founding Partners will have an interest in the ████████ Tokens, Kyle Roche, Velvel Freedman, and Jason Cyrulnik will be the only partners expected to bill to the ████████████. In the event that

_____

also be allocable to prior hours, Kyle and Velvel agree to run these hours through the firm's formula compensation so as to share this benefit through the firm's equity pool.

further partner resources are required, the Firm will revisit the above distribution of ███████ Tokens.

     *C.*    ██████████

The Founding Partners understand that Roche Freedman LLP represents ████████ ████████████████████████████████████████████. As part of that representation, Roche Freedman LLP maintains a contingency interest in any recovery. Any proceeds the Firm recovers from this contingency shall be distributed according to a distribution agreement Kyle, Velvel, and Jason previously negotiated.

     *D.*    ██████████

The Founding Partners understand that Roche Freedman LLP ███████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████

     *E.*    ██████████

The Founding Partners understand that Amos Friedland, Ted Normand, and Nathan Holcomb ████████████████████████████, in which Friedland, Normand, and Holcomb have invested significant time and effort, ████████████████████ ████████████████████████████████████ The Founding Partners agree that to the extent any settlement or settlements ██████ are received on or before March 1, 2020, without significant litigation, the Firm will receive 10% of any fee proceeds from same, and Friedland, Normand, and Holcomb will receive 90% of any fee to apportion among themselves in proportions they determine are appropriate. The Founding Partners agree that to the extent any settlement is reached ██████ on or before March 1 and absent summary judgment briefing or trial, the Firm will receive 10% of any fee proceeds from same, and Friedland, Normand, and Holcomb will receive 90% of any fee to apportion among themselves in proportions they determine are appropriate. For the avoidance of doubt, any partial rack rate hourly fees ████████████ shall belong to the Firm and be distributed according to the formula governing Firm revenue. For further avoidance of doubt, any settlement reached ████████ on or after March 2, 2020, shall belong to the Firm and be distributed according to the Firm's compensation system, subject to any adjustments for the apportionment of revenue among Friedland, Normand, and Holcomb that they may unanimously agree to among themselves.


## V.    Treatment of Existing Cases

The following client/cases are already part of Roche Freeman LLP's cases, and origination credit has been allocated as follows:

1.  50/50 Vel and Kyle
2. ▇▇▇▇ 50/40/10 Kyle/Vel/Joe Delich
3. ▇▇▇ 60/40 (▇▇▇▇▇▇▇▇▇▇▇▇▇) and 55/45 ▇▇▇▇▇▇▇▇▇▇: Kyle and Vel
4. ▇▇ 50/50 Vel and Kyle
5. ▇▇▇▇ Kyle
6. ▇▇▇ Vel (all cases)
7. ▇▇▇ Vel (all cases)
8. ▇▇▇▇ Vel (all cases)
9. ▇▇▇ Vel
10. ▇▇▇ Vel
11. ▇▇▇ Vel
12. ▇▇▇▇ 50/50 Vel/Jason
13. ▇▇▇▇▇▇▇▇▇▇ Jason
14. ▇▇▇▇▇▇▇▇▇▇ Jason
15. ▇▇▇▇▇▇ Jason
16. ▇▇▇ ▇▇ Jason
17. ▇▇▇▇▇ Jason
18. ▇▇▇▇▇▇ Jason
19. ▇▇▇▇▇ Jason
20. ▇▇▇▇▇▇▇▇ Jason
21. ▇▇▇▇▇ Jason
22. ▇▇▇ Jason
23. ▇▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)
24. ▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)
25. ▇▇▇▇▇▇▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)
26. ▇▇▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)
27. ▇▇▇▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)
28. ▇▇▇▇▇▇▇ Amos (originator; credits apportionment to be determined)

## VI. FIRM MANAGEMENT

### A. New Clients / Matters

All new billable hour representations that an attorney wishes to bring into the Firm will be presented to the Firm's partnership. Equity partners can voice any objections to the proposed representation as soon as practicable. All prospective representations will be approved by 75% of the members of the New Matter Committee, which shall consist of Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Ted Normand. The New Matter Committee shall vote as soon as

---

practicable after the New Matter Memorandum and Conflict Check and after allowing time for views, concerns or feedback from the Firm's partnership.

### B.     New Associate / Partner Hires

All lawyer hires will be subject to a vote amongst the Firm's Founding Partners requiring 2/3 approval.

### C.     Withdrawal from Firm

If any Partner withdraws from the firm within 18 months from the Firm's formation, the following shall occur: That Partner shall return to the firm any amount of payments received that exceed what that Partner was entitled to under the Firm's formula compensation model. If the Firm owes that Partner funds under the formula, that amount shall be paid to that Partner at the next quarterly distribution, but the Firm shall not owe that Partner any additional compensation going forward. That Partner's equity shall be returned to the balance of the firm's equity partners pro-rata.

### D.     Firm Marketing

Kyle Roche will head up the Firm's marketing efforts.  This means that Kyle Roche must circulate any marketing plan or decision to the Founding Partners and provide reasonable time for them to provide comments, input, and ultimately vote to approve or disapprove any marketing decisions.

### E.     Approval over Lodestar

All lodestar calculations must be approved by the Originating Lawyer.

### F.     Firm Name

Any change in the Firm's name requires unanimous vote of the Named Partners.

### G.     Partner Removal

A Founding Partner cannot be removed without cause. A Founding Partner can be removed for cause only on the affirmative vote of 2/3 of the Firm's equity partners.

### H.     Death of Partner

If a Partner dies, or becomes severely disabled, he/her or her/his estate is entitled to any unpaid lodestar accrued to him/her under the Firm's then existing formulas. If a Founding Partner dies, or becomes severely disabled, in addition to the payment of lodestar contemplated above, the Firm shall make best efforts to buy out the value of that partner's equity (as valued by an

independent 3rd party). That Partner's equity will then be reallocated according to the vote of the Equity Committee.

> ### I.     Firm Equity

Any change in the Firm Equity will be decided by an Equity Committee consisting of the following four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Ted Normand. Any change in Firm equity shall require a unanimous vote of the Equity Committee. Notwithstanding the above, Roche, Freedman, and Cyrulnik may, any time following six months after the Founding Partners join the Firm, terminate Normand from the Equity Committee if (1) Roche, Freedman, and Cyrulnik unanimously vote to do so; and (2) Roche, Freedman, and Cyrulnik provide all the Founding Partners with three months' notice of such termination. Additional members may be appointed to the Equity Committee by the Equity Committee's members by unanimous vote.  The Equity Committee will make no changes to the pro-rata equity levels of the Founding Partners prior to December 2020; any changes to the pro-rata levels of the Founding Partners thereafter shall only take place following 90 days' notice by the Equity Committee to the Founding Partners, provided that no notice will be required if the Founding Partners unanimously agree to a change to such pro rata distribution levels.

> ### J.     Firm Expenses

The Firm shall have an Expense Committee consisting of four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Amos Friedland. Any expense to be borne by the Firm must be approved by at least 1 member of the Expense Committee if it is below $500, 2 Expense Committee members if it exceeds $500, and 3 Expense Committee members if it exceeds $5,000.

> ### K.     Compensation Formulas

The Firm shall have a Compensation Formula Committee consisting of four members: Kyle Roche, Velvel Freedman, Jason Cyrulnik, and Nathan Holcomb. Any change to the compensation formulas must be approved by 3 of the 4 members of the Compensation Formula Committee and can only be effected on six months' notice to the full partnership, unless the Founding Partners approve an early effective date by 2/3 vote.

> ### L.     Benefits/Admin:

The benefits offered by the firm, insurance policies the firm carries, salaries and bonuses of admin staff shall be determined by Velvel Freedman and Jason Cyrulnik. The Expense Committee must approve any such Benefit / Admin expenses according to the procedure set forth in Section VIII(J).

> ### M.     Firm Co-Chairpersons

The Firm shall have two co-chairpersons serving at all times. The job and powers of the chairpersons shall be to propose ideas, opportunities, and additional partners to the Firm's governing committees and partnership to help lead the firm and provide direction for the Firm's

future development. They shall call the firm's meetings to order and be responsible for the orderly conducting of those meetings. The chairpersons shall be named "co-chairman (or chairwoman)" on the Firm's website and shall be entitled to use that title in public facing communications.

The Firm's partnership shall hold an election every two years to elect the chairpersons. One chairperson must be based in the New York office, the other must be based in the Miami office.

To be eligible for chairperson, the candidate must be a partner of the Firm holding at least 8% of the Firm's equity.

At inception, and for the first term only, the New York chairperson shall be Ted Normand for the first year, followed by Jason Cyrulnik for the second year. The Miami chairperson shall be Vel Freedman.

The Firm may only alter these obligations and requirements upon the affirmative vote of 100% of the Firm's Founding Partners.

    *N.*      *Bank Account Access*

All Founding Partners will have access to view the Firm's bank accounts. Kyle Roche, Velvel Freedman, and Jason Cyrulnik will have full access to the Firm's bank accounts.

By: *Jason Cyrulnik*
    Jason Cyrulnik (Dec 27, 2019)
Name: Jason Cyrulnik

Date: Dec 27, 2019

By: _____
    Velvel Freedman (Dec 27, 2019)
Name: Velvel (Devin) Freedman

Date: Dec 27, 2019

By: *Amos Friedland*
    Amos Friedland (Dec 27, 2019)
Name: Amos Friedland

Date: Dec 27, 2019

By: _____
    Nathan Holcomb (Dec 27, 2019)
Name: Nathan Holcomb

Date: Dec 27, 2019

By: _____
    Edward Normand (Dec 27, 2019)
Name: Ted Normand

Date: Dec 27, 2019

By: *Kyle Roche*
Name: Kyle Roche

Date: Dec 27, 2019

# EXHIBIT B

Memorandum of Understanding
January 4, 2019

This Memorandum of Understanding ("MOU") is dated and made effective as of 1/4/20 and establishes the terms of agreement between the named partners of Roche Cyrulnik Freedman ("RCF") – Kyle Roche, Jason Cyrulnik, and Devin "Vel" Freedman (the "Parties").

**Payments**: The Parties understand that to facilitate the founding of Roche Freedman LLP, Roche and Freedman raised $7.5 million in litigation finance (the "Finance Agreement"). At that time, Freedman and Roche agreed that Roche would receive $1.5 million of the cash proceeds from the Finance Agreement, of which $250,000 was immediately paid and the remaining $1,250,000 would be paid over a 30-month period as the funding from the Finance Agreement was drawn down. In consideration for being first named partner, Roche shall forfeit his right to the remaining $1,250,000, $850,000 of which will be distributed to Cyrulnik and $400,000 of which shall be distributed to Freedman, which shall be paid out from the Finance Agreement to Cyrulnik and Freedman pro rata on the following schedule:

1. January 12, 2020 - $300,000
2. July 12, 2020 - $300,000
3. January 12, 2021 - $300,000
4. July 12, 2021 - $350,000

As additional consideration from Roche to Freedman, Freedman shall be entitled to the first $100,000 out of Roche's RCF formula compensation payment at the end of 2020 and the first $150,000 out of Roche's RCF formula compensation payment at the end of 2021.

Should Freedman or Cyrulnik voluntarily leave the firm or be terminated for cause before any of the foregoing payments is scheduled to be paid, the departing partner's remaining payments hereunder will be forfeited back to Roche. Should Freedman or Cyrulnik voluntarily leave the firm or be terminated for cause before January 1,2021, the departing partner shall return the 2020 payments received hereunder to Roche.

███████: should Roche, Freedman, Roche Freedman LLP, or RCF be entitled to any contingent recovery in connection with ██████████████████, Freedman, Roche, and Cyrulnik agree to split the recovery as follows:

1. Freedman: 50% of any recovery
2. Roche: 25% of any recovery
3. Cyrulnik: 25% of any recovery

Kyle Roche: _Kyle W Roche_
Kyle W Roche (Jan 27, 2020)
Dated: Jan 27, 2020

Devin Freedman: _Devin Freedman_
Dated: 1/21/20

Jason Cyrulnik: _Jason Cyrulnik (Jan 22, 2020)_
Dated: Jan 22, 2020

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP, | |
| Plaintiff, | Case No.: 1:21-cv-01756 (JGK) |
| v. | **ANSWER TO COUNTERCLAIM** |
| JASON CYRULNIK, | |
| Defendant. | |
| JASON CYRULNIK, | |
| Counterclaim-Plaintiff, | |
| v. | |
| ROCHE CYRULNIK FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN, AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND, | |
| Counterclaim-Defendants. | |

Plaintiff and Counterclaim-Defendant Roche Freedman LLP ("RF" or the "Firm"), by and through its undersigned counsel, hereby answers the Counterclaim dated March 2, 2022, filed by Defendant and Counterclaim-Plaintiff Jason Cyrulnik, as follows:

## ANSWER

Each paragraph in Cyrulnik's counterclaims (*see* Dkt. No. 72) is copied below, followed by RF's answer to each paragraph. Any allegation not expressly admitted is denied.

## INTRODUCTION

1.     This action arises from a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from

the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful

share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency

by one of the Firm's clients that ███████████ had suddenly appreciated exponentially to more

than $250 million. The Firm's governing agreement expressly prohibits the removal of a Founding

Partner without cause, so Roche and Freedman, together with certain other partners they secretly

recruited to their scheme and to whom they agreed to provide a share of Cyrulnik's assets,

concocted an absurd and purely pretextual "cause" — their principal claim that Cyrulnik had raised

his voice during two telephone conversations months earlier — and then, jeopardizing Cyrulnik's

ability to represent his clients in active ongoing litigation, they cut his access to the Firm's client

files, emails, electronic systems and bank accounts, and terminated his and his family's access to

the Firm's health insurance.

**RESPONSE TO PARAGRAPH 1**: RF admits that the parties' Memorandum of

Understanding dated December 26, 2019 (the "MOU"), states that "[a] Founding Partner cannot

be removed without cause" and that Cyrulnik's access to certain Firm records, bank accounts, and

benefits was limited after he was removed for cause. RF also admits that the value of a certain and

highly volatile cryptocurrency token, some of which may have been paid by a client of RF, rose in

value before crashing down in value, and has repeated this erratic rise and fall many times before

and since. RF otherwise denies the allegations in paragraph 1.

2. What makes Counterclaim-Defendants' greedy and unlawful scheme even more

egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who

had spent months recruiting and convincing Cyrulnik, a highly accomplished lawyer with a long-

standing, robust and growing practice, to leave his equity partnership at a prominent national law

firm to transform their fledgling firm into a stable and respected litigation practice. They

convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Counterclaim-Defendants are now trying to steal.

**RESPONSE TO PARAGRAPH 2**: RF admits Cyrulnik was an equity partner at a prominent national law firm and told Counterclaim-Defendants he held a half-point of equity there. RF lacks knowledge and information sufficient to form a belief about whether Cyrulnik is "a highly accomplished lawyer with a long-standing, robust and growing practice." RF otherwise denies the allegations in paragraph 2.

3.      Roche, who graduated law school in 2016, and Freedman, who graduated in 2012, had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF"). Counterclaim-Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm focusing on cryptocurrency and other specialized practice areas. Shortly thereafter, realizing that they needed an experienced lawyer with an established and successful practice and cash flow to fund the firm's operations and help procure lead counsel appointments in their class-action cases, they approached Cyrulnik about his leaving BSF to join them and co-found RCF. After fifteen years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to found a law firm with Roche and Freedman in January 2020. As the Conspiring Partners knew, in doing so, Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing lucrative offers to join other national law firms. As the Conspiring Partners also knew, Cyrulnik did so in reliance on the negotiated and unambiguous terms of the new Firm's governing agreement that provided him with fixed, guaranteed, and significant equity interests in the new Firm's contingency and alternative fee matters, with substantial financial upside.

**RESPONSE TO PARAGRAPH 3**: RF admits that Roche and Freedman graduated from law school in 2016 and 2012, respectively; that they met Cyrulnik while they were associates at BSF; that they left BSF in summer 2019 to start their own law firm; and that, in December 2019, Cyrulnik executed the MOU, which refers to "the basic terms upon which the Founding Partners will enter into a definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-oriented firm to be named Roche Cyrulnik Freedman LLP." RF otherwise denies the allegations in paragraph 3.

4.     Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases and core client base, and his practice, which Counterclaim-Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

**RESPONSE TO PARAGRAPH 4**: RF denies the allegations in paragraph 4.

5.     Then, in late ███ 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and ██ ████████████ in ██████ 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

**RESPONSE TO PARAGRAPH 5**: RF admits that the market value of its potential/contingent interest in the Tokens (defined below) increased over the referenced time period, but otherwise denies the allegations in paragraph 5.

6.     Notwithstanding months of reaffirming their admiration for Cyrulnik and his enormous contributions to the Firm's success, the Conspiring Partners seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the

cryptocurrency and keep it for themselves. To circumvent the threshold hurdle of their scheme –
that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without
cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency – Roche and
Freedman manufactured transparently false grounds to remove him for "cause." Alleging that
Cyrulnik raised his voice on two phone calls concerning certain questionable actions Roche and
Freedman (and two other partners) had taken that threatened to endanger the Firm, the Conspiring
Partners claimed that Cyrulnik suddenly somehow lost the guaranteed equity and cryptocurrency
interests expressly granted to him by the parties' agreement. They then invited handpicked
partners – the other Conspiring Partners – to a secret meeting, excluding anyone they knew would
not participate in their improper scheme. At the secret meeting, the Conspiring Partners held a
self-serving "vote" to "remove" him from the Firm. They then took the position that Cyrulnik was
no longer entitled to the cryptocurrency and other interests expressly granted to him by the parties'
agreement – even though nothing in the agreement provides for such a forfeiture.

**RESPONSE TO PARAGRAPH 6**: RF admits that the Founding Partners unanimously
voted to remove Cyrulnik for cause, but otherwise denies the allegations in paragraph 6.

7. Counterclaim-Defendants compounded their egregious misconduct by seeking to
pressure clients to stay with them rather than continue to have Cyrulnik represent them. That
scheme failed miserably: a mass exodus of those clients ensued, as they wanted Cyrulnik to lead
their litigations. At the same time, the Firm's other equity partner, Paul Fattaruso, rebuffed
Counterclaim-Defendants' requests to continue working with them in the wake of the scheme they
had perpetrated.

**RESPONSE TO PARAGRAPH 7**: RF admits that certain clients Cyrulnik had originated
followed him to his new firm after he was removed from the Firm for cause and that Paul Fattaruso

later left the Firm to join Cyrulnik at a new venture, Cyrulnik Fattaruso LLP. RF otherwise denies the allegations in paragraph 7.

8. Counterclaim-Defendants' unconscionable misconduct is in flagrant violation of their contractual, fiduciary, and ethical duties to Cyrulnik and their professional responsibilities to the Firm's clients. Cyrulnik's conduct was consistently exemplary, in contrast to several Conspiring Partners (whose missteps Cyrulnik was addressing in the very discussions about which they now complain and seek to use as the purported basis for their scheme), including with respect to Roche's lax attitude toward billing practices and timekeeping and Freedman's problematic referral-fee arrangements with other firms.

**RESPONSE TO PARAGRAPH 8**: This paragraph contains legal conclusions to which no response is required. RF denies the allegations in the second sentence of paragraph 8.

9. Accordingly, Cyrulnik brings these claims seeking, among other things, dissolution of the Firm and distribution of its assets in accordance with Florida law and the parties' unambiguous governing agreement, and recovery of the damages Counterclaim-Defendants' egregious conduct has caused.

**RESPONSE TO PARAGRAPH 9**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits this is what Cyrulnik's lawsuit claims to be doing, but RF otherwise denies the allegations in paragraph 9.

## THE PARTIES

10. Counterclaim-Plaintiff Jason Cyrulnik is a citizen of New Jersey and a cofounding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 10**: RF admits that Cyrulnik is a citizen of New Jersey, but otherwise denies the allegations in paragraph 10.

6

11.     Counterclaim-Defendant RCF is a Florida limited liability partnership, with offices in Miami, Florida and New York, New York.

**RESPONSE TO PARAGRAPH 11**: RF admits the allegations in paragraph 11, with the understanding that "RCF" is a reference to the Firm.

12.     Counterclaim-Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 12**: RF admits the allegations in paragraph 12, with the understanding that "RCF" is a reference to the Firm.

13.     Counterclaim-Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 13**: RF admits that at the time of filing, Mr. Roche was a citizen of New York. RF also admits the remaining allegations in paragraph 13, with the understanding that "RCF" is a reference to the Firm.

14.     Counterclaim-Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 14**: RF admits that Mr. Friedland is an equity partner at the Firm, but otherwise denies the allegations in paragraph 14.

15.     Counterclaim-Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 15**: RF admits the allegations in paragraph 15, with the understanding that "RCF" is a reference to the Firm.

16.     Counterclaim-Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 16**: RF admits the allegations in paragraph 16, with the understanding that "RCF" is a reference to the Firm.

## JURISDICTION

17. This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees, and costs.

**RESPONSE TO PARAGRAPH 17**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits Cyrulnik so claims, but denies the allegations in paragraph 17.

18. Cyrulnik is filing his counterclaims in accordance with and pursuant to the Court's ruling that "[g]iven the intertwined nature of the jurisdictional question with the merits, '[t]he Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims.'" (ECF No. 56 at 13).

**RESPONSE TO PARAGRAPH 18**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 18, and so denies them.

19. The Court has personal jurisdiction because Counterclaim-Defendant RCF has an office in this District in which the Conspiring Partners regularly practice, RCF and the Conspiring Partners regularly conduct business in this District, and RCF (at the direction of the Conspiring Partners) has availed itself of this forum by bringing suit here.

**RESPONSE TO PARAGRAPH 19**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that it has an office in this District in which Roche, Friedland, Holcomb, and Normand regularly practice law, that RF and each individual defendant regularly conducts business in this District, and that RF commenced an action in this District against Cyrulnik. RF otherwise denies the allegations in paragraph 19.

## FACTS

I. **COUNTERCLAIM-DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FORGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

    A. **Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF**

20.     Cyrulnik graduated Yale Law School in 2004 and joined BSF. With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

**RESPONSE TO PARAGRAPH 20**: RF denies the allegations in Roman numeral "I," lacks information and therefore denies the allegations in subsection "A," but admits the allegations in paragraph 20.

21.     Cyrulnik rose through the ranks quickly. He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

**RESPONSE TO PARAGRAPH 21**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 21, and therefore denies them.

22.     Cyrulnik's steadfast commitment to clients generated a substantial following and client base. He has been leading bet-the-company litigations for a growing base of core clients for many years. He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

**RESPONSE TO PARAGRAPH 22**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 22, and therefore denies them.

23.     He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly. He mentored associates, brought in partners in to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

**RESPONSE TO PARAGRAPH 23**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 23, and therefore denies them.

24.     Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters.  In 2019, Cyrulnik was recruited aggressively by several major national law firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

**RESPONSE TO PARAGRAPH 24**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 24, and therefore denies them.

**B.      Roche And Freedman Recruit Cyrulnik To Join RCF**

25.     In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP.  Roche was a third-year associate who had extensive expertise in the cryptocurrency space.  Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel.  Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

**RESPONSE TO PARAGRAPH 25**: RF admits Roche and Freedman left BSF in the summer of 2019 to start their own law firm. RF admits Roche was a third-year associate with extensive experience in the cryptocurrency space. RF admits Freedman graduated law school in 2012, that he became BSF's youngest counsel ever in his fifth year, but denies that he "left BSF six months after being passed over for partnership and being named counsel." RF admits they intended to pursue, among other things, cryptocurrency-related matters.

26.     Cyrulnik had interacted with both Roche and Freedman at BSF.  Indeed, Freedman regularly sought advice from Cyrulnik about how to manage cases, legal strategy, and general guidance as Freedman embarked on his new venture in 2019.

**RESPONSE TO PARAGRAPH 26**: RF admits both Roche and Freedman interacted with Cyrulnik at BSF. RF admits that at BSF, Freedman worked on a case with Cyrulnik that Freedman originated, and that on that case, Freedman would consult with Cyrulnik on legal strategy as they worked on the matter together. RF denies the balance of paragraph 26.

27. During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman. Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate platform (in quality and size) to service his growing client base, which was his top priority.

**RESPONSE TO PARAGRAPH 27**: RF admits Cyrulnik and Freedman discussed the possibility of Cyrulnik joining RF. RF also admits that at the time, Freedman thought highly of Cyrulnik. RF denies the balance of paragraph 27.

28. Freedman would not take no for an answer. He continued to press over the course of several months, ultimately bringing Roche into the conversation. The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many clients' needs. In exchange for his agreement to leave BSF to co-found a firm with them, Roche and Freedman promised Cyrulnik significant stakes in what they described as their high-upside contingency work and in certain assets that they had secured. The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue and stability that would help finance Roche and Freedman's contingency and alternative fee

arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

**RESPONSE TO PARAGRAPH 28**: RF admits that conversations between Freedman, Roche, and Cyrulnik continued at the initiation of all three parties. RF also admits that it needed a larger associate base to handle its own work, as well as the work Cyrulnik, Friedland, Normand, and Holcomb would originate. RF otherwise denies the allegations in paragraph 28.

29.     After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to cofound the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

**RESPONSE TO PARAGRAPH 29**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that Cyrulnik decided to leave BSF and join the Firm, but otherwise denies the allegations in paragraph 29.

## C.     The Parties Negotiate And Execute The MOU

30.     On December 27, 2019, RCF's Founding Partners — named partners Cyrulnik, Roche and Freedman, together with Counterclaim-Defendants Friedland, Holcomb and Normand (as defined in the MOU) — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

**RESPONSE TO PARAGRAPH 30**: RF admits the parties executed the MOU on December 27, 2019. RF denies the balance of paragraph 30.

31.     Section II of the MOU sets forth the partners' equity positions in the Firm.  In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%).  Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies

12

for revenue earned through hourly and contingency matters. Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

**RESPONSE TO PARAGRAPH 31**: RF refers to the MOU for its content, admits that Cyrulnik's descriptions of Sections III and V of the MOU are generally correct, denies the ambiguous term "as modified," and otherwise denies the allegations in paragraph 31.

32. Section IV of the MOU lists a series of "assets" (most of which were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)), excludes those assets from the Compensation Model, and instead sets forth the agreed-upon fixed allocations of those assets to the Founding Partners in different formulas and percentages that varied by asset.

**RESPONSE TO PARAGRAPH 32**: RF refers to the MOU for its content, admits that Section IV of the MOU lists a series of "assets" that were mostly generated between August 2019 and January 2020, and otherwise denies the allegations in paragraph 32.

33. One of the key assets allocated in the MOU was cryptocurrency (referred to as "Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the "Startup Client"), had agreed to convey to the Firm. The MOU expressly granted each of the Founding Partners a fixed allocation of the Tokens (which was to be ▮▮▮▮ of all Tokens issued by the Startup Client), as follows: Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and Normand, Friedland, and Holcomb, 5% each.

**RESPONSE TO PARAGRAPH 33**: RF refers to the MOU for its content, admits that in 2019 and before Cyrulnik was even in discussions to join RF, the Startup Client agreed to convey Tokens to RF under certain conditions, and otherwise denies the allegations in paragraph 33.

34.     Section VI of the MOU addresses the management of the Firm.  In particular, the parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

**RESPONSE TO PARAGRAPH 34**: RF refers to the MOU for its content, and admits that Cyrulnik's description of Section VI of the MOU is generally accurate and that Cyrulnik has accurately quoted a sentence in that section.

35.     The MOU has two separate provisions governing the departure of a partner from the Firm.  The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who voluntarily elects to withdraw from the Firm within 18 months would have his or her compensation limited to the amount to which he or she would have been entitled under the Compensation Model, and would return his or her equity in the Firm to the other equity partners.

**RESPONSE TO PARAGRAPH 35**: RF refers to the MOU for its content, admits that Section VI(C) is entitled "Withdrawal from Firm," and otherwise denies the allegations in paragraph 35.

36.     The second, Section VI(G), entitled "Partner Removal," expressly provides that a "Founding Partner cannot be removed without cause."  That section also provides that, even if cause arose for the removal of a Founding Partner, that removal would require an affirmative vote of at least two-thirds of the Firm's equity partners.  In stark contrast to the voluntary withdrawal provision, however, such an involuntary removal (for "cause") does not result in the forfeiture of any compensation, interests, or assets owed or allocated to the Founding Partner under the MOU.

**RESPONSE TO PARAGRAPH 36**: RF refers to the MOU for its content, and admits that Section VI(G) is entitled "Partner Removal" and states that a "Founding Partner cannot be removed without cause" and that for-cause removal requires "the affirmative vote of 2/3 of the Firm's equity partners." RF otherwise denies the allegations in paragraph 36.

14

37.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter," attached as Exhibit B).  Given his reputation, seniority, and equity stake in the new Firm, Cyrulnik was the natural choice for the "first-named" partner.  But Roche — consumed with securing that recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be listed as the first named partner at RCF.  The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model.  Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

**RESPONSE TO PARAGRAPH 37**: RF refers to the Side Letter for its content, admits that Cyrulnik's description of the actual terms of the Side Letter is generally accurate though incomplete, and otherwise denies the allegations in paragraph 37.

38.     In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

> a.     27% of the Firm's equity, which could not be diminished at any time without his consent;
>
> b.     25% of the cryptocurrency Tokens from the Startup Client;
>
> c.     a 25% interest in a specified contingency matter; and
>
> d.     an $850,000 cash payment from Roche (to be paid in specified installments).

**RESPONSE TO PARAGRAPH 38**: RF denies the allegations in paragraph 38.

39.     In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

**RESPONSE TO PARAGRAPH 39**: RF lacks knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 39, and therefore denies them.

## II.  CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

40.     Cyrulnik's many clients all elected to follow him from BSF to RCF.  During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice.  Specifically, Cyrulnik was singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

**RESPONSE TO PARAGRAPH 40**: RF lacks knowledge and information sufficient to form a belief about how many of Cyrulnik's clients "elected to follow him from BSF to RCF." RF otherwise denies the allegations in paragraph 40.

41.     As Freedman stated at the end-of-year partner's meeting in January 2021 (just a few weeks before orchestrating the scheme to try and steal Cyrulnik's assets), and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

**RESPONSE TO PARAGRAPH 41**: RF denies the allegations in paragraph 41.

42.     Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions.  Cyrulnik also devoted tireless efforts to managing the Firm, including overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease. Roche and Freedman, separately and together, and as recently as January 2021 (just a few weeks

16

before effectuating the scheme to try and steal Cyrulnik's assets), told Cyrulnik how much they enjoyed working with him to build the Firm, that they could not have built the Firm without him, that his contributions were instrumental to the Firm's success, and that his performance and accomplishments were remarkable. Normand told Cyrulnik in or about December 2020 (less than eight weeks before participating in the scheme to try and steal his assets) that Cyrulnik was "the leader" of the Firm.

> **RESPONSE TO PARAGRAPH 42**: RF denies the allegations in paragraph 42.

43. While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections. Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they maintained would bring enormous revenue to the Firm over time. That was particularly applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

> **RESPONSE TO PARAGRAPH 43**: RF denies the allegations in paragraph 43.

## III. THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD

44. The Named Partners met regularly to discuss the Firm's administration matters. Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements. Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success, and that they could not have accomplished what they had without Cyrulnik. Freedman actually remarked to Cyrulnik during an in-person meeting in the Firm's Florida office on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running

the Firm (referring to Freedman's effort to enrich himself at the Firm's expense through referral arrangements and other "discounts" he would apply to the Firm's revenue but not his own take on that revenue).

**RESPONSE TO PARAGRAPH 44**: RF denies the allegations in paragraph 44.

45.     With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues.  Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings and his responsibilities as counsel representing class clients; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense.  Roche and Freedman were content to downplay such problems, or to delay resolution of the matter "for another day." With respect to these issues, Cyrulnik expressed the view that it was important for the Firm to address these issues promptly and definitively to ensure that the Firm was complying with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try to ensure that the partners would do so.

**RESPONSE TO PARAGRAPH 45**: RF admits that Roche and Freedman worked well together, but otherwise denies the allegations in paragraph 45.

## IV.   CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM'S LONG-TERM SUSTAINABILITY

46.     As the senior member of the group meeting regularly to administer the Firm, Cyrulnik addressed serious concerns that had come to his attention regarding, among other things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation Model.

RESPONSE TO PARAGRAPH 46: RF admits Cyrulnik claimed certain issues were serious and threw temper tantrums, was abusive, and yelled at his co-workers when he did not get his way. RF otherwise denies the allegations in paragraph 46.

A.    **Cyrulnik Asks Roche To Fix His Lax Approach To Time Keeping**

47.    First, in or about April 2020, Cyrulnik was reviewing time record reports from the Firm's billing system and learned that Roche had not recorded the hours he had worked on client matters for months.  Cyrulnik reached out to Roche and asked him to remedy that serious deficiency, stressing the importance of being honest and accurate with respect to client billing. Roche apologized and told Cyrulnik that he had messed up and that he would take care of it.  Roche stated that he was hiring his mother to try and "reconstruct" his time by scrolling through his emails and guesstimating time entries.  Cyrulnik was not comfortable with Roche's approach and reminded Roche that he needed to ensure that he was keeping accurate time records.  Roche exhibited a similar immature and inappropriate attitude toward client bills.  Roche boasted to Cyrulnik about his desire to "pound the lodestar" on his class-action contingency matters, stating that he wanted to hire more associates and staff attorneys to work on his contingency matters so that he could position himself to obtain a better percentage of fee awards being split with the Firm's co-counsel in class matters.  Cyrulnik was concerned about Roche's approach and again told Roche that he needed to take his obligations to clients and class representations seriously.  Freedman told Cyrulnik that his concerns about Roche were not unfounded, but that Freedman would keep Roche in line.  Specifically, Freedman told Cyrulnik that Roche was dishonest, explaining that Roche was the kind of person "who will lie to your face and then beg for forgiveness if he's caught" – but Freedman stressed that he uniquely knew how to "control" Roche, and that Freedman could get Roche to do "anything I want him to do."

**RESPONSE TO PARAGRAPH 47**: RF admits Roche interviewed and discussed hiring his mother to assist with secretarial work that would include facilitation of time entries for both himself and Cyrulnik, but that he ultimately chose not to hire her. RF otherwise denies the allegations in paragraph 47.

### B. Cyrulnik Seeks To Correct Freedman's Efforts To Engage In Self-Dealing

48.     Second, Freedman engaged in self-dealing by manipulating the Firm's Compensation Model to enrich himself at the Firm's expense.  Specifically, Freedman struck a deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to pay Schall a 20% referral fee in connection with Freedman's desire to apply for lead counsel appointments in securities class actions.  Instead of paying that referral fee out of Freedman's origination credit, moreover, Freedman demanded the Firm absorb that referral fee.  Freedman's non-economic, "pay to play" origination strategy put the Firm in an unsustainable financial position; namely, the Firm was paying as much as 50% of all client revenue from Freedman's clients merely to "originate" the matters, and then paying the attorneys who worked on the case as much as 45% of the remaining revenue pursuant to the Compensation Model.  In other words, after paying associates and partners their shares, virtually nothing would be left to cover Firm expenses and pay partnership distributions.  Incongruously, Freedman's referral scheme was not only objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting himself.  When partner Katherine Eskovitz sought a similar arrangement for a matter she was suggesting the Firm take on (and pay her husband a large referral fee), Freedman rejected her proposal as a "money grab," a non-starter, and wholly unacceptable.  Freedman and Roche both called Cyrulnik and told him that Eskovitz was a "liability" and "a problem" who was just trying to exploit the Firm, and proceeded to blame Cyrulnik for supporting making an offer to Eskovitz back in 2019.  Freedman's excessive focus on enriching himself at the expense of the Firm's long-

term sustainability was deeply concerning, as was his response. Freedman told Cyrulnik that Freedman's objective in life was simple: "I don't want to just be rich; I want to be super rich." Cyrulnik and Roche both discussed their concerns about Freedman's approach to compensation, but Roche assured Cyrulnik that he knew Freedman well, and that although Freedman often acted "immature" and was fixated on short-term financial upside, Roche was committed to ensuring that the concerns Cyrulnik identified would be remedied.

**RESPONSE TO PARAGRAPH 48**: RF admits the Firm approved certain ethical co-counsel agreements, but otherwise denies the allegations in paragraph 48.

## V. THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM THE STARTUP CLIENT

49.    Cyrulnik's many stable clients and billable hour matters substantially funded the Firm's operations and many of the Firm's alternate fee arrangement representations of other clients.

**RESPONSE TO PARAGRAPH 49**: RF admits that while Cyrulnik used the Firm's associates, software, property, and reputation, and while it paid his salary and benefits, some of the revenue generated from clients he originated was used to fund firm overhead. RF otherwise denies the allegations in paragraph 49 and Roman numeral "V."

50.    For example, as discussed above, the Firm was retained by the Startup Client, which planned to distribute digital cryptocurrency assets in the form of Tokens and build a platform of decentralized assets and applications. The purpose of the representation was to assist the Startup Client and its officers during the growth and development of their business.

**RESPONSE TO PARAGRAPH 50**: RF admits it was retained to represent the Startup Client prior to the announcement of RCF and prior to Cyrulnik's involvement in the Firm. RF otherwise denies the allegations of paragraph 50.

51. Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all Tokens issued by the Startup Client in connection with all future distributions.

**RESPONSE TO PARAGRAPH 51**: RF denies the allegations in paragraph 51.

52. Under the engagement letter, the Firm would receive a flat percentage of all Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any Token Distribution." Further, under the engagement letter, the Tokens functioned as a nonrefundable advance, meaning "any unused portion of the Billable Hour Advance will expire on the fourth anniversary of this agreement's execution."

**RESPONSE TO PARAGRAPH 52**: RF admits that Cyrulnik has accurately quoted portions of the engagement letter. RF otherwise denies the allegations in paragraph 52.

53. Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

**RESPONSE TO PARAGRAPH 53**: RF refers to the MOU for its content and otherwise denies the allegations in paragraph 53.

54. At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be. Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

**RESPONSE TO PARAGRAPH 54**: RF admits that, at the time the engagement letter was signed, the Startup Client was in its development phase, Tokens had not been distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be. RF

22

denies the allegations that "Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters."

55.     In ███████ 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors.  The sale ascribed real value to the Tokens.  More importantly though, it validated the Startup Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

**RESPONSE TO PARAGRAPH 55**: RF admits the allegations in paragraph 55.

## VI.    ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION

56.     Roche understood that addressing the Firm's sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik.  Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm and that Freedman was out for himself too much.  To that end, Roche and Cyrulnik had worked for months to clarify the formulas used to calculate credits in the Compensation Model to try and protect against future exploitation of it, in an effort to disincentivize the practices that were problematic and in which Freedman in particular was engaged.  But when Roche presented the updates to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him.

**RESPONSE TO PARAGRAPH 56**: RF admits that at Cyrulnik's insistence, Roche discusses potential changes to the Firm's formula compensation model. RF otherwise denies the allegations in paragraph 56.

57.     In ███ 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that.  But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long and hard to fashion.  When Cyrulnik asked Roche what happened after the call, Roche admitted to Cyrulnik that Roche was "scared" of Freedman because Freedman "sometimes acts irrationally" and is selfish.  Roche told Cyrulnik that Roche had concluded it was not "worth it" to stand up to Freedman.  Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants."  Cyrulnik told Roche that the Firm needed to be more principled and that problems need to be addressed rather than ignored.  He told both Roche and Freedman that he believed it was critical to the Firm's success that they look beyond their own individual interests to address any vulnerabilities in the formula applications for compensation to ensure that the Firm was sustaining itself and doing so fairly.

**RESPONSE TO PARAGRAPH 57**: RF admits there was a conversation where Cyrulnik raised changes to the formula that deviated from the agreed-upon formulas, that Freedman resisted those changes, and that Cyrulnik completely lost control, erupted into an alarming rage, and screamed at both Roche and Freedman at the top of his lungs. RF otherwise denies the allegations in paragraph 57.

58.     Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates.  Roche uniquely understood how the Startup Client's ███ 2020 Token sale foreshadowed their enormous potential value, and sensed an

opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens.  To that end, Roche wrote to Cyrulnik following the meeting with Freedman about fixing the Firm's formulas: "I agree with the economics of the proposed formula comp. change," but then shockingly told Cyrulnik that, in order for Roche to vote consistent with what he believed was best for the Firm, Cyrulnik needed to buy his support by agreeing to pay Roche 40% of Cyrulnik's Tokens (10% of the total Tokens): "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU."  The request came out of left field.

**RESPONSE TO PARAGRAPH 58**: RF admits that Roche is deeply engaged in the cryptocurrency industry, that he regularly, speaks, writes, and litigates on that topic, and that Cyrulnik has accurately quoted excerpts of an email that Roche sent to Cyrulnik on July 22. RF refers to that email for its content (*see* Dkt. No. 31-1), and notes that Cyrulnik has taken Roche's statements out of context and omitted key portions that make clear Roche was explaining to Cyrulnik that there were significant problems with Cyrulnik's proposal and that, separately, a re-allocation of Tokens was necessary under the MOU because, in contrast to his commitments under that agreement, Cyrulnik had not provided services to the Startup Client (while Roche and another attorney at the Firm, Joe Delich, had devoted a significant amount of time to providing such services). RF otherwise denies the allegations in paragraph 58.

59.     Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands.  He flatly rejected any such change to his Token stake and explained that acting in the best interests of the Firm and making decisions designed to protect its long-term sustainability was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was unjust and unethical.  As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

**RESPONSE TO PARAGRAPH 59**: RF denies the allegations in paragraph 59.

## VII.    THE PARTNERS COMPLETE 2020 AND PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS

60.    Although there were a couple of important issues that had arisen over the course of the first year of the Firm's operations on which the partners had expressed different views (and with respect to which decisions proceeded by split votes), the partnership was generally very functional and friendly.  The partners consistently touted the collegiality of the Firm in discussions with potential lateral candidates.  Throughout January 2021 (in the few weeks prior to the scheme at issue in this lawsuit), the partners continued to interact as they had in the past.  Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, 2021, and they discussed many Firm planning issues.

**RESPONSE TO PARAGRAPH 60**: RF admits that outside of interactions with Cyrulnik, the partnership was very friendly and functional. RF admits Freedman and Cyrulnik went to lunch in January when Cyrulnik visited Miami. RF otherwise denies the allegations in paragraph 60.

61.    Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

**RESPONSE TO PARAGRAPH 61**: RF admits Cyrulnik raised various issues he claimed to have about the firm at that meeting.

62.    Counterclaim-Defendant Friedland reached out to Cyrulnik on January 2, 2021: "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

**RESPONSE TO PARAGRAPH 62**: RF admits the allegation in paragraph 62.

63.     On January 22, 2021, less than three weeks before their bad-faith "removal" ploy, Freedman was arranging to ensure that the Firm's bank accounts at Chase Bank were corrected to finally ensure that Cyrulnik was listed as a registered owner – something that Freedman was required to do when the Firm was first formed one year prior, but had delayed due to the pandemic and the requirement that the owners be present together at a Chase branch to update the accounts in person.  Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York the following week (less than two weeks before the illegal "removal" scheme) in light of a family conflict Freedman had to navigate that day.

**RESPONSE TO PARAGRAPH 63**: RF admits Cyrulnik wanted to be added to the bank accounts as an authorized person to transact with the accounts, that Freedman did not add him, and instead told him to ask Roche about it in New York. RF otherwise denies the allegations in paragraph 63.

64.     ▮▮▮▮▮▮, the value of the Tokens exploded.

**RESPONSE TO PARAGRAPH 64**: RF refers to publicly available market data for the actual price of Tokens over time but admits that the price of the highly volatile Tokens generally increased during the period referenced by Cyrulnik and fluctuated wildly thereafter.

## VIII.   COUNTERCLAIM-DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF TO TRY AND MISAPPROPRIATE HIS INTERESTS IN THE FIRM'S VALUABLE ASSETS

65.     In ▮▮▮▮▮ 2020, the Tokens began trading publicly for the first time.  Between ▮▮▮▮▮ 2020 and ▮▮▮▮▮ 2020, the price of the Tokens remained relatively stable.

**RESPONSE TO PARAGRAPH 65**: RF refers to publicly available market data for the actual price of the highly volatile Tokens over time, but admits Cyrulnik's allegations in paragraph 65 are generally accurate. RF denies the allegation in roman numeral "VIII."

27

66.     In ▮▮▮ 2021, however, the Tokens experienced a precipitous rise in value. Between ▮▮▮ 2021 and ▮▮▮ 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between ▮▮▮ 2021, and ▮▮▮ 2021.  The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in ▮▮ 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the ▮▮ days leading up to Cyrulnik's purported "removal" for cause.

**RESPONSE TO PARAGRAPH 66**: RF refers to publicly available market data for the actual price of Tokens over time, but admits that Cyrulnik's statements regarding the price trend of Tokens during the refenced period is generally accurate, though misleading. RF otherwise denies the allegations in paragraph 66.

67.     Below is a chart of the Tokens' price between ▮▮▮▮ and the day of the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm:



**RESPONSE TO PARAGRAPH 67**: RF refers to publicly available market data for the actual price of Tokens over time, but admits that Cyrulnik's chart appears to accurately reflect the price trend of Tokens during the referenced time period (with the caveat that Cyrulnik's characterization of the Founding Partners' meeting to remove him for his pervasive misconduct as "the Conspiring Partners' secret meeting to expel Cyrulnik" is grossly inaccurate and misleading).

68.     As the chart shows, as of ███████, 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than ██ per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million.  But that was not enough for Roche and Freedman, the latter of whom had previously remarked that his goal in life was to be "super rich."

**RESPONSE TO PARAGRAPH 68**: RF denies the allegations in paragraph 68.

69.     Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters.  With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

**RESPONSE TO PARAGRAPH 69**: RF denies the allegations in paragraph 69.

70.     Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with Friedland, Holcomb and Normand, convened a secret meeting on or about February 10, 2021, without even informing two of the Firm's seven equity partners, to concoct the pretext for his removal. Cyrulnik was not informed of the meeting, and was not given the opportunity to address whatever false allegations the Conspiring Partners had decided to use as a

pretext for the "removal" – neither at the meeting nor at any other time prior to his purported (and unlawful) "removal."

**RESPONSE TO PARAGRAPH 70**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that Cyrulnik was not given notice of the meeting on February 10, 2021 that the other Founding Partners attended, but otherwise denies the allegations in paragraph 70.

71.    Also excluded from the covert meeting was equity partner Paul Fattaruso, who was the only partner at the Firm who regularly worked with Cyrulnik on running the Firm's core matters while the other partners focused primarily on the Firm's contingency work (and small billable matters).  Fattaruso was deliberately and unjustifiably excluded so that the Conspiring Partners could falsely mischaracterize the vote to oust Cyrulnik as "unanimous," when in fact, they did not even include two of the Firm's seven equity partners (constituting almost 30% of the Firm's equity votes).

**RESPONSE TO PARAGRAPH 71**: RF admits that Fattaruso was not given notice of the February 10, 2021, meeting, but otherwise denies the allegations in paragraph 71.

72.    The secret meeting not only breached the fiduciary duties owed by the Conspiring Partners to Cyrulnik, but directly breached the MOU.  As the Firm's co-chairperson, only Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting of those meetings."  Cyrulnik's right to initiate and conduct Firm meetings could not be altered without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik, which of course never happened.

**RESPONSE TO PARAGRAPH 72**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 72.

73.     Two days after the meeting, on February 12, 2021, the Conspiring Partners sent Cyrulnik an email informing him that he was "removed," which email was riddled with errors, misstatements, and mischaracterizations, purporting to remove Cyrulnik from the Firm for "cause."  The fictitious bases set forth in the email had not even occurred, much less constituted proper "cause" as required.

**RESPONSE TO PARAGRAPH 73**: RF admits that the other Founding Partners sent Cyrulnik notice of his removal on February 12, 2021, but otherwise denies the allegations in paragraph 73.

## IX.     COUNTERCLAIM-DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS

### A.     Counterclaim-Defendants Indisputably Lacked "Cause" To Expel Cyrulnik

74.     Counterclaim-Defendants indisputably lacked anything close to "cause" — which, under applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of his job — to remove Cyrulnik.

**RESPONSE TO PARAGRAPH 74**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 74, Roman numeral "IX," and subsection "A."

75.     Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from associate to partner to equity partner as quickly as anyone in BSF's history. All of the Firm's equity partners, including all of the Conspiring Partners, had worked for years at BSF with Cyrulnik.  He had never before had any complaints lodged against him for any improper interactions with any

colleague — associate, partner, or otherwise. Cyrulnik is highly respected by scores of colleagues with whom he works and has worked. Because there was no record of misconduct and, of course, no actual misconduct, the Conspiring Partners had no substance upon which to base their pretextual removal for cause. Instead, they contrived a removal email that not only was false and devoid of substance, but failed to describe any actual cause.

**RESPONSE TO PARAGRAPH 75**: RF admits that Cyrulnik worked at BSF for fifteen years prior to joining the Firm, that Cyrulnik was an equity partner at BSF, and that some of the other Founding Partners had worked with Cyrulnik at BSF. RF lacks knowledge and information sufficient to form a belief about whether Cyrulnik is "highly respected by scores of colleagues" and whether Cyrulnik rose "from associate to partner to equity partner as quickly as anyone in BSF's history." RF denies that no one at RF lodged a complaint about Cyrulnik prior to his for-cause removal and denies that no one at BSF lodged a complaint about Cyrulnik either. RF likewise denies the remaining allegations in paragraph 75.

76. For example, Counterclaim-Defendants' purported "removal" email asserts that Cyrulnik screamed, "spoke over" other partners, refused to listen, and was antagonistic at meetings. Setting aside that "screaming" cannot and does not constitute cause, it in any event mischaracterizes two instances of disagreement about Firm decisions throughout 14 months of Cyrulnik's tenure. For example, in July 2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on Cyrulnik and coordinated matching e-mails, alleging Cyrulnik had "screamed" at them, accompanied by a misleading account of events. These emails were a misguided effort to pressure Cyrulnik into conceding financial rights. When Roche and

Freedman realized that Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

**RESPONSE TO PARAGRAPH 76**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that the February 12, 2021, email identified a non-exhaustive list of Cyrulnik's misconduct. RF otherwise denies the allegations in paragraph 76.

77. The other allegations in the email are equally misguided. The email vaguely asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other founding partners." Yet, it provides no context or support for these accusations (because they are false). And the email includes a vague and nebulous accusation that Cyrulnik created "unsustainable environments for associates," which is completely false. To the contrary, Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who has spoken ill of him or working for him.

**RESPONSE TO PARAGRAPH 77**: RF admits that the February 12, 2021, email identified Cyrulnik's attempts "to undermine the intent of the MOU and marginalize other founding partners" and creation of an "unsustainable environment[] for associates" as examples of Cyrulnik's problematic behavior. RF otherwise denies the allegations in paragraph 77.

78. As the removal email evidences, the actions by the Conspiring Partners are about one thing only: greed. They had no problem working with Cyrulnik at BSF — actively recruiting him to leave his hard-earned position and lead the Firm — and no problem working with Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue base) until ▮ ▮ days before his removal when his assets skyrocketed in value and the Tokens suddenly appreciated to more than $60 million in value. Then, without any precipitating incident, the

Conspiring Partners felt compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an opportunity for him to respond to their pretextual and baseless allegations.

**RESPONSE TO PARAGRAPH 78**: RF admits that some of the Founding Partners had no problem working with Cyrulnik at BSF and that Cyrulnik was not given notice of the February 10, 2021, meeting, but otherwise denies the allegations in paragraph 78.

79.     Following their wrongful attempted removal of Cyrulnik, the Conspiring Partners have stopped at nothing in their quest to defame him.  In a truly cynical effort, the Conspiring Partners attempted to exploit the legal community's rightful concerns over diversity and inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit themselves — *i.e.*, five white males.  Cyrulnik has never expressed anything other than outright support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Conspiring Partners are manifestly false.

**RESPONSE TO PARAGRAPH 79**: RF denies the allegations in paragraph 79.

80.     Accordingly, after receiving the Conspiring Partners' email on February 12, 2021, Cyrulnik expressly placed the Conspiring Partners on notice that their purported removal was "in bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

**RESPONSE TO PARAGRAPH 80**: RF admits that Cyrulnik's counsel, Marc Kasowitz, sent a letter to the other Founding Partners on February 22, 2021, containing the quoted statements, but otherwise denies the allegations in paragraph 80.

**B.** **The Conspiring Partners Breached The MOU By Denying Cyrulnik The Compensation They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause**

81.     The Conspiring Partners' scheme suffered from many fatal flaws, including the threshold problem that, even where partners have grounds for removing a Founding Partner for cause (there were none here) and the proper procedures for doing so were followed (again not the case here), such a removal would not impact Cyrulnik's core compensation rights under the MOU in any event.

**RESPONSE TO PARAGRAPH 81**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 81 and subsection "B."

82.     In Section VI of the MOU ("Firm Management"), the MOU addressed two different instances where a Founding Partner would depart from the Firm.  The partner could withdraw voluntarily under Section VI(C), or under limited circumstances could be removed involuntarily for cause under Section VI(G).

**RESPONSE TO PARAGRAPH 82**: RF denies the allegations in paragraph 82.

83.     In their complaint, the Conspiring Partners intentionally sought to conflate the provisions in a misguided attempt to treat their improper and involuntary removal as Cyrulnik deciding to "withdraw" from the Firm.  In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an involuntary removal and voluntary withdrawal separately, and the intent of the parties (including the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily agreed to change their economics).

**RESPONSE TO PARAGRAPH 83**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 83.

84.     The MOU unambiguously provides for certain ramifications in the event of voluntary withdrawal.  It unequivocally does not set forth those ramifications for involuntarily removal, and Counterclaim-Defendants' attempt to do so is baseless and improper.

**RESPONSE TO PARAGRAPH 84**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 84.

## X.     THE CONSPIRING PARTNERS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS

85.     Since perpetrating their scheme and purporting to remove Cyrulnik as a partner, the Conspiring Partners have egregiously breached their duties to and badly mistreated the Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik.  Despite the Conspiring Partners' extreme efforts to keep the Firm's clients at RCF, every single client that Cyrulnik brought to the Firm left the Firm and remained with Cyrulnik.

**RESPONSE TO PARAGRAPH 85**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 85 and roman numeral "X," except admits that Cyrulnik's clients followed Cyrulnik to his new Firm, Cyrulnik Fattaruso LLP.

### A.     The Conspiring Partners Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets

86.     After sending Cyrulnik their "removal" email, the Conspiring Partners tried to pressure him to agree to sign a confidential mediation and binding arbitration agreement to

facilitate an "amicable" re-division of his assets and rights under the MOU. After calling out the Conspiring Partners' improper scheme, Cyrulnik told the Conspiring Partners that a necessary predicate for any discussion about splitting the Firm was their commitment to provide him all of the compensation he is owed under the MOU.

**RESPONSE TO PARAGRAPH 86**: RF admits it sought to amicably resolve this dispute, including through mediation and/or arbitration, and that Cyrulnik made absurd demands for compensation he was not entitled to. RF otherwise denies the allegations in paragraph 86 and subsection "A."

87.     On February 19, Roche sent Cyrulnik a proposal in which he proposed that Cyrulnik give the Conspiring Partners 75% of his Tokens. Through his counsel, Cyrulnik told the Conspiring Partners that, if they did not commit to providing Cyrulnik everything to which he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens, Cyrulnik would be forced to commence litigation. The Conspiring Partners' counsel stated that his clients were looking to resolve the matter, and that he would speak with them and revert on Sunday morning, February 28, 2021.

**RESPONSE TO PARAGRAPH 87**: RF admits that, on February 19, 2021, Roche proposed a resolution of the parties' dispute and that Cyrulnik rejected that proposal. RF denies the remaining allegations in paragraph 87.

88.     Having forestalled litigation through that stall tactic, the Conspiring Partners rushed to prepare their own anticipatory pleading and rushed into court, in the hope that publicizing a false narrative would force Cyrulnik to give them what they wanted and would enable the Conspiring Partners to keep Cyrulnik's clients. Without providing any further response to Cyrulnik, the Counterclaim-Defendants filed a declaratory relief lawsuit in this Court on the night

37

of Saturday, February 27, 2021 (a day before the scheduled call between their counsel and Cyrulnik's counsel, pursuant to Counterclaim-Defendants' counsel's request).

**RESPONSE TO PARAGRAPH 88**: RF denies the allegations in paragraph 88.

89.     Concurrent with their late-night filing, the Conspiring Partners suddenly cut Cyrulnik's access to client files without notice.  At the time, Cyrulnik was lead counsel on many active matters with a number of court hearings and depositions scheduled the next business day and throughout the ensuing week, and the Conspiring Partners' actions materially hindered Cyrulnik's ability to work on these matters – as the Conspiring Partners intended all along, as further leverage to force Cyrulnik to give up his rights.  Cyrulnik rejected the Conspiring Partners' extortionate actions, and demanded that his access to client files be restored so that he could continue representing and protecting the interests of his clients – clients who, at the time, remained Firm clients to whom each of the Conspiring Partners owed fiduciary duties.  Ultimately, the Conspiring Partners agreed to provide Cyrulnik access to his clients' files – although only after he was forced to scramble and waste significant time and effort to protect client interests.

**RESPONSE TO PARAGRAPH 89**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies it cut off Cyrulnik's access to client files without significant advance notice.  RF otherwise denies the allegations in paragraph 89.

**B.     The Conspiring Partners Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Choosing Cyrulnik**

90.     Faced with the imminent prospect of losing most of their core clients and revenue, the Conspiring Partners sought to leverage deadlines in active matters to pressure clients to execute new engagement letters with the Firm or else be left without adequate staffing for their matters on

virtually no notice at all. Indeed, in many cases, the Counterclaim-Defendants' letters to clients demanded responses within just a few business hours.

**RESPONSE TO PARAGRAPH 90**: RF denies the allegations in paragraph 90 and subsection "B."

91.     When the clients informed the Firm that they wanted Cyrulnik to lead their matters but expected an appropriate and non-prejudicial transition of their active matters, the Firm scrambled to punish those clients by rapidly removing the associates who had been staffed on those cases for months – with imminent deadlines fast approaching and against the request and recommendation of the other Firm partner who had been running the cases with Cyrulnik (and who remained at the Firm at the time).

**RESPONSE TO PARAGRAPH 91**: RF denies the allegations in paragraph 91.

92.     The Counterclaim-Defendants also enlisted newly hired partner, Eric Rosen, to send harassing letters to clients, in which Rosen threatened to file notices of withdrawal in less than two days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to continue handling your matter." Cyrulnik continued to field daily phone calls for weeks from clients who were receiving Rosen's emails threatening to prejudice their cases by filing withdrawal notices in their active cases.

**RESPONSE TO PARAGRAPH 92**: RF lacks knowledge and information sufficient to form a belief about whether Cyrulnik fielded "daily phone calls for weeks from clients" regarding communications from Rosen, and otherwise denies the allegations in paragraph 92.

93.     Even after the Conspiring Partners resigned themselves to the fact that Cyrulnik's clients had no interest in being represented by RCF unless Cyrulnik was leading their cases, they sought to harm those clients by generating and demanding payment of inaccurate and improper

invoices, and refusing to remit client funds that did not belong to them. Specifically, the Conspiring Partners drafted invoices for those clients without the input or oversight of any of the partners who oversaw the matter, and demanded that Cyrulnik sign off on them without review. When Cyrulnik told the Conspiring Partners that client invoicing needed to be done carefully and properly and that he needed access to Firm timekeeping and recording systems to perform his customary review of pre-bills before they were sent out to clients, the Conspiring Partners refused.

**RESPONSE TO PARAGRAPH 93**: RF denies the allegations in paragraph 93.

94.     Cyrulnik's counsel called out Counterclaim-Defendants' attempt to mistreat clients:

> Any effort to send bills to clients without the lead partner overseeing those matters reviewing them is obviously improper. Client bills need to be reviewed before they are sent out, as clients reasonably expect to happen. The fact that these clients declined to have your clients represent them going forward does not change that. If you want to treat clients properly and fairly, we have offered a process for doing so. If your clients desire to punish clients for declining to be represented by the kinds of people you represent, we strongly oppose such efforts and will obviously not facilitate them. We have proposed a mechanism for dealing with invoicing; if you refuse to approach that effort in a manner consistent with your clients' duties to their former clients and to mine, we will address that in court.

**RESPONSE TO PARAGRAPH 94**: RF has reviewed its records and denies having received any communication from Cyrulnik's counsel containing the block-quoted text.

95.     Confronted with this reality, Counterclaim-Defendants then partially backtracked, demanding that Cyrulnik send "corrections" to the invoices based on guesswork and memory alone, without access to the firm timekeeping systems, calendars and records or to the lawyers whose time was being listed on the bills, and that he do so within two business days. The Conspiring Partners also demanded that Cyrulnik send them entries for the time he worked on all matters in January and February so that they could include those entries on the improper invoices,

which would enable them to give clients the false impression that Cyrulnik had signed off on the invoices and the work being billed. Although it was against Cyrulnik's own financial interests, he declined to participate in the Conspiring Partners' effort to bill clients without customary and proper review of the invoices to ensure accuracy and that clients were being treated fairly and honestly.

**RESPONSE TO PARAGRAPH 95**: RF admits that it offered Cyrulnik the opportunity to review proposed client bills and that Cyrulnik never provided any comments on those proposed bills. RF admits that it demanded that, consistent with his obligations, Cyrulnik provide it with records of the time that he spent working on behalf of Firm clients in January and February 2021, and that Cyrulnik refused to do so. RF otherwise denies the allegations in paragraph 95.

96. To this day, despite multiple requests and demands, the Conspiring Partners continue to block Cyrulnik's access to the billing systems needed to send out proper invoices, causing substantial harm to Cyrulnik.

**RESPONSE TO PARAGRAPH 96**: RF denies the allegations in paragraph 96.

97. Astonishingly, in its Amended Complaint, RCF somehow tries to turn these facts on their head, alleging that Cyrulnik breached his duties to the Firm by not participating in its plan to send out invoices without customary and requisite review, to bill clients for unauthorized work, and to create the false impression for clients that the invoices had been properly reviewed and approved – when it is the Conspiring Partners who have unilaterally and improperly blocked Cyrulnik's access to the records necessary to ensure that the Conspiring Partners do not send out false or fraudulent invoices. The Conspiring Partners then feign ignorance in their Amended Complaint as to why the many clients they so badly mistreated – and whose cases the Conspiring

Partners endangered through their bad-faith, retaliatory conduct – apparently did not pay the invoices that RCF sent.

**RESPONSE TO PARAGRAPH 97**: RF admits that it has asserted claims against Cyrulnik based on his failure to provide his time records for January and February 2021, and for tortiously interfering with the Firm's rights, but otherwise denies the allegations in paragraph 97.

### C. The Conspiring Partners Cause the Firm To Disseminate False Tax Forms In An Effort To Further Their Scheme.

98.     Recognizing that their scheme had been exposed, the Conspiring Partners scrambled to devise a backup plan for stealing Cyrulnik's assets in mid-2021.

**RESPONSE TO PARAGRAPH 98**: RF denies the allegations in paragraph 98 and subsection "C."

99.     Specifically, they secretly directed the Firm's accountant to withhold Cyrulnik's Form K-1 – the tax form utilized by partners in lieu of a Form W-2 – and then issued him a falsified W-2 form, claiming that Cyrulnik – the Firm's largest equity holder at 27% – would suddenly and retroactively being recharacterized as an employee of the Firm.

**RESPONSE TO PARAGRAPH 99**: RF admits that it issued Cyrulnik a W-2 form, and otherwise denies the allegations in paragraph 99.

100.     Upset that Fattaruso declined to support their scheme, the Conspiring Partners then denied Fattaruso's status as an equity partner and falsified his tax forms, seeking to punish him for being honest and refusing to endorse their unethical and illegal behavior.

**RESPONSE TO PARAGRAPH 100**: RF admits that Fattaruso (Cyrulnik's current junior partner at his new firm, Cyrulnik Fattaruso LLP) was not an equity partner at the Firm, and otherwise denies the allegations in paragraph 100.

101. The Conspiring Partners then reallocated to themselves Cyrulnik's allocated expenses in connection with starting the Firm and its operations, and on information and belief, filed false tax returns with the federal and local authorities claiming deductions to which they were not entitled and mischaracterizing income received by individual partners.

**RESPONSE TO PARAGRAPH 101**: RF denies the allegations in paragraph 101.

102. The Conspiring Partners then used Cyrulnik's funds to keep the Firm afloat in the face of the mass exodus of clients and refused to remit large amounts of compensation owed to Cyrulnik for months. Then, in April 2021, Counterclaim-Defendants finally, and belatedly, sent a portion of the amounts owed but improperly withheld the rest of Cyrulnik's assets (and continue to do so to this day). In violation of the express provisions of the MOU and the controlling Florida statutes governing the partnership, the Conspiring Partners sought to obscure their misconduct by withholding from Cyrulnik basic information about the Firm's accounts and revenues in which he held substantial interests, never paying him the rest of his formula compensation or any of the equity distributions owed to him, and misappropriating the other assets given to him under the MOU, including his Tokens and his 25% interest ███████████████████████ in a $100 million jury award, with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision).

**RESPONSE TO PARAGRAPH 102**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that it provided a multimillion-dollar payment to Cyrulnik in April 2021 and obtained a $100-million jury verdict on behalf of a Firm client (in yet another case in which Cyrulnik never participated). RF otherwise denies the allegations in paragraph 102.

## COUNT 1
### (Dissolution pursuant to Florida Statutes § 620.8801)

103. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 102 herein.

**RESPONSE TO PARAGRAPH 103**: RF incorporates its responses to the corresponding paragraphs.

104. Cyrulnik seeks judicial dissolution of RCF pursuant to Florida Statutes §§ 620.8405 and 620.8801.

**RESPONSE TO PARAGRAPH 104**: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, RF admits that is what Cyrulnik seeks.

105. RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

**RESPONSE TO PARAGRAPH 105**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that the Firm is a limited liability partnership as defined by the Florida Revised Uniform Partnership Act, and otherwise denies the allegations in paragraph 105.

106. Counterclaim-Defendants breached the MOU by purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The purported "cause" cited by Counterclaim-Defendants is plainly insufficient as a matter of law, indisputably pretextual, in bad faith and based on lies and mischaracterizations of the events. Accordingly, the Conspiring Partners lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU and is ultra vires and void *ab initio*. Accordingly, Cyrulnik remains a Founding Partner and Co-Chairperson of RCF.

**RESPONSE TO PARAGRAPH 106**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 106.

107.    Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

**RESPONSE TO PARAGRAPH 107**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 107.

108.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, the economic purpose of the partnership has been unreasonably frustrated by the actions of the Conspiring Partners, and likely will continue to be unreasonably frustrated, within the meaning of Florida Statutes § 620.8801(5)(a).

**RESPONSE TO PARAGRAPH 108**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 108.

109.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Conspiring Partners, within the meaning of Florida Statutes § 620.8801(5)(b).

**RESPONSE TO PARAGRAPH 109**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 109.

110.     By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practical to carry on the activities of the limited liability partnership in conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

**RESPONSE TO PARAGRAPH 110**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 110.

111.     Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE TO PARAGRAPH 111**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 111.

112.     By reason thereof, Cyrulnik respectfully requests that this Court enter a judgment dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just and proper.

**RESPONSE TO PARAGRAPH 112**: This paragraph contains legal conclusions to which no response is required.

## COUNT 2
### (Buyout under Florida Statutes § 620.8701 in the Alternative)

113.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1

through 112 herein.

RESPONSE TO PARAGRAPH 113: RF incorporates its responses to the corresponding paragraphs.

114.  RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

RESPONSE TO PARAGRAPH 114: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that the Firm is a limited liability partnership as defined by the Florida Revised Uniform Partnership Act, and otherwise denies the allegations in paragraph 114.

115.  Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-Chairperson of RCF.

RESPONSE TO PARAGRAPH 115: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that Cyrulnik was a "Founding Partner" as that term is used in the MOU, and otherwise denies the allegations in paragraph 115.

116.  Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

RESPONSE TO PARAGRAPH 116: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 116.

117.  Should judicial dissolution be found inappropriate or inequitable, in the alternative, the Conspiring Partners' actions to expel Cyrulnik from RCF entitle him to a buyout pursuant to Florida Statutes § 620.8701.

**RESPONSE TO PARAGRAPH 117**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 117.

118.    Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE TO PARAGRAPH 118**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 118.

119.    By reason thereof, in the alternative to dissolution, Cyrulnik respectfully requests that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and proper.

**RESPONSE TO PARAGRAPH 119**: This paragraph contains legal conclusions to which no response is required.

## <u>COUNT 3</u>
### (Accounting Pursuant to Florida Statutes §§ 620.8403 and 620.1407)

120.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 119 herein.

**RESPONSE TO PARAGRAPH 120**: RF incorporates its responses to the corresponding paragraphs.

121.    The Conspiring Partners have taken control of RCF, have unlawfully excluded Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused to allow Cyrulnik any say in the operation of RCF, and have otherwise abused their status as partners of the Firm.

**RESPONSE TO PARAGRAPH 121**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that, after Cyrulnik's removal, it has not provided Cyrulnik with unfettered access to its books and records, provided him with a full accounting, or allowed him "any say" in the Firm's management. RF denies the remaining allegations in paragraph 121.

122.    An accounting of the assets, profits, and losses of RCF is necessary and appropriate at this time.

**RESPONSE TO PARAGRAPH 122**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 122.

123.    Florida Statutes § 620.8403 requires a limited liability partnership to provide its current (and former) partners access to the Firm's records that are required to be kept by all limited liability partnerships. Florida Statutes § 620.1407 affords a current (and former) partner the right to inspect and copy and "records maintained by the limited liability partnership regarding the limited partnership's activities and financial condition."

**RESPONSE TO PARAGRAPH 123**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 123, and notes that Cyrulnik has misquoted Fla. Stat. § 620.1407 by erroneously adding the word "liability."

124.    Cyrulnik has been denied access to RCF's books and records notwithstanding numerous requests for access to the Firm's financial records and accounts.

**RESPONSE TO PARAGRAPH 124**: RF admits it has not provided Cyrulnik with unfettered access to its books and records as he is not entitled to them.

125. By reason thereof, Cyrulnik demands judgment in his favor, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present; find and determine the amount due to Cyrulnik from RCF; and enter a judgment or decree in favor of Cyrulnik for his compensatory damages, prejudgment interest, cost, and such further relief as this Court deems just and proper.

**RESPONSE TO PARAGRAPH 125**: This paragraph contains legal conclusions to which no response is required.

**COUNT 4**
**(Breach of Contract)**
**(Against the Conspiring Partners)**

126. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 125 herein.

**RESPONSE TO PARAGRAPH 126**: RF incorporates its responses to the corresponding paragraphs.

127. The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE TO PARAGRAPH 127**: This paragraph contains legal conclusions to which no response is required.

128. The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE TO PARAGRAPH 128**: This paragraph contains legal conclusions to which no response is required.

129. Cyrulnik has fully performed and is ready, willing, and able to continue to perform his obligations under the MOU and the Side Letter.

**RESPONSE TO PARAGRAPH 129**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 129.

130. The Conspiring Partners breached the MOU by, among other things, purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The "cause" cited by Counterclaim-Defendants was indisputably pretextual, in bad faith, based on Counterclaim-Defendants' lies and mischaracterizations of the events, and in any case did not rise to the level of "cause" under the law. Accordingly, the Conspiring Partners did not have the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU.

**RESPONSE TO PARAGRAPH 130**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 130.

131. Even if the Conspiring Partners had "cause" to expel Cyrulnik from the Firm, the Conspiring Partners further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU, including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity. Although the MOU limits the ability of a partner who has withdrawn from the Firm to retain his equity, it does not provide any such limitation on a partner who was removed. Accordingly, by citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Conspiring Partners have breached their obligations under the MOU.

**RESPONSE TO PARAGRAPH 131**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 131.

132. Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

**RESPONSE TO PARAGRAPH 132**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 132.

133. The Conspiring Partners unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

**RESPONSE TO PARAGRAPH 133**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that the Firm changed its name, website, and letterhead to "Roche Freedman LLP" following Cyrulnik's removal and that Cyrulnik did not authorize these changes. RF notes Cyrulnik has taken the position that it would be a violation of ethics rules for the Firm to continue to operate with the name "Roche Cyrulnik Freedman LLP" in light of Cyrulnik's removal. (*See* Dkt. No. 40 at 16.) RF otherwise denies the allegations in paragraph 133.

134. Conspiring Partners Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

**RESPONSE TO PARAGRAPH 134**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies it never complied with the obligations of the MOU, but admits Roche and Freedman removed Cyrulnik's access after he was removed.

135. The Conspiring Partners also breached the MOU by not performing multiple obligations set forth therein and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE TO PARAGRAPH 135**: This paragraph contains ambiguous legal conclusions to which no response is required or possible. To the extent that a response is required, RF denies the allegations in paragraph 135.

136. The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE TO PARAGRAPH 136**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 136.

137. By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 137**: This paragraph contains legal conclusions to which no response is required.

## COUNT 5
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against the Conspiring Partners)

138.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 137 herein.

**RESPONSE TO PARAGRAPH 138**: RF incorporates its responses to the corresponding paragraphs.

139.     The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE TO PARAGRAPH 139**: This paragraph contains legal conclusions to which no response is required.

140.     The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE TO PARAGRAPH 140**: This paragraph contains legal conclusions to which no response is required.

141.     Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

**RESPONSE TO PARAGRAPH 141**: This paragraph contains legal conclusions to which no response is required.

142.     The Conspiring Partners breached this implied covenant by, among other things, taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity,

54

and by denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 142**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 142.

143. The Conspiring Partners also breached the covenant of good faith and fair dealing by not performing multiple obligations set forth therein in the MOU and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE TO PARAGRAPH 143**: This paragraph contains ambiguous legal conclusions to which no response is possible or required. To the extent that a response is required, RF denies the allegations in paragraph 143.

144. By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 144**: This paragraph contains legal conclusions to which no response is required.

**COUNT 6**
**(Breach of Fiduciary Duty)**
**(Against the Conspiring Partners)**

145. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 144 herein.

**RESPONSE TO PARAGRAPH 145**: RF incorporates its responses to the corresponding paragraphs.

146.     As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik.  These duties include the duties of care and loyalty.

**RESPONSE TO PARAGRAPH 146**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 146.

147.     The Conspiring Partners breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 147**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 147.

148.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the

Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 148**: This paragraph contains legal conclusions to which no response is required.

## COUNT 7
### (Conversion)

149.　Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 148 herein.

**RESPONSE TO PARAGRAPH 149**: RF incorporates its responses to the corresponding paragraphs.

150.　Counterclaim-Defendants knowingly and intentionally converted Cyrulnik's specific and identifiable membership interest in RCF and his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

**RESPONSE TO PARAGRAPH 150**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 150.

151.　Counterclaim-Defendants, without authority, deprived Cyrulnik of such membership interest and substantial equity interest for their own use.

**RESPONSE TO PARAGRAPH 151**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 151.

152.　Counterclaim-Defendants' deprivation of Cyrulnik's partnership and equity interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

**RESPONSE TO PARAGRAPH 152**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 152.

153.     Counterclaim-Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests.  Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

**RESPONSE TO PARAGRAPH 153**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits Cyrulnik hasn't been provided equity in RF, nor is he an equity partner of RF.

154.     As a direct and proximate result of Counterclaim-Defendants' conversion, Cyrulnik has suffered damages.

**RESPONSE TO PARAGRAPH 154**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 154.

155.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 155**: This paragraph contains legal conclusions to which no response is required.

## COUNT 8
### (Unjust Enrichment)

156.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 155 herein.

**RESPONSE TO PARAGRAPH 156**: RF incorporates its responses to the corresponding paragraphs.

157.     Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Conspiring Partners.

**RESPONSE TO PARAGRAPH 157**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that Cyrulnik originated clients to the Firm, devoted time and attention to Firm matters, and conferred benefits on the Firm, but otherwise denies the allegations in paragraph 157 and states that any benefits conferred by Cyrulnik were outweighed by the harm caused by his conduct.

158.     Counterclaim-Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik.  Indeed, Counterclaim-Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

**RESPONSE TO PARAGRAPH 158**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF admits that it knowingly and voluntarily accepted services and retained benefits from Cyrulnik, but states Cyrulnik was paid millions of dollars, *i.e.,* what he negotiated for under the MOU, in return for those benefits. RF otherwise denies the allegations in paragraph 158 and states that any benefits conferred by Cyrulnik were outweighed by the harm caused by his conduct.

159.    The circumstances are such that it would be inequitable for Counterclaim-Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

**RESPONSE TO PARAGRAPH 159**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 159.

160.    Cyrulnik is entitled to damages as a result of Counterclaim-Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Counterclaim-Defendants from Cyrulnik.

**RESPONSE TO PARAGRAPH 160**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 160.

161.    By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 161**: This paragraph contains legal conclusions to which no response is required.

### COUNT 9
### (Promissory Estoppel)
### (Against the Conspiring Partners)

162.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 161 herein.

**RESPONSE TO PARAGRAPH 162**: RF incorporates its responses to the corresponding paragraphs.

163.    The Conspiring Partners made a clear and unambiguous promise to pay Cyrulnik certain amounts and to remit to him interests in many assets – including but not limited to 25% ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of all Tokens issued by the Startup Client (which value has exceeded $400 million) and 27% of RCF's profits including from its contingency interests in various litigations – and to impart to him certain control rights, along with several other assets the parties listed.  They did so to induce Cyrulnik to give up his long-standing equity partnership and other lucrative opportunities and leverage his reputation, experience, and substantial practice to cofound RCF.

**RESPONSE TO PARAGRAPH 163**: RF refers Cyrulnik to the MOU for its content and otherwise denies the allegations in this paragraph.

164.    Conspiring Partners Roche and Freedman made a clear and unambiguous promise to pay Cyrulnik the amounts set forth in the Side Letter, including 25% of their interest in ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a $100 million jury award with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision), and an $850,000 cash payment to induce Cyrulnik to allow Roche to list his name before Cyrulnik's and proceed with co-founding the Firm as RCF.

**RESPONSE TO PARAGRAPH 164**: RF refers Cyrulnik to the Side Letter for its content and otherwise denies the allegations in this paragraph.

165.    Cyrulnik reasonably and foreseeably relied on the foregoing promises the Conspiring Partners made by, among other things, leaving his lucrative practice at BSF, foregoing the opportunity to work at various other law firms, and spending the next year servicing clients at RCF.

**RESPONSE TO PARAGRAPH 165**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 165.

166.     The Conspiring Partners caused unconscionable injury to Cyrulnik by breaking those promises, misappropriating the foregoing assets for their own benefit, and refusing to remit his assets or honor the guaranteed rights he had been promised.

**RESPONSE TO PARAGRAPH 166**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 166.

167.     The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE TO PARAGRAPH 167**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 167.

168.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 168**: This paragraph contains legal conclusions to which no response is required.

**COUNT 10**
**(Civil Conspiracy)**
**(Against the Conspiring Partners)**

169.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 168 herein.

**RESPONSE TO PARAGRAPH 169**: RF incorporates its responses to the corresponding paragraphs.

170.     The Conspiring Partners are parties to a civil conspiracy.

**RESPONSE TO PARAGRAPH 170**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 170.

171.     The Conspiring Partners conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 171**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 171.

172.     Each of the Conspiring Partners committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

**RESPONSE TO PARAGRAPH 172**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 172.

173.     As a direct and proximate result of the Conspiring Partners' civil conspiracy, Cyrulnik has suffered damages.

**RESPONSE TO PARAGRAPH 173**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, RF denies the allegations in paragraph 173.

174.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, and awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 174**: This paragraph contains legal conclusions to which no response is required.

## <u>AFFIRMATIVE DEFENSES</u>

By alleging the defenses set forth below, RF does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part. Nor does RF concede that such defenses are "affirmative defenses" under applicable law that must be pleaded to be preserved.

## FIRST DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he has failed to state a claim upon which relief may be granted. Cyrulnik's non-contract claims are fatally infirm because of the contract's existence and provisions.

## SECOND DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he lacks standing to assert any claim that requires him to be or have been a partner at the Firm. This includes, but is not necessarily limited to, Counts 1, 2, and 3.

## THIRD DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the doctrines of promissory, judicial, and equitable estoppel.

## FOURTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, under the doctrines of waiver, laches, and unclean hands.

First, to the extent that Cyrulnik had any right to Tokens payable for services provided prior to him joining the Firm (he doesn't have such a right), Cyrulnik waived his right to those Tokens by knowingly, and without objection, not claiming them.

Second, Cyrulnik waived any right to object to the ethical co-counsel arrangement discussed in his Counterclaims, because he expressly approved it. His claims based on that arrangement are likewise barred by the doctrine of laches.

Third, Cyrulnik's claims are barred by the doctrine of unclean hands because, as explained in RF's Amended Complaint, he engaged in abusive and improper conduct during the time that he worked at the Firm, which necessitated his removal.

## FIFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the doctrines of consent, acquiescence, and ratification. As stated above, Cyrulnik knowingly failed to claim Tokens earned prior to his joining the Firm and approved of the Firm's ethical co-counsel arrangements.

## SIXTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by his failure to satisfy conditions precedent, including his failure to execute the Partnership Agreement as required by the MOU and his termination for cause.

## SEVENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the faithless fiduciary or faithless servant doctrine, because Cyrulnik breached fiduciary duties to the Firm prior to and after his for-cause removal.

## EIGHTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the fact that he was not a "partner" in the Firm under applicable law, and therefore was not owed fiduciary duties and was not entitled to any of the rights reserved for partners under the law.

## NINTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by Cyrulnik's fraudulent conduct, including but not limited to, his failure to obtain engagement letters for his clients while representing to the Firm he had them.

## TENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because, as explained in RF's Amended Complaint, he materially breached the parties' agreements, such that any alleged non-

performance by RF under those agreements is excused.

## ELEVENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the Firm was precluded by applicable ethical rules from using the trade name Roche Cyrulnik Freedman LLP during the relevant time period.

## TWELFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because there are no proximately caused injuries or damages.

## THIRTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because as explained in RF's Amended Complaint, his own acts and/or omissions caused or contributed to his alleged losses.

## FOURTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by his failure to mitigate.

## FIFTEENTH DEFENSE

To the extent that Cyrulnik suffered any damages (which RF denies), any such damages must be reduced as a result of Cyrulnik's failure to take reasonable steps to mitigate damages. Upon information and belief, Cyrulnik did not seek to, for example, acquire Tokens on the open market after he was allegedly deprived of his Tokens.

## SIXTEENTH DEFENSE

To the extent that Cyrulnik is entitled to any damages (he is not), any such damages must be offset by the amount that Cyrulnik owes the Firm in connection with the claims that the Firm has asserted against Cyrulnik in its Amended Complaint and otherwise.

<u>RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES AND RIGHTS</u>

RF gives notice that it intends to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserves its right to amend this Answer to assert any such defenses.


Dated:  April 1, 2022


By: */s/ Sean Hecker*                  */s/ Eric Rosen*
Sean Hecker                                    Eric Rosen
KAPLAN HECKER & FINK LLP         ROCHE FREEDMAN LLP
350 Fifth Avenue, Suite 110           99 Park Avenue, 19th Floor
New York, New York 10118            New York, NY 10016
Tel: (212) 763-0883                       Tel.: (646) 350-0527
Email: shecker@kaplanhecker.com   Email: erosen@rochefreedman.com

*Attorneys for Plaintiff and Counterclaim-Defendants*

# EXHIBIT 12

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## AMENDED FINAL JUDGMENT

**THIS CAUSE** is before the Court following entry of the Final Judgment, ECF No. [814], and Order on Motion to Amend Final Judgment, ECF No. [888] ("Order"). Pursuant to Rule 58, and for the reasons set forth in the Court's Order, it is **ORDERED AND ADJUDGED** as follows:

1. Judgment is entered in favor of Plaintiff W&K Info Defense Research, LLC, as to its claim against Defendant Craig Wright for Conversion in the amount of $100,000,000.00, for which sum let execution issue.

2. Consistent with the Court's Order, ECF No. [888], prejudgment interest shall be awarded in the amount of **$43,132,492.48** pursuant to Florida Statute § 55.03.

3. The Court reserves jurisdiction to award attorneys' fees and costs.

4. Post-judgment interest shall accrue on this Judgment pursuant to 28 U.S.C. § 1961.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 9, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and
W&K INFO DEFENSE RESEARCH, LLC

   *Plaintiffs,*

v.

CRAIG WRIGHT

   *Defendant.*

CASE NO.: 9:18-cv-80176-BB

## NOTICE OF APPEAL

  Notice is given that Plaintiff Ira Kleiman, as personal representative of the Estate of David

Kleiman, appeals to the United States Court of Appeals for the Eleventh Circuit from the Amended

Final Judgment entered March 9, 2022 (Dkt. No. 889), and all antecedent orders, including but not

limited to the Order on Motion for New Trial dated February 28, 2022. (Dkt. No. 887.)

Dated: April 8, 2022

Respectfully submitted,

By: */s/ Devin (Velvel) Freedman*
Velvel (Devin) Freedman
**ROCHE FREEDMAN LLP**
One SE 3rd Avenue, Suite 1240
Miami, Florida 33131
vel@rochefreedman.com

Kyle W. Roche
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, New York 10016
kyle@rochefreedman.com

Andrew S. Brenner
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Maxwell V. Pritt
Alexander J. Holtzman
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, Floor 41
San Francisco, CA 94104
mpritt@bsfllp.com
aholtzman@bsfllp.com


*Counsel to Plaintiff Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 8, 2022 a true and correct copy of the foregoing was filed with CM/ECF, which caused a copy to be served on all counsel of record.

*/s/ Devin (Velvel) Freedman*
Devin (Velvel) Freedman

# EXHIBIT 14

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Case No. 22-11150-GG
L.T. Case No. 9:18-cv-80176-BB

---

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,
*plaintiff-appellant*,

v.

CRAIG WRIGHT,
*defendant-appellee*.

---

## **MOTION TO DISQUALIFY ROCHE FREEDMAN LLP**

---

Andrés Rivero
Alan H. Rolnick
Robert J. Kuntz, Jr.
RIVERO MESTRE LLP
2525 Ponce de León Blvd.,
Suite 1000
Miami, FL 33134
Tel: (305) 445-2500
Fax: (305) 445-2505
E-mail: arivero@riveromestre.com
Counsel for appellee

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and

Eleventh Circuit Rule 26.1, Appellee Dr. Craig Wright ("Dr. Wright"), respectfully

submits the following Certificate of Interested Persons[1] and Corporate Disclosure

Statement:

1. The Honorable Judge Beth Bloom, *U.S. District Judge*

2. Boies Schiller Flexner LLP, *Counsel for Plaintiff-Appellant*

3. Brenner, Andrew, *Counsel for Plaintiff-Appellant*

4. BTCN 1610-491 LLC (CE)

5. Delich, Joseph, *Counsel for Plaintiff-Appellant*

6. Devine Goodman & Rasco, LLP, *Counsel for non-party Andrew O'Hagan*

7. Economides, Constantine Philip *Counsel for Plaintiff-Appellant*

8. Estate of David Kleiman, *Plaintiff-Appellant*

9. Fernandez, Amanda Lara, *Counsel for Defendant-Appellee*

10. Fernandez, Michael Alexander*, Counsel for Defendant-Appellee*

11. Freedman, Velvel, *Counsel for Plaintiff-Appellant*

12. Glaser, Patricia, *Counsel for non-party John Doe*

13. Glaser Weil Fink Howard Avchen & Shapiro LLP, *Counsel for nonparty*

---

[1] Based on the facts set forth in this motion, Ava Labs and Emin Gun Sirer appear
to be interested persons.

*John Doe*

14. Harrison, Laselve, *Counsel for Plaintiff-Appellant*

15. Henry, Allison, *Counsel for Defendant-Appellee*

16. *Holtzman, Alexander, *Counsel for Plaintiff-Appellant*

17. Kass, Zalman, *Counsel for Defendant-Appellee*

18. Kleiman, Ira, *Plaintiff-Appellant*

19. Kuntz, Robert, *Counsel for Defendant-Appellee*

20. Lagos, Stephen, *Counsel for Plaintiff-Appellant*

21. Licata, Samantha, *Counsel for Plaintiff-Appellant*

22. *Lohr, Whitney, *Counsel for Defendant-Appellee*

23. *Markoe, Zaharah*, Counsel for Defendant-Appellee*

24. McGovern, Amanda *Counsel for Defendant-Appellee*

25. Mestre, Jorge, *Counsel for Defendant-Appellee*

26. Payne, Darrell Winston, *Counsel for non-party John Doe*

27. Pritt, Maxwell, *Counsel for Plaintiff-Appellant*

28. Rasco, Guy Austin, *Counsel for non-party Andrew O'Hagan*

29. The Honorable Judge Bruce Reinhart, *U.S. District Magistrate Judge*

30. Rivero, Andres, *Counsel for Defendant-Appellee*

31. Rivero Mestre LLP, *Counsel for Defendant-Appellee*

32. Roche Freedman LLP, *Counsel for Plaintiff-Appellant*

33. Roche, Kyle, *Counsel for Plaintiff-Appellant*

34. Rolnick, Alan, *Counsel for Defendant-Appellee*

35. Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., *Counsel for non-party John Doe*

36. Wright, Craig, *Defendant-Appellee*

37. Zack, Stephen, *Counsel for Plaintiff-Appellant*

\* = no longer involved in representation

Appellee certifies that no other judges, attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal.

## <u>MOTION TO DISQUALIFY ROCHE FREEDMAN LLP</u>

In a shocking series of extraordinary, recorded statements, opposing counsel Kyle W. Roche, of Roche Freedman LLP ("the Firm"), has confessed to misusing the legal system for the purpose of unlawfully advancing the commercial interests of AVA Labs ("Ava"), by suing Ava's competitors and notables in the cryptocurrency industry.

Roche recently confessed on camera to bringing fraudulent, purported class actions in the names of investors he referred to as "idiots." Roche admitted that his business plan is never to settle a case, irrespective of his purported clients' interests, and instead to take all cases to trial, where they will be decided by juries he also referred to as "idiots." He admitted that he does this to harm Ava's competitors and enforce the personal vendettas of Emin Gun Sirer ("Gun")—its CEO—and to keep regulators from investigating Ava, by keeping the SEC and CFTC busy investigating Ava's competitors (but not Ava) for, among other things, selling unregistered securities.

On camera, Roche admits at length to a serious conflict of interest, undisclosed principals, a course of conduct that is unlawful on its face, and a fraud on the court in every case in which his firm has appeared, including this one. He admits that he not only brings cases for manifestly improper purposes and ignores the interests of his purported clients to further his and Ava's undisclosed interests,

but also leverages the litigation process to learn (and misuse) for Ava's benefit the confidential information and trade secrets of those he sues. He admits that he does all this for the express purpose of advancing the interests of the Firm and his benefactor Ava, to enforce personal vendettas of Ava's Gun, as well as "for sport."

In the days since Roche's on-camera statements were posted by a cryptocurrency whistleblower site ("Crypto Leaks"), Ava Labs proclaimed its innocence, Roche claimed he was drunk and taken out of context when (apparently on separate occasions) he made these damning admissions, ***which he does not deny***, and attempted to personally withdraw as counsel from his fraudulent class actions, where his Firm now faces motions to disqualify.[2] His admissions of wrongdoing demonstrate the Firm's unlawful "business plan" and its ongoing efforts to subvert the fair administration of justice, which heap scorn and disrepute upon the legal profession and every court (including this one) in which the Firm has appeared. Mr. Roche and his Firm should be dismissed from further

---

[2] On August 31, 2022, one group of defendants in *In re Tether and Bitfinex Crypto Asset Litig.,* 1:19-cv-1936 (S.D.N.Y), moved to disqualify Roche Freedman. *See* Debevoise & Plimpton letter, attached as part of Composite Exhibit A. On September 1, 2022, a second group of defendants in that case moved for disqualification. *See id.* On September 2, 2022, Roche Freedman opposed disqualification. *See id.* Also on September 2, 2022, the first group of defendants replied in support of disqualification. *See id.* On September 2, 2022, Roche Freedman's co-counsel moved to terminate Roche Freedman as putative class counsel, noting that Roche Freedman had refused their request to withdraw. *See id.*

representation in this matter.[3] Dr. Wright has standing to bring this motion,[4] which should be granted in the interests of justice.

## I.   **ARGUMENT**

On Saturday, August 27, 2021, extraordinary video recordings of appellant's counsel, Kyle Roche, were released on the internet. On camera, Roche expressly admitted to conduct that violates his fundamental obligations as a lawyer. His statements amount to admissions of his and his firm's conflicts of interest under Rule 1.7 of the New York Rules of Professional Conduct.[5] On camera, Roche admitted to bringing purported class actions in the names of purported class

---

[3] Appellant Ira Kleiman, as personal representative of the Estate of David Kleiman, also is represented by attorneys from the well-respected firm of Boies, Schiller, et al. Removing Roche Freedman will not prejudice appellant or delay this appeal.

[4] *E.g., Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977) ("[A]ppellant has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations committed in the case."). Decisions of the former Fifth Circuit rendered prior to October 1, 1981, such as *Brown*, are binding in this Court. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[5] Copy attached as part of Composite Exhibit B. This Court applies the professional conduct rules of the state where a lawyer is licensed, to the extent they do not conflict with the Model Rules. Rule 1.A., 11th Cir. R. Addendum Eight (Rules Governing Attorney Discipline in the U.S. Court of Appeals for the Eleventh Circuit). Roche is licensed in New York (Bar No. 5517776), and appeared pro hac vice below. New York's version of Rule 1.7 does not conflict with Model Rule 1.7. *Compare* N.Y. RULES OF PROF'L CONDUCT R. 1.7 (Ex. B), *with* MODEL RULES OF PROF'L CONDUCT R. 1.7 (also attached as part of Composite Exhibit B).

representatives, but actually acting on behalf of Ava, an undisclosed interested party, and bragged about having an enormously valuable financial stake in Ava. He also admitted that he files lawsuits to advance the financial interests, enforce the vendettas, and for the entertainment, of his undisclosed benefactor and principal, Gun, Ava's CEO, as well as "for sport." In sum, on camera, Roche admitted to motives and conduct that plainly violate his fundamental obligation as a lawyer to not put his own interests before those of his clients.[6]

In the days since the recordings were posted: (1) Ava Labs released a statement claiming it would never "engage in the unlawful, unethical and just plain wrong behavior claimed in these self-serving videos . . . ," Emin Gün Sirer, *My Statement about the Crypto Leaks lies*, MEDIUM (Aug. 29, 2022), https://el33th 4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752; (2) Roche publicly confirmed that the recordings are genuine, claiming he was "exploit[ed] using leading questions," and his statements were taken "out of context," Kyle Roche, *My Response*, MEDIUM (Aug. 29, 2022), https://medium. com/@kyleroche/my-response-b691563c255b; (3) Roche filed motions to personally withdraw from two of his firm's class actions against Ava's

---

[6] Because "there is a significant risk that [Roche's] professional judgment on behalf of a client will be adversely affected by [his] own financial, business, property or other personal interests," he has an express conflict of interest under New York Rule 1.7(a)(2).

competitors; and (4) at least two of those competitors moved to disqualify him and his Firm in the *Tether* case. *See* Composite Exhibit A.

In his Motion to Withdraw from the *Tether* case, Roche stated that he "is no longer involved in [Roche Freedman's] class action practice." *See* Roche's Motion to Withdraw in *In re Tether,* 1:19-cv-1936 (S.D.N.Y) (D.E. 229 at 1), attached  as part of Composite Exhibit A. Because Roche is a founder of Roche Freedman and his firm's practice concentrates on plaintiffs' class actions, this drastic step undermines his claim that the recordings misrepresented "the context" of his statements, and both underscores and heightens the disqualifying nature of those statements. Two *In re Tether* defendants have moved to disqualify Roche and the Firm. *See* Comp. Ex. A. Other such motions in other cases surely will follow.

Because Kyle Roche's own statements, now widely distributed on the internet by many outlets, are open and notorious, demonstrate a serious conflict of interest that calls into question the fair administration of justice in this matter, Dr. Wright and his counsel are compelled to seek the disqualification of Roche and Roche Freedman LLP.

## A.    THE FACTS

In 25 video clips released on August 27, 2022, Kyle Roche discloses and describes his Firm's close, improper, and previously undisclosed ties to Ava and its CEO, Gun. Roche says he founded the Firm the same day that Ava launched, on

August 21, 2019, sharing the same co-working space. Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 1) (Aug. 26, 2022), https://d33wubrfki0l68.cloud front.net/1a432cb907f50390478d5c7b5c2c30c24547d110/5ca00/videos/c3-00-office-ava-labs-launch.mp4. Roche says he was the third shareholder in Ava (after its founders, Gun and COO Kevin Sekniqi). Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 2) (Aug. 26, 2022), https://d33wubrfki0l68. cloudfront.net/ba470e47132c5cb938f344be9ffd8261adc0eca2/6c3ea/videos/c3-01-office-deal-for-perc-token-supply.mp4.

On camera, Roche says he owns 1% of Ava Labs tokens and shares, which are worth tens, if not hundreds, of millions of dollars.[7] Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 3) (Aug. 26, 2022), https://d33wubrfki0l68.cloud front.net/96d2fbedbfb4ac619f2656ce923aa707cfca9cbe/3d59f/videos/c3-02-office-i-got-1-point-on-both.mp4. He admits his personal bias to favor Ava, and states that he has "the same interest, same goals" as Gun and Sekniqi, whom he "trust[s]

---

[7] The market capitalization of AVAX tokens currently is $5.7 billion and has been as high as $30 billion in the past year. Avalanche Price (AVAX/USD) | Today's Price, TIME https://time.com/nextadvisor/investing/cryptocurrency/price/avalanche-avax/.

like brothers." Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 5) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/61dabcad45d46c6207e4acded4ab 34a49a0aa163/fc7a7/videos/c3-04-office-same-interests-same-goals.mp4.

> KR: Obviously, I'm biased. I have an interest in Ava Labs and I . . .
> Q: You have a stake in Ava Labs?
> KR: Yes.
> Q: How big?
> KR: I can't . . .  A big one. I did very well.

Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 3) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/96d2fbedbfb4ac619f2656ce923aa707cfca9c be/3d59f/videos/c3-02-office-i-got-1-point-on-both.mp4. Roche says he now lives with Sekniqi in Miami for tax purposes. Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 7) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/ 789531f0f9b4b55626c52801967703b1968bca18/b171a/videos/c3-06-office-i-live-with-kevin-in-miami.mp4.

### 1.       The Firm Sues Ava's Competitors Using Straw Plaintiffs

Roche said he uses litigation as a "strategic instrument to support" Ava. Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 6) (Aug. 26, 2022),

https://d33wubrfki0l68.cloudfront.net/a799bb8bcde3170c313e3ad7662a41148621

c4d1/2fbf3/videos/c3-05-office-litigation-is-a-strategic-instrument.mp4. He

expressly admits that he sued Ava Labs' competitors, including Solana and

Dfinity, without naming Ava Labs as a plaintiff, using purported class

representatives to conceal his undisclosed principals, who, along with himself, are

real parties in interest in these actions:

> Q: Has Ava Labs filed a complaint against one of their
> competitors?
> KR: **No, they have me to do that on behalf of the class Their
> name was never** . . .
> X: Explain.
> KR: **So, I can sue Solana** . . .
> X: Yeah.
> KR: **but a plaintiff will purchase Solana**.
> X: And what about Dfinity?
> KR: Oh yeah.

Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil*

*Conspiracy with Bought Law Firm, Roche Freedman* (video 19) (Aug. 26, 2022),

https://d33wubrfki0l68.cloudfront.net/b4a2e7900f289e01ce2b25dfa5a254850a224

96d/e7035/videos/c3-17-i-can-sue-solana.mp4 (emphasis added); Cryptoleaks, *Ava*

*Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought*

*Law Firm, Roche Freedman* (video 17) (Aug. 26, 2022), https://d33wubrfki0l68.

cloudfront.net/b660cb79f51a071ece800cda7fc3521e5e21a59d/0467e/videos/c3-

16-0-dfinity-is-a-competitor-to-avalanche.mp4 (Dfinity also is a competitor of

Ava).

## 2.      The Firm Uses Other Improper Tactics to Benefit Ava

On camera, Roche brags about harassing "Emre Crypto,"[8] a Turkish "top competitor" of Gun and AVA, causing him to be "tagged" coming into the United States and recording that service of process, which Roche says Gun "enjoys" watching "once a month." Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 14) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/ccce812b0d07fc6c1bb9928 d1a7a99db011ed1af/13125/videos/c3-13-gun-watches-video-once-a-month.mp4. He also boasts that **"I took down one of Gun's biggest arch-nemeses. The guy who claimed to be Satoshi, Craig Wright."** Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 15) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/54 bcd83ef86e546fa4f97c2e481fba064e228c8d/483a3/videos/c3-14-gun-goes-after-craig-wright.mp4 (emphasis added).

On camera, Roche further admits that the Firm has developed and executed a strategic plan to feed tips against Ava's competitors to regulatory authorities in such volume that the regulators are drawn away from scrutinizing Ava's activities.

---

[8] In the videos, Roche refers to him as "Emre Crypto." His actual name is Emre Aksoy, and he goes by the assumed name of "Kripto Emre." *See* Roche Freedman's press release about serving him at Miami Int'l Airport: https://www. rochefreedman.com/crypto-thought-leader-cant-duck-ceos-defamation-claims/

Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 10) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/1edf92baa6d2ec8203a8568c7869ef5e4b326 a71/428f7/videos/c3-09-magnets-for-sec-and-competitive-attacks.mp4 ("KR: yes, yeah, I deal with making sure that the SEC has . . . the SEC and the CFTC have other magnets to go after. . . ."); Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 11) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/91987bc2f582f 24ecb688ab4c137a485d139dfe1/b4646/videos/c3-10-office-theres-no-such-thing-as-regulation.mp4 (". . . . since [Gun] signed me up, I've ensured that there's no such thing as regulation for what they want to do.").

### 3.    Roche Elevates His Personal Interests Above His Clients' Interests

On camera, Roche brazenly states that "I'm a crazy motherf*cker and I have resources and I will take you to the end [in a lawsuit]." Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 18) (Aug. 26, 2022), https://d33wubrfki0l68.cloud front.net/2f1313a474fff7dedbb5432d16e848725ce51e04/4f9ab/videos/c3-16-im-a-crazy-motherfucker.mp4. He says "that is power and that is what I think is a tool that has not been unlocked by very many . . . ." *Id.* He also says that because of his personal stake in Ava, "I have to ability to say 'look it's not about the money

- 13 -

anymore for me it's about taking you guys to trial and **the sport of it**.'"
Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil
Conspiracy with Bought Law Firm, Roche Freedman* (video 19) (Aug. 26, 2022),
https://d33wubrfki0l68.cloudfront.net/b4a2e7900f289e01ce2b25dfa5a254850a224
96d/e7035/videos/c3-17-i-can-sue-solana.mp4 (emphasis added).

Roche says he does not "think there's any reason to settle for less than half a
billion to a billion but . . . if we get $100 million settlement we are in the front
page of all the legal press and so it's good for me and my partners and my firm."
Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil
Conspiracy with Bought Law Firm, Roche Freedman* (video 23) (Aug. 26, 2022),
https://d33wubrfki0l68.cloudfront.net/6ab1d54cf47b4b43a28ec4d52d2a12be5078b
5d7/8826b/videos/c3-21-no-reason-to-settle-less-than-500m.mp4. Completely
absent from Roche's explanation of his approach to litigation is any consideration
of his clients' interests or their right to decide to settle or not settle.

### 4.    Roche Demonstrates Utter Contempt for the Administration of Justice

By his own admission, Roche operates without respect for his role as an
attorney or his duties as an officer of the Court. Discussing jury trials like the one
in the case that spawned this appeal, he says "what you do is, metaphorically, you
pull down your pants and you tell your jury, 'here is my c*ck, now you talk . . .
pull down your pants a little bit . . . .'" Cryptoleaks, *Ava Labs (Avalanche) Attacks*

*Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman*

(video 21) (Aug. 26, 2022), https://d33wubrfki0l68.cloudfront.net/251c0d83886

aba0804637ca9f8819e12adb26238/ab979/videos/c3-19-show-me-your-cock.mp4.

Of the jury, Roche derisively states "that 10 idiots control the flow of all the

money that happens in American class actions." Cryptoleaks, *Ava Labs*

*(Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law*

*Firm, Roche Freedman* (video 22) (Aug. 26, 2022), https://d33wubrfki0l68.cloud

front.net/f580f15300ae3305352a21a810a4cbce4b1247a7/73e42/videos/c3-20-ten-

idiots-control-the-flow.mp4. About putative class members, as to whom he is a

fiduciary, he says that "I go to the Court, and I say, hey 'I got $100 million for

these 100,000 idiots out here. Give me . . . give me $30 million and I will

administer . . . .'" Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC*

*in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 24) (Aug. 26,

2022), https://d33wubrfki0l68.cloudfront.net/ca154b2403c4f503206afd0666cf46

94c23c8dd3/de306/videos/c3-22-these-100000-idiots.mp4.

## B.   THE LAW

On camera, Roche repeatedly emphasized that his personal interests come

before his clients, which violates New York Rule of Professional Conduct

1.7(a)(2), prohibiting representation of a client when "there is a significant risk that

the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."[9]

When Roche says he will not settle any case and insists on going to trial to extract a larger settlement, or settles because of publicity for the Firm, he admits to expressly putting his interests ahead of those of his clients. The plain import of his claim that his newfound wealth frees him from the constraints on plaintiffs' lawyers is that his wealth allows him to disregard his clients' interests in the settlement process. Indeed, in this case, after multiple mediations, settlement offers were made, which Roche and his Firm made public by breaching mediation confidentiality rules, then rejected. This perfectly conforms to Roche's admissions of the unlawful motives and methods by which the Firm does its business.

On camera, Roche states directly and unequivocally that he sues Ava's competitors (at its behest) in the names of straw plaintiffs and does so by filing class actions. This is, at a minimum, Rule 404(b) evidence that Roche is engaged in a pattern and practice of secretly representing Ava's and Gun's interests by

---

[9] The New York Rules of Professional Conduct apply to Roche in this Court, unless and to the extent they conflict with the Model Rules. *See supra,* note 4. Both Model Rule 1.7(a)(2) and New York Rule 1.7(a)(2) compel the conclusion that Roche's elevation of Ava's interests over those of his purported clients is a conflict of interest. Further, the New York Rule expands on (but does not conflict with) the Model Rule in declaring a conflict of interest where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person *or by a personal interest of the lawyer.*" *See* Comp. Ex. B (emphasis added).

using straw plaintiffs to conceal the real parties in interest. After Roche's on-camera admissions, there is a sound basis for concluding that in attempting to "take down" Gun's arch-nemesis, Dr. Craig Wright, Roche has been acting for the benefit of Ava and Gun, who were undisclosed interested parties. Roche's admitted conduct as to "Emre Crypto," discussed above in Section 1.A.2, demonstrates an abuse of process akin to what appears to have happened here.

On camera, Roche admitted to other improper conduct in furtherance of Ava's interests, including sharing with Ava the discovery obtained in the Firm's class actions against Ava's competitors (surely in violation of confidentiality orders), distracting regulators from Ava by feeding them incriminating information about Ava's competitors, and, as noted, harassing Gun's "nemeses"—such as videotaping service of process on "Emre Crypto," Gun's principal Turkish competitor—for Gun's viewing pleasure. Roche's discussion of Dr. Wright (Cryptoleaks, *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman* (video 15) (Aug. 26, 2022), [https://d33wubrfki0l68.cloudfront.net/54bcd83ef86e546fa4f97c2e481fba064e228c8d/483a3/videos/c3-14-gun-goes-after-craig-wright.mp4](https://d33wubrfki0l68.cloudfront.net/54bcd83ef86e546fa4f97c2e481fba064e228c8d/483a3/videos/c3-14-gun-goes-after-craig-wright.mp4)), strongly suggests that this action was motivated by Gun's rivalry with Dr. Wright.

In addition to demonstrating fundamental conflicts that Rule 1.7 prohibits, Roche's admitted, serial misconduct flouts and fundamentally offends the core

responsibilities imposed on every lawyer to uphold the dignity of the courts, and to treat litigants and other counsel forthrightly and with respect. New York Rule 8.4 (like the corresponding Model Rule) embodies these obligations, which Roche has, through his statements, expressly abjured.

Both New York's Rule 8.4(c) (attached as part of Comp. Ex. B), and Model Rule 8.4(c) bar attorneys from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." Roche has now confessed to bringing pretextual lawsuits, for improper purposes, on behalf of undisclosed shadow clients. Both New York's Rule 8.4(d) and Model Rule 8.4(d) prohibit "conduct that is prejudicial to the administration of justice." But Roche—in a shameful display that inherently prejudices the administration of justice in any court where he appears— has publicly denounced his purported clients and all jurors as "idiots," declared himself "crazy," and denigrated the entire jury-trial and class-action system as nothing more than a cynical competitive tool.

The Court has the absolute authority to decide which attorneys may practice before it. *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1990) (A federal court's inherent power includes the authority to "control admission to its bar and to discipline attorneys who appear before it."); *In re Herman*, 632 F. App'x 580, 584 (11th Cir. 2015) (The court did not abuse its discretion in suspending an attorney from practicing before it where good cause was shown.); *Brown & Williamson*

*Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977) (Opposing party "has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations committed in the case."); *accord Greene v. Greene*, 47 N.Y.2d 447, 451-453 (1979) (applying New York law); *In re Liberty Music & Video, Inc.*, 54 B.R. 799, 803-805 (Bankr. S.D.N.Y. 1985) (same). Here, the continued presence of Roche and the Firm in this matter would be an ongoing affront and insult to the Court, to the judges and lawyers who labor there, and to the litigants who come before it seeking a dignified process aimed at justice.

Lastly, Roche's misconduct must be imputed to the Firm. New York Rule 1.10 (attached as part of Comp. Ex. B), states that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9 . . . ." Model Rule 1.10 is identical but does not reference Rule 1.8 (not relevant here).

Roche directs the affairs of the boutique Firm that bears his name, which lists 24 lawyers on its website as of this writing. He "lead[s] the Roche Freedman team appointed as lead counsel in over 15 class actions" and "build[s its] legal strategies." *See* https://www.rochefreedman.com/attorneys/kyle-roche/, last visited Sept. 5, 2022. Roche ran the case below in the unlawful manner he admitted to Crypto Leaks, which included improperly disclosing a settlement offer to get

- 19 -

publicity for the Firm, then rejecting it to go to trial, irrespective of his named clients' interests. His conflicts of interest are properly imputed to the Firm.

Disqualification of Kyle Roche and the Firm will not leave appellant without adequate representation. Andrew Brenner of Boies, Schiller is a highly capable lawyer who has been co-counsel to the Firm throughout this case, and the Firm's client will suffer no harm whatsoever from the fully warranted removal of the Firm from any further role in this matter.

## II.   **CONCLUSION**

For all these good and sufficient reasons, the Court should disqualify and remove Kyle Roche and Roche Freedman LLP from any further involvement in this matter and should order such other and further relief as is warranted.


Date: September 6, 2022.                     Respectfully submitted,


                                             By: s/ Andrés Rivero
                                             ANDRÉS RIVERO
                                             Florida Bar No. 613819
                                             ALAN H. ROLNICK
                                             Florida Bar No. 715085
                                             ROBERT J. KUNTZ, JR.
                                             Florida Bar No. 94668

                                             **RIVERO MESTRE LLP**
                                             2525 Ponce de Leon Boulevard,
                                             Suite 1000
                                             Miami, Florida 33134
                                             Telephone: (305) 445-2500

- 20 -

Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: arolnick@riveromestre.com
Email: rkuntz@riveromestre.com
Email:receptionist@riveromestre.com

## **CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 3,742 words. This motion also complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word Office Version 2013 and 14-point Times New Roman type style.

/s/ Andrés Rivero

## **CERTIFICATE OF SERVICE**

I CERTIFY that on September 6, 2022, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Andrés Rivero

- 21 -

# Composite Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID LEIBOWITZ, BENJAMIN LEIBOWITZ, JASON LEIBOWITZ, AARON LEIBOWITZ, and PINCHAS GOLDSHTEIN,<br><br>    Plaintiffs,<br><br>v.<br><br>IFINEX INC., BFXNA INC., BFXWW INC., TETHER HOLDINGS LIMITED, TETHER OPERATIONS LIMITED, TETHER LIMITED, TETHER INTERNATIONAL LIMITED, DIGFINEX INC., PHILIP G. POTTER, GIANCARLO DEVASINI, LUDOVICUS JAN VAN DER VELDE, REGINALD FOWLER, CRYPTO CAPITAL CORP., and GLOBAL TRADE SOLUTIONS AG,<br><br>    Defendants. | CASE NO. 1:19-cv-09236-KPF |

## NOTICE OF MOTION TO WITHDRAW AS COUNSEL

PLEASE TAKE NOTICE that Kyle W. Roche, Esq. of Roche Freedman, LLP ("RF") respectfully moves the Court pursuant to Local Rule 1.4 to withdraw as one of the attorneys for the Proposed Class. Mr. Roche is no longer involved in RF's class action practice. Accordingly, pursuant to Local Rule 1.4, Mr. Roche respectfully requests to no longer receive docketing notifications *via* the ECF system. Mr. Roche also asks that the Court approve this withdrawal.

DATED: August 31, 2022                    Respectfully Submitted,


                                          **ROCHE FREEDMAN LLP**


                                          */s/ Kyle W. Roche*
                                          Kyle W. Roche
                                          99 Park Avenue, 19th Floor
                                          New York, NY 10016

kyle@rochefreedman.com

*Interim Lead Counsel and Attorneys for Plaintiffs and the Proposed Class*

SO ORDERED this _____ day of _____, 2022.

_____

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on August 31, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

_/s/ Kyle W. Roche_____
Kyle W. Roche

**Debevoise
& Plimpton**

**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

August 31, 2022

BY ECF AND EMAIL

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

*Re:  In re Tether and Bitfinex Crypto Asset Litigation*, No. 19 Civ. 9236 (S.D.N.Y.)

Dear Judge Failla:

We represent the B/T Defendants in the above-referenced matter and write in response to
Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney.  (Dkt No. 229.)  Mr. Roche's
motion comes immediately following the public disclosure of a series of videos of Mr. Roche
suggesting that he and his law firm are misusing the litigation process.  Mr. Roche apparently
has an enormous stake in a crypto company called Ava Labs, Inc., files class action lawsuits
against companies in the crypto space for the purpose of harming competitors of Ava Labs, and
uses market intelligence gathered through the discovery process for the benefit of Ava Labs.
The videos also show Mr. Roche making several disparaging remarks about juries, class
members, and the class-action process in the United States.[1]

Mr. Roche's statements raise grave concerns for the B/T Defendants regarding the motivations
behind filing this lawsuit, the purpose for which certain discovery has been sought, and whether
the highly sensitive, confidential information the B/T Defendants have provided is being
misused.  That Mr. Roche, who initially claimed that his comments were taken out of context,
has now announced that he "is no longer involved" in his firm's class action practice further
heightens those concerns.

The B/T Defendants' concerns are not addressed by Mr. Roche's individual withdrawal as
counsel of record in this matter.  Accordingly, the B/T Defendants respectfully request that
Mr. Roche's firm, Roche Freedman LLP, be terminated as counsel in this case, and that
Mr. Roche and Roche Freedman LLP certify to this Court that they (*i*) have returned or
destroyed all documents and information produced by Defendants in this lawsuit and (*ii*) have
not shared any such documents or information with Ava Labs or any other third party.

---

[1]  *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law
Firm, Roche Freedman*, CRYPTO LEAKS (Aug. 26, 2022), available at
https://cryptoleaks.info/case-no-3 [https://perma.cc/N433-63SC].

The Honorable Katherine Polk Failla          2          August 31, 2022

## I.    The Kyle Roche Video.

Mr. Roche's withdrawal motion comes on the heels of a high profile investigative exposé published by the Crypto Leaks website on August 26, 2022 that includes a series of video clips in which Mr. Roche, a founding partner of the Roche Freedman firm, makes a number of highly disturbing comments about his significant financial interest in Ava Labs and his misuse of class action litigation.  Among other things, Mr. Roche states that:

- He personally owns approximately 1% of the Avalanche tokens ("AVAX") issued by Ava Labs, as well as 1% of the equity in Ava Labs.   (That interest is worth tens of millions, if not hundreds of millions of dollars:  the market capitalization of AVAX tokens is currently $5.7 billion and has been as high as $30 billion in the past year.)

- He uses litigation as "a strategic instrument to support Ava Labs," which he states is "a completely different way than being a lawyer."   Litigation, according to Mr. Roche, is "a fantastic tool to competition."

- Ava Labs does not file complaints against its competitors, but instead "they have me do that on behalf of the class."

- By filing lawsuits against competitors of Ava Labs, Mr. Roche "deal[s] with making sure that . . . the SEC and the CFTC have other magnets to go after," thereby protecting Ava Labs from regulatory scrutiny.

Mr. Roche's statements also give rise to a serious concern that he may be abusing the discovery process and misusing information that he learns through litigation.  He states that he is Ava Lab's "crypto expert" because he "*sue[s] half the companies in the space*" and "know[s] where this market is going" because he has "*seen the insides of every single crypto company*."   These concerns resonate strongly in this case, where Plaintiffs have served a number of document requests seeking information that has no apparent link to the claims and defenses in this lawsuit.  For example, Plaintiffs have sought documents related to numerous entities and individuals with whom the B/T Defendants have business relations, as well as all documents related to the B/T Defendants' investments in other crypto companies, their efforts to raise equity and to obtain loans, and a wide array of financial information unrelated to the issues raised by Plaintiffs' complaint.

More broadly, Mr. Roche disparages the putative class members whom he seeks to represent – and to whom he and his firm owe a fiduciary duty – as "100,000 idiots out there" and dismissively refers to juries as "10 idiots" who "control the flow of all the money that happens in American class actions."

The Honorable Katherine Polk Failla                3                August 31, 2022

Mr. Roche has publicly confirmed that the recordings are genuine.  He claims that he was "exploit[ed]" using "leading questions," and that his statements were taken out of context.[2]

## II.  Mr. Roche's Motion to Withdraw Does Not Adequately Address the Concerns Raised by the Kyle Roche Video.

In his Motion to Withdraw, Mr. Roche states that he "is no longer involved in [Roche Freedman's] class action practice."  (Dkt. No. 229 at 1.)  That is an extraordinary statement given that Mr. Roche is a founder of Roche Freedman LLP and the "class action practice" represents the vast majority of his firm's work.  Such a drastic step is inconsistent with Mr. Roche's suggestion that his videotaped statements were taken out of context, and it validates the serious concerns caused by those statements.  Indeed, it heightens those concerns.

The individual withdrawal of Mr. Roche, however, does little if anything to address the serious issues regarding the potential misuse of discovery and class action lawsuits generally.  Even if he is no longer counsel of record, he would still have access to discovery materials, would retain the ability to direct the conduct of other lawyers at his firm, and would profit from any potential recovery in this lawsuit.  Moreover, any conflict of interest impacting Mr. Roche is imputed to his entire firm.  And, in fact, it appears that other lawyers at Roche Freedman who have entered appearances in this litigation – including Devin "Vevel" Freedman, Amos Friedland, and Edward Normand – may also own substantial amounts of AVAX tokens and have similar involvement with Ava Labs.[3]

Accordingly, the B/T Defendants respectfully request that, in response to Mr. Roche's motion to withdraw, the Court order that the entire firm of Roche Freedman LLP be terminated as counsel in this case.  Such a removal would not prejudice Plaintiffs, as they would remain represented by two other large and experienced firms:  Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP.

In order to protect the highly sensitive information that Defendants have produced in discovery, the B/T Defendants also respectfully request that the Court issue an order requiring Mr. Roche and Roche Freedman LLP to certify that they (*i*) have returned or destroyed all documents and information produced by Defendants in this lawsuit and (*ii*) have not shared any such documents or information with Ava Labs or any other third party.  The documents produced by the B/T Defendants and other parties in this litigation are highly sensitive, as they include not only confidential, competitively sensitive information about Defendants' businesses but also information that, if disclosed, would threatens the privacy and security of Defendants and their

---

[2]  *See* Kyle Roche, *My Response*, MEDIUM (Aug. 29, 2022), available at https://medium.com/@kyleroche/my-response-b691563c255b [https://perma.cc/WH2G-ZD8B].

[3]  Crypto Leaks (@CryptoLeaksInfo), TWITTER (Aug. 29, 2022, 5:44 A.M.), https://twitter.com/CryptoLeaksInfo/status/1564187241949298688.

The Honorable Katherine Polk Failla                    4                    August 31, 2022

customers.  The Court has already recognized the importance of protecting information about cryptocurrencies and related accounts and wallets.  (Dkt. No. 195.)

*     *     *

We thank the Court for its consideration.

Respectfully submitted,

/s/ Elliot Greenfield

LAW OFFICES OF
### McNaul Ebel Nawrot & Helgren
A PROFESSIONAL LIMITED LIABILITY COMPANY

600 UNIVERSITY STREET, SUITE 2700
SEATTLE, WASHINGTON 98101-3143
TELEPHONE: (206) 467-1816
FACSIMILE: (206) 624-5128

GREGORY J. HOLLON

E-MAIL: GHollon@McNaul.com
Direct (206) 389-9348

TIMOTHY B. FITZGERALD

E-MAIL: TFitzgerald@McNaul.com
Direct (206) 389-9338

September 1, 2022

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:     **In re Tether and Bitfinex Crypto Asset Litigation**
        **No. 19 Civ. 9236 (S.D.N.Y.)**

Dear Judge Failla:

Together with O'Melveny & Myers, we represent Defendant Bittrex, Inc. in the referenced matter. Defendant Poloniex LLC, represented by Nelson Mullins, also joins in this letter (Bittrex and Poloniex are collectively "the Exchange Defendants"). We write to join in the requests made by the B/T Defendants in responding to Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney (Dkt. No. 229) – namely, (1) that Roche Freedman LLP be terminated as counsel in this case, and (2) that both Mr. Roche and Roche Freedman LLP certify, in connection with their termination, that they have returned or destroyed all documents and information produced by the Exchange Defendants and that they have not shared any of those documents or information with any third party.

In the video recordings released by Crypto Leaks, Mr. Roche states that "litigation is an underused tool," and confirms that he has used class action litigation as a "strategic instrument" to support non-party Ava Labs, a cryptocurrency company in which he and other Roche Freedman attorneys maintain a substantial interest. He states that he has used litigation against other participants in the cryptocurrency space to further the interests of Ava Labs. He goes on to state that he is Ava Labs' "crypto expert . . . because I sue half the companies in the space" and brags that he has "seen in the insides of every single crypto company." Mr. Roche describes himself in one of the videos as a "crazy mother****er" who will "take you to the end" to get a

The Honorable Katherine Polk Failla
September 1, 2022
Page 2

piece of paper saying "I own your company now," and describes that "power" as "a tool that has not been unlocked by many."

Mr. Roche's statements raise troubling questions about his firm's use of the discovery process in this matter. As the Court is aware, Plaintiffs amended their complaint in June 2020 to add the Exchange Defendants. *See* Dkt. No. 114. The Amended Complaint relies heavily on allegations that the B/T Defendants owned or controlled certain accounts on the Exchange Defendants' platforms, including specifically the "1AA6" account on Bittrex and the "1J1d" account on Poloniex, incorrectly describing those accounts as the "Bitfinex deposit address(es)." *Id.* at ¶ 207. In response to those allegations, the Exchange Defendants provided Mr. Roche and his colleagues conclusive evidence, including a sworn declaration from the actual holder of the supposed "Bitfinex deposit address(es)," that the accounts in question are not and never have been owned or controlled by the B/T Defendants; instead, they have always been exclusively owned and controlled by a foreign arbitrage trader who has no relation to the B/T Defendants. The Exchange Defendants have identified that trader, provided sworn testimony from him about his arbitrage activities, and produced documents proving that the relevant accounts are—contrary to the allegations in the Amended Complaint—not owned or controlled by the B/T Defendants.

Notwithstanding the arbitrage trader's sworn testimony about his trading, Plaintiffs say that they cannot yet re-evaluate their claims against the Exchange Defendants because "[f]ull discovery, from all Defendants, is needed to test the assertions in the Anonymous Declaration." Plaintiffs say that such discovery must include "documents and deposition testimony not only from the declarant, but also from the Exchange Defendants, Bitfinex, and their affiliates." Dkt. No. 181 at 2.

The Exchange Defendants have worked diligently in preparing a substantial production of documents to Plaintiffs.[1] Mr. Roche's recent statements raise serious concerns about the intent behind such discovery and how it will be used. While the Exchange Defendants appreciate that a protective order has been entered in this matter and that attorneys can be expected to comply with such orders, Mr. Roche's statements make clear that he has already used confidential materials produced in litigation for improper purposes. Moreover, the Court previously recognized that the protective order is not sufficient protection for certain information Defendants have produced. *See* Dkt. No. 195. Under the circumstances, simply accommodating Mr. Roche's withdrawal is not sufficient. He remains a member of Roche Freedman, and it must be assumed that, just as the actions he described in the recently released videos benefited Mr. Roche, his firm, and Ava Labs, any further access by Roche Freedman to the highly confidential materials produced in this matter may be subject to similar misuse.

For the above reasons, the Exchange Defendants respectfully join in the B/T Defendants' requests that (1) Roche Freedman LLP be terminated as counsel in the matter, and (2) Roche

---

[1] Plaintiffs originally proposed nearly 300 search terms to each of the Exchange Defendants, many of which related to broad aspects of the cryptocurrency industry but did not appear related to any of the claims or defenses in this matter.

The Honorable Katherine Polk Failla
September 1, 2022
Page 3


Freedman LLP be required to certify that is has destroyed all documents produced by the Defendants in this matter, and that no such materials remain in the possession, custody, or control of any principals, agents, or employees of the firm.

     Given these revelations, the Exchanges Defendants reserve the right to pursue additional relief as they obtain more information.


     Respectfully,

     Gregory J. Hollon
     Timothy B. Fitzgerald

GJH/TBF:ln

**RF** ROCHE
FREEDMAN

September 2, 2022

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:    *In re Tether and Bitfinex Crypto Asset Litigation,* 19 Civ. 9236 (S.D.N.Y.)

Dear Judge Failla:

We write in response to Defendants' August 31, 2020 letters asking the Court to disqualify Roche Freedman LLP ("Firm") as co-lead counsel for Plaintiffs based on statements made by Kyle Roche. We respectfully submit the Court should deny Defendants' request.

## A.  **RELEVANT BACKGROUND**

On January 27, 2022, Mr. Roche attended a meeting in London to facilitate a potential venture capitalist investment. Mr. Roche believed he was attending that meeting to pursue the interests of a technology start-up initiative. But it now appears the meeting was actually a set up orchestrated by a defendant in a different class action the Firm is pursing. Roche Decl. ¶ 2.

Unfortunately, at that meeting, Mr. Roche made untrue statements apparently intended to impress the participants at the meeting. He also made inappropriate remarks disparaging jurors and class members.

As demonstrated below, the statements with which Defendants take issue are not just false, they are *demonstrably* false. Nonetheless, to protect against even the appearance of impropriety, and to avoid unnecessary distraction from the merits of this case, Mr. Roche has withdrawn from this case and the Firm has removed him from its entire class action practice. Mr. Roche has also been screened from the Firm's class actions (this case included). Finally, to ensure there is no optical concern whatsoever, Mr. Roche has also forfeited any financial interest in this litigation.

It's no surprise, however, that Defendants are using it as a litigation tactic to disqualify the entire Firm. The Firm has one of the leading litigation practice groups in this space, understands the technology exceptionally well, originated the case theory, was retained by every single client in this action, and drafted and filed the original complaint.

Roche Freedman LLP

The Honorable Katherine Polk Failla
September 2, 2022
Page 2 of 5

## B. **THE STATEMENTS**

1. **The Firm did not use this litigation as a strategic instrument to support Ava Labs, did not file this action at Ava Labs' request, and any interest in Ava Labs or AVAX tokens doesn't present a conflict.**

   The notion that Roche Freedman decided to pursue this case in order to further the interests of Ava Labs is plainly false. First and foremost, the Firm's retention in this case by the three original named plaintiffs - Jason Liebowitz, Benjamin Liebowitz and Aaron Liebowitz - pre-dates Ava Lab's retention of the Firm. Indeed, when the Firm filed the 95-page complaint in this matter, Ava Labs had only been a Firm client for a matter of days. Moreover, at that time, Ava Labs was a relatively unknown start up and the AVAX crypto-asset was not existent. The idea, therefore, that the Firm filed this case for Ava Labs, is both impossible, nonsensical, and untrue.

   In fact, shortly after this incident unfolded, Ava Labs' CEO issued a statement confirming that "[n]either I, nor anyone else at Ava Labs ever directed Roche in his selection of cases."[1]

   Further, Defendants' suggestion that a disqualifying conflict of interest exists owing to the fact that some Roche Freedman lawyers own AVAX tokens, or have a personal equity interest in Ava Labs, is meritless. The result of this lawsuit would not have any particularized effect on Ava Labs or the AVAX crypto-asset. Ava Labs and AVAX do not compete with the Exchange Defendants, Tether, Bitfinex, or USDT. In fact, Tether and Bitfinex leverage the AVAX ecosystem and support its efforts.[2] And the Exchange Defendants facilitate the sale of AVAX on their platforms.

   But even if Defendants are competitors of Ava Labs or AVAX (they are not), it does not create a disqualifying conflict here. Lawyers that sue Microsoft on behalf of a class do not need to disclose that they hold shares in Apple. That's because "the mere existence of financial or business interests does not warrant disqualification." *Power Play 1 LLC v. Norfolk Tide Baseball Club, LLC,* No. 17CV4831, 2017 WL 5312193, at *4 (S.D.N.Y. Nov. 13, 2017). "Rather, there must be a 'significant risk' that these interests will 'adversely affect[ ]' the lawyer's exercise of professional judgment on behalf of the client." *Id*. (citing N.Y. Rule of Prof'l Conduct 1.7(a)(2) (finding that even though a lawyer's financial arrangement simply seemed "unseemly," the movant failed to explain how the lawyer's "financial and business interests . . . would impair his professional judgment or how it was adverse to Defendants' interests"). Defendants have done nothing to show such a "significant risk" exists in this case.

   None of the co-lead counsel in this case is pursuing this litigation for any collateral purpose, and there is no basis for that assertion beyond Mr. Roche's improper and false statements (which themselves don't even specifically reference this case).

---

[1] https://el33th4x0r.medium.com/my-statement-about-the-crypto-leaks-lies-ef2005da752.

[2] https://medium.com/avalancheavax/tether-token-usdt-launches-on-avalanche-baf5a313f1a7.

99 Park Ave., Suite 1910, New York, NY 10016    (t) 646.350.0527 (f) 646.392.8842    |    www.rochefreedman.com

The Honorable Katherine Polk Failla
September 2, 2022
Page 3 of 5

**2.  There could not have been, and has not been, any sharing of confidential discovery material.**

Defendants' letter also voices a "concern" that Mr. Roche may be "misusing information that he learns through litigation" including information produced in this case. First and foremost, Mr. Roche and the Firm can confirm that no confidential discovery material has ever been shared with Ava Labs (or any third party). Roche Decl. ¶ 5. Nor would we ever do that.

Importantly, Mr. Roche's comments do not actually include a statement that he shared confidential discovery materials and he's explained that is not what he meant. The actual statement was:

> because I sue half the companies in the space, I know where the market is going, I believe, better than one of the top ten people in the world. I've seen the insides of every crypto company [video cuts mid-sentence].

Mr. Roche's declaration explains that what he intended to convey was that due to the numerous suits he has filed in this space, dozens of whistleblowers and other insiders have sent him information that has proved useful in pursuing class action claims. Roche Decl. ¶ 6.

**3.  Mr. Roche's comments do not reflect the Firm's beliefs about jurors, class members, or class actions.**

The inappropriate comments Mr. Roche made regarding (i) jurors and class members, and (ii) his approach to class actions and intention on how and why to resolve them, do not reflect the view of the Firm or any of the other 24 other lawyers practicing at the Firm. Indeed, Mr. Roche only made these comments under the influence of alcohol.

Nonetheless, these statements are one of the reasons he has promptly withdrawn from this case, from the Firm's other class actions, and has been screened from them.

In sum, none of the alleged factual impropriety that Defendants frame as the foundation for their request to disqualify the Firm has actually occurred, and any optical issue should be cured based on Mr. Roche's withdrawal, screening, and forfeiture.

**C.    DEFENDANTS' PURPORTED CONCERNS ABOUT THE DISCOVERY PROCESS DO NOT SUPPORT THE FIRM'S DISQUALIFICATION**

In support of their request to terminate the Firm as co-lead counsel, Defendants argue that Mr. Roche's statements "raise grave concerns . . . regarding the motivations behind filing this lawsuit for which discovery has been sought, and whether the highly sensitive, confidential information the B/T Defendants have provided is being misused." This claim cannot be squared with Defendants' later recognition in their letter that Plaintiffs in this action are also represented by two other law firms. In other words, even crediting Defendants' argument that Mr. Roche's statements raise concerns about the motives for initiating this lawsuit, the complaint was also

The Honorable Katherine Polk Failla
September 2, 2022
Page 4 of 5

signed by two other law firms who have conducted a good faith inquiry into the merits of this case and the claims have already withstood a motion to dismiss.

The same is true of Plaintiffs' discovery requests, which Defendants characterize as having "no apparent link to the claims and defenses in this lawsuit." Obviously Plaintiffs' disagree, but more importantly, those discovery requests were reviewed and approved by the two other law firms that Defendants' have already told the Court should remain in the case. We appreciate that Mr. Roche's statements and the ensuing publicity have created a regrettable distraction, but they do not provide a basis for *the Firm's* disqualification.

Moreover, to the extent Defendants intend to create a distraction or spend further time on this issue, the Firm's removal from this action will not prevent them from pursuing these efforts.

**D.    THE FIRM'S STATUS AS CO-COUNSEL BENEFITS THE CLASS**

**1.  RF's continued participation in this case is in the best interests of the class.**

Roche Freedman's participation as co-lead counsel will continue to benefit the proposed class. The Firm's lawyers who would remain working on the case include the principal lawyers who helped formulate the original complaint, *i.e.*, Vel Freedman and Joseph Delich. In addition to those two attorneys, many of the lawyers from the Firm that would remain on this case have the most institutional knowledge of the facts and law underlying the case. Their contribution of many thousands of hours on the case to date have been invaluable and their removal from the case would be detrimental to the class's interest.

Finally, these same attorneys are those working on the Firm's many other crypto-related cases and class actions. All of these facts thus stand to continue to benefit the named Plaintiffs and the proposed class. The Court carefully appointed three firms to represent the named Plaintiffs, considering their respective resources and areas of expertise, and those rationales continue to counsel in favor of the three-firm team that has been working effectively to date.

**2.  The named plaintiffs request the Firm remain as co-lead counsel.**

The named Plaintiffs request that the Firm remain as co-lead counsel. This is reflected in their attached affidavits. Jason Leibowitz Decl.; Benjamin Leibowitz Decl.; Aaron Leibowitz Decl.; Matt Script Decl.; Pinchas Goldshtein Decl.

Having conceived of and filed the lawsuit, the Firm has the original and closest relationships with the named Plaintiffs. These Plaintiffs understand the relevant facts, have reviewed the videos, read both letters from Defendants, and are adamant the Firm remain on the case. They all state that they do not believe or see how they, or the class, would benefit from removing the Firm's crypto-related expertise from the current team of lawyers that have been diligently prosecuting the case.

The Honorable Katherine Polk Failla
September 2, 2022
Page 5 of 5

Moreover, they have all signed declarations stating that they "have never heard or seen anything that would in anyway support the concerns raised by the Defendants." and that "RF has only ever been concerned about the best interests of the class."

These individuals have already dedicated a substantial amount of their time and energy to the case, and they intend to remain as lead Plaintiffs. Accordingly, we respectfully submit that their views are entitled to significant weight and their opinions should be considered by the Court.

* * * * *

We note that what is in the best interests of the proposed class in this case overlaps with what the Firm believes is fair and equitable under the circumstances. In speaking as he did, Mr. Roche engaged in a serious lapse of judgment. However, the extreme remedy of disqualifying the entire Firm, which would have the effect of punishing all of the Firm's lawyers for Mr. Roche's lapse in judgment (which amounts to statements that were either untrue or misunderstood), seems disproportionate and unwarranted.

Finally, to the extent the Court is considering a formal request to disqualify Roche Freedman from this matter, we respectfully request that the Court first schedule a conference to address these issues and allow the Firm to submit additional evidence to address any specific concerns that the Court may have.

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*

Devin "Vel" Freedman
Edward Normand
Joseph M. Delich
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
vel@rochefreedman.com
tnormand@rochefreedman.com
jdelich@ rochefreedman.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

I, Kyle Roche, declare as follows:

1.      I am a partner at Roche Freedman LLP ("Firm").

2.      I have reviewed the videos referenced by the Defendants in this action. Those videos were illegally taken without my knowledge or consent during meetings that occurred in in London on January 27, 2022. I was invited to London under the false pretense of pitching a venture capital investment, but I now understand that the real reason I was brought there was through a scheme that was executed by a defendant in a different lawsuit the Firm recently filed. The purpose of this scheme was to surreptitiously obtain comprising recordings of me.

3.      I deeply regret making many of the statements I made during these meetings as they are not only inconsistent with the manner in which I have practiced law, but also because some of the statements were false.

4.      The Firm has never filed a class action at the direction of or for the benefit of another Firm client. This case is no exception. The sole reason we filed this action was for the benefit of the named plaintiffs in this action and the other members of the class. We filed the action at the direction of the named plaintiffs. We have not shared any confidential information from this lawsuit with any third party, including other clients of the firm.

5.     I have never disclosed or used, for any collateral purpose, any confidential information from any lawsuit—including this lawsuit. Indeed, at the time the recordings took place (January 27, 2022), there had been no confidential documents produced by any party.

6.     The statement I made in one of the video recordings was: "because I sue half the companies in the space, I know where the market is going, I believe, better than one of the top ten people in the world. I've seen the insides of every crypto company [video cuts]." What I intended to convey was that due to the numerous suits I've filed in this space, many whistleblowers and other insiders send information that has proved valuable in pursuing class action claims.

7.     None of the co-lead counsel in this matter have served any discovery requests for any purpose collateral to the prosecution of the claims in this case. All of the initial discovery requests were derived from information contained in the Amended Complaint or sourced from publicly available material, including foreign documents and were solely intended to obtain information material to the claims and defenses in this matter.

8.     The comments I made regarding the nature of jury trials, jurors, and absent class members have nothing to do with the Firm's views and are not even representative of my own personal views. My comments in the video were highly inappropriate, made while I was intoxicated, and I deeply regret my statements.

9.     While the published videos are carefully edited and spliced to remove context and paint me in the worst possible light, the fact remains that my actions and words were inexcusable. I have spent years helping build the Firm's crypto-asset practice, and I'm ashamed that my conduct called into question the excellent work the attorneys at the Firm have done pursuing the interests of class members across numerous and innovative class actions in the space.

10.     I have withdrawn from this case, been screened from the matter, and will not receive any financial interest in this action.

11.     I respectfully request that this Court accept my motion to withdraw but that it not terminate the Firm as Co-Lead Counsel. The expertise of the other attorneys working on this matter from the Firm will continue to add significant value to the Proposed Class.

12.     I declare under penalty of perjury that the foregoing is true and correct.


Dated September 2, 2022


Kyle W. Roche

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Tether and Bitfinex Crypto Asset Litigation

Case No. 19 Civ. 9236 (KPF)

## <u>Declaration of Aaron Leibowitz</u>

I, Aaron Leibowitz, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complaint (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

Aaron Leibowitz (Sep 1, 2022 21:40 EDT)

Aaron Leibowitz

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

### Declaration of Benjamin Leibowitz

I, Benjamin Leibowitz, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complaint (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

*Benjamin Leibowitz*
Benjamin Leibowitz (Sep 1, 2022 21:17 EDT)

Benjamin Leibowitz

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Tether and Bitfinex Crypto Asset
Litigation

Case No. 19 Civ. 9236 (KPF)

### <u>Declaration of Jason Leibowitz</u>

I, Jason Leibowitz, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I retained Roche Freedman LLP on September 3, 2019. I worked with attorneys Kyle Roche, Velvel Freedman, and Joseph Delich on the drafting of the initial complaint (ECF No. 1). All allegations in that complaint were sourced from materials that were obtained through online resources – including documents Roche Freedman had to translate from foreign materials.

9.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities.

Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

10.     I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022

Jason Leibowitz (Sep 1, 2022 20:51 EDT)

Jason Leibowitz

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

**<u>Declaration of Matthew Script</u>**

I, Matthew Script, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in monthly calls where Co-Lead Counsel provides us updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities. Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

9.      I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That

would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

     10.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022


Matthew Script (Sep 1, 2022 20:31 EDT)

          Matthew Script

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) |

<u>**Declaration of Pinchas Goldshtein**</u>

I, Pinchas Goldshtein, based on my personal knowledge, declare as follows:

1.      I am a named plaintiff in this case.

2.      I retained Roche Freedman LLP ("RF") to pursue this action as a result of harm I suffered from the purchase of artificially inflated crypto-commodities because I believe RF is uniquely qualified to serve both the named plaintiffs and the proposed class in this action.

3.      Throughout the litigation, I have participated in calls with Mr. Freedman who provides me with updates on the case.

4.      I reviewed the video clips of Kyle Roche published by the Crypto Leaks website on August 26, 2022.

5.      I understand RF has removed Kyle Roche from the case, its entire class action practice group, has screened him from receiving and/or participating in the Firm's class actions, and directed him to obtain ethics training. I also understand Mr. Roche has forfeited any financial interest in this litigation.

6.      I have also reviewed the Bitfinex, Tether, Bittrex, and Poloniex Defendants' letters seeking to have the entire RF firm be terminated as counsel from this case.

7.      In all my interactions and discussions with RF attorneys, I have never heard or seen anything that would in anyway support the concerns raised by the Defendants. RF has only ever been concerned about the best interests of the class.

8.      I strongly oppose Defendants' request and believe that such relief is not in the best interests of the class. I know that the claims at issue in this case will require co-lead counsel to oversee and direct blockchain forensic experts to show the manipulation of crypto-commodities. Given RF's unique and market leading experience in this space, their creativity, and the work done to date by RF, I believe the class will be prejudiced if RF is terminated.

9.      I also understand that if RF is terminated, Selendy Gay Elsberg PLLC and Schneider Wallace Cottrell Konecky LLP would remain on co-lead counsel in this case. That

would not address my significant concerns that terminating RF would leave the class without the benefit of its crypto-asset litigation experience and thereby result in prejudice.

10.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 1, 2022



Pinchas Goldshtein

# Debevoise & Plimpton

**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

September 2, 2022

BY ECF AND EMAIL

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

*Re:  In re Tether and Bitfinex Crypto Asset Litigation*, No. 19 Civ. 9236 (S.D.N.Y.)

Dear Judge Failla:

We represent the B/T Defendants in the above-referenced matter and write in response to Roche Freedman's September 2, 2022 filing regarding Plaintiffs' Motion for Kyle W. Roche to Withdraw as Attorney.  (Dkt No. 232.)

While we appreciate that Mr. Roche and his firm have sought to address the issues raised in the B/T Defendants' August 31 letter to the Court (Dkt. No. 230), the evolving explanations they have offered regarding his videotaped statements – which implicate both Mr. Roche and the Roche Freedman law firm – offer little comfort with respect to the grave concerns raised by those statements.

Mr. Roche first claimed that his statements were taken "out of context" and/or were somehow elicited from him "using leading questions."[1]  Notwithstanding that initial response, Mr. Roche then took the extraordinary step of withdrawing entirely from his firm's class action practice.

In its September 2 letter, Roche Freedman states that Mr. Roche's statements are "demonstrably false" but offers no such demonstration.  That the initial complaint in this case was filed prior to when Roche Freedman reports it commenced a formal attorney-client relationship with Ava Labs says nothing about how it has conducted the lawsuit since that time, including potential misuse of the discovery process.[2]  Beyond that, Roche Freedman relies on its own denials.

---

[1]  Kyle Roche, *My Response*, MEDIUM (Aug. 29, 2022), available at https://medium.com/
@kyleroche/my-response-b691563c255b [https://perma.cc/WH2G-ZD8B].

[2]  Notably, Mr. Roche stated on video that his firm and Ava Labs launched their businesses together at the same time in the same co-working space, he already knew the CEO of Ava Labs, and he received a percentage of the AVAX token supply in September 2019, prior to the commencement of this action.

The Honorable Katherine Polk Failla          2                    September 2, 2022

In his affidavit, Mr. Roche himself states only that "some of the statements were false."  The videos published on the Crypto Leaks website, however, do not show merely a discrete set of questionable statements but a comprehensive description of how Mr. Roche and his law firm abuse the class action process and discovery.

Importantly, the B/T Defendants expressed a serious and valid concern that the discovery process is being misused based on Mr. Roche's statement that he serves as Ava Lab's "crypto expert" and "know[s] where this market is going" because he "sue[s] half the companies in the space" and has "seen the insides of every single crypto company."[3]  In his affidavit, relied on by Roche Freedman, Mr. Roche offers only the implausible explanation that he was not referring to information gained in discovery but to other information purportedly provided to him outside of litigation by "whistleblowers and other insiders."

Roche Freedman's assertion that Defendants have raised Mr. Roche's statements with the Court as a "litigation tactic" suggests that it fails to fully understand the egregious nature of those statements or the seriousness of the concerns they raise.

Respectfully submitted,

/s/ Elliot Greenfield

---

[3]  *Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm*, Roche Freedman, CRYPTO LEAKS (Aug. 26, 2022), available at https://cryptoleaks.info/case-no-3 [https://perma.cc/N433-63SC].

Case 5:20-cv-03642-EJD Document 160-234 Filed 09/07/22 Page 282 of 675
Case 1:19-cv-09236-KPF Document 234 Filed 09/02/22 Page 32 of 34
USCA11 Case: 22-11150    Date Filed: 09/06/2022    Page: 32 of 34





September 2, 2022

**Via ECF and E-mail**

The Honorable Katherine Polk Failla
U.S. District Court Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007

Re:    *In re Tether and Bitfinex Crypto Asset Litigation*, **19-cv-09236 (KPF)**

Dear Judge Failla:

Selendy Gay Elsberg PLLC ("Selendy Gay Elsberg") and Schneider Wallace Cottrell Konecky LLP ("Schneider Wallace") write in their capacity as interim class counsel, and specifically not on behalf of the named plaintiffs, in response to the letter dated September 2, 2022, by Roche Freedman LLP ("Roche Freedman"), ECF No. 232. The named plaintiffs have all reviewed this letter and stated that they disagree with its content and recommendation; in short, the named plaintiffs express a strong preference that Roche Freedman remain in the case.[1] Undersigned counsel nevertheless believe they have a duty to the Court and the putative class to inform the Court of their views. *See* Fed. R. Civ. P. 23(g)(3) (stating interim class counsel is appointed to "act on behalf of a putative class.").

As explained below, Selendy Gay Elsberg and Schneider Wallace believe that Roche Freedman's continued involvement in the litigation is not in the best interests of the class. Accordingly, we respectfully request that the Court terminate Roche Freedman's status as interim co-lead counsel. Selendy Gay Elsberg and Schneider Wallace are ready and willing to continue representing the class as interim co-lead counsel.

Selendy Gay Elsberg and Schneider Wallace became aware of video recordings of Kyle Roche, a founding partner of Roche Freedman, when they were published online on August 26, 2022.[2] In the recordings, Mr. Roche makes statements regarding the blockchain industry and his approach to class action litigation. On August 31, 2022, Mr. Roche (though not Roche Freedman) filed a motion to withdraw as counsel. ECF No. 229. Later that day, the B/T Defendants submitted

---

[1] Selendy Gay Elsberg and Schneider Wallace were not aware of the affidavits of the class representatives until they were filed as exhibits to Roche Freedman's letter. *See* ECF Nos. 232-2–232-6. Although Selendy Gay Elsberg and Schneider Wallace respect the opinions expressed in those affidavits, they believe their duty as interim class counsel is to "the interests of the class" as a whole. *See* Fed. R. Civ. P. 23(g)(4).

[2] *See Ava Labs (Avalanche) Attacks Solana & Cons SEC in Evil Conspiracy with Bought Law Firm, Roche Freedman*, CRYPTO LEAKS (Aug. 26, 2022), *available at* https://cryptoleaks.info/case-no-3.

a letter asking the Court to terminate Roche Freedman as counsel for the class. ECF No. 230. The Exchange Defendants filed a letter on September 1, joining this request. ECF No. 231.[3]

Given the content of the recordings—and the fact that Mr. Roche, in an August 29, 2022 public response, did not deny the recordings' authenticity[4]—Selendy Gay Elsberg and Schneider Wallace asked Roche Freedman to withdraw as counsel to protect the interests of the class. Roche Freedman declined to withdraw.

Selendy Gay Elsberg and Schneider Wallace are not able to evaluate the credibility of Roche Freedman's statements concerning Ava Labs, AVAX tokens, or Mr. Roche's position at his firm or his financial interest in this litigation. However, Roche Freedman's continued involvement as counsel in the case is contrary to the best interests of the class. Roche Freedman's continued representation of the class would likely spawn significant discovery and motion practice as to the veracity and/or import of the allegations. These issues are likely to unnecessarily distract from the merits of this dispute, and can be avoided by the removal of Roche Freedman as class counsel.

Selendy Gay Elsberg and Schneider Wallace are both experienced and capable class counsel, with expertise in litigation concerning digital assets, and will continue to prosecute this action on behalf of the class as interim co-lead counsel. For example, Selendy Gay Elsberg has been appointed as co-lead counsel in numerous class actions in this district where the plaintiffs' allegations involve the technical details of dozens of different crypto-assets.

To protect the interests of the putative class, we respectfully request that the Court terminate Roche Freedman's appointment as interim co-lead counsel.

---

[3] Selendy Gay Elsberg and Schneider Wallace disagree with Defendants' claims that Plaintiffs have sought "information that has no apparent link to the claims and defenses in this lawsuit," ECF No. 230 at 2, or which "related to broad aspects of the cryptocurrency industry but did not appear related to any of the claims or defenses in this matter," ECF No. 231 at 2 n.1. Rather than air that dispute here, Plaintiffs will continue to meet and confer with Defendants in an effort to resolve any remaining discovery issues without Court intervention. *See* ECF No. 228 at 2.

[4] https://medium.com/@kyleroche/my-response-b691563c255b

Respectfully submitted,

/s/ Caitlin Halligan
Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
SELENDY GAY ELSBERG PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com

/s/ Todd M. Schneider
Todd M. Schneider (*pro hac vice*)
Jason H. Kim (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com

*Interim Lead Counsel and Attorneys for Plaintiffs and the Proposed Class*

# Composite Exhibit B

# NYSBA NY Rules of Professional Conduct (2021)

*Effective April 1, 2009, as amended through June 24, 2020, with commentary as amended through October 30, 2021.*

Reproduced with permission by the
New York State Bar Association,
One Elk Street, Albany, NY 12207.

Please contact MRC@nysba.org for
permission to use or distribute this content.

NEW YORK STATE BAR ASSOCIATION

Use of this product confirms acceptance of the NYSBA license.

# RULE 1.7

## CONFLICT OF INTEREST: CURRENT CLIENTS

**(a)** Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

**(1)** the representation will involve the lawyer in representing differing interests; or

**(2)** there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

**(b)** Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

**(1)** the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

**(2)** the representation is not prohibited by law;

**(3)** the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

**(4)** each affected client gives informed consent, confirmed in writing.

**Comment**

**General Principles**

[1]     Loyalty and independent judgment are essential aspects of a lawyer's relationship with a client. The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Concurrent conflicts of interest, which can impair a lawyer's professional judgment, can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests. A lawyer should not permit these competing responsibilities or interests to impair the law-

yer's ability to exercise professional judgment on behalf of each client. For specific Rules regarding certain concurrent conflicts of interest, see Rule 1.8. For former client conflicts of interest, see Rule 1.9. For conflicts of interest involving prospective clients, see Rule 1.18. For definitions of "differing interests," "informed consent" and "confirmed in writing," see Rules 1.0(f), (j) and (e), respectively.

[2]    Resolution of a conflict of interest problem under this Rule requires the lawyer, acting reasonably, to: (i) identify clearly the client or clients, (ii) determine whether a conflict of interest exists, *i.e.*, whether the lawyer's judgment may be impaired or the lawyer's loyalty may be divided if the lawyer accepts or continues the representation, (iii) decide whether the representation may be undertaken despite the existence of a conflict, *i.e.*, whether the conflict is consentable under paragraph (b); and if so (iv) consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include all of the clients who may have differing interests under paragraph (a)(1) and any clients whose representation might be adversely affected under paragraph (a)(2).

[3]    A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). *See* Rule 1.10(e), which requires every law firm to create, implement and maintain a conflict-checking system.

[4]    If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). *See* Rule 1.16(b)(1). Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. *See* Rule 1.9; *see also* Comments [5], [29A].

[5]    Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is acquired by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The lawyer

must seek court approval where necessary and take steps to minimize harm to the clients. See Rules 1.16(d) and (e). The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. *See* Rule 1.9(c).

**Identifying Conflicts of Interest**

[6]     The duty to avoid the representation of differing interest prohibits, among other things, undertaking representation adverse to a current client without that client's informed consent. For example, absent consent, a lawyer may not advocate in one matter against another client that the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is adverse is likely to feel betrayed and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken may reasonably fear that the lawyer will pursue that client's case less effectively out of deference to the other client, that is, that the lawyer's exercise of professional judgment on behalf of that client will be adversely affected by the lawyer's interest in retaining the current client. Similarly, a conflict may arise when a lawyer is required to cross-examine a client appearing as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client represented in the lawsuit. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

[7]     Differing interests can also arise in transactional matters. For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.

[8]     Differing interests exist if there is a significant risk that a lawyer's exercise of professional judgment in considering, recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests. For example, the professional judgment of a lawyer asked to represent several individuals operating a joint venture is likely to be adversely affected to the extent that the lawyer is unable to recommend or advocate all possible positions

USCA11 Case: 22-11150    Date Filed: 03/06/2022    Page: 6 of 24

that each client might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will adversely affect the lawyer's professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

**Lawyer's Responsibilities to Former Clients and Other Third Persons**

[9]    In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be adversely affected by responsibilities to former clients under Rule 1.9, or by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.

**Personal-Interest Conflicts**

[10]    The lawyer's own financial, property, business or other personal interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client or with a law firm representing the opponent, such discussions could materially limit the lawyer's representation of the client. In addition, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. *See* Rule 5.7 on responsibilities regarding nonlegal services and Rule 1.8 pertaining to a number of personal-interest conflicts, including business transactions with clients.

[11]    When lawyers representing different clients in the same matter or in substantially related matters are closely related, there may be a significant risk that client confidences will be revealed and that the lawyer's family relationship will interfere with both loyalty and professional judgment. As a result, each client is entitled to know of the existence and implications of the relationship between the lawyers, before the lawyer agrees to undertake the representation. Thus, a lawyer who has a significant intimate or close family relationship with another lawyer ordinarily

may not represent a client in a matter where that other lawyer is representing another party, unless each client gives informed consent, as defined in Rule 1.0(j).

[12]   A lawyer is prohibited from engaging in sexual relations with a client in domestic relations matters. In all other matters a lawyer's sexual relations with a client are circumscribed by the provisions of Rule 1.8(j).

**Interest of Person Paying for Lawyer's Services**

[13]   A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's exercise of professional judgment on behalf of a client will be adversely affected by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

**Prohibited Representations**

[14]   Ordinarily, clients may consent to representation notwithstanding a conflict. As paragraph (b) indicates, however, some conflicts are nonconsentable. If a lawyer does not reasonably believe that the conditions set forth in paragraph (b) can be met, the lawyer should neither ask for the client's consent nor provide representation on the basis of the client's consent. A client's consent to a nonconsentable conflict is ineffective. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15]   Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), notwithstanding client consent, a representation is prohibited if, in the circumstances, the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See Rule 1.1 regarding competence and Rule 1.3 regarding diligence.

USCA11 Case: 22-11150   Date Filed: 05/06/2022   Page: 8 of 24

[16]    Paragraph (b)(2) describes conflicts that are nonconsentable because the representation is prohibited by applicable law. For example, federal criminal statutes prohibit certain representations by a former government lawyer despite the informed consent of the former governmental client. In addition, there are some instances where conflicts are nonconsentable under decisional law.

[17]    Paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal. Whether clients are aligned directly against each other within the meaning of this paragraph requires examination of the context of the proceeding. Although this paragraph does not preclude a lawyer's multiple representation of adverse parties to mediation (because mediation is not a proceeding before a "tribunal" as defined in Rule 1.0(w)), such representation may be precluded by paragraph (b)(1).

**Informed Consent**

[18]    Informed consent requires that each affected client be aware of the relevant circumstances, including the material and reasonably foreseeable ways that the conflict could adversely affect the interests of that client. Informed consent also requires that the client be given the opportunity to obtain other counsel if the client so desires. *See* Rule 1.0(j). The information that a lawyer is required to communicate to a client depends on the nature of the conflict and the nature of the risks involved, and a lawyer should take into account the sophistication of the client in explaining the potential adverse consequences of the conflict. There are circumstances in which it is appropriate for a lawyer to advise a client to seek the advice of a disinterested lawyer in reaching a decision as to whether to consent to the conflict. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege, and the advantages and risks involved. *See* Comments [30] and [31] concerning the effect of common representation on confidentiality.

[19]    Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one client refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent. In

some cases the alternative to common representation is that each party obtains separate representation with the possibility of incurring additional costs. These costs, along with the benefits of securing separate representation, are factors that may be considered by the affected client in determining whether common representation is in the client's interests. Where the fact, validity or propriety of client consent is called into question, the lawyer has the burden of establishing that the client's consent was properly obtained in accordance with the Rule.

## Client Consent Confirmed in Writing

[20]    Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of (i) a document from the client, (ii) a document that the lawyer promptly transmits to the client confirming an oral informed consent, or (iii) a statement by the client made on the record of any proceeding before a tribunal, whether before, during or after a trial or hearing. *See* Rule 1.0(e) for the definition of "confirmed in writing." *See also* Rule 1.0(x) ("writing" includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. The Rule does not require that the information communicated to the client by the lawyer necessary to make the consent "informed" be in writing or in any particular form in all cases. *See* Rules 1.0(e) and (j). The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing. *See* Comment [18].

## Revoking Consent

[21]    A client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to the client's own representation precludes the lawyer from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other clients, and whether material detriment to the other clients or the lawyer would result.

**Consent to Future Conflict**

[22]    Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the conditions set forth in paragraph (b). The effectiveness of advance waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. At a minimum, the client should be advised generally of the types of possible future adverse representations that the lawyer envisions, as well as the types of clients and matters that may present such conflicts. The more comprehensive the explanation and disclosure of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the understanding necessary to make the consent "informed" and the waiver effective. *See* Rule 1.0(j). The lawyer should also disclose the measures that will be taken to protect the client should a conflict arise, including procedures such as screening that would be put in place. *See* Rule 1.0(t) for the definition of "screening." The adequacy of the disclosure necessary to obtain valid advance consent to conflicts may also depend on the sophistication and experience of the client. For example, if the client is unsophisticated about legal matters generally or about the particular type of matter at hand, the lawyer should provide more detailed information about both the nature of the anticipated conflict and the adverse consequences to the client that may ensue should the potential conflict become an actual one. In other instances, such as where the client is a child or an incapacitated or impaired person, it may be impossible to inform the client sufficiently, and the lawyer should not seek an advance waiver. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, an advance waiver is more likely to be effective, particularly if, for example, the client is independently represented or advised by in-house or other counsel in giving consent. Thus, in some circumstances, even general and open-ended waivers by experienced users of legal services may be effective.

[22A] Even if a client has validly consented to waive future conflicts, however, the lawyer must reassess the propriety of the adverse concurrent representation under paragraph (b) when an actual conflict arises. If the actual conflict is materially different from the conflict that has been waived, the lawyer may not rely on the advance consent previously obtained. Even if the actual conflict is not materially different from the conflict the client has previously waived, the client's advance consent

cannot be effective if the particular circumstances that have created an actual conflict during the course of the representation would make the conflict nonconsentable under paragraph (b). *See* Comments [14]–[17] and [28] addressing nonconsentable conflicts.

## Conflicts in Litigation

[23]     Paragraph (b)(3) prohibits representation of opposing parties in the same litigation, regardless of the clients' consent. On the other hand, simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(1). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal as well as civil cases. Some examples are those in which a lawyer is asked to represent co-defendants in a criminal case, co-plaintiffs or co-defendants in a personal injury case, an insured and insurer, or beneficiaries of the estate of a decedent. In a criminal case, the potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, multiple representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.

[24]     Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest. A conflict of interest exists, however, if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's representation of another client in a different case; for example, when a decision favoring one client will create a precedent likely to weaken seriously the position taken on behalf of the other client. Factors relevant in determining whether the clients need to be advised of this risk include: (i) where the cases are pending, (ii) whether the issue is substantive or procedural, (iii) the temporal relationship between the matters, (iv) the significance of the issue to the immediate and long-term interests of the clients involved, and (v) the clients' reasonable expectations in retaining the lawyer. Similar concerns may be present when lawyers advocate on behalf of clients before other entities, such as regulatory authorities whose regulations or rulings may significantly implicate clients' interests. If there is significant

risk of an adverse effect on the lawyer's professional judgment, then absent informed consent of the affected clients, the lawyer must decline the representation.

[25]   When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1). Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter. Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter.

**Nonlitigation Conflicts**

[26]   Conflicts of interest under paragraph (a)(1) arise in contexts other than litigation. For a discussion of such conflicts in transactional matters, see Comment [7]. Regarding paragraph (a)(2), relevant factors in determining whether there is a significant risk that the lawyer's professional judgment will be adversely affected include: (i) the importance of the matter to each client, (ii) the duration and intimacy of the lawyer's relationship with the client or clients involved, (iii) the functions being performed by the lawyer, (iv) the likelihood that significant disagreements will arise, (v) the likelihood that negotiations will be contentious, (vi) the likelihood that the matter will result in litigation, and (vii) the likelihood that the client will suffer prejudice from the conflict. The issue is often one of proximity (how close the situation is to open conflict) and degree (how serious the conflict will be if it does erupt). *See* Comments [8], [29] and [29A].

[27]   For example, conflict questions may arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may be present at the outset or may arise during the representation. In order to avoid the development of a disqualifying conflict, the lawyer should, at the outset of the common representation and as part of the process of obtaining each client's informed consent, advise each client that information will be shared (and regardless of whether it is shared, may not be privileged in a subsequent dispute between the parties) and that the lawyer will have to withdraw from one or both representations if one client decides that some matter material to the representation should be kept secret from the other. *See* Comment [31].

[28]   Whether a conflict is consentable depends on the circumstances. For example, a lawyer may not represent multiple parties to a negotiation if their interests are fundamentally antagonistic to one another, but common representation is permissible where the clients are generally aligned in interest, even though there is some difference in interest among them. Thus, a lawyer may seek to establish or adjust a relationship between clients on an amicable and mutually advantageous basis. Examples include helping to organize a business in which two or more clients are entrepreneurs, working out the financial reorganization of an enterprise in which two or more clients have an interest, and arranging a property distribution in settlement of an estate. The lawyer seeks to resolve potentially adverse interests by developing the parties' mutual interests. Otherwise, each party might have to obtain separate representation, with the possibility of incurring additional cost, complication or even litigation. Given these and other relevant factors, the clients may prefer that the lawyer act for all of them.

**Special Considerations in Common Representation**

[29]   In civil matters, two or more clients may wish to be represented by a single lawyer in seeking to establish or adjust a relationship between them on an amicable and mutually advantageous basis. For example, clients may wish to be represented by a single lawyer in helping to organize a business, working out a financial reorganization of an enterprise in which two or more clients have an interest, arranging a property distribution of an estate or resolving a dispute between clients. The alternative to common representation can be that each party may have to obtain separate representation, with the possibility of incurring additional cost, complication or even litigation that might otherwise be avoided, or that some parties will have no lawyer at all. Given these and other relevant factors, clients may prefer common representation to separate representation or no representation. A lawyer should consult with each client concerning the implications of the common representation, including the advantages and the risks involved, and the effect on the attorney-client privilege, and obtain each client's informed consent, confirmed in writing, to the common representation.

[29A] Factors may be present that militate against a common representation. In considering whether to represent multiple clients in the same matter, a lawyer should be mindful that if the common representation fails because the potentially adverse interests cannot be reconciled, the result can be additional cost, embarrassment and recrimination. Ordinarily, absent the informed consent of all clients, the lawyer will be forced

to withdraw from representing all of the clients if the common representation fails. *See* Rule 1.9(a). In some situations, the risk of failure is so great that multiple representation is plainly impossible. For example, a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated. Moreover, because the lawyer is required to be impartial between or among commonly represented clients, representation of multiple clients is improper when it is unlikely that impartiality can be maintained. Generally, if the relationship between the parties has already assumed antagonism, it is unlikely that the clients' interests can be adequately served by common representation. For example, a lawyer who has represented one of the clients for a long period or in multiple matters might have difficulty being impartial between that client and one to whom the lawyer has only recently been introduced.

[30]    A particularly important factor in determining the appropriateness of common representation is the effect on client-lawyer confidentiality and the attorney-client privilege. With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach. It must therefore be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, and the clients should be so advised.

[31]    As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common representation. This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit. *See* Rule 1.4. At the outset of the common representation and as part of the process of obtaining each client's informed consent, the lawyer should advise each client that information will be shared and that the lawyer will have to withdraw if one client decides that some matter material to the representation should be kept from the other. In limited circumstances, it may be appropriate for the lawyer to proceed with the representation when the clients have agreed, after being properly informed, that the lawyer will keep certain information confidential even as among the commonly represented clients. For example, the lawyer may reasonably conclude that failure to disclose one client's trade secrets to another client

will not adversely affect representation involving a joint venture between the two clients and agree to keep that information confidential with the informed consent of both clients.

[32]    When seeking to establish or adjust a relationship between clients, the lawyer should make clear that the lawyer's role is not that of partisanship normally expected in other circumstances and, thus, that the clients may be required to assume greater responsibility for decisions than when each client is separately represented. Any limitation on the scope of the representation made necessary as a result of the common representation should be fully explained to the clients at the outset of the representation. *See* Rule 1.2(c).

[33]    Subject to the above limitations, each client in the common representation has the right to loyal and diligent representation and the protection of Rule 1.9 concerning the obligations to a former client. The client also has the right to discharge the lawyer as stated in Rule 1.16.

## Organizational Clients

[34]    A lawyer who represents a corporation or other organization does not, simply by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. *See* Rule 1.13(a). Although a desire to preserve good relationships with clients may strongly suggest that the lawyer should always seek informed consent of the client organization before undertaking any representation that is adverse to its affiliates, Rule 1.7 does not require the lawyer to obtain such consent unless: (i) the lawyer has an understanding with the organizational client that the lawyer will avoid representation adverse to the client's affiliates, (ii) the lawyer's obligations to either the organizational client or the new client are likely to adversely affect the lawyer's exercise of professional judgment on behalf of the other client, or (iii) the circumstances are such that the affiliate should also be considered a client of the lawyer. Whether the affiliate should be considered a client will depend on the nature of the lawyer's relationship with the affiliate or on the nature of the relationship between the client and its affiliate. For example, the lawyer's work for the client organization may be intended to benefit its affiliates. The overlap or identity of the officers and boards of directors, and the client's overall mode of doing business, may be so extensive that the entities would be viewed as "alter egos." Under such circumstances, the lawyer may conclude that the affiliate is the lawyer's client despite the lack of any formal agreement to represent the affiliate.

[34A] Whether the affiliate should be considered a client of the lawyer may also depend on: (i) whether the affiliate has imparted confidential information to the lawyer in furtherance of the representation, (ii) whether the affiliated entities share a legal department and general counsel, and (iii) other factors relating to the legitimate expectations of the client as to whether the lawyer also represents the affiliate. Where the entities are related only through stock ownership, the ownership is less than a controlling interest, and the lawyer has had no significant dealings with the affiliate or access to its confidences, the lawyer may reasonably conclude that the affiliate is not the lawyer's client.

[34B] Finally, before accepting a representation adverse to an affiliate of a corporate client, a lawyer should consider whether the extent of the possible adverse economic impact of the representation on the entire corporate family might be of such a magnitude that it would materially limit the lawyer's ability to represent the client opposing the affiliate. In those circumstances, Rule 1.7 will ordinarily require the lawyer to decline representation adverse to a member of the same corporate family, absent the informed consent of the client opposing the affiliate of the lawyer's corporate client.

**Lawyer as Corporate Director**

[35]     A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the two roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board, and the possibility of the corporation's obtaining legal advice from another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's professional judgment, the lawyer should not serve as a director or should cease to act as the corporation's lawyer when conflicts of interest arise. The lawyer should advise the other members of the board that, in some circumstances, matters discussed at board meetings while the lawyer is present in the capacity of director might not be protected by the attorney-client privilege and that conflict of interest considerations might require the lawyer's recusal as a director or might require the lawyer and the lawyer's firm to decline representation of the corporation in a matter.

# Rule 1.7: Conflict of Interest: Current Clients

Share:



## *Client-Lawyer Relationship*

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Comment | Table of Contents | Next Rule

ABA American Bar Association |
/content/aba-cms-
dotorg/en/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_7_conflict_of_interest_current_clients

# NYSBA NY Rules of Professional Conduct (2021)

*Effective April 1, 2009, as amended through June 24, 2020, with commentary as amended through October 30, 2021.*

Reproduced with permission by the
New York State Bar Association,
One Elk Street, Albany, NY 12207.

Please contact MRC@nysba.org for
permission to use or distribute this content.

NEW YORK STATE BAR ASSOCIATION

Use of this product confirms acceptance of the NYSBA license.

# RULE 8.4

## MISCONDUCT

**A lawyer or law firm shall not:**

**(a)    violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;**

**(b)    engage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer;**

**(c)    engage in conduct involving dishonesty, fraud, deceit or misrepresentation;**

**(d)    engage in conduct that is prejudicial to the administration of justice;**

**(e)    state or imply an ability:**

**(1)    to influence improperly or upon irrelevant grounds any tribunal, legislative body or public official; or**

**(2)    to achieve results using means that violate these Rules or other law;**

**(f)    knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law;**

**(g)    unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment on the basis of age, race, creed, color, national origin, sex, disability, marital status, sexual orientation, gender identity, or gender expression. Where there is a tribunal with jurisdiction to hear a complaint, if timely brought, other than a Departmental Disciplinary Committee, a complaint based on unlawful discrimination shall be brought before such tribunal in the first instance. A certified copy of a determination by such a tribunal, which has become final and enforceable and as to which the right to judicial or appellate review has been exhausted, finding that the lawyer has engaged in an unlawful discriminatory practice shall constitute prima facie evidence of professional misconduct in a disciplinary proceeding; or**

**(h)     engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.**

**Comment**

[1]     Lawyers are subject to discipline when they violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another, as when they request or instruct an agent to do so on their behalf. Paragraph (a), however, does not prohibit a lawyer from advising a client concerning action the client is legally entitled to take.

[2]     Many kinds of illegal conduct reflect adversely on fitness to practice law. Illegal conduct involving violence, dishonesty, fraud, breach of trust, or serious interference with the administration of justice is illustrative of conduct that reflects adversely on fitness to practice law. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

[3]     The prohibition on conduct prejudicial to the administration of justice is generally invoked to punish conduct, whether or not it violates another ethics rule, that results in substantial harm to the justice system comparable to those caused by obstruction of justice, such as advising a client to testify falsely, paying a witness to be unavailable, altering documents, repeatedly disrupting a proceeding, or failing to cooperate in an attorney disciplinary investigation or proceeding. The assertion of the lawyer's constitutional rights consistent with Rule 8.1, Comment [2] does not constitute failure to cooperate. The conduct must be seriously inconsistent with a lawyer's responsibility as an officer of the court.

[4]     A lawyer may refuse to comply with an obligation imposed by law if such refusal is based upon a reasonable good-faith belief that no valid obligation exists because, for example, the law is unconstitutional, conflicts with other legal or professional obligations, or is otherwise invalid. As set forth in Rule 3.4(c), a lawyer may not disregard a specific ruling or standing rule of a tribunal, but can take appropriate steps to test the validity of such a rule or ruling.

[4A]   A lawyer harms the integrity of the law and the legal profession when the lawyer states or implies an ability to influence improperly any officer or agency of the executive, legislative or judicial branches of government.

USCA11 Case: 22-11150   Date Filed: 09/06/2022   Page: 22 of 24

[5]     Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers. The same is true of abuse of positions of private trust such as trustee, executor, administrator, guardian, agent and officer, director or manager of a corporation or other organization.

[5A]    Unlawful discrimination in the practice of law on the basis of age, race, creed, color, national origin, sex, disability, marital status, or sexual orientation is governed by paragraph (g).

# Rule 8.4: Misconduct

Share:



*Maintaining The Integrity Of The Profession*

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law;

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

(g) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude legitimate advice or advocacy consistent with these Rules.

Comment | Table of Contents | Next Rule



**ABA**   American Bar Association

/content/aba-cms-dotorg/en/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_8_4_misconduct

# EXHIBIT 15


The State Bar *of California*

# California
# Rules of Professional Conduct

2021

# California Rules of Professional Conduct and Other Related Rules and Codes

## Volume 1

Rules of Professional Conduct
State Bar Act (Bus. & Prof. Code, §§ 6000 et seq.)
"1992" Rules of Professional Conduct
"1989" Rules of Professional Conduct
"1975" Rules of Professional Conduct
Rules Cross-Reference Tables

Published by the State Bar of California
Office of Professional Competence

Pub. No. 250
2021

**PRODUCTION STAFF**

**EDITOR**
Randall Difuntorum

**PRODUCTION EDITOR**
Lauren McCurdy

**ASSISTANT EDITOR**
Mimi Lee

**LEGISLATIVE RESEARCH**
Mimi Lee
Lauren McCurdy
Andrew Tuft

**DISTRIBUTION**
Angela Marlaud

**WEB PRODUCTION**
Mimi Lee

# TABLE OF CONTENTS

**RULES OF PROFESSIONAL CONDUCT
CROSS-REFERENCE TABLES**

Current Rules to the "1992" Rules                iii

"1992" Rules to the Current Rules                vii

**RULES OF PROFESSIONAL CONDUCT**

Rule 1.0  Purpose and Function of the Rules of
      Professional Conduct                1

Rule 1.0.1  Terminology                2

CHAPTER 1.  LAWYER-CLIENT RELATIONSHIP                3

Rule 1.1  Competence                3

Rule 1.2  Scope of Representation and Allocation of
      Authority                4

Rule 1.2.1  Advising or Assisting the Violation of Law  5

Rule 1.3  Diligence                5

Rule 1.4  Communication with Clients                6

Rule 1.4.1  Communication of Settlement Offers                6

Rule 1.4.2  Disclosure of Professional Liability
      Insurance                6

Rule 1.5  Fees for Legal Services                7

Rule 1.5.1  Fee Divisions Among Lawyers                8

Rule 1.6  Confidential Information of a Client                8

Rule 1.7  Conflict of Interest: Current Clients                12

Rule 1.8.1  Business Transactions with a Client and
      Pecuniary Interests Adverse to a Client
                      15

Rule 1.8.2  Use of Current Client's Information                16

Rule 1.8.3  Gifts from Client                16

Rule 1.8.4  [Reserved]                16

Rule 1.8.5  Payment of Personal or Business Expenses
      Incurred by or for a Client                16

Rule 1.8.6  Compensation from One Other than Client
                      17

Rule 1.8.7  Aggregate Settlements                18

Rule 1.8.8  Limiting Liability to Client                18

Rule 1.8.9  Purchasing Property at a Foreclosure or a
      Sale Subject to Judicial Review                18

Rule 1.8.10  Sexual Relations with Current Client                18

Rule 1.8.11  Imputation of Prohibitions Under Rules
      1.8.1 to 1.8.9                19

Rule 1.9  Duties to Former Clients                19

Rule 1.10  Imputation of Conflicts of Interest: General
      Rule                20

Rule 1.11  Special Conflicts of Interest for Former and
      Current Government Officials and
      Employees                21

Rule 1.12  Former Judge, Arbitrator, Mediator, or
      Other Third-Party Neutral                23

Rule 1.13  Organization as Client                24

Rule 1.14  [Reserved]                26

Rule 1.15  Safekeeping Funds and Property of Clients
      and Other Persons*                26

Rule 1.16  Declining or Terminating Representation 28

Rule 1.17  Sale of a Law Practice                29

Rule 1.18  Duties to Prospective Client                31

CHAPTER 2. COUNSELOR                32

Rule 2.1 Advisor                32

Rule 2.2  [Reserved]                32

Rule 2.3  [Reserved]                32

Rule 2.4  Lawyer as Third-Party Neutral                32

Rule 2.4.1  Lawyer as Temporary Judge, Referee, or
      Court-Appointed Arbitrator                32

**TABLE OF CONTENTS**

CHAPTER 3. ADVOCATE 33

Rule 3.1 Meritorious Claims and Contentions 33

Rule 3.2 Delay of Litigation 33

Rule 3.3 Candor Toward the Tribunal* 33

Rule 3.4 Fairness to Opposing Party and Counsel 35

Rule 3.5 Contact with Judges, Officials, Employees, and Jurors 35

Rule 3.6 Trial Publicity 36

Rule 3.7 Lawyer as Witness 37

Rule 3.8 Special Responsibilities of a Prosecutor 38

Rule 3.9 Advocate in Nonadjudicative Proceedings 39

Rule 3.10 Threatening Criminal, Administrative, or Disciplinary Charges 40

CHAPTER 4.  TRANSACTIONS WITH PERSONS*  OTHER THAN CLIENTS 40

Rule 4.1 Truthfulness in Statements to Others 40

Rule 4.2 Communication with a Represented Person* 41

Rule 4.3 Communicating with an Unrepresented Person* 42

Rule 4.4 Duties Concerning Inadvertently Transmitted Writings* 43

CHAPTER 5.  LAW FIRMS* AND ASSOCIATIONS 43

Rule 5.1 Responsibilities of Managerial and Supervisory Lawyers 43

Rule 5.2 Responsibilities of a Subordinate Lawyer 44

Rule 5.3 Responsibilities Regarding Nonlawyer Assistants 45

Rule 5.3.1 Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Lawyer 45

Rule 5.4 Financial and Similar Arrangements with Nonlawyers 46

Rule 5.5 Unauthorized Practice of Law; Multijurisdictional Practice of Law 48

Rule 5.6 Restrictions on a Lawyer's Right to Practice 48

Rule 5.7 [Reserved] 49

CHAPTER 6. PUBLIC SERVICE 49

Rule 6.1 [Reserved] 49

Rule 6.2 [Reserved] 49

Rule 6.3 Membership in Legal Services Organization 49

Rule 6.4 [Reserved] 49

Rule 6.5 Limited Legal Services Programs 49

CHAPTER 7.  INFORMATION ABOUT LEGAL SERVICES 50

Rule 7.1 Communications Concerning a Lawyer's Services 50

Rule 7.2 Advertising 51

Rule 7.3 Solicitation of Clients 52

Rule 7.4 Communication of Fields of Practice and Specialization 53

Rule 7.5 Firm* Names and Trade Names 53

Rule 7.6 [Reserved] 53

CHAPTER 8.  MAINTAINING THE INTEGRITY  OF THE PROFESSION 53

Rule  8.1 False Statement Regarding Application for Admission to Practice Law 53

Rule 8.1.1 Compliance with Conditions of Discipline and Agreements in Lieu of Discipline 54

Rule 8.2 Judicial Officials 54

Rule 8.3 [Reserved] 54

**TABLE OF CONTENTS**

Rule 8.4  Misconduct                                    54

Rule 8.4.1 Prohibited Discrimination, Harassment and
                    Retaliation                          55

Rule 8.5  Disciplinary Authority; Choice of Law         57

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) | "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) |
|---|---|
| **1.0** Purpose and Function of the Rules of Professional Conduct | **1-100** Rules of Professional Conduct, in General |
| **1.0.1** Terminology | **1-100(B)** |
| **1.1** Competence[1] | **3-110** Failing to Act Competently |
| **1.2** Scope of Representation and Allocation of Authority | **No Former California Rule Counterpart** |
| **1.2.1** Advising or Assisting the Violation of Law | **3-210** Advising the Violation of Law |
| **1.3** Diligence | **3-110(B)**[2] |
| **1.4** Communication with Clients | **3-500** Communication |
| **1.4.1** Communication of Settlement Offers | **3-510** Communication of Settlement Offer |
| **1.4.2** Disclosure of Professional Liability Insurance | **3-410** Disclosure of Professional Liability Insurance |
| **1.5** Fees for Legal Services | **4-200** Fees for Legal Services |
| **1.5.1** Fee Divisions Among Lawyers | **2-200** Financial Arrangements Among Lawyers |
| **1.6** Confidential Information of a Client | **3-100** Confidential Information of a Client |
| **1.7** Conflict of Interest: Current Clients | **3-310(B),(C)** [Avoiding the Representation of Adverse Interests]<br>**3-320** Relationship With Other Party's Lawyer |
| **1.8.1** Business Transactions with a Client and Pecuniary Interests Adverse to the Client | **3-300** Avoiding Interests Adverse to a Client |
| **1.8.2** Use of Current Client's Information | **No Former California Rule Counterpart**[3] |
| **1.8.3** Gifts from Client | **4-400** Gifts From Client |
| **1.8.5** Payment of Personal or Business Expenses Incurred by or for a Client | **4-210** Payment of Personal or Business Expenses Incurred by or for a Client |
| **1.8.6** Compensation from One Other than Client | **3-310(F)** |
| **1.8.7** Aggregate Settlements | **3-310(D)** |
| **1.8.8** Limiting Liability to Client | **3-400** Limiting Liability to Client |
| **1.8.9** Purchasing Property at a Foreclosure or a Sale Subject to Judicial Review | **4-300** Purchasing Property at a Foreclosure or a Sale Subject to Judicial Review |
| **1.8.10** Sexual Relations with Current Client | **3-120** Sexual Relations With Client |
| **1.8.11** Imputation of Prohibitions Under Rules 1.8.1 to 1.8.9 | **No Former California Rule Counterpart** |

---

[1]   Rule 1.1, Comment [1] was added by order of the Supreme Court, effective March 22, 2021.

[2]   Rule 3-110(B) provides:

(B)   For purposes of this rule, "competence" in any legal service shall mean to apply the 1) *diligence*, 2) learning and skill, and 3) mental, emotional, and physical ability reasonably necessary for the performance of such service. (Emphasis added.)

[3]   But see Cal. Bus. & Prof. Code § 6068(e)(1).

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) | "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) |
|---|---|
| **1.9** Duties To Former Clients | **3-310(E)** |
| **1.10** Imputation of Conflicts of Interest: General Rule | **No Former California Rule Counterpart** |
| **1.11** Special Conflicts of Interest for Former and Current Government Officials and Employees | **No Former California Rule Counterpart** |
| **1.12** Former Judge, Arbitrator, Mediator or Other Third-Party Neutral | **No Former California Rule Counterpart** |
| **1.13** Organization as Client | **3-600** Organization as Client |
| **1.14** [Reserved][4] | |
| **1.15** Safekeeping Funds and Property of Clients and Other Persons | **4-100** Preserving Identity of Funds and Property of a Client |
| **1.16** Declining or Terminating Representation[5] | **3-700** Termination of Employment |
| **1.17** Sale of a Law Practice | **2-300** Sale or Purchase of a Law Practice of a Member, Living or Deceased |
| **1.18** Duties to Prospective Client | **No Former California Rule Counterpart** |
| **2.1** Advisor | **No Former California Rule Counterpart** |
| **2.2** [Reserved][6] | |
| **2.3** [Reserved][7] | |
| **2.4** Lawyer as Third-Party Neutral | **No Former California Rule Counterpart** |
| **2.4.1** Lawyer as Temporary Judge, Referee, or Court-Appointed Arbitrator | **1-710** Member as Temporary Judge, Referee, or Court-Appointed Arbitrator |
| **3.1** Meritorious Claims and Contentions | **3-200** Prohibited Objectives of Employment |
| **3.2** Delay of Litigation | **No Former California Rule Counterpart** |
| **3.3** Candor Toward the Tribunal | **5-200(A)-(D)** Trial Conduct |
| **3.4** Fairness to Opposing Party and Counsel | **5-200(E)** [Trial Conduct]<br>**5-220** Suppression of Evidence<br>(Note: Rule 5-220 was revised effective May 1, 2017.)<br>**5-310** Prohibited Contact With Witnesses<br>(Note: See also Rule 5-110 was revised effective November 2, 2017.) |
| **3.5** Contact with Judges, Officials, Employees, and Jurors | **5-300** Contact With Officials<br>**5-320** Contact With Jurors |
| **3.6** Trial Publicity | **5-120** Trial Publicity |
| **3.7** Lawyer as Witness | **5-210** Member as Witness |

---

[4]   ABA Model Rule 1.14 ("Client With Diminished Capacity") has not been adopted in California.

[5]   Rule 1.16, Comment [5] was amended by order of the Supreme Court, effective June 1, 2020.

[6]   ABA Model Rule 2.2 was deleted and has not been adopted in California.

[7]   ABA Model Rule 2.3 ("Evaluation For Use By Third Persons") has not been adopted in California.

2021

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) | "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) |
|---|---|
| **3.8**  Special Responsibilities of a Prosecutor[8] | **5-110**  Performing the Duty of Member in Government Service<br>(Note: Rule 5-110 was revised effective November 2, 2017.) |
| **3.9**  Advocate in Non-adjudicative Proceedings | **No Former California Rule Counterpart** |
| **3.10**  Threatening Criminal, Administrative, or Disciplinary Charges | **5-100**  Threatening Criminal, Administrative, or Disciplinary Charges |
| **4.1**  Truthfulness in Statements to Others | **No Former California Rule Counterpart** |
| **4.2**  Communication with a Represented Person | **2-100**  Communication With a Represented Party |
| **4.3**  Communicating with an Unrepresented Person | **No Former California Rule Counterpart** |
| **4.4**  Duties Concerning Inadvertently Transmitted Writings | **No Former California Rule Counterpart** |
| **5.1**  Responsibilities of Managerial and Supervisory Lawyers | **No Former California Rule Counterpart**[9] |
| **5.2**  Responsibilities of a Subordinate Lawyer | **No Former California Rule Counterpart** |
| **5.3**  Responsibilities Regarding Nonlawyer Assistants | **No Former California Rule Counterpart**[10] |
| **5.3.1**  Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Lawyer | **1-311**  Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Members |
| **5.4**  Financial and Similar Arrangements with Nonlawyers[11] | **1-310**  Forming a Partnership With a Non-Lawyer<br>**1-320**  Financial Arrangements With Non-Lawyer<br>**1-600**  Legal Service Programs |
| **5.5**  Unauthorized Practice of Law; Multijurisdictional Practice of Law | **1-300**  Unauthorized Practice of Law |
| **5.6**  Restrictions on a Lawyer's Right to Practice | **1-500**  Agreements Restricting a Member's Practice |
| **6.3**  Membership in Legal Services Organizations | **No Former California Rule Counterpart** |
| **6.5**  Limited Legal Services Programs | **1-650**  Limited Legal Service Programs |
| **7.1**  Communications Concerning a Lawyer's Services | **1-400**  Advertising and Solicitation |
| **7.2**  Advertising | **1-320(B)-(C) & (A)(4)** [Financial Arrangements With Non-Lawyer]<br>**1-400**  Advertising and Solicitation<br>**2-200**  Financial Arrangements Among Lawyers |
| **7.3**  Solicitation of Clients | **1-400**  Advertising and Solicitation |
| **7.4**  Communication of Fields of Practice and Specialization | **1-400**  Advertising and Solicitation |
| **7.5**  Firm Names and Trade Names | **1-400**  Advertising and Solicitation |
| **7.6** [Reserved][12] | |

---

[8]   Rule 3.8, Comment [7] was amended by order of the Supreme Court, effective June 1, 2020.

[9]   But see rule 3-110, Discussion ¶. 1.

[10]   But see rule 3-110, Discussion ¶. 1.

[11]   Rule 5.4 was amended by order of the Supreme Court, effective March 22, 2021.

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) | "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) |
|---|---|
| **8.1** False Statement Regarding Application for Admission to Practice Law | **1-200** False Statement Regarding Admission to the State Bar |
| **8.1.1** Compliance with Conditions of Discipline and Agreements in Lieu of Discipline | **1-110** Disciplinary Authority of the State Bar |
| **8.2** Judicial Officials | **1-700** Member as Candidate for Judicial Office |
| **8.3** [Reserved][13] | |
| **8.4** Misconduct | **1-120** Assisting, Soliciting, or Inducing Violations |
| **8.4.1** Prohibited Discrimination, Harassment and Retaliation | **2-400** Prohibited Discriminatory Conduct in a Law Practice |
| **8.5** Disciplinary Authority; Choice of Law | **1-100(D)** Rules of Professional Conduct, in General |

---

[12]   ABA Model Rule 7.6 ("Political Contributions To Obtain Legal Engagements Or Appointments By Judges") has not been adopted in California.

[13]   ABA Model Rule 8.3 ("Reporting Professional Misconduct") has not been adopted in California.

2021

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| **"1992" Rules of Professional Conduct**<br>*Effective until October 31, 2018*<br>(Rule Number and Title) | **Current Rules of Professional Conduct**<br>*Effective on November 1, 2018*<br>(Rule Number and Title) |
|---|---|
| **1-100(A)** [Rules of Professional Conduct, in General] | **1.0** Purpose and Function of the Rules of Professional Conduct |
| **1-100(B)** | **1.0.1** Terminology |
| **1-100(D)** | **8.5** Disciplinary Authority; Choice of Law |
| **1-110** Disciplinary Authority of the State Bar | **8.1.1** Compliance with Conditions of Discipline and Agreements in Lieu of Discipline |
| **1-120** Assisting, Soliciting, or Inducing Violations | **8.4** Misconduct |
| **1-200** False Statement Regarding Admission to the State Bar | **8.1** False Statement Regarding Application for Admission to Practice Law |
| **1-300** Unauthorized Practice of Law | **5.5** Unauthorized Practice of Law; Multijurisdictional Practice of Law |
| **1-310** Forming a Partnership With a Non-Lawyer | **5.4** Financial and Similar Arrangements with Nonlawyers[14] |
| **1-311** Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Members | **5.3.1** Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Lawyer |
| **1-320(A)** | **5.4** Financial and Similar Arrangements with Nonlawyers[15] |
| **1-320(A)(4) & (B)-(C)** [Financial Arrangements With Non-Lawyer] | **7.2(b)** Advertising |
| **1-400** Advertising and Solicitation | **7.1** Communications Concerning a Lawyer's Services<br>**7.2** Advertising<br>**7.3** Solicitation of Clients<br>**7.4** Communication of Fields of Practice and Specialization<br>**7.5** Firm Names and Trade Names |
| **1-500** Agreements Restricting a Member's Practice | **5.6** Restrictions on a Lawyer's Right to Practice |
| **1-600** Legal Service Programs | **5.4** Financial and Similar Arrangements with Nonlawyers[16] |
| **1-650** Limited Legal Service Programs | **6.5** Limited Legal Services Programs |
| **1-700** Member as Candidate for Judicial Office | **8.2** Judicial Officials |
| **1-710** Member as Temporary Judge, Referee, or Court-Appointed Arbitrator | **2.4.1** Lawyer as Temporary Judge, Referee, or Court-Appointed Arbitrator |
| **2-100** Communication With a Represented Party | **4.2** Communication with a Represented Person |
| **2-200(A)** Financial Arrangements Among Lawyers | **1.5.1** Fee Divisions Among Lawyers |
| **2-200(B)** | **7.2(b)** Advertising |
| **2-300** Sale or Purchase of a Law Practice of a Member, Living or Deceased | **1.17** Sale of a Law Practice |
| **2-400** Prohibited Discriminatory Conduct in a Law Practice | **8.4.1** Prohibited Discrimination, Harassment and Retaliation |
| **3-100** Confidential Information of a Client | **1.6** Confidential Information of a Client |

---

[14]   Rule 5.4 was amended by order of the Supreme Court, effective March 22, 2021.

[15]   Rule 5.4 was amended by order of the Supreme Court, effective March 22, 2021.

[16]   Rule 5.4 was amended by order of the Supreme Court, effective March 22, 2021.

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) | Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) |
|---|---|
| **3-110** Failing to Act Competently | **1.1** Competence[17] |
| **3-110(B)** | **1.3** Diligence |
| **3-110, Discussion ¶.1** | **Rule 5.1** Responsibilities of Managerial and Supervisory Lawyers<br>**Rule 5.2** Responsibilities of a Subordinate Lawyer<br>**Rule 5.3** Responsibilities Regarding Nonlawyer Assistants |
| **3-120** Sexual Relations With Client | **1.8.10** Sexual Relations with Current Client |
| **3-200** Prohibited Objectives of Employment | **3.1** Meritorious Claims and Contentions |
| **3-210** Advising the Violation of Law | **1.2.1** Advising or Assisting the Violation of Law |
| **3-300** Avoiding Interests Adverse to a Client | **1.8.1** Business Transactions with a Client and Pecuniary Interests Adverse to the Client |
| **3-310(B), (C)** Avoiding the Representation of Adverse Interests | **1.7** Conflict of Interest: Current Clients |
| **3-310(D)** | **1.8.7** Aggregate Settlements |
| **3-310(E)** | **1.9** Duties To Former Clients |
| **3-310(F)** | **1.8.6** Compensation from One Other than Client |
| **3-320** Relationship With Other Party's Lawyer | **1.7(c)(2)** Conflict of Interest: Current Clients |
| **3-400** Limiting Liability to Client | **1.8.8** Limiting Liability to Client |
| **3-410** Disclosure of Professional Liability Insurance | **1.4.2** Disclosure of Professional Liability Insurance |
| **3-500** Communication | **1.4** Communication with Clients |
| **3-510** Communication of Settlement Offer | **1.4.1** Communication of Settlement Offers |
| **3-600** Organization as Client | **1.13** Organization as Client |
| **3-700** Termination of Employment | **1.16** Declining or Terminating Representation[18] |
| **4-100** Preserving Identity of Funds and Property of a Client | **1.15** Safekeeping Funds and Property of Clients and Other Persons |
| **4-200** Fees for Legal Services | **1.5** Fees for Legal Services |
| **4-210** Payment of Personal or Business Expenses Incurred by or for a Client | **1.8.5** Payment of Personal or Business Expenses Incurred by or for a Client |
| **4-300** Purchasing Property at a Foreclosure or a Sale Subject to Judicial Review | **1.8.9** Purchasing Property at a Foreclosure or a Sale Subject to Judicial Review |
| **4-400** Gifts From Client | **1.8.3** Gifts from Client |
| **5-100** Threatening Criminal, Administrative, or Disciplinary Charges | **3.10** Threatening Criminal, Administrative, or Disciplinary Charges |

---

[17]   Rule 1.1, Comment [1] was added by order of the Supreme Court, effective March 22, 2021.

[18]   Rule 1.16, Comment [5] was amended by order of the Supreme Court, effective June 1, 2020.

**RULES OF PROFESSIONAL CONDUCT**
**CROSS-REFERENCE CHART**

| "1992" Rules of Professional Conduct<br>*Effective until October 31, 2018*<br>(Rule Number and Title) | Current Rules of Professional Conduct<br>*Effective on November 1, 2018*<br>(Rule Number and Title) |
|---|---|
| **5-110** Performing the Duty of Member in Government Service<br><br>(**Note**: Rule 5-110 was revised effective November 2, 2017.) | **3.8** Special Responsibilities of a Prosecutor[19] |
| **5-120** Trial Publicity | **3.6** Trial Publicity |
| **5-200(A)-(D)** Trial Conduct | **3.3** Candor Toward the Tribunal |
| **5-200(E)** Trial Conduct | **3.4** Fairness to Opposing Party and Counsel |
| **5-210** Member as Witness | **3.7** Lawyer as Witness |
| **5-220** Suppression of Evidence<br><br>(**Note**: Rule 5-220 was revised effective May 1, 2017.) | **3.4** Fairness to Opposing Party and Counsel<br><br>(**Note**: See also Rule 3.8(d) regarding the duties of a prosecutor.) |
| **5-300** Contact With Officials | **3.5** Contact with Judges, Officials, Employees, and Jurors |
| **5-310** Prohibited Contact With Witnesses | **3.4** Fairness to Opposing Party and Counsel |
| **5-320** Contact With Jurors | **3.5** Contact with Judges, Officials, Employees, and Jurors |

**Current Rules With No Former California Rule Counterpart**

Rule 1.2 Scope of Representation and Allocation of Authority

Rule 1.8.2 Use of Current Client's Information[20]

Rule 1.8.11 Imputation of Prohibitions Under Rules 1.8.1 to 1.8.9

Rule 1.10 Imputation of Conflicts of Interest: General Rule

Rule 1.11 Special Conflicts of Interest for Former and Current Government Officials and Employees

Rule 1.12 Former Judge, Arbitrator, Mediator or Other Third-Party Neutral

Rule 1.18 Duties to Prospective Client

Rule 2.1 Advisor

Rule 2.4 Lawyer as Third-Party Neutral

Rule 3.2 Delay of Litigation

Rule 3.9 Advocate in Non-adjudicative Proceedings

Rule 4.1 Truthfulness in Statements to Others

Rule 4.3 Communicating with an Unrepresented Person[21]

Rule 4.4 Duties Concerning Inadvertently Transmitted Writings

Rule 5.3 Responsibilities Regarding Nonlawyer Assistants

Rule 6.3 Membership in Legal Services Organizations

---

[19]   Rule 3.8, Comment [7] was amended by order of the Supreme Court, effective June 1, 2020.

[20]   But see Bus. & Prof. Code § 6068(e).

[21]   But see current rule 3-600(D) regarding similar duties in an organizational context.

2021

# RULES OF PROFESSIONAL CONDUCT

*(On May 10, 2018, the California Supreme Court issued an order approving new Rules of Professional Conduct, which are effective on November 1, 2018 On September 26, 2018, the Court issued an order approving non-substantive clean-up revisions to the rules. These revisions are effective on the same date.)*

## Rule 1.0  Purpose and Function of the Rules of Professional Conduct

(a)    Purpose.

The following rules are intended to regulate professional conduct of lawyers through discipline. They have been adopted by the Board of Trustees of the State Bar of California and approved by the Supreme Court of California pursuant to Business and Professions Code sections 6076 and 6077 to protect the public, the courts, and the legal profession; protect the integrity of the legal system; and promote the administration of justice and confidence in the legal profession. These rules together with any standards adopted by the Board of Trustees pursuant to these rules shall be binding upon all lawyers.

(b)    Function.

(1)    A willful violation of any of these rules is a basis for discipline.

(2)    The prohibition of certain conduct in these rules is not exclusive. Lawyers are also bound by applicable law including the State Bar Act (Bus. & Prof. Code, § 6000 et seq.) and opinions of California courts.

(3)    A violation of a rule does not itself give rise to a cause of action for damages caused by failure to comply with the rule. Nothing in these rules or the Comments to the rules is intended to enlarge or to restrict the law regarding the liability of lawyers to others.

(c)    Purpose of Comments.

The comments are not a basis for imposing discipline but are intended only to provide guidance for interpreting and practicing in compliance with the rules.

(d)    These rules may be cited and referred to as the "California Rules of Professional Conduct."

## Comment

[1]    The Rules of Professional Conduct are intended to establish the standards for lawyers for purposes of discipline.  (See *Ames v. State Bar* (1973) 8 Cal.3d 910, 917 [106 Cal.Rptr. 489].)  Therefore, failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process.  Because the rules are not designed to be a basis for civil liability, a violation of a rule does not itself give rise to a cause of action for enforcement of a rule or for damages caused by failure to comply with the rule.  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1097 [41 Cal.Rptr.2d 768].)  Nevertheless, a lawyer's violation of a rule may be evidence of breach of a lawyer's fiduciary or other substantive legal duty in a non-disciplinary context.  (*Ibid.*; see also *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 44 [5 Cal.Rptr.2d 571].)  A violation of a rule may have other non-disciplinary consequences. (See, e.g., *Fletcher v. Davis* (2004) 33 Cal.4th 61, 71-72 [14 Cal.Rptr.3d 58] [enforcement of attorney's lien]; *Chambers v. Kay* (2002) 29 Cal.4th 142, 161 [126 Cal.Rptr.2d 536] [enforcement of fee sharing agreement].)

[2]    While the rules are intended to regulate professional conduct of lawyers, a violation of a rule can occur when a lawyer is not practicing law or acting in a professional capacity.

[3]    A willful violation of a rule does not require that the lawyer intend to violate the rule.  (*Phillips v. State Bar* (1989) 49 Cal.3d 944, 952 [264 Cal.Rptr. 346]; and see Bus. & Prof. Code, § 6077.)

[4]    In addition to the authorities identified in paragraph (b)(2), opinions of ethics committees in California, although not binding, should be consulted for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered.

[5]    The disciplinary standards created by these rules are not intended to address all aspects of a lawyer's professional obligations.  A lawyer, as a member of the legal profession, is a representative and advisor of clients, an officer of the legal system and a public citizen having special responsibilities for the quality of justice.  A lawyer should be aware of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons* who are not poor cannot afford adequate legal assistance.  Therefore,

**RULES OF PROFESSIONAL CONDUCT**

all lawyers are encouraged to devote professional time and resources and use civic influence to ensure equal access to the system of justice for those who because of economic or social barriers cannot afford or secure adequate legal counsel.  In meeting this responsibility of the profession, every lawyer should aspire to render at least fifty hours of pro bono publico legal services per year.  The lawyer should aim to provide a substantial* majority of such hours to indigent individuals or to nonprofit organizations with a primary purpose of providing services to the poor or on behalf of the poor or disadvantaged. Lawyers may also provide financial support to organizations providing free legal services.  (See Bus. & Prof. Code, § 6073.)

## Rule 1.0.1  Terminology

(a)   "Belief" or "believes" means that the person* involved actually supposes the fact in question to be true.   A person's* belief may be inferred from circumstances.

(b)   [Reserved]

(c)   "Firm" or "law firm" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)   "Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)   "Informed consent" means a person's* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably* foreseeable adverse consequences of the proposed course of conduct.

(e-1) "Informed written consent" means that the disclosures and the consent required by paragraph (e) must be in writing.*

(f)   "Knowingly," "known," or "knows" means actual knowledge of the fact in question.   A person's* knowledge may be inferred from circumstances.

(g)   "Partner" means a member of a partnership, a shareholder in a law firm* organized as a professional corporation, or a member of an association authorized to practice law.

(g-1) "Person" has the meaning stated in Evidence Code section 175.

(h)   "Reasonable" or "reasonably" when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer.

(i)   "Reasonable belief" or "reasonably believes" when used in reference to a lawyer means that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

(j)   "Reasonably should know" when used in reference to a lawyer means that a lawyer of reasonable prudence and competence would ascertain the matter in question.

(k)   "Screened" means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to protect information that the isolated lawyer is obligated to protect under these rules or other law; and (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer with respect to the matter.

(l)   "Substantial" when used in reference to degree or extent means a material matter of clear and weighty importance.

(m)   "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(n)   "Writing" or "written" has the meaning stated in Evidence Code section 250.   A "signed" writing includes an electronic sound, symbol, or process attached to or logically associated with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to sign the writing.

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

*Firm\* or Law Firm\**

[1]   Practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a law firm.\* However, if they present themselves to the public in a way that suggests that they are a law firm\* or conduct themselves as a law firm,\* they may be regarded as a law firm\* for purposes of these rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm,\* as is the fact that they have mutual access to information concerning the clients they serve.

[2]   The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,\* other than as a partner\* or associate, or officer or shareholder, that is close, personal, continuous, and regular.  Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed a member of a law firm\* for purposes of these rules will also depend on the specific facts.  (Compare *People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816] with *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

*Fraud\**

[3]   When the terms "fraud"\* or "fraudulent"\* are used in these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud\* would impede the purpose of certain rules to prevent fraud\* or avoid a lawyer assisting in the perpetration of a fraud,\* or otherwise frustrate the imposition of discipline on lawyers who engage in fraudulent\* conduct.  The term "fraud"\* or "fraudulent"\* when used in these rules does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information.

*Informed Consent\* and Informed Written Consent\**

[4]   The communication necessary to obtain informed consent\* or informed written consent\* will vary according to the rule involved and the circumstances giving rise to the need to obtain consent.

*Screened\**

[5]   The purpose of screening\* is to assure the affected client, former client, or prospective client that confidential information known\* by the personally prohibited lawyer is neither disclosed to other law firm\* lawyers or nonlawyer personnel nor used to the detriment of the person\* to whom the duty of confidentiality is owed.   The personally prohibited lawyer shall acknowledge the obligation not to communicate with any of the other lawyers and nonlawyer personnel in the law firm\* with respect to the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm\* who are working on the matter promptly shall be informed that the screening\* is in place and that they may not communicate with the personally prohibited lawyer with respect to the matter.  Additional screening\* measures that are appropriate for the particular matter will depend on the circumstances.     To implement, reinforce and remind all affected law firm\* personnel of the presence of the screening,\* it may be appropriate for the law firm\* to undertake such procedures as a written\* undertaking by the personally prohibited lawyer to avoid any communication with other law firm\* personnel and any contact with any law firm\* files or other materials relating to the matter, written\* notice and instructions to all other law firm\* personnel forbidding any communication with the personally prohibited lawyer relating to the matter, denial of access by that lawyer to law firm\* files or other materials relating to the matter, and periodic reminders of the screen\* to the personally prohibited lawyer and all other law firm\* personnel.

[6]   In order to be effective, screening\* measures must be implemented as soon as practical after a lawyer or law firm\* knows\* or reasonably should know\* that there is a need for screening.\*

# CHAPTER 1.
# LAWYER-CLIENT RELATIONSHIP

## Rule 1.1  Competence

(a)   A lawyer shall not intentionally, recklessly, with gross negligence, or repeatedly fail to perform legal services with competence.

**RULES OF PROFESSIONAL CONDUCT**

(b)   For purposes of this rule, "competence" in any legal service shall mean to apply the (i) learning and skill, and (ii) mental, emotional, and physical ability reasonably* necessary for the performance of such service.

(c)   If a lawyer does not have sufficient learning and skill when the legal services are undertaken, the lawyer nonetheless may provide competent representation by (i) associating with or, where appropriate, professionally consulting another lawyer whom the lawyer reasonably believes* to be competent, (ii) acquiring sufficient learning and skill before performance is required, or (iii) referring the matter to another lawyer whom the lawyer reasonably believes* to be competent.

(d)   In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required if referral to, or association or consultation with, another lawyer would be impractical. Assistance in an emergency must be limited to that reasonably* necessary in the circumstances.

**Comment**

[1]   The duties set forth in this rule include the duty to keep abreast of the changes in the law and its practice, including the benefits and risks associated with relevant technology.

[2]   This rule addresses only a lawyer's responsibility for his or her own professional competence.  See rules 5.1 and 5.3 with respect to a lawyer's disciplinary responsibility for supervising subordinate lawyers and nonlawyers.

[3]   See rule 1.3 with respect to a lawyer's duty to act with reasonable* diligence.

[**Publisher's Note:** Comment [1] was added by order of the Supreme Court, effective March 22, 2021.]

## Rule 1.2  Scope of Representation and Allocation of Authority

(a)   Subject to rule 1.2.1, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by rule 1.4, shall reasonably* consult with the client as to the means by which they are to be pursued.  Subject to Business and Professions Code section 6068, subdivision (e)(1)

and rule 1.6, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.  A lawyer shall abide by a client's decision whether to settle a matter.  Except as otherwise provided by law in a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b)   A lawyer may limit the scope of the representation if the limitation is reasonable* under the circumstances, is not otherwise prohibited by law, and the client gives informed consent.*

**Comment**

*Allocation of Authority between Client and Lawyer*

[1]   Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations.  (See, e.g., Cal. Const., art. I, § 16; Pen. Code, § 1018.)  A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions.  A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.  (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 404 [212 Cal.Rptr. 151, 156].)

[2]   At the outset of, or during a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation.  Absent a material change in circumstances and subject to rule 1.4, a lawyer may rely on such an advance authorization.  The client may revoke such authority at any time.

*Independence from Client's Views or Activities*

[3]   A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

*Agreements Limiting Scope of Representation*

[4]   All agreements concerning a lawyer's representation of a client must accord with the Rules of Professional Conduct and other law. (See, e.g., rules 1.1, 1.8.1, 5.6; see also Cal. Rules of Court, rules 3.35-3.37 [limited scope rules applicable in civil

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

matters generally], 5.425 [limited scope rule applicable in family law matters].)

## Rule 1.2.1  Advising or Assisting the Violation of Law

(a)   A lawyer shall not counsel a client to engage, or assist a client in conduct that the lawyer knows* is criminal, fraudulent,* or a violation of any law, rule, or ruling of a tribunal.*

(b)   Notwithstanding paragraph (a), a lawyer may:

(1)   discuss the legal consequences of any proposed course of conduct with a client; and

(2)   counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of a law, rule, or ruling of a tribunal.*

### Comment

[1]   There is a critical distinction under this rule between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud* might be committed with impunity. The fact that a client uses a lawyer's advice in a course of action that is criminal or fraudulent* does not of itself make a lawyer a party to the course of action.

[2]   Paragraphs (a) and (b) apply whether or not the client's conduct has already begun and is continuing. In complying with this rule, a lawyer shall not violate the lawyer's duty under Business and Professions Code section 6068, subdivision (a) to uphold the Constitution and laws of the United States and California or the duty of confidentiality as provided in Business and Professions Code section 6068, subdivision (e)(1) and rule 1.6. In some cases, the lawyer's response is limited to the lawyer's right and, where appropriate, duty to resign or withdraw in accordance with rules 1.13 and 1.16.

[3]   Paragraph (b) authorizes a lawyer to advise a client in good faith regarding the validity, scope, meaning or application of a law, rule, or ruling of a tribunal* or of the meaning placed upon it by governmental authorities, and of potential consequences to disobedience of the law, rule, or ruling of a tribunal* that the lawyer concludes in good faith to be invalid, as well as legal procedures that

may be invoked to obtain a determination of invalidity.

[4]   Paragraph (b) also authorizes a lawyer to advise a client on the consequences of violating a law, rule, or ruling of a tribunal* that the client does not contend is unenforceable or unjust in itself, as a means of protesting a law or policy the client finds objectionable. For example, a lawyer may properly advise a client about the consequences of blocking the entrance to a public building as a means of protesting a law or policy the client believes* to be unjust or invalid.

[5]   If a lawyer comes to know* or reasonably should know* that a client expects assistance not permitted by these rules or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must advise the client regarding the limitations on the lawyer's conduct. (See rule 1.4(a)(4).)

[6]   Paragraph (b) permits a lawyer to advise a client regarding the validity, scope, and meaning of California laws that might conflict with federal or tribal law. In the event of such a conflict, the lawyer may assist a client in drafting or administering, or interpreting or complying with, California laws, including statutes, regulations, orders, and other state or local provisions, even if the client's actions might violate the conflicting federal or tribal law. If California law conflicts with federal or tribal law, the lawyer must inform the client about related federal or tribal law and policy and under certain circumstances may also be required to provide legal advice to the client regarding the conflict (see rules 1.1 and 1.4).

## Rule 1.3  Diligence

(a)   A lawyer shall not intentionally, repeatedly, recklessly or with gross negligence fail to act with reasonable diligence in representing a client.

(b)   For purposes of this rule, "reasonable diligence" shall mean that a lawyer acts with commitment and dedication to the interests of the client and does not neglect or disregard, or unduly delay a legal matter entrusted to the lawyer.

### Comment

[1]   This rule addresses only a lawyer's responsibility for his or her own professional diligence.  See rules 5.1 and 5.3 with respect to a lawyer's disciplinary

responsibility for supervising subordinate lawyers and nonlawyers.

[2]   See rule 1.1 with respect to a lawyer's duty to perform legal services with competence.

## Rule 1.4 Communication with Clients

(a)   A lawyer shall:

(1)   promptly inform the client of any decision or circumstance with respect to which disclosure or the client's informed consent* is required by these rules or the State Bar Act;

(2)   reasonably* consult with the client about the means by which to accomplish the client's objectives in the representation;

(3)   keep the client reasonably* informed about significant developments relating to the representation, including promptly complying with reasonable* requests for information and copies of significant documents when necessary to keep the client so informed; and

(4)   advise the client about any relevant limitation on the lawyer's conduct when the lawyer knows* that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b)   A lawyer shall explain a matter to the extent reasonably* necessary to permit the client to make informed decisions regarding the representation.

(c)   A lawyer may delay transmission of information to a client if the lawyer reasonably believes* that the client would be likely to react in a way that may cause imminent harm to the client or others.

(d)   A lawyer's obligation under this rule to provide information and documents is subject to any applicable protective order, non-disclosure agreement, or limitation under statutory or decisional law.

**Comment**

[1]   A lawyer will not be subject to discipline under paragraph (a)(3) of this rule for failing to communicate insignificant or irrelevant information. (See Bus. & Prof. Code, § 6068, subd. (m).)   Whether a

particular development is significant will generally depend on the surrounding facts and circumstances.

[2]   A lawyer may comply with paragraph (a)(3) by providing to the client copies of significant documents by electronic or other means.   This rule does not prohibit a lawyer from seeking recovery of the lawyer's expense in any subsequent legal proceeding.

[3]   Paragraph (c) applies during a representation and does not alter the obligations applicable at termination of a representation. (See rule 1.16(e)(1).)

[4]   This rule is not intended to create, augment, diminish, or eliminate any application of the work product rule.   The obligation of the lawyer to provide work product to the client shall be governed by relevant statutory and decisional law.

## Rule 1.4.1 Communication of Settlement Offers

(a)   A lawyer shall promptly communicate to the lawyer's client:

(1)   all terms and conditions of a proposed plea bargain or other dispositive offer made to the client in a criminal matter; and

(2)   all amounts, terms, and conditions of any written* offer of settlement made to the client in all other matters.

(b)   As used in this rule, "client" includes a person* who possesses the authority to accept an offer of settlement or plea, or, in a class action, all the named representatives of the class.

**Comment**

An oral offer of settlement made to the client in a civil matter must also be communicated if it is a "significant development" under rule 1.4.

## Rule 1.4.2 Disclosure of Professional Liability Insurance

(a)   A lawyer who knows* or reasonably should know* that the lawyer does not have professional liability insurance shall inform a client in writing,* at the time of the client's engagement of the lawyer, that the lawyer does not have professional liability insurance.

**RULES OF PROFESSIONAL CONDUCT**

(b)   If notice under paragraph (a) has not been provided at the time of a client's engagement of the lawyer, the lawyer shall inform the client in writing* within thirty days of the date the lawyer knows* or reasonably should know* that the lawyer no longer has professional liability insurance during the representation of the client.

(c)   This rule does not apply to:

(1)   a lawyer who knows* or reasonably should know* at the time of the client's engagement of the lawyer that the lawyer's legal representation of the client in the matter will not exceed four hours; provided that if the representation subsequently exceeds four hours, the lawyer must comply with paragraphs (a) and (b);

(2)   a lawyer who is employed as a government lawyer or in-house counsel when that lawyer is representing or providing legal advice to a client in that capacity;

(3)   a lawyer who is rendering legal services in an emergency to avoid foreseeable prejudice to the rights or interests of the client;

(4)   a lawyer who has previously advised the client in writing* under paragraph (a) or (b) that the lawyer does not have professional liability insurance.

**Comment**

[1]   The disclosure obligation imposed by paragraph (a) applies with respect to new clients and new engagements with returning clients.

[2]   A lawyer may use the following language in making the disclosure required by paragraph (a), and may include that language in a written* fee agreement with the client or in a separate writing:

> *"Pursuant to rule 1.4.2 of the California Rules of Professional Conduct, I am informing you in writing that I do not have professional liability insurance."*

[3]   A lawyer may use the following language in making the disclosure required by paragraph (b):

> *"Pursuant to rule 1.4.2 of the California Rules of Professional Conduct, I am informing you in writing that I no longer have professional liability insurance."*

[4]   The exception in paragraph (c)(2) for government lawyers and in-house counsels is limited to situations involving direct employment and representation, and does not, for example, apply to outside counsel for a private or governmental entity, or to counsel retained by an insurer to represent an insured.  If a lawyer is employed by and provides legal services directly for a private entity or a federal, state or local governmental entity, that entity is presumed to know* whether the lawyer is or is not covered by professional liability insurance.

**Rule 1.5  Fees for Legal Services**

(a)   A lawyer shall not make an agreement for, charge, or collect an unconscionable or illegal fee.

(b)   Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events.  The factors to be considered in determining the unconscionability of a fee include without limitation the following:

(1)   whether the lawyer engaged in fraud* or overreaching in negotiating or setting the fee;

(2)   whether the lawyer has failed to disclose material facts;

(3)   the amount of the fee in proportion to the value of the services performed;

(4)   the relative sophistication of the lawyer and the client;

(5)   the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(6)   the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(7)   the amount involved and the results obtained;

(8)   the time limitations imposed by the client or by the circumstances;

(9)   the nature and length of the professional relationship with the client;

**RULES OF PROFESSIONAL CONDUCT**

(10)   the experience, reputation, and ability of the lawyer or lawyers performing the services;

(11)   whether the fee is fixed or contingent;

(12)   the time and labor required; and

(13)   whether the client gave informed consent* to the fee.

(c)   A lawyer shall not make an agreement for, charge, or collect:

(1)   any fee in a family law matter, the payment or amount of which is contingent upon the securing of a dissolution or declaration of nullity of a marriage or upon the amount of spousal or child support, or property settlement in lieu thereof; or

(2)   a contingent fee for representing a defendant in a criminal case.

(d)   A lawyer may make an agreement for, charge, or collect a fee that is denominated as "earned on receipt" or "non-refundable," or in similar terms, only if the fee is a true retainer and the client agrees in writing* after disclosure that the client will not be entitled to a refund of all or part of the fee charged. A true retainer is a fee that a client pays to a lawyer to ensure the lawyer's availability to the client during a specified period or on a specified matter, but not to any extent as compensation for legal services performed or to be performed.

(e)   A lawyer may make an agreement for, charge, or collect a flat fee for specified legal services. A flat fee is a fixed amount that constitutes complete payment for the performance of described services regardless of the amount of work ultimately involved, and which may be paid in whole or in part in advance of the lawyer providing those services.

**Comment**

*Prohibited Contingent Fees*

[1]   Paragraph (c)(1) does not preclude a contract for a contingent fee for legal representation in connection with the recovery of post-judgment balances due under child or spousal support or other financial orders.

*Payment of Fees in Advance of Services*

[2]   Rule 1.15(a) and (b) govern whether a lawyer must deposit in a trust account a fee paid in advance.

[3]   When a lawyer-client relationship terminates, the lawyer must refund the unearned portion of a fee. (See rule 1.16(e)(2).)

*Division of Fee*

[4]   A division of fees among lawyers is governed by rule 1.5.1.

*Written* Fee Agreements*

[5]   Some fee agreements must be in writing* to be enforceable. (See, e.g., Bus. & Prof. Code, §§ 6147 and 6148.)

## Rule 1.5.1  Fee Divisions Among Lawyers

(a)   Lawyers who are not in the same law firm* shall not divide a fee for legal services unless:

(1)   the lawyers enter into a written* agreement to divide the fee;

(2)   the client has consented in writing,* either at the time the lawyers enter into the agreement to divide the fee or as soon thereafter as reasonably* practicable, after a full written* disclosure to the client of: (i) the fact that a division of fees will be made; (ii) the identity of the lawyers or law firms* that are parties to the division; and (iii) the terms of the division; and

(3)   the total fee charged by all lawyers is not increased solely by reason of the agreement to divide fees.

(b)   This rule does not apply to a division of fees pursuant to court order.

**Comment**

The writing* requirements of paragraphs (a)(1) and (a)(2) may be satisfied by one or more writings.*

## Rule 1.6  Confidential Information of a Client

(a)   A lawyer shall not reveal information protected from disclosure by Business and Professions Code

RULES OF PROFESSIONAL CONDUCT

section 6068, subdivision (e)(1) unless the client gives informed consent,* or the disclosure is permitted by paragraph (b) of this rule.

(b)   A lawyer may, but is not required to, reveal information protected by Business and Professions Code section 6068, subdivision (e)(1) to the extent that the lawyer reasonably believes* the disclosure is necessary to prevent a criminal act that the lawyer reasonably believes* is likely to result in death of, or substantial* bodily harm to, an individual, as provided in paragraph (c).

(c)   Before revealing information protected by Business and Professions Code section 6068, subdivision (e)(1) to prevent a criminal act as provided in paragraph (b), a lawyer shall, if reasonable* under the circumstances:

> (1)   make a good faith effort to persuade the client: (i) not to commit or to continue the criminal act; or (ii) to pursue a course of conduct that will prevent the threatened death or substantial* bodily harm; or do both (i) and (ii); and

> (2)   inform the client, at an appropriate time, of the lawyer's ability or decision to reveal information protected by Business and Professions Code section 6068, subdivision (e)(1) as provided in paragraph (b).

(d)   In revealing information protected by Business and Professions Code section 6068, subdivision (e)(1) as provided in paragraph (b), the lawyer's disclosure must be no more than is necessary to prevent the criminal act, given the information known* to the lawyer at the time of the disclosure.

(e)   A lawyer who does not reveal information permitted by paragraph (b) does not violate this rule.

**Comment**

*Duty of confidentiality*

[1]   Paragraph (a) relates to a lawyer's obligations under Business and Professions Code section 6068, subdivision (e)(1), which provides it is a duty of a lawyer: "To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." A lawyer's duty to preserve the confidentiality of client information involves public policies of paramount importance. (*In*

*Re Jordan* (1974) 12 Cal.3d 575, 580 [116 Cal.Rptr. 371].) Preserving the confidentiality of client information contributes to the trust that is the hallmark of the lawyer-client relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or detrimental subjects. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know* that almost all clients follow the advice given, and the law is upheld. Paragraph (a) thus recognizes a fundamental principle in the lawyer-client relationship, that, in the absence of the client's informed consent,* a lawyer must not reveal information protected by Business and Professions Code section 6068, subdivision (e)(1). (See, e.g., *Commercial Standard Title Co. v. Superior Court* (1979) 92 Cal.App.3d 934, 945 [155 Cal.Rptr.393].)

*Lawyer-client confidentiality encompasses the lawyer-client privilege, the work-product doctrine and ethical standards of confidentiality*

[2]   The principle of lawyer-client confidentiality applies to information a lawyer acquires by virtue of the representation, whatever its source, and encompasses matters communicated in confidence by the client, and therefore protected by the lawyer-client privilege, matters protected by the work product doctrine, and matters protected under ethical standards of confidentiality, all as established in law, rule and policy. (See *In the Matter of Johnson* (Rev. Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 621 [120 Cal.Rptr. 253].) The lawyer-client privilege and work-product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or be otherwise compelled to produce evidence concerning a client. A lawyer's ethical duty of confidentiality is not so limited in its scope of protection for the lawyer-client relationship of trust and prevents a lawyer from revealing the client's information even when not subjected to such compulsion. Thus, a lawyer may not reveal such information except with the informed consent* of the client or as authorized or required by the State Bar Act, these rules, or other law.

**RULES OF PROFESSIONAL CONDUCT**

*Narrow exception to duty of confidentiality under this rule*

[3]   Notwithstanding the important public policies promoted by lawyers adhering to the core duty of confidentiality, the overriding value of life permits disclosures otherwise prohibited by Business and Professions Code section 6068, subdivision (e)(1). Paragraph (b) is based on Business and Professions Code section 6068, subdivision (e)(2), which narrowly permits a lawyer to disclose information protected by Business and Professions Code section 6068, subdivision (e)(1) even without client consent. Evidence Code section 956.5, which relates to the evidentiary lawyer-client privilege, sets forth a similar express exception.   Although a lawyer is not permitted to reveal information protected by section 6068, subdivision (e)(1) concerning a client's past, completed criminal acts, the policy favoring the preservation of human life that underlies this exception to the duty of confidentiality and the evidentiary privilege permits disclosure to prevent a future or ongoing criminal act.

*Lawyer not subject to discipline for revealing information protected by Business and Professions Code section 6068, subdivision (e)(1) as permitted under this rule*

[4]   Paragraph (b) reflects a balancing between the interests of preserving client confidentiality and of preventing a criminal act that a lawyer reasonably believes* is likely to result in death or substantial* bodily harm to an individual.  A lawyer who reveals information protected by Business and Professions Code section 6068, subdivision (e)(1) as permitted under this rule is not subject to discipline.

*No duty to reveal information protected by Business and Professions Code section 6068, subdivision (e)(1)*

[5]   Neither Business and Professions Code section 6068, subdivision (e)(2) nor paragraph (b) imposes an affirmative obligation on a lawyer to reveal information protected by Business and Professions Code section 6068, subdivision (e)(1) in order to prevent harm.  A lawyer may decide not to reveal such information.  Whether a lawyer chooses to reveal information protected by section 6068, subdivision (e)(1) as permitted under this rule is a matter for the individual lawyer to decide, based on all the facts and circumstances, such as those discussed in Comment [6] of this rule.

*Whether to reveal information protected by Business and Professions Code section 6068, subdivision (e) as permitted under paragraph (b)*

[6]   Disclosure permitted under paragraph (b) is ordinarily a last resort, when no other available action is reasonably* likely to prevent the criminal act. Prior to revealing information protected by Business and Professions Code section 6068, subdivision (e)(1) as permitted by paragraph (b), the lawyer must, if reasonable* under the circumstances, make a good faith effort to persuade the client to take steps to avoid the criminal act or threatened harm.  Among the factors to be considered in determining whether to disclose information protected by section 6068, subdivision (e)(1) are the following:

(1)   the amount of time that the lawyer has to make a decision about disclosure;

(2)   whether the client or a third-party has made similar threats before and whether they have ever acted or attempted to act upon them;

(3)   whether the lawyer believes* the lawyer's efforts to persuade the client or a third person* not to engage in the criminal conduct have or have not been successful;

(4)   the extent of adverse effect to the client's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and analogous rights and privacy rights under Article I of the Constitution of the State of California that may result from disclosure contemplated by the lawyer;

(5)   the extent of other adverse effects to the client that may result from disclosure contemplated by the lawyer; and

(6)   the nature and extent of information that must be disclosed to prevent the criminal act or threatened harm.

A lawyer may also consider whether the prospective harm to the victim or victims is imminent in deciding whether to disclose the information protected by section 6068, subdivision (e)(1).   However, the imminence of the harm is not a prerequisite to disclosure and a lawyer may disclose the information protected by section 6068, subdivision (e)(1) without waiting until immediately before the harm is likely to occur.

**CURRENT RULES**   2021
*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

### RULES OF PROFESSIONAL CONDUCT

*Whether to counsel client or third person\* not to commit a criminal act reasonably\* likely to result in death or substantial\* bodily harm*

[7]   Paragraph (c)(1) provides that before a lawyer may reveal information protected by Business and Professions Code section 6068, subdivision (e)(1), the lawyer must, if reasonable\* under the circumstances, make a good faith effort to persuade the client not to commit or to continue the criminal act, or to persuade the client to otherwise pursue a course of conduct that will prevent the threatened death or substantial\* bodily harm, including persuading the client to take action to prevent a third person\* from committing or continuing a criminal act. If necessary, the client may be persuaded to do both. The interests protected by such counseling are the client's interests in limiting disclosure of information protected by section 6068, subdivision (e) and in taking responsible action to deal with situations attributable to the client. If a client, whether in response to the lawyer's counseling or otherwise, takes corrective action — such as by ceasing the client's own criminal act or by dissuading a third person\* from committing or continuing a criminal act before harm is caused — the option for permissive disclosure by the lawyer would cease because the threat posed by the criminal act would no longer be present. When the actor is a nonclient or when the act is deliberate or malicious, the lawyer who contemplates making adverse disclosure of protected information may reasonably\* conclude that the compelling interests of the lawyer or others in their own personal safety preclude personal contact with the actor. Before counseling an actor who is a nonclient, the lawyer should, if reasonable\* under the circumstances, first advise the client of the lawyer's intended course of action. If a client or another person\* has already acted but the intended harm has not yet occurred, the lawyer should consider, if reasonable\* under the circumstances, efforts to persuade the client or third person\* to warn the victim or consider other appropriate action to prevent the harm. Even when the lawyer has concluded that paragraph (b) does not permit the lawyer to reveal information protected by section 6068, subdivision (e)(1), the lawyer nevertheless is permitted to counsel the client as to why it may be in the client's best interest to consent to the attorney's disclosure of that information.

*Disclosure of information protected by Business and Professions Code section 6068, subdivision (e)(1) must be no more than is reasonably\* necessary to prevent the criminal act*

[8]   Paragraph (d) requires that disclosure of information protected by Business and Professions Code section 6068, subdivision (e) as permitted by paragraph (b), when made, must be no more extensive than is necessary to prevent the criminal act. Disclosure should allow access to the information to only those persons\* who the lawyer reasonably believes\* can act to prevent the harm. Under some circumstances, a lawyer may determine that the best course to pursue is to make an anonymous disclosure to the potential victim or relevant law-enforcement authorities. What particular measures are reasonable\* depends on the circumstances known\* to the lawyer. Relevant circumstances include the time available, whether the victim might be unaware of the threat, the lawyer's prior course of dealings with the client, and the extent of the adverse effect on the client that may result from the disclosure contemplated by the lawyer.

*Informing client pursuant to paragraph (c)(2) of lawyer's ability or decision to reveal information protected by Business and Professions Code section 6068, subdivision (e)(1)*

[9]   A lawyer is required to keep a client reasonably\* informed about significant developments regarding the representation. (See rule 1.4; Bus. & Prof. Code, § 6068, subd. (m).) Paragraph (c)(2), however, recognizes that under certain circumstances, informing a client of the lawyer's ability or decision to reveal information protected by section 6068, subdivision (e)(1) as permitted in paragraph (b) would likely increase the risk of death or substantial\* bodily harm, not only to the originally-intended victims of the criminal act, but also to the client or members of the client's family, or to the lawyer or the lawyer's family or associates. Therefore, paragraph (c)(2) requires a lawyer to inform the client of the lawyer's ability or decision to reveal information protected by section 6068, subdivision (e)(1) as permitted in paragraph (b) only if it is reasonable\* to do so under the circumstances. Paragraph (c)(2) further recognizes that the appropriate time for the lawyer to inform the client may vary depending upon the circumstances. (See Comment [10] of this rule.) Among the factors to be considered in determining an appropriate time, if any, to inform a client are:

**RULES OF PROFESSIONAL CONDUCT**

(1)   whether the client is an experienced user of legal services;

(2)   the frequency of the lawyer's contact with the client;

(3)   the nature and length of the professional relationship with the client;

(4)   whether the lawyer and client have discussed the lawyer's duty of confidentiality or any exceptions to that duty;

(5)   the likelihood that the client's matter will involve information within paragraph (b);

(6)   the lawyer's belief,* if applicable, that so informing the client is likely to increase the likelihood that a criminal act likely to result in the death of, or substantial* bodily harm to, an individual; and

(7)   the lawyer's belief,* if applicable, that good faith efforts to persuade a client not to act on a threat have failed.

*Avoiding a chilling effect on the lawyer-client relationship*

[10]  The foregoing flexible approach to the lawyer's informing a client of his or her ability or decision to reveal information protected by Business and Professions Code section 6068, subdivision (e)(1) recognizes the concern that informing a client about limits on confidentiality may have a chilling effect on client communication. (See Comment [1].) To avoid that chilling effect, one lawyer may choose to inform the client of the lawyer's ability to reveal information protected by section 6068, subdivision (e)(1) as early as the outset of the representation, while another lawyer may choose to inform a client only at a point when that client has imparted information that comes within paragraph (b), or even choose not to inform a client until such time as the lawyer attempts to counsel the client as contemplated in Comment [7]. In each situation, the lawyer will have satisfied the lawyer's obligation under paragraph (c)(2), and will not be subject to discipline.

*Informing client that disclosure has been made; termination of the lawyer-client relationship*

[11]  When a lawyer has revealed information protected by Business and Professions Code section

6068, subdivision (e) as permitted in paragraph (b), in all but extraordinary cases the relationship between lawyer and client that is based on trust and confidence will have deteriorated so as to make the lawyer's representation of the client impossible. Therefore, when the relationship has deteriorated because of the lawyer's disclosure, the lawyer is required to seek to withdraw from the representation, unless the client has given informed consent* to the lawyer's continued representation. The lawyer normally must inform the client of the fact of the lawyer's disclosure.   If the lawyer has a compelling interest in not informing the client, such as to protect the lawyer, the lawyer's family or a third person* from the risk of death or substantial* bodily harm, the lawyer must withdraw from the representation. (See rule 1.16.)

*Other consequences of the lawyer's disclosure*

[12]  Depending upon the circumstances of a lawyer's disclosure of information protected by Business and Professions Code section 6068, subdivision (e)(1) as permitted by this rule, there may be other important issues that a lawyer must address.   For example, a lawyer who is likely to testify as a witness in a matter involving a client must comply with rule 3.7. Similarly, the lawyer must also consider his or her duties of loyalty and competence. (See rules 1.7 and 1.1.)

*Other exceptions to confidentiality under California law*

[13]  This rule is not intended to augment, diminish, or preclude any other exceptions to the duty to preserve information protected by Business and Professions Code section 6068, subdivision (e)(1) recognized under California law.

**Rule 1.7  Conflict of Interest: Current Clients**

(a)   A lawyer shall not, without informed written consent* from each client and compliance with paragraph (d), represent a client if the representation is directly adverse to another client in the same or a separate matter.

(b)   A lawyer shall not, without informed written consent* from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client,

a former client or a third person,* or by the lawyer's own interests.

(c)   Even when a significant risk requiring a lawyer to comply with paragraph (b) is not present, a lawyer shall not represent a client without written* disclosure of the relationship to the client and compliance with paragraph (d) where:

(1)   the lawyer has, or knows* that another lawyer in the lawyer's firm* has, a legal, business, financial, professional, or personal relationship with or responsibility to a party or witness in the same matter; or

(2)   the lawyer knows* or reasonably should know* that another party's lawyer is a spouse, parent, child, or sibling of the lawyer, lives with the lawyer, is a client of the lawyer or another lawyer in the lawyer's firm,* or has an intimate personal relationship with the lawyer.

(d)   Representation is permitted under this rule only if the lawyer complies with paragraphs (a), (b), and (c), and:

(1)   the lawyer reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)   the representation is not prohibited by law; and

(3)   the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

(e)   For purposes of this rule, "matter" includes any judicial or other proceeding, application, request for a ruling or other determination, contract, transaction, claim, controversy, investigation, charge, accusation, arrest, or other deliberation, decision, or action that is focused on the interests of specific persons,* or a discrete and identifiable class of persons.*

**Comment**

[1]   Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.  The duty of undivided loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed written consent.*  Thus, absent consent, a lawyer may not act as an advocate in one matter against a person* the lawyer represents in some other matter, even when the matters are wholly unrelated. (See *Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537].) A directly adverse conflict under paragraph (a) can arise in a number of ways, for example, when: (i) a lawyer accepts representation of more than one client in a matter in which the interests of the clients actually conflict; (ii) a lawyer, while representing a client, accepts in another matter the representation of a person* who, in the first matter, is directly adverse to the lawyer's client; or (iii) a lawyer accepts representation of a person* in a matter in which an opposing party is a client of the lawyer or the lawyer's law firm.*  Similarly, direct adversity can arise when a lawyer cross-examines a non-party witness who is the lawyer's client in another matter, if the examination is likely to harm or embarrass the witness.  On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require informed written consent* of the respective clients.

[2]   Paragraphs (a) and (b) apply to all types of legal representations, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship.  Examples of the latter include the formation of a partnership for several partners* or a corporation for several shareholders, the preparation of a pre-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution.  If a lawyer initially represents multiple clients with the informed written consent* as required under paragraph (b), and circumstances later develop indicating that direct adversity exists between the clients, the lawyer must obtain further informed written consent* of the clients under paragraph (a).

[3]   In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App.4th 1422 [86 Cal.Rptr.2d 20], the court held that paragraph (C)(3) of predecessor rule 3-310 was violated when a lawyer, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent.  Notwithstanding *State Farm*, paragraph (a) does not apply with respect to the relationship

**RULES OF PROFESSIONAL CONDUCT**

between an insurer and a lawyer when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

[4]   Even where there is no direct adversity, a conflict of interest requiring informed written consent* under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal.  For example, a lawyer's obligations to two or more clients in the same matter, such as several individuals seeking to form a joint venture, may materially limit the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the other clients.  The risk is that the lawyer may not be able to offer alternatives that would otherwise be available to each of the clients.   The mere possibility of subsequent harm does not itself require disclosure and informed written consent.*  The critical questions are the likelihood that a difference in interests exists or will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably* should be pursued on behalf of each client.  The risk that the lawyer's representation may be materially limited may also arise from present or past relationships between the lawyer, or another member of the lawyer's firm*, with a party, a witness, or another person* who may be affected substantially by the resolution of the matter.

[5]   Paragraph (c) requires written* disclosure of any of the specified relationships even if there is not a significant risk the relationship will materially limit the lawyer's representation of the client.  However, if the particular circumstances present a significant risk the relationship will materially limit the lawyer's representation of the client, informed written consent* is required under paragraph (b).

[6]   Ordinarily paragraphs (a) and (b) will not require informed written consent* simply because a lawyer takes inconsistent legal positions in different tribunals* at different times on behalf of different clients.  Advocating a legal position on behalf of a client that might create precedent adverse to the interests of another client represented by a lawyer in an unrelated matter is not sufficient, standing alone,

to create a conflict of interest requiring informed written consent.*  Informed written consent* may be required, however, if there is a significant risk that: (i) the lawyer may temper the lawyer's advocacy on behalf of one client out of concern about creating precedent adverse to the interest of another client; or (ii) the lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case, for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client.  Factors relevant in determining whether the clients' informed written consent* is required include: the courts and jurisdictions where the different cases are pending, whether a ruling in one case would have a precedential effect on the other case, whether the legal question is substantive or procedural, the temporal relationship between the matters, the significance of the legal question to the immediate and long-term interests of the clients involved, and the clients' reasonable* expectations in retaining the lawyer.

[7]   Other rules and laws may preclude the disclosures necessary to obtain the informed written consent* or provide the information required to permit representation under this rule. (See, e.g., Bus. & Prof. Code, § 6068, subd. (e)(1) and rule 1.6.)  If such disclosure is precluded, representation subject to paragraph (a), (b), or (c) of this rule is likewise precluded.

[8]   Paragraph (d) imposes conditions that must be satisfied even if informed written consent* is obtained as required by paragraphs (a) or (b) or the lawyer has informed the client in writing* as required by paragraph (c).  There are some matters in which the conflicts are such that even informed written consent* may not suffice to permit representation. (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

[9]   This rule does not preclude an informed written consent* to a future conflict in compliance with applicable case law.  The effectiveness of an advance consent is generally determined by the extent to which the client reasonably* understands the material risks that the consent entails.  The more comprehensive the explanation of the types of future

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

representations that might arise and the actual and reasonably* foreseeable adverse consequences to the client of those representations, the greater the likelihood that the client will have the requisite understanding.  The experience and sophistication of the client giving consent, as well as whether the client is independently represented in connection with giving consent, are also relevant in determining whether the client reasonably* understands the risks involved in giving consent.   An advance consent cannot be effective if the circumstances that materialize in the future make the conflict nonconsentable under paragraph (d).  A lawyer who obtains from a client an advance consent that complies with this rule will have all the duties of a lawyer to that client except as expressly limited by the consent.  A lawyer cannot obtain an advance consent to incompetent representation. (See rule 1.8.8.)

[10]  A material change in circumstances relevant to application of this rule may trigger a requirement to make new disclosures and, where applicable, obtain new informed written consents.*  In the absence of such consents, depending on the circumstances, the lawyer may have the option to withdraw from one or more of the representations in order to avoid the conflict.  The lawyer must seek court approval where necessary and take steps to minimize harm to the clients.  See rule 1.16.  The lawyer must continue to protect the confidences of the clients from whose representation the lawyer has withdrawn.  (See rule 1.9(c).)

[11]  For special rules governing membership in a legal service organization, see rule 6.3; and for work in conjunction with certain limited legal services programs, see rule 6.5.

### Rule 1.8.1  Business Transactions with a Client and Pecuniary Interests Adverse to a Client

A lawyer shall not enter into a business transaction with a client, or knowingly* acquire an ownership, possessory, security or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(a)   the transaction or acquisition and its terms are fair and reasonable* to the client and the terms and the lawyer's role in the transaction or acquisition are fully disclosed and transmitted in writing* to the

client in a manner that should reasonably* have been understood by the client;

(b)   the client either is represented in the transaction or acquisition by an independent lawyer of the client's choice or the client is advised in writing* to seek the advice of an independent lawyer of the client's choice and is given a reasonable* opportunity to seek that advice; and

(c)   the client thereafter provides informed written consent* to the terms of the transaction or acquisition, and to the lawyer's role in it.

**Comment**

[1]   A lawyer has an "other pecuniary interest adverse to a client" within the meaning of this rule when the lawyer possesses a legal right to significantly impair or prejudice the client's rights or interests without court action.  (See *Fletcher v. Davis* (2004) 33 Cal.4th 61, 68 [14 Cal.Rptr.3d 58]; see also Bus. & Prof. Code, § 6175.3 [Sale of financial products to elder or dependent adult clients; Disclosure]; Fam. Code, §§ 2033-2034 [Attorney lien on community real property].)   However, this rule does not apply to a charging lien given to secure payment of a contingency fee.  (See *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38 [108 Cal.Rptr.3d 455].)

[2]   For purposes of this rule, factors that can be considered in determining whether a lawyer is independent include whether the lawyer: (i) has a financial interest in the transaction or acquisition; and (ii) has a close legal, business, financial, professional or personal relationship with the lawyer seeking the client's consent.

[3]   Fairness and reasonableness under paragraph (a) are measured at the time of the transaction or acquisition based on the facts that then exist.

[4]   In some circumstances, this rule may apply to a transaction entered into with a former client.  (Compare *Hunniecutt v. State Bar* (1988) 44 Cal.3d 362, 370-71 ["[W]hen an attorney enters into a transaction with a former client regarding a fund which resulted from the attorney's representation, it is reasonable to examine the relationship between the parties for indications of special trust resulting therefrom. We conclude that if there is evidence that the client placed his trust in the attorney because of the representation, an attorney-client relationship exists for the purposes of [the predecessor rule] even

if the representation has otherwise ended [and] It appears that [the client] became a target of [the lawyer's] solicitation because he knew, through his representation of her, that she had recently received the settlement fund [and the court also found the client to be unsophisticated]."] with *Wallis v. State Bar* (1942) 21 Cal.2d 322 [finding lawyer not subject to discipline for entering into business transaction with a former client where the former client was a sophisticated businesswoman who had actively negotiated for terms she thought desirable, and the transaction was not connected with the matter on which the lawyer previously represented her].)

[5]   This rule does not apply to the agreement by which the lawyer is retained by the client, unless the agreement confers on the lawyer an ownership, possessory, security, or other pecuniary interest adverse to the client.  Such an agreement is governed, in part, by rule 1.5.  This rule also does not apply to an agreement to advance to or deposit with a lawyer a sum to be applied to fees, or costs or other expenses, to be incurred in the future.  Such agreements are governed, in part, by rules 1.5 and 1.15.

[6]   This rule does not apply: (i) where a lawyer and client each make an investment on terms offered by a third person* to the general public or a significant portion thereof; or (ii) to standard commercial transactions for products or services that a lawyer acquires from a client on the same terms that the client generally markets them to others, where the lawyer has no advantage in dealing with the client.

## Rule 1.8.2  Use of Current Client's Information

A lawyer shall not use a client's information protected by Business and Professions Code section 6068, subdivision (e)(1) to the disadvantage of the client unless the client gives informed consent,* except as permitted by these rules or the State Bar Act.

**Comment**

A lawyer violates the duty of loyalty by using information protected by Business and Professions Code section 6068, subdivision (e)(1) to the disadvantage of a current client.

## Rule 1.8.3  Gifts from Client

(a)   A lawyer shall not:

(1)   solicit a client to make a substantial* gift, including a testamentary gift, to the lawyer or a person* related to the lawyer, unless the lawyer or other recipient of the gift is related to the client, or

(2)   prepare on behalf of a client an instrument giving the lawyer or a person* related to the lawyer any substantial* gift, unless (i) the lawyer or other recipient of the gift is related to the client, or (ii) the client has been advised by an independent lawyer who has provided a certificate of independent review that complies with the requirements of Probate Code section 21384.

(b)   For purposes of this rule, related persons* include a person* who is "related by blood or affinity" as that term is defined in California Probate Code section 21374, subdivision (a).

**Comment**

[1]   A lawyer or a person* related to a lawyer may accept a gift from the lawyer's client, subject to general standards of fairness and absence of undue influence.  A lawyer also does not violate this rule merely by engaging in conduct that might result in a client making a gift, such as by sending the client a wedding announcement.  Discipline is appropriate where impermissible influence occurs.  (See *Magee v. State Bar* (1962) 58 Cal.2d 423 [24 Cal.Rptr. 839].)

[2]   This rule does not prohibit a lawyer from seeking to have the lawyer or a partner* or associate of the lawyer named as executor of the client's estate or to another potentially lucrative fiduciary position.  Such appointments, however, will be subject to rule 1.7(b) and (c).

## Rule 1.8.4  [Reserved]

## Rule 1.8.5  Payment of Personal or Business Expenses Incurred by or for a Client

(a)   A lawyer shall not directly or indirectly pay or agree to pay, guarantee, or represent that the lawyer

or lawyer's law firm* will pay the personal or business expenses of a prospective or existing client.

(b)  Notwithstanding paragraph (a), a lawyer may:

(1)  pay or agree to pay such expenses to third persons,* from funds collected or to be collected for the client as a result of the representation, with the consent of the client;

(2)  after the lawyer is retained by the client, agree to lend money to the client based on the client's written* promise to repay the loan, provided the lawyer complies with rules 1.7(b), 1.7(c), and 1.8.1 before making the loan or agreeing to do so;

(3)  advance the costs of prosecuting or defending a claim or action, or of otherwise protecting or promoting the client's interests, the repayment of which may be contingent on the outcome of the matter; and

(4)  pay the costs of prosecuting or defending a claim or action, or of otherwise protecting or promoting the interests of an indigent person* in a matter in which the lawyer represents the client.

(c)  "Costs" within the meaning of paragraphs (b)(3) and (b)(4) are not limited to those costs that are taxable or recoverable under any applicable statute or rule of court but may include any reasonable* expenses of litigation, including court costs, and reasonable* expenses in preparing for litigation or in providing other legal services to the client.

(d)  Nothing in this rule shall be deemed to limit the application of rule 1.8.9.

## Rule 1.8.6  Compensation from One Other than Client

A lawyer shall not enter into an agreement for, charge, or accept compensation for representing a client from one other than the client unless:

(a)  there is no interference with the lawyer's independent professional judgment or with the lawyer-client relationship;

(b)  information is protected as required by Business and Professions Code section 6068, subdivision (e)(1) and rule 1.6; and

(c)  the lawyer obtains the client's informed written consent* at or before the time the lawyer has entered into the agreement for, charged, or accepted the compensation, or as soon thereafter as reasonably* practicable, provided that no disclosure or consent is required if:

(1)  nondisclosure or the compensation is otherwise authorized by law or a court order; or

(2)  the lawyer is rendering legal services on behalf of any public agency or nonprofit organization that provides legal services to other public agencies or the public.

**Comment**

[1]  A lawyer's responsibilities in a matter are owed only to the client except where the lawyer also represents the payor in the same matter.  With respect to the lawyer's additional duties when representing both the client and the payor in the same matter, see rule 1.7.

[2]  A lawyer who is exempt from disclosure and consent requirements under paragraph (c) nevertheless must comply with paragraphs (a) and (b).

[3]  This rule is not intended to abrogate existing relationships between insurers and insureds whereby the insurer has the contractual right to unilaterally select counsel for the insured, where there is no conflict of interest. (See *San Diego Navy Federal Credit Union v. Cumis Insurance Society* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].).

[4]  In some limited circumstances, a lawyer might not be able to obtain client consent before the lawyer has entered into an agreement for, charged, or accepted compensation, as required by this rule. This might happen, for example, when a lawyer is retained or paid by a family member on behalf of an incarcerated client or in certain commercial settings, such as when a lawyer is retained by a creditors' committee involved in a corporate debt restructuring and agrees to be compensated for any services to be provided to other similarly situated creditors who have not yet been identified.  In such limited situations, paragraph (c) permits the lawyer to comply with this rule as soon thereafter as is reasonably* practicable.

**RULES OF PROFESSIONAL CONDUCT**

[5]   This rule is not intended to alter or diminish a lawyer's obligations under rule 5.4(c).

### Rule 1.8.7  Aggregate Settlements

(a)   A lawyer who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregate agreement as to guilty or nolo contendere pleas, unless each client gives informed written consent.* The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person* in the settlement.

(b)   This rule does not apply to class action settlements subject to court approval.

### Rule 1.8.8  Limiting Liability to Client

A lawyer shall not:

(a)   Contract with a client prospectively limiting the lawyer's liability to the client for the lawyer's professional malpractice; or

(b)   Settle a claim or potential claim for the lawyer's liability to a client or former client for the lawyer's professional malpractice, unless the client or former client is either:

> (1)   represented by an independent lawyer concerning the settlement; or

> (2)   advised in writing* by the lawyer to seek the advice of an independent lawyer of the client's choice regarding the settlement and given a reasonable* opportunity to seek that advice.

### Comment

[1]   Paragraph (b) does not absolve the lawyer of the obligation to comply with other law.  (See, e.g., Bus. & Prof. Code, § 6090.5.)

[2]   This rule does not apply to customary qualifications and limitations in legal opinions and memoranda, nor does it prevent a lawyer from reasonably* limiting the scope of the lawyer's representation.  (See rule 1.2(b).)

### Rule 1.8.9  Purchasing Property at a Foreclosure or a Sale Subject to Judicial Review

(a)   A lawyer shall not directly or indirectly purchase property at a probate, foreclosure, receiver's, trustee's, or judicial sale in an action or proceeding in which such lawyer or any lawyer affiliated by reason of personal, business, or professional relationship with that lawyer or with that lawyer's law firm* is acting as a lawyer for a party or as executor, receiver, trustee, administrator, guardian, or conservator.

(b)   A lawyer shall not represent the seller at a probate, foreclosure, receiver, trustee, or judicial sale in an action or proceeding in which the purchaser is a spouse or relative of the lawyer or of another lawyer in the lawyer's law firm* or is an employee of the lawyer or the lawyer's law firm.*

(c)   This rule does not prohibit a lawyer's participation in transactions that are specifically authorized by and comply with Probate Code sections 9880 through 9885, but such transactions remain subject to the provisions of rules 1.8.1 and 1.7.

### Comment

A lawyer may lawfully participate in a transaction involving a probate proceeding which concerns a client by following the process described in Probate Code sections 9880-9885.  These provisions, which permit what would otherwise be impermissible self-dealing by specific submissions to and approval by the courts, must be strictly followed in order to avoid violation of this rule.

### Rule 1.8.10  Sexual Relations with Current Client

(a)   A lawyer shall not engage in sexual relations with a current client who is not the lawyer's spouse or registered domestic partner, unless a consensual sexual relationship existed between them when the lawyer-client relationship commenced.

(b)   For purposes of this rule, "sexual relations" means sexual intercourse or the touching of an intimate part of another person* for the purpose of sexual arousal, gratification, or abuse.

(c)   If a person* other than the client alleges a violation of this rule, no Notice of Disciplinary Charges may be filed by the State Bar against a lawyer under this rule until the State Bar has attempted to obtain the client's statement regarding, and has considered, whether the client would be unduly burdened by further investigation or a charge.

**Comment**

[1]   Although this rule does not apply to a consensual sexual relationship that exists when a lawyer-client relationship commences, the lawyer nevertheless must comply with all other applicable rules.  (See, e.g., rules 1.1, 1.7, and 2.1.)

[2]   When the client is an organization, this rule applies to a lawyer for the organization (whether inside counsel or outside counsel) who has sexual relations with a constituent of the organization who supervises, directs or regularly consults with that lawyer concerning the organization's legal matters.  (See rule 1.13.)

[3]   Business and Professions Code section 6106.9, including the requirement that the complaint be verified, applies to charges under subdivision (a) of that section.   This rule and the statute impose different obligations.

## Rule 1.8.11  Imputation of Prohibitions Under Rules 1.8.1 to 1.8.9

While lawyers are associated in a law firm,* a prohibition in rules 1.8.1 through 1.8.9 that applies to any one of them shall apply to all of them.

**Comment**

A prohibition on conduct by an individual lawyer in rules 1.8.1 through 1.8.9 also applies to all lawyers associated in a law firm* with the personally prohibited lawyer.  For example, one lawyer in a law firm* may not enter into a business transaction with a client of another lawyer associated in the law firm* without complying with rule 1.8.1, even if the first lawyer is not personally involved in the representation of the client.  This rule does not apply to rule 1.8.10 since the prohibition in that rule is personal and is not applied to associated lawyers.

## Rule 1.9  Duties to Former Clients

(a)   A lawyer who has formerly represented a client in a matter shall not thereafter represent another person* in the same or a substantially related matter in which that person's* interests are materially adverse to the interests of the former client unless the former client gives informed written consent.*

(b)   A lawyer shall not knowingly* represent a person* in the same or a substantially related matter in which a firm* with which the lawyer formerly was associated had previously represented a client

(1)   whose interests are materially adverse to that person;* and

(2)   about whom the lawyer had acquired information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed written consent.*

(c)   A lawyer who has formerly represented a client in a matter or whose present or former firm* has formerly represented a client in a matter shall not thereafter:

(1)   use information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 acquired by virtue of the representation of the former client to the disadvantage of the former client except as these rules or the State Bar Act would permit with respect to a current client, or when the information has become generally known;* or

(2)   reveal information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 acquired by virtue of the representation of the former client except as these rules or the State Bar Act permit with respect to a current client.

**Comment**

[1]   After termination of a lawyer-client relationship, the lawyer owes two duties to a former client.   The lawyer may not (i) do anything that will injuriously affect the former client in any matter in which the lawyer represented the former client, or (ii) at any

time use against the former client knowledge or information acquired by virtue of the previous relationship. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811 [124 Cal.Rptr.3d 256]; *Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564 [15 P.2d 505].) For example, (i) a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client and (ii) a lawyer who has prosecuted an accused person* could not represent the accused in a subsequent civil action against the government concerning the same matter. (See also Bus. & Prof. Code, § 6131; 18 U.S.C. § 207(a).) These duties exist to preserve a client's trust in the lawyer and to encourage the client's candor in communications with the lawyer.

[2]   For what constitutes a "matter" for purposes of this rule, see rule 1.7(e).

[3]   Two matters are "the same or substantially related" for purposes of this rule if they involve a substantial* risk of a violation of one of the two duties to a former client described above in Comment [1]. For example, this will occur: (i) if the matters involve the same transaction or legal dispute or other work performed by the lawyer for the former client; or (ii) if the lawyer normally would have obtained information in the prior representation that is protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6, and the lawyer would be expected to use or disclose that information in the subsequent representation because it is material to the subsequent representation.

[4]   Paragraph (b) addresses a lawyer's duties to a client who has become a former client because the lawyer no longer is associated with the law firm* that represents or represented the client. In that situation, the lawyer has a conflict of interest only when the lawyer involved has actual knowledge of information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c). Thus, if a lawyer while with one firm* acquired no knowledge or information relating to a particular client of the firm,* and that lawyer later joined another firm,* neither the lawyer individually nor lawyers in the second firm* would violate this rule by representing another client in the same or a related matter even though the interests of the two clients conflict. See rule 1.10(b) for the restrictions on lawyers in a firm* once a lawyer has terminated association with the firm.*

[5]   The fact that information can be discovered in a public record does not, by itself, render that information generally known* under paragraph (c). (See, e.g., *In the Matter of Johnson* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179.)

[6]   With regard to the effectiveness of an advance consent, see rule 1.7, Comment [9]. With regard to imputation of conflicts to lawyers in a firm* with which a lawyer is or was formerly associated, see rule 1.10. Current and former government lawyers must comply with this rule to the extent required by rule 1.11.

## Rule 1.10  Imputation of Conflicts of Interest: General Rule

(a)   While lawyers are associated in a firm,* none of them shall knowingly* represent a client when any one of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9, unless

(1)   the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm;* or

(2)   the prohibition is based upon rule 1.9(a) or (b) and arises out of the prohibited lawyer's association with a prior firm,* and

(i)   the prohibited lawyer did not substantially participate in the same or a substantially related matter;

(ii)   the prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom; and

(iii)   written* notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this rule, which shall include a description of the screening* procedures employed; and an agreement by the firm* to respond promptly to any written* inquiries or objections by the former client about the screening* procedures.

### RULES OF PROFESSIONAL CONDUCT

(b)   When a lawyer has terminated an association with a firm,* the firm* is not prohibited from thereafter representing a person* with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm,* unless:

(1)   the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

(2)   any lawyer remaining in the firm* has information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter.

(c)   A prohibition under this rule may be waived by each affected client under the conditions stated in rule 1.7.

(d)   The imputation of a conflict of interest to lawyers associated in a firm* with former or current government lawyers is governed by rule 1.11.

**Comment**

[1]   In determining whether a prohibited lawyer's previously participation was substantial,* a number of factors should be considered, such as the lawyer's level of responsibility in the prior matter, the duration of the lawyer's participation, the extent to which the lawyer advised or had personal contact with the former client, and the extent to which the lawyer was exposed to confidential information of the former client likely to be material in the current matter.

[2]   Paragraph (a) does not prohibit representation by others in the law firm* where the person* prohibited from involvement in a matter is a nonlawyer, such as a paralegal or legal secretary.  Nor does paragraph (a) prohibit representation if the lawyer is prohibited from acting because of events before the person* became a lawyer, for example, work that the person* did as a law student. Such persons,* however, ordinarily must be screened* from any personal participation in the matter. (See rules 1.0.1(k) and 5.3.)

[3]   Paragraph (a)(2)(ii) does not prohibit the screened* lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is prohibited.

[4]   Where a lawyer is prohibited from engaging in certain transactions under rules 1.8.1 through 1.8.9, rule 1.8.11, and not this rule, determines whether that prohibition also applies to other lawyers associated in a firm* with the personally prohibited lawyer.

[5]   The responsibilities of managerial and supervisory lawyers prescribed by rules 5.1 and 5.3 apply to screening* arrangements implemented under this rule.

[6]   Standards for disqualification, and whether in a particular matter (1) a lawyer's conflict will be imputed to other lawyers in the same firm,* or (2) the use of a timely screen* is effective to avoid that imputation, are also the subject of statutes and case law.  (See, e.g., Code Civ. Proc., § 128, subd. (a)(5); Pen. Code, § 1424; *In re Charlisse* C. (2008) 45 Cal.4th 145 [84 Cal.Rptr.3d 597]; *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566 [45 Cal.Rptr.3d 464]; *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776 [108 Cal.Rptr.3d 620].)

### Rule 1.11  Special Conflicts of Interest for Former and Current Government Officials and Employees

(a)   Except as law may otherwise expressly permit, a lawyer who has formerly served as a public official or employee of the government:

(1)   is subject to rule 1.9(c); and

(2)   shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public official or employee, unless the appropriate government agency gives its informed written consent* to the representation.  This paragraph shall not apply to matters governed by rule 1.12(a).

(b)   When a lawyer is prohibited from representation under paragraph (a), no lawyer in a firm* with which that lawyer is associated may knowingly* undertake or continue representation in such a matter unless:

**RULES OF PROFESSIONAL CONDUCT**

(1)   the personally prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom; and

(2)   written* notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule

(c)   Except as law may otherwise expressly permit, a lawyer who was a public official or employee and, during that employment, acquired information that the lawyer knows* is confidential government information about a person,* may not represent a private client whose interests are adverse to that person* in a matter in which the information could be used to the material disadvantage of that person.* As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority, that, at the time this rule is applied, the government is prohibited by law from disclosing to the public, or has a legal privilege not to disclose, and that is not otherwise available to the public.   A firm* with which that lawyer is associated may undertake or continue representation in the matter only if the personally prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom.

(d)   Except as law may otherwise expressly permit, a lawyer currently serving as a public official or employee:

(1)   is subject to rules 1.7 and 1.9; and

(2)   shall not:

(i)   participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless the appropriate government agency gives its informed written consent;* or

(ii)   negotiate for private employment with any person* who is involved as a party, or as a lawyer for a party, or with a law firm* for a party, in a matter in which the lawyer is participating personally and substantially, except that a lawyer serving as a law clerk to a judge, other adjudicative officer or arbitrator may negotiate for

private employment as permitted by rule 1.12(b) and subject to the conditions stated in rule 1.12(b).

**Comment**

[1]   Rule 1.10 is not applicable to the conflicts of interest addressed by this rule.

[2]   For what constitutes a "matter" for purposes of this rule, see rule 1.7(e).

[3]   Paragraphs (a)(2) and (d)(2) apply regardless of whether a lawyer is adverse to a former client.   Both provisions apply when the former public official or employee of the government has personally and substantially participated in the matter.   Personal participation includes both direct participation and the supervision of a subordinate's participation. Substantial* participation requires that the lawyer's involvement be of significance to the matter. Participation may be substantial* even though it is not determinative of the outcome of a particular matter. However, it requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue.   A finding of substantiality should be based not only on the effort devoted to the matter, but also on the importance of the effort.   Personal and substantial* participation may occur when, for example, a lawyer participates through decision, approval, disapproval, recommendation, investigation or the rendering of advice in a particular matter.

[4]   By requiring a former government lawyer to comply with rule 1.9(c), paragraph (a)(1) protects information obtained while working for the government to the same extent as information learned while representing a private client.   This provision applies regardless of whether the lawyer was working in a "legal" capacity.   Thus, information learned by the lawyer while in public service in an administrative, policy, or advisory position also is covered by paragraph (a)(1).

[5]   Paragraph (c) operates only when the lawyer in question has actual knowledge of the information; it does not operate with respect to information that merely could be imputed to the lawyer.

[6]   When a lawyer has been employed by one government agency and then moves to a second government agency, it may be appropriate to treat that second agency as another client for purposes of

this rule, as when a lawyer is employed by a city and subsequently is employed by a federal agency. Because conflicts of interest are governed by paragraphs (a) and (b), the latter agency is required to screen* the lawyer. Whether two government agencies should be regarded as the same or different clients for conflict of interest purposes is beyond the scope of these rules. (See rule 1.13, Comment [6]; see also *Civil Service Commission v. Superior Court* (1984) 163 Cal.App.3d 70, 76-78 [209 Cal.Rptr. 159].)

[7]   Paragraphs (b) and (c) do not prohibit a lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly relating the lawyer's compensation to the fee in the matter in which the lawyer is personally prohibited from participating.

[8]   Paragraphs (a) and (d) do not prohibit a lawyer from jointly representing a private party and a government agency when doing so is permitted by rule 1.7 and is not otherwise prohibited by law.

[9]   A lawyer serving as a public official or employee of the government may participate in a matter in which the lawyer participated substantially while in private practice or non-governmental employment only if: (i) the government agency gives its informed written consent* as required by paragraph (d)(2)(i); and (ii) the former client gives its informed written consent* as required by rule 1.9, to which the lawyer is subject by paragraph (d)(1).

[10]  This rule is not intended to address whether in a particular matter: (i) a lawyer's conflict under paragraph (d) will be imputed to other lawyers serving in the same governmental agency; or (ii) the use of a timely screen* will avoid that imputation.   The imputation and screening* rules for lawyers moving from private practice into government service under paragraph (d) are left to be addressed by case law and its development. (See *City & County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847, 851-54 [43 Cal.Rptr.3d 776]; *City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 26-27 [18 Cal.Rptr.3d 403].)   Regarding the standards for recusals of prosecutors in criminal matters, see Penal Code section 1424; *Haraguchi v. Superior Court* (2008) 43 Cal. 4th 706, 711-20 [76 Cal.Rptr.3d 250]; and *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 727-35 [76 Cal.Rptr.3d 264].   Concerning prohibitions against former prosecutors participating in matters in which they served or participated in as prosecutor, see, e.g., Business and Professions Code section 6131 and 18 United States Code section 207(a).

## Rule 1.12  Former Judge, Arbitrator, Mediator, or Other Third-Party Neutral

(a)   Except as stated in paragraph (d), a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer, judicial staff attorney or law clerk to such a person* or as an arbitrator, mediator, or other third-party neutral, unless all parties to the proceeding give informed written consent.*

(b)   A lawyer shall not seek employment from any person* who is involved as a party or as lawyer for a party, or with a law firm* for a party, in a matter in which the lawyer is participating personally and substantially as a judge or other adjudicative officer or as an arbitrator, mediator, or other third party neutral.  A lawyer serving as a judicial staff attorney or law clerk to a judge or other adjudicative officer may seek employment from a party, or with a lawyer or a law firm* for a party, in a matter in which the staff attorney or clerk is participating personally and substantially, but only with the approval of the court.

(c)   If a lawyer is prohibited from representation by paragraph (a), other lawyers in a firm* with which that lawyer is associated may knowingly* undertake or continue representation in the matter only if:

> (1)   the prohibition does not arise from the lawyer's service as a mediator or settlement judge;
>
> (2)   the prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (3)   written* notice is promptly given to the parties and any appropriate tribunal* to enable them to ascertain compliance with the provisions of this rule.

(d)   An arbitrator selected as a partisan of a party in a multimember arbitration panel is not prohibited from subsequently representing that party.

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

[1]    Paragraphs (a) and (b) apply when a former judge or other adjudicative officer, or a judicial staff attorney or law clerk to such a person,* or an arbitrator, mediator, or other third-party neutral, has personally and substantially participated in the matter.    Personal participation includes both direct participation and the supervision of a subordinate's participation, as may occur in a chambers with several staff attorneys or law clerks. Substantial* participation requires that the lawyer's involvement was of significance to the matter.  Participation may be substantial* even though it was not determinative of the outcome of a particular case or matter.  A finding of substantiality should be based not only on the effort devoted to the matter, but also on the importance of the effort.   Personal and substantial* participation may occur when, for example, the lawyer participated through decision, recommendation, or the rendering of advice on a particular case or matter.  However, a judge who was a member of a multi-member court, and thereafter left judicial office to practice law, is not prohibited from representing a client in a matter pending in the court, but in which the former judge did not participate, or acquire material confidential information.  The fact that a former judge exercised administrative responsibility in a court also does not prevent the former judge from acting as a lawyer in a matter where the judge had previously exercised remote or incidental administrative responsibility that did not affect the merits, such as uncontested procedural duties typically performed by a presiding or supervising judge or justice.  The term "adjudicative officer" includes such officials as judges pro tempore, referees, and special masters.

[2]    Other law or codes of ethics governing third-party neutrals may impose more stringent standards of personal or imputed disqualification.  (See rule 2.4.)

[3]    Paragraph (c)(2) does not prohibit the screened* lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is personally prohibited from participating.

## Rule 1.13  Organization as Client

(a)    A lawyer employed or retained by an organization shall conform his or her representation to the concept that the client is the organization itself, acting through its duly authorized directors, officers, employees, members, shareholders, or other constituents overseeing the particular engagement.

(b)    If a lawyer representing an organization knows* that a constituent is acting, intends to act or refuses to act in a matter related to the representation in a manner that the lawyer knows* or reasonably should know* is (i) a violation of a legal obligation to the organization or a violation of law reasonably* imputable to the organization, and (ii) likely to result in substantial* injury to the organization, the lawyer shall proceed as is reasonably* necessary in the best lawful interest of the organization.  Unless the lawyer reasonably believes* that it is not necessary in the best lawful interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

(c)    In taking any action pursuant to paragraph (b), the lawyer shall not reveal information protected by Business and Professions Code section 6068, subdivision (e).

(d)    If, despite the lawyer's actions in accordance with paragraph (b), the highest authority that can act on behalf of the organization insists upon action, or fails to act, in a manner that is a violation of a legal obligation to the organization or a violation of law reasonably* imputable to the organization, and is likely to result in substantial* injury to the organization, the lawyer shall continue to proceed as is reasonably* necessary in the best lawful interests of the organization.  The lawyer's response may include the lawyer's right and, where appropriate, duty to resign or withdraw in accordance with rule 1.16.

(e)    A lawyer who reasonably believes* that he or she has been discharged because of the lawyer's actions taken pursuant to paragraph (b), or who resigns or withdraws under circumstances described in paragraph (d), shall proceed as the lawyer reasonably believes* necessary to assure that the organization's highest authority is informed of the lawyer's discharge, resignation, or withdrawal.

(f)    In dealing with an organization's constituents, a lawyer representing the organization shall explain the identity of the lawyer's client whenever the lawyer

*An asterisk (\*) identifies a word or phrase defined in rule 1.0.1*

RULES OF PROFESSIONAL CONDUCT

knows* or reasonably should know* that the organization's interests are adverse to those of the constituent(s) with whom the lawyer is dealing.

(g)    A lawyer representing an organization may also represent any of its constituents, subject to the provisions of rules 1.7, 1.8.2, 1.8.6, and 1.8.7.  If the organization's consent to the dual representation is required by any of these rules, the consent shall be given by an appropriate official, constituent, or body of the organization other than the individual who is to be represented, or by the shareholders.

**Comment**

*The Entity as the Client*

[1]    This rule applies to all forms of private, public and governmental organizations.  (See Comment [6].)  An organizational client can only act through individuals who are authorized to conduct its affairs.  The identity of an organization's constituents will depend on its form, structure, and chosen terminology.    For example, in the case of a corporation, constituents include officers, directors, employees and shareholders.  In the case of other organizational forms, constituents include the equivalents of officers, directors, employees, and shareholders.  For purposes of this rule, any agent or fiduciary authorized to act on behalf of an organization is a constituent of the organization.

[2]    A lawyer ordinarily must accept decisions an organization's constituents make on behalf of the organization, even if the lawyer questions their utility or prudence.  It is not within the lawyer's province to make decisions on behalf of the organization concerning policy and operations, including ones entailing serious risk.  A lawyer, however, has a duty to inform the client of significant developments related to the representation under Business and Professions Code section 6068, subdivision (m) and rule 1.4.  Even when a lawyer is not obligated to proceed in accordance with paragraph (b), the lawyer may refer to higher authority, including the organization's highest authority, matters that the lawyer reasonably believes* are sufficiently important to refer in the best interest of the organization subject to Business and Professions Code section 6068, subdivision (e) and rule 1.6.

[3]    Paragraph (b) distinguishes between knowledge of the conduct and knowledge of the consequences of that conduct.  When a lawyer knows* of the conduct,

the lawyer's obligations under paragraph (b) are triggered when the lawyer knows* or reasonably should know* that the conduct is (i) a violation of a legal obligation to the organization, or a violation of law reasonably* imputable to the organization, and (ii) likely to result in substantial* injury to the organization.

[4]    In determining how to proceed under paragraph (b), the lawyer should consider the seriousness of the violation and its potential consequences, the responsibility in the organization and the apparent motivation of the person* involved, the policies of the organization concerning such matters, and any other relevant considerations.    Ordinarily, referral to a higher authority would be necessary.    In some circumstances, however, the lawyer may ask the constituent to reconsider the matter.  For example, if the circumstances involve a constituent's innocent misunderstanding of law and subsequent acceptance of the lawyer's advice, the lawyer may reasonably* conclude that the best interest of the organization does not require that the matter be referred to higher authority.  If a constituent persists in conduct contrary to the lawyer's advice, it will be necessary for the lawyer to take steps to have the matter reviewed by a higher authority in the organization.  If the matter is of sufficient seriousness and importance or urgency to the organization, referral to higher authority in the organization may be necessary even if the lawyer has not communicated with the constituent.   For the responsibility of a subordinate lawyer in representing an organization, see rule 5.2.

[5]    In determining how to proceed in the best lawful interests of the organization, a lawyer should consider the extent to which the organization should be informed of the circumstances, the actions taken by the organization with respect to the matter and the direction the lawyer has received from the organizational client.

*Governmental Organizations*

[6]    It is beyond the scope of this rule to define precisely the identity of the client and the lawyer's obligations when representing a governmental agency.  Although in some circumstances the client may be a specific agency, it may also be a branch of government or the government as a whole.  In a matter involving the conduct of government officials, a government lawyer may have authority under applicable law to question such conduct more

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

extensively than that of a lawyer for a private organization in similar circumstances. Duties of lawyers employed by the government or lawyers in military service may be defined by statutes and regulations. In addition, a governmental organization may establish internal organizational rules and procedures that identify an official, agency, organization, or other person* to serve as the designated recipient of whistle-blower reports from the organization's lawyers, consistent with Business and Professions Code section 6068, subdivision (e) and rule 1.6. This rule is not intended to limit that authority.

## Rule 1.14  [Reserved]

## Rule 1.15  Safekeeping Funds and Property of Clients and Other Persons*

(a)  All funds received or held by a lawyer or law firm* for the benefit of a client, or other person* to whom the lawyer owes a contractual, statutory, or other legal duty, including advances for fees, costs and expenses, shall be deposited in one or more identifiable bank accounts labeled "Trust Account" or words of similar import, maintained in the State of California, or, with written* consent of the client, in any other jurisdiction where there is a substantial* relationship between the client or the client's business and the other jurisdiction.

(b)  Notwithstanding paragraph (a), a flat fee paid in advance for legal services may be deposited in a lawyer's or law firm's operating account, provided:

(1)  the lawyer or law firm* discloses to the client in writing* (i) that the client has a right under paragraph (a) to require that the flat fee be deposited in an identified trust account until the fee is earned, and (ii) that the client is entitled to a refund of any amount of the fee that has not been earned in the event the representation is terminated or the services for which the fee has been paid are not completed; and

(2)  if the flat fee exceeds $1,000.00, the client's agreement to deposit the flat fee in the lawyer's operating account and the disclosures required by paragraph (b)(1) are set forth in a writing* signed by the client.

(c)  Funds belonging to the lawyer or the law firm* shall not be deposited or otherwise commingled with funds held in a trust account except:

(1)  funds reasonably* sufficient to pay bank charges; and

(2)  funds belonging in part to a client or other person* and in part presently or potentially to the lawyer or the law firm,* in which case the portion belonging to the lawyer or law firm* must be withdrawn at the earliest reasonable* time after the lawyer or law firm's interest in that portion becomes fixed. However, if a client or other person* disputes the lawyer or law firm's right to receive a portion of trust funds, the disputed portion shall not be withdrawn until the dispute is finally resolved.

(d)  A lawyer shall:

(1)  promptly notify a client or other person* of the receipt of funds, securities, or other property in which the lawyer knows* or reasonably should know* the client or other person* has an interest;

(2)  identify and label securities and properties of a client or other person* promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable;

(3)  maintain complete records of all funds, securities, and other property of a client or other person* coming into the possession of the lawyer or law firm;*

(4)  promptly account in writing* to the client or other person* for whom the lawyer holds funds or property;

(5)  preserve records of all funds and property held by a lawyer or law firm* under this rule for a period of no less than five years after final appropriate distribution of such funds or property;

(6)  comply with any order for an audit of such records issued pursuant to the Rules of Procedure of the State Bar; and

(7)  promptly distribute, as requested by the client or other person,* any undisputed funds or

**CURRENT RULES**
*An asterisk (\*) identifies a word or phrase defined in rule 1.0.1*

property in the possession of the lawyer or law firm* that the client or other person* is entitled to receive.

(e)   The Board of Trustees of the State Bar shall have the authority to formulate and adopt standards as to what "records" shall be maintained by lawyers and law firms* in accordance with subparagraph (d)(3). The standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all lawyers.

*Standards:*

Pursuant to this rule, the Board of Trustees of the State Bar adopted the following standards, effective November 1, 2018, as to what "records" shall be maintained by lawyers and law firms* in accordance with paragraph (d)(3).

(1)   A lawyer shall, from the date of receipt of funds of the client or other person* through the period ending five years from the date of appropriate disbursement of such funds, maintain:

(a)   a written* ledger for each client or other person* on whose behalf funds are held that sets forth:

(i)   the name of such client or other person;*

(ii)   the date, amount and source of all funds received on behalf of such client or other person;*

(iii)   the date, amount, payee and purpose of each disbursement made on behalf of such client or other person;* and

(iv)   the current balance for such client or other person;*

(b)   a written* journal for each bank account that sets forth:

(i)   the name of such account;

(ii)   the date, amount and client affected by each debit and credit; and

(iii)   the current balance in such account;

(c)   all bank statements and cancelled checks for each bank account; and

(d)   each monthly reconciliation (balancing) of (a), (b), and (c).

(2)   A lawyer shall, from the date of receipt of all securities and other properties held for the benefit of client or other person* through the period ending five years from the date of appropriate disbursement of such securities and other properties, maintain a written* journal that specifies:

(a)   each item of security and property held;

(b)   the person* on whose behalf the security or property is held;

(c)   the date of receipt of the security or property;

(d)   the date of distribution of the security or property; and

(e)   person* to whom the security or property was distributed.

**Comment**

[1]   Whether a lawyer owes a contractual, statutory or other legal duty under paragraph (a) to hold funds on behalf of a person* other than a client in situations where client funds are subject to a third-party lien will depend on the relationship between the lawyer and the third-party, whether the lawyer has assumed a contractual obligation to the third person* and whether the lawyer has an independent obligation to honor the lien under a statute or other law.  In certain circumstances, a lawyer may be civilly liable when the lawyer has notice of a lien and disburses funds in contravention of the lien. (See *Kaiser Foundation Health Plan, Inc. v. Aguiluz* (1996) 47 Cal.App.4th 302 [54 Cal.Rptr.2d 665].)  However, civil liability by itself does not establish a violation of this rule.  (Compare *Johnstone v. State Bar of California* (1966) 64 Cal.2d 153, 155-156 [49 Cal.Rptr. 97] ["'When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct.'"] with *Crooks v. State Bar* (1970) 3 Cal.3d 346, 358 [90

**RULES OF PROFESSIONAL CONDUCT**

Cal.Rptr. 600] [lawyer who agrees to act as escrow or stakeholder for a client and a third-party owes a duty to the nonclient with regard to held funds].)

[2]   As used in this rule, "advances for fees" means a payment intended by the client as an advance payment for some or all of the services that the lawyer is expected to perform on the client's behalf. With respect to the difference between a true retainer and a flat fee, which is one type of advance fee, see rule 1.5(d) and (e).  Subject to rule 1.5, a lawyer or law firm* may enter into an agreement that defines when or how an advance fee is earned and may be withdrawn from the client trust account.

[3]   Absent written* disclosure and the client's agreement in a writing* signed by the client as provided in paragraph (b), a lawyer must deposit a flat fee paid in advance of legal services in the lawyer's trust account.  Paragraph (b) does not apply to advance payment for costs and expenses. Paragraph (b) does not alter the lawyer's obligations under paragraph (d) or the lawyer's burden to establish that the fee has been earned.

## Rule 1.16  Declining or Terminating Representation

(a)   Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1)   the lawyer knows* or reasonably should know* that the client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person;*

(2)   the lawyer knows* or reasonably should know* that the representation will result in violation of these rules or of the State Bar Act;

(3)   the lawyer's mental or physical condition renders it unreasonably difficult to carry out the representation effectively; or

(4)   the client discharges the lawyer.

(b)   Except as stated in paragraph (c), a lawyer may withdraw from representing a client if:

(1)   the client insists upon presenting a claim or defense in litigation, or asserting a position or making a demand in a non-litigation matter, that is not warranted under existing law and cannot be supported by good faith argument for an extension, modification, or reversal of existing law;

(2)   the client either seeks to pursue a criminal or fraudulent* course of conduct or has used the lawyer's services to advance a course of conduct that the lawyer reasonably believes* was a crime or fraud;*

(3)   the client insists that the lawyer pursue a course of conduct that is criminal or fraudulent;*

(4)   the client by other conduct renders it unreasonably difficult for the lawyer to carry out the representation effectively;

(5)   the client breaches a material term of an agreement with, or obligation, to the lawyer relating to the representation, and the lawyer has given the client a reasonable* warning after the breach that the lawyer will withdraw unless the client fulfills the agreement or performs the obligation;

(6)   the client knowingly* and freely assents to termination of the representation;

(7)   the inability to work with co-counsel indicates that the best interests of the client likely will be served by withdrawal;

(8)   the lawyer's mental or physical condition renders it difficult for the lawyer to carry out the representation effectively;

(9)   a continuation of the representation is likely to result in a violation of these rules or the State Bar Act; or

(10)  the lawyer believes* in good faith, in a proceeding pending before a tribunal,* that the tribunal* will find the existence of other good cause for withdrawal.

(c)   If permission for termination of a representation is required by the rules of a tribunal,* a lawyer shall

**CURRENT RULES**

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

RULES OF PROFESSIONAL CONDUCT

not terminate a representation before that tribunal* without its permission.

(d)   A lawyer shall not terminate a representation until the lawyer has taken reasonable* steps to avoid reasonably* foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel, and complying with paragraph (e).

(e)   Upon the termination of a representation for any reason:

(1)   subject to any applicable protective order, non-disclosure agreement, statute or regulation, the lawyer promptly shall release to the client, at the request of the client, all client materials and property.   "Client materials and property" includes correspondence, pleadings, deposition transcripts, experts' reports and other writings,* exhibits, and physical evidence, whether in tangible, electronic or other form, and other items reasonably* necessary to the client's representation, whether the client has paid for them or not; and

(2)   the lawyer promptly shall refund any part of a fee or expense paid in advance that the lawyer has not earned or incurred.   This provision is not applicable to a true retainer fee paid solely for the purpose of ensuring the availability of the lawyer for the matter.

**Comment**

[1]   This rule applies, without limitation, to a sale of a law practice under rule 1.17.   A lawyer can be subject to discipline for improperly threatening to terminate a representation.   (See *In the Matter of Shalant* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 829, 837.)

[2]   When a lawyer withdraws from the representation of a client in a particular matter under paragraph (a) or (b), the lawyer might not be obligated to withdraw from the representation of the same client in other matters.   For example, a lawyer might be obligated under paragraph (a)(1) to withdraw from representing a client because the lawyer has a conflict of interest under rule 1.7, but that conflict might not arise in other representations of the client.

[3]   Withdrawal under paragraph (a)(1) is not mandated where a lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, or involuntary commitment or confinement, defends the proceeding by requiring that every element of the case be established. (See rule 3.1(b).)

[4]   Lawyers must comply with their obligations to their clients under Business and Professions Code section 6068, subdivision (e) and rule 1.6, and to the courts under rule 3.3 when seeking permission to withdraw under paragraph (c).   If a tribunal* denies a lawyer permission to withdraw, the lawyer is obligated to comply with the tribunal's* order.   (See Bus. & Prof. Code, §§ 6068, subd. (b) and 6103.)   This duty applies even if the lawyer sought permission to withdraw because of a conflict of interest.   Regarding withdrawal from limited scope representations that involve court appearances, compliance with applicable California Rules of Court concerning limited scope representation satisfies paragraph (c).

[5]   Statutes may prohibit a lawyer from releasing information in the client materials and property under certain circumstances. (See, e.g., Pen. Code, §§ 1054.2 and 1054.10.) A lawyer in certain criminal matters may be required to retain a copy of a former client's file for the term of his or her imprisonment. (See, Pen. Code, § 1054.9.)

[6]   Paragraph (e)(1) does not prohibit a lawyer from making, at the lawyer's own expense, and retaining copies of papers released to the client, or to prohibit a claim for the recovery of the lawyer's expense in any subsequent legal proceeding.

[*Publisher's Note: Comment [5] was amended by order of the Supreme Court, effective June 1, 2020.*]

## Rule 1.17  Sale of a Law Practice

All or substantially* all of the law practice of a lawyer, living or deceased, including goodwill, may be sold to another lawyer or law firm* subject to all the following conditions:

(a)   Fees charged to clients shall not be increased solely by reason of the sale.

(b)   If the sale contemplates the transfer of responsibility for work not yet completed or responsibility for client files or information protected by Business and Professions Code section 6068, subdivision (e)(1), then;

**RULES OF PROFESSIONAL CONDUCT**

(1)   if the seller is deceased, or has a conservator or other person* acting in a representative capacity, and no lawyer has been appointed to act for the seller pursuant to Business and Professions Code section 6180.5, then prior to the transfer;

(i)   the purchaser shall cause a written* notice to be given to each client whose matter is included in the sale, stating that the interest in the law practice is being transferred to the purchaser; that the client has the right to retain other counsel; that the client may take possession of any client materials and property, as required by rule 1.16(e)(1); and that if no response is received to the notice within 90 days after it is sent, or if the client's rights would be prejudiced by a failure of the purchaser to act during that time, the purchaser may act on behalf of the client until otherwise notified by the client, and

(ii)   the purchaser shall obtain the written* consent of the client.   If reasonable* efforts have been made to locate the client and no response to the paragraph (b)(1)(i) notice is received within 90 days, consent shall be presumed until otherwise notified by the client.

(2)   in all other circumstances, not less than 90 days prior to the transfer;

(i)   the seller, or the lawyer appointed to act for the seller pursuant to Business and Professions Code section 6180.5, shall cause a written* notice to be given to each client whose matter is included in the sale, stating that the interest in the law practice is being transferred to the purchaser; that the client has the right to retain other counsel; that the client may take possession of any client materials and property, as required by rule 1.16(e)(1); and that if no response is received to the notice within 90 days after it is sent, or if the client's rights would be prejudiced by a failure of the purchaser to act during that time, the purchaser may act on behalf of the client until otherwise notified by the client, and

(ii)   the seller, or the lawyer appointed to act for the seller pursuant to Business and Professions Code section 6180.5, shall obtain the written* consent of the client prior to the transfer.  If reasonable* efforts have been made to locate the client and no response to the paragraph (b)(2)(i) notice is received within 90 days, consent shall be presumed until otherwise notified by the client.

(c)   If substitution is required by the rules of a tribunal* in which a matter is pending, all steps necessary to substitute a lawyer shall be taken.

(d)   The purchaser shall comply with the applicable requirements of rules 1.7 and 1.9.

(e)   Confidential information shall not be disclosed to a nonlawyer in connection with a sale under this rule.

(f)   This rule does not apply to the admission to or retirement from a law firm,* retirement plans and similar arrangements, or sale of tangible assets of a law practice.

**Comment**

[1]   The requirement that the sale be of "all or substantially* all of the law practice of a lawyer" prohibits the sale of only a field or area of practice or the seller's practice in a geographical area or in a particular jurisdiction.  The prohibition against the sale of less than all or substantially* all of a practice protects those clients whose matters are less lucrative and who might find it difficult to secure other counsel if a sale could be limited to substantial* fee-generating matters.  The purchasers are required to undertake all client matters sold in the transaction, subject to client consent.  This requirement is satisfied, however, even if a purchaser is unable to undertake a particular client matter because of a conflict of interest.

[2]   Under paragraph (a), the purchaser must honor existing arrangements between the seller and the client as to fees and scope of work and the sale may not be financed by increasing fees charged for client matters transferred through the sale.  However, fee increases or other changes to the fee arrangements might be justified by other factors, such as modifications of the purchaser's responsibilities, the passage of time, or reasonable* costs that were not

addressed in the original agreement. Any such modifications must comply with rules 1.4 and 1.5 and other relevant provisions of these rules and the State Bar Act.

[3] Transfer of individual client matters, where permitted, is governed by rule 1.5.1. Payment of a fee to a nonlawyer broker for arranging the sale or purchase of a law practice is governed by rule 5.4(a).

### Rule 1.18  Duties to Prospective Client

(a) A person* who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from the lawyer in the lawyer's professional capacity, is a prospective client.

(b) Even when no lawyer-client relationship ensues, a lawyer who has communicated with a prospective client shall not use or reveal information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that the lawyer learned as a result of the consultation, except as rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received from the prospective client information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that is material to the matter, except as provided in paragraph (d). If a lawyer is prohibited from representation under this paragraph, no lawyer in a firm* with which that lawyer is associated may knowingly* undertake or continue representation in such a matter, except as provided in paragraph (d).

(d) When the lawyer has received information that prohibits representation as provided in paragraph (c), representation of the affected client is permissible if:

(1) both the affected client and the prospective client have given informed written consent,* or

(2) the lawyer who received the information took reasonable* measures to avoid exposure to more information than was reasonably* necessary to determine whether to represent the prospective client; and

(i) the prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom; and

(ii) written* notice is promptly given to the prospective client to enable the prospective client to ascertain compliance with the provisions of this rule.

### Comment

[1] As used in this rule, a prospective client includes a person's* authorized representative. A lawyer's discussions with a prospective client can be limited in time and depth and leave both the prospective client and the lawyer free, and sometimes required, to proceed no further. Although a prospective client's information is protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 the same as that of a client, in limited circumstances provided under paragraph (d), a law firm* is permitted to accept or continue representation of a client with interests adverse to the prospective client. This rule is not intended to limit the application of Evidence Code section 951 (defining "client" within the meaning of the Evidence Code).

[2] Not all persons* who communicate information to a lawyer are entitled to protection under this rule. A person* who by any means communicates information unilaterally to a lawyer, without reasonable* expectation that the lawyer is willing to discuss the possibility of forming a lawyer-client relationship or provide legal advice is not a "prospective client" within the meaning of paragraph (a). In addition, a person* who discloses information to a lawyer after the lawyer has stated his or her unwillingness or inability to consult with the person* (*People v. Gionis* (1995) 9 Cal.4th 1196 [40 Cal.Rptr.2d 456]), or who communicates information to a lawyer without a good faith intention to seek legal advice or representation, is not a prospective client within the meaning of paragraph (a).

[3] In order to avoid acquiring information from a prospective client that would prohibit representation as provided in paragraph (c), a lawyer considering whether or not to undertake a new matter must limit the initial interview to only such information as reasonably* appears necessary for that purpose.

[4] Under paragraph (c), the prohibition in this rule is imputed to other lawyers in a law firm* as provided

in rule 1.10. However, under paragraph (d)(1), the consequences of imputation may be avoided if the informed written consent* of both the prospective and affected clients is obtained. (See rule 1.0.1(e-1) [informed written consent].) In the alternative, imputation may be avoided if the conditions of paragraph (d)(2) are met and all prohibited lawyers are timely screened* and written* notice is promptly given to the prospective client. Paragraph (d)(2)(i) does not prohibit the screened* lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is prohibited.

[5]   Notice under paragraph (d)(2)(ii) must include a general description of the subject matter about which the lawyer was consulted, and the screening* procedures employed.


# CHAPTER 2. COUNSELOR

## Rule 2.1 Advisor

In representing a client, a lawyer shall exercise independent professional judgment and render candid advice.

**Comment**

[1]   A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest.

[2]   This rule does not preclude a lawyer who renders advice from referring to considerations other than the law, such as moral, economic, social and political factors that may be relevant to the client's situation.

## Rule 2.2 [Reserved]

## Rule 2.3 [Reserved]

## Rule 2.4  Lawyer as Third-Party Neutral

(a)   A lawyer serves as a third-party neutral when the lawyer assists two or more persons* who are not clients of the lawyer to reach a resolution of a dispute, or other matter, that has arisen between them. Service as a third-party neutral may include service as an arbitrator, a mediator or in such other capacity as will enable the lawyer to assist the parties to resolve the matter.

(b)   A lawyer serving as a third-party neutral shall inform unrepresented parties that the lawyer is not representing them. When the lawyer knows* or reasonably should know* that a party does not understand the lawyer's role in the matter, the lawyer shall explain the difference between the lawyer's role as a third-party neutral and a lawyer's role as one who represents a client.

**Comment**

[1]   In serving as a third-party neutral, the lawyer may be subject to court rules or other law that apply either to third-party neutrals generally or to lawyers serving as third-party neutrals. Lawyer neutrals may also be subject to various codes of ethics, such as the Judicial Council Standards for Mediators in Court Connected Mediation Programs or the Judicial Council Ethics Standards for Neutral Arbitrators in Contractual Arbitration.

[2]   A lawyer who serves as a third-party neutral subsequently may be asked to serve as a lawyer representing a client in the same matter. The conflicts of interest that arise for both the individual lawyer and the lawyer's law firm* are addressed in rule 1.12.

[3]   This rule is not intended to apply to temporary judges, referees or court-appointed arbitrators. (See rule 2.4.1.)

## Rule 2.4.1  Lawyer as Temporary Judge, Referee, or Court-Appointed Arbitrator

A lawyer who is serving as a temporary judge, referee, or court-appointed arbitrator, and is subject to canon 6D of the California Code of Judicial Ethics, shall comply with the terms of that canon.

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

[1]   This rule is intended to permit the State Bar to discipline lawyers who violate applicable portions of the California Code of Judicial Ethics while acting in a judicial capacity pursuant to an order or appointment by a court.

[2]   This rule is not intended to apply to a lawyer serving as a third-party neutral in a mediation or a settlement conference, or as a neutral arbitrator pursuant to an arbitration agreement.  (See rule 2.4.)

## CHAPTER 3. ADVOCATE

### Rule 3.1  Meritorious Claims and Contentions

(a)   A lawyer shall not:

(1)   bring or continue an action, conduct a defense, assert a position in litigation, or take an appeal, without probable cause and for the purpose of harassing or maliciously injuring any person;* or

(2)   present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by a good faith argument for an extension, modification, or reversal of the existing law.

(b)   A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, or involuntary commitment or confinement, may nevertheless defend the proceeding by requiring that every element of the case be established.

### Rule 3.2  Delay of Litigation

In representing a client, a lawyer shall not use means that have no substantial* purpose other than to delay or prolong the proceeding or to cause needless expense.

**Comment**

See rule 1.3 with respect to a lawyer's duty to act with reasonable* diligence and rule 3.1(b) with respect to a lawyer's representation of a defendant in a criminal

proceeding.  See also Business and Professions Code section 6128, subdivision (b).

### Rule 3.3  Candor Toward the Tribunal*

(a)   A lawyer shall not:

(1)   knowingly* make a false statement of fact or law to a tribunal* or fail to correct a false statement of material fact or law previously made to the tribunal* by the lawyer;

(2)   fail to disclose to the tribunal* legal authority in the controlling jurisdiction known* to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel, or knowingly* misquote to a tribunal* the language of a book, statute, decision or other authority; or

(3)   offer evidence that the lawyer knows* to be false.  If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence, and the lawyer comes to know* of its falsity, the lawyer shall take reasonable* remedial measures, including, if necessary, disclosure to the tribunal,* unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e) and rule 1.6.  A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes* is false.

(b)   A lawyer who represents a client in a proceeding before a tribunal* and who knows* that a person* intends to engage, is engaging or has engaged in criminal or fraudulent* conduct related to the proceeding shall take reasonable* remedial measures to the extent permitted by Business and Professions Code section 6068, subdivision (e) and rule 1.6.

(c)   The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding.

(d)   In an ex parte proceeding where notice to the opposing party in the proceeding is not required or given and the opposing party is not present, a lawyer shall inform the tribunal* of all material facts known* to the lawyer that will enable the tribunal* to make an informed decision, whether or not the facts are adverse to the position of the client.

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

[1]   This rule governs the conduct of a lawyer in proceedings of a tribunal,* including ancillary proceedings such as a deposition conducted pursuant to a tribunal's* authority.   See rule 1.0.1(m) for the definition of "tribunal."

[2]   The prohibition in paragraph (a)(1) against making false statements of law or failing to correct a material misstatement of law includes citing as authority a decision that has been overruled or a statute that has been repealed or declared unconstitutional, or failing to correct such a citation previously made to the tribunal* by the lawyer.

*Legal Argument*

[3]   Legal authority in the controlling jurisdiction may include legal authority outside the jurisdiction in which the tribunal* sits, such as a federal statute or case that is determinative of an issue in a state court proceeding or a Supreme Court decision that is binding on a lower court.

[4]   The duties stated in paragraphs (a) and (b) apply to all lawyers, including defense counsel in criminal cases.   If a lawyer knows* that a client intends to testify falsely or wants the lawyer to introduce false evidence, the lawyer should seek to persuade the client that the evidence should not be offered and, if unsuccessful, must refuse to offer the false evidence.   If a criminal defendant insists on testifying, and the lawyer knows* that the testimony will be false, the lawyer may offer the testimony in a narrative form if the lawyer made reasonable* efforts to dissuade the client from the unlawful course of conduct and the lawyer has sought permission from the court to withdraw as required by rule 1.16.  (See, e.g., *People v. Johnson* (1998) 62 Cal.App.4th 608 [72 Cal.Rptr.2d 805]; *People v. Jennings* (1999) 70 Cal.App.4th 899 [83 Cal.Rptr.2d 33].)  The obligations of a lawyer under these rules and the State Bar Act are subordinate to applicable constitutional provisions.

*Remedial Measures*

[5]   Reasonable*   remedial   measures   under paragraphs (a)(3) and (b) refer to measures that are available under these rules and the State Bar Act, and which a reasonable* lawyer would consider appropriate under the circumstances to comply with the lawyer's duty of candor to the tribunal.*   (See,

e.g., rules 1.2.1, 1.4(a)(4), 1.16(a), 8.4; Bus. & Prof. Code, §§ 6068, subd. (d), 6128.)  Remedial measures also include explaining to the client the lawyer's obligations under this rule and, where applicable, the reasons for the lawyer's decision to seek permission from the tribunal* to withdraw, and remonstrating further with the client to take corrective action that would eliminate the need for the lawyer to withdraw.   If the client is an organization, the lawyer should also consider the provisions of rule 1.13.  Remedial measures do not include disclosure of client confidential information, which the lawyer is required to protect under Business and Professions Code section 6068, subdivision (e) and rule 1.6.

*Duration of Obligation*

[6]   A proceeding has concluded within the meaning of this rule when a final judgment in the proceeding has been affirmed on appeal or the time for review has passed.   A prosecutor may have obligations that go beyond the scope of this rule. (See, e.g., rule 3.8(f) and (g).)

*Ex Parte Communications*

[7]   Paragraph (d) does not apply to ex parte communications that are not otherwise prohibited by law or the tribunal.*

*Withdrawal*

[8]   A lawyer's compliance with the duty of candor imposed by this rule does not require that the lawyer withdraw from the representation.   The lawyer may, however, be required by rule 1.16 to seek permission of the tribunal* to withdraw if the lawyer's compliance with this rule results in a deterioration of the lawyer-client relationship such that the lawyer can no longer competently and diligently represent the client, or where continued employment will result in a violation of these rules. A lawyer must comply with Business and Professions Code section 6068, subdivision (e) and rule 1.6 with respect to a request to withdraw that is premised on a client's misconduct.

[9]   In addition to this rule, lawyers remain bound by Business and Professions Code sections 6068, subdivision (d) and 6106.

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

**RULES OF PROFESSIONAL CONDUCT**

## Rule 3.4  Fairness to Opposing Party and Counsel

A lawyer shall not:

(a)   unlawfully obstruct another party's access to evidence, including a witness, or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value.  A lawyer shall not counsel or assist another person* to do any such act;

(b)   suppress any evidence that the lawyer or the lawyer's client has a legal obligation to reveal or to produce;

(c)   falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

(d)   directly or indirectly pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case.  Except where prohibited by law, a lawyer may advance, guarantee, or acquiesce in the payment of:

  (1)   expenses reasonably* incurred by a witness in attending or testifying;

  (2)   reasonable* compensation to a witness for loss of time in attending or testifying; or

  (3)   a reasonable* fee for the professional services of an expert witness;

(e)   advise or directly or indirectly cause a person* to secrete himself or herself or to leave the jurisdiction of a tribunal* for the purpose of making that person* unavailable as a witness therein;

(f)   knowingly* disobey an obligation under the rules of a tribunal* except for an open refusal based on an assertion that no valid obligation exists; or

(g)   in trial, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the guilt or innocence of an accused.

### Comment

[1]   Paragraph (a) applies to evidentiary material generally, including computerized information.  It is a criminal offense to destroy material for purpose of impairing its availability in a pending proceeding or one whose commencement can be foreseen. (See, e.g., Pen. Code, § 135; 18 U.S.C. §§ 1501-1520.)  Falsifying evidence is also generally a criminal offense.  (See, e.g., Pen. Code, § 132; 18 U.S.C. § 1519.)  Applicable law may permit a lawyer to take temporary possession of physical evidence of client crimes for the purpose of conducting a limited examination that will not alter or destroy material characteristics of the evidence.  Applicable law may require a lawyer to turn evidence over to the police or other prosecuting authorities, depending on the circumstances. (See *People v. Lee* (1970) 3 Cal.App.3d 514, 526 [83 Cal.Rptr. 715]; *People v. Meredith* (1981) 29 Cal.3d 682 [175 Cal.Rptr. 612].)

[2]   A violation of a civil or criminal discovery rule or statute does not by itself establish a violation of this rule.  See rule 3.8 for special disclosure responsibilities of a prosecutor.

## Rule 3.5  Contact with Judges, Officials, Employees, and Jurors

(a)   Except as permitted by statute, an applicable code of judicial ethics or code of judicial conduct, or standards governing employees of a tribunal,* a lawyer shall not directly or indirectly give or lend anything of value to a judge, official, or employee of a tribunal.* This rule does not prohibit a lawyer from contributing to the campaign fund of a judge or judicial officer running for election or confirmation pursuant to applicable law pertaining to such contributions.

(b)   Unless permitted to do so by law, an applicable code of judicial ethics or code of judicial conduct, a rule or ruling of a tribunal,* or a court order, a lawyer shall not directly or indirectly communicate with or argue to a judge or judicial officer upon the merits of a contested matter pending before the judge or judicial officer, except:

  (1)   in open court;

  (2)   with the consent of all other counsel and any unrepresented parties in the matter;

  (3)   in the presence of all other counsel and any unrepresented parties in the matter;

  (4)   in writing* with a copy thereof furnished to all other counsel and any unrepresented parties in the matter; or

**RULES OF PROFESSIONAL CONDUCT**

(5)   in ex parte matters.

(c)   As used in this rule, "judge" and "judicial officer" shall also include: (i) administrative law judges; (ii) neutral arbitrators; (iii) State Bar Court judges; (iv) members of an administrative body acting in an adjudicative capacity; and (v) law clerks, research attorneys, or other court personnel who participate in the decision-making process, including referees, special masters, or other persons* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(d)   A lawyer connected with a case shall not communicate directly or indirectly with anyone the lawyer knows* to be a member of the venire from which the jury will be selected for trial of that case.

(e)   During trial, a lawyer connected with the case shall not communicate directly or indirectly with any juror.

(f)   During trial, a lawyer who is not connected with the case shall not communicate directly or indirectly concerning the case with anyone the lawyer knows* is a juror in the case.

(g)   After discharge of the jury from further consideration of a case a lawyer shall not communicate directly or indirectly with a juror if:

(1)   the communication is prohibited by law or court order;

(2)   the juror has made known* to the lawyer a desire not to communicate; or

(3)   the communication involves misrepresentation, coercion, or duress, or is intended to harass or embarrass the juror or to influence the juror's actions in future jury service.

(h)   A lawyer shall not directly or indirectly conduct an out of court investigation of a person* who is either a member of a venire or a juror in a manner likely to influence the state of mind of such person* in connection with present or future jury service.

(i)   All restrictions imposed by this rule also apply to communications with, or investigations of, members of the family of a person* who is either a member of a venire or a juror.

(j)   A lawyer shall reveal promptly to the court improper conduct by a person* who is either a member of a venire or a juror, or by another toward a person* who is either a member of a venire or a juror or a member of his or her family, of which the lawyer has knowledge.

(k)   This rule does not prohibit a lawyer from communicating with persons* who are members of a venire or jurors as a part of the official proceedings.

(l)   For purposes of this rule, "juror" means any empaneled, discharged, or excused juror.

**Comment**

[1]   An applicable code of judicial ethics or code of judicial conduct under this rule includes the California Code of Judicial Ethics and the Code of Conduct for United States Judges.   Regarding employees of a tribunal* not subject to judicial ethics or conduct codes, applicable standards include the Code of Ethics for the Court Employees of California and 5 United States Code section 7353 (Gifts to Federal employees). The statutes applicable to adjudicatory proceedings of state agencies generally are contained in the Administrative Procedure Act (Gov. Code, § 11340 et seq.; see Gov. Code, § 11370 [listing statutes with the act].)   State and local agencies also may adopt their own regulations and rules governing communications with members or employees of a tribunal.*

[2]   For guidance on permissible communications with a juror in a criminal action after discharge of the jury, see Code of Civil Procedure section 206.

[3]   It is improper for a lawyer to communicate with a juror who has been removed, discharged, or excused from an empaneled jury, regardless of whether notice is given to other counsel, until such time as the entire jury has been discharged from further service or unless the communication is part of the official proceedings of the case.

**Rule 3.6 Trial Publicity**

(a)   A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows* or reasonably should know* will (i) be disseminated by means of public communication and (ii) have a substantial* likelihood of materially prejudicing an adjudicative proceeding in the matter.

**RULES OF PROFESSIONAL CONDUCT**

(b)   Notwithstanding paragraph (a), but only to the extent permitted by Business and Professions Code section 6068, subdivision (e) and rule 1.6, lawyer may state:

(1)   the claim, offense or defense involved and, except when prohibited by law, the identity of the persons* involved;

(2)   information contained in a public record;

(3)   that an investigation of a matter is in progress;

(4)   the scheduling or result of any step in litigation;

(5)   a request for assistance in obtaining evidence and information necessary thereto;

(6)   a warning of danger concerning the behavior of a person* involved, when there is reason to believe* that there exists the likelihood of substantial* harm to an individual or to the public but only to the extent that dissemination by public communication is reasonably* necessary to protect the individual or the public; and

(7)   in a criminal case, in addition to subparagraphs (1) through (6):

(i)   the identity, general area of residence, and occupation of the accused;

(ii)   if the accused has not been apprehended, the information necessary to aid in apprehension of that person;*

(iii)   the fact, time, and place of arrest; and

(iv)   the identity of investigating and arresting officers or agencies and the length of the investigation.

(c)   Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable* lawyer would believe* is required to protect a client from the substantial* undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

(d)   No lawyer associated in a law firm* or government agency with a lawyer subject to paragraph (a) shall make a statement prohibited by paragraph (a).

**Comment**

[1]   Whether an extrajudicial statement violates this rule depends on many factors, including: (i) whether the extrajudicial statement presents information clearly inadmissible as evidence in the matter for the purpose of proving or disproving a material fact in issue; (ii) whether the extrajudicial statement presents information the lawyer knows* is false, deceptive, or the use of which would violate Business and Professions Code section 6068, subdivision (d) or rule 3.3; (iii) whether the extrajudicial statement violates a lawful "gag" order, or protective order, statute, rule of court, or special rule of confidentiality, for example, in juvenile, domestic, mental disability, and certain criminal proceedings, (see Bus. & Prof. Code, § 6068, subd. (a) and rule 3.4(f), which require compliance with such obligations); and (iv) the timing of the statement.

[2]   This rule applies to prosecutors and criminal defense counsel. See rule 3.8(e) for additional duties of prosecutors in connection with extrajudicial statements about criminal proceedings.

**Rule 3.7  Lawyer as Witness**

(a)   A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless:

(1)   the lawyer's testimony relates to an uncontested issue or matter;

(2)   the lawyer's testimony relates to the nature and value of legal services rendered in the case; or

(3)   the lawyer has obtained informed written consent* from the client.  If the lawyer represents the People or a governmental entity, the consent shall be obtained from the head of the office or a designee of the head of the office by which the lawyer is employed.

(b)   A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm* is likely to be called as a witness unless precluded from doing so by rule 1.7 or rule 1.9.

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

**Comment**

[1]   This rule applies to a trial before a jury, judge, administrative law judge or arbitrator. This rule does not apply to other adversarial proceedings. This rule also does not apply in non-adversarial proceedings, as where a lawyer testifies on behalf of a client in a hearing before a legislative body.

[2]   A lawyer's obligation to obtain informed written consent* may be satisfied when the lawyer makes the required disclosure, and the client gives informed consent* on the record in court before a licensed court reporter or court recorder who prepares a transcript or recording of the disclosure and consent. See definition of "written" in rule 1.0.1(n).

[3]   Notwithstanding a client's informed written consent,* courts retain discretion to take action, up to and including disqualification of a lawyer who seeks to both testify and serve as an advocate, to protect the trier of fact from being misled or the opposing party from being prejudiced. (See, e.g., *Lyle v. Superior Court* (1981) 122 Cal.App.3d 470 [175 Cal.Rptr. 918].)

## Rule 3.8  Special Responsibilities of a Prosecutor

The prosecutor in a criminal case shall:

(a)   not institute or continue to prosecute a charge that the prosecutor knows* is not supported by probable cause;

(b)   make reasonable* efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable* opportunity to obtain counsel;

(c)   not seek to obtain from an unrepresented accused a waiver of important pretrial rights unless the tribunal* has approved the appearance of the accused in propria persona;

(d)   make timely disclosure to the defense of all evidence or information known* to the prosecutor that the prosecutor knows* or reasonably should know* tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal;* and

(e)   exercise reasonable* care to prevent persons* under the supervision or direction of the prosecutor, including investigators, law enforcement personnel, employees or other persons* assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under rule 3.6.

(f)   When a prosecutor knows* of new, credible and material evidence creating a reasonable* likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall:

(1)   promptly disclose that evidence to an appropriate court or authority, and

(2)   if the conviction was obtained in the prosecutor's jurisdiction,

(i)   promptly disclose that evidence to the defendant unless a court authorizes delay, and

(ii)   undertake further investigation, or make reasonable* efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.

(g)   When a prosecutor knows* of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction.

**Comment**

[1]   A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons.* This rule is intended to achieve those results. All lawyers in government service remain bound by rules 3.1 and 3.4.

[2]   Paragraph (c) does not forbid the lawful questioning of an uncharged suspect who has knowingly* waived the right to counsel and the right to remain silent. Paragraph (c) also does not forbid prosecutors from seeking from an unrepresented accused a reasonable* waiver of time for initial appearance or preliminary hearing as a means of

facilitating the accused's voluntary cooperation in an ongoing law enforcement investigation.

[3]   The disclosure obligations in paragraph (d) are not limited to evidence or information that is material as defined by *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194] and its progeny.   For example, these obligations include, at a minimum, the duty to disclose impeachment evidence or information that a prosecutor knows* or reasonably should know* casts significant doubt on the accuracy or admissibility of witness testimony on which the prosecution intends to rely.   Paragraph (d) does not require disclosure of information protected from disclosure by federal or California laws and rules, as interpreted by case law or court orders.   Nothing in this rule is intended to be applied in a manner inconsistent with statutory and constitutional provisions governing discovery in California courts.   A disclosure's timeliness will vary with the circumstances, and paragraph (d) is not intended to impose timing requirements different from those established by statutes, procedural rules, court orders, and case law interpreting those authorities and the California and federal constitutions.

[4]   The exception in paragraph (d) recognizes that a prosecutor may seek an appropriate protective order from the tribunal* if disclosure of information to the defense could result in substantial* harm to an individual or to the public interest.

[5]   Paragraph (e) supplements rule 3.6, which prohibits extrajudicial statements that have a substantial* likelihood of prejudicing an adjudicatory proceeding.   Paragraph (e) is not intended to restrict the statements which a prosecutor may make which comply with rule 3.6(b) or 3.6(c).

[6]   Prosecutors have a duty to supervise the work of subordinate lawyers and nonlawyer employees or agents.   (See rules 5.1 and 5.3.)   Ordinarily, the reasonable* care standard of paragraph (e) will be satisfied if the prosecutor issues the appropriate cautions to law enforcement personnel and other relevant individuals.

[7]   When a prosecutor knows* of new, credible and material evidence creating a reasonable* likelihood that a person* outside the prosecutor's jurisdiction was convicted of a crime that the person* did not commit, paragraph (f) requires prompt disclosure to the court or other appropriate authority, such as the chief prosecutor of the jurisdiction where the conviction occurred.   If the conviction was obtained in the prosecutor's jurisdiction, paragraph (f) requires

the prosecutor to examine the evidence and undertake further investigation to determine whether the defendant is in fact innocent or make reasonable* efforts to cause another appropriate authority to undertake the necessary investigation, and to promptly disclose the evidence to the court and, absent court authorized delay, to the defendant. Disclosure to a represented defendant must be made through the defendant's counsel, and, in the case of an unrepresented defendant, would ordinarily be accompanied by a request to a court for the appointment of counsel to assist the defendant in taking such legal measures as may be appropriate. (See rule 4.2.) Statutes may require a prosecutor to preserve certain types of evidence in criminal matters. (See Pen. Code, §§ 1417.1-1417.9.) In addition, prosecutors must obey file preservation orders concerning rights of discovery guaranteed by the Constitution and statutory provisions. (See *People v. Superior Court (Morales)* (2017) 2 Cal.5th 523 [213 Cal.Rptr.3d 581]; *Shorts v. Superior Court* (2018) 24 Cal.App.5th 709 [234 Cal.Rptr.3d 392].)

[8]   Under paragraph (g), once the prosecutor knows* of clear and convincing evidence that the defendant was convicted of an offense that the defendant did not commit, the prosecutor must seek to remedy the conviction.   Depending upon the circumstances, steps to remedy the conviction could include disclosure of the evidence to the defendant, requesting that the court appoint counsel for an unrepresented indigent defendant and, where appropriate, notifying the court that the prosecutor has knowledge that the defendant did not commit the offense of which the defendant was convicted.

[9]   A prosecutor's independent judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of paragraphs (f) and (g), though subsequently determined to have been erroneous, does not constitute a violation of this rule.

[**Publisher's Note:** *Comment [7] was amended by order of the Supreme Court, effective June 1, 2020.*]

## Rule 3.9  Advocate in Nonadjudicative Proceedings

A lawyer representing a client before a legislative body or administrative agency in connection with a pending nonadjudicative matter or proceeding shall disclose that the appearance is in a representative capacity, except when the lawyer seeks information from an agency that is available to the public.

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

This rule only applies when a lawyer represents a client in connection with an official hearing or meeting of a governmental agency or a legislative body to which the lawyer or the lawyer's client is presenting evidence or argument. It does not apply to representation of a client in a negotiation or other bilateral transaction with a governmental agency or in connection with an application for a license or other privilege or the client's compliance with generally applicable reporting requirements, such as the filing of income-tax returns. This rule also does not apply to the representation of a client in connection with an investigation or examination of the client's affairs conducted by government investigators or examiners. Representation in such matters is governed by rules 4.1 through 4.4. This rule does not require a lawyer to disclose a client's identity.

### Rule 3.10 Threatening Criminal, Administrative, or Disciplinary Charges

(a)    A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute.

(b)    As used in paragraph (a) of this rule, the term "administrative charges" means the filing or lodging of a complaint with any governmental organization that may order or recommend the loss or suspension of a license, or may impose or recommend the imposition of a fine, pecuniary sanction, or other sanction of a quasi-criminal nature but does not include filing charges with an administrative entity required by law as a condition precedent to maintaining a civil action.

(c)    As used in this rule, the term "civil dispute" means a controversy or potential controversy over the rights and duties of two or more persons* under civil law, whether or not an action has been commenced, and includes an administrative proceeding of a quasi-civil nature pending before a federal, state, or local governmental entity.

**Comment**

[1]    Paragraph (a) does not prohibit a statement by a lawyer that the lawyer will present criminal, administrative, or disciplinary charges, unless the statement is made to obtain an advantage in a civil dispute. For example, if a lawyer believes* in good faith that the conduct of the opposing lawyer or party violates criminal or other laws, the lawyer may state that if the conduct continues the lawyer will report it to criminal or administrative authorities. On the other hand, a lawyer could not state or imply that a criminal or administrative action will be pursued unless the opposing party agrees to settle the civil dispute.

[2]    This rule does not apply to a threat to bring a civil action. It also does not prohibit actually presenting criminal, administrative or disciplinary charges, even if doing so creates an advantage in a civil dispute. Whether a lawyer's statement violates this rule depends on the specific facts. (See, e.g., *Crane v. State Bar* (1981) 30 Cal.3d 117 [177 Cal.Rptr. 670].) A statement that the lawyer will pursue "all available legal remedies," or words of similar import, does not by itself violate this rule.

[3]    This rule does not apply to: (i) a threat to initiate contempt proceedings for a failure to comply with a court order; or (ii) the offer of a civil compromise in accordance with a statute such as Penal Code sections 1377 and 1378.

[4]    This rule does not prohibit a government lawyer from offering a global settlement or release-dismissal agreement in connection with related criminal, civil or administrative matters. The government lawyer must have probable cause for initiating or continuing criminal charges. (See rule 3.8(a).)

[5]    As used in paragraph (b), "governmental organizations" includes any federal, state, local, and foreign governmental organizations. Paragraph (b) exempts the threat of filing an administrative charge that is a prerequisite to filing a civil complaint on the same transaction or occurrence.

### CHAPTER 4.
### TRANSACTIONS WITH PERSONS* OTHER THAN CLIENTS

### Rule 4.1  Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:*

(a)    make a false statement of material fact or law to a third person;* or

(b)    fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a

criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6.

**Comment**

[1]   A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts.   A misrepresentation can occur if the lawyer incorporates or affirms the truth of a statement of another person* that the lawyer knows* is false.  However, in drafting an agreement or other document on behalf of a client, a lawyer does not necessarily affirm or vouch for the truthfulness of representations made by the client in the agreement or document.  A nondisclosure can be the equivalent of a false statement of material fact or law under paragraph (a) where a lawyer makes a partially true but misleading material statement or material omission.  In addition to this rule, lawyers remain bound by Business and Professions Code section 6106 and rule 8.4.

[2]   This rule refers to statements of fact.  Whether a particular statement should be regarded as one of fact can depend on the circumstances.  For example, in negotiation, certain types of statements ordinarily are not taken as statements of material fact.  Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.*

[3]   Under rule 1.2.1, a lawyer is prohibited from counseling or assisting a client in conduct that the lawyer knows* is criminal or fraudulent.*  See rule 1.4(a)(4) regarding a lawyer's obligation to consult with the client about limitations on the lawyer's conduct.  In some circumstances, a lawyer can avoid assisting a client's crime or fraud* by withdrawing from the representation in compliance with rule 1.16.

[4]   Regarding a lawyer's involvement in lawful covert activity in the investigation of violations of law, see rule 8.4, Comment [5].

## Rule 4.2  Communication with a Represented Person*

(a)   In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person* the lawyer knows* to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.

(b)   In the case of a represented corporation, partnership, association, or other private or governmental organization, this rule prohibits communications with:

(1)   A current officer, director, partner,*or managing agent of the organization; or

(2)   A current employee, member, agent, or other constituent of the organization, if the subject of the communication is any act or omission of such person* in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability.

(c)   This rule shall not prohibit:

(1)   communications with a public official, board, committee, or body; or

(2)   communications otherwise authorized by law or a court order.

(d)   For purposes of this rule:

(1)   "Managing agent" means an employee, member, agent, or other constituent of an organization with substantial* discretionary authority over decisions that determine organizational policy.

(2)   "Public official" means a public officer of the United States government, or of a state, county, city, town, political subdivision, or other governmental organization, with the comparable decision-making authority and responsibilities as the organizational constituents described in paragraph (b)(1).

**Comment**

[1]   This rule applies even though the represented person* initiates or consents to the communication.  A lawyer must immediately terminate communication with a person* if, after commencing communication, the lawyer learns that the person* is one with whom communication is not permitted by this rule.

[2]   "Subject of the representation," "matter," and "person" are not limited to a litigation context.  This rule applies to communications with any person,*

**RULES OF PROFESSIONAL CONDUCT**

whether or not a party to a formal adjudicative proceeding, contract, or negotiation, who is represented by counsel concerning the matter to which the communication relates.

[3] The prohibition against communicating "indirectly" with a person* represented by counsel in paragraph (a) is intended to address situations where a lawyer seeks to communicate with a represented person* through an intermediary such as an agent, investigator or the lawyer's client. This rule, however, does not prevent represented persons* from communicating directly with one another with respect to the subject of the representation, nor does it prohibit a lawyer from advising a client concerning such a communication. A lawyer may also advise a client not to accept or engage in such communications. The rule also does not prohibit a lawyer who is a party to a legal matter from communicating on his or her own behalf with a represented person* in that matter.

[4] This rule does not prohibit communications with a represented person* concerning matters outside the representation. Similarly, a lawyer who knows* that a person* is being provided with limited scope representation is not prohibited from communicating with that person* with respect to matters that are outside the scope of the limited representation. (See, e.g., Cal. Rules of Court, rules 3.35 – 3.37, 5.425 [Limited Scope Representation].)

[5] This rule does not prohibit communications initiated by a represented person* seeking advice or representation from an independent lawyer of the person's* choice.

[6] If a current constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication is sufficient for purposes of this rule.

[7] This rule applies to all forms of governmental and private organizations, such as cities, counties, corporations, partnerships, limited liability companies, and unincorporated associations. When a lawyer communicates on behalf of a client with a governmental organization, or certain employees, members, agents, or other constituents of a governmental organization, however, special considerations exist as a result of the right to petition conferred by the First Amendment of the United States Constitution and article I, section 3 of the California Constitution. Paragraph (c)(1) recognizes these special considerations by generally exempting from application of this rule communications with public boards, committees, and bodies, and with public officials as defined in paragraph (d)(2) of this rule. Communications with a governmental organization constituent who is not a public official, however, will remain subject to this rule when the lawyer knows* the governmental organization is represented in the matter and the communication with that constituent falls within paragraph (b)(2).

[8] Paragraph (c)(2) recognizes that statutory schemes, case law, and court orders may authorize communications between a lawyer and a person* that would otherwise be subject to this rule. Examples of such statutory schemes include those protecting the right of employees to organize and engage in collective bargaining, employee health and safety, and equal employment opportunity. The law also recognizes that prosecutors and other government lawyers are authorized to contact represented persons,* either directly or through investigative agents and informants, in the context of investigative activities, as limited by relevant federal and state constitutions, statutes, rules, and case law. (See, e.g., *United States v. Carona* (9th Cir. 2011) 630 F.3d 917; *United States v. Talao* (9th Cir. 2000) 222 F.3d 1133.) The rule is not intended to preclude communications with represented persons* in the course of such legitimate investigative activities as authorized by law. This rule also is not intended to preclude communications with represented persons* in the course of legitimate investigative activities engaged in, directly or indirectly, by lawyers representing persons* whom the government has accused of or is investigating for crimes, to the extent those investigative activities are authorized by law.

[9] A lawyer who communicates with a represented person* pursuant to paragraph (c) is subject to other restrictions in communicating with the person.* (See, e.g. Bus. & Prof. Code, § 6106; *Snider v. Superior Court* (2003) 113 Cal.App.4th 1187, 1213 [7 Cal.Rptr.3d 119]; *In the Matter of Dale* (2005) 4 Cal. State Bar Ct. Rptr. 798.)

## Rule 4.3 Communicating with an Unrepresented Person*

(a) In communicating on behalf of a client with a person* who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows* or reasonably should know* that the unrepresented person* incorrectly believes* the lawyer is disinterested in the matter, the lawyer shall make reasonable* efforts to correct the misunderstanding.

If the lawyer knows* or reasonably should know* that the interests of the unrepresented person* are in conflict with the interests of the client, the lawyer shall not give legal advice to that person,* except that the lawyer may, but is not required to, advise the person* to secure counsel.

(b)   In communicating on behalf of a client with a person* who is not represented by counsel, a lawyer shall not seek to obtain privileged or other confidential information the lawyer knows* or reasonably should know* the person* may not reveal without violating a duty to another or which the lawyer is not otherwise entitled to receive.

**Comment**

[1]   This rule is intended to protect unrepresented persons,* whatever their interests, from being misled when communicating with a lawyer who is acting for a client.

[2]   Paragraph (a) distinguishes between situations in which a lawyer knows* or reasonably should know* that the interests of an unrepresented person* are in conflict with the interests of the lawyer's client and situations in which the lawyer does not. In the former situation, the possibility that the lawyer will compromise the unrepresented person's* interests is so great that the rule prohibits the giving of any legal advice, apart from the advice to obtain counsel. A lawyer does not give legal advice merely by stating a legal position on behalf of the lawyer's client. This rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person.* So long as the lawyer discloses that the lawyer represents an adverse party and not the person,* the lawyer may inform the person* of the terms on which the lawyer's client will enter into the agreement or settle the matter, prepare documents that require the person's* signature, and explain the lawyer's own view of the meaning of the document and the underlying legal obligations.

[3]   Regarding a lawyer's involvement in lawful covert activity in the investigation of violations of law, see rule 8.4, Comment [5].

**Rule 4.4  Duties Concerning Inadvertently Transmitted Writings***

Where it is reasonably* apparent to a lawyer who receives a writing* relating to a lawyer's representation of a client that the writing* was inadvertently sent or produced, and the lawyer knows* or reasonably should know* that the writing* is privileged or subject to the work product doctrine, the lawyer shall:

(a)   refrain from examining the writing* any more than is necessary to determine that it is privileged or subject to the work product doctrine, and

(b)   promptly notify the sender.

**Comment**

[1]   If a lawyer determines this rule applies to a transmitted writing,* the lawyer should return the writing* to the sender, seek to reach agreement with the sender regarding the disposition of the writing,* or seek guidance from a tribunal.* (See *Rico v. Mitsubishi* (2007) 42 Cal.4th 807, 817 [68 Cal.Rptr.3d 758].) In providing notice required by this rule, the lawyer shall comply with rule 4.2.

[2]   This rule does not address the legal duties of a lawyer who receives a writing* that the lawyer knows* or reasonably should know* may have been inappropriately disclosed by the sending person.* (See *Clark v. Superior Court* (2011) 196 Cal.App.4th 37 [125 Cal.Rptr.3d 361].)

# CHAPTER 5.
# LAW FIRMS* AND ASSOCIATIONS

**Rule 5.1 Responsibilities of Managerial and Supervisory Lawyers**

(a)   A lawyer who individually or together with other lawyers possesses managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that all lawyers in the firm* comply with these rules and the State Bar Act.

(b)   A lawyer having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm,* shall make reasonable* efforts to ensure that the other lawyer complies with these rules and the State Bar Act.

(c)   A lawyer shall be responsible for another lawyer's violation of these rules and the State Bar Act if:

(1)   the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

**RULES OF PROFESSIONAL CONDUCT**

(2)   the lawyer, individually or together with other lawyers, possesses managerial authority in the law firm* in which the other lawyer practices, or has direct supervisory authority over the other lawyer, whether or not a member or employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

*Paragraph (a) – Duties Of Managerial Lawyers To Reasonably\* Assure Compliance with the Rules*

[1]   Paragraph (a) requires lawyers with managerial authority within a law firm* to make reasonable* efforts to establish internal policies and procedures designed, for example, to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property, and ensure that inexperienced lawyers are properly supervised.

[2]   Whether particular measures or efforts satisfy the requirements of paragraph (a) might depend upon the law firm's structure and the nature of its practice, including the size of the law firm,* whether it has more than one office location or practices in more than one jurisdiction, or whether the firm* or its partners* engage in any ancillary business.

[3]   A partner,* shareholder or other lawyer in a law firm* who has intermediate managerial responsibilities satisfies paragraph (a) if the law firm* has a designated managing lawyer charged with that responsibility, or a management committee or other body that has appropriate managerial authority and is charged with that responsibility.  For example, the managing lawyer of an office of a multi-office law firm* would not necessarily be required to promulgate firm-wide policies intended to reasonably* assure that the law firm's lawyers comply with the rules or State Bar Act.  However, a lawyer remains responsible to take corrective steps if the lawyer knows* or reasonably should know* that the delegated body or person* is not providing or implementing measures as required by this rule.

[4]   Paragraph (a) also requires managerial lawyers to make reasonable* efforts to assure that other lawyers in an agency or department comply with these rules and the State Bar Act.  This rule contemplates, for example, the creation and implementation of reasonable* guidelines relating to the assignment of cases and the distribution of workload among lawyers in a public sector legal agency or other legal department.  (See, e.g., State Bar of California, Guidelines on Indigent Defense Services Delivery Systems (2006).)

*Paragraph (b) – Duties of Supervisory Lawyers*

[5]   Whether a lawyer has direct supervisory authority over another lawyer in particular circumstances is a question of fact.

*Paragraph (c) – Responsibility for Another's Lawyer's Violation*

[6]   The appropriateness of remedial action under paragraph (c)(2) would depend on the nature and seriousness of the misconduct and the nature and immediacy of its harm.  A managerial or supervisory lawyer must intervene to prevent avoidable consequences of misconduct if the lawyer knows* that the misconduct occurred.

[7]   A supervisory lawyer violates paragraph (b) by failing to make the efforts required under that paragraph, even if the lawyer does not violate paragraph (c) by knowingly* directing or ratifying the conduct, or where feasible, failing to take reasonable* remedial action.

[8]   Paragraphs (a), (b), and (c) create independent bases for discipline.  This rule does not impose vicarious responsibility on a lawyer for the acts of another lawyer who is in or outside the law firm.*  Apart from paragraph (c) of this rule and rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner,* associate, or subordinate lawyer.  The question of whether a lawyer can be liable civilly or criminally for another lawyer's conduct is beyond the scope of these rules.

**Rule 5.2  Responsibilities of a Subordinate Lawyer**

(a)   A lawyer shall comply with these rules and the State Bar Act notwithstanding that the lawyer acts at the direction of another lawyer or other person.*

(b)   A subordinate lawyer does not violate these rules or the State Bar Act if that lawyer acts in accordance with a supervisory lawyer's reasonable* resolution of an arguable question of professional duty.

*An asterisk (\*) identifies a word or phrase defined in rule 1.0.1*

**RULES OF PROFESSIONAL CONDUCT**

**Comment**

When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to the lawyers' responsibilities under these rules or the State Bar Act and the question can reasonably* be answered only one way, the duty of both lawyers is clear and they are equally responsible for fulfilling it. Accordingly, the subordinate lawyer must comply with his or her obligations under paragraph (a). If the question reasonably* can be answered more than one way, the supervisory lawyer may assume responsibility for determining which of the reasonable* alternatives to select, and the subordinate may be guided accordingly. If the subordinate lawyer believes* that the supervisor's proposed resolution of the question of professional duty would result in a violation of these rules or the State Bar Act, the subordinate is obligated to communicate his or her professional judgment regarding the matter to the supervisory lawyer.

## Rule 5.3  Responsibilities Regarding Nonlawyer Assistants

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a)   a lawyer who individually or together with other lawyers possesses managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer;

(b)   a lawyer having direct supervisory authority over the nonlawyer, whether or not an employee of the same law firm,* shall make reasonable* efforts to ensure that the person's* conduct is compatible with the professional obligations of the lawyer; and

(c)   a lawyer shall be responsible for conduct of such a person* that would be a violation of these rules or the State Bar Act if engaged in by a lawyer if:

(1)   the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

(2)   the lawyer, individually or together with other lawyers, possesses managerial authority in the law firm* in which the person* is employed, or has direct supervisory authority over the person,* whether or not an employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

Lawyers often utilize nonlawyer personnel, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning all ethical aspects of their employment. The measures employed in instructing and supervising nonlawyers should take account of the fact that they might not have legal training.

## Rule 5.3.1  Employment of Disbarred, Suspended, Resigned, or Involuntarily Inactive Lawyer

(a)   For purposes of this rule:

(1)   "Employ" means to engage the services of another, including employees, agents, independent contractors and consultants, regardless of whether any compensation is paid;

(2)   "Member" means a member of the State Bar of California;

(3)   "Involuntarily inactive member" means a member who is ineligible to practice law as a result of action taken pursuant to Business and Professions Code sections 6007, 6203, subdivision (d)(1), or California Rules of Court, rule 9.31(d);

(4)   "Resigned member" means a member who has resigned from the State Bar while disciplinary charges are pending; and

(5)   "Ineligible person" means a member whose current status with the State Bar of California is disbarred, suspended, resigned, or involuntarily inactive.

(b)   A lawyer shall not employ, associate in practice with, or assist a person* the lawyer knows* or reasonably should know* is an ineligible person to perform the following on behalf of the lawyer's client:

(1)   Render legal consultation or advice to the client;

**RULES OF PROFESSIONAL CONDUCT**

(2)   Appear on behalf of a client in any hearing or proceeding or before any judicial officer, arbitrator, mediator, court, public agency, referee, magistrate, commissioner, or hearing officer;

(3)   Appear as a representative of the client at a deposition or other discovery matter;

(4)   Negotiate or transact any matter for or on behalf of the client with third parties;

(5)   Receive, disburse or otherwise handle the client's funds; or

(6)   Engage in activities that constitute the practice of law.

(c)   A lawyer may employ, associate in practice with, or assist an ineligible person to perform research, drafting or clerical activities, including but not limited to:

(1)   Legal work of a preparatory nature, such as legal research, the assemblage of data and other necessary information, drafting of pleadings, briefs, and other similar documents;

(2)   Direct communication with the client or third parties regarding matters such as scheduling, billing, updates, confirmation of receipt or sending of correspondence and messages; or

(3)   Accompanying an active lawyer in attending a deposition or other discovery matter for the limited purpose of providing clerical assistance to the active lawyer who will appear as the representative of the client.

(d)   Prior to or at the time of employing, associating in practice with, or assisting a person* the lawyer knows* or reasonably should know* is an ineligible person, the lawyer shall serve upon the State Bar written* notice of the employment, including a full description of such person's current bar status.  The written* notice shall also list the activities prohibited in paragraph (b) and state that the ineligible person will not perform such activities.  The lawyer shall serve similar written* notice upon each client on whose specific matter such person* will work, prior to or at the time of employing, associating with, or assisting such person* to work on the client's specific matter. The lawyer shall obtain proof of service of the client's written* notice and shall retain such proof and a true and correct copy of the client's written* notice for

two years following termination of the lawyer's employment by the client.

(e)   A lawyer may, without client or State Bar notification, employ, associate in practice with, or assist an ineligible person whose sole function is to perform office physical plant or equipment maintenance, courier or delivery services, catering, reception, typing or transcription, or other similar support activities.

(f)   When the lawyer no longer employs, associates in practice with, or assists the ineligible person, the lawyer shall promptly serve upon the State Bar written* notice of the termination.

**Comment**

If the client is an organization, the lawyer shall serve the notice required by paragraph (d) on its highest authorized officer, employee, or constituent overseeing the particular engagement.  (See rule 1.13.)

[**Publisher's Note re rule 5.3.1:** *Operative January 1, 2019, Business and Professions Code section 6002, in part, provides that any provision of law referring to the "member of the State Bar" shall be deemed to refer to a licensee of the State Bar.  In accordance with this law, references to a "member" included in the current Rules of Professional Conduct are deemed to refer to a "licensee."*]

**Rule 5.4  Financial and Similar Arrangements with Nonlawyers**

(a)   A lawyer or law firm* shall not share legal fees directly or indirectly with a nonlawyer or with an organization that is not authorized to practice law, except that:

(1)   an agreement by a lawyer with the lawyer's firm,* partner,* or associate may provide for the payment of money or other consideration over a reasonable* period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;*

(2)   a lawyer purchasing the practice of a deceased, disabled or disappeared lawyer may pay the agreed-upon purchase price, pursuant to rule 1.17, to the lawyer's estate or other representative;

(3)   a lawyer or law firm* may include nonlawyer employees in a compensation or

## RULES OF PROFESSIONAL CONDUCT

retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement, provided the plan does not otherwise violate these rules or the State Bar Act;

(4)   a lawyer or law firm* may pay a prescribed registration, referral, or other fee to a lawyer referral service established, sponsored and operated in accordance with the State Bar of California's Minimum Standards for Lawyer Referral Services;

(5)   a lawyer or law firm* may share with or pay a court-awarded legal fee to a nonprofit organization that employed, retained, recommended, or facilitated employment of the lawyer or law firm* in the matter; or

(6)   a lawyer or law firm* may share with or pay a legal fee that is not court-awarded but arises from a settlement or other resolution of the matter with a nonprofit organization that employed, retained, recommended, or facilitated employment of the lawyer or law firm* in the matter provided:

>    (i)   the nonprofit organization qualifies under section 501(c)(3) of the Internal Revenue Code;

>    (ii)   the lawyer or law firm* enters into a written* agreement to divide the fee with the nonprofit organization;

>    (iii)   the lawyer or law firm* obtains the client's consent in writing,* either at the time the lawyer or law firm* enters into the agreement with the nonprofit organization to divide the fee or as soon thereafter as reasonably* practicable, after a full written* disclosure to the client of the fact that a division of fees will be made, the identity of the lawyer or law firm* and the nonprofit organization that are parties to the division, and the terms of the division, including the restriction imposed under paragraph (a)(6)(iv); and

>    (iv)   the total fee charged by the lawyer or law firm* is not increased solely by reason of the agreement to divide fees.

(b)   A lawyer shall not form a partnership or other organization with a nonlawyer if any of the activities of the partnership or other organization consist of the practice of law.

(c)   A lawyer shall not permit a person* who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's independent professional judgment or interfere with the lawyer-client relationship in rendering legal services.

(d)   A lawyer shall not practice with or in the form of a professional corporation or other organization authorized to practice law for a profit if:

>    (1)   a nonlawyer owns any interest in it, except that a fiduciary representative of a lawyer's estate may hold the lawyer's stock or other interest for a reasonable* time during administration;

>    (2)   a nonlawyer is a director or officer of the corporation or occupies a position of similar responsibility in any other form of organization; or

>    (3)   a nonlawyer has the right or authority to direct or control the lawyer's independent professional judgment.

(e)   The Board of Trustees of the State Bar shall formulate and adopt Minimum Standards for Lawyer Referral Services, which, as from time to time amended, shall be binding on lawyers.  A lawyer shall not accept a referral from, or otherwise participate in, a lawyer referral service unless it complies with such Minimum Standards for Lawyer Referral Services.

(f)   A lawyer shall not practice with or in the form of a nonprofit legal aid, mutual benefit or advocacy group if the nonprofit organization allows any third person* to interfere with the lawyer's independent professional judgment, or with the lawyer-client relationship, or allows or aids any person* to practice law in violation of these rules or the State Bar Act.

**Comment**

[1]   Paragraph (a) does not prohibit a lawyer or law firm* from paying a bonus to or otherwise compensating a nonlawyer employee from general revenues received for legal services, provided the arrangement does not interfere with the independent professional judgment of the lawyer or lawyers in the firm* and does not violate these rules or the State Bar Act.  However, a nonlawyer employee's bonus or other form of compensation may not be based on a percentage or share of fees in specific cases or legal matters.

**RULES OF PROFESSIONAL CONDUCT**

[2]    Paragraph (a) also does not prohibit payment to a nonlawyer third-party for goods and services provided to a lawyer or law firm;* however, the compensation to a nonlawyer third-party may not be determined as a percentage or share of the lawyer's or law firm's overall revenues or tied to fees in particular cases or legal matters.   A lawyer may pay to a nonlawyer third-party, such as a collection agency, a percentage of past due or delinquent fees in concluded matters that the third-party collects on the lawyer's behalf.

[3]    Paragraph (a)(5) permits a lawyer to share with or pay court-awarded legal fees to nonprofit legal aid, mutual benefit, and advocacy groups that are not engaged in the unauthorized practice of law.   (See *Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23 [40 Cal.Rptr.3d 221]; see also rule 6.3.)   Under the specified circumstances, paragraph (a)(6) permits a lawyer to share with or pay legal fees arising from a settlement or other resolution of the matter to 501(c)(3) organizations, such as nonprofit legal aid and charitable groups that are not engaged in the unauthorized practice of law. Paragraphs (a)(5) and (a)(6) include the concept of a nonprofit organization facilitating the employment of a lawyer to provide legal services. One example of such facilitation is a nonprofit organization's operation of a law practice incubator program.

[4]    A lawyer or law firm* who has agreed to share with or pay legal fees to a qualifying organization under paragraphs (a)(5) or (a)(6) remains obligated to exercise independent professional judgment in the client's best interest. See rules 1.7 and 2.1. Regarding a lawyer's contribution of legal fees to a legal services organization, see rule 1.0, Comment [5] on financial support for programs providing pro bono legal services.

[5]    Nothing in paragraphs (a)(5) or (a)(6) is intended to alter the regulation of lawyer referral activity set forth in Business and Professions Code section 6155. In addition, a lawyer must comply with rules 5.4(a)(4) and 7.2(b).

[6]    This rule is not intended to affect case law regarding the relationship between insurers and lawyers providing legal services to insureds. (See, e.g., *Gafcon, Inc. v. Ponsor Associates* (2002) 98 Cal.App.4th 1388 [120 Cal.Rptr.2d 392].)

[7]    Paragraph (c) is not intended to alter or diminish a lawyer's obligations under rule 1.8.6 (Compensation from One Other than Client).

[**Publisher's Note:** *Rule 5.4 was amended by order of the Supreme Court, effective March 22, 2021.*]

## Rule 5.5  Unauthorized Practice of Law; Multijurisdictional Practice of Law

(a)    A lawyer admitted to practice law in California shall not:

(1)    practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction; or

(2)    knowingly* assist a person* in the unauthorized practice of law in that jurisdiction.

(b)    A lawyer who is not admitted to practice law in California shall not:

(1)    except as authorized by these rules or other law, establish or maintain a resident office or other systematic or continuous presence in California for the practice of law; or

(2)    hold out to the public or otherwise represent that the lawyer is admitted to practice law in California.

**Comment**

Paragraph (b)(1) prohibits lawyers from practicing law in California unless otherwise entitled to practice law in this state by court rule or other law. (See, e.g., Bus. & Prof. Code, § 6125 et seq.; see also Cal. Rules of Court, rules 9.40 [counsel pro hac vice], 9.41 [appearances by military counsel], 9.42 [certified law students], 9.43 [out-of-state attorney arbitration counsel program], 9.44 [registered foreign legal consultant], 9.45 [registered legal services attorneys], 9.46 [registered in-house counsel], 9.47 [attorneys practicing temporarily in California as part of litigation], 9.48 [non-litigating attorneys temporarily in California to provide legal services].)

## Rule 5.6  Restrictions on a Lawyer's Right to Practice

(a)    Unless authorized by law, a lawyer shall not participate in offering or making:

(1)    a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement that concerns benefits upon retirement; or

This rule is not intended to affect case

(2)   an agreement that imposes a restriction on a lawyer's right to practice in connection with a settlement of a client controversy, or otherwise.

(b)   A lawyer shall not participate in offering or making an agreement which precludes the reporting of a violation of these rules.

(c)   This rule does not prohibit an agreement that is authorized by Business and Professions Code sections 6092.5, subdivision (i) or 6093.

**Comment**

[1]   Concerning the application of paragraph (a)(1), see Business and Professions Code section 16602; *Howard v. Babcock* (1993) 6 Cal.4th 409, 425 [25 Cal.Rptr.2d 80].

[2]   Paragraph (a)(2) prohibits a lawyer from offering or agreeing not to represent other persons* in connection with settling a claim on behalf of a client.

[3]   This rule does not prohibit restrictions that may be included in the terms of the sale of a law practice pursuant to rule 1.17.

**Rule 5.7  [Reserved]**

## CHAPTER 6. PUBLIC SERVICE

**Rule 6.1  [Reserved]**

**Rule 6.2  [Reserved]**

### Rule 6.3  Membership in Legal Services Organization

A lawyer may serve as a director, officer or member of a legal services organization, apart from the law firm* in which the lawyer practices, notwithstanding that the organization serves persons* having interests adverse to a client of the lawyer.  The lawyer shall not knowingly* participate in a decision or action of the organization:

(a)   if participating in the decision or action would be incompatible with the lawyer's obligations to a client under Business and Professions Code section 6068, subdivision (e)(1) or rules 1.6(a), 1.7, 1.9, or 1.18; or

(b)   where the decision or action could have a material adverse effect on the representation of a client of the organization whose interests are adverse to a client of the lawyer.

**Comment**

Lawyers should support and participate in legal service organizations.  A lawyer who is an officer or a member of such an organization does not thereby have a lawyer-client relationship with persons* served by the organization.  However, there is potential conflict between the interests of such persons* and the interests of the lawyer's clients.  If the possibility of such conflict disqualified a lawyer from serving on the board of a legal services organization, the profession's involvement in such organizations would be severely curtailed.

**Rule 6.4  [Reserved]**

### Rule 6.5  Limited Legal Services Programs

(a)   A lawyer who, under the auspices of a program sponsored by a court, government agency, bar association, law school, or nonprofit organization, provides short-term limited legal services to a client without expectation by either the lawyer or the client that the lawyer will provide continuing representation in the matter:

(1)   is subject to rules 1.7 and 1.9(a) only if the lawyer knows* that the representation of the client involves a conflict of interest; and

(2)   is subject to rule 1.10 only if the lawyer knows* that another lawyer associated with the lawyer in a law firm* is prohibited from representation by rule 1.7 or 1.9(a) with respect to the matter.

(b)   Except as provided in paragraph (a)(2), rule 1.10 is inapplicable to a representation governed by this rule.

(c)   The personal disqualification of a lawyer participating in the program will not be imputed to other lawyers participating in the program.

**Comment**

[1]   Courts, government agencies, bar associations, law schools and various nonprofit organizations have established programs through which lawyers provide short-term limited legal services — such as advice or

**RULES OF PROFESSIONAL CONDUCT**

the completion of legal forms that will assist persons* in addressing their legal problems without further representation by a lawyer. In these programs, such as legal-advice hotlines, advice-only clinics or pro se counseling programs, whenever a lawyer-client relationship is established, there is no expectation that the lawyer's representation of the client will continue beyond that limited consultation. Such programs are normally operated under circumstances in which it is not feasible for a lawyer to systematically screen* for conflicts of interest as is generally required before undertaking a representation.

[2] A lawyer who provides short-term limited legal services pursuant to this rule must secure the client's informed consent* to the limited scope of the representation. (See rule 1.2(b).) If a short-term limited representation would not be reasonable* under the circumstances, the lawyer may offer advice to the client but must also advise the client of the need for further assistance of counsel. Except as provided in this rule, these rules and the State Bar Act, including the lawyer's duty of confidentiality under Business and Professions Code section 6068, subdivision (e)(1) and rules 1.6 and 1.9, are applicable to the limited representation.

[3] A lawyer who is representing a client in the circumstances addressed by this rule ordinarily is not able to check systematically for conflicts of interest. Therefore, paragraph (a)(1) requires compliance with rules 1.7 and 1.9(a) only if the lawyer knows* that the representation presents a conflict of interest for the lawyer. In addition, paragraph (a)(2) imputes conflicts of interest to the lawyer only if the lawyer knows* that another lawyer in the lawyer's law firm* would be disqualified under rules 1.7 or 1.9(a).

[4] Because the limited nature of the services significantly reduces the risk of conflicts of interest with other matters being handled by the lawyer's law firm,* paragraph (b) provides that imputed conflicts of interest are inapplicable to a representation governed by this rule except as provided by paragraph (a)(2). Paragraph (a)(2) imputes conflicts of interest to the participating lawyer when the lawyer knows* that any lawyer in the lawyer's firm* would be disqualified under rules 1.7 or 1.9(a). By virtue of paragraph (b), moreover, a lawyer's participation in a short-term limited legal services program will not be imputed to the lawyer's law firm* or preclude the lawyer's law firm* from undertaking or continuing the representation of a client with interests adverse to a client being

represented under the program's auspices. Nor will the personal disqualification of a lawyer participating in the program be imputed to other lawyers participating in the program.

[5] If, after commencing a short-term limited representation in accordance with this rule, a lawyer undertakes to represent the client in the matter on an ongoing basis, rules 1.7, 1.9(a), and 1.10 become applicable.

# CHAPTER 7.
# INFORMATION ABOUT LEGAL SERVICES

### Rule 7.1  Communications Concerning a Lawyer's Services

(a) A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the communication considered as a whole not materially misleading.

(b) The Board of Trustees of the State Bar may formulate and adopt standards as to communications that will be presumed to violate rule 7.1, 7.2, 7.3, 7.4 or 7.5. The standards shall only be used as presumptions affecting the burden of proof in disciplinary proceedings involving alleged violations of these rules. "Presumption affecting the burden of proof" means that presumption defined in Evidence Code sections 605 and 606. Such standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all lawyers.

**Comment**

[1] This rule governs all communications of any type whatsoever about the lawyer or the lawyer's services, including advertising permitted by rule 7.2. A communication includes any message or offer made by or on behalf of a lawyer concerning the availability for professional employment of a lawyer or a lawyer's law firm* directed to any person.*

[2] A communication that contains an express guarantee or warranty of the result of a particular representation is a false or misleading communication under this rule. (See also Bus. & Prof. Code, § 6157.2, subd. (a).)

**CURRENT RULES**
*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

RULES OF PROFESSIONAL CONDUCT

[3]   This rule prohibits truthful statements that are misleading.  A truthful statement is misleading if it omits a fact necessary to make the lawyer's communication considered as a whole not materially misleading.  A truthful statement is also misleading if it is presented in a manner that creates a substantial* likelihood that it will lead a reasonable* person* to formulate a specific conclusion about the lawyer or the lawyer's services for which there is no reasonable* factual foundation.  Any communication that states or implies "no fee without recovery" is also misleading unless the communication also expressly discloses whether or not the client will be liable for costs.

[4]   A communication that truthfully reports a lawyer's achievements on behalf of clients or former clients, or a testimonial about or endorsement of the lawyer, may be misleading if presented so as to lead a reasonable* person* to form an unjustified expectation that the same results could be obtained for other clients in similar matters without reference to the specific factual and legal circumstances of each client's case.  Similarly, an unsubstantiated comparison of the lawyer's services or fees with the services or fees of other lawyers may be misleading if presented with such specificity as would lead a reasonable* person* to conclude that the comparison can be substantiated.  An appropriate disclaimer or qualifying language often avoids creating unjustified expectations.

[5]   This rule prohibits a lawyer from making a communication that states or implies that the lawyer is able to provide legal services in a language other than English unless the lawyer can actually provide legal services in that language or the communication also states in the language of the communication the employment title of the person* who speaks such language.

[6]   Rules 7.1 through 7.5 are not the sole basis for regulating communications concerning a lawyer's services. (See, e.g., Bus. & Prof. Code, §§ 6150 – 6159.2, 17000 et seq.)  Other state or federal laws may also apply.

## Rule 7.2  Advertising

(a)   Subject to the requirements of rules 7.1 and 7.3, a lawyer may advertise services through any written,* recorded or electronic means of communication, including public media.

(b)   A lawyer shall not compensate, promise or give anything of value to a person* for the purpose of recommending or securing the services of the lawyer or the lawyer's law firm,* except that a lawyer may:

   (1)   pay the reasonable* costs of advertisements or communications permitted by this rule;

   (2)   pay the usual charges of a legal services plan or a qualified lawyer referral service.  A qualified lawyer referral service is a lawyer referral service established, sponsored and operated in accordance with the State Bar of California's Minimum Standards for a Lawyer Referral Service in California;

   (3)   pay for a law practice in accordance with rule 1.17;

   (4)   refer clients to another lawyer or a nonlawyer professional pursuant to an arrangement not otherwise prohibited under these Rules or the State Bar Act that provides for the other person* to refer clients or customers to the lawyer, if:

      (i)   the reciprocal referral arrangement is not exclusive; and

      (ii)   the client is informed of the existence and nature of the arrangement;

   (5)   offer or give a gift or gratuity to a person* having made a recommendation resulting in the employment of the lawyer or the lawyer's law firm,* provided that the gift or gratuity was not offered or given in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future.

(c)   Any communication made pursuant to this rule shall include the name and address of at least one lawyer or law firm* responsible for its content.

**Comment**

[1]   This rule permits public dissemination of accurate information concerning a lawyer and the lawyer's services, including for example, the lawyer's name or firm* name, the lawyer's contact information; the kinds of services the lawyer will undertake; the basis on which the lawyer's fees are determined, including prices for specific services and payment and credit arrangements; a lawyer's foreign language ability; names of references and, with their

**RULES OF PROFESSIONAL CONDUCT**

consent, names of clients regularly represented; and other information that might invite the attention of those seeking legal assistance. This rule, however, prohibits the dissemination of false or misleading information, for example, an advertisement that sets forth a specific fee or range of fees for a particular service where, in fact, the lawyer charges or intends to charge a greater fee than that stated in the advertisement.

[2] Neither this rule nor rule 7.3 prohibits communications authorized by law, such as court-approved class action notices.

*Paying Others to Recommend a Lawyer*

[3] Paragraph (b)(1) permits a lawyer to compensate employees, agents, and vendors who are engaged to provide marketing or client-development services, such as publicists, public-relations personnel, business-development staff, and website designers. See rule 5.3 for the duties of lawyers and law firms* with respect to supervising the conduct of nonlawyers who prepare marketing materials and provide client development services.

[4] Paragraph (b)(4) permits a lawyer to make referrals to another lawyer or nonlawyer professional, in return for the undertaking of that person* to refer clients or customers to the lawyer. Such reciprocal referral arrangements must not interfere with the lawyer's professional judgment as to making referrals or as to providing substantive legal services. (See rules 2.1 and 5.4(c).) Conflicts of interest created by arrangements made pursuant to paragraph (b)(4) are governed by rule 1.7. A division of fees between or among lawyers not in the same law firm* is governed by rule 1.5.1.

## Rule 7.3  Solicitation of Clients

(a) A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment when a significant motive for doing so is the lawyer's pecuniary gain, unless the person* contacted:

> (1)   is a lawyer; or

> (2)   has a family, close personal, or prior professional relationship with the lawyer.

(b) A lawyer shall not solicit professional employment by written,* recorded or electronic communication or by in-person, telephone or real-time electronic contact even when not otherwise prohibited by paragraph (a), if:

> (1)   the person* being solicited has made known* to the lawyer a desire not to be solicited by the lawyer; or

> (2)   the solicitation is transmitted in any manner which involves intrusion, coercion, duress or harassment.

(c) Every written,* recorded or electronic communication from a lawyer soliciting professional employment from any person* known* to be in need of legal services in a particular matter shall include the word "Advertisement" or words of similar import on the outside envelope, if any, and at the beginning and ending of any recorded or electronic communication, unless the recipient of the communication is a person* specified in paragraphs (a)(1) or (a)(2), or unless it is apparent from the context that the communication is an advertisement.

(d) Notwithstanding the prohibitions in paragraph (a), a lawyer may participate with a prepaid or group legal service plan operated by an organization not owned or directed by the lawyer that uses in-person, live telephone or real-time electronic contact to solicit memberships or subscriptions for the plan from persons* who are not known* to need legal services in a particular matter covered by the plan.

(e) As used in this rule, the terms "solicitation" and "solicit" refer to an oral or written* targeted communication initiated by or on behalf of the lawyer that is directed to a specific person* and that offers to provide, or can reasonably* be understood as offering to provide, legal services.

**Comment**

[1] A lawyer's communication does not constitute a solicitation if it is directed to the general public, such as through a billboard, an Internet banner advertisement, a website or a television commercial, or if it is in response to a request for information or is automatically generated in response to Internet searches.

[2] Paragraph (a) does not apply to situations in which the lawyer is motivated by considerations other than the lawyer's pecuniary gain. Therefore, paragraph (a) does not prohibit a lawyer from participating in constitutionally protected activities of bona fide public or charitable legal-service organizations, or bona fide political, social, civic, fraternal, employee or trade organizations whose purposes include providing or recommending legal

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

RULES OF PROFESSIONAL CONDUCT

services to its members or beneficiaries.  (See, e.g., *In re Primus* (1978) 436 U.S. 412 [98 S.Ct. 1893].)

[3]   This rule does not prohibit a lawyer from contacting representatives of organizations or groups that may be interested in establishing a bona fide group or prepaid legal plan for their members, insureds, beneficiaries or other third parties for the purpose of informing such entities of the availability of and details concerning the plan or arrangement which the lawyer or lawyer's firm* is willing to offer.

[4]    Lawyers who participate in a legal service plan as permitted under paragraph (d) must comply with rules 7.1, 7.2, and 7.3(b). (See also rules 5.4 and 8.4(a).)

## Rule 7.4  Communication of Fields of Practice and Specialization

(a)    A lawyer shall not state that the lawyer is a certified specialist in a particular field of law, unless:

>    (1)   the lawyer is currently certified as a specialist by the Board of Legal Specialization, or any other entity accredited by the State Bar to designate specialists pursuant to standards adopted by the Board of Trustees; and

>    (2)   the name of the certifying organization is clearly identified in the communication.

(b)    Notwithstanding paragraph (a), a lawyer may communicate the fact that the lawyer does or does not practice in particular fields of law.  A lawyer may also communicate that his or her practice specializes in, is limited to, or is concentrated in a particular field of law, subject to the requirements of rule 7.1.

## Rule 7.5  Firm* Names and Trade Names

(a)    A lawyer shall not use a firm* name, trade name or other professional designation that violates rule 7.1.

(b)    A lawyer in private practice shall not use a firm* name, trade name or other professional designation that states or implies a relationship with a government agency or with a public or charitable legal services organization, or otherwise violates rule 7.1.

(c)    A lawyer shall not state or imply that the lawyer practices in or has a professional relationship with a law firm* or other organization unless that is the fact.

**Comment**

The term "other professional designation" includes, but is not limited to, logos, letterheads, URLs, and signature blocks.

## Rule 7.6  [Reserved]

# CHAPTER 8.
# MAINTAINING THE INTEGRITY
# OF THE PROFESSION

## Rule  8.1  False Statement Regarding Application for Admission to Practice Law

(a)    An applicant for admission to practice law shall not, in connection with that person's* own application for admission, make a statement of material fact that the lawyer knows* to be false, or make such a statement with reckless disregard as to its truth or falsity.

(b)    A lawyer shall not, in connection with another person's* application for admission to practice law, make a statement of material fact that the lawyer knows* to be false.

(c)    An applicant for admission to practice law, or a lawyer in connection with an application for admission, shall not fail to disclose a fact necessary to correct a statement known* by the applicant or the lawyer to have created a material misapprehension in the matter, except that this rule does not authorize disclosure of information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6.

(d)    As used in this rule, "admission to practice law" includes admission or readmission to membership in the State Bar; reinstatement to active membership in the State Bar; and any similar process relating to admission or certification to practice law in California or elsewhere.

**Comment**

[1]   A person* who makes a false statement in connection with that person's* own application for admission to practice law may be subject to discipline under this rule after that person* has been admitted.

*An asterisk (\*) identifies a word or phrase defined in rule 1.0.1*

**RULES OF PROFESSIONAL CONDUCT**

(See, e.g., *In re Gossage* (2000) 23 Cal.4th 1080 [99 Cal.Rptr.2d 130].)

[2]   A lawyer's duties with respect to a *pro hac vice* application or other application to a court for admission to practice law are governed by rule 3.3.

[3]   A lawyer representing an applicant for admission to practice law is governed by the rules applicable to the lawyer-client relationship, including Business and Professions Code section 6068, subdivision (e)(1) and rule 1.6.   A lawyer representing a lawyer who is the subject of a disciplinary proceeding is not governed by this rule but is subject to the requirements of rule 3.3.

### Rule 8.1.1   Compliance with Conditions of Discipline and Agreements in Lieu of Discipline

A lawyer shall comply with the terms and conditions attached to any agreement in lieu of discipline, any public or private reproval, or to other discipline administered by the State Bar pursuant to Business and Professions Code sections 6077 and 6078 and California Rules of Court, rule 9.19.

**Comment**

Other provisions also require a lawyer to comply with agreements in lieu of discipline and conditions of discipline.   (See, e.g., Bus. & Prof. Code, § 6068, subds. (k), (l).)

### Rule 8.2   Judicial Officials

(a)   A lawyer shall not make a statement of fact that the lawyer knows* to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge or judicial officer, or of a candidate for election or appointment to judicial office.

(b)   A lawyer who is a candidate for judicial office in California shall comply with canon 5 of the California Code of Judicial Ethics.   For purposes of this rule, "candidate for judicial office" means a lawyer seeking judicial office by election. The determination of when a lawyer is a candidate for judicial office by election is defined in the terminology section of the California Code of Judicial Ethics.   A lawyer's duty to comply with this rule shall end when the lawyer announces withdrawal of the lawyer's candidacy or when the results of the election are final, whichever occurs first.

(c)   A lawyer who seeks appointment to judicial office shall comply with canon 5B(1) of the California Code of Judicial Ethics.   A lawyer becomes an applicant seeking judicial office by appointment at the time of first submission of an application or personal data questionnaire to the appointing authority.   A lawyer's duty to comply with this rule shall end when the lawyer advises the appointing authority of the withdrawal of the lawyer's application.

**Comment**

To maintain the fair and independent administration of justice, lawyers should defend judges and courts unjustly criticized.   Lawyers also are obligated to maintain the respect due to the courts of justice and judicial officers.   (See Bus. & Prof. Code, § 6068, subd. (b).)

### Rule 8.3   [Reserved]

### Rule 8.4   Misconduct

It is professional misconduct for a lawyer to:

(a)   violate these rules or the State Bar Act, knowingly* assist, solicit, or induce another to do so, or do so through the acts of another;

(b)   commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c)   engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation;

(d)   engage in conduct that is prejudicial to the administration of justice;

(e)   state or imply an ability to influence improperly a government agency or official, or to achieve results by means that violate these rules, the State Bar Act, or other law; or

(f)   knowingly* assist, solicit, or induce a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law.   For purposes of this rule, "judge" and "judicial officer" have the same meaning as in rule 3.5(c).

*An asterisk (*) identifies a word or phrase defined in rule 1.0.1*

## RULES OF PROFESSIONAL CONDUCT

**Comment**

[1]   A violation of this rule can occur when a lawyer is acting in propria persona or when a lawyer is not practicing law or acting in a professional capacity.

[2]   Paragraph (a) does not prohibit a lawyer from advising a client concerning action the client is legally entitled to take.

[3]   A lawyer may be disciplined for criminal acts as set forth in Business and Professions Code sections 6101 et seq., or if the criminal act constitutes "other misconduct warranting discipline" as defined by California Supreme Court case law. (See *In re Kelley* (1990) 52 Cal.3d 487 [276 Cal.Rptr. 375].)

[4]   A lawyer may be disciplined under Business and Professions Code section 6106 for acts involving moral turpitude, dishonesty, or corruption, whether intentional, reckless, or grossly negligent.

[5]   Paragraph (c) does not apply where a lawyer advises clients or others about, or supervises, lawful covert activity in the investigation of violations of civil or criminal law or constitutional rights, provided the lawyer's conduct is otherwise in compliance with these rules and the State Bar Act.

[6]   This rule does not prohibit those activities of a particular lawyer that are protected by the First Amendment to the United States Constitution or by Article I, section 2 of the California Constitution.

## Rule 8.4.1 Prohibited Discrimination, Harassment and Retaliation

(a)   In representing a client, or in terminating or refusing to accept the representation of any client, a lawyer shall not:

   (1)   unlawfully harass or unlawfully discriminate against persons* on the basis of any protected characteristic; or

   (2)   unlawfully retaliate against persons.*

(b)   In relation to a law firm's operations, a lawyer shall not:

   (1)   on the basis of any protected characteristic,

      (i)   unlawfully discriminate or knowingly* permit unlawful discrimination;

      (ii)   unlawfully harass or knowingly* permit the unlawful harassment of an employee, an applicant, an unpaid intern or volunteer, or a person* providing services pursuant to a contract; or

      (iii)   unlawfully refuse to hire or employ a person*, or refuse to select a person* for a training program leading to employment, or bar or discharge a person* from employment or from a training program leading to employment, or discriminate against a person* in compensation or in terms, conditions, or privileges of employment; or

   (2)   unlawfully retaliate against persons.*

(c)   For purposes of this rule:

   (1)   "protected characteristic" means race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, sexual orientation, age, military and veteran status, or other category of discrimination prohibited by applicable law, whether the category is actual or perceived;

   (2)   "knowingly permit" means to fail to advocate corrective action where the lawyer knows* of a discriminatory policy or practice that results in the unlawful discrimination or harassment prohibited by paragraph (b);

   (3)   "unlawfully" and "unlawful" shall be determined by reference to applicable state and federal statutes and decisions making unlawful discrimination or harassment in employment and in offering goods and services to the public; and

   (4)   "retaliate" means to take adverse action against a person* because that person* has (i) opposed, or (ii) pursued, participated in, or assisted any action alleging, any conduct prohibited by paragraphs (a)(1) or (b)(1) of this rule.

(d)   A lawyer who is the subject of a State Bar investigation or State Bar Court proceeding alleging a violation of this rule shall promptly notify the State Bar of any criminal, civil, or administrative action premised, whether in whole or part, on the same

**RULES OF PROFESSIONAL CONDUCT**

conduct that is the subject of the State Bar investigation or State Bar Court proceeding.

(e)   Upon being issued a notice of a disciplinary charge under this rule, a lawyer shall:

(1)   if the notice is of a disciplinary charge under paragraph (a) of this rule, provide a copy of the notice to the California Department of Fair Employment and Housing and the United States Department of Justice, Coordination and Review Section; or

(2)   if the notice is of a disciplinary charge under paragraph (b) of this rule, provide a copy of the notice to the California Department of Fair Employment and Housing and the United States Equal Employment Opportunity Commission.

(f)   This rule shall not preclude a lawyer from:

(1)   representing a client alleged to have engaged in unlawful discrimination, harassment, or retaliation;

(2)   declining or withdrawing from a representation as required or permitted by rule 1.16; or

(3)   providing advice and engaging in advocacy as otherwise required or permitted by these rules and the State Bar Act.

**Comment**

[1]   Conduct that violates this rule undermines confidence in the legal profession and our legal system and is contrary to the fundamental principle that all people are created equal.   A lawyer may not engage in such conduct through the acts of another.   (See rule 8.4(a).) In relation to a law firm's operations, this rule imposes on all law firm* lawyers the responsibility to advocate corrective action to address known* harassing or discriminatory conduct by the firm* or any of its other lawyers or nonlawyer personnel.   Law firm* management and supervisorial lawyers retain their separate responsibility under rules 5.1 and 5.3. Neither this rule nor rule 5.1 or 5.3 imposes on the alleged victim of any conduct prohibited by this rule any responsibility to advocate corrective action.

[2]   The conduct prohibited by paragraph (a) includes the conduct of a lawyer in a proceeding before a judicial officer.   (See Cal. Code Jud. Ethics, canon 3B(6) ["A judge shall require lawyers in

proceedings before the judge to refrain from manifesting, by words or conduct, bias or prejudice based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation against parties, witnesses, counsel, or others."].)   A lawyer does not violate paragraph (a) by referring to any particular status or group when the reference is relevant to factual or legal issues or arguments in the representation.   While both the parties and the court retain discretion to refer such conduct to the State Bar, a court's finding that peremptory challenges were exercised on a discriminatory basis does not alone establish a violation of paragraph (a).

[3]   A lawyer does not violate this rule by limiting the scope or subject matter of the lawyer's practice or by limiting the lawyer's practice to members of underserved populations.   A lawyer also does not violate this rule by otherwise restricting who will be accepted as clients for advocacy-based reasons, as required or permitted by these rules or other law.

[4]   This rule does not apply to conduct protected by the First Amendment to the United States Constitution or by Article I, section 2 of the California Constitution.

[5]   What constitutes a failure to advocate corrective action under paragraph (c)(2) will depend on the nature and seriousness of the discriminatory policy or practice, the extent to which the lawyer knows* of unlawful discrimination or harassment resulting from that policy or practice, and the nature of the lawyer's relationship to the lawyer or law firm* implementing that policy or practice.   For example, a law firm* non-management and non-supervisorial lawyer who becomes aware that the law firm* is engaging in a discriminatory hiring practice may advocate corrective action by bringing that discriminatory practice to the attention of a law firm* management lawyer who would have responsibility under rule 5.1 or 5.3 to take reasonable* remedial action upon becoming aware of a violation of this rule.

[6]   Paragraph (d) ensures that the State Bar and the State Bar Court will be provided with information regarding related proceedings that may be relevant in determining whether a State Bar investigation or a State Bar Court proceeding relating to a violation of this rule should be abated.

[7]   Paragraph (e) recognizes the public policy served by enforcement of laws and regulations prohibiting unlawful discrimination, by ensuring that the state and

RULES OF PROFESSIONAL CONDUCT

federal agencies with primary responsibility for coordinating the enforcement of those laws and regulations is provided with notice of any allegation of unlawful discrimination, harassment, or retaliation by a lawyer that the State Bar finds has sufficient merit to warrant issuance of a notice of a disciplinary charge.

[8]   This rule permits the imposition of discipline for conduct that would not necessarily result in the award of a remedy in a civil or administrative proceeding if such proceeding were filed.

[9]   A disciplinary investigation or proceeding for conduct coming within this rule may also be initiated and maintained if such conduct warrants discipline under California Business and Professions Code sections 6106 and 6068, the California Supreme Court's inherent authority to impose discipline, or other disciplinary standard.

## Rule 8.5  Disciplinary Authority; Choice of Law

(a)   Disciplinary Authority.

A lawyer admitted to practice in California is subject to the disciplinary authority of California, regardless of where the lawyer's conduct occurs.   A lawyer not admitted in California is also subject to the disciplinary authority of California if the lawyer provides or offers to provide any legal services in California.   A lawyer may be subject to the disciplinary authority of both California and another jurisdiction for the same conduct.

(b)   Choice of Law.

In any exercise of the disciplinary authority of California, the rules of professional conduct to be applied shall be as follows:

(1)   for conduct in connection with a matter pending before a tribunal,* the rules of the jurisdiction in which the tribunal* sits, unless the rules of the tribunal* provide otherwise; and

(2)   for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes* the predominant effect of the lawyer's conduct will occur.

**Comment**

*Disciplinary Authority*

The conduct of a lawyer admitted to practice in California is subject to the disciplinary authority of California.   (See Bus. & Prof. Code, §§ 6077, 6100.) Extension of the disciplinary authority of California to other lawyers who provide or offer to provide legal services in California is for the protection of the residents of California.   A lawyer disciplined by a disciplinary authority in another jurisdiction may be subject to discipline in California for the same conduct. (See, e.g., § 6049.1.)

*An asterisk (\*) identifies a word or phrase defined in rule 1.0.1*

# EXHIBIT 16

# NYSBA NY Rules of Professional Conduct (2021)

*Effective April 1, 2009, as amended through June 24, 2020, with commentary as amended through October 30, 2021.*

Reproduced with permission by the
New York State Bar Association,
One Elk Street, Albany, NY 12207.

Please contact MRC@nysba.org for
permission to use or distribute this content.

NEW YORK STATE BAR ASSOCIATION

Use of this product confirms acceptance of the NYSBA license.



# NYSBA NY Rules of Professional Conduct
(2021)

NEW YORK STATE BAR ASSOCIATION

The New York Rules of Professional Conduct, which became effective on April 1, 2009, have been adopted by the Appellate Division of the New York State Supreme Court and are published as Part 1200 of the Joint Rules of the Appellate Division (22 N.Y.C.R.R. Part 1200). The Appellate Division has not adopted the Preamble, Scope and Comments, which are published solely by the New York State Bar Association to provide guidance for attorneys in complying with the Rules.

ISBN: 978-1-57969-109-7
Product Number: 403021E

# TABLE OF CONTENTS

Preamble: A Lawyer's Responsibilities............................................. 1
Scope................................................................................................ 2

Rule 1.0       Terminology................................................... 5
Rule 1.1       Competence .................................................. 12
Rule 1.2       Scope of Representation and Allocation of Authority
               Between Client and Lawyer........................... 15
Rule 1.3       Diligence ....................................................... 21
Rule 1.4       Communication.............................................. 23
Rule 1.5       Fees and Division of Fees............................. 26
Rule 1.6       Confidentiality of Information....................... 33
Rule 1.7       Conflict of Interest: Current Clients ............. 45
Rule 1.8       Current Clients: Specific Conflict of Interest Rules ..... 59
Rule 1.9       Duties to Former Clients............................... 74
Rule 1.10      Imputation of Conflicts of Interest................ 77
Rule 1.11      Special Conflicts of Interest for Former and Current
               Government Officers and Employees............ 85
Rule 1.12      Specific Conflicts of Interest for Former Judges,
               Arbitrators, Mediators or Other Third-Party Neutrals .. 92
Rule 1.13      Organization as Client .................................. 96
Rule 1.14      Client With Diminished Capacity.................. 102
Rule 1.15      Preserving Identity of Funds and Property of Others;
               Fiduciary Responsibility; Commingling and
               Misappropriation of Client Funds or Property;
               Maintenance of Bank Accounts; Record Keeping;
               Examination of Records................................. 106
Rule 1.16      Declining or Terminating Representation...................... 113
Rule 1.17      Sale of Law Practice ..................................... 118
Rule 1.18      Duties to Prospective Clients........................ 124
Rule 2.1       Advisor.......................................................... 129
Rule 2.2       [Reserved].................................................... 131
Rule 2.3       Evaluation for Use by Third Persons............. 132
Rule 2.4       Lawyer Serving as Third-Party Neutral........ 135
Rule 3.1       Non-Meritorious Claims and Contentions.................... 137
Rule 3.2       Delay of Litigation........................................ 139
Rule 3.3       Conduct Before a Tribunal ........................... 140
Rule 3.4       Fairness to Opposing Party and Counsel ...... 147
Rule 3.5       Maintaining and Preserving the Impartiality of
               Tribunals and Jurors..................................... 151
Rule 3.6       Trial Publicity ............................................... 154
Rule 3.7       Lawyer as Witness ........................................ 158

Rule 3.8     Special Responsibilities of Prosecutors and Other
Government Lawyers ..................................................... 161
Rule 3.9     Advocate in Non-Adjudicative Matters ........................ 165
Rule 4.1     Truthfulness in Statements to Others ............................ 166
Rule 4.2     Communication With Person Represented by Counsel .. 167
Rule 4.3     Communicating With Unrepresented Persons .............. 171
Rule 4.4     Respect for Rights of Third Persons ............................. 173
Rule 4.5     Communication After Incidents Involving Personal
Injury or Wrongful Death ............................................. 175
Rule 5.1     Responsibilities of Law Firms, Partners, Managers
and Supervisory Lawyers ............................................. 176
Rule 5.2     Responsibilities of a Subordinate Lawyer .................... 179
Rule 5.3     Lawyer's Responsibility for Conduct of Nonlawyers .. 180
Rule 5.4     Professional Independence of a Lawyer ....................... 183
Rule 5.5     Unauthorized Practice of Law ...................................... 185
Rule 5.6     Restrictions on Right To Practice ................................. 186
Rule 5.7     Responsibilities Regarding Nonlegal Services ............. 189
Rule 5.8     Contractual Relationships Between Lawyers and
Nonlegal Professionals .................................................. 195
Rule 6.1     Voluntary Pro Bono Service ......................................... 200
Rule 6.2     [Reserved] ..................................................................... 204
Rule 6.3     Membership in a Legal Services Organization ............. 205
Rule 6.4     Law Reform Activities Affecting Client Interests ........ 206
Rule 6.5     Participation in Limited Pro Bono Legal Services
Programs ....................................................................... 207
Rule 7.1     Advertising .................................................................... 210
Rule 7.2     Payment for Referrals ................................................... 221
Rule 7.3     Solicitation and Recommendation of Professional
Employment .................................................................. 227
Rule 7.4     Identification of Practice and Specialty ........................ 234
Rule 7.5     Professional Notices, Letterheads and Names .............. 236
Rule 8.1     Candor in the Bar Admission Process .......................... 242
Rule 8.2     Judicial Officers and Candidates .................................. 243
Rule 8.3     Reporting Professional Misconduct .............................. 244
Rule 8.4     Misconduct .................................................................... 246
Rule 8.5     Disciplinary Authority and Choice of Law ................... 249

Index ................................................................................. 253

**NEW YORK RULES OF PROFESSIONAL CONDUCT
(EFFECTIVE APRIL 1, 2009)
AS AMENDED THROUGH APRIL 1, 2021
WITH COMMENTS AS AMENDED
THROUGH OCTOBER 30, 2021**

# PREAMBLE:
# A LAWYER'S RESPONSIBILITIES

[1]     A lawyer, as a member of the legal profession, is a representative of clients and an officer of the legal system with special responsibility for the quality of justice. As a representative of clients, a lawyer assumes many roles, including advisor, advocate, negotiator, and evaluator. As an officer of the legal system, each lawyer has a duty to uphold the legal process; to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice. In addition, a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because, in a constitutional democracy, legal institutions depend on popular participation and support to maintain their authority.

[2]     The touchstone of the client-lawyer relationship is the lawyer's obligation to assert the client's position under the rules of the adversary system, to maintain the client's confidential information except in limited circumstances, and to act with loyalty during the period of the representation.

[3]     A lawyer's responsibilities in fulfilling these many roles and obligations are usually harmonious. In the course of law practice, however, conflicts may arise among the lawyer's responsibilities to clients, to the legal system and to the lawyer's own interests. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Nevertheless, within the framework of the Rules, many difficult issues of professional discretion can arise. The lawyer must resolve such issues through the exercise of sensitive professional and moral judgment, guided by the basic principles underlying the Rules.

[4]     The legal profession is largely self-governing. An independent legal profession is an important force in preserving government under law, because abuse of legal authority is more readily challenged by a profession whose members are not dependent on government for the right to practice law. To the extent that lawyers meet these professional obligations, the occasion for government regulation is obviated.

[5]    The relative autonomy of the legal profession carries with it special responsibilities of self-governance. Every lawyer is responsible for observance of the Rules of Professional Conduct and also should aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest that it serves. Compliance with the Rules depends primarily upon the lawyer's understanding of the Rules and desire to comply with the professional norms they embody for the benefit of clients and the legal system, and, secondarily, upon reinforcement by peer and public opinion. So long as its practitioners are guided by these principles, the law will continue to be a noble profession.

## SCOPE

[6]    The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself. Some of the Rules are imperatives, cast in the terms "shall" or "shall not." These Rules define proper conduct for purposes of professional discipline. Others, generally cast in the term "may," are permissive and define areas under the Rules in which the lawyer has discretion to exercise professional judgment. No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of such discretion. Other Rules define the nature of relationships between the lawyer and others. The Rules are thus partly obligatory and disciplinary and partly constitutive and descriptive in that they define a lawyer's professional role. Many of the Comments use the term "should." Comments do not add obligations to the Rules but provide guidance for practicing in compliance with the Rules. The Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action.

[7]    The Rules presuppose a larger legal context shaping the lawyer's role. That context includes court rules and statutes relating to matters of licensure, laws defining specific obligations of lawyers, and substantive and procedural law in general. The Comments are sometimes used to alert lawyers to their responsibilities under such other law.

[8]    The Rules provide a framework for the ethical practice of law. Compliance with the Rules, as with all law in an open society, depends primarily upon understanding and voluntary compliance, secondarily upon reinforcement by peer and public opinion and finally, when necessary, upon enforcement through disciplinary proceedings. The Rules

do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules.

[9]    Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine whether a client-lawyer relationship exists. Most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so. But there are some duties, such as that of confidentiality under Rule 1.6, that attach when the lawyer agrees to consider whether a client-lawyer relationship shall be established. See Rule 1.18. Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact.

[10]    Under various legal provisions, including constitutional, statutory and common law, the responsibilities of government lawyers may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships. For example, a lawyer for a government agency may have authority on behalf of the government to decide whether to agree to a settlement or to appeal from an adverse judgment. Such authority in various respects is generally vested in the attorney general and the state's attorney in state government, and in their federal counterparts, and the same may be true of other government law officers. Also, lawyers under the supervision of these officers may be authorized to represent several government agencies in intragovernmental legal controversies in circumstances where a private lawyer could not represent multiple private clients. These Rules do not abrogate any such authority.

[11]    Failure to comply with an obligation or prohibition imposed by a Rule is a basis for invoking the disciplinary process. The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation. Moreover, the Rules presuppose that whether discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations.

[12]    Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule

does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Nevertheless, because the Rules do establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct.

[13]    The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule. The Preamble and this note on Scope provide general orientation. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative.

# RULE 1.0

## TERMINOLOGY

(a)   **"Advertisement" means any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the retention of the lawyer or law firm. It does not include communications to existing clients or other lawyers.**

(b)   **"Belief" or "believes" denotes that the person involved actually believes the fact in question to be true. A person's belief may be inferred from circumstances.**

(c)   **"Computer-accessed communication" means any communication made by or on behalf of a lawyer or law firm that is disseminated through the use of a computer or related electronic device, including, but not limited to, web sites, weblogs, search engines, electronic mail, banner advertisements, pop-up and pop-under advertisements, chat rooms, list servers, instant messaging, or other internet presences, and any attachments or links related thereto.**

(d)   **"Confidential information" is defined in Rule 1.6.**

(e)   **"Confirmed in writing" denotes (i) a writing from the person to the lawyer confirming that the person has given consent, (ii) a writing that the lawyer promptly transmits to the person confirming the person's oral consent, or (iii) a statement by the person made on the record of any proceeding before a tribunal. If it is not feasible to obtain or transmit the writing at the time the person gives oral consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.**

(f)   **"Differing interests" include every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.**

(g)   **"Domestic relations matter" denotes representation of a client in a claim, action or proceeding, or preliminary to the filing of a claim, action or proceeding, in either Supreme Court or Family Court, or in any court of appellate jurisdiction, for divorce, separation, annulment, custody, visitation, maintenance, child support or alimony, or to enforce or modify a judgment or order in connection with any such claim, action or proceeding.**

(h)   **"Firm" or "law firm"** includes, but is not limited to, a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a qualified legal assistance organization, a government law office, or the legal department of a corporation or other organization.

(i)   **"Fraud" or "fraudulent"** denotes conduct that is fraudulent under the substantive or procedural law of the applicable jurisdiction or has a purpose to deceive, provided that it does not include conduct that, although characterized as fraudulent by statute or administrative rule, lacks an element of scienter, deceit, intent to mislead, or knowing failure to correct misrepresentations that can be reasonably expected to induce detrimental reliance by another.

(j)   **"Informed consent"** denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives.

(k)   **"Knowingly," "known," "know," or "knows"** denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.

(l)   **"Matter"** includes any litigation, judicial or administrative proceeding, case, claim, application, request for a ruling or other determination, contract, controversy, investigation, charge, accusation, arrest, negotiation, arbitration, mediation or any other representation involving a specific party or parties.

(m)   **"Partner"** denotes a member of a partnership, a shareholder in a law firm organized as a professional legal corporation or a member of an association authorized to practice law.

(n)   **"Person"** includes an individual, a corporation, an association, a trust, a partnership, and any other organization or entity.

(o)   **"Professional legal corporation"** means a corporation, or an association treated as a corporation, authorized by law to practice law for profit.

(p)     **"Qualified legal assistance organization" means an office or organization of one of the four types listed in Rule 7.2(b)(1)-(4) that meets all of the requirements thereof.**

(q)     **"Reasonable" or "reasonably," when used in relation to conduct by a lawyer, denotes the conduct of a reasonably prudent and competent lawyer. When used in the context of conflict of interest determinations, "reasonable lawyer" denotes a lawyer acting from the perspective of a reasonably prudent and competent lawyer who is personally disinterested in commencing or continuing the representation.**

(r)     **"Reasonable belief" or "reasonably believes," when used in reference to a lawyer, denotes that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.**

(s)     **"Reasonably should know," when used in reference to a lawyer, denotes that a lawyer of reasonable prudence and competence would ascertain the matter in question.**

(t)     **"Screened" or "screening" denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer or the firm is obligated to protect under these Rules or other law.**

(u)     **"Sexual relations" denotes sexual intercourse or the touching of an intimate part of the lawyer or another person for the purpose of sexual arousal, sexual gratification or sexual abuse.**

(v)     **"State" includes the District of Columbia, Puerto Rico, and other federal territories and possessions.**

(w)     **"Tribunal" denotes a court, an arbitrator in an arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a legal judgment directly affecting a party's interests in a particular matter.**

**(x)** **"Writing" or "written" denotes a tangible or electronic record of a communication or representation, including handwriting, typewriting, printing, photocopying, photography, audio or video recording, email or other electronic communication or any other form of recorded communication or recorded representation. A "signed" writing includes an electronic sound, symbol or process attached to or logically associated with a writing and executed or adopted by a person with the intent to sign the writing.**

**Comment**

**Confirmed in Writing**

[1]    Some Rules require that a person's oral consent be "confirmed in writing." *E.g.*, Rules 1.5(g)(2) (client's consent to division of fees with lawyer in another firm must be confirmed in writing), 1.7(b)(4) (client's informed consent to conflict of interest must be confirmed in writing) and 1.9(a) (former client's informed consent to conflict of interest must be confirmed in writing). The definition of "confirmed in writing" provides three distinct methods of confirming a person's consent: (i) a writing from the person to the lawyer, (ii) a writing from the lawyer to the person, or (iii) consent by the person on the record in any proceeding before a tribunal. The confirming writing need not recite the information that the lawyer communicated to the person in order to obtain the person's consent. For the definition of "informed consent" See Rule 1.0(j). If it is not feasible for the lawyer to obtain or transmit a written confirmation at the time the client gives oral consent, then the lawyer must obtain or transmit the confirming writing within a reasonable time thereafter. If a lawyer has obtained a client's informed oral consent, the lawyer may act in reliance on that consent so long as it is confirmed in writing within a reasonable time thereafter.

**Computer-Accessed Communication**

[1A]   Rule 1.0(c), which defines the phrase "computer-accessed communication," embraces electronic and wireless communications of every kind and includes, without limitation, communication by devices such as cell phones, smartphones, and all other handheld or portable devices that can send or receive communications by and electronic or wireless means, including cellular service, the Internet, wireless networks, or any other technology.

**Firm**

[2]    Whether two or more lawyers constitute a firm within paragraph (h) will depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve. Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the Rule that is involved. For example, a group of lawyers could be regarded as a firm for purposes of determining whether a conflict of interest exists but not for application of the advertising rules.

[3]    With respect to the law department of an organization, there is ordinarily no question that the members of the department constitute a firm within the meaning of the Rules of Professional Conduct. There can be uncertainty, however, as to the identity of the client. For example, it may not be clear whether the law department of a corporation represents a subsidiary or an affiliated corporation, as well as the corporation by which the members of the department are directly employed. A similar question can arise concerning an unincorporated association and its local affiliates. Whether lawyers in a government agency or department constitute a firm may depend upon the issue involved or be governed by other law.

[4]    Similar questions can also arise with respect to lawyers in legal aid and legal services organizations. Depending upon the structure of the organization, the entire organization or components of it may constitute a firm or firms for purposes of these Rules.

**Fraud**

[5]    When used in these Rules, the terms "fraud" and "fraudulent" refer to conduct that is characterized as such under the substantive or procedural law of the applicable jurisdiction or has a purpose to deceive. This does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information. For purposes of these Rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform, so long as the necessary scienter is present and the conduct in question could be reasonably expected to induce detrimental reliance.

**Informed Consent**

[6]     Many of the Rules of Professional Conduct require the lawyer to obtain the informed consent of a client or other person (*e.g.*, a former client or, under certain circumstances, a prospective client) before accepting or continuing representation or pursuing a course of conduct. *E.g.*, Rules 1.2(c), 1.6(a) and 1.7(b). The communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent. The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct, and a discussion of the client's or other person's options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid. In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent. Other considerations may apply in representing impaired clients. *See* Rule 1.14.

[7]     Obtaining informed consent will usually require an affirmative response by the client or other person. In general, a lawyer may not assume consent from a client's or other person's silence. Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. A number of Rules require that a person's consent be confirmed in writing. *E.g.*, Rules 1.7(b) and 1.9(a). For definitions of "writing" and "confirmed in writing" see paragraphs (x) and (e), respectively. Other Rules require that a client's consent be obtained in a writing signed by the client. *E.g.*, Rules 1.8(a) and (g). For the meaning of "signed," see paragraph (x).

**Screened or Screening**

[8]     The definition of "screened" or "screening" applies to situations where screening of a personally disqualified lawyer is permitted to remove imputation of a conflict of interest under Rule 1.11, 1.12 or 1.18. See those Rules for the particular requirements of establishing effective screening.

[9]     The purpose of screening is to ensure that confidential information known by the personally disqualified lawyer remains protected. The personally disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter. Similarly, other lawyers in the firm who are working on the matter should promptly be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter. Additional screening measures that are appropriate for the particular matter will depend on the circumstances. In any event, procedures should be adequate to protect confidential information.

[10]     In order to be effective, screening measures must be implemented as soon as practicable after a lawyer or law firm knows or reasonably should know that there is a need for screening.

# RULE 1.1

## COMPETENCE

(a)    A lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

(b)    A lawyer shall not handle a legal matter that the lawyer knows or should know that the lawyer is not competent to handle, without associating with a lawyer who is competent to handle it.

(c)    A lawyer shall not intentionally:

(1)    fail to seek the objectives of the client through reasonably available means permitted by law and these Rules; or

(2)    prejudice or damage the client during the course of the representation except as permitted or required by these Rules.

Comment

**Legal Knowledge and Skill**

[1]    In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to associate with a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances. One such circumstance would be where the lawyer, by representations made to the client, has led the client reasonably to expect a special level of expertise in the matter undertaken by the lawyer.

[2]    A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all

legal problems. Perhaps the most fundamental legal skill consists of determining what kinds of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

[3]     [Reserved.]

[4]     A lawyer may accept representation where the requisite level of competence can be achieved by adequate preparation before handling the legal matter. This applies as well to a lawyer who is appointed as counsel for an unrepresented person.

**Thoroughness and Preparation**

[5]     Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. An agreement between the lawyer and the client may limit the scope of the representation if the agreement complies with Rule 1.2(c).

**Retaining or Contracting with Lawyers Outside the Firm**

[6]     Before a lawyer retains or contracts with other lawyers outside the lawyer's own firm to provide or assist in the provision of legal services to a client, the lawyer should ordinarily obtain informed consent from the client and should reasonably believe that the other lawyers' services will contribute to the competent and ethical representation of the client. *See also* Rules 1.2 (allocation of authority), 1.4 (communication with client), 1.5(g) (fee sharing with lawyers outside the firm), 1.6 (confidentiality), and 5.5(a) (unauthorized practice of law). The reasonableness of the decision to retain or contract with other lawyers outside the lawyer's own firm will depend upon the circumstances, including the needs of the client; the education, experience and reputation of the outside lawyers; the nature of the services assigned to the outside lawyers; and the legal protections, professional conduct rules, and ethical environments of the jurisdictions in which the services will be performed, particularly relating to confidential information.

[6A]   Client consent to contract with a lawyer outside the lawyer's own firm may not be necessary for discrete and limited tasks supervised closely by a lawyer in the firm. However, a lawyer should ordinarily obtain client consent before contracting with an outside lawyer to perform substantive or strategic legal work on which the lawyer will exercise independent judgment without close supervision or review by the referring lawyer. For example, on one hand, a lawyer who hires an outside lawyer on a per diem basis to cover a single court call or a routing calendar call ordinarily would not need to obtain the client's prior informed consent. On the other hand, a lawyer who hires an outside lawyer to argue a summary judgment motion or negotiate key points in a transaction ordinarily should seek to obtain the client's prior informed consent.

[7]     When lawyer from more than one law firm are providing legal services to the client on a particular matter, the lawyers ordinarily should consult with each other about the scope of their respective roles and the allocation of responsibility among them. *See* Rule 1.2(a). When allocating responsibility in a matter pending before a tribunal, lawyers and parties may have additional obligations (*e.g.*, under local court rules, the CPLR, or the Federal Rules of Civil Procedure) that are a matter of law beyond the scope of these Rules.

[7A]   Whether a lawyer who contracts with a lawyer outside the firm needs to obtain informed consent from the client about the roles and responsibilities of the retaining and outside lawyers will depend on the circumstances. On one hand, if a lawyer retains an outside lawyer or law firm to work under the lawyer's close direction and supervision, and the retaining lawyer closely reviews the outside lawyer's work, the retaining lawyer usually will not need to consult with the client about the outside lawyer's role and level of responsibility. On the other hand, if the outside lawyer will have a more material role and will exercise more autonomy and responsibility, then the retaining lawyer usually should consult with the client. In any event, whenever a retaining lawyer discloses a client's confidential information to lawyers outside the firm, the retaining lawyer should comply with Rule 1.6(a).

[8]     To maintain the requisite knowledge and skill, a lawyer should (i) keep abreast of changes in substantive and procedural law relevant to the lawyer's practice, (ii) keep abreast of the benefits and risks associated with technology the lawyer uses to provide services to clients or to store or transmit confidential information, and (iii) engage in continuing study and education and comply with all applicable continuing legal education requirements under 22 N.Y.C.R.R. Part 1500.

# RULE 1.2

## SCOPE OF REPRESENTATION AND ALLOCATION OF AUTHORITY BETWEEN CLIENT AND LAWYER

(a)     Subject to the provisions herein, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b)     A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

(c)     A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, the client gives informed consent and where necessary notice is provided to the tribunal and/or opposing counsel.

(d)     A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is illegal or fraudulent, except that the lawyer may discuss the legal consequences of any proposed course of conduct with a client.

(e)     A lawyer may exercise professional judgment to waive or fail to assert a right or position of the client, or accede to reasonable requests of opposing counsel, when doing so does not prejudice the rights of the client.

(f)     A lawyer may refuse to aid or participate in conduct that the lawyer believes to be unlawful, even though there is some support for an argument that the conduct is legal.

(g)     A lawyer does not violate these Rules by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, and by treating with courtesy and consideration all persons involved in the legal process.

**Comment**

**Allocation of Authority Between Client and Lawyer**

[1]     Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. The decisions specified in paragraph (a), such as whether to settle a civil matter, must also be made by the client. See Rule 1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions. The lawyer shall consult with the client with respect to the means by which the client's objectives are to be pursued. See Rule 1.4(a)(2).

[2]     Clients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters. On the other hand, lawyers usually defer to their clients regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected. On occasion, however, a lawyer and a client may disagree about the means to be used to accomplish the client's objectives. Because of the varied nature of the matters about which a lawyer and client might disagree, and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved. Other law, however, may be applicable and should be consulted by the lawyer. The lawyer should also consult with the client and seek a mutually acceptable resolution of the disagreement. If such efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation. See Rule 1.16(c)(4). Likewise, the client may resolve the disagreement by discharging the lawyer, in which case the lawyer must withdraw from the representation. *See* Rule 1.16(b)(3).

[3]     At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation. Absent a material change in circumstances and subject to Rule 1.4, a lawyer may rely on such an advance authorization. The client, however, may revoke such authority at any time.

[4]     In a case in which the client appears to be suffering diminished capacity, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14.

## Independence from Client's Views or Activities

[5]    Legal representation should not be denied to any person who is unable to afford legal services, or whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities.

## Agreements Limiting Scope of Representation

[6]    The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. When a lawyer has been retained by an insurer to represent an insured, for example, the representation may be limited to issues related to the insurance coverage. A limited representation may be appropriate because the client has limited objectives for the representation. In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent.

[6A]   In obtaining consent from the client, the lawyer must adequately disclose the limitations on the scope of the engagement and the matters that will be excluded. In addition, the lawyer must disclose the reasonably foreseeable consequences of the limitation. In making such disclosure, the lawyer should explain that if the lawyer or the client determines during the representation that additional services outside the limited scope specified in the engagement are necessary or advisable to represent the client adequately, then the client may need to retain separate counsel, which could result in delay, additional expense, and complications.

[7]    Although this Rule affords the lawyer and client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances. If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief telephone consultation. Such a limitation, however, would not be reasonable if the time allotted were not sufficient to yield advice upon which the client could rely. Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation,

the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. See Rule 1.1.

[8]    All agreements concerning a lawyer's representation of a client must accord with the Rules of Professional Conduct and other law. *See* Rules 1.1, 1.8 and 5.6.

**Illegal and Fraudulent Transactions**

[9]    Paragraph (d) prohibits a lawyer from counseling or assisting a client in conduct that the lawyer knows is illegal or fraudulent. This prohibition, however, does not preclude the lawyer from giving an honest opinion about the consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is illegal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.

[10]    When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. When the representation will result in violation of the Rules of Professional Conduct or other law, the lawyer must advise the client of any relevant limitation on the lawyer's conduct and remonstrate with the client. *See* Rules 1.4(a)(5) and 1.16(b)(1). Persuading a client to take necessary preventive or corrective action that will bring the client's conduct within the bounds of the law is a challenging but appropriate endeavor. If the client fails to take necessary corrective action and the lawyer's continued representation would assist client conduct that is illegal or fraudulent, the lawyer is required to withdraw. *See* Rule 1.16(b)(1). In some circumstances, withdrawal alone might be insufficient. In those cases the lawyer may be required to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. *See* Rule 1.6(b)(3); Rule 4.1, Comment [3].

[11]    Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

[12]   Paragraph (d) prohibits a lawyer from assisting a client's illegal or fraudulent activity against a third person, whether or not the defrauded party is a party to the transaction. Paragraph (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise, but does preclude such a retainer for an enterprise known to be engaged in illegal or fraudulent activity.

[13]   If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law, or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct. See Rule 1.4(a)(5).

## Exercise of Professional Judgment

[14]   Paragraph (e) permits a lawyer to exercise professional judgment to waive or fail to assert a right of a client, or accede to reasonable requests of opposing counsel in such matters as court proceedings, settings, continuances, and waiver of procedural formalities, as long as doing so does not prejudice the rights of the client. Like paragraphs (f) and (g), paragraph (e) effectively creates a limited exception to the lawyer's obligations under Rule 1.1(c) (a lawyer shall not intentionally "fail to seek the objectives of the client through reasonably available means permitted by law and these Rules" or "prejudice or damage the client during the course of the representation except as permitted or required by these Rules"). If the lawyer is representing the client before a tribunal, the lawyer is required under Rule 3.3(f)(1) to comply with local customs of courtesy or practice of the bar or a particular tribunal unless the lawyer gives opposing counsel timely notice of the intent not to comply.

## Refusal to Participate in Conduct a Lawyer Believes to Be Unlawful

[15]   In some situations such as those described in paragraph (d), a lawyer is prohibited from aiding or participating in a client's improper or potentially improper conduct; but in other situations, a lawyer has discretion. Paragraph (f) permits a lawyer to refuse to aid or participate in conduct the lawyer *believes* to be unlawful, even if the conduct is arguably legal. In addition, under Rule 1.16(c)(2), the lawyer *may* withdraw from representing a client when the client persists in a course of action involving the lawyer's services that the lawyer reasonably *believes* is criminal or fraudulent, even if the course of action is arguably legal. In contrast, when the lawyer *knows* (or reasonably should know) that the representation will result in a violation of law or the Rules of Professional

Conduct, the lawyer *must* withdraw from the representation under Rule 1.16(b)(1). If the client "insists" that the lawyer pursue a course of conduct that is illegal or prohibited under the Rules, the lawyer must not carry out those instructions and, in addition, may withdraw from the representation under Rule 1.16(c)(13). If the lawyer is representing the client before a tribunal, additional rules may come into play. For example, the lawyer may be required to obtain the tribunal's permission to withdraw under Rule 1.16(d), and the lawyer may be required to take reasonable remedial measures under Rule 3.3 with respect to false evidence or other criminal or fraudulent conduct relating to a proceeding.

**Fulfilling Professional Commitments and Treating Others with Courtesy**

[16]    Both Rule 1.1(c)(1) and Rule 1.2(a) require generally that a lawyer seek the client's objectives and abide by the client's decisions concerning the objectives of the representation; but those rules do not require a lawyer to be offensive, discourteous, inconsiderate or dilatory. Paragraph (g) specifically affirms that a lawyer does not violate the Rules by being punctual in fulfilling professional commitments, avoiding offensive tactics and treating with courtesy and consideration all persons involved in the legal process. Lawyers should be aware of the New York State Standards of Civility adopted by the courts to guide the legal profession (22 NYCRR Part 1200 Appendix A). Although the Standards of Civility are not intended to be enforced by sanctions or disciplinary action, conduct before a tribunal that fails to comply with known local customs of courtesy or practice, or that is undignified or discourteous, may violate Rule 3.3(f). Conduct in a proceeding that serves merely to harass or maliciously injury another would be frivolous in violation of Rule 3.1. Dilatory conduct may violate Rule 1.3(a), which requires a lawyer to act with reasonable diligence and promptness in representing a client.

# RULE 1.3

## DILIGENCE

**(a)    A lawyer shall act with reasonable diligence and promptness in representing a client.**

**(b)    A lawyer shall not neglect a legal matter entrusted to the lawyer.**

**(c)    A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services, but the lawyer may withdraw as permitted under these Rules.**

**Comment**

[1]    A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and in advocacy upon the client's behalf. A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued. *See* Rule 1.2. Notwithstanding the foregoing, the lawyer should not use offensive tactics or fail to treat all persons involved in the legal process with courtesy and respect.

[2]    A lawyer's work load must be controlled so that each matter can be handled diligently and promptly. Lawyers are encouraged to adopt and follow effective office procedures and systems; neglect may occur when such arrangements are not in place or are ineffective.

[3]    Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. A lawyer's duty to act with reasonable promptness, however, does not preclude the lawyer from agreeing to a reasonable request for a postponement that will not prejudice the lawyer's client.

[4]    Unless the relationship is terminated, as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved. If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so. If a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client and the lawyer and the client have not agreed that the lawyer will handle the matter on appeal, Rule 1.16(e) may require the lawyer to consult with the client about the possibility of appeal before relinquishing responsibility for the matter. Whether the lawyer is obligated to prosecute the appeal for the client depends on the scope of the representation the lawyer has agreed to provide to the client. *See* Rule 1.2.

[5]    To avoid possible prejudice to client interests, a sole practitioner is well advised to prepare a plan that designates another competent lawyer to review client files, notify each client of the lawyer's death or disability, and determine whether there is a need for immediate protective action.

# RULE 1.4

## COMMUNICATION

**(a)    A lawyer shall:**

**(1)    promptly inform the client of:**

**(i)    any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(j), is required by these Rules;**

**(ii)    any information required by court rule or other law to be communicated to a client; and**

**(iii)    material developments in the matter including settlement or plea offers.**

**(2)    reasonably consult with the client about the means by which the client's objectives are to be accomplished;**

**(3)    keep the client reasonably informed about the status of the matter;**

**(4)    promptly comply with a client's reasonable requests for information; and**

**(5)    consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by these Rules or other law.**

**(b)    A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.**

## Comment

[1]    Reasonable communication between the lawyer and the client is necessary for the client to participate effectively in the representation.

### Communicating with Client

[2]    In instances where these Rules require that a particular decision about the representation be made by the client, paragraph (a)(1) requires that the lawyer promptly consult with the client and secure the

client's consent prior to taking action, unless prior discussions with the client have resolved what action the client wants the lawyer to take. For example, paragraph (a)(1)(iii) requires that a lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case must promptly inform the client of its substance unless the client has previously made clear that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer. *See* Rule 1.2(a).

[3]     Paragraph (a)(2) requires that the lawyer reasonably consult with the client about the means to be used to accomplish the client's objectives. In some situations — depending on both the importance of the action under consideration and the feasibility of consulting with the client — this duty will require consultation prior to taking action. In other circumstances, such as during a trial when an immediate decision must be made, the exigency of the situation may require the lawyer to act without prior consultation. In such cases, the lawyer must nonetheless act reasonably to inform the client of actions the lawyer has taken on the client's behalf. Likewise, for routine matters such as scheduling decisions not materially affecting the interests of the client, the lawyer need not consult in advance, but should keep the client reasonably informed thereafter. Additionally, paragraph (a)(3) requires that the lawyer keep the client reasonably informed about the status of the matter, such as significant developments affecting the timing or the substance of the representation.

[4]     A lawyer's regular communication with clients will minimize the occasions on which a client will need to request information concerning the representation. When a client makes a reasonable request for information, however, paragraph (a)(4) requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer or a member of the lawyer's staff acknowledge receipt of the request and advise the client when a response may be expected. A lawyer should promptly respond to or acknowledge client communications, or arrange for an appropriate person who works with the lawyer to do so.

**Explaining Matters**

[5]     The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. Adequacy of communication depends in part on the kind of advice or assistance that is involved. For example, when there is time to explain a proposal made in a negotiation, the lawyer should

review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that are likely to result in significant expense or to injure or coerce others. On the other hand, a lawyer ordinarily will not be expected to describe trial or negotiation strategy in detail. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interest and the client's overall requirements as to the character of representation. In certain circumstances, such as when a lawyer asks a client to consent to a representation affected by a conflict of interest, the client must give informed consent, as defined in Rule 1.0(j).

[6]    Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers from diminished capacity. *See* Rule 1.14. When the client is an organization or group, it is often impossible or inappropriate to inform every one of its members about its legal affairs; ordinarily, the lawyer should address communications to those who the lawyer reasonably believes to be appropriate persons within the organization. *See* Rule 1.13. Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client.

**Withholding Information**

[7]    In some circumstances, a lawyer may be justified in delaying transmission of information when the client would be likely to react imprudently to an immediate communication. Thus, a lawyer might withhold a psychiatric diagnosis of a client when the examining psychiatrist indicates that disclosure would harm the client. A lawyer may not withhold information to serve the lawyer's own interest or convenience or the interests or convenience of another person. Rules or court orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client. Rule 3.4(c) directs compliance with such rules or orders.

# RULE 1.5

## FEES AND DIVISION OF FEES

(a)    A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense. A fee is excessive when, after a review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the fee is excessive. The factors to be considered in determining whether a fee is excessive may include the following:

(1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)    the likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)    the fee customarily charged in the locality for similar legal services;

(4)    the amount involved and the results obtained;

(5)    the time limitations imposed by the client or by circumstances;

(6)    the nature and length of the professional relationship with the client;

(7)    the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8)    whether the fee is fixed or contingent.

(b)    A lawyer shall communicate to a client the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible. This information shall be communicated to the client before or within a reasonable time after commencement of the representation and shall be in writing where required by statute or court rule. This provision shall not apply when the lawyer will charge a regularly represented client on the same basis or rate and perform services that are of the same general kind as previously rendered to and paid for by the client. Any changes in the scope of the

representation or the basis or rate of the fee or expenses shall also be communicated to the client.

(c)     A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. Promptly after a lawyer has been employed in a contingent fee matter, the lawyer shall provide the client with a writing stating the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or, if not prohibited by statute or court rule, after the contingent fee is calculated. The writing must clearly notify the client of any expenses for which the client will be liable regardless of whether the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a writing stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d)     A lawyer shall not enter into an arrangement for, charge or collect:

(1)     a contingent fee for representing a defendant in a criminal matter;

(2)     a fee prohibited by law or rule of court;

(3)     a fee based on fraudulent billing;

(4)     a nonrefundable retainer fee; provided that a lawyer may enter into a retainer agreement with a client containing a reasonable minimum fee clause if it defines in plain language and sets forth the circumstances under which such fee may be incurred and how it will be calculated; or

(5)     any fee in a domestic relations matter if:

(i)     the payment or amount of the fee is contingent upon the securing of a divorce or of obtaining child custody or visitation or is in any way determined by reference to the amount of maintenance, support, equitable distribution, or property settlement;

     **(ii)**    **a written retainer agreement has not been signed by the lawyer and client setting forth in plain language the nature of the relationship and the details of the fee arrangement; or**

     **(iii)**    **the written retainer agreement includes a security interest, confession of judgment or other lien without prior notice being provided to the client in a signed retainer agreement and approval from a tribunal after notice to the adversary. A lawyer shall not foreclose on a mortgage placed on the marital residence while the spouse who consents to the mortgage remains the titleholder and the residence remains the spouse's primary residence.**

     **(e)**    **In domestic relations matters, a lawyer shall provide a prospective client with a Statement of Client's Rights and Responsibilities at the initial conference and prior to the signing of a written retainer agreement.**

     **(f)**    **Where applicable, a lawyer shall resolve fee disputes by arbitration at the election of the client pursuant to a fee arbitration program established by the Chief Administrator of the Courts and approved by the Administrative Board of the Courts.**

     **(g)**    **A lawyer shall not divide a fee for legal services with another lawyer who is not associated in the same law firm unless:**

     **(1)**    **the division is in proportion to the services performed by each lawyer or, by a writing given to the client, each lawyer assumes joint responsibility for the representation;**

     **(2)**    **the client agrees to employment of the other lawyer after a full disclosure that a division of fees will be made, including the share each lawyer will receive, and the client's agreement is confirmed in writing; and**

     **(3)**    **the total fee is not excessive.**

     **(h)**    **Rule 1.5(g) does not prohibit payment to a lawyer formerly associated in a law firm pursuant to a separation or retirement agreement.**

**Comment**

[1]     Paragraph (a) requires that lawyers not charge fees that are excessive or illegal under the circumstances. The factors specified in paragraphs (a)(1) through (a)(8) are not exclusive, nor will each factor be relevant in each instance. The time and labor required for a matter may be affected by the actions of the lawyer's own client or by those of the opposing party and counsel. Paragraph (a) also requires that expenses for which the client will be charged must not be excessive or illegal. A lawyer may seek payment for services performed in-house, such as copying, or for other expenses incurred in-house, such as telephone charges, either by charging an amount to which the client has agreed in advance or by charging an amount that reflects the cost incurred by the lawyer, provided in either case that the amount charged is not excessive.

[1A]   A billing is fraudulent if it is knowingly and intentionally based on false or inaccurate information. Thus, under an hourly billing arrangement, it would be fraudulent to knowingly and intentionally charge a client for more than the actual number of hours spent by the lawyer on the client's matter; similarly, where the client has agreed to pay the lawyer's cost of in-house services, such as for photocopying or telephone calls, it would be fraudulent knowingly and intentionally to charge a client more than the actual costs incurred. Fraudulent billing requires an element of scienter and does not include inaccurate billing due to an innocent mistake.

[1B]   A supervising lawyer who submits a fraudulent bill for fees or expenses to a client based on submissions by a subordinate lawyer has not automatically violated this Rule. In this situation, whether the lawyer is responsible for a violation must be determined by reference to Rules 5.1, 5.2 and 5.3. As noted in Comment [8] to Rule 5.1, nothing in that Rule alters the personal duty of each lawyer in a firm to abide by these Rules and in some situations, other Rules may impose upon a supervising lawyer a duty to ensure that the books and records of a firm are accurate. *See* Rule 1.15(j).

**Basis or Rate of Fee**

[2]     When the lawyer has regularly represented a client, they ordinarily will have evolved an understanding concerning the basis or rate of the fee and the expenses for which the client will be responsible. In a new clientlawyer relationship, however, an understanding as to fees and expenses must be promptly established. Court rules regarding engagement letters require that such an understanding be memorialized in writ-

ing in certain cases. *See* 22 N.Y.C.R.R. Part 1215. Even where not required, it is desirable to furnish the client with at least a simple memorandum or copy of the lawyer's customary fee arrangements that states the general nature of the legal services to be provided, the basis, rate or total amount of the fee, and whether and to what extent the client will be responsible for any costs, expenses or disbursements in the course of the representation. A written statement concerning the terms of the engagement reduces the possibility of misunderstanding.

[3]     Contingent fees, like any other fees, are subject to the excessiveness standard of paragraph (a). In determining whether a particular contingent fee is excessive, or whether it is excessive to charge any form of contingent fee, a lawyer must consider the factors that are relevant under the circumstances. Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage allowable, or may regulate the type or amount of the fee that may be charged.

**Terms of Payment**

[4]     A lawyer may require advance payment of a fee, but is obliged to return any unearned portion. *See* Rule 1.16(e). A lawyer may charge a minimum fee, if that fee is not excessive, and if the wording of the minimum fee clause of the retainer agreement meets the requirements of paragraph (d)(4). A lawyer may accept property in payment for services, such as an ownership interest in an enterprise, providing this does not involve acquisition of a proprietary interest in the cause of action or subject matter of the litigation contrary to Rule 1.8(i). A fee paid in property instead of money may, however, be subject to the requirements of Rule 1.8(a), because such fees often have the essential qualities of a business transaction with the client.

[5]     An agreement may not be made if its terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction. In matters in litigation, the court's approval for the lawyer's withdrawal may be required. *See* Rule 1.16(d). It is proper, however, to define the extent of services in light of the client's ability to pay. A lawyer should not exploit a fee arrangement based primarily on hourly charges by using wasteful procedures.

[5A]   The New York Court Rules require every lawyer with an office located in New York to post in that office, in a manner visible to clients of the lawyer, a "Statement of Client's Rights." See 22 N.Y.C.R.R. § 1210.1. Paragraph (e) requires a lawyer in a domestic relations matter, as defined in Rule 1.0(g), to provide a prospective client with the "Statement of Client's Rights and Responsibilities," as further set forth in 22 N.Y.C.R.R. § 1400.2, at the initial conference and, in any event, prior to the signing of a written retainer agreement.

### Prohibited Contingent Fees

[6]   Paragraph (d) prohibits a lawyer from charging a contingent fee in a domestic relations matter when payment is contingent upon the securing of a divorce or upon the amount of alimony or support or property settlement to be obtained or upon obtaining child custody or visitation. This provision also precludes a contract for a contingent fee for legal representation in connection with the recovery of post-judgment balances due under support, alimony or other financial orders. *See* Rule 1.0(g) (defining "domestic relations matter" to include an action to enforce such a judgment).

### Division of Fee

[7]   A division of fee is a single billing to a client covering the fee of two or more lawyers who are not affiliated in the same firm. A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well. Paragraph (g) permits the lawyers to divide a fee either on the basis of the proportion of services they render or if each lawyer assumes responsibility for the representation as a whole in a writing given to the client. In addition, the client must agree to the arrangement, including the share that each lawyer is to receive, and the client's agreement must be confirmed in writing. Contingent fee arrangements must comply with paragraph (c). Joint responsibility for the representation entails financial and ethical responsibility for the representation as if the lawyers were associated in a partnership. *See* Rule 5.1. A lawyer should refer a matter only to a lawyer who the referring lawyer reasonably believes is competent to handle the matter. *See* Rule 1.1.

[8]   Paragraph (g) does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm. Paragraph (h) recognizes that this Rule does not prohibit payment to a previously associated lawyer pursuant to a separation or retirement agreement.

**Disputes over Fees**

[9]     A lawyer should seek to avoid controversies over fees with clients and should attempt to resolve amicably any differences on the subject. The New York courts have established a procedure for resolution of fee disputes through arbitration and the lawyer must comply with the procedure when it is mandatory. Even when it is voluntary, the lawyer should conscientiously consider submitting to it.

# RULE 1.6

## CONFIDENTIALITY OF INFORMATION

**(a)    A lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person, unless:**

   **(1)    the client gives informed consent, as defined in Rule 1.0(j);**

   **(2)    the disclosure is impliedly authorized to advance the best interests of the client and is either reasonable under the circumstances or customary in the professional community; or**

   **(3)    the disclosure is permitted by paragraph (b).**

**"Confidential information" consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential. "Confidential information" does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates.**

**(b)    A lawyer may reveal or use confidential information to the extent that the lawyer reasonably believes necessary:**

   **(1)    to prevent reasonably certain death or substantial bodily harm;**

   **(2)    to prevent the client from committing a crime;**

   **(3)    to withdraw a written or oral opinion or representation previously given by the lawyer and reasonably believed by the lawyer still to be relied upon by a third person, where the lawyer has discovered that the opinion or representation was based on materially inaccurate information or is being used to further a crime or fraud;**

      **(4)** **to secure legal advice about compliance with these Rules or other law by the lawyer, another lawyer associated with the lawyer's firm or the law firm;**

      **(5)** **(i)** **to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct; or**

      **(ii)** **to establish or collect a fee; or**

      **(6)** **when permitted or required under these Rules or to comply with other law or court order.**

    **(c)** **A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure or use of, or unauthorized access to, information protected by Rules 1.6, 1.9(c), or 1.18(b).**

**Comment**

**Scope of the Professional Duty of Confidentiality**

    [1]    This Rule governs the disclosure of information protected by the professional duty of confidentiality. Such information is described in these Rules as "confidential information" as defined in this Rule. Other rules also deal with confidential information. See Rules 1.8(b) and 1.9(c)(1) for the lawyer's duties with respect to the use of such information to the disadvantage of clients and former clients; Rule 1.9(c)(2) for the lawyer's duty not to reveal information relating to the lawyer's prior representation of a former client; Rule 1.14(c) for information relating to representation of a client with diminished capacity; Rule 1.18(b) for the lawyer's duties with respect to information provided to the lawyer by a prospective client; Rule 3.3 for the lawyer's duty of candor to a tribunal; and Rule 8.3(c) for information gained by a lawyer or judge while participating in an approved lawyer assistance program.

    [2]    A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, or except as permitted or required by these Rules, the lawyer must not knowingly reveal information gained during and related to the representation, whatever its source. See Rule 1.0(j) for the definition of informed consent. The lawyer's duty of confidentiality contributes to the trust that is the hallmark of the client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer,

even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Typically, clients come to lawyers to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is thereby upheld.

[3]    The principle of client-lawyer confidentiality is given effect in three related bodies of law: the attorney-client privilege of evidence law, the work-product doctrine of civil procedure and the professional duty of confidentiality established in legal ethics codes. The attorney-client privilege and the work-product doctrine apply when compulsory process by a judicial or other governmental body seeks to compel a lawyer to testify or produce information or evidence concerning a client. The professional duty of client-lawyer confidentiality, in contrast, applies to a lawyer in all settings and at all times, prohibiting the lawyer from disclosing confidential information unless permitted or required by these Rules or to comply with other law or court order. The confidentiality duty applies not only to matters communicated in confidence by the client, which are protected by the attorney-client privilege, but also to all information gained during and relating to the representation, whatever its source. The confidentiality duty, for example, prohibits a lawyer from volunteering confidential information to a friend or to any other person except in compliance with the provisions of this Rule, including the Rule's reference to other law that may compel disclosure. *See* Comments [12]-[13]; *see also* Scope.

[4]    Paragraph (a) prohibits a lawyer from knowingly revealing confidential information as defined by this Rule. This prohibition also applies to disclosures by a lawyer that do not in themselves reveal confidential information but could reasonably lead to the discovery of such information by a third person. A lawyer's use of a hypothetical to discuss issues relating to the representation with persons not connected to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client.

[4A]    Paragraph (a) protects all factual information "gained during or relating to the representation of a client." Information relates to the representation if it has any possible relevance to the representation or is received because of the representation. The accumulation of legal knowledge or legal research that a lawyer acquires through practice ordinarily is not client information protected by this Rule. However, in some

circumstances, including where the client and the lawyer have so agreed, a client may have a proprietary interest in a particular product of the lawyer's research. Information that is generally known in the local community or in the trade, field or profession to which the information relates is also not protected, unless the client and the lawyer have otherwise agreed. Information is not "generally known" simply because it is in the public domain or available in a public file.

### Use of Information Related to Representation

[4B]  The duty of confidentiality also prohibits a lawyer from using confidential information to the advantage of the lawyer or a third person or to the disadvantage of a client or former client unless the client or former client has given informed consent. See Rule 1.0(j) for the definition of "informed consent." This part of paragraph (a) applies when information is used to benefit either the lawyer or a third person, such as another client, a former client or a business associate of the lawyer. For example, if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not (absent the client's informed consent) use that information to buy a nearby parcel that is expected to appreciate in value due to the client's purchase, or to recommend that another client buy the nearby land, even if the lawyer does not reveal any confidential information. The duty also prohibits disadvantageous use of confidential information unless the client gives informed consent, except as permitted or required by these Rules. For example, a lawyer assisting a client in purchasing a parcel of land may not make a competing bid on the same land. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client, even to the disadvantage of the former client, after the client-lawyer relationship has terminated. *See* Rule 1.9(c)(1).

### Authorized Disclosure

[5]  Except to the extent that the client's instructions or special circumstances limit that authority, a lawyer may make disclosures of confidential information that are impliedly authorized by a client if the disclosures (i) advance the best interests of the client and (ii) are either reasonable under the circumstances or customary in the professional community. In some situations, for example, a lawyer may be impliedly authorized to admit a fact that cannot properly be disputed or to make a disclosure that facilitates a satisfactory conclusion to a matter. In addition, lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client has

instructed that particular information be confined to specified lawyers. Lawyers are also impliedly authorized to reveal information about a client with diminished capacity when necessary to take protective action to safeguard the client's interests. See Rules 1.14(b) and (c).

**Disclosure Adverse to Client**

[6]    Although the public interest is usually best served by a strict rule requiring lawyers to preserve the confidentiality of information relating to the representation of their clients, the confidentiality rule is subject to limited exceptions that prevent substantial harm to important interests, deter wrongdoing by clients, prevent violations of the law, and maintain the impartiality and integrity of judicial proceedings. Paragraph (b) permits, but does not require, a lawyer to disclose information relating to the representation to accomplish these specified purposes.

[6A]   The lawyer's exercise of discretion conferred by paragraphs (b)(1) through (b)(3) requires consideration of a wide range of factors and should therefore be given great weight. In exercising such discretion under these paragraphs, the lawyer should consider such factors as: (i) the seriousness of the potential injury to others if the prospective harm or crime occurs, (ii) the likelihood that it will occur and its imminence, (iii) the apparent absence of any other feasible way to prevent the potential injury, (iv) the extent to which the client may be using the lawyer's services in bringing about the harm or crime, (v) the circumstances under which the lawyer acquired the information of the client's intent or prospective course of action, and (vi) any other aggravating or extenuating circumstances. In any case, disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to prevent the threatened harm or crime. When a lawyer learns that a client intends to pursue or is pursuing a course of conduct that would permit disclosure under paragraphs (b)(1), (b)(2) or (b)(3), the lawyer's initial duty, where practicable, is to remonstrate with the client. In the rare situation in which the client is reluctant to accept the lawyer's advice, the lawyer's threat of disclosure is a measure of last resort that may persuade the client. When the lawyer reasonably believes that the client will carry out the threatened harm or crime, the lawyer may disclose confidential information when permitted by paragraphs (b)(1), (b)(2) or (b)(3). A lawyer's permissible disclosure under paragraph (b) does not waive the client's attorney-client privilege; neither the lawyer nor the client may be forced to testify about communications protected by the privilege, unless a tribunal or body with authority to compel testimony makes a determination that the crime-fraud exception to the privilege, or some other exception,

has been satisfied by a party to the proceeding. For a lawyer's duties when representing an organizational client engaged in wrongdoing, see Rule 1.13(b).

[6B]   Paragraph (b)(1) recognizes the overriding value of life and physical integrity and permits disclosure reasonably necessary to prevent reasonably certain death or substantial bodily harm. Such harm is reasonably certain to occur if it will be suffered imminently or if there is a present and substantial risk that a person will suffer such harm at a later date if the lawyer fails to take action necessary to eliminate the threat. Thus, a lawyer who knows that a client has accidentally discharged toxic waste into a town's water supply may reveal this information to the authorities if there is a present and substantial risk that a person who drinks the water will contract a life-threatening or debilitating disease and the lawyer's disclosure is necessary to eliminate the threat or reduce the number of victims. Wrongful execution of a person is a life-threatening and imminent harm under paragraph (b)(1) once the person has been convicted and sentenced to death. On the other hand, an event that will cause property damage but is unlikely to cause substantial bodily harm is not a present and substantial risk under paragraph (b)(1); similarly, a remote possibility or small statistical likelihood that any particular unit of a mass-distributed product will cause death or substantial bodily harm to unspecified persons over a period of years does not satisfy the element of reasonably certain death or substantial bodily harm under the exception to the duty of confidentiality in paragraph (b)(1).

[6C]   Paragraph (b)(2) recognizes that society has important interests in preventing a client's crime. Disclosure of the client's intention is permitted to the extent reasonably necessary to prevent the crime. In exercising discretion under this paragraph, the lawyer should consider such factors as those stated in Comment [6A].

[6D]   Some crimes, such as criminal fraud, may be ongoing in the sense that the client's past material false representations are still deceiving new victims. The law treats such crimes as continuing crimes in which new violations are constantly occurring. The lawyer whose services were involved in the criminal acts that constitute a continuing crime may reveal the client's refusal to bring an end to a continuing crime, even though that disclosure may also reveal the client's past wrongful acts, because refusal to end a continuing crime is equivalent to an intention to commit a new crime. Disclosure is not permitted under paragraph (b)(2), however, when a person who may have committed a crime employs a new lawyer for investigation or defense. Such a lawyer does not have discretion under

paragraph (b)(2) to use or disclose the client's past acts that may have continuing criminal consequences. Disclosure is permitted, however, if the client uses the new lawyer's services to commit a further crime, such as obstruction of justice or perjury.

[6E]    Paragraph (b)(3) permits a lawyer to withdraw a legal opinion or to disaffirm a prior representation made to third parties when the lawyer reasonably believes that third persons are still relying on the lawyer's work and the work was based on "materially inaccurate information or is being used to further a crime or fraud." *See* Rule 1.16(b)(1), requiring the lawyer to withdraw when the lawyer knows or reasonably should know that the representation will result in a violation of law. Paragraph (b)(3) permits the lawyer to give only the limited notice that is implicit in withdrawing an opinion or representation, which may have the collateral effect of inferentially revealing confidential information. The lawyer's withdrawal of the tainted opinion or representation allows the lawyer to prevent further harm to third persons and to protect the lawyer's own interest when the client has abused the professional relationship, but paragraph (b)(3) does not permit explicit disclosure of the client's past acts unless such disclosure is permitted under paragraph (b)(2).

[7]    [Reserved.]

[8]    [Reserved.]

[9]    A lawyer's confidentiality obligations do not preclude a lawyer from securing confidential legal advice about compliance with these Rules and other law by the lawyer, another lawyer in the lawyer's firm, or the law firm. In many situations, disclosing information to secure such advice will be impliedly authorized for the lawyer to carry out the representation. Even when the disclosure is not impliedly authorized, paragraph (b)(4) permits such disclosure because of the importance of a lawyer's compliance with these Rules, court orders and other law.

[10]    Where a claim or charge alleges misconduct of the lawyer related to the representation of a current or former client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. Such a claim can arise in a civil, criminal, disciplinary or other proceeding and can be based on a wrong allegedly committed by the lawyer against the client or on a wrong alleged by a third person, such as a person claiming to have been defrauded by the lawyer and client acting together or by the lawyer acting alone. The lawyer may respond directly to the person who has made an accusation that permits disclosure, pro-

vided that the lawyer's response complies with Rule 4.2 and Rule 4.3, and other Rules or applicable law. A lawyer may make the disclosures authorized by paragraph (b)(5) through counsel. The right to respond also applies to accusations of wrongful conduct concerning the lawyer's law firm, employees or associates.

[11]    A lawyer entitled to a fee is permitted by paragraph (b)(5) to prove the services rendered in an action to collect it. This aspect of the rule expresses the principle that the beneficiary of a fiduciary relationship may not exploit it to the detriment of the fiduciary.

[12]    Paragraph (b) does not mandate any disclosures. However, other law may require that a lawyer disclose confidential information. Whether such a law supersedes Rule 1.6 is a question of law beyond the scope of these Rules. When disclosure of confidential information appears to be required by other law, the lawyer must consult with the client to the extent required by Rule 1.4 before making the disclosure, unless such consultation would be prohibited by other law. If the lawyer concludes that other law supersedes this Rule and requires disclosure, paragraph (b)(6) permits the lawyer to make such disclosures as are necessary to comply with the law.

[13]    A tribunal or governmental entity claiming authority pursuant to other law to compel disclosure may order a lawyer to reveal confidential information. Absent informed consent of the client to comply with the order, the lawyer should assert on behalf of the client nonfrivolous arguments that the order is not authorized by law, the information sought is protected against disclosure by an applicable privilege or other law, or the order is invalid or defective for some other reason. In the event of an adverse ruling, the lawyer must consult with the client to the extent required by Rule 1.4 about the possibility of an appeal or further challenge, unless such consultation would be prohibited by other law. If such review is not sought or is unsuccessful, paragraph (b)(6) permits the lawyer to comply with the order.

[14]    Paragraph (b) permits disclosure only to the extent the lawyer reasonably believes the disclosure is necessary to accomplish one of the purposes specified in paragraphs (b)(1) through (b)(6). Before making a disclosure, the lawyer should, where practicable, first seek to persuade the client to take suitable action to obviate the need for disclosure. In any case, a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to accomplish the purpose, particularly when accusations of wrongdoing in the representation of a client

have been made by a third party rather than by the client. If the disclosure will be made in connection with an adjudicative proceeding, the disclosure should be made in a manner that limits access to the information to the tribunal or other persons having a need to know the information, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.

[15]    Paragraph (b) permits but does not require the disclosure of information relating to a client's representation to accomplish the purposes specified in paragraphs (b)(1) through (b)(6). A lawyer's decision not to disclose as permitted by paragraph (b) does not violate this Rule. Disclosure may, however, be required by other Rules or by other law. *See* Comments [12]-[13]. Some Rules require disclosure only if such disclosure would be permitted by paragraph (b). *E.g.*, Rule 8.3(c)(1). Rule 3.3(c), on the other hand, requires disclosure in some circumstances whether or not disclosure is permitted or prohibited by this Rule.

**Withdrawal**

[15A] If the lawyer's services will be used by the client in materially furthering a course of criminal or fraudulent conduct, the lawyer must withdraw pursuant to Rule 1.16(b)(1). Withdrawal may also be required or permitted for other reasons under Rule 1.16. After withdrawal, the lawyer is required to refrain from disclosing or using information protected by Rule 1.6, except as this Rule permits such disclosure. Neither this Rule, nor Rule 1.9(c), nor Rule 1.16(e) prevents the lawyer from giving notice of the fact of withdrawal. For withdrawal or disaffirmance of an opinion or representation, see paragraph (b)(3) and Comment [6E]. Where the client is an organization, the lawyer may be in doubt whether the organization will actually carry out the contemplated conduct. Where necessary to guide conduct in connection with this Rule, the lawyer may, and sometimes must, make inquiry within the organization. *See* Rules 1.13(b) and (c).

**Duty to Preserve Confidentiality**

[16]    Paragraph (c) imposes three related obligations. It requires a lawyer to make reasonable efforts to safeguard confidential information against unauthorized access by third parties and against inadvertent or unauthorized disclosure by the lawyer or other persons who are participating in the representation of the client or who are otherwise subject to the lawyer's supervision. See Rules 1.1, 5.1 and 5.3. Confidential information includes not only information protected by Rule 1.6(a) with respect to

current clients but also information protected by Rule 1.9(c) with respect to former clients and information protected by Rule 1.18(b) with respect to prospective clients. Unauthorized access to, or the inadvertent or unauthorized disclosure of, information protected by Rules 1.6, 1.9, or 1.18, does not constitute a violation of paragraph (c) if the lawyer has made reasonable efforts to prevent the unauthorized access or disclosure. Factors to be considered in determining the reasonableness of the lawyer's efforts include, but are not limited to: (i) the sensitivity of the information; (ii) the likelihood of disclosure if additional safeguards are not employed; (iii) the cost of employing additional safeguards; (iv) the difficulty of implementing the safeguards; and (v) the extent to which the safeguards adversely affect the lawyer's ability to represent clients (*e.g.,* by making a device or software excessively difficult to use). A client may require the lawyer to implement special security measures not required by this Rule, or may give informed consent to forgo security measures that would otherwise be required by this Rule. For a lawyer's duties when sharing information with nonlawyers inside or outside the lawyer's own firm, see Rule 5.3, Comment [2].

[17]   When transmitting a communication that includes information relating to the representation of a client, the lawyer must take reasonable precautions to prevent the information from coming into the hands of unintended recipients. Paragraph (c) does not ordinarily require that the lawyer use special security measures if the method of communication affords a reasonable expectation of confidentiality. However, a lawyer may be required to take specific steps to safeguard a client's information to comply with a court order (such as a protective order) or to comply with other law (such as state and federal laws or court rules that govern data privacy or that impose notification requirements upon the loss of, or unauthorized access to, electronic information). For example, a protective order may extend a high level of protection to documents marked "Confidential" or "Confidential—Attorneys' Eyes Only"; the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") may require a lawyer to take specific precautions with respect to a client's or adversary's medical records; and court rules may require a lawyer to block out a client's Social Security number or a minor's name when electronically filing papers with the court. The specific requirements of court orders, court rules, and other laws are beyond the scope of these Rules.

**Lateral Moves, Law Firm Mergers, and Confidentiality**

[18A] When lawyers or law firms (including in-house legal departments) contemplate a new association with other lawyers or law firms though lateral hiring or merger, disclosure of limited information may be necessary to resolve conflicts of interest pursuant to Rule 1.10 and to address financial, staffing, operational, and other practical issues. However, Rule 1.6(a) requires lawyers and law firms to protect their clients' confidential information, so lawyers and law firms may not disclose such information for their own advantage or for the advantage of third parties absent a client's informed consent or some other exception to Rule 1.6.

[18B] Disclosure without client consent in the context of a possible lateral move or law firm merger is ordinarily permitted regarding basic information such as: (i) the identities of clients or other parties involved in a matter; (ii) a brief summary of the status and nature of a particular matter, including the general issues involved; (iii) information that is publicly available; (iv) the lawyer's total book of business; (v) the financial terms of each lawyer-client relationship; and (vi) information about aggregate current and historical payment of fees (such as realization rates, average receivables, and aggregate timeliness of payments). Such information is generally not "confidential information" within the meaning of Rule 1.6.

[18C] Disclosure without client consent in the context of a possible lateral move or law firm merger is ordinarily *not* permitted, however, if information is protected by Rule 1.6(a), 1.9(c), or Rule 1.18(b). This includes information that a lawyer knows or reasonably believes is protected by the attorney-client privilege, or is likely to be detrimental or embarrassing to the client, or is information that the client has requested be kept confidential. For example, many clients would not want their lawyers to disclose their tardiness in paying bills; the amounts they spend on legal fees in particular matters; forecasts about their financial prospects; or information relating to sensitive client matters (e.g., an unannounced corporate takeover, an undisclosed possible divorce, or a criminal investigation into the client's conduct).

[18D] When lawyers are exploring a new association, whether by lateral move or by merger, all lawyers involved must individually consider fiduciary obligations to their existing firms that may bear on the timing and scope of disclosures to clients relating to conflicts and financial concerns, and should consider whether to ask clients for a waiver of confiden-

tiality if consistent with these fiduciary duties—*see* Rule 1.10(e) (requiring law firms to check for conflicts of interest). Questions of fiduciary duty are legal issues beyond the scope of the Rules.

[18E] For the unique confidentiality and notice provisions that apply to a lawyer or law firm seeking to sell all or part of its practice, see Rule 1.17 and Comment [7] to that Rule.

[18F] Before disclosing information regarding a possible lateral move or law firm merger, law firms and lawyers moving between firms— both those providing information and those receiving information— should use reasonable measures to minimize the risk of any improper, unauthorized or inadvertent disclosures, whether or not the information is protected by Rule 1.6(a), 1.9(c), or 1.18(b). These steps might include such measures as: (1) disclosing client information in stages; initially identifying only certain clients and providing only limited information, and providing a complete list of clients and more detailed financial information only at subsequent stages; (2) limiting disclosure to those at the firm, or even a single person at the firm, directly involved in clearing conflicts and making the business decision whether to move forward to the next stage regarding the lateral hire or law firm merger; and/or (3) agreeing not to disclose financial or conflict information outside the firm(s) during and after the lateral hiring negotiations or merger process.

# RULE 1.7

## CONFLICT OF INTEREST: CURRENT CLIENTS

**(a)** **Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:**

**(1)** **the representation will involve the lawyer in representing differing interests; or**

**(2)** **there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.**

**(b)** **Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:**

**(1)** **the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;**

**(2)** **the representation is not prohibited by law;**

**(3)** **the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and**

**(4)** **each affected client gives informed consent, confirmed in writing.**

**Comment**

**General Principles**

[1]     Loyalty and independent judgment are essential aspects of a lawyer's relationship with a client. The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Concurrent conflicts of interest, which can impair a lawyer's professional judgment, can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests. A lawyer should not permit these competing responsibilities or interests to impair the law-

yer's ability to exercise professional judgment on behalf of each client. For specific Rules regarding certain concurrent conflicts of interest, see Rule 1.8. For former client conflicts of interest, see Rule 1.9. For conflicts of interest involving prospective clients, see Rule 1.18. For definitions of "differing interests," "informed consent" and "confirmed in writing," see Rules 1.0(f), (j) and (e), respectively.

[2]    Resolution of a conflict of interest problem under this Rule requires the lawyer, acting reasonably, to: (i) identify clearly the client or clients, (ii) determine whether a conflict of interest exists, *i.e.*, whether the lawyer's judgment may be impaired or the lawyer's loyalty may be divided if the lawyer accepts or continues the representation, (iii) decide whether the representation may be undertaken despite the existence of a conflict, *i.e.*, whether the conflict is consentable under paragraph (b); and if so (iv) consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include all of the clients who may have differing interests under paragraph (a)(1) and any clients whose representation might be adversely affected under paragraph (a)(2).

[3]    A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). *See* Rule 1.10(e), which requires every law firm to create, implement and maintain a conflict-checking system.

[4]    If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). *See* Rule 1.16(b)(1). Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. *See* Rule 1.9; *see also* Comments [5], [29A].

[5]    Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is acquired by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The lawyer

must seek court approval where necessary and take steps to minimize harm to the clients. See Rules 1.16(d) and (e). The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. *See* Rule 1.9(c).

**Identifying Conflicts of Interest**

[6]     The duty to avoid the representation of differing interest prohibits, among other things, undertaking representation adverse to a current client without that client's informed consent. For example, absent consent, a lawyer may not advocate in one matter against another client that the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is adverse is likely to feel betrayed and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken may reasonably fear that the lawyer will pursue that client's case less effectively out of deference to the other client, that is, that the lawyer's exercise of professional judgment on behalf of that client will be adversely affected by the lawyer's interest in retaining the current client. Similarly, a conflict may arise when a lawyer is required to cross-examine a client appearing as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client represented in the lawsuit. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

[7]     Differing interests can also arise in transactional matters. For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.

[8]     Differing interests exist if there is a significant risk that a lawyer's exercise of professional judgment in considering, recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests. For example, the professional judgment of a lawyer asked to represent several individuals operating a joint venture is likely to be adversely affected to the extent that the lawyer is unable to recommend or advocate all possible positions

that each client might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will adversely affect the lawyer's professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

**Lawyer's Responsibilities to Former Clients and Other Third Persons**

[9]    In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be adversely affected by responsibilities to former clients under Rule 1.9, or by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.

**Personal-Interest Conflicts**

[10]    The lawyer's own financial, property, business or other personal interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client or with a law firm representing the opponent, such discussions could materially limit the lawyer's representation of the client. In addition, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. *See* Rule 5.7 on responsibilities regarding nonlegal services and Rule 1.8 pertaining to a number of personal-interest conflicts, including business transactions with clients.

[11]    When lawyers representing different clients in the same matter or in substantially related matters are closely related, there may be a significant risk that client confidences will be revealed and that the lawyer's family relationship will interfere with both loyalty and professional judgment. As a result, each client is entitled to know of the existence and implications of the relationship between the lawyers, before the lawyer agrees to undertake the representation. Thus, a lawyer who has a significant intimate or close family relationship with another lawyer ordinarily

may not represent a client in a matter where that other lawyer is representing another party, unless each client gives informed consent, as defined in Rule 1.0(j).

[12]   A lawyer is prohibited from engaging in sexual relations with a client in domestic relations matters. In all other matters a lawyer's sexual relations with a client are circumscribed by the provisions of Rule 1.8(j).

**Interest of Person Paying for Lawyer's Services**

[13]   A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's exercise of professional judgment on behalf of a client will be adversely affected by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

**Prohibited Representations**

[14]   Ordinarily, clients may consent to representation notwithstanding a conflict. As paragraph (b) indicates, however, some conflicts are nonconsentable. If a lawyer does not reasonably believe that the conditions set forth in paragraph (b) can be met, the lawyer should neither ask for the client's consent nor provide representation on the basis of the client's consent. A client's consent to a nonconsentable conflict is ineffective. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15]   Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), notwithstanding client consent, a representation is prohibited if, in the circumstances, the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See Rule 1.1 regarding competence and Rule 1.3 regarding diligence.

[16]    Paragraph (b)(2) describes conflicts that are nonconsentable because the representation is prohibited by applicable law. For example, federal criminal statutes prohibit certain representations by a former government lawyer despite the informed consent of the former governmental client. In addition, there are some instances where conflicts are nonconsentable under decisional law.

[17]    Paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal. Whether clients are aligned directly against each other within the meaning of this paragraph requires examination of the context of the proceeding. Although this paragraph does not preclude a lawyer's multiple representation of adverse parties to mediation (because mediation is not a proceeding before a "tribunal" as defined in Rule 1.0(w)), such representation may be precluded by paragraph (b)(1).

## Informed Consent

[18]    Informed consent requires that each affected client be aware of the relevant circumstances, including the material and reasonably foreseeable ways that the conflict could adversely affect the interests of that client. Informed consent also requires that the client be given the opportunity to obtain other counsel if the client so desires. *See* Rule 1.0(j). The information that a lawyer is required to communicate to a client depends on the nature of the conflict and the nature of the risks involved, and a lawyer should take into account the sophistication of the client in explaining the potential adverse consequences of the conflict. There are circumstances in which it is appropriate for a lawyer to advise a client to seek the advice of a disinterested lawyer in reaching a decision as to whether to consent to the conflict. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege, and the advantages and risks involved. *See* Comments [30] and [31] concerning the effect of common representation on confidentiality.

[19]    Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one client refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent. In

some cases the alternative to common representation is that each party obtains separate representation with the possibility of incurring additional costs. These costs, along with the benefits of securing separate representation, are factors that may be considered by the affected client in determining whether common representation is in the client's interests. Where the fact, validity or propriety of client consent is called into question, the lawyer has the burden of establishing that the client's consent was properly obtained in accordance with the Rule.

### Client Consent Confirmed in Writing

[20]    Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of (i) a document from the client, (ii) a document that the lawyer promptly transmits to the client confirming an oral informed consent, or (iii) a statement by the client made on the record of any proceeding before a tribunal, whether before, during or after a trial or hearing. *See* Rule 1.0(e) for the definition of "confirmed in writing." *See also* Rule 1.0(x) ("writing" includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. The Rule does not require that the information communicated to the client by the lawyer necessary to make the consent "informed" be in writing or in any particular form in all cases. *See* Rules 1.0(e) and (j). The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing. *See* Comment [18].

### Revoking Consent

[21]    A client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to the client's own representation precludes the lawyer from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other clients, and whether material detriment to the other clients or the lawyer would result.

**Consent to Future Conflict**

[22] Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the conditions set forth in paragraph (b). The effectiveness of advance waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. At a minimum, the client should be advised generally of the types of possible future adverse representations that the lawyer envisions, as well as the types of clients and matters that may present such conflicts. The more comprehensive the explanation and disclosure of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the understanding necessary to make the consent "informed" and the waiver effective. *See* Rule 1.0(j). The lawyer should also disclose the measures that will be taken to protect the client should a conflict arise, including procedures such as screening that would be put in place. *See* Rule 1.0(t) for the definition of "screening." The adequacy of the disclosure necessary to obtain valid advance consent to conflicts may also depend on the sophistication and experience of the client. For example, if the client is unsophisticated about legal matters generally or about the particular type of matter at hand, the lawyer should provide more detailed information about both the nature of the anticipated conflict and the adverse consequences to the client that may ensue should the potential conflict become an actual one. In other instances, such as where the client is a child or an incapacitated or impaired person, it may be impossible to inform the client sufficiently, and the lawyer should not seek an advance waiver. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, an advance waiver is more likely to be effective, particularly if, for example, the client is independently represented or advised by in-house or other counsel in giving consent. Thus, in some circumstances, even general and open-ended waivers by experienced users of legal services may be effective.

[22A] Even if a client has validly consented to waive future conflicts, however, the lawyer must reassess the propriety of the adverse concurrent representation under paragraph (b) when an actual conflict arises. If the actual conflict is materially different from the conflict that has been waived, the lawyer may not rely on the advance consent previously obtained. Even if the actual conflict is not materially different from the conflict the client has previously waived, the client's advance consent

cannot be effective if the particular circumstances that have created an actual conflict during the course of the representation would make the conflict nonconsentable under paragraph (b). *See* Comments [14]–[17] and [28] addressing nonconsentable conflicts.

**Conflicts in Litigation**

[23]    Paragraph (b)(3) prohibits representation of opposing parties in the same litigation, regardless of the clients' consent. On the other hand, simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(1). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal as well as civil cases. Some examples are those in which a lawyer is asked to represent co-defendants in a criminal case, co-plaintiffs or co-defendants in a personal injury case, an insured and insurer, or beneficiaries of the estate of a decedent. In a criminal case, the potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, multiple representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.

[24]    Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest. A conflict of interest exists, however, if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's representation of another client in a different case; for example, when a decision favoring one client will create a precedent likely to weaken seriously the position taken on behalf of the other client. Factors relevant in determining whether the clients need to be advised of this risk include: (i) where the cases are pending, (ii) whether the issue is substantive or procedural, (iii) the temporal relationship between the matters, (iv) the significance of the issue to the immediate and long-term interests of the clients involved, and (v) the clients' reasonable expectations in retaining the lawyer. Similar concerns may be present when lawyers advocate on behalf of clients before other entities, such as regulatory authorities whose regulations or rulings may significantly implicate clients' interests. If there is significant

risk of an adverse effect on the lawyer's professional judgment, then absent informed consent of the affected clients, the lawyer must decline the representation.

[25]   When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1). Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter. Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter.

**Nonlitigation Conflicts**

[26]   Conflicts of interest under paragraph (a)(1) arise in contexts other than litigation. For a discussion of such conflicts in transactional matters, see Comment [7]. Regarding paragraph (a)(2), relevant factors in determining whether there is a significant risk that the lawyer's professional judgment will be adversely affected include: (i) the importance of the matter to each client, (ii) the duration and intimacy of the lawyer's relationship with the client or clients involved, (iii) the functions being performed by the lawyer, (iv) the likelihood that significant disagreements will arise, (v) the likelihood that negotiations will be contentious, (vi) the likelihood that the matter will result in litigation, and (vii) the likelihood that the client will suffer prejudice from the conflict. The issue is often one of proximity (how close the situation is to open conflict) and degree (how serious the conflict will be if it does erupt). *See* Comments [8], [29] and [29A].

[27]   For example, conflict questions may arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may be present at the outset or may arise during the representation. In order to avoid the development of a disqualifying conflict, the lawyer should, at the outset of the common representation and as part of the process of obtaining each client's informed consent, advise each client that information will be shared (and regardless of whether it is shared, may not be privileged in a subsequent dispute between the parties) and that the lawyer will have to withdraw from one or both representations if one client decides that some matter material to the representation should be kept secret from the other. *See* Comment [31].

[28]   Whether a conflict is consentable depends on the circumstances. For example, a lawyer may not represent multiple parties to a negotiation if their interests are fundamentally antagonistic to one another, but common representation is permissible where the clients are generally aligned in interest, even though there is some difference in interest among them. Thus, a lawyer may seek to establish or adjust a relationship between clients on an amicable and mutually advantageous basis. Examples include helping to organize a business in which two or more clients are entrepreneurs, working out the financial reorganization of an enterprise in which two or more clients have an interest, and arranging a property distribution in settlement of an estate. The lawyer seeks to resolve potentially adverse interests by developing the parties' mutual interests. Otherwise, each party might have to obtain separate representation, with the possibility of incurring additional cost, complication or even litigation. Given these and other relevant factors, the clients may prefer that the lawyer act for all of them.

## Special Considerations in Common Representation

[29]   In civil matters, two or more clients may wish to be represented by a single lawyer in seeking to establish or adjust a relationship between them on an amicable and mutually advantageous basis. For example, clients may wish to be represented by a single lawyer in helping to organize a business, working out a financial reorganization of an enterprise in which two or more clients have an interest, arranging a property distribution of an estate or resolving a dispute between clients. The alternative to common representation can be that each party may have to obtain separate representation, with the possibility of incurring additional cost, complication or even litigation that might otherwise be avoided, or that some parties will have no lawyer at all. Given these and other relevant factors, clients may prefer common representation to separate representation or no representation. A lawyer should consult with each client concerning the implications of the common representation, including the advantages and the risks involved, and the effect on the attorney-client privilege, and obtain each client's informed consent, confirmed in writing, to the common representation.

[29A] Factors may be present that militate against a common representation. In considering whether to represent multiple clients in the same matter, a lawyer should be mindful that if the common representation fails because the potentially adverse interests cannot be reconciled, the result can be additional cost, embarrassment and recrimination. Ordinarily, absent the informed consent of all clients, the lawyer will be forced

to withdraw from representing all of the clients if the common representation fails. *See* Rule 1.9(a). In some situations, the risk of failure is so great that multiple representation is plainly impossible. For example, a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated. Moreover, because the lawyer is required to be impartial between or among commonly represented clients, representation of multiple clients is improper when it is unlikely that impartiality can be maintained. Generally, if the relationship between the parties has already assumed antagonism, it is unlikely that the clients' interests can be adequately served by common representation. For example, a lawyer who has represented one of the clients for a long period or in multiple matters might have difficulty being impartial between that client and one to whom the lawyer has only recently been introduced.

[30]   A particularly important factor in determining the appropriateness of common representation is the effect on client-lawyer confidentiality and the attorney-client privilege. With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach. It must therefore be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, and the clients should be so advised.

[31]   As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common representation. This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit. *See* Rule 1.4. At the outset of the common representation and as part of the process of obtaining each client's informed consent, the lawyer should advise each client that information will be shared and that the lawyer will have to withdraw if one client decides that some matter material to the representation should be kept from the other. In limited circumstances, it may be appropriate for the lawyer to proceed with the representation when the clients have agreed, after being properly informed, that the lawyer will keep certain information confidential even as among the commonly represented clients. For example, the lawyer may reasonably conclude that failure to disclose one client's trade secrets to another client

will not adversely affect representation involving a joint venture between the two clients and agree to keep that information confidential with the informed consent of both clients.

[32]   When seeking to establish or adjust a relationship between clients, the lawyer should make clear that the lawyer's role is not that of partisanship normally expected in other circumstances and, thus, that the clients may be required to assume greater responsibility for decisions than when each client is separately represented. Any limitation on the scope of the representation made necessary as a result of the common representation should be fully explained to the clients at the outset of the representation. *See* Rule 1.2(c).

[33]   Subject to the above limitations, each client in the common representation has the right to loyal and diligent representation and the protection of Rule 1.9 concerning the obligations to a former client. The client also has the right to discharge the lawyer as stated in Rule 1.16.

## Organizational Clients

[34]   A lawyer who represents a corporation or other organization does not, simply by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. *See* Rule 1.13(a). Although a desire to preserve good relationships with clients may strongly suggest that the lawyer should always seek informed consent of the client organization before undertaking any representation that is adverse to its affiliates, Rule 1.7 does not require the lawyer to obtain such consent unless: (i) the lawyer has an understanding with the organizational client that the lawyer will avoid representation adverse to the client's affiliates, (ii) the lawyer's obligations to either the organizational client or the new client are likely to adversely affect the lawyer's exercise of professional judgment on behalf of the other client, or (iii) the circumstances are such that the affiliate should also be considered a client of the lawyer. Whether the affiliate should be considered a client will depend on the nature of the lawyer's relationship with the affiliate or on the nature of the relationship between the client and its affiliate. For example, the lawyer's work for the client organization may be intended to benefit its affiliates. The overlap or identity of the officers and boards of directors, and the client's overall mode of doing business, may be so extensive that the entities would be viewed as "alter egos." Under such circumstances, the lawyer may conclude that the affiliate is the lawyer's client despite the lack of any formal agreement to represent the affiliate.

[34A] Whether the affiliate should be considered a client of the lawyer may also depend on: (i) whether the affiliate has imparted confidential information to the lawyer in furtherance of the representation, (ii) whether the affiliated entities share a legal department and general counsel, and (iii) other factors relating to the legitimate expectations of the client as to whether the lawyer also represents the affiliate. Where the entities are related only through stock ownership, the ownership is less than a controlling interest, and the lawyer has had no significant dealings with the affiliate or access to its confidences, the lawyer may reasonably conclude that the affiliate is not the lawyer's client.

[34B] Finally, before accepting a representation adverse to an affiliate of a corporate client, a lawyer should consider whether the extent of the possible adverse economic impact of the representation on the entire corporate family might be of such a magnitude that it would materially limit the lawyer's ability to represent the client opposing the affiliate. In those circumstances, Rule 1.7 will ordinarily require the lawyer to decline representation adverse to a member of the same corporate family, absent the informed consent of the client opposing the affiliate of the lawyer's corporate client.

### Lawyer as Corporate Director

[35] A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the two roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board, and the possibility of the corporation's obtaining legal advice from another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's professional judgment, the lawyer should not serve as a director or should cease to act as the corporation's lawyer when conflicts of interest arise. The lawyer should advise the other members of the board that, in some circumstances, matters discussed at board meetings while the lawyer is present in the capacity of director might not be protected by the attorney-client privilege and that conflict of interest considerations might require the lawyer's recusal as a director or might require the lawyer and the lawyer's firm to decline representation of the corporation in a matter.

# RULE 1.8

## CURRENT CLIENTS:
## SPECIFIC CONFLICT OF INTEREST RULES

**(a)** A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

    **(1)** the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

    **(2)** the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

    **(3)** the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

**(b)** A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.

**(c)** A lawyer shall not:

    **(1)** solicit any gift from a client, including a testamentary gift, for the benefit of the lawyer or a person related to the lawyer; or

    **(2)** prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any gift, unless the lawyer or other recipient of the gift is related to the client and a reasonable lawyer would conclude that the transaction is fair and reasonable.

For purposes of this paragraph, related persons include a spouse, child, grandchild, parent, grandparent or other relative, or

individual with whom the lawyer or the client maintains a close, familial relationship.

(d)     Prior to conclusion of all aspects of the matter giving rise to the representation or proposed representation of the client or prospective client, a lawyer shall not negotiate or enter into any arrangement or understanding with:

(1)     a client or a prospective client by which the lawyer acquires an interest in literary or media rights with respect to the subject matter of the representation or proposed representation; or

(2)     any person by which the lawyer transfers or assigns any interest in literary or media rights with respect to the subject matter of the representation of a client or prospective client.

(e)     While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to the client, except that:

(1)     a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter;

(2)     a lawyer representing an indigent or pro bono client may pay court costs and expenses of litigation on behalf of the client; and

(3)     a lawyer, in an action in which an attorney's fee is payable in whole or in part as a percentage of the recovery in the action, may pay on the lawyer's own account court costs and expenses of litigation. In such case, the fee paid to the lawyer from the proceeds of the action may include an amount equal to such costs and expenses incurred; and

(4)     a lawyer providing legal services without fee, a not-for-profit legal services or public interest organization, or a law school clinical or pro bono program, may provide financial assistance to indigent clients but may not promise or assure financial assistance prior to retention, or as an inducement to continue the lawyer-client relationship. Funds raised for any

legal services or public interest organization for purposes of providing legal services will not be considered useable for providing financial assistance to indigent clients, and financial assistance referenced in this subsection may not include loans or any other form of support that causes the client to be financially beholden to the provider of the assistance.

(f)     A lawyer shall not accept compensation for representing a client, or anything of value related to the lawyer's representation of the client, from one other than the client unless:

      (1)     the client gives informed consent;

      (2)     there is no interference with the lawyer's independent professional judgment or with the client-lawyer relationship; and

      (3)     the client's confidential information is protected as required by Rule 1.6.

(g)     A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, absent court approval, unless each client gives informed consent in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims involved and of the participation of each person in the settlement.

(h)     A lawyer shall not:

      (1)     make an agreement prospectively limiting the lawyer's liability to a client for malpractice; or

      (2)     settle a claim or potential claim for such liability with an unrepresented client or former client unless that person is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel in connection therewith.

(i)     A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

      (1)     acquire a lien authorized by law to secure the lawyer's fee or expenses; and

**(2)    contract with a client for a reasonable contingent fee in a civil matter subject to Rule 1.5(d) or other law or court rule.**

**(j)    (1)    A lawyer shall not:**

**(i)    as a condition of entering into or continuing any professional representation by the lawyer or the lawyer's firm, require or demand sexual relations with any person;**

**(ii)    employ coercion, intimidation or undue influence in entering into sexual relations incident to any professional representation by the lawyer or the lawyer's firm; or**

**(iii)    in domestic relations matters, enter into sexual relations with a client during the course of the lawyer's representation of the client.**

**(2)    Rule 1.8(j)(1) shall not apply to sexual relations between lawyers and their spouses or to ongoing consensual sexual relationships that predate the initiation of the client-lawyer relationship.**

**(k)    Where a lawyer in a firm has sexual relations with a client but does not participate in the representation of that client, the lawyers in the firm shall not be subject to discipline under this Rule solely because of the occurrence of such sexual relations.**

## Comment

### Business Transactions Between Client and Lawyer

[1]    A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client, for example, a loan or sales transaction or a lawyer's investment on behalf of a client. For these reasons business transactions between a lawyer and client are not advisable. If a lawyer nevertheless elects to enter into a business transaction with a current client, the requirements of paragraph (a) must be met if the client and lawyer have differing interests in the transaction and the client expects the lawyer to exercise professional judgment therein for the bene-

fit of the client. This will ordinarily be the case even when the transaction is not related to the subject matter of the representation, as when a lawyer drafting a will for a client learns that the client needs money for unrelated expenses and offers to make a loan to the client. The Rule applies to lawyers engaged in the sale of goods or services related to the practice of law, such as the sale of title insurance or investment services to existing clients of the lawyer's legal practice. *See* Rule 5.7. It also applies to lawyers purchasing property from estates they represent.

[2]    Paragraphs (a)(1), (a)(2) and (a)(3) set out the conditions that a lawyer must satisfy under this Rule. Paragraph (a)(1) requires that the transaction itself be fair to the client and that its essential terms be communicated in writing to the client in a manner that can be reasonably understood. Paragraph (a)(2) requires that the client also be advised in writing of the desirability of seeking the advice of independent legal counsel. It also requires that the client be given a reasonable opportunity to obtain such advice. Paragraph (a)(3) requires that the lawyer obtain the client's informed consent, in a writing signed by the client, both to the essential terms of the transaction and to the lawyer's role. When necessary, the lawyer should discuss both the material risks of the proposed transaction, including any risk presented by the lawyer's involvement and the existence of reasonably available alternatives, and should explain why the advice of independent legal counsel is desirable. See Rule 1.0(j) for the definition of "informed consent."

[3]    The risk to a client is greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that the lawyer's representation of the client will be materially adversely affected by the lawyer's financial interest in the transaction. Here the lawyer's role requires that the lawyer must comply, not only with the requirements of paragraph (a), but also with the requirements of Rule 1.7. Under that Rule, the lawyer must disclose the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the client's expense. Moreover, the lawyer must obtain the client's informed consent. In some cases, the lawyer's interest may be such that Rule 1.7 will preclude the lawyer from seeking the client's consent to the transaction. A lawyer has a continuing duty to monitor the inherent conflicts of interest that arise out of the lawyer's business transaction with a client or because the lawyer has an ownership interest in property in which the client also has an interest. A lawyer is

also required to make such additional disclosures to the client as are necessary to obtain the client's informed consent to the continuation of the representation.

[3A]   The self-interest of a lawyer resulting from a business transaction with a client may interfere with the lawyer's exercise of independent judgment on behalf of the client. If such interference will occur should a lawyer agree to represent a prospective client, the lawyer should decline the proffered employment. After accepting employment, a lawyer should not acquire property rights that would adversely affect the lawyer's professional judgment in representing the client. Even if the property interests of a lawyer do not presently interfere with the exercise of independent judgment, but the likelihood of interference can be reasonably foreseen by the lawyer, the lawyer should explain the situation to the client and should decline employment or withdraw unless the client gives informed consent to the continued representation, confirmed in writing. A lawyer should not seek to persuade a client to permit the lawyer to invest in an undertaking of the client nor make improper use of a professional relationship to influence the client to invest in an enterprise in which the lawyer is interested.

[4]     If the client is independently represented in the transaction, paragraph (a)(2) is inapplicable, and the requirement of full disclosure in paragraph (a)(1) is satisfied by a written disclosure by either the lawyer involved in the transaction or the client's independent counsel. The fact that the client was independently represented in the transaction is relevant in determining whether the agreement was fair and reasonable to the client, as paragraph (a)(1) further requires.

[4A]   Rule 1.8(a) does not apply to business transactions with former clients, but the line between current and former clients is not always clear. A lawyer entering into a business transaction with a former client may not use information relating to the representation to the disadvantage of the former client unless the information has become generally known. *See* Rule 1.9(c).

[4B]   The Rule does not apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities services. In such transactions, the lawyer has no advantage in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable.

[4C]   This Rule also does not apply to ordinary fee arrangements between client and lawyer reached at the inception of the client-lawyer relationship, which are governed by Rule 1.5. The requirements of the Rule ordinarily must be met, however, when the lawyer accepts an interest in the client's business or other nonmonetary property as payment of all or part of the lawyer's fee. For example, the requirements of paragraph (a) must ordinarily be met if a lawyer agrees to take stock (or stock options) in the client in lieu of cash fees. Such an exchange creates a risk that the lawyer's judgment will be skewed in favor of closing a transaction to such an extent that the lawyer may fail to exercise professional judgment as to whether it is in the client's best interest for the transaction to close. This may occur where the client expects the lawyer to provide professional advice in structuring a securities-for-services exchange. If the lawyer is expected to play any role in advising the client regarding the securities-for-services exchange, especially if the client lacks sophistication, the requirements of fairness, full disclosure and written consent set forth in paragraph (a) must be met. When a lawyer represents a client in a transaction concerning literary property, Rule 1.8(d) does not prohibit the lawyer from agreeing that the lawyer's fee shall consist of a share of the ownership of the literary property or a share of the royalties or license fees from the property, but the lawyer must ordinarily comply with Rule 1.8(a).

[4D]   An exchange of securities for legal services will also trigger the requirements of Rule 1.7 if the lawyer's ownership interest in the client would, or reasonably may, affect the lawyer's exercise of professional judgment on behalf of the client. For example, where a lawyer has agreed to accept securities in a client corporation as a fee for negotiating and documenting an equity investment, or for representing a client in connection with an initial public offering, there is a risk that the lawyer's judgment will be skewed in favor of closing the transaction to such an extent that the lawyer may fail to exercise professional judgment. (The lawyer's judgment may be skewed because unless the transaction closes, the securities will be worthless.) Unless a lawyer reasonably concludes that he or she will be able to provide competent, diligent and loyal representation to the client, the lawyer may not undertake or continue the representation, even with the client's consent. To determine whether a reasonable possibility of such an adverse effect on the representation exists, the lawyer should analyze the nature and relationship of the particular interest and the specific legal services to be rendered. Some salient factors may be (i) the size of the lawyer's investment in proportion to the holdings of other investors,

(ii) the potential value of the investment in relation to the lawyer's or law firm's earnings or other assets, and (iii) whether the investment is active or passive.

[4E] If the lawyer reasonably concludes that the lawyer's representation of the client will not be adversely affected by the agreement to accept client securities as a legal fee, the Rules permit the representation, but only if full disclosure is made to the client and the client's informed consent is obtained and confirmed in writing. *See* Rules 1.0(e) (defining "confirmed in writing"), 1.0(j) (defining "informed consent"), and 1.7.

[4F] A lawyer must also consider whether accepting securities in a client corporation as payment for legal services constitutes charging or collecting an unreasonable or excessive fee in violation of Rule 1.5. Determining whether a fee accepted in the form of securities is unreasonable or excessive requires a determination of the value of the securities at the time the agreement is reached and may require the lawyer to engage the services of an investment professional to appraise the value of the securities to be given. The lawyer and client can then make their own advised decisions as to whether the securities-for-fees exchange results in a reasonable fee.

[5] A lawyer's use of information relating to the representation to the disadvantage of the client violates the lawyer's duty of loyalty. Paragraph (b) applies when the information is used to benefit either the lawyer or a third person, such as another client or a business associate of the lawyer, at the expense of a client. For example, if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client or to recommend that another client make such a purchase. But the rule does not prohibit uses that do not disadvantage the client. For example, a lawyer who learns a government agency's interpretation of trade legislation during the representation of one client may properly use that information to benefit other clients. Paragraph (b) prohibits use of client information to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules. Rules that permit or require use of client information to the disadvantage of the client include Rules 1.6, 1.9(c) and 3.3.

## Gifts to Lawyers

[6] A lawyer may accept a gift from a client if the transaction meets general standards of fairness. If a client offers the lawyer a gift, paragraph (c) does not prohibit the lawyer from accepting it, although

such a gift may be voidable by the client. Before accepting a gift offered by a client, a lawyer should urge the client to secure disinterested advice from an independent, competent person who is cognizant of all of the circumstances. In any event, due to concerns about overreaching and imposition on clients, a lawyer may not suggest that a gift be made to the lawyer or for the lawyer's benefit.

[6A]   This Rule does not apply to success fees, bonuses and the like from clients for legal services. These are governed by Rule 1.5.

[7]   If effectuation of a gift requires preparing a legal instrument such as a will or conveyance, the client should have the detached advice that another lawyer can provide. The sole exception to this Rule is where the client is related to the donee and a reasonable lawyer would conclude that the transaction is fair and reasonable, as set forth in paragraph (c).

[8]   This Rule does not prohibit a lawyer or a partner or associate of the lawyer from being named as executor of the client's estate or named to another fiduciary position. Nevertheless, such appointments will be subject to the general conflict of interest provision in Rule 1.7 when there is a significant risk that the lawyer's interest in obtaining the appointment will adversely affect the lawyer's professional judgment in advising the client concerning the choice of an executor or other fiduciary. In obtaining the client's informed consent to the conflict, the lawyer should advise the client concerning the nature and extent of the lawyer's financial interest in the appointment, as well as the availability of alternative candidates for the position.

**Literary or Media Rights**

[9]   An agreement by which a lawyer acquires literary or media rights concerning the subject matter of the representation creates a conflict between the interest of the client and the personal interests of the lawyer. The lawyer may be tempted to subordinate the interests of the client to the lawyer's own anticipated pecuniary gain. For example, a lawyer in a criminal case who obtains from the client television, radio, motion picture, newspaper, magazine, book, or other literary or media rights with respect to the case may be influenced, consciously or unconsciously, to a course of conduct that will enhance the value of the literary or media rights to the prejudice of the client. To prevent this adverse impact on the representation, such arrangements should be scrupulously avoided prior to the termination of all aspects of the matter giving rise to the representation, even though the representation has previously ended. Likewise,

arrangements with third parties, such as book, newspaper or magazine publishers or television, radio or motion picture producers, pursuant to which the lawyer conveys whatever literary or media rights the lawyer may have, should not be entered into prior to the conclusion of all aspects of the matter giving rise to the representation.

[9A]   Rule 1.8(d) does not prohibit a lawyer representing a client in a transaction concerning intellectual property from agreeing that the lawyer's fee shall consist of an ownership share in the property, if the arrangement conforms to paragraph (a) and Rule 1.5.

**Financial Assistance**

[9B]   Paragraph (e) eliminates the former requirement that the client remain "ultimately liable" to repay any costs and expenses of litigation that were advanced by the lawyer regardless of whether the client obtained a recovery. Accordingly, a lawyer may make repayment from the client contingent on the outcome of the litigation, and may forgo repayment if the client obtains no recovery or a recovery less than the amount of the advanced costs and expenses. A lawyer may also, in an action in which the lawyer's fee is payable in whole or in part as a percentage of the recovery, pay court costs and litigation expenses on the lawyer's own account. However, like the former New York rule, paragraph (e) limits permitted financial assistance to court costs directly related to litigation. Examples of permitted expenses include filing fees, expenses of investigation, medical diagnostic work connected with the matter under litigation and treatment necessary for the diagnosis, and the costs of obtaining and presenting evidence. Permitted expenses do not include living or medical expenses other than those listed above.

[10]   Lawyers may not subsidize lawsuits or administrative proceedings brought on behalf of their clients, including making or guaranteeing loans to their clients for living expenses, because to do so would encourage clients to pursue lawsuits that might not otherwise be brought and because such assistance gives lawyers too great a financial stake in the litigation. These dangers do not warrant a prohibition against a lawyer lending a client money for court costs and litigation expenses, including the expenses of medical examination and testing and the costs of obtaining and presenting evidence, because these advances are virtually indistinguishable from contingent fee agreements and help ensure access to the courts. Similarly, an exception is warranted permitting lawyers representing indigent or pro bono clients to pay court costs and litigation expenses whether or not these funds will be repaid.

**Person Paying for a Lawyer's Services**

[11]   Lawyers are frequently asked to represent clients under circumstances in which a third person will compensate them, in whole or in part. The third person might be a relative or friend, an indemnitor (such as a liability insurance company) or a co-client (such as a corporation sued along with one or more of its employees). Third-party payers frequently have interests that may differ from those of the client. A lawyer is therefore prohibited from accepting or continuing such a representation unless the lawyer determines that there will be no interference with the lawyer's professional judgment and there is informed consent from the client. *See also* Rule 5.4(c), prohibiting interference with a lawyer's professional judgment by one who recommends, employs or pays the lawyer to render legal services for another.

[12]   Sometimes it will be sufficient for the lawyer to obtain the client's informed consent regarding the fact of the payment and the identity of the third-party payer. If, however, the fee arrangement creates a conflict of interest for the lawyer, then the lawyer must comply with Rule 1.7. The lawyer must also conform to the requirements of Rule 1.6 concerning confidentiality. Under Rule 1.7(a), a conflict of interest may exist if the lawyer will be involved in representing differing interests or if there is a significant risk that the lawyer's professional judgment on behalf of the client will be adversely affected by the lawyer's own interest in the fee arrangement or by the lawyer's responsibilities to the third-party payer (for example, when the third-party payer is a co-client). Under Rule 1.7(b), the lawyer may accept or continue the representation with the informed consent of each affected client, unless the conflict is nonconsentable under that paragraph. Under Rule 1.7(b), the informed consent must be confirmed in writing. *See* Rules 1.0(e) (definition of "confirmed in writing"), 1.0(j) (definition of "informed consent"), and 1.0(x) (definition of "writing" or "written").

**Aggregate Settlements**

[13]   Differences in willingness to make or accept an offer of settlement are among the risks of common representation of multiple clients by a single lawyer. Under Rule 1.7, this is one of the risks that should be discussed before undertaking the representation, as part of the process of obtaining the clients' informed consents. In addition, Rule 1.2(a) protects each client's right to have the final say in deciding whether to accept or reject an offer of settlement. Paragraph (g) is a corollary of both these Rules and provides that, before any settlement offer is made or accepted

on behalf of multiple clients, the lawyer must inform each of them about all the material terms of the settlement, including what the other clients will receive or pay if the settlement is accepted. *See also* Rule 1.0(j) (definition of "informed consent"). Lawyers representing a class of plaintiffs or defendants, or those proceeding derivatively, may not have a full client-lawyer relationship with each member of the class; nevertheless, such lawyers must comply with applicable rules regulating notification of class members and other procedural requirements designed to ensure adequate protection of the entire class.

## Limiting Liability and Settling Malpractice Claims

[14]   Agreements prospectively limiting a lawyer's liability for malpractice are prohibited because they are likely to undermine competent and diligent representation. Also, many clients are unable to evaluate the desirability of making such an agreement before a dispute has arisen, particularly if they are currently represented by the lawyer seeking the agreement. This paragraph does not, however, prohibit a lawyer from entering into an agreement with the client to arbitrate legal malpractice claims, provided such agreements are enforceable and the client is fully informed of the scope and effect of the agreement. Nor does this paragraph limit the ability of lawyers to practice in the form of a limited-liability entity, where permitted by law, provided that each lawyer remains personally liable to the client for the lawyer's own conduct and the firm complies with any conditions required by law, such as provisions requiring client notification or maintenance of adequate liability insurance. Nor does it prohibit an agreement in accordance with Rule 1.2 that defines the scope of the representation, although a definition of scope that makes the obligations of representation illusory will amount to an attempt to limit liability.

[15]   Agreements settling a claim or a potential claim for malpractice are not prohibited by this Rule. Nevertheless, in view of the danger that a lawyer will take unfair advantage of an unrepresented client or former client, the lawyer must first advise such a person in writing of the appropriateness of independent representation in connection with such a settlement. In addition, the lawyer must give the client or former client a reasonable opportunity to find and consult independent counsel.

## Acquiring Proprietary Interest in Litigation

[16]   Paragraph (i) states the traditional general rule that lawyers are prohibited from acquiring a proprietary interest in litigation. Like paragraph (e), the general rule has its basis in common law champerty and

maintenance and is designed to avoid giving the lawyer too great an interest in the representation. In addition, when the lawyer acquires an ownership interest in the subject of the representation, it will be more difficult for a client to discharge the lawyer if the client so desires. The rule is subject to specific exceptions developed in decisional law and continued in these Rules. The exception for certain advances of the costs of litigation is set forth in paragraph (e). In addition, paragraph (i) sets forth exceptions for liens authorized by law to secure the lawyer's fees or expenses and contracts for reasonable contingent fees. These may include liens granted by statute, liens originating in common law and liens acquired by contract with the client. When a lawyer acquires by contract a security interest in property other than that recovered through the lawyer's efforts in the litigation, such an acquisition is a business or financial transaction with a client and is governed by the requirements of paragraph (a). Contracts for contingent fees in civil matters are governed by Rule 1.5.

### Client-Lawyer Sexual Relationships

[17]   The relationship between lawyer and client is a fiduciary one in which the lawyer occupies the highest position of trust and confidence. The relationship is often unequal; thus, a sexual relationship between lawyer and client can involve unfair exploitation of the lawyer's fiduciary role, in violation of the lawyer's basic ethical obligation not to use the trust of the client to the client's disadvantage. In addition, such a relationship presents a significant danger that if the sexual relationship leads to the lawyer's emotional involvement, the lawyer will be unable to represent the client without impairing the lawyer's exercise of professional judgment. Moreover, a blurred line between the professional and personal relationships may make it difficult to predict the extent to which client confidences will be protected by the attorney-client evidentiary privilege. A client's sexual involvement with the client's lawyer, especially if the sexual relations create emotional involvement, will often render it unlikely that the client could rationally determine whether to consent to the conflict created by the sexual relations. If a client were to consent to the conflict created by the sexual relations without fully appreciating the nature and implications of that conflict, there is a significant risk of harm to client interests. Therefore, sexual relations between lawyers and their clients are dangerous and inadvisable. Out of respect for the desires of consenting adults, however, paragraph (j) does not flatly prohibit client-lawyer sexual relations in matters other than domestic relations matters. Even when sexual relations between a lawyer and client are permitted under paragraph (j), however, they may lead to incompetent

representation in violation of Rule 1.1. Because domestic relations clients are often emotionally vulnerable, domestic relations matters entail a heightened risk of exploitation of the client. Accordingly, lawyers are flatly prohibited from entering into sexual relations with domestic relations clients during the course of the representation even if the sexual relationship is consensual and even if prejudice to the client is not immediately apparent. For a definition of "sexual relations" for the purposes of this Rule, see Rule 1.0(u).

[17A] The prohibitions in paragraph (j)(1) apply to all lawyers in a firm who know of the representation, whether or not they are personally representing the client. The Rule prohibits any lawyer in the firm from exploiting the client-lawyer relationship by directly or indirectly requiring or demanding sexual relations as a condition of representation by the lawyer or the lawyer's firm. Paragraph (j)(1)(i) thus seeks to prevent a situation where a client may fear that a willingness or unwillingness to have sexual relations with a lawyer in the firm may have an impact on the representation, or even on the firm's willingness to represent or continue representing the client. The Rule also prohibits the use of coercion, undue influence or intimidation to obtain sexual relations with a person known to that lawyer to be a client or a prospective client of the firm. Paragraph (j)(1)(ii) thus seeks to prevent a lawyer from exploiting the professional relationship between the client and the lawyer's firm. Even if a lawyer does not know that the firm represents a person, the lawyer's use of coercion or intimidation to obtain sexual relations with that person might well violate other Rules or substantive law. Where the representation of the client involves a domestic relations matter, the restrictions stated in paragraphs (j)(1)(i) and (j)(1)(ii), and not the per se prohibition imposed by paragraph (j)(1)(iii), apply to lawyers in a firm who know of the representation but who are not personally representing the client. Nevertheless, because domestic relations matters may be volatile and may entail a heightened risk of exploitation of the client, the risk that a sexual relationship with a client of the firm may result in a violation of other Rules is likewise heightened, even if the sexual relations are not per se prohibited by paragraph (j).

[17B] A law firm's failure to educate lawyers about the restrictions on sexual relations—or a firm's failure to enforce those restrictions against lawyers who violate them—may constitute a violation of Rule 5.1, which obligates a law firm to make reasonable efforts to ensure that all lawyers in the firm conform to these Rules.

[18]   Sexual relationships between spouses or those that predate the client-lawyer relationship are not prohibited. Issues relating to the exploitation of the fiduciary relationship and client dependency are diminished when the sexual relationship existed prior to the commencement of the client-lawyer relationship. However, before proceeding with the representation in these circumstances, the lawyer should consider whether the lawyer's ability to represent the client will be materially limited by the sexual relationship and therefore constitute an impermissible conflict of interest. See Rule 1.7(a)(2).

[19]   When the client is an organization, paragraph (j) applies to sexual relations between a lawyer for the organization (whether inside counsel or outside counsel) and a constituent of the organization who supervises, directs or regularly consults with that lawyer or a lawyer in that lawyer's firm concerning the organization's legal matters.

**Imputation of Prohibitions**

[20]   Where a lawyer who is not personally representing a client has sexual relations with a client of the firm in violation of paragraph (j), the other lawyers in the firm are not subject to discipline solely because those improper sexual relations occurred. There may be circumstances, however, where a violation of paragraph (j) by one lawyer in a firm gives rise to violations of other Rules by the other lawyers in the firm through imputation. For example, sexual relations between a lawyer and a client may give rise to a violation of Rule 1.7(a), and such a conflict under Rule 1.7 may be imputed to all other lawyers in the firm under Rule 1.10(a).

# RULE 1.9

## DUTIES TO FORMER CLIENTS

(a)    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b)    Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

(1)    whose interests are materially adverse to that person; and

(2)    about whom the lawyer had acquired information protected by Rules 1.6 or paragraph (c) of this Rule that is material to the matter.

(c)    A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1)    use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client, except as these Rules would permit or require with respect to a current client or when the information has become generally known; or

(2)    reveal confidential information of the former client protected by Rule 1.6 except as these Rules would permit or require with respect to a current client.

## Comment

[1]    After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with these Rules. Under this Rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf

of a former client. So also, a lawyer who has prosecuted an accused person could not properly represent that person in a subsequent civil action against the government concerning the same transaction. Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent. *See* Comment [9]. Current and former government lawyers must comply with this Rule to the extent required by Rule 1.11.

[2]     The scope of a "matter" for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type, even though the subsequent representation involves a position adverse to the prior client. Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdictions. The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

[3]     Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that

may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation. On the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

[4]     [Moved to Comment to Rule 1.10.]

[5]     [Moved to Comment to Rule 1.10.]

[6]     [Moved to Comment to Rule 1.10.]

[7]     Independent of the prohibition against subsequent representation, a lawyer changing professional association has a continuing duty to preserve confidentiality of information about a client formerly represented. *See* Rules 1.6, 1.9(c).

[8]     Paragraph (c) generally extends the confidentiality protections of Rule 1.6 to a lawyer's former clients. Paragraph (c)(1) provides that information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client. Paragraph (c)(2) provides that a lawyer may not reveal information acquired in the course of representing a client except as these Rules would permit or require with respect to a current client. *See* Rules 1.6, 3.3.

[9]     The provisions of this Rule are for the protection of former clients and can be waived if the client gives informed consent, which consent must be confirmed in writing under paragraph (a). See also Rule 1.0(j) for the definition of "informed consent." With regard to the effectiveness of an advance waiver, see Rule 1.7, Comments [22]–[22A]. With regard to disqualification of a firm with which a lawyer is or was formerly associated, see Rule 1.10.

# RULE 1.10

## IMPUTATION OF CONFLICTS OF INTEREST

(a)     While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9, except as otherwise provided therein.

(b)     When a lawyer has terminated an association with a firm, the firm is prohibited from thereafter representing a person with interests that the firm knows or reasonably should know are materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm if the firm or any lawyer remaining in the firm has information protected by Rule 1.6 or Rule 1.9(c) that is material to the matter.

(c)     When a lawyer becomes associated with a firm, the firm may not knowingly represent a client in a matter that is the same as or substantially related to a matter in which the newly associated lawyer, or a firm with which that lawyer was associated, formerly represented a client whose interests are materially adverse to the prospective or current client unless the newly associated lawyer did not acquire any information protected by Rule 1.6 or Rule 1.9(c) that is material to the current matter.

(d)     A disqualification prescribed by this Rule may be waived by the affected client or former client under the conditions stated in Rule 1.7.

(e)     A law firm shall make a written record of its engagements, at or near the time of each new engagement, and shall implement and maintain a system by which proposed engagements are checked against current and previous engagements when:

(1)     the firm agrees to represent a new client;

(2)     the firm agrees to represent an existing client in a new matter;

(3)     the firm hires or associates with another lawyer; or

**(4)    an additional party is named or appears in a pending matter.**

**(f)    Substantial failure to keep records or to implement or maintain a conflict-checking system that complies with paragraph (e) shall be a violation thereof regardless of whether there is another violation of these Rules.**

**(g)    Where a violation of paragraph (e) by a law firm is a substantial factor in causing a violation of paragraph (a) by a lawyer, the law firm, as well as the individual lawyer, shall be responsible for the violation of paragraph (a).**

**(h)    A lawyer related to another lawyer as parent, child, sibling or spouse shall not represent in any matter a client whose interests differ from those of another party to the matter who the lawyer knows is represented by the other lawyer unless the client consents to the representation after full disclosure and the lawyer concludes that the lawyer can adequately represent the interests of the client.**

**Comment**

**Definition of "Firm"**

[1]    For purposes of these Rules, the term "firm" includes, but is not limited to, (i) a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law, and (ii) lawyers employed in a legal services organization, a government law office or the legal department of a corporation or other organization. See Rule 1.0(h). Whether two or more lawyers constitute a "firm" within this definition will depend on the specific facts. See Rule 1.0, Comments [2]-[4].

**Principles of Imputed Disqualification**

[2]    The rule of imputed disqualification stated in paragraph (a) gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer

with whom the lawyer is associated. Paragraph (a) operates only among the lawyers currently associated in a firm. When a lawyer moves from one firm to another, the situation is governed by paragraphs (b) and (c).

[3]    [Reserved]

[4]    The rule in paragraph (a) also does not prohibit representation by others in the law firm where the person prohibited from involvement in a matter is a nonlawyer, such as a paralegal or legal secretary. Such persons, however, ordinarily must be screened from any personal participation in the matter to avoid communication to others in the firm of confidential information that both the nonlawyers and the firm have a legal duty to protect. *See* Rules 1.0(t), 5.3.

**Lawyers Moving Between Firms**

[4A]    The principles of imputed disqualification are modified when lawyers have been associated in a firm and then end their association. The nature of contemporary law practice and the organization of law firms have made the fiction that the law firm is the same as a single lawyer unrealistic in certain situations. In crafting a rule to govern imputed conflicts, there are several competing considerations. First, the former client must be reasonably assured that the client's confidentiality interests are not compromised. Second, the principles of imputed disqualification should not be so broadly cast as to preclude others from having reasonable choice of counsel. Third, the principles of imputed disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after leaving a firm. In this connection, it should be recognized that today most lawyers practice in firms, that many limit their practice to, or otherwise concentrate in, one area of law, and that many move from one association to another multiple times in their careers. If the principles of imputed disqualification were defined too strictly, the result would be undue curtailment of the opportunity of lawyers to move from one practice setting to another, of the opportunity of clients to choose counsel, and of the opportunity of firms to retain qualified lawyers. For these reasons, a functional analysis that focuses on preserving the former client's reasonable confidentiality interests is appropriate in balancing the competing interests.

[5]    Paragraph (b) permits a law firm, under certain circumstances, to represent a client with interests directly adverse to those of a client represented by a lawyer who formerly was associated with the firm. The Rule applies regardless of when the formerly associated lawyer repre-

sented the client. However, under Rule 1.7 the law firm may not represent a client with interests adverse to those of a current client of the firm. Moreover, the firm may not represent the client where the matter is the same or substantially related to a matter in which (i) the formerly associated lawyer represented the client, and (ii) the firm or any lawyer currently in the firm has information protected by Rule 1.6 and Rule 1.9(c) that is material to the matter.

[5A]  In addition to information that may be in the possession of one or more of the lawyers remaining in the firm, information in documents or files retained by the firm itself may preclude the firm from opposing the former client in the same or substantially related matter.

[5B]  Rule 1.10(c) permits a law firm to represent a client in a matter that is the same as or substantially related to a matter in which the newly associated lawyer, or the firm with which the lawyer was previously associated, represented a client whose interests are materially adverse to that client, provided the newly associated lawyer did not acquire any confidential information of the previously represented client that is material to the current matter.

## Client Consent

[6]  Rule 1.10(d) removes imputation with the informed consent of the affected client or former client under the conditions stated in Rule 1.7. The conditions stated in Rule 1.7 require the lawyer to determine that the representation is not prohibited by Rule 1.7(b) and that each affected client or former client has given informed consent to the representation, confirmed in writing. In some cases, the risk may be so severe that the conflict cannot be cured by client consent. For a discussion of the effectiveness of client waivers of conflicts that might arise in the future, see Rule 1.7, Comments [22]–[22A]. For a definition of "informed consent," see Rule 1.0(j).

## Former Government Lawyers

[7]  Where a lawyer has joined a private firm after having represented the government, imputation is governed by Rule 1.11(b), not this Rule.

**Relationship Between this Rule and Rule 1.8(k)**

[8]     Where a lawyer is prohibited from engaging in certain trans-actions under Rule 1.8(a) through (i), this Rule imputes that prohibition to other lawyers associated in a firm with the personally prohibited lawyer. Under Rule 1.8(k), however, where a lawyer in a firm has sexual relations with a client but does not participate in the representation of that client, the other lawyers in the firm are not subject to discipline under Rule 1.8 solely because such sexual relations occur.

**Conflict-Checking Procedures**

[9]     Under paragraph (e), every law firm, no matter how large or small (including sole practitioners), is responsible for creating, imple-menting and maintaining a system to check proposed engagements against current and previous engagements and against new parties in pending matters. The system must be adequate to detect conflicts that will or reasonably may arise if: (i) the firm agrees to represent a new client, (ii) the firm agrees to represent an existing client in a new matter, (iii) the firm hires or associates with another lawyer, or (iv) an additional party is named or appears in a pending matter. The system will thus render effec-tive assistance to lawyers in the firm in avoiding conflicts of interest. *See also* Rule 5.1.

[9A]   Failure to create, implement and maintain a conflict-check-ing system adequate for this purpose is a violation of this Rule by the firm. In cases in which a lawyer, despite reasonably diligent efforts to do so, could not acquire the information that would have revealed a conflict because of the firm's failure to maintain an adequate conflict-checking system, the firm shall be responsible for the violation. However, a lawyer who knows or should know of a conflict in a matter that the lawyer is han-dling remains individually responsible for the violation of these Rules, whether or not the firm's conflict-checking system has identified the con-flict. In cases in which a violation of paragraph (e) by the firm is a sub-stantial factor in causing a violation of these Rules by a lawyer, the firm, as well as the individual lawyer, is responsible for the violation. As to whether a client-lawyer relationship exists or is continuing, see Scope [9]–[10]; Rule 1.3, Comment [4].

[9B]   The records required to be maintained under paragraph (e) must be in written form. *See* Rule 1.0(x) for the definition of "written," which includes tangible or electronic records. To be effective, a conflict-checking system may also need to supplement written information with

recourse to the memory of the firm's lawyers through in-person, telephonic, or electronic communications. An effective conflict-checking system as required by this Rule may not, however, depend solely on recourse to lawyers' memories or other such informal sources of information.

[9C]   The nature of the records needed to render effective assistance to lawyers will vary depending on the size, structure, history, and nature of the firm's practice. At a minimum, however, a firm must record information that will enable the firm to identify (i) each client that the firm represents, (ii) each party in a litigated, transactional or other matter whose interests are materially adverse to the firm's clients, and (iii) the general nature of each matter.

[9D]   To the extent that the records made and maintained for the purpose of complying with this Rule contain confidential information, a firm must exercise reasonable care to protect the confidentiality of these records. *See* Rule 1.6(c).

[9E]   The nature of a firm's conflict-checking system may vary depending on a number of factors, including the size and structure of the firm, the nature of the firm's practice, the number and location of the firm offices, and the relationship among the firm's separate offices. In all cases, however, an effective conflict-checking system should record and maintain information in a way that permits the information to be checked systematically and accurately when the firm is considering a proposed engagement. A small firm or a firm with a small number of engagements may be able to create and maintain an effective conflict-checking system through the use of hard-copy rather than electronic records. But larger firms, or firms with a large number of engagements, may need to create and maintain records in electronic form so that the information can be accessed quickly and efficiently.

**Organizational Clients**

[9F]   Representation of corporate or other organizational clients makes it prudent for a firm to maintain additional information in its conflict-checking system. For example, absent an agreement with the client to the contrary, a conflict may arise when a firm desires to oppose an entity that is part of a current or former client's corporate family (*e.g.*, an affiliate, subsidiary, parent or sister organization). *See* Rule 1.7, Comments [34]-[34B]. Although a law firm is not required to maintain records showing every corporate affiliate of every corporate client, if a law firm frequently represents corporations that belong to large corporate families,

the law firm should make reasonable efforts to institute and maintain a system for alerting the firm to potential conflicts with the members of the corporate client's family.

[9G]   Under certain circumstances, a law firm may also need to include information about the constituents of a corporate client. Although Rule 1.13 provides that a firm is the lawyer for the entity and not for any of its constituents, confusion may arise when a law firm represents small or closely held corporations with few shareholders, or when a firm represents both the corporation and individual officers or employees but bills the corporate client for the legal services. In other situations, a client-lawyer relationship may develop unintentionally between the law firm and one or more individual constituents of the entity. Accordingly, a firm that represents corporate clients may need a system for determining whether or not the law firm has a client-lawyer relationship with individual constituents of an organizational client. If so, the law firm should add the names of those constituents to the database of its conflict-checking system.

[9H]   Rule 1.10(e) requires a law firm to avoid conflicts of interest by checking proposed engagements against current and previous engagements. When lawyers move from one firm to another firm as lateral hires, or when two law firms merge, the lateral lawyers' conflicts and the merging firms' conflicts arising under Rule 1.9(a) and (b) will be imputed to the hiring or newly merged firms under Rule 1.10(a). To fulfill the duty to check for conflicts *before* hiring laterals or before merging firms, the hiring or merging should ordinarily obtain such information as (i) the identity of each client that the lateral lawyers or merging firms currently represent; (ii) the identity of each client that the lateral lawyers or merging firms, within a reasonable period in the past, either formerly represented within the meaning of Rule 1.9(a), or about whom the lateral lawyers or the lawyers in the merging firms acquired material confidential information within the meaning of Rule 1.9(b); (iii) the identity of other parties to the matters in which the lateral lawyers or merging firms represented those clients; and (iv) the general nature of each such matter. The hiring or merging firms may also request aggregate financial data for all clients or from groups of clients (such as past billings, pending receivables, timeliness of payment, and probable future billings) to determine whether the employment or merger is economically justified.

[9I]   Whether lawyers may disclose information in response to such requests depends on the nature of the information. Some of this information is ordinarily not confidential (*e.g.*, the names of clients and

adversaries in publicly disclosed matters, the general nature of such matters, and *aggregate* information about legal fees from all clients or from groups of clients), but other information is ordinarily confidential (*e.g.*, non-public criminal or matrimonial representations, or client-specific payment information). The lateral lawyers or merging firms should carefully assess the nature of the information being requested to determine whether it is confidential before asking lawyers to disclose it. Some measures to assist attorneys in abiding by confidentiality requirements in the lateral and merger context are discussed in Comments [18A]-[18F] to Rule 1.6.

# RULE 1.11

## SPECIAL CONFLICTS OF INTEREST FOR FORMER AND CURRENT GOVERNMENT OFFICERS AND EMPLOYEES

(a)      Except as law may otherwise expressly provide, a lawyer who has formerly served as a public officer or employee of the government:

(1)      shall comply with Rule 1.9(c); and

(2)      shall not represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation. This provision shall not apply to matters governed by Rule 1.12(a).

(b)      When a lawyer is disqualified from representation under paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1)      the firm acts promptly and reasonably to:

(i)      notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client;

(ii)      implement effective screening procedures to prevent the flow of information about the matter between the personally disqualified lawyer and the others in the firm;

(iii)      ensure that the disqualified lawyer is apportioned no part of the fee therefrom; and

(iv)      give written notice to the appropriate government agency to enable it to ascertain compliance with the provisions of this Rule; and

(2)      there are no other circumstances in the particular representation that create an appearance of impropriety.

(c)　　Except as law may otherwise expressly provide, a lawyer having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and that, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and that is not otherwise available to the public. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely and effectively screened from any participation in the matter in accordance with the provisions of paragraph (b).

(d)　　Except as law may otherwise expressly provide, a lawyer currently serving as a public officer or employee shall not:

　　　　(1)　　participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless under applicable law no one is, or by lawful delegation may be, authorized to act in the lawyer's stead in the matter; or

　　　　(2)　　negotiate for private employment with any person who is involved as a party or as lawyer for a party in a matter in which the lawyer is participating personally and substantially.

(e)　　As used in this Rule, the term "matter" as defined in Rule 1.0(l) does not include or apply to agency rulemaking functions.

(f)　　A lawyer who holds public office shall not:

　　　　(1)　　use the public position to obtain, or attempt to obtain, a special advantage in legislative matters for the lawyer or for a client under circumstances where the lawyer knows or it is obvious that such action is not in the public interest;

　　　　(2)　　use the public position to influence, or attempt to influence, a tribunal to act in favor of the lawyer or of a client; or

> **(3)** **accept anything of value from any person when the lawyer knows or it is obvious that the offer is for the purpose of influencing the lawyer's action as a public official.**

**Comment**

[1]     A lawyer who has served or is currently serving as a public officer or employee is personally subject to the Rules of Professional Conduct, including the prohibition against concurrent conflicts of interest stated in Rule 1.7. In addition, such a lawyer may be subject to statutes and government regulations regarding conflicts of interest. Such statutes and regulations may circumscribe the extent to which the government agency may give consent under this Rule. See Rule 1.0(j) for the definition of "informed consent."

[2]     Paragraphs (a), (d) and (f) restate the obligations of an individual lawyer who has served or is currently serving as an officer or employee of the government toward a former government or private client. Paragraph (b) sets forth special imputation rules for former government lawyers, with screening and notice provisions, and rule 1.10 is not applicable to these conflicts. See Comments [6]-[7B] concerning imputation of the conflicts of former government lawyers.

[3]     Paragraphs (a)(2), (d) and (f) apply regardless of whether a lawyer is adverse to a former client and are thus designed not only to protect the former client, but also to prevent a lawyer from exploiting public office for the advantage of another client. For example, a lawyer who has pursued a claim on behalf of the government may not pursue the same claim on behalf of a private client after the lawyer has left government service, except when authorized to do so by the government agency under paragraph (a). Similarly, a lawyer who has pursued a claim on behalf of a private client may not pursue the claim on behalf of the government, except when authorized to do so.

[4]     This Rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government. Also, unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service. On

the other hand, the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards. A former government lawyer is therefore disqualified only from particular matters in which the lawyer participated personally and substantially. The provisions for screening and waiver in paragraph (b) are necessary to prevent the disqualification rule from imposing too severe a deterrent to entering public service. The limitation on disqualification in paragraphs (a)(2) and (d) to matters involving a specific party or specific parties, rather than extending disqualification to all substantive issues on which the lawyer worked, serves a similar function.

[4A]　By requiring a former government lawyer to comply with Rule 1.9(c), Rule 1.11(a)(1) protects information obtained while working for the government to the same extent as information learned while representing a private client. Accordingly, unless the information acquired during government service is "generally known" or these Rules would otherwise permit or require its use or disclosure, the information may not be used or revealed to the government's disadvantage. This provision applies regardless of whether the lawyer was working in a "legal" capacity. Thus, information learned by the lawyer while in public service in an administrative, policy or advisory position also is covered by Rule 1.11(a)(1). Paragraph (c) of Rule 1.11 adds further protections against exploitation of confidential information. Paragraph (c) prohibits a lawyer who has information about a person acquired when the lawyer was a public officer or employee, that the lawyer knows is confidential government information, from representing a private client whose interests are adverse to that person in a matter in which the information could be used to that person's material disadvantage. A firm with which the lawyer is associated may undertake or continue representation in the matter only if the lawyer who possesses the confidential government information is timely and effectively screened. Because Rule 1.11 is not among the Rules enumerated in Rule 1.10, Rule 1.10 is not applicable to (and therefore does not impute) conflicts arising under Rule 1.11. Thus, the purpose and effect of the prohibitions contained in Rule 1.11(c) are to prevent the private client of a law firm with which the former public officer or official is associated from obtaining an unfair advantage by using the lawyer's confidential government information about the private client's adversary.

[5]   When a lawyer has been employed by one government agency and then moves to a second government agency, it may be appropriate to treat that second agency as another client for purposes of this Rule, as when a lawyer is employed by a municipality and subsequently is employed by a federal agency. The question whether two government agencies should be regarded as the same or different clients for conflict of interest purposes is beyond the scope of these Rules. *See* Rule 1.13, Comment [9].

## Former Government Lawyers: Using Screening to Avoid Imputed Disqualification

[6]   Paragraphs (b) and (c) contemplate the use of screening procedures that permit the law firm of a personally disqualified former government lawyer to avoid imputed disqualification. Nevertheless, there may be circumstances where, despite screening, representation by the personally disqualified lawyer's firm could still undermine the public's confidence in the integrity of the legal system. Such a circumstance may arise, for example, where the personally disqualified lawyer occupied a highly visible government position prior to entering private practice, or where other facts and circumstances of the representation itself create an appearance of impropriety. Where the particular circumstances create an appearance of impropriety, a law firm must decline the representation. See Rule 1.0(t) for the definition of "screened" and "screening."

[7]   A firm seeking to avoid disqualification under this Rule should also consider its ability to implement, maintain, and monitor the screening procedures permitted by paragraphs (b) and (c) before undertaking or continuing the representation. In deciding whether the screening procedures permitted by this Rule will be effective to avoid imputed disqualification, a firm should consider a number of factors, including how the size, practices and organization of the firm will affect the likelihood that any confidential information acquired about the matter by the personally disqualified lawyer can be protected. If the firm is large and is organized into separate departments, or maintains offices in multiple locations, or for any reason the structure of the firm facilitates preventing the sharing of information with lawyers not participating in the particular matter, it is more likely that the requirements of this Rule can be met and imputed disqualification avoided. Although a large firm will find it easier to maintain effective screening, lack of timeliness in instituting, or lack of vigilance in maintaining, the procedures required by this Rule may make those procedures ineffective in avoiding imputed disqualification. If a personally disqualified lawyer is working on other matters with lawyers who

are participating in a matter requiring screening, it may be impossible to maintain effective screening procedures. Although the size of the firm may be considered as one of the factors affecting the firm's ability to institute and maintain effective screening procedures, it is not a dispositive factor. A small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of paragraphs (b) and (c).

[7A]   In order to prevent any lawyer in the firm from acquiring confidential information about the matter from the newly associated lawyer, it is essential that notification be given and screening procedures implemented promptly. If the matter requiring screening is already pending before the personally disqualified lawyer joins the firm, the procedures required by this Rule should be implemented before the lawyer joins the firm. If a newly associated lawyer joins a firm before a conflict requiring screening arises, the requirements of this Rule should be satisfied as soon as practicable after the conflict arises. If any lawyer in the firm acquires confidential information about the matter from the personally disqualified lawyer, the requirements of this Rule cannot be met, and any subsequent efforts to institute or maintain screening will not be effective in avoiding the firm's disqualification. Other factors may affect the likelihood that screening procedures will be effective in preventing the flow of confidential information between the personally disqualified lawyer and other lawyers in the firm in a given matter.

[7B]   To enable the government agency to determine compliance with the Rule, notice to the appropriate government agency generally should be given as soon as practicable after the need for screening becomes apparent.

[8]     Paragraph (c) operates only when the lawyer in question has actual knowledge of the information. It does not operate with respect to information that merely could be imputed to the lawyer.

[9]     Paragraph (a) does not prohibit a lawyer from representing a private party and a government agency jointly when doing so is permitted by Rule 1.7 and is not otherwise prohibited by law.

[9A]   Paragraph (d)(1) prohibits a lawyer currently serving as a government officer or employee from participating in a matter in which the lawyer participated personally and substantially while in private practice or other non-governmental employment, unless under applicable law no one else is, or by lawful designation could be, authorized to act in the

lawyer's stead. Informed consent on the part of the government agency is not required where such necessity exists. Conversely, informed consent does not suffice to overcome the conflict in the absence of necessity.

[9B]   Unlike paragraphs (a) and (c), paragraph (d)(1) contains no special rules providing for imputation of the conflict addressed in paragraph (d)(1) to other lawyers in the same agency. Moreover, Rule 1.10 by its terms does not apply to conflicts under paragraph (d)(1). Thus, even where paragraph (d)(1) bars one lawyer in a government law office from working on a matter, other lawyers in the office may ordinarily work on the matter unless prohibited by other law. Where a government law office's representation is materially adverse to a government lawyer's former private client, however, the representation would, absent informed consent of the former client, also be prohibited by Rule 1.9. Rule 1.10 remains applicable to that former client conflict so as to impute the conflict to all lawyers associated in the same government law office. In applying Rule 1.10 to such conflicts, see Rule 1.0(h) (defining "firm" and "law firm").

[10]   For purposes of paragraph (e), a "matter" may continue in another form. In determining whether two particular matters are the same, the lawyer should consider the extent to which (i) the matters involve the same basic facts, (ii) the matters involve the same or related parties, and (iii) time has elapsed between the matters.

# RULE 1.12

## SPECIFIC CONFLICTS OF INTEREST FOR FORMER JUDGES, ARBITRATORS, MEDIATORS OR OTHER THIRD-PARTY NEUTRALS

(a)     A lawyer shall not accept private employment in a matter upon the merits of which the lawyer has acted in a judicial capacity.

(b)     Except as stated in paragraph (e), and unless all parties to the proceeding give informed consent, confirmed in writing, a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as:

(1)     an arbitrator, mediator or other third-party neutral; or

(2)     a law clerk to a judge or other adjudicative officer or an arbitrator, mediator or other third-party neutral.

(c)     A lawyer shall not negotiate for employment with any person who is involved as a party or as lawyer for a party in a matter in which the lawyer is participating personally and substantially as a judge or other adjudicative officer or as an arbitrator, mediator or other third-party neutral.

(d)     When a lawyer is disqualified from representation under this Rule, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1)     the firm acts promptly and reasonably to:

(i)     notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client;

(ii)     implement effective screening procedures to prevent the flow of information about the matter between the personally disqualified lawyer and the others in the firm;

        **(iii)**    **ensure that the disqualified lawyer is apportioned no part of the fee therefrom; and**

        **(iv)**    **give written notice to the parties and any appropriate tribunal to enable it to ascertain compliance with the provisions of this Rule; and**

    **(2)**    **there are no other circumstances in the particular representation that create an appearance of impropriety.**

    **(e)**    **An arbitrator selected as a partisan of a party in a multi-member arbitration panel is not prohibited from subsequently representing that party.**

## Comment

    [1]    A lawyer acts in a "judicial capacity" within the meaning of paragraph (a) when the lawyer serves as a judge or other adjudicative officer. Where a judge or other adjudicative officer in a multimember court, leaves judicial office to practice law, the former judge or adjudicative officer is not prohibited from representing a client in a matter that was pending in the court if the former judge or adjudicative officer did not act upon the merits in that matter. So also, the fact that a former judge or adjudicative officer exercised administrative responsibility in a court does not prevent the former judge or adjudicative officer from acting as a lawyer in a matter where the judge or adjudicative officer had previously exercised remote or incidental administrative responsibility that did not affect the merits. *See* Rule 1.11, Comment [4] (a former government lawyer is disqualified "only from particular matters I which the lawyer participated personally and substantially"). A former judge or adjudicative officer may not, however, accept private employment in a matter upon the merits of which the judge or adjudicative officer has acted in a judicial capacity and—unlike conflicts for lawyers who have acted in a capacity listed in Rule 1.12 (b)—a conflict arising under paragraph (a) cannot be waived. The term "adjudicative officer" in paragraphs (b)(2) and (c) includes such officials as judges pro tempore, referees, special masters, hearing officers and other parajudicial officers.

    [2]    A lawyer who has served as an arbitrator, mediator or other third-party neutral may be asked to represent a client in a matter in which the lawyer participated personally and substantially. This Rule forbids such representation unless all of the parties to the proceedings give their

informed consents, confirmed in writing. *See* Rules 1.0(j), (e). Other law or codes of ethics governing third-party neutrals may impose more stringent standards of personal or imputed disqualification. *See* Rule 2.4.

[3]    Although lawyers who serve as third-party neutrals do not obtain information concerning the parties that is protected under Rule 1.6, they typically owe the parties an obligation of confidentiality under law or codes of ethics governing third-party neutrals. Paragraph (d) therefore provides that conflicts of the personally disqualified lawyer will be imputed to other lawyers in a law firm unless the conditions of this paragraph are met.

[4]    Requirements for screening procedures are stated in paragraph (d). "Screened" and "screening" are defined in Rule 1.0(t).

[4A]   A firm seeking to avoid imputed disqualification under this Rule must prohibit the personally disqualified lawyer from sharing in the fees in the matter.

[4B]   A firm seeking to avoid disqualification under this Rule should also consider its ability to implement, maintain, and monitor the screening procedures permitted by paragraph (d) before undertaking or continuing the representation. In deciding whether the screening procedures permitted by this Rule will be effective to avoid imputed disqualification, a firm should consider a number of factors, including how the size, practices and organization of the firm will affect the likelihood that any confidential information acquired about the matter by the personally disqualified lawyer can be protected. If the firm is large and is organized into separate departments, or maintains offices in multiple locations, or for any reason the structure of the firm facilitates preventing the sharing of information with lawyers not participating in the particular matter, it is more likely that the requirements of this Rule can be met and imputed disqualification avoided. Although a large firm will find it easier to maintain effective screening, lack of timeliness in instituting, or lack of vigilance in maintaining, the procedures required by this Rule may make those procedures ineffective in avoiding imputed disqualification. If a personally disqualified lawyer is working on other matters with lawyers who are participating in a matter requiring screening, it may be impossible to maintain effective screening procedures. The size of the firm may be considered as one of the factors affecting the firm's ability to institute and maintain effective screening procedures, it is not a dispositive factor. A

small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of paragraph (d).

[4C]   In order to prevent any lawyer in the firm from acquiring confidential information about the matter from the newly associated lawyer, it is essential that notification be given and screening procedures implemented promptly. If the matter requiring screening is already pending before the personally disqualified lawyer joins the firm, the procedures required by this Rule should be implemented before the lawyer joins the firm. If a newly associated lawyer joins a firm before a conflict requiring screening arises, the requirements of this Rule should be satisfied as soon as practicable after the conflict arises. If any lawyer in the firm acquires confidential information about the matter from the personally disqualified lawyer, the requirements of this Rule cannot be met, and any subsequent efforts to institute or maintain screening will not be effective in avoiding the firm's disqualification. Other factors may affect the likelihood that screening procedures will be effective in preventing the flow of confidential information between the personally disqualified lawyer and others in the firm in a given matter.

[5]    To enable the tribunal to determine compliance with the Rule, notice to the parties and any appropriate tribunal generally should be given as soon as practicable after the need for screening becomes apparent.

# RULE 1.13

## ORGANIZATION AS CLIENT

(a) When a lawyer employed or retained by an organization is dealing with the organization's directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.

(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action or intends to act or refuses to act in a matter related to the representation that (i) is a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization, and (ii) is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include, among others:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to an appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

(c) If, despite the lawyer's efforts in accordance with paragraph (b), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly in

**violation of law and is likely to result in a substantial injury to the organization, the lawyer may reveal confidential information only if permitted by Rule 1.6, and may resign in accordance with Rule 1.16.**

**(d)    A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the concurrent representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.**

**Comment**

**The Entity as the Client**

[1]    An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, members, shareholders and other constituents. Officers, directors, employees and shareholders are the constituents of the corporate organizational client. The duties defined in this Rule apply equally to unincorporated associations. "Other constituents" as used in this Rule means the positions equivalent to officers, directors, employees, and shareholders held by persons acting for organizational clients that are not corporations.

[2]    When one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected by Rule 1.6. Thus, for example, if an organizational client requests its lawyer to investigate allegations of wrongdoing, interviews between the lawyer and the client's employees or other constituents made in the course of that investigation are covered by Rule 1.6. This does not mean, however, that constituents of an organizational client are the clients of the lawyer. The lawyer may not disclose to such constituents information relating to the representation except for disclosures explicitly or impliedly authorized by the organizational client in order to carry out the representation or as otherwise permitted by Rule 1.6.

[2A]    There are times when the organization's interests may differ from those of one or more of its constituents. In such circumstances, the lawyer should advise any constituent whose interest differs from that of the organization: (i) that a conflict or potential conflict of interest exists, (ii) that the lawyer does not represent the constituent in connection with

the matter, unless the representation has been approved in accordance with Rule 1.13(d), (iii) that the constituent may wish to obtain independent representation, and (iv) that any attorney-client privilege that applies to discussions between the lawyer and the constituent belongs to the organization and may be waived by the organization. Care must be taken to ensure that the constituent understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent, and that discussions between the lawyer for the organization and the constituent may not be privileged.

[2B]   Whether such a warning should be given by the lawyer for the organization to any constituent may turn on the facts of each case.

**Acting in the Best Interest of the Organization**

[3]   When constituents of the organization make decisions for it, the decisions ordinarily must be accepted by the lawyer, even if their utility or prudence is doubtful. Decisions concerning policy and operations, including ones entailing serious risk, are not as such in the lawyer's province. Paragraph (b) makes clear, however, that when the lawyer knows that the organization is likely to be substantially injured by action of an officer or other constituent that violates a legal obligation to the organization or is in violation of law that might be imputed to the organization, the lawyer must proceed as is reasonably necessary in the best interest of the organization. Under Rule 1.0(k), a lawyer's knowledge can be inferred from circumstances, and a lawyer cannot ignore the obvious. The terms "reasonable" and "reasonably" connote a range of conduct that will satisfy the requirements of Rule 1.13. In determining what is reasonable in the best interest of the organization, the circumstances at the time of determination are relevant. Such circumstances may include, among others, the lawyer's area of expertise, the time constraints under which the lawyer is acting, and the lawyer's previous experience and familiarity with the client.

[4]   In determining how to proceed under paragraph (b), the lawyer should give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility within the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations. Measures to be taken may include, among others, asking the constituent to reconsider the matter. For example, if the circumstances involve a constituent's innocent misunderstanding of law and subsequent acceptance of the lawyer's advice, the lawyer

may reasonably conclude that the best interest of the organization does not require that the matter be referred to higher authority. If a constituent persists in conduct contrary to the lawyer's advice, it may be necessary for the lawyer to take steps to have the matter reviewed by a higher authority in the organization. If the matter is of sufficient seriousness and importance or urgency to the organization, referral to higher authority in the organization may be necessary even if the lawyer has not communicated with the constituent. Any measures taken should, to the extent practicable, minimize the risk of revealing information relating to the representation to persons outside the organization. Even in circumstances where a lawyer is not obligated by Rule 1.13 to proceed, a lawyer may bring to the attention of an organizational client, including its highest authority, matters that the lawyer reasonably believes to be of sufficient importance to warrant doing so in the best interest of the organization. *See* Rule 1.4.

[5]     The organization's highest authority to which a matter may be referred ordinarily will be the board of directors or similar governing body. However, applicable law may prescribe that under certain conditions the highest authority reposes elsewhere, for example, in the independent directors of a corporation.

**Relation to Other Rules**

[6]     The authority and responsibility provided in this Rule are concurrent with the authority and responsibility provided in other Rules. In particular, this Rule does not limit or expand the lawyer's responsibility under Rule 1.6, Rule 1.8, Rule 1.16, Rule 3.3 or Rule 4.1. Rules 1.6(b)(2) and (b)(3) may permit the lawyer in some circumstances to disclose confidential information. In such circumstances Rule 1.2(d) may also be applicable, in which event withdrawal from the representation under Rule 1.16(b)(1) may be required.

[7]     The authority of a lawyer to disclose information relating to a representation under Rule 1.6 does not apply with respect to information relating to a lawyer's engagement by an organization to investigate an alleged violation of law or to defend the organization or an officer, employee or other person associated with the organization against a claim arising out of an alleged past violation of law. Having a lawyer who cannot disclose confidential information concerning past acts relevant to the representation for which the lawyer was retained enables an organizational client to enjoy the full benefits of legal counsel in conducting an investigation or defending against a claim.

[8]     A lawyer for an organization who reasonably believes that the lawyer's discharge was because of actions taken pursuant to paragraph (b), or who withdraws in circumstances that require or permit the lawyer to take action under paragraph (b), must proceed as "reasonably necessary in the best interest of the organization." Under some circumstances, the duty of communication under Rule 1.4 and the duty under Rule 1.16(e) to protect a client's interest upon termination of the representation, in conjunction with this Rule, may require the lawyer to inform the organization's highest authority of the lawyer's discharge or withdrawal, and of what the lawyer reasonably believes to be the basis for the discharge or withdrawal.

## Government Agency

[9]     The duties defined in this Rule apply to governmental organizations. Defining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context. Although in some circumstances the client may be a specific agency, it may also be a branch of government, such as the executive branch, or the government as a whole. For example, if the action or failure to act involves the head of a bureau, either the department of which the bureau is a part or the relevant branch of government may be the client for purposes of this Rule. Defining or identifying the client of a lawyer representing a government entity depends on applicable federal, state and local law and is a matter beyond the scope of these Rules. *See* Scope [9]. Moreover, in a matter involving the conduct of government officials, a government lawyer may have greater authority under applicable law to question such conduct than would a lawyer for a private organization in similar circumstances. Thus, when the client is a governmental organization, a different balance may be appropriate between maintaining confidentiality and assuring that the wrongful act is prevented or rectified. In addition, duties of lawyers employed by the government or lawyers in military service may be defined by statutes and regulation. This Rule does not limit that authority. *See* Scope [10].

[10]     *See* Comment [2A].

[11]     *See* Comment [2B].

**Concurrent Representation**

[12]   Paragraph (d) recognizes that a lawyer for an organization may also represent a principal officer or major shareholder, subject to the provisions of Rule 1.7. If the corporation's informed consent to such a concurrent representation is needed, the lawyer should advise the principal officer or major shareholder that any consent given on behalf of the corporation by the conflicted officer or shareholder may not be valid, and the lawyer should explain the potential consequences of an invalid consent.

**Derivative Actions**

[13]   Under generally prevailing law, the shareholders or members of a corporation may bring suit to compel the directors to perform their legal obligations in the supervision of the organization. Members of unincorporated associations have essentially the same right. Such an action may be brought nominally by the organization, but usually is, in fact, a legal controversy over management of the organization.

[14]   The question can arise whether counsel for the organization may defend such an action. The proposition that the organization is the lawyer's client does not alone resolve the issue. Most derivative actions are normal incidents of an organization's affairs, to be defended by the organization's lawyer like any other suits. However, if the claim involves serious charges of wrongdoing by those in control of the organization, a conflict may arise between the lawyer's duty to the organization and the lawyer's relationship with the board. In those circumstances, Rule 1.7 governs who should represent the directors and the organization.

# RULE 1.14

## CLIENT WITH DIMINISHED CAPACITY

**(a)    When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a conventional relationship with the client.**

**(b)    When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.**

**(c)    Information relating to the representation of a client with diminished capacity is protected by Rule 1.6. When taking protective action pursuant to paragraph (b), the lawyer is impliedly authorized under Rule 1.6(a) to reveal information about the client, but only to the extent reasonably necessary to protect the client's interests.**

## Comment

[1]    The responsibilities of a lawyer may vary according to the intelligence, experience, mental condition or age of a client, the obligation of a public officer, or the nature of a particular proceeding. The conventional client-lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters. Any condition that renders a client incapable of communicating or making a considered judgment on the client's own behalf casts additional responsibilities upon the lawyer. When the client is a minor or suffers from a diminished mental capacity, maintaining the conventional client-lawyer relationship may not be possible in all respects. In particular, a severely incapacitated person may have no power to make legally binding decisions. Nevertheless, a client with diminished capacity often has the ability to understand, deliberate upon and reach conclusions about matters affecting the client's own well-being.

[2]    The fact that a client suffers a disability does not diminish the lawyer's obligation to treat the client attentively and with respect.

[3]    The client may wish to have family members or other persons participate in discussions with the lawyer. The lawyer should consider whether the presence of such persons will affect the attorney-client privilege. Nevertheless, the lawyer must keep the client's interests foremost and, except for protective action authorized under paragraph (b), must look to the client, and not family members, to make decisions on the client's behalf.

[4]    If a legal representative has already been appointed for the client, the lawyer should ordinarily look to the representative for decisions on behalf of the client. In matters involving a minor, with or without a disability, the question whether the lawyer should look to the parents as natural guardians may depend on the type of proceeding or matter in which the lawyer is representing the minor. If the lawyer represents the guardian as distinct from the ward, and reasonably believes that the guardian is acting adversely to the ward's interest, the lawyer may have an obligation to prevent or rectify the guardian's misconduct. *See* Rule 1.2(d).

## Taking Protective Action

[5]    If a lawyer reasonably believes that a client is at risk of substantial physical, financial or other harm unless action is taken, and that a conventional client-lawyer relationship cannot be maintained as provided in paragraph (a) because the client lacks sufficient capacity to communicate or to make adequately considered decisions in connection with the representation, then paragraph (b) permits the lawyer to take reasonably necessary protective measures. Such measures could include: consulting with family members, using a reconsideration period to permit clarification or improvement of circumstances, using voluntary surrogate decision-making tools such as durable powers of attorney, or consulting with support groups, professional services, adult-protective agencies or other individuals or entities that have the ability to protect the client. In taking any protective action, the lawyer should be guided by such factors as the wishes and values of the client to the extent known, the client's best interest, and the goals of minimizing intrusion into the client's decision-making autonomy and maximizing respect for the client's family and social connections.

[6]    In determining the extent of the client's diminished capacity, the lawyer should consider and balance such factors as: (i) the client's ability to articulate reasoning leading to a decision, (ii) variability of state of mind and ability to appreciate consequences of a decision; the substantive fairness of a decision, and (iii) the consistency of a decision with the known long-term commitments and values of the client. In appropriate circumstances, the lawyer may seek guidance from an appropriate diagnostician.

[7]    If a legal representative has not been appointed, the lawyer should consider whether appointment of a guardian ad litem, conservator or guardian is necessary to protect the client's interests. Thus, if a client with diminished capacity has substantial property that should be sold for the client's benefit, effective completion of the transaction may require appointment of a legal representative. In addition, rules of procedure in litigation sometimes provide that a minor or a person with diminished capacity must be represented by a guardian or next friend if they do not have a general guardian. In many circumstances, however, appointment of a legal representative may be unnecessarily expensive or traumatic for the client. Seeking a guardian or conservator without the client's consent (including doing so over the client's objection) is appropriate only in the limited circumstances where a client's diminished capacity is such that the lawyer reasonably believes that no other practical method of protecting the client's interests is readily available. The lawyer should always consider less restrictive protective actions before seeking the appointment of a guardian or conservator. The lawyer should act as petitioner in such a proceeding only when no other person is available to do so.

[7A]   Prior to withdrawing from the representation of a client whose capacity is in question, the lawyer should consider taking reasonable protective action. *See* Rule 1.16(e).

**Disclosure of the Client's Condition**

[8]    Disclosure of the client's diminished capacity could adversely affect the client's interests. For example, raising the question of diminished capacity could, in some circumstances, lead to proceedings for involuntary commitment. Information relating to the representation is protected by Rule 1.6. Therefore, unless authorized to do so, the lawyer may not disclose such information. When taking protective action pursuant to paragraph (b), the lawyer is impliedly authorized to make the necessary disclosures, even when the client directs the lawyer to the contrary. Nevertheless, given the risks of disclosure, paragraph (c) limits what the

lawyer may disclose in consulting with other individuals or entities or in seeking the appointment of a legal representative. At the very least, the lawyer should determine whether it is likely that the person or entity consulted will act adversely to the client's interests before discussing matters related to the client.

# RULE 1.15

## PRESERVING IDENTITY OF FUNDS AND PROPERTY OF OTHERS; FIDUCIARY RESPONSIBILITY; COMMINGLING AND MISAPPROPRIATION OF CLIENT FUNDS OR PROPERTY; MAINTENANCE OF BANK ACCOUNTS; RECORD KEEPING; EXAMINATION OF RECORDS

(a)    **Prohibition Against Commingling and Misappropriation of Client Funds or Property.**

A lawyer in possession of any funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary, and must not misappropriate such funds or property or commingle such funds or property with his or her own.

(b)    **Separate Accounts.**

(1)    A lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law shall maintain such funds in a banking institution within New York State that agrees to provide dishonored check and overdraft reports in accordance with the provisions of 22 N.Y.C.R.R. Part 1300. "Banking institution" means a state or national bank, trust company, savings bank, savings and loan association or credit union. Such funds shall be maintained, in the lawyer's own name, or in the name of a firm of lawyers of which the lawyer is a member, or in the name of the lawyer or firm of lawyers by whom the lawyer is employed, in a special account or accounts, separate from any business or personal accounts of the lawyer or lawyer's firm, and separate from any accounts that the lawyer may maintain as executor, guardian, trustee or receiver, or in any other fiduciary capacity; into such special account or accounts all funds held in escrow or otherwise entrusted to the lawyer or firm shall be deposited; provided, however, that such funds may be maintained in a banking institution located outside New York State if such banking institution complies with 22 N.Y.C.R.R. Part 1300 and the lawyer has obtained the prior written approval of the person to whom such funds belong specifying the name and address of the office or branch of the banking institution where

such funds are to be maintained. No special account or trust aforementioned may have overdraft protection.

(2)     A lawyer or the lawyer's firm shall identify the special bank account or accounts required by Rule 1.15(b)(1) as an "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account," and shall obtain checks and deposit slips that bear such title. Such title may be accompanied by such other descriptive language as the lawyer may deem appropriate, provided that such additional language distinguishes such special account or accounts from other bank accounts that are maintained by the lawyer or the lawyer's firm.

(3)     Funds reasonably sufficient to maintain the account or to pay account charges may be deposited therein.

(4)     Funds belonging in part to a client or third person and in part currently or potentially to the lawyer or law firm shall be kept in such special account or accounts, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client or third person, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(c)     Notification of Receipt of Property; Safekeeping; Rendering Accounts; Payment or Delivery of Property.

A lawyer shall:

(1)     promptly notify a client or third person of the receipt of funds, securities, or other properties in which the client or third person has an interest;

(2)     identify and label securities and properties of a client or third person promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable;

(3)     maintain complete records of all funds, securities, and other properties of a client or third person coming into the

possession of the lawyer and render appropriate accounts to the client or third person regarding them; and

(4)    promptly pay or deliver to the client or third person as requested by the client or third person the funds, securities, or other properties in the possession of the lawyer that the client or third person is entitled to receive.

(d)    **Required Bookkeeping Records.**

(1)    A lawyer shall maintain for seven years after the events that they record:

(i)    the records of all deposits in and withdrawals from the accounts specified in Rule 1.15(b) and of any other bank account that concerns or affects the lawyer's practice of law; these records shall specifically identify the date, source and description of each item deposited, as well as the date, payee and purpose of each withdrawal or disbursement;

(ii)    a record for special accounts, showing the source of all funds deposited in such accounts, the names of all persons for whom the funds are or were held, the amount of such funds, the description and amounts, and the names of all persons to whom such funds were disbursed;

(iii)    copies of all retainer and compensation agreements with clients;

(iv)    copies of all statements to clients or other persons showing the disbursement of funds to them or on their behalf;

(v)    copies of all bills rendered to clients;

(vi)    copies of all records showing payments to lawyers, investigators or other persons, not in the lawyer's regular employ, for services rendered or performed;

(vii)    copies of all retainer and closing statements filed with the Office of Court Administration; and

       **(viii)   all checkbooks and check stubs, bank statements, prenumbered canceled checks and duplicate deposit slips.**

       **(2)    Lawyers shall make accurate entries of all financial transactions in their records of receipts and disbursements, in their special accounts, in their ledger books or similar records, and in any other books of account kept by them in the regular course of their practice, which entries shall be made at or near the time of the act, condition or event recorded.**

       **(3)    For purposes of Rule 1.15(d), a lawyer may satisfy the requirements of maintaining "copies" by maintaining any of the following items: original records, photocopies, microfilm, optical imaging, and any other medium that preserves an image of the document that cannot be altered without detection.**

**(e)    Authorized Signatories.**

**All special account withdrawals shall be made only to a named payee and not to cash. Such withdrawals shall be made by check or, with the prior written approval of the party entitled to the proceeds, by bank transfer. Only a lawyer admitted to practice law in New York State shall be an authorized signatory of a special account.**

**(f)    Missing Clients.**

**Whenever any sum of money is payable to a client and the lawyer is unable to locate the client, the lawyer shall apply to the court in which the action was brought if in the unified court system, or, if no action was commenced in the unified court system, to the Supreme Court in the county in which the lawyer maintains an office for the practice of law, for an order directing payment to the lawyer of any fees and disbursements that are owed by the client and the balance, if any, to the Lawyers' Fund for Client Protection for safeguarding and disbursement to persons who are entitled thereto.**

**(g)    Designation of Successor Signatories.**

       **(1)    Upon the death of a lawyer who was the sole signatory on an attorney trust, escrow or special account, an**

application may be made to the Supreme Court for an order designating a successor signatory for such trust, escrow or special account, who shall be a member of the bar in good standing and admitted to the practice of law in New York State.

(2)     An application to designate a successor signatory shall be made to the Supreme Court in the judicial district in which the deceased lawyer maintained an office for the practice of law. The application may be made by the legal representative of the deceased lawyer's estate; a lawyer who was affiliated with the deceased lawyer in the practice of law; any person who has a beneficial interest in such trust, escrow or special account; an officer of a city or county bar association; or counsel for an attorney disciplinary committee. No lawyer may charge a legal fee for assisting with an application to designate a successor signatory pursuant to this Rule.

(3)     The Supreme Court may designate a successor signatory and may direct the safeguarding of funds from such trust, escrow or special account, and the disbursement of such funds to persons who are entitled thereto, and may order that funds in such account be deposited with the Lawyers' Fund for Client Protection for safeguarding and disbursement to persons who are entitled thereto.

(h)     Dissolution of a Firm.

Upon the dissolution of any firm of lawyers, the former partners or members shall make appropriate arrangements for the maintenance, by one of them or by a successor firm, of the records specified in Rule 1.15(d).

(i)     Availability of Bookkeeping Records: Records Subject to Production in Disciplinary Investigations and Proceedings.

The financial records required by this Rule shall be located, or made available, at the principal New York State office of the lawyers subject hereto, and any such records shall be produced in response to a notice or subpoena duces tecum issued in connection with a complaint before or any investigation by the appropriate grievance or departmental disciplinary committee, or shall be produced at the direction of the appropriate Appellate Division before any person designated by it. All books and records produced pursuant to this

Rule shall be kept confidential, except for the purpose of the particular proceeding, and their contents shall not be disclosed by anyone in violation of the attorney-client privilege.

  **(j)**  **Disciplinary Action.**

  A lawyer who does not maintain and keep the accounts and records as specified and required by this Rule, or who does not produce any such records pursuant to this Rule, shall be deemed in violation of these Rules and shall be subject to disciplinary proceedings.

**Comment**

  [1]  A lawyer should hold the funds and property of others using the care required of a professional fiduciary. Securities and other property should be kept in a safe deposit box, except when some other form of safekeeping is warranted by special circumstances. All property that is the property of clients or third persons, including prospective clients, must be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts, including an account established pursuant to the "Interest on Lawyer Accounts" law where appropriate. *See* State Finance Law § 97-v(4)(a); Judiciary Law § 497(2); 21 N.Y.C.R.R. § 7000.10. Separate trust accounts may be warranted or required when administering estate monies or acting in similar fiduciary capacities.

  [2]  While normally it is impermissible to commingle the lawyer's own funds with client funds, paragraph (b)(3) provides that it is permissible when necessary to pay bank service charges on that account. Accurate records must be kept regarding which portion of the funds belongs to the lawyer.

  [3]  Lawyers often receive funds from which the lawyer's fee will or may be paid. A lawyer is not required to remit to the client funds that the lawyer reasonably believes represent fees owed to the lawyer. However, a lawyer may not withhold the client's share of the funds to coerce the client into accepting the lawyer's claim for fees. While a lawyer may be entitled under applicable law to assert a retaining lien on funds in the lawyer's possession, a lawyer may not enforce such a lien by taking the lawyer's fee from funds that the lawyer holds in an attorney's trust account, escrow account or special account, except as may be provided in an applicable agreement or directed by court order. Furthermore, any disputed portion of the funds must be kept in or transferred into a trust

account, and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds is to be distributed promptly.

[4]     Paragraph (c)(4) also recognizes that third parties may have lawful claims against specific funds or other property in a lawyer's custody, such as a client's creditor who has a lien on funds recovered in a personal injury action. A lawyer may have a duty under applicable law to protect such third party claims against wrongful interference by the client. In such cases, when the third-party claim is not frivolous under applicable law, the lawyer must refuse to surrender the property to the client until the claims are resolved. A lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party, but, when there are substantial grounds for dispute as to the person entitled to the funds, the lawyer may file an action to have a court resolve the dispute.

[5]     The obligations of a lawyer under this Rule are independent of those arising from activity other than rendering legal services. For example, a lawyer who serves only as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction and is not governed by this Rule.

# RULE 1.16

## DECLINING OR TERMINATING REPRESENTATION

(a) A lawyer shall not accept employment on behalf of a person if the lawyer knows or reasonably should know that such person wishes to:

(1) bring a legal action, conduct a defense, or assert a position in a matter, or otherwise have steps taken for such person, merely for the purpose of harassing or maliciously injuring any person; or

(2) present a claim or defense in a matter that is not warranted under existing law, unless it can be supported by a good faith argument for an extension, modification, or reversal of existing law.

(b) Except as stated in paragraph (d), a lawyer shall withdraw from the representation of a client when:

(1) the lawyer knows or reasonably should know that the representation will result in a violation of these Rules or of law;

(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client;

(3) the lawyer is discharged; or

(4) the lawyer knows or reasonably should know that the client is bringing the legal action, conducting the defense, or asserting a position in the matter, or is otherwise having steps taken, merely for the purpose of harassing or maliciously injuring any person.

(c) Except as stated in paragraph (d), a lawyer may withdraw from representing a client when:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client;

(2)     the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

(3)     the client has used the lawyer's services to perpetrate a crime or fraud;

(4)     the client insists upon taking action with which the lawyer has a fundamental disagreement;

(5)     the client deliberately disregards an agreement or obligation to the lawyer as to expenses or fees;

(6)     the client insists upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good faith argument for an extension, modification, or reversal of existing law;

(7)     the client fails to cooperate in the representation or otherwise renders the representation unreasonably difficult for the lawyer to carry out employment effectively;

(8)     the lawyer's inability to work with co-counsel indicates that the best interest of the client likely will be served by withdrawal;

(9)     the lawyer's mental or physical condition renders it difficult for the lawyer to carry out the representation effectively;

(10)     the client knowingly and freely assents to termination of the employment;

(11)     withdrawal is permitted under Rule 1.13(c) or other law;

(12)     the lawyer believes in good faith, in a matter pending before a tribunal, that the tribunal will find the existence of other good cause for withdrawal; or

(13)     the client insists that the lawyer pursue a course of conduct which is illegal or prohibited under these Rules.

**(d)    If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a matter before that tribunal without its permission. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.**

**(e)    Even when withdrawal is otherwise permitted or required, upon termination of representation, a lawyer shall take steps, to the extent reasonably practicable, to avoid foreseeable prejudice to the rights of the client, including giving reasonable notice to the client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, promptly refunding any part of a fee paid in advance that has not been earned and complying with applicable laws and rules.**

## Comment

[1]    A lawyer should not accept representation in a matter unless it can be performed competently, promptly, without improper conflict of interest and to completion. Ordinarily, a representation in a matter is completed when the agreed-upon assistance has been concluded. *See* Rules 1.2(c), 6.5; *see also* Rule 1.3, Comment [4].

## Mandatory Withdrawal

[2]    A lawyer ordinarily must decline or withdraw from representation under paragraph (a), (b)(1) or (b)(4), as the case may be, if the client demands that the lawyer engage in conduct that is illegal or that violates these Rules or other law. The lawyer is not obliged to decline or withdraw simply because the client suggests such a course of conduct; a client may make such a suggestion in the hope that a lawyer will not be constrained by a professional obligation.

[3]    Court approval or notice to the court is often required by applicable law, and when so required by applicable law is also required by paragraph (d), before a lawyer withdraws from pending litigation. Difficulty may be encountered if withdrawal is based on the client's demand that the lawyer engage in unprofessional conduct. The court may request an explanation for the withdrawal, while the lawyer may be bound to keep confidential the facts that would constitute such an explanation. The lawyer's statement that professional considerations require termination of the

representation ordinarily should be accepted as sufficient. Lawyers should be mindful of their obligations to both clients and the court under Rule 1.6 and Rule 3.3.

**Discharge**

[4]     As provided in paragraph (b)(3), a client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services. Where future dispute about the withdrawal may be anticipated, it may be advisable to prepare a written statement reciting the circumstances.

[5]     Whether a client can discharge appointed counsel may depend on applicable law. A client seeking to do so should be given a full explanation of the consequences. These consequences may include a decision by the appointing authority that appointment of successor counsel is unjustified, thus requiring self-representation by the client.

[6]     If the client has severely diminished capacity, the client may lack the legal capacity to discharge the lawyer, and in any event the discharge may be seriously adverse to the client's interests. The lawyer should make special effort to help the client consider the consequences and may take reasonably necessary protective action as provided in Rule 1.14(b).

**Optional Withdrawal**

[7]     Under paragraph (c), a lawyer may withdraw from representation in some circumstances. The lawyer has the option to withdraw if withdrawal can be accomplished without material adverse effect on the client's interests. Withdrawal is also justified if the client persists in a course of action that the lawyer reasonably believes is criminal or fraudulent, for a lawyer is not required to be associated with such conduct even if the lawyer does not further it. Withdrawal is also permitted if the lawyer's services were misused in the past, even if withdrawal would materially prejudice the client. The lawyer may also withdraw where the client insists on taking action with which the lawyer has a fundamental disagreement.

[7A]   In accordance with paragraph (c)(4), a lawyer should use reasonable foresight in determining whether a proposed representation will involve client objectives or instructions with which the lawyer has a fundamental disagreement. A client's intended action does not create a

fundamental disagreement simply because the lawyer disagrees with it. *See* Rule 1.2 regarding the allocation of responsibility between client and lawyer. The client has the right, for example, to accept or reject a settlement proposal; a client's decision on settlement involves a fundamental disagreement only when no reasonable person in the client's position, having regard for the hazards of litigation, would have declined the settlement. In addition, the client should be given notice of intent to withdraw and an opportunity to reconsider.

[8]    Under paragraph (c)(5), a lawyer may withdraw if the client refuses to abide by the terms of an agreement concerning fees or court costs (or other expenses or disbursements).

[8A]   Continuing to represent a client may impose an unreasonable burden unexpected by the client and lawyer at the outset of the representation. However, lawyers are ordinarily better suited than clients to foresee and provide for the burdens of representation. The burdens of uncertainty should therefore ordinarily fall on lawyers rather than clients unless they are attributable to client misconduct. That a representation will require more work or significantly larger advances of expenses than the lawyer contemplated when the fee was fixed is not grounds for withdrawal under paragraph (c)(5).

**Assisting the Client upon Withdrawal**

[9]    Even if the lawyer has been unfairly discharged by the client, under paragraph (e) a lawyer must take all reasonable steps to mitigate the consequences to the client. The lawyer may retain papers as security for a fee only to the extent permitted by law. *See* Rule 1.15.

# RULE 1.17

## SALE OF LAW PRACTICE

(a)     A lawyer retiring from a private practice of law; a law firm, one or more members of which are retiring from the private practice of law with the firm; or the personal representative of a deceased, disabled or missing lawyer, may sell a law practice, including goodwill, to one or more lawyers or law firms, who may purchase the practice. The seller and the buyer may agree on reasonable restrictions on the seller's private practice of law, notwithstanding any other provision of these Rules. Retirement shall include the cessation of the private practice of law in the geographic area, that is, the county and city and any county or city contiguous thereto, in which the practice to be sold has been conducted.

(b)     Confidential information.

(1)     With respect to each matter subject to the contemplated sale, the seller may provide prospective buyers with any information not protected as confidential information under Rule 1.6.

(2)     Notwithstanding Rule 1.6, the seller may provide the prospective buyer with information as to individual clients:

(i)     concerning the identity of the client, except as provided in paragraph (b)(6);

(ii)     concerning the status and general nature of the matter;

(iii)     available in public court files; and

(iv)     concerning the financial terms of the client-lawyer relationship and the payment status of the client's account.

(3)     Prior to making any disclosure of confidential information that may be permitted under paragraph (b)(2), the seller shall provide the prospective buyer with information regarding the matters involved in the proposed sale sufficient to enable the prospective buyer to determine whether any conflicts of interest exist. Where sufficient information cannot be

disclosed without revealing client confidential information, the seller may make the disclosures necessary for the prospective buyer to determine whether any conflict of interest exists, subject to paragraph (b)(6). If the prospective buyer determines that conflicts of interest exist prior to reviewing the information, or determines during the course of review that a conflict of interest exists, the prospective buyer shall not review or continue to review the information unless the seller shall have obtained the consent of the client in accordance with Rule 1.6(a)(1).

(4) Prospective buyers shall maintain the confidentiality of and shall not use any client information received in connection with the proposed sale in the same manner and to the same extent as if the prospective buyers represented the client.

(5) Absent the consent of the client after full disclosure, a seller shall not provide a prospective buyer with information if doing so would cause a violation of the attorney-client privilege.

(6) If the seller has reason to believe that the identity of the client or the fact of the representation itself constitutes confidential information in the circumstances, the seller may not provide such information to a prospective buyer without first advising the client of the identity of the prospective buyer and obtaining the client's consent to the proposed disclosure.

(c) Written notice of the sale shall be given jointly by the seller and the buyer to each of the seller's clients and shall include information regarding:

(1) the client's right to retain other counsel or to take possession of the file;

(2) the fact that the client's consent to the transfer of the client's file or matter to the buyer will be presumed if the client does not take any action or otherwise object within 90 days of the sending of the notice, subject to any court rule or statute requiring express approval by the client or a court;

(3) the fact that agreements between the seller and the seller's clients as to fees will be honored by the buyer;

(4)      proposed fee increases, if any, permitted under paragraph (e); and

(5)      the identity and background of the buyer or buyers, including principal office address, bar admissions, number of years in practice in New York State, whether the buyer has ever been disciplined for professional misconduct or convicted of a crime, and whether the buyer currently intends to resell the practice.

(d)      When the buyer's representation of a client of the seller would give rise to a waivable conflict of interest, the buyer shall not undertake such representation unless the necessary waiver or waivers have been obtained in writing.

(e)      The fee charged a client by the buyer shall not be increased by reason of the sale, unless permitted by a retainer agreement with the client or otherwise specifically agreed to by the client.

## Comment

[1]      The practice of law is a profession, not merely a business. Clients are not commodities that can be purchased and sold at will. Pursuant to this Rule, when a lawyer or an entire firm ceases to practice, and other lawyers or firms take over the representation, the selling lawyer or firm may obtain compensation for the reasonable value of the practice, as may withdrawing partners of law firms.

## Termination of Practice by Seller

[2]      The requirement that all of the private practice be sold is satisfied if the seller in good faith makes the entire practice available for sale to the buyers. The fact that a number of the seller's clients decide not to be represented by the buyers but take their matters elsewhere, therefore, does not result in a violation. Return to private practice as a result of an unanticipated change in circumstances does not necessarily result in a violation. For example, a lawyer who has sold the practice to accept an appointment to judicial office does not violate the requirement that the sale be attendant to cessation of practice if the lawyer later resumes private practice upon being defeated in a contested or a retention election for the office or resigns from a judiciary position. Although the requirements of this Rule may not be violated in these situations, contractual provisions

in the agreement governing the sale of the practice may contain reasonable restrictions on a lawyer's resuming private practice. *See* Rule 5.6, Comment [1], regarding restrictions on right to practice.

[3]     The private practice of law refers to a private law firm or lawyer, not to a public agency, legal services entity, or in-house counsel to a business. The requirement that the seller cease to engage in the private practice of law therefore does not prohibit employment as a lawyer on the staff of a public agency or a legal services entity that provides legal services to the poor, or as in-house counsel to a business.

[4]     The Rule permits a sale of an entire practice attendant upon retirement from the private practice of law within a geographic area, defined as the county and city and any county or city contiguous thereto, in which the practice to be sold has been conducted. Its provisions therefore accommodate the lawyer who sells the practice on the occasion of moving to another city and county that does not border on the city or county.

[5]     [Reserved.]

**Sale of Entire Practice**

[6]     The Rule requires that the seller's entire practice be sold. The prohibition against sale of less than an entire practice protects those clients whose matters are less lucrative and who might find it difficult to secure other counsel if a sale could be limited to substantial fee-generating matters. The buyers are required to undertake all client matters in the practice, subject to client consent. This requirement is not violated even if a buyer is unable to undertake a particular client matter because of a conflict of interest and the seller therefore remains as attorney of record for the matter in question.

**Client Confidences, Consent and Notice**

[7]     Giving the buyer access to client-specific information relating to the representation and to the file requires client consent. Rule 1.17 provides that before such information can be disclosed by the seller to the buyer, the client must be given actual written notice of the contemplated sale, including the identity of the buyer, and must be told that the decision to consent or make other arrangements must be made within 90 days. If nothing is heard from the client within that time, consent to the sale is presumed under paragraph (c)(2).

[8]    A lawyer or law firm ceasing to practice cannot be required to remain in practice because some clients cannot be given actual notice of the proposed purchase. The selling lawyer must make a good-faith effort to notify all of the lawyer's current clients. Where clients cannot be given actual notice and therefore cannot themselves consent to the purchase or direct any other disposition of their files, they are nevertheless protected by the fact that the buyer has the duty to maintain their confidences under paragraph (b)(4).

[9]    All elements of client autonomy, including the client's absolute right to discharge a lawyer and transfer the representation to another, survive the sale of the practice.

**Fee Arrangements Between Client and Buyer**

[10]    The sale may not be financed by increases in fees charged to the clients of the purchased practice except to the extent permitted by subparagraph (e) of this Rule. Under subparagraph (e), the buyer must honor existing arrangements between the seller and the client as to fees unless the seller's retainer agreement with the client permits a fee increase or the buyer obtains a client's specific agreement to a fee increase in compliance with the strict standards of Rule 1.8(a) (governing business transactions between lawyers and clients).

**Other Applicable Ethical Standards**

[11]    Lawyers participating in the sale or purchase of a law practice are subject to the ethical standards applicable to involving another lawyer in the representation of a client. Examples include (i) the seller's obligation to exercise competence in identifying a buyer qualified to assume the practice and the buyer's obligation to undertake the representation competently under Rule 1.1, (ii) the obligation of the seller and the buyer to avoid disqualifying conflicts, and to secure the client's informed consent for those conflicts that can be agreed to under Rule 1.7, and (iii) the obligation of the seller and the buyer to protect information relating to the representation under Rule 1.6 and Rule 1.9. *See also* Rule 1.0(j) for the definition of "informed consent."

[12]    If approval of the substitution of the purchasing lawyer for the selling lawyer is required by the rules of any tribunal in which a matter is pending, such approval must be obtained before the matter can be included in the sale. *See* Rule 1.16. If a tribunal refuses to give its permis-

sion for the substitution and the seller therefore must continue in the matter, the seller does not thereby violate the portion of this Rule requiring the seller to cease practice in the described geographic area.

**Applicability of the Rule**

[13]    [Reserved.]

[14]    This Rule does not apply to: (i) admission to or retirement from a law partnership or professional association, (ii) retirement plans and similar arrangements, (iii) a sale of tangible assets of a law practice, or (iv) the transfers of legal representation between lawyers when such transfers are unrelated to the sale of a practice. This Rule governs the sale of an entire law practice upon retirement, which is defined in paragraph (a) as the cessation of the private practice of law in a given geographic area. Rule 5.4(a)(2) provides for the compensation of a lawyer who undertakes to complete one or more unfinished pieces of legal business of a deceased lawyer.

# RULE 1.18

## DUTIES TO PROSPECTIVE CLIENTS

**(a)**    **Except as provided in Rule 1.18(e), a person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.**

**(b)**    **Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client.**

**(c)**    **A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).**

**(d)**    **When the lawyer has received disqualifying information as defined in paragraph (c), representation is permissible if:**

> **(1)    both the affected client and the prospective client have given informed consent, confirmed in writing; or**

> **(2)    the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and**

> > **(i)    the firm acts promptly and reasonably to notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client;**

> > **(ii)    the firm implements effective screening procedures to prevent the flow of information about the matter between the disqualified lawyer and the others in the firm;**

        **(iii)** **the disqualified lawyer is apportioned no part of the fee therefrom; and**

        **(iv)** **written notice is promptly given to the prospective client; and**

      **(3)** **a reasonable lawyer would conclude that the law firm will be able to provide competent and diligent representation in the matter.**

    **(e)** **A person is not a prospective client within the meaning of paragraph (a) if the person:**

      **(1)** **communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship; or**

      **(2)** **communicates with a lawyer for the purpose of disqualifying the lawyer from handling a materially adverse representation on the same or a substantially related matter.**

**Comment**

[1]    Prospective clients, like current clients, may disclose information to a lawyer, place documents or other property in the lawyer's custody, or rely on the lawyer's advice. A lawyer's consultations with a prospective client usually are limited in time and depth and leave both the prospective client and the lawyer free (and sometimes required) to proceed no further. Prospective clients should therefore receive some, but not all, of the protection afforded clients.

[2]    A person becomes a prospective client by consulting with a lawyer about the possibility of forming client-lawyer relationship with respect to a matter. Whether communications, including written, oral, or electronic communications, constitute a consultation depends on the circumstances. For example, a consultation is likely to have occurred if a lawyer, either in person or through the lawyer's advertising in any medium, specifically requests or invites the submission of information about a potential representation without clear and reasonably understandable warnings and cautionary statements that limit the lawyer's obligations, and a person provides information in response. In contrast, a consultation does not occur if a person provides information to a lawyer

in response to advertising that merely describes the lawyer's education, experience, areas of practice, and contact information, or provides legal information of general interest. Such a person communicates information unilaterally to a lawyer without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, and is thus not a "prospective client." Moreover, a person who communicates with a lawyer for the purpose of disqualifying the lawyer is not a "prospective client"—*see* Rule 1.18(e).

[3]    It is often necessary for a prospective client to reveal information to the lawyer during an initial consultation prior to the decision about formation of a client-lawyer relationship. The lawyer often must learn such information to determine whether there is a conflict of interest with an existing client and whether the matter is one that the lawyer is willing to undertake. Paragraph (b) prohibits the lawyer from using or revealing that information, except as permitted by Rule 1.9, even if the client or lawyer decides not to proceed with the representation. The duty exists regardless of how brief the initial conference may be.

[4]    In order to avoid acquiring disqualifying information from a prospective client, a lawyer considering whether to undertake a new matter should limit the initial consultation to only such information as reasonably appears necessary for that purpose. Where the information indicates that a conflict of interest or other reason for non-representation exists, the lawyer should so inform the prospective client or decline the representation. If the prospective client wishes to retain the lawyer, and if consent is possible under Rule 1.7 or Rule 1.9, then consent from all affected current or former clients must be obtained before accepting the representation. The representation must be declined if the lawyer will be unable to provide competent, diligent and adequate representation to the affected current and former clients and the prospective client.

[5]    A lawyer may condition a consultation with a prospective client on the person's informed consent that no information disclosed during the consultation will prohibit the lawyer from representing a different client in the matter. See Rule 1.0(j) for the definition of "informed consent," and with regard to the effectiveness of an advance waiver see Rule 1.7, Comments [22]-[22A] and Rule 1.9, Comment [9]. If permitted by law and if the agreement expressly so provides, the prospective client may also consent to the lawyer's subsequent use of information received from the prospective client.

[6]     Under paragraph (c), even in the absence of an agreement the lawyer is not prohibited from representing a client with interests adverse to those of the prospective client in the same or a substantially related matter unless the lawyer has received from the prospective client information that could be significantly harmful if used in that matter.

[7]     Under paragraph (c), the prohibition in this Rule is imputed to other lawyers as provided in Rule 1.10, but, under paragraph (d)(1), imputation may be avoided if the lawyer obtains the informed consent, confirmed in writing, of both the prospective and affected clients. In the alternative, imputation may be avoided if the conditions of paragraph (d)(2) are met and all disqualified lawyers are timely screened, and written notice is promptly given to the prospective client. *See* Rule 1.10. Paragraph (d)(2)(i) does not prohibit the screened lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified. Before proceeding under paragraph (d)(1) or paragraph (d)(2), however, a lawyer must be mindful of the requirement of paragraph (d)(3) that "a reasonable lawyer would conclude that the law firm will be able to provide competent and diligent representation in the matter."

[7A]     Paragraph (d)(2) sets out the basic procedural requirements that a law firm must satisfy to ensure that a personally disqualified lawyer is effectively screened from participation in the matter. This Rule requires that the firm promptly: (i) notify, as appropriate, lawyers and relevant nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client, and (ii) implement effective screening procedures to prevent the flow of information about the matter between the personally disqualified lawyer and others in the firm.

[7B]     A firm seeking to avoid disqualification under this Rule should also consider its ability to implement, maintain, and monitor the screening procedures permitted by paragraph (d)(2) before undertaking or continuing the representation. In deciding whether the screening procedures permitted by this Rule will be effective to avoid imputed disqualification, a firm should consider a number of factors, including how the size, practices and organization of the firm will affect the likelihood that any confidential information acquired about the matter by the personally disqualified lawyer can be protected. If the firm is large and is organized into separate departments, or maintains offices in multiple locations, or for any reason the structure of the firm facilitates preventing the sharing of infor-

mation with lawyers not participating in the particular matter, it is more likely that the requirements of this Rule can be met and imputed disqualification avoided. Although a large firm will find it easier to maintain effective screening, lack of timeliness in instituting, or lack of vigilance in maintaining, the procedures required by this Rule may make those procedures ineffective in avoiding imputed disqualification. If a personally disqualified lawyer is working on other matters with lawyers who are participating in a matter requiring screening, it may be impossible to maintain effective screening procedures. The size of the firm may be considered as one of the factors affecting the firm's ability to institute and maintain effective screening procedures, but it is not a dispositive factor. A small firm may need to exercise special care and vigilance to maintain effective screening but, if appropriate precautions are taken, small firms can satisfy the requirements of paragraph (d)(2).

[7C]   In order to prevent any other lawyer in the firm from acquiring confidential information about the matter from the disqualified lawyer, it is essential that notification be given and screening procedures implemented promptly. If any lawyer in the firm acquires confidential information about the matter from the disqualified lawyer, the requirements of this Rule cannot be met, and any subsequent efforts to institute or maintain screening will not be effective in avoiding the firm's disqualification. Other factors may affect the likelihood that screening procedures will be effective in preventing the flow of confidential information between the disqualified lawyer and other lawyers in the firm in a given matter.

[8]   Notice under paragraph (d)(2), including a general description of the subject matter about which the lawyer was consulted and of the screening procedures employed, generally should be given as soon as practicable after the need for screening becomes apparent.

[9]   For the duty of competence of a lawyer who gives assistance on the merits of a matter to a prospective client, *see* Rule 1.1. For a lawyer's duties when a prospective client entrusts valuables or papers to the lawyer's care, see Rule 1.15.

# RULE 2.1

## ADVISOR

**In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social, psychological, and political factors that may be relevant to the client's situation.**

**Comment**

**Scope of Advice**

[1]    A client is entitled to straightforward advice expressing the lawyer's honest assessment. Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront. In presenting advice, a lawyer endeavors to sustain the client's morale and may put advice in as acceptable a form as honesty permits. Nevertheless, a lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client.

[2]    Advice couched in narrow legal terms may be of little value to a client, especially where practical considerations, such as cost or effects on other people, are predominant. Purely technical legal advice, therefore, can sometimes be inadequate. It is proper for a lawyer to refer to relevant moral and ethical considerations in giving advice. Although a lawyer is not a moral advisor as such, moral and ethical considerations impinge upon most legal questions and may decisively influence how the law will be applied.

[3]    A client may expressly or impliedly ask the lawyer for purely technical advice. When such a request is made by a client experienced in legal matters, the lawyer may accept it at face value. When such a request is made by a client inexperienced in legal matters, however, the lawyer's responsibilities as advisor may include the responsibility to indicate that more may be involved than strictly legal considerations. For the allocation of responsibility in decision making between lawyer and client, see Rule 1.2.

[4]    Matters that go beyond strictly legal questions may also be in the domain of another profession. Family matters can involve problems within the professional competence of psychiatry, clinical psychology or social work; business matters can involve problems within the compe-

tence of the accounting profession or of financial or public relations specialists. Where consultation with a professional in another field is itself something a competent lawyer would recommend, the lawyer should make such a recommendation. At the same time, a lawyer's advice at its best often consists of recommending a course of action in the face of conflicting recommendations of experts.

**Offering Advice**

[5]    In general, a lawyer is not expected to give advice until asked by the client. However, when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client, the lawyer's duty to the client under Rule 1.4 may require that the lawyer offer advice if the client's course of action is related to the representation. Similarly, when a matter is likely to involve litigation, it may be advisable under Rule 1.4 to inform the client of forms of dispute resolution that might constitute reasonable alternatives to litigation. A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest.

# RULE 2.2
## [RESERVED]

# RULE 2.3

## EVALUATION FOR USE BY THIRD PERSONS

**(a)    A lawyer may provide an evaluation of a matter affecting a client for the use of someone other than the client if the lawyer reasonably believes that making the evaluation is compatible with other aspects of the lawyer's relationship with the client.**

**(b)    When the lawyer knows or reasonably should know that the evaluation is likely to affect the client's interests materially and adversely, the lawyer shall not provide the evaluation unless the client gives informed consent.**

**(c)    Unless disclosure is authorized in connection with a report of an evaluation, information relating to the evaluation is protected by Rule 1.6.**

Comment

Definition

[1]    An evaluation may be performed at the client's direction or if the lawyer reasonably believes that making the evaluation is compatible with other aspects of the lawyer's relationship with the client. Such an evaluation may be for the primary purpose of establishing information for the benefit of third parties: for example, an opinion concerning the title of property rendered at the behest of a vendor for the information of a prospective purchaser, or at the behest of a borrower for the information of a prospective lender. In some situations, the evaluation may be required by a government agency: for example, an opinion concerning the legality of securities registered for sale under the securities laws. In other instances, the evaluation may be required by a third person, such as a purchaser of a business, or of intellectual property or a similar asset.

[2]    A legal evaluation should be distinguished from an investigation of a person with whom the lawyer does not have a client-lawyer relationship. For example, a lawyer retained by a purchaser to analyze a vendor's title to property does not have a client-lawyer relationship with the vendor. So also, an investigation into a person's affairs by a government lawyer or by special counsel employed by the government is not an "evaluation" as that term is used in this Rule. The question is whether the lawyer is retained by the person whose affairs are being examined. When the lawyer is retained by that person, the general rules concerning loyalty

to a client and preservation of confidences apply, which is not the case if the lawyer is retained by someone else. For this reason, it is essential to identify the person by whom the lawyer is retained. This should be made clear not only to the person under examination, but also to others to whom the results are to be made available.

### Duties Owed to Third Person and Client

[3]    When the evaluation is intended for the information or use of a third person, a legal duty to that person may or may not arise. That legal question is beyond the scope of this Rule. However, because such an evaluation involves a departure from the normal client-lawyer relationship, careful analysis of the situation is required. The lawyer must be satisfied as a matter of professional judgment that making the evaluation is compatible with other functions undertaken on behalf of the client. For example, if the lawyer is acting as advocate in defending the client against charges of fraud, it would normally be incompatible with that responsibility for the lawyer to perform an evaluation for others concerning the same or a related transaction. Assuming no such impediment is apparent, however, the lawyer should advise the client of the implications of the evaluation, particularly the lawyer's responsibilities to third persons and the duty to disseminate the findings.

### Access to and Disclosure of Information

[4]    The quality of an evaluation depends on the freedom and extent of the investigation upon which it is based. Ordinarily a lawyer should have whatever latitude of investigation seems necessary as a matter of professional judgment. Under some circumstances, however, the terms of the evaluation may be limited. For example, certain issues or sources may be categorically excluded, or the scope of the search may be limited by time constraints or the non-cooperation of persons having relevant information. Any such limitations that are material to the evaluation should be described in the report. If, after a lawyer has commenced an evaluation, the client refuses to comply with the terms upon which it was understood the evaluation was to have been made, the lawyer's obligations are determined by law having reference to the terms of the client's agreement and the surrounding circumstances. In no circumstances is the lawyer permitted knowingly to make a false statement of fact or law in providing an evaluation under this Rule. *See* Rule 4.1. A knowing omission of information that must be disclosed to make statements in the evaluation not false or misleading may violate this Rule.

**Obtaining Client's Informed Consent**

[5]     Information relating to an evaluation is protected by Rule 1.6. In many situations, providing an evaluation to a third party poses no significant risk to the client; thus, the lawyer may be impliedly authorized to disclose information to carry out the representation, if the disclosures (i) advance the best interests of the client and (ii) are either reasonable under the circumstances or customary in the professional community. *See* Rule 1.6(a)(2). Where, however, it is reasonably likely that providing the evaluation will affect the client's interests materially and adversely, the lawyer must first obtain the client's consent after the lawyer has consulted with the client and the client has been adequately informed concerning the conditions of the evaluation, the nature of the information to be disclosed and important possible effects on the client's interests. *See* Rules 1.0(j), 1.6(a).

**Financial Auditors' Requests for Information**

[6]     When a question is raised by the client's financial auditor concerning the legal situation of a client, and the question is referred to the lawyer, the lawyer's response may be made in accordance with procedures recognized in the legal profession. Such a procedure is set forth in the American Bar Association Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information, adopted in 1975.

# RULE 2.4

## LAWYER SERVING AS THIRD-PARTY NEUTRAL

**(a)     A lawyer serves as a "third-party neutral" when the lawyer assists two or more persons who are not clients of the lawyer to reach a resolution of a dispute or other matter that has arisen between them. Service as a third-party neutral may include service as an arbitrator, a mediator or in such other capacity as will enable the lawyer to assist the parties to resolve the matter.**

**(b)     A lawyer serving as a third-party neutral shall inform unrepresented parties that the lawyer is not representing them. When the lawyer knows or reasonably should know that a party does not understand the lawyer's role in the matter, the lawyer shall explain the difference between the lawyer's role as a third-party neutral and a lawyer's role as one who represents a client.**

**Comment**

[1]     Alternative dispute resolution has become a substantial part of the civil justice system. In addition to representing clients in dispute-resolution processes, lawyers often serve as third-party neutrals. A "third-party neutral" is a person such as a mediator, arbitrator, conciliator or evaluator or a person serving in another capacity that assists the parties, represented or unrepresented, in the resolution of a dispute or in the arrangement of a transaction. Whether a third-party neutral serves primarily as a facilitator, evaluator or decision maker depends on the particular process that is either selected by the parties or mandated by a court.

[2]     The role of a third-party neutral is not unique to lawyers although, in some court-connected contexts, only lawyers are permitted to serve in this role or to handle certain types of cases. In performing this role, the lawyer may be subject to court rules or other law that applies either to third-party neutrals generally or to lawyers serving as third-party neutrals. Lawyer-neutrals may also be subject to various codes of ethics, such as the Code of Ethics for Arbitration in Commercial Disputes prepared by a joint committee of the American Bar Association and the American Arbitration Association or the Model Standards of Conduct for Mediators jointly prepared by the American Bar Association, the American Arbitration Association and the Society of Professionals in Dispute Resolution.

[3]    Unlike nonlawyers who serve as third-party neutrals, lawyers serving in this role may experience unique problems as a result of differences between the role of a third-party neutral and a lawyer's service as a client representative. The potential for confusion is significant when the parties are unrepresented in the process. Thus, paragraph (b) requires a lawyer-neutral to inform unrepresented parties that the lawyer is not representing them. For some parties, particularly parties who frequently use dispute-resolution processes, this information will be sufficient. For others, particularly those who are using the process for the first time, more information will be required. Where appropriate, the lawyer should inform unrepresented parties of the important differences between the lawyer's role as a third-party neutral and as a client representative, including the inapplicability of the attorney-client evidentiary privilege. The extent of disclosure required under this paragraph will depend on the particular parties involved and the subject matter of the proceeding, as well as the particular features of the dispute-resolution process selected.

[4]    A lawyer who serves as a third-party neutral may be asked subsequently to serve as a lawyer representing a client in the same matter. The conflicts of interest that arise for both the lawyer and the lawyer's law firm are addressed in Rule 1.12.

[5]    Lawyers who represent clients in alternative dispute-resolution processes are governed by the Rules of Professional Conduct. When the dispute-resolution process takes place before a tribunal, as in binding arbitration (*see* Rule 1.0(w)), the lawyer's duty of candor is governed by Rule 3.3. Otherwise, the lawyer's duty of candor toward both the third-party neutral and other parties is governed by Rule 4.1.

# RULE 3.1

## NON-MERITORIOUS CLAIMS AND CONTENTIONS

**(a)     A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous. A lawyer for the defendant in a criminal proceeding or for the respondent in a proceeding that could result in incarceration may nevertheless so defend the proceeding as to require that every element of the case be established.**

**(b)     A lawyer's conduct is "frivolous" for purposes of this Rule if:**

**(1)     the lawyer knowingly advances a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law;**

**(2)     the conduct has no reasonable purpose other than to delay or prolong the resolution of litigation, in violation of Rule 3.2, or serves merely to harass or maliciously injure another; or**

**(3)     the lawyer knowingly asserts material factual statements that are false.**

**Comment**

[1]     The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and is never static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

[2]     The filing of a claim or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Lawyers are required, however, to inform themselves about the facts of their clients' cases and the applicable law, and determine that they can make good-faith arguments in support of their clients' positions.

Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however, if the action has no reasonable purpose other than to harass or maliciously injure a person, or if the lawyer is unable either to make a good-faith argument on the merits of the action taken or to support the action taken by a good-faith argument for an extension, modification or reversal of existing law (which includes the establishment of new judge-made law). The term "knowingly," which is used in Rule 3.1(b)(1) and (b)(3), is defined in Rule 1.0(k).

[3]     The lawyer's obligations under this Rule are subordinate to federal or state constitutional law that entitles a defendant in a criminal matter to the assistance of counsel in presenting a claim or contention that otherwise would be prohibited by this Rule.

# RULE 3.2

## DELAY OF LITIGATION

**In representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense.**

**Comment**

[1]     Dilatory practices bring the administration of justice into disrepute. Such tactics are prohibited if their only substantial purpose is to frustrate an opposing party's attempt to obtain rightful redress or repose. It is not a justification that such tactics are often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay or needless expense. Seeking or realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

# RULE 3.3

## CONDUCT BEFORE A TRIBUNAL

**(a)    A lawyer shall not knowingly:**

**(1)    make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;**

**(2)    fail to disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or**

**(3)    offer or use evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.**

**(b)    A lawyer who represents a client before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.**

**(c)    The duties stated in paragraphs (a) and (b) apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.**

**(d)    In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.**

**(e)    In presenting a matter to a tribunal, a lawyer shall disclose, unless privileged or irrelevant, the identities of the clients the lawyer represents and of the persons who employed the lawyer.**

**(f)    In appearing as a lawyer before a tribunal, a lawyer shall not:**

       **(1)    fail to comply with known local customs of courtesy or practice of the bar or a particular tribunal without giving to opposing counsel timely notice of the intent not to comply;**

       **(2)    engage in undignified or discourteous conduct;**

       **(3)    intentionally or habitually violate any established rule of procedure or of evidence; or**

       **(4)    engage in conduct intended to disrupt the tribunal.**

## Comment

[1]    This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal. See Rule 1.0(w) for the definition of "tribunal." It also applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition. Thus, for example, paragraph (a)(3) requires a lawyer to take reasonable remedial measures if the lawyer comes to know that a client has offered false evidence in a deposition.

[2]    This Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client, however, is qualified by the advocate's duty of candor to the tribunal. Consequently, although a lawyer in an adversary proceeding is not required to present an impartial exposition of the law and may not vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or by evidence that the lawyer knows to be false.

## Representations by a Lawyer

[3]    An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein because litigation documents ordinarily present assertions by the client or by someone on the client's behalf and not assertions by the lawyer. Compare Rule 3.1. However, an assertion purporting to be based on the lawyer's own knowledge, as in an affi-

davit or declaration by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation. The obligation prescribed in Rule 1.2(d) not to counsel a client to commit or assist the client in committing a fraud applies in litigation. *See also* Rule 8.4(b), Comments [2]-[3].

**Legal Argument**

[4]     Although a lawyer is not required to make a disinterested exposition of the law, legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. Paragraph (a)(2) requires an advocate to disclose directly adverse and controlling legal authority that is known to the lawyer and that has not been disclosed by the opposing party. A tribunal that is fully informed on the applicable law is better able to make a fair and accurate determination of the matter before it.

**Offering or Using False Evidence**

[5]     Paragraph (a)(3) requires that the lawyer refuse to offer or use evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence. A lawyer does not violate this Rule if the lawyer offers the evidence for the purpose of establishing its falsity.

[6]     If a lawyer knows that the client intends to testify falsely or wants the lawyer to introduce or use false evidence, the lawyer should seek to persuade the client that the evidence should not be offered. If the persuasion is ineffective and the lawyer continues to represent the client, the lawyer must refuse to offer the false evidence. If only a portion of a witness's testimony will be false, the lawyer may call the witness to testify but may not (i) elicit or otherwise permit the witness to present testimony that the lawyer knows is false or (ii) base arguments to the trier of fact on evidence known to be false.

[6A]   The duties stated in paragraphs (a) and (b)—including the prohibitions against offering and using false evidence—apply to all lawyers, including lawyers for plaintiffs and defendants in civil matters, and to both prosecutors and defense counsel in criminal cases. In criminal matters, therefore, Rule 3.3(a)(3) requires a prosecutor to refrain from

offering or using false evidence, and to take reasonable remedial measures to correct any false evidence that the government has already offered. For example, when a prosecutor comes to know that a prosecution witness has testified falsely, the prosecutor should either recall the witness to give truthful testimony or should inform the tribunal about the false evidence. At the sentencing stage, a prosecutor should correct any material errors in a presentence report. In addition, prosecutors are subject to special duties and prohibitions that are set out in Rule 3.8.

[7]    If a criminal defendant insists on testifying and the lawyer knows that the testimony will be false, the lawyer may have the option of offering the testimony in a narrative form, though this option may require advance notice to the court or court approval. The lawyer's ethical duties under paragraphs (a) and (b) may be qualified by judicial decisions interpreting the constitutional rights to due process and to counsel in criminal cases. The obligation of the advocate under the Rules of Professional Conduct is subordinate to such requirements.

[8]    The prohibition against offering or using false evidence applies only if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact. A lawyer's knowledge that evidence is false, however, can be inferred from the circumstances. See Rule 1.0(k) for the definition of "knowledge." Thus, although a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, the lawyer cannot ignore an obvious falsehood.

[9]    Although paragraph (a)(3) prohibits a lawyer from offering or using evidence the lawyer knows to be false, it permits the lawyer to refuse to offer testimony or other proof that the lawyer reasonably believes to be false. Offering such proof may impair the integrity of an adjudicatory proceeding. Because of the special protections historically provided criminal defendants, however, this Rule does not permit a lawyer to refuse to offer the testimony of a criminal defense client where the lawyer reasonably believes, but does not know, that the testimony will be false. Unless the lawyer knows the testimony will be false, the lawyer must honor the criminal defendant's decision to testify.

**Remedial Measures**

[10]    A lawyer who has offered or used material evidence in the belief that it was true may subsequently come to know that the evidence is false. Or, a lawyer may be surprised when the lawyer's client or another

witness called by the lawyer offers testimony the lawyer knows to be false, either during the lawyer's direct examination or in response to cross-examination by the opposing lawyer. In such situations, or if the lawyer knows of the falsity of testimony elicited from the client during a deposition, the lawyer must take reasonable remedial measures. The advocate's proper course is to remonstrate with the client confidentially, advise the client of the lawyer's duty of candor to the tribunal, and seek the client's cooperation with respect to the withdrawal or correction of the false statements or evidence. If that fails, the advocate must take further remedial action. If withdrawal from the representation is not permitted or will not undo the effect of the false evidence, the advocate must make such disclosure to the tribunal as is reasonably necessary to remedy the situation, even if doing so requires the lawyer to reveal confidential information that otherwise would be protected by Rule 1.6. It is for the tribunal then to determine what should be done, such as making a statement about the matter to the trier of fact, ordering a mistrial, taking other appropriate steps or doing nothing.

[11]  The disclosure of a client's false testimony can result in grave consequences to the client, including not only a sense of betrayal but also loss of the case and perhaps a prosecution for perjury. But the alternative is for the lawyer to cooperate in deceiving the court, thereby subverting the truth-finding process, which the adversary system is designed to implement. *See* Rule 1.2(d). Furthermore, unless it is clearly understood that the lawyer will act upon the duty to disclose the existence of false evidence, the client can simply reject the lawyer's advice to reveal the false evidence and insist that the lawyer keep silent. The client could therefore in effect coerce the lawyer into being a party to a fraud on the court.

**Preserving Integrity of the Adjudicative Process**

[12]  Lawyers have a special obligation as officers of the court to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process. Accordingly, paragraph (b) requires a lawyer who represents a client in an adjudicative proceeding to take reasonable remedial measures, including disclosure if necessary, whenever the lawyer knows that a person, including the lawyer's client, intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding. Such conduct includes, among other things, bribing, intimidating or otherwise unlawfully communicating with a witness, juror, court official or other participant in the proceeding; unlawfully destroying or concealing documents or other evidence related

to the proceeding; and failing to disclose information to the tribunal when required by law to do so. For example, under some circumstances a person's omission of a material fact may constitute a crime or fraud on the tribunal.

[12A] A lawyer's duty to take reasonable remedial measures under paragraph (b) does not apply to another lawyer who is retained to represent a person in an investigation or proceeding concerning that person's conduct in the prior proceeding.

[13]  Judicial hearings ought to be conducted through dignified and orderly procedures designed to protect the rights of all parties. A lawyer should not engage in conduct that offends the dignity and decorum of proceedings or that is intended to disrupt the tribunal. While maintaining independence, a lawyer should be respectful and courteous in relations with a judge or hearing officer before whom the lawyer appears. In adversary proceedings, ill feeling may exist between clients, but such ill feeling should not influence a lawyer's conduct, attitude, and demeanor toward opposing lawyers. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

**Ex Parte Proceedings**

[14]  Ordinarily, an advocate has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the opposing position is expected to be presented by the adverse party. However, in any ex parte proceeding, such as an application for a temporary restraining order, there may be no presentation by opposing advocates. The object of an ex parte proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the opposing party, if absent, just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer that the lawyer reasonably believes are necessary to an informed decision.

**Withdrawal**

[15]  A lawyer's compliance with the duty of candor imposed by this Rule does not automatically require that the lawyer withdraw from the representation of a client whose interests will be or have been adversely affected by the lawyer's disclosure. The lawyer, however, may

be required by Rule 1.16(d) to seek permission of the tribunal to withdraw if the lawyer's compliance with this Rule's duty of candor results in such an extreme deterioration of the client-lawyer relationship that the lawyer can no longer competently represent the client. *See also* Rule 1.16(c) for the circumstances in which a lawyer will be permitted to seek a tribunal's permission to withdraw. In connection with a request for permission to withdraw that is premised on a client's misconduct, a lawyer may reveal information relating to the representation only to the extent reasonably necessary to comply with this Rule or as otherwise permitted by Rule 1.6.

# RULE 3.4

## FAIRNESS TO OPPOSING PARTY AND COUNSEL

A lawyer shall not:

(a)     (1)     suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce;

(2)     advise or cause a person to hide or leave the jurisdiction of a tribunal for the purpose of making the person unavailable as a witness therein;

(3)     conceal or knowingly fail to disclose that which the lawyer is required by law to reveal;

(4)     knowingly use perjured testimony or false evidence;

(5)     participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false; or

(6)     knowingly engage in other illegal conduct or conduct contrary to these Rules;

(b)     offer an inducement to a witness that is prohibited by law or pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the matter. A lawyer may advance, guarantee or acquiesce in the payment of:

(1)     reasonable compensation to a witness for the loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses; or

(2)     a reasonable fee for the professional services of an expert witness and reasonable related expenses;

(c)     disregard or advise the client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but the lawyer may take appropriate steps in good faith to test the validity of such rule or ruling;

**(d)** **in appearing before a tribunal on behalf of a client:**

**(1) state or allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence;**

**(2)** **assert personal knowledge of facts in issue except when testifying as a witness;**

**(3)** **assert a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused but the lawyer may argue, upon analysis of the evidence, for any position or conclusion with respect to the matters stated herein; or**

**(4)** **ask any question that the lawyer has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person; or**

**(e)** **present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.**

**Comment**

[1]     The procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructionist tactics in discovery procedure, and the like. The Rule applies to any conduct that falls within its general terms (for example, "obstruct another party's access to evidence") that is a crime, an intentional tort or prohibited by rules or a ruling of a tribunal. An example is "advis[ing] or caus[ing] a person to hide or leave the jurisdiction of a tribunal for the purpose of making the person unavailable as a witness therein."

[2]     Documents and other evidence are often essential to establish a claim or defense. Subject to evidentiary privileges, the right of an opposing party, including the government, to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is altered, concealed or destroyed. Paragraph (a) protects that right. Evidence that has been properly requested must be produced unless there is a good-faith basis for not

doing so. Applicable state and federal law may make it an offense to destroy material for the purpose of impairing its availability in a pending or reasonably foreseeable proceeding, even though no specific request to reveal or produce evidence has been made. Paragraph (a) applies to evidentiary material generally, including computerized information.

[2A]   Falsifying evidence, dealt with in paragraph (a), is also generally a criminal offense. Of additional relevance is Rule 3.3(a)(3), dealing with use of false evidence in a proceeding before a tribunal. Applicable law may permit a lawyer to take temporary possession of physical evidence of client crimes for the purpose of conducting a limited examination that will not alter or destroy material characteristics of the evidence. In such a case, applicable law may require the lawyer to turn the evidence over to the police or other prosecuting authority, depending on the circumstances.

[3]   Paragraph (b) applies generally to any inducement to a witness that is prohibited by law. It is not improper to pay a witness's reasonable expenses or to compensate an expert witness on terms permitted by law. However, any fee contingent upon the content of a witness' testimony or the outcome of the case is prohibited.

[3A]   Paragraph (d) deals with improper statements relating to the merits of a case when representing a client before a tribunal: alluding to irrelevant matters, asserting personal knowledge of facts in issue, and asserting a personal opinion on issues to be decided by the trier of fact. *See also* Rule 4.4, prohibiting the use of any means that have no substantial purpose other than to embarrass or harm a third person. However, a lawyer may argue, upon analysis of the evidence, for any position or conclusion supported by the record. The term "admissible evidence" refers to evidence considered admissible in the particular context. For example, admission of evidence in an administrative adjudication or an arbitration proceeding may be governed by different standards than those applied in a jury trial.

[4]   In general, a lawyer is prohibited from giving legal advice to an unrepresented person, other than the advice to secure counsel, when the interests of that person are or may have a reasonable possibility of being in conflict with the interests of the lawyer's client. See Rule 4.3.

[5]   The use of threats in negotiation may constitute the crime of extortion. However, not all threats are improper. For example, if a lawyer represents a client who has been criminally harmed by a third person (for

example, a theft of property), the lawyer's threat to report the crime does not constitute extortion when honestly claimed in an effort to obtain restitution or indemnification for the harm done. But extortion is committed if the threat involves conduct of the third person unrelated to the criminal harm (for example, a threat to report tax evasion by the third person that is unrelated to the civil dispute).

# RULE 3.5

## MAINTAINING AND PRESERVING THE IMPARTIALITY OF TRIBUNALS AND JURORS

**(a)    A lawyer shall not:**

**(1)    seek to or cause another person to influence a judge, official or employee of a tribunal by means prohibited by law or give or lend anything of value to such judge, official, or employee of a tribunal when the recipient is prohibited from accepting the gift or loan but a lawyer may make a contribution to the campaign fund of a candidate for judicial office in conformity with Part 100 of the Rules of the Chief Administrator of the Courts;**

**(2)    in an adversarial proceeding communicate or cause another person to do so on the lawyer's behalf, as to the merits of the matter with a judge or official of a tribunal or an employee thereof before whom the matter is pending, except:**

**(i)    in the course of official proceedings in the matter;**

**(ii)    in writing, if the lawyer promptly delivers a copy of the writing to counsel for other parties and to a party who is not represented by a lawyer;**

**(iii)    orally, upon adequate notice to counsel for the other parties and to any party who is not represented by a lawyer; or**

**(iv)    as otherwise authorized by law, or by Part 100 of the Rules of the Chief Administrator of the Courts;**

**(3)    seek to or cause another person to influence a juror or prospective juror by means prohibited by law;**

**(4)    communicate or cause another to communicate with a member of the jury venire from which the jury will be selected for the trial of a case or, during the trial of a case, with any member of the jury unless authorized to do so by law or court order;**

      **(5)**    **communicate with a juror or prospective juror after discharge of the jury if:**

      **(i)**    **the communication is prohibited by law or court order;**

      **(ii)**    **the juror has made known to the lawyer a desire not to communicate;**

      **(iii)**    **the communication involves misrepresentation, coercion, duress or harassment; or**

      **(iv)**    **the communication is an attempt to influence the juror's actions in future jury service; or**

      **(6)**    **conduct a vexatious or harassing investigation of either a member of the venire or a juror or, by financial support or otherwise, cause another to do so.**

      **(b)**    **During the trial of a case a lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case.**

      **(c)**    **All restrictions imposed by this Rule also apply to communications with or investigations of members of a family of a member of the venire or a juror.**

      **(d)**    **A lawyer shall reveal promptly to the court improper conduct by a member of the venire or a juror, or by another toward a member of the venire or a juror or a member of his or her family of which the lawyer has knowledge.**

## Comment

      [1]    Many forms of improper influence upon a tribunal are proscribed by criminal law. In addition, gifts and loans to judges and judicial employees, as well as contributions to candidates for judicial election, are regulated by the New York Code of Judicial Conduct, with which an advocate should be familiar. *See* New York Code of Judicial Conduct, Canon 4(D)(5), 22 N.Y.C.R.R. § 100.4(D)(5) (prohibition of a judge's receipt of a gift, loan, etc., and exceptions) and Canon 5(A)(5), 22 N.Y.C.R.R. § 100.5(A)(5) (concerning lawyer contributions to the cam-

paign committee of a candidate for judicial office). A lawyer is prohibited from aiding a violation of such provisions. Limitations on contributions in the Election Law may also be relevant.

[2]    Unless authorized to do so by law or court order, a lawyer is prohibited from communicating ex parte with persons serving in a judicial capacity in an adjudicative proceeding, such as judges, masters or jurors, or to employees who assist them, such as law clerks. *See* New York Code of Judicial Conduct, Canon 3(B)(6), 22 N.Y.C.R.R. § 100.3(B)(6).

[3]    A lawyer may on occasion want to communicate with a juror or prospective juror after the jury has been discharged. Paragraph (a)(5) permits a lawyer to do so unless the communication is prohibited by law or a court order, but the lawyer must respect the desire of a juror not to talk with the lawyer. The lawyer may not engage in improper conduct during the communication.

[4]    The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's misbehavior is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

[4A]    Paragraph (b) prohibits lawyers who are not connected with a case from communicating (or causing another to communicate) with jurors concerning the case.

[4B]    Paragraph (c) extends the rules concerning communications with jurors and members of the venire to communication with family members of the jurors and venire members.

[4C]    Paragraph (d) imposes a reporting obligation on lawyers who have knowledge of improper conduct by or toward jurors, members of the venire, or family members thereof.

# RULE 3.6

## TRIAL PUBLICITY

(a)    A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

(b)    A statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration, and the statement relates to:

(1)    the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness or the expected testimony of a party or witness;

(2)    in a criminal matter that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission or statement given by a defendant or suspect, or that person's refusal or failure to make a statement;

(3)    the performance or results of any examination or test, or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

(4)    any opinion as to the guilt or innocence of a defendant or suspect in a criminal matter that could result in incarceration;

(5)    information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would, if disclosed, create a substantial risk of prejudicing an impartial trial; or

(6)    the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining

that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

(c)     Provided that the statement complies with paragraph (a), a lawyer may state the following without elaboration:

(1)     the claim, offense or defense and, except when prohibited by law, the identity of the persons involved;

(2)     information contained in a public record;

(3)     that an investigation of a matter is in progress;

(4)     the scheduling or result of any step in litigation;

(5)     a request for assistance in obtaining evidence and information necessary thereto;

(6)     a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(7)     in a criminal matter:

(i)     the identity, age, residence, occupation and family status of the accused;

(ii)     if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii)     the identity of investigating and arresting officers or agencies and the length of the investigation; and

(iv)     the fact, time and place of arrest, resistance, pursuit and use of weapons, and a description of physical evidence seized, other than as contained only in a confession, admission or statement.

(d)     Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity

**not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.**

**(e)      No lawyer associated in a firm or government agency with a lawyer subject to paragraph (a) shall make a statement prohibited by paragraph (a).**

## Comment

[1]      It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

[2]      Special rules of confidentiality may validly govern proceedings in juvenile, domestic relations and mental disability proceedings and perhaps other types of litigation. Rule 3.4(c) requires compliance with such rules.

[3]      The Rule sets forth a basic general prohibition against a lawyer making statements that the lawyer knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding. It recognizes that the public value of informed commentary is great and that the likelihood of prejudice to a proceeding because of the commentary of a lawyer who is not involved in the proceeding is small. Thus, the Rule applies only to lawyers who are participating or have participated in the investigation or litigation of a matter and their associates.

[4]     There are certain subjects that are more likely than not to have a material prejudicial effect on a proceeding, particularly when they refer to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration. Paragraph (b) specifies certain statements that ordinarily will have prejudicial effect.

[5]     Paragraph (c) identifies specific matters about which a lawyer's statements would not ordinarily be considered to present a substantial likelihood of material prejudice. Nevertheless, some statements in criminal cases are also required to meet the fundamental requirements of paragraph (a), for example, those identified in paragraph (c)(7)(iv). Paragraph (c) is not intended to be an exhaustive listing of the subjects upon which a lawyer may make a statement; statements on other matters may be permissible under paragraph (a).

[6]     Another relevant factor in determining prejudice is the nature of the proceeding involved. Criminal jury trials will be most sensitive to extrajudicial speech. Civil trials may be less sensitive. Non-jury hearings and arbitration proceedings may be even less affected. The Rule will still place limitations on prejudicial comments in these cases, but the likelihood of prejudice may be different depending on the type of proceeding.

[7]     Extrajudicial statements that might otherwise raise a question under this Rule may be permissible when they are made in response to statements made publicly by another party, another party's lawyer or third persons, where a reasonable lawyer would believe a public response is required in order to avoid prejudice to the lawyer's client. When prejudicial statements have been publicly made by others, responsive statements may have the salutary effect of lessening any resulting adverse impact on the adjudicative proceeding. Paragraph (d) permits such responsive statements, provided they contain only such information as is necessary to mitigate undue prejudice created by the statements made by others.

[8]     See Rule 3.8 Comment [5] for additional duties of prosecutors in connection with extrajudicial statements about criminal proceedings.

# RULE 3.7

## LAWYER AS WITNESS

**(a)    A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:**

> **(1)    the testimony relates solely to an uncontested issue;**
>
> **(2)    the testimony relates solely to the nature and value of legal services rendered in the matter;**
>
> **(3)    disqualification of the lawyer would work substantial hardship on the client;**
>
> **(4)    the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or**
>
> **(5)    the testimony is authorized by the tribunal.**

**(b)    A lawyer may not act as advocate before a tribunal in a matter if:**

> **(1)    another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client; or**
>
> **(2)    the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9.**

**Comment**

[1]    Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and also can create a conflict of interest between the lawyer and client.

**Advocate-Witness Rule**

[2]     The tribunal may properly object when the trier of fact may be confused or misled by a lawyer's serving as both advocate and witness. The opposing party may properly object where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof. The requirement that the testimony of the advocate-witness be on a significant issue of fact provides a materiality limitation.

[3]     To protect the tribunal, the Rule prohibits a lawyer from simultaneously serving as advocate and witness except in those circumstances specified in paragraph (a). Paragraph (a)(1) recognizes that if the testimony will be uncontested, the ambiguities in the dual role are purely theoretical. Testimony relating solely to a formality is uncontested when the lawyer reasonably believes that no substantial evidence will be offered in opposition to the testimony. Paragraph (a)(2) recognizes that where the testimony concerns the extent and value of legal services rendered in the action in which the testimony is offered, permitting the lawyer to testify avoids the need for a second trial with new counsel to resolve that issue. Moreover, in such a situation the judge has firsthand knowledge of the matter in issue; hence, there is less dependence on the adversary process to test the credibility of the testimony.

[4]     Apart from these two exceptions, paragraph (a)(3) recognizes that a balancing is required among the interests of the client, of the tribunal, and of the opposing party. Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness. The conflict of interest principles stated in Rule 1.7, 1.9 and 1.10, which may separately require disqualification of the lawyer-advocate, have no application to the tribunal's determination of the balancing of judicial and party interests required by paragraph (a)(3).

[5]     The tribunal is not likely to be misled when a lawyer acts as advocate before a tribunal in a matter in which another lawyer in the lawyer's firm testifies as a witness. Therefore, paragraph (b) permits the non-testifying lawyer to act as advocate before the tribunal except (1) when another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client, or (2) when either Rule 1.7 or Rule 1.9 would prohibit the non-testifying lawyer from acting as advocate before the tribunal. Moreover, unless Rules 1.7 or 1.9 preclude it, the non-testifying lawyer and the testifying lawyer may continue to represent the client outside of the tribunal, with the client's informed consent, in pretrial activities such as legal research, fact gathering, and preparation or argument of motions and briefs on issues of law, and may be consulted during the trial by the lawyer serving as advocate.

**Conflict of Interest**

[6]     In determining whether it is permissible to act as advocate before a tribunal in which the lawyer will be a witness, the lawyer must also consider that the dual role may give rise to a conflict of interest that will require compliance with Rule 1.7 or Rule 1.9. For example, if there is likely to be substantial conflict between the testimony of the client and that of the lawyer, the representation involves a conflict of interest that requires compliance with Rule 1.7. This would be true even though the lawyer might not be prohibited by paragraph (a) from simultaneously serving as advocate and witness because the lawyer's disqualification would work a substantial hardship on the client. Similarly, a lawyer who might be permitted to serve simultaneously as an advocate and a witness by paragraph (a)(3) might be precluded from doing so by Rule 1.9. The problem can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party. Determining whether such a conflict exists is primarily the responsibility of the lawyer involved. If there is a conflict of interest, the lawyer must secure the client's informed consent, confirmed in writing. In some cases, the lawyer will be precluded from seeking the client's consent. *See* Rule 1.7. See Rule 1.0(e) for the definition of "confirmed in writing" and Rule 1.0(j) for the definition of "informed consent."

# RULE 3.8

## SPECIAL RESPONSIBILITIES OF PROSECUTORS AND OTHER GOVERNMENT LAWYERS

(a)     A prosecutor or other government lawyer shall not institute, cause to be instituted or maintain a criminal charge when the prosecutor or other government lawyer knows or it is obvious that the charge is not supported by probable cause.

(b)     A prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant or to a defendant who has no counsel of the existence of evidence or information known to the prosecutor or other government lawyer that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal.

(c)     When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall within a reasonable time:

(1)     disclose that evidence to an appropriate court or prosecutor's office; or

(2)     if the conviction was obtained by that prosecutor's office,

(A)     notify the appropriate court and the defendant that the prosecutor's office possesses such evidence unless a court authorizes delay for good cause shown;

(B)     disclose that evidence to the defendant unless the disclosure would interfere with an ongoing investigation or endanger the safety of a witness or other person, and a court authorizes delay for good cause shown; and

(C)     undertake or make reasonable efforts to cause to be undertaken such further inquiry or investigation as may be necessary to provide a reasonable belief that the conviction should or should not be set aside.

**(d)    When a prosecutor knows of clear and convincing evidence establishing that a defendant was convicted, in a prosecution by the prosecutor's office, of an offense that the defendant did not commit, the prosecutor shall seek a remedy consistent with justice, applicable law, and the circumstances of the case.**

**(e)    A prosecutor's independent judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of sections (c) and (d), though subsequently determined to have been erroneous, does not constitute a violation of this rule.**

**Comment**

[1]    A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Applicable state or federal law may require other measures by the prosecutor, and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4. A government lawyer in a criminal case is considered a "prosecutor" for purposes of this Rule.

[2]    A defendant who has no counsel may waive a preliminary hearing or other important pretrial rights and thereby lose a valuable opportunity to challenge probable cause. Accordingly, prosecutors should not seek to obtain waivers of preliminary hearings or other important pretrial rights from unrepresented accused persons. This would not be applicable, however, to an accused appearing pro se with the approval of the tribunal, or to the lawful questioning of an uncharged suspect who has knowingly waived the rights to counsel and silence.

[3]    The exception in paragraph (b) recognizes that a prosecutor may seek an appropriate protective order from the tribunal if disclosure of information to the defense could result in substantial harm to an individual or to the public interest.

[4]    [Reserved.]

[5]    Rule 3.6 prohibits extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding. In the context of a criminal prosecution, a prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the

accused. Although the announcement of an indictment, for example, will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments that have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium against the accused. A prosecutor in a criminal case should make reasonable efforts to prevent persons under the prosecutor's supervisory authority, which may include investigators, law enforcement personnel, employees and other persons assisting or associated with the prosecutor, from making extrajudicial statements that the prosecutor would be prohibited from making under Rule 3.6. See Rule 5.3. Nothing in this Comment is intended to restrict the statements that a prosecutor may make that comply with Rule 3.6(c) or Rule 3.6(d).

[6] Like other lawyers, prosecutors are subject to Rule 5.1 and Rule 5.3, which relate to responsibilities regarding lawyers and nonlawyers who work for or are associated with the lawyer's office. Prosecutors should bear in mind the importance of these obligations in connection with the unique dangers of improper extrajudicial statements in a criminal case, and should exercise reasonable care to prevent persons assisting or associated with the prosecutor from making improper extrajudicial statements. Ordinarily, the reasonable care standard will be satisfied if the prosecutor issues the appropriate cautions to law enforcement personnel and other relevant individuals.

[6A] Reference to a "prosecutor" in this Rule includes the office of the prosecutor and all lawyers affiliated with the prosecutor's office who are responsible for the prosecution function. Like other lawyers, prosecutors are subject to Rule 3.3, which requires a lawyer to take reasonable remedial measures to correct material evidence that the lawyer has offered when the lawyer comes to know of its falsity. *See* Rule 3.3, Comment [6A].

[7] When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a person outside the prosecutor's jurisdiction was convicted of a crime that the person did not commit, paragraph (c) requires reasonably timely disclosure to the court or other appropriate authority, such as the chief prosecutor of the jurisdiction where the conviction occurred. If the conviction was obtained in the prosecutor's jurisdiction, paragraph (c) requires the prosecutor to examine the evidence and undertake, or make reasonable efforts to cause to be undertaken, further inquiry or investigation to support a reasonable belief that the conviction should or should not be set aside. Paragraph (c) also requires the prosecutor to notify the court and defendant that the prosecu-

tor possesses such evidence, and to disclose that evidence to the defendant, absent court-authorized delay for good cause. Consistent with the objectives of Rules 4.2 and 4.3, disclosure to a represented defendant must be made through the defendant's counsel, and in the case of an unrepresented defendant, may also be accompanied by a request to the court for the appointment of counsel to assist the defendant in taking such legal measures as may be appropriate.

[8]     Under paragraph (d), once the prosecutor knows of clear and convincing evidence that the defendant was convicted of an offense that the defendant did not commit, the prosecutor must seek a remedy consistent with justice, applicable law, and the circumstances of the case.

[9]     A prosecutor's independent judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of sections (c) and (d), though subsequently determined to have been erroneous, does not constitute a violation of this Rule.

# RULE 3.9

## ADVOCATE IN NON-ADJUDICATIVE MATTERS

**A lawyer communicating in a representative capacity with a legislative body or administrative agency in connection with a pending non-adjudicative matter or proceeding shall disclose that the appearance is in a representative capacity, except when the lawyer seeks information from an agency that is available to the public.**

**Comment**

[1]     In representation before bodies such as legislatures, municipal councils and executive and administrative agencies acting in a rule-making or policy-making capacity, lawyers present facts, formulate issues and advance arguments regarding the matters under consideration. The legislative body or administrative agency is entitled to know that the lawyer is appearing in a representative capacity. Ordinarily the client will consent to being identified, but if not, such as when the lawyer is appearing on behalf of an undisclosed principal, the governmental body at least knows that the lawyer is acting in a representative capacity as opposed to advancing the lawyer's personal opinion as a citizen. Representation in such matters is governed by Rules 4.1 through 4.4, and 8.4.

[1A]   Rule 3.9 does not apply to adjudicative proceedings before a tribunal. Court rules and other law require a lawyer, in making an appearance before a tribunal in a representative capacity, to identify the client or clients and provide other information required for communication with the tribunal or other parties.

[2]     [Reserved.]

[3]     [Reserved.]

# RULE 4.1

## TRUTHFULNESS IN STATEMENTS TO OTHERS

**In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person.**

**Comment**

**Misrepresentation**

[1]     A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements. As to dishonest conduct that does not amount to a false statement or for misrepresentations by a lawyer other than in the course of representing a client, see Rule 8.4.

**Statements of Fact**

[2]     This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are ordinarily in this category; so is the existence of an undisclosed principal, except where nondisclosure of the principal would constitute fraud. Lawyers should be mindful of their obligations under applicable law to avoid criminal and tortious misrepresentation.

**Illegal or Fraudulent Conduct by Client**

[3]     Under Rule 1.2(d), a lawyer is prohibited from counseling or assisting a client as to conduct that the lawyer knows is illegal or fraudulent. Ordinarily, a lawyer can avoid assisting a client's illegality or fraud by withdrawing from the representation. *See* Rule 1.16(c)(2). Sometimes it may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm an opinion, document, affirmation or the like. *See* Rules 1.2(d), 1.6(b)(3).

# RULE 4.2

## COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

**(a)     In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.**

**(b)     Notwithstanding the prohibitions of paragraph (a), and unless otherwise prohibited by law, a lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel the client with respect to those communications, provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.**

**(c)     A lawyer who is acting *pro se* or is represented by counsel in a matter is subject to paragraph (a), but may communicate with a represented person, unless otherwise prohibited by law and unless the represented person is not legally competent, provided the lawyer or the lawyer's counsel gives reasonable advance notice to the represented person's counsel that such communications will be taking place.**

**Comment**

[1]     This Rule contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship, and un-counseled disclosure of information relating to the representation.

[2]     Paragraph (a) applies to communications with any party who is represented by counsel concerning the matter to which the communication relates.

[3]    Paragraph (a) applies even though the represented party initiates or consents to the communication. A lawyer must immediately terminate communication with a party if after commencing communication, the lawyer learns that the party is one with whom communication is not permitted by this Rule.

[4]    This Rule does not prohibit communication with a represented party or person or an employee or agent of such a party or person concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party or person or between two organizations does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Nor does this Rule preclude communication with a represented party or person who is seeking advice from a lawyer who is not otherwise representing a client in the matter. A lawyer having independent justification or legal authorization for communicating with a represented party or person is permitted to do so.

[5]    Communications authorized by law may include communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communicate with the government. Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement (as defined by law) of criminal or civil enforcement proceedings. When communicating with the accused in a criminal matter, a government lawyer must comply with this Rule in addition to honoring the state or federal rights of the accused. The fact that a communication does not violate a state or federal right is insufficient to establish that the communication is permissible under this Rule. This Rule is not intended to effect any change in the scope of the anti-contact rule in criminal cases.

[6]    [Reserved.]

[7]    In the case of a represented organization, paragraph (a) ordinarily prohibits communications with a constituent of the organization who: (i) supervises, directs or regularly consults with the organization's lawyer concerning the matter, (ii) has authority to obligate the organization with respect to the matter, or (iii) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization's lawyer is not required for communication with a former unrepresented constituent. If an individual constituent of the organization is represented in the matter

by the person's own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. *See* Rules 1.13, 4.4.

[8]    The prohibition on communications with a represented party applies only in circumstances where the lawyer knows that the party is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such knowledge may be inferred from the circumstances. See Rule 1.0(k) for the definition of "knowledge." Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by ignoring the obvious.

[9]    In the event the party with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

[10]    A lawyer may not make a communication prohibited by paragraph (a) through the acts of another. *See* Rule 8.4(a).

## Client-to-Client Communications

[11]    Persons represented in a matter may communicate directly with each other. A lawyer may properly advise a client to communicate directly with a represented person, and may counsel the client with respect to those communications, provided the lawyer complies with paragraph (b). Agents for lawyers, such as investigators, are not considered clients within the meaning of this Rule even where the represented entity is an agency, department or other organization of the government, and therefore a lawyer may not cause such an agent to communicate with a represented person, unless the lawyer would be authorized by law or a court order to do so. A lawyer may also counsel a client with respect to communications with a represented person, including by drafting papers for the client to present to the represented person. In advising a client in connection with such communications, a lawyer may not advise the client to seek privileged information or other information that the represented person is not personally authorized to disclose or is prohibited from disclosing, such as a trade secret or other information protected by law, or to encourage or invite the represented person to take actions without the advice of counsel.

[12]   A lawyer who advises a client with respect to communications with a represented person should be mindful of the obligation to avoid abusive, harassing, or unfair conduct with regard to the represented person. The lawyer should advise the client against such conduct. A lawyer shall not advise a client to communicate with a represented person if the lawyer knows that the represented person is legally incompetent. *See* Rule 4.4.

[12A] When a lawyer is proceeding *pro se* in a matter, or is being represented by his or her own counsel with respect to a matter, the lawyer's direct communications with a counterparty are subject to the no-contact rule, Rule 4.2. Unless authorized by law, the lawyer must not engage in direct communications with a party the lawyer knows to be represented by counsel without either (i) securing the prior consent of the represented party's counsel under Rule 4.2(a), or (ii) providing opposing counsel with reasonable advance notice that such communications will be taking place.

# RULE 4.3

## COMMUNICATING WITH UNREPRESENTED PERSONS

**In communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person other than the advice to secure counsel if the lawyer knows or reasonably should know that the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client.**

### Comment

[1]    An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client. In order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person. As to misunderstandings that sometimes arise when a lawyer for an organization deals with an unrepresented constituent, see Rule 1.13(a), Comment [2A].

[2]    The Rule distinguishes between situations involving unrepresented parties whose interests may be adverse to those of the lawyer's client and those in which the person's interests are not in conflict with the client's. In the former situation, the possibility that the lawyer will compromise the unrepresented person's interests is so great that the Rule prohibits the giving of any advice apart from the advice to obtain counsel. Whether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented party, as well as the setting in which the behavior and comments occur. This Rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person. So long as the lawyer has explained that the lawyer represents an adverse party and is not representing the person, the lawyer may inform the person of the terms on which the lawyer's client will enter into an agreement or settle a matter, prepare documents

that require the person's signature, and explain the lawyer's own view of the meaning of the document or the lawyer's view of the underlying legal obligations.

# RULE 4.4

## RESPECT FOR RIGHTS OF THIRD PERSONS

**(a)    In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass or harm a third person or use methods of obtaining evidence that violate the legal rights of such a person.**

**(b)    A lawyer who receives a document, electronically stored information, or other writing relating to the representation of the lawyer's client and knows or reasonably should know that it was inadvertently sent shall promptly notify the sender.**

### Comment

[1]    Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship.

[2]    Paragraph (b) recognizes that lawyers and law firms sometimes receive a document, electronically stored information, or other "writing as defined in Rule 1.0(x), that was mistakenly sent, produced, or otherwise inadvertently made available by opposing parties or their lawyers. A document, electronically stored information, or other writing is "inadvertently sent" within the meaning of paragraph (b) when it is accidentally transmitted, such as when an email or letter is misaddressed or a document or other writing is accidentally included with information that was intentionally transmitted. One way to resolve this situation is for lawyers and law firms to enter into agreements containing explicit provisions as to how the parties will deal with inadvertently sent documents. In the absence of such an agreement, however, if a lawyer or law firm knows or reasonably should know that such a document or other writing was sent inadvertently, this Rule requires only that the receiving lawyer promptly notify the sender in order to permit that person to take protective measures. Although this Rule does not require that the receiving lawyer refrain from reading or continuing to read the document, a lawyer who reads or continues to read a document that contains privileged or confidential information may be subject to court-imposed sanctions, including disqualification and evidence-preclusion. Whether the lawyer or law firm

is required to take additional steps, such as returning the document or other writing, is a matter of law beyond the scope of these Rules, as is the question whether the privileged status of a document or other writing has been waived. Similarly, this Rule does not address the legal duties of a lawyer who receives a document or other writing that the lawyer knows or reasonably should know may have been inappropriately obtained by the sending person. For purposes of this Rule, "document, electronically stored information or other writing" includes not only paper documents, but also email and other forms of electronically stored information—including embedded data (commonly referred to as "metadata")—that is subject to being read or put into readable form. *See* Rule 1.0(x).

[3] Refraining from reading or continuing to read a document or other writing once a lawyer realizes that it was inadvertently sent and returning the document to the sender or permanently deleting electronically stored information, honors the policy of these Rules to protect the principles of client confidentiality. Because there are circumstances where a lawyer's ethical obligations should not bar use of the information obtained from an inadvertently sent document or other writing, however, this Rule does not subject a lawyer to professional discipline for reading and using that information. Nevertheless, substantive law or procedural rules may require a lawyer to refrain from reading an inadvertently sent document or other writing, or to return the document or other writing to the sender or permanently delete electronically stored information, or both. Accordingly, in deciding whether to retain or use an inadvertently received document or other writing, some lawyers may take into account whether the attorney-client privilege would attach. But if applicable law or rules do not address the situation, decisions to refrain from reading such a document or other writing or instead to return them, or both, are matters of professional judgment reserved to the lawyer. *See* Rules 1.2, 1.4.

# RULE 4.5

## COMMUNICATION AFTER INCIDENTS INVOLVING PERSONAL INJURY OR WRONGFUL DEATH

**(a)    In the event of a specific incident involving potential claims for personal injury or wrongful death, no unsolicited communication shall be made to an individual injured in the incident or to a family member or legal representative of such an individual, by a lawyer or law firm, or by any associate, agent, employee or other representative of a lawyer or law firm representing actual or potential defendants or entities that may defend and/or indemnify said defendants, before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.**

**(b)    An unsolicited communication by a lawyer or law firm, seeking to represent an injured individual or the legal representative thereof under the circumstance described in paragraph (a) shall comply with Rule 7.3(e).**

**Comment**

[1]    Paragraph (a) imposes a 30-day (or 15-day) restriction on unsolicited communications directed to potential claimants relating to a specific incident involving potential claims for personal injury or wrongful death, by lawyers or law firms who represent actual or potential defendants or entities that may defend or indemnify those defendants. However, if potential claimants are represented by counsel, it is proper for defense counsel to communicate with potential plaintiffs' counsel even during the 30-day (or 15-day) period. *See also* Rule 7.3(e).

# RULE 5.1

## RESPONSIBILITIES OF LAW FIRMS, PARTNERS, MANAGERS AND SUPERVISORY LAWYERS

(a)     A law firm shall make reasonable efforts to ensure that all lawyers in the firm conform to these Rules.

(b)     (1)     A lawyer with management responsibility in a law firm shall make reasonable efforts to ensure that other lawyers in the law firm conform to these Rules.

(2)     A lawyer with direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the supervised lawyer conforms to these Rules.

(c)     A law firm shall ensure that the work of partners and associates is adequately supervised, as appropriate. A lawyer with direct supervisory authority over another lawyer shall adequately supervise the work of the other lawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter, and the likelihood that ethical problems might arise in the course of working on the matter.

(d)     A lawyer shall be responsible for a violation of these Rules by another lawyer if:

(1)     the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

(2)     the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the other lawyer practices or is a lawyer who has supervisory authority over the other lawyer; and

(i)     knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

(ii)     in the exercise of reasonable management or supervisory authority should have known of the con-

> **duct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.**

## Comment

[1]     Paragraph (a) applies to law firms; paragraph (b) applies to lawyers with management responsibility in a law firm or a lawyer with direct supervisory authority over another lawyer.

[2]     Paragraph (b) requires lawyers with management authority within a firm or those having direct supervisory authority over other lawyers to make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that all lawyers in the firm will conform to these Rules. Such policies and procedures include those designed (i) to detect and resolve conflicts of interest (*see* Rule 1.10(e)), (ii) to identify dates by which actions must be taken in pending matters, (iii) to account for client funds and property, and (iv) to ensure that inexperienced lawyers are appropriately supervised.

[3]     Other measures that may be required to fulfill the responsibility prescribed in paragraph (b) can depend on the firm's structure and the nature of its practice. In a small firm of experienced lawyers, informal supervision and periodic review of compliance with the required systems ordinarily will suffice. In a large firm, or in practice situations in which difficult ethical problems frequently arise, more elaborate measures may be necessary. Some firms, for example, have a procedure whereby junior lawyers can make confidential referral of ethical problems directly to a designated senior partner or special committee. *See* Rule 5.2. Firms, whether large or small, may also rely on continuing legal education in professional ethics. In any event, the ethical atmosphere of a firm can influence the conduct of all its members and lawyers with management authority may not assume that all lawyers associated with the firm will inevitably conform to the Rules.

[4]     Paragraph (d) expresses a general principle of personal responsibility for acts of other lawyers in the law firm. *See also* Rule 8.4(a).

[5]     Paragraph (d) imposes such responsibility on a lawyer who orders, directs or ratifies wrongful conduct and on lawyers who are partners or who have comparable managerial authority in a law firm who know or reasonably should know of the conduct. Whether a lawyer has

supervisory authority in particular circumstances is a question of fact. Partners and lawyers with comparable authority have at least indirect responsibility for all work being done by the firm, while a partner or manager in charge of a particular matter ordinarily also has supervisory responsibility for the work of other firm lawyers engaged in the matter. Partners and lawyers with comparable authority, as well as those who supervise other lawyers, are indirectly responsible for improper conduct of which they know or should have known in the exercise of reasonable managerial or supervisory authority. Appropriate remedial action by a partner or managing lawyer would depend on the immediacy of that lawyer's involvement and the seriousness of the misconduct. A supervisor is required to intervene to prevent misconduct or to prevent or mitigate avoidable consequences of misconduct if the supervisor knows that the misconduct occurred.

[6]    Professional misconduct by a lawyer under supervision could reveal a violation of paragraph (a), (b) or (c) on the part of a law firm, partner or supervisory lawyer even though it does not entail a violation of paragraph (d) because there was no direction, ratification or knowledge of the violation or no violation occurred.

[7]    Apart from this Rule and Rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of another lawyer. Whether a lawyer may be liable civilly or criminally for another lawyer's conduct is a question of law beyond the scope of these Rules.

[8]    The duties imposed by this Rule on managing and supervising lawyers do not alter the personal duty of each lawyer in a firm to abide by these Rules. *See* Rule 5.2(a).

# RULE 5.2

## RESPONSIBILITIES OF A SUBORDINATE LAWYER

(a)    **A lawyer is bound by these Rules notwithstanding that the lawyer acted at the direction of another person.**

(b)    **A subordinate lawyer does not violate these Rules if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.**

**Comment**

[1]    Although a lawyer is not relieved of responsibility for a violation by the fact that the lawyer acted at the direction of a supervisor, that fact may be relevant in determining whether a lawyer had the knowledge required to render conduct a violation of these Rules. For example, if a subordinate filed a frivolous pleading at the direction of a supervisor, the subordinate would not be guilty of a professional violation unless the subordinate knew of the document's frivolous character.

[2]    When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment. Otherwise, a consistent course of action or position could not be taken. If the question can reasonably be answered only one way, the duty of both lawyers is clear, and they are equally responsible for fulfilling it. However, if the question is reasonably arguable, someone has to decide upon the course of action. That authority ordinarily reposes in the supervisor, and a subordinate may be guided accordingly. To evaluate the supervisor's conclusion that the question is arguable and the supervisor's resolution of it is reasonable in light of applicable Rules of Professional Conduct and other law, it is advisable that the subordinate lawyer undertake research, consult with a designated senior partner or special committee, if any (*see* Rule 5.1, Comment [3]), or use other appropriate means. For example, if a question arises whether the interests of two clients conflict under Rule 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.

# RULE 5.3

## LAWYER'S RESPONSIBILITY FOR CONDUCT OF NONLAWYERS

**(a)** A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate. A lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter and the likelihood that ethical problems might arise in the course of working on the matter.

**(b)** A lawyer shall be responsible for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of these Rules if engaged in by a lawyer, if:

**(1)** the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

**(2)** the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the nonlawyer is employed or is a lawyer who has supervisory authority over the nonlawyer; and

**(i)** knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

**(ii)** in the exercise of reasonable management or supervisory authority should have known of the conduct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.

**Comment**

[1]     This Rule requires a law firm to ensure that work of nonlawyers is appropriately supervised. In addition, a lawyer with direct supervisory authority over the work of nonlawyers must adequately supervise

those nonlawyers. Comments [2] and [3] to Rule 5.1, which concern supervision of lawyers, provide guidance by analogy for the methods and extent of supervising nonlawyers.

[2]     With regard to nonlawyers, who are not themselves subject to these Rules, the purpose of the supervision is to give reasonable assurance that the conduct of all nonlawyers employed by or retained by or associated with the law firm, including nonlawyers outside the firm working on firm matters, is compatible with the professional obligations of the lawyers and firm. Lawyers typically employ nonlawyer assistants in their practice, including secretaries, investigators, law student interns and paraprofessionals. Such nonlawyer assistants, whether they are employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. Likewise, lawyers may employ nonlawyers outside the firm to assist in rendering those services. *See* Comment [6] to Rule 1.1 (retaining lawyers outside the firm). A law firm must ensure that such nonlawyer assistants are given appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose confidential information—*see* Rule 1.6 (c) (requiring lawyers to take reasonable care to avoid unauthorized disclosure of confidential information. Lawyers also should be responsible for the work done by their nonlawyer assistants. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline. A law firm should make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that nonlawyers in the firm and nonlawyers outside the firm who work on firm matters will act in a way compatible with the professional obligations of the lawyer. A lawyer with supervisory authority over a nonlawyer within or outside the firm has a parallel duty to provide appropriate supervision of the supervised nonlawyer.

[2A]   Paragraph (b) specifies the circumstances in which a lawyer is responsible for conduct of a nonlawyer that would be a violation of these Rules if engaged in by a lawyer. For guidance by analogy, see Rule 5.1, Comments [5]-[8].

[3]     A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include (i) retaining or contracting with an investigative or paraprofessional service, (ii) hiring a document management company to create and maintain a database for complex litigation, (iii) sending client documents to a third party for printing or scanning, and (iv) using an Internet-based service to

store client information. When using such services outside the firm, a lawyer or law firm must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the professional obligations of the lawyer and law firm. The extent of the reasonable efforts required under this Rule will depend upon the circumstances, including: (a) the education, experience and reputation of the nonlawyer; (b) the nature of the services involved; (c) the terms of any arrangements concerning the protection of client information; (d) the legal and ethical environments of the jurisdictions in which the services will be performed, particularly with regard to confidentiality; (e) the sensitivity of the particular kind of confidential information at issue; (f) whether the client will be supervising all or part of the nonlawyer's work. *See also* Rules 1.1 (competence), 1.2 (allocation of authority), 1.4 (communication with client), 1.6 (confidentiality), 5.4 (professional independence of the lawyer) and 5.5 (unauthorized practice of law). When retaining or directing a nonlawyer outside the firm, a lawyer should communicate directions appropriate under the circumstances to give reasonable assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer.

# RULE 5.4

## PROFESSIONAL INDEPENDENCE OF A LAWYER

(a)    A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1)    an agreement by a lawyer with the lawyer's firm or another lawyer associated in the firm may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2)    a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer; and

(3)    a lawyer or law firm may compensate a nonlawyer employee or include a nonlawyer employee in a retirement plan based in whole or in part on a profit-sharing arrangement.

(b)    A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c)    Unless authorized by law, a lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d)    A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

(1)    a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

**(2)   a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or**

**(3)   a nonlawyer has the right to direct or control the professional judgment of a lawyer.**

**Comment**

[1]   The provisions of this Rule express traditional limitations on sharing fees. These limitations are to protect the lawyer's professional independence of judgment. Where someone other than the client pays the lawyer's fee or salary, or recommends employment of the lawyer, that arrangement does not modify the lawyer's obligation to the client. As stated in paragraph (c), such arrangements should not interfere with the lawyer's professional judgment.

[1A]   Paragraph (a)(2) governs the compensation of a lawyer who undertakes to complete one or more unfinished pieces of legal business of a deceased lawyer. Rule 1.17 governs the sale of an entire law practice upon retirement, which is defined as the cessation of the private practice of law in a given geographic area.

[1B]   Paragraph (a)(3) permits limited fee sharing with a nonlawyer employee, where the employee's compensation or retirement plan is based in whole or in part on a profit-sharing arrangement. Such sharing of profits with a nonlawyer employee must be based on the total profitability of the law firm or a department within a law firm and may not be based on the fee resulting from a single case.

[2]   This Rule also expresses traditional limitations on permitting a third party to direct or regulate the lawyer's professional judgment in rendering legal services to another. *See also* Rule 1.8(f), providing that a lawyer may accept compensation from a third party as long as there is no interference with the lawyer's professional judgment and the client gives informed consent.

# RULE 5.5

## UNAUTHORIZED PRACTICE OF LAW

**(a)    A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction.**

**(b)    A lawyer shall not aid a nonlawyer in the unauthorized practice of law.**

**Comment**

[1]    A lawyer may practice law only in a jurisdiction in which the lawyer is authorized to practice. A lawyer may be admitted to practice law in a jurisdiction on a regular basis or may be authorized by court rule or order or by law to practice for a limited purpose or on a restricted basis. Paragraph (a) applies to unauthorized practice of law in another jurisdiction by a lawyer through the lawyer's direct action, and paragraph (b) prohibits a lawyer from aiding a nonlawyer in the unauthorized practice of law.

[2]    The definition of the "practice of law" is established by law and varies from one jurisdiction to another. Whatever the definition, limiting the practice of law to members of the bar protects the public against rendition of legal services by unqualified persons. This Rule does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for their work. *See* Rule 5.3.

# RULE 5.6

## RESTRICTIONS ON RIGHT TO PRACTICE

(a)     A lawyer shall not participate in offering or making:

(1)     a partnership, shareholder, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or

(2)     an agreement in which a restriction on a lawyer's right to practice is part of the settlement of a client controversy.

(b)     This Rule does not prohibit restrictions that may be included in the terms of the sale of a law practice pursuant to Rule 1.17.

**Comment**

[1]     An agreement restricting the right of a lawyer who has left a firm (a "departed lawyer") to practice after leaving a firm limits the freedom of clients to choose a lawyer and limits the professional autonomy of lawyers. Paragraph (a) prohibits such agreements except (i) restrictions incident to provisions concerning retirement benefits for service with the firm or (ii) restrictions justified by special circumstances described in this Comment. Throughout this Comment, the phrase "law firm" shall have the meaning given in the definition in Rule 1.0(h).

**Scope of Rule**

[1A]     This Rule and this Comment are intended to address the duties of lawyers and law firms solely under the Rules of Professional Conduct. They are not intended to address the obligations of a law firm or a departed lawyer under the law of fiduciary duties, partnership law, contract law, tort law, or other substantive law.

[1B]     Paragraph (a)(1) applies to any written or oral agreement governing or intended to govern: (i) the operation of a law firm; (ii) the terms of partnership, shareholding, or of counsel status at a law firm; and (iii) the terms of an individual lawyer's full-time or part-time employment at a law firm or other entity.

[1C]   Paragraph (a)(1) applies whether the agreement is embodied in a written or oral contract, a firm or employee handbook, a memorandum, or any other kind of document. Paragraph (a)(1) prohibits any agreement (other than a provision relating to retirement benefits) that prohibits or limits a departed lawyer from contacting or serving the firm's current, former, or prospective clients, except that: (i) an agreement may include provisions to protect confidential or proprietary information belonging to the law firm or to the law firm's current, former, or prospective clients; and (ii) an agreement may include provisions that impose reasonable restrictions or remedies on a departed lawyer in the circumstances described in Comment [1F].

[1D]   Paragraph (a)(1) applies not only to agreements regarding lawyers in private practice but also to agreements between employed ("in-house") attorneys and the clients or entities that employ them, whether in a legal or non-legal capacity. However, paragraph (a)(1) does not prevent an entity and its employed lawyers from agreeing to restrictions on post-departure *non-legal* functions. In every type of law firm, the departed lawyer and the law firm must balance their rights and obligations to each other in a manner consistent with the Rules of Professional Conduct and the law governing contracts, partnerships, and fiduciary obligations, all while recognizing the primacy of client interests and client autonomy. With this in mind, Comment [1E] addresses restrictions that ordinarily violate the Rule, and Comment [1F] addresses restrictions that ordinarily do not violate the Rule.

**Prohibited Agreements**

[1E] Agreements that ordinarily violate paragraph (a)(1) (unless they fit within the exception for retirement benefits) include, but are not limited to, agreements that purport to do any of the following: (i) prohibit or limit a departed lawyer from contacting or representing some or all current, former, or prospective clients of the firm; (ii) prohibit or limit a departed lawyer from practicing law for any period of time following his or her withdrawal (*e.g.*, imposing a mandatory "garden leave"); (iii) prohibit or limit a departed lawyer from contacting or soliciting law firm employees after the lawyer has departed from the firm; or (iv) impose more severe financial penalties on departed lawyers who intend to compete, actually compete, are suspected of competing, or are presumed to be competing with the firm than are imposed on departed lawyers who do not compete.

## Permissible Agreements

[1F] Agreements that ordinarily do not violate paragraph (a)(1) include, but are not limited to, agreements permitting a firm to impose reasonable restrictions or remedies if: (i) a departed lawyer has approved, within a reasonable time before departing from the firm, a specific, significant financial undertaking with respect to the firm that remains outstanding where the lawyer's departure will have a material effect on the firm's ability to satisfy that undertaking; or (ii) a departed lawyer has, before leaving the firm, breached material employment or partnership responsibilities to the firm in a manner that has caused or is likely to cause material financial or reputational harm to the firm.

## Reasonable Management Discretion

[1G]   Paragraph (a)(1) is not intended to prohibit a law firm in the ordinary course of its operations from exercising reasonable management discretion regarding case assignments, case staffing, promotions, demotions, compensation, or other aspects of a law firm's operations, finances, and management. The Rule is intended to prevent overly restrictive practices with respect to lawyers who have provided notice of an intention to leave a firm, or who have taken affirmative steps toward planning to leave the firm (with or without notice to the firm).

[2]   Paragraph (a)(2) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client.

[3]   This Rule does not apply to prohibit restrictions that may be included in the terms of the sale of a law practice pursuant to Rule 1.17.

# RULE 5.7

## RESPONSIBILITIES REGARDING NONLEGAL SERVICES

(a)     With respect to lawyers or law firms providing nonlegal services to clients or other persons:

(1)     A lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services.

(2)     A lawyer or law firm that provides nonlegal services to a person that are distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(3)     A lawyer or law firm that is an owner, controlling party or agent of, or that is otherwise affiliated with, an entity that the lawyer or law firm knows to be providing nonlegal services to a person is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(4)     For purposes of paragraphs (a)(2) and (a)(3), it will be presumed that the person receiving nonlegal services believes the services to be the subject of a client-lawyer relationship unless the lawyer or law firm has advised the person receiving the services in writing that the services are not legal services and that the protection of a client-lawyer relationship does not exist with respect to the nonlegal services, or if the interest of the lawyer or law firm in the entity providing nonlegal services is *de minimis*.

(b)     Notwithstanding the provisions of paragraph (a), a lawyer or law firm that is an owner, controlling party, agent, or is otherwise affiliated with an entity that the lawyer or law firm knows is providing nonlegal services to a person shall not permit any nonlawyer providing such services or affiliated with that entity to direct or

**regulate the professional judgment of the lawyer or law firm in rendering legal services to any person, or to cause the lawyer or law firm to compromise its duty under Rule 1.6(a) and Rule 1.6(c) with respect to the confidential information of a client receiving legal services.**

**(c)    For purposes of this Rule, "nonlegal services" shall mean those services that lawyers may lawfully provide and that are not prohibited as an unauthorized practice of law when provided by a nonlawyer.**

## Comment

[1]    For many years, lawyers have provided nonlegal services to their clients. By participating in the delivery of these services, lawyers can serve a broad range of economic and other interests of clients. Whenever a lawyer directly provides nonlegal services, the lawyer must avoid confusion on the part of the client as to the nature of the lawyer's role, so that the person for whom the nonlegal services are performed understands that the services may not carry with them the legal and ethical protections that ordinarily accompany a client-lawyer relationship. The recipient of the nonlegal services may expect, for example, that the protection of client confidences and secrets, prohibitions against representation of persons with conflicting interests, and obligations of a lawyer to maintain professional independence apply to the provision of nonlegal services when that may not be the case. The risk of confusion is especially acute when the lawyer renders both legal and nonlegal services with respect to the same matter. Under some circumstances, the legal and nonlegal services may be so closely entwined that they cannot be distinguished from each other. In this situation, the recipient is likely to be confused as to whether and when the relationship is protected as a client-lawyer relationship. Therefore, where the legal and nonlegal services are not distinct, paragraph (a)(1) requires that the lawyer providing nonlegal services adhere to all of the requirements of these Rules with respect to the nonlegal services. Paragraph (a)(1) applies to the provision of nonlegal services by a law firm if the person for whom the nonlegal services are being performed is also receiving legal services from the firm that are not distinct from the nonlegal services.

[2]    Even when the lawyer believes that the provision of nonlegal services is distinct from any legal services being provided, there is still a risk that the recipient of the nonlegal services might reasonably believe that the recipient is receiving the protection of a client-lawyer relationship. Therefore, paragraph (a)(2) requires that the lawyer providing the

nonlegal services adhere to these Rules, unless the person understands that the nonlegal services are not the subject of a client-lawyer relationship. Nonlegal services also may be provided through an entity with which a lawyer is affiliated, for example, as owner, controlling party or agent. In this situation, there is still a risk that the recipient of the nonlegal services might reasonably believe that the recipient is receiving the protection of a client-lawyer relationship. Therefore, paragraph (a)(3) requires that the lawyer involved with the entity providing nonlegal services adhere to all of these Rules with respect to the nonlegal services, unless the person understands that the nonlegal services are not the subject of a client-lawyer relationship.

[3]     These Rules will be presumed to apply to a lawyer who directly provides or is otherwise involved in the provision of nonlegal services unless the lawyer complies with paragraph (a)(4) by communicating in writing to the person receiving the nonlegal services that the services are not legal services and that the protection of a client-lawyer relationship does not exist with respect to the nonlegal services. Such a communication should be made before entering into an agreement for the provision of nonlegal services in a manner sufficient to ensure that the person understands the significance of the communication. In certain circumstances, however, additional steps may be required to ensure that the person understands the distinction. For example, while the written disclaimer set forth in paragraph (a)(4) will be adequate for a sophisticated user of legal and nonlegal services, a more detailed explanation may be required for someone unaccustomed to making distinctions between legal services and nonlegal services. Where appropriate and especially where legal services are provided in the same transaction as nonlegal services, the lawyer should counsel the client about the possible effect of the proposed provision of services on the availability of the attorney-client privilege. The lawyer or law firm will not be required to comply with these requirements if its interest in the entity providing the nonlegal services is so small as to be de minimis.

[4]     Although a lawyer may be exempt from the application of these Rules with respect to nonlegal services on the face of paragraph (a), the scope of the exemption is not absolute. A lawyer who provides or who is involved in the provision of nonlegal services may be excused from compliance with only those Rules that are dependent upon the existence of a representation or client-lawyer relationship. Other Rules, such as those prohibiting lawyers from misusing the confidences or secrets of a former client (see Rule 1.9), requiring lawyers to report certain lawyer

misconduct (see Rule 8.3), and prohibiting lawyers from engaging in illegal, dishonest, fraudulent or deceptive conduct (see Rule 8.4), apply to a lawyer irrespective of the existence of a representation, and thus govern a lawyer not covered by paragraph (a). A lawyer or law firm rendering legal services is always subject to these Rules.

## Provision of Legal and Nonlegal Services in the Same Transaction

[5]    In some situations it may be beneficial to a client to purchase both legal and nonlegal services from a lawyer, law firm or affiliated entity in the same matter or in two or more substantially related matters. Examples include: (i) a law firm that represents corporations and also provides public lobbying, public relations, investment banking and business relocation services, (ii) a law firm that represents clients in environmental matters and also provides engineering consulting services to those clients, and (iii) a law firm that represents clients in litigation and also provides consulting services relating to electronic document discovery. In these situations, the lawyer may have a financial interest in the nonlegal services that would constitute a conflict of interest under Rule 1.7(a)(2), which governs conflicts between a client and a lawyer's personal interests.

[5A]   Under Rule 1.7(a)(2), a concurrent conflict of interest exists when a reasonable lawyer would conclude that there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or personal interests. When a lawyer or law firm provides both legal and nonlegal services in the same matter (or in substantially related matters), a conflict with the lawyer's own interests will nearly always arise. For example, if the legal representation involves exercising judgment about whether to recommend nonlegal services and which provider to recommend, or if it involves overseeing the provision of the nonlegal services, then a conflict with the lawyer's own interests under Rule 1.7(a)(2) is likely to arise. However, when seeking the consent of a client to such a conflict, the lawyer should comply with both Rule 1.7(b) regarding the conflict affecting the legal representation of the client and Rule 1.8(a) regarding the business transaction with the client.

[5B]    Thus, the client may consent if: (i) the lawyer complies with Rule 1.8(a) with respect to the transaction in which the lawyer agrees to provide the nonlegal services, including obtaining the client's informed consent in a writing signed by the client, (ii) the lawyer reasonably believes that the lawyer can provide competent and diligent legal repre-

sentation despite the conflict within the meaning of Rule 1.7(b), and (iii) the client gives informed consent pursuant to Rule 1.7(b), confirmed in writing. In certain cases, it will not be possible to provide both legal and nonlegal services because the lawyer could not reasonably believe that he or she can represent the client competently and diligently while providing both legal and nonlegal services in the same or substantially related matters. Whether providing dual services gives rise to an impermissible conflict must be determined on a case-by-case basis, taking into account all of the facts and circumstances, including factors such as: (i) the experience and sophistication of the client in obtaining legal and non-legal services of the kind being provided in the matter, (ii) the relative size of the anticipated fees for the legal and nonlegal services, (iii) the close-ness of the relationship between the legal and nonlegal services, and (iv) the degree of discretion the lawyer has in providing the legal and nonlegal services.

[6]     In the context of providing legal and nonlegal services in the same transaction, Rule 1.8(a) first requires that: (i) the nonlegal services be provided on terms that are fair and reasonable to the client, (ii) full dis-closure of the terms on which the nonlegal services will be provided be made in writing to the client in a manner understandable by the client, (iii) the client is advised to seek the advice of independent counsel about the provision of the nonlegal services by the lawyer, and (iv) the client gives informed consent, as set forth in Rule 1.8(a)(3), in a writing signed by the client, to the terms of the transaction in which the nonlegal services are provided and to the lawyer's inherent conflict of interest.

[7]     In addition, in the context of providing legal and nonlegal services in the same transaction, Rule 1.8(a) requires a full disclosure of the nature and extent of the lawyer's financial interest or stake in the pro-vision of the nonlegal services. By its terms, Rule 1.8(a) requires that the nonlegal services be provided on terms that are fair and reasonable to the client. (Where the nonlegal services are provided on terms generally available to the public in the marketplace, that requirement is ordinarily met.) Consequently, as a further safeguard against conflicts that may arise when the same lawyer provides both legal and nonlegal services in the same or substantially related matters, a lawyer may do so only if the law-yer not only complies with Rule 1.8(a) with respect to the nonlegal ser-vices, but also obtains the client's informed consent, pursuant to Rule 1.7(b), confirmed in writing, after fully disclosing the advantages and risks of obtaining legal and nonlegal services from the same or affiliated

providers in a single matter (or in substantially related matters), including the lawyer's conflict of interest arising from the lawyer's financial interest in the provision of the nonlegal services.

[8]     [Reserved.]

[9]     [Reserved.]

[10]    [Reserved.]

[11]    [Reserved.]

# RULE 5.8

## CONTRACTUAL RELATIONSHIPS BETWEEN LAWYERS AND NONLEGAL PROFESSIONALS

(a)    The practice of law has an essential tradition of complete independence and uncompromised loyalty to those it serves. Recognizing this tradition, clients of lawyers practicing in New York State are guaranteed "independent professional judgment and undivided loyalty uncompromised by conflicts of interest." Indeed, these guarantees represent the very foundation of the profession and allow and foster its continued role as a protector of the system of law. Therefore, a lawyer must remain completely responsible for his or her own independent professional judgment, maintain the confidences and secrets of clients, preserve funds of clients and third parties in his or her control, and otherwise comply with the legal and ethical principles governing lawyers in New York State.

Multi-disciplinary practice between lawyers and nonlawyers is incompatible with the core values of the legal profession and therefore, a strict division between services provided by lawyers and those provided by nonlawyers is essential to protect those values. However, a lawyer or law firm may enter into and maintain a contractual relationship with a nonlegal professional or nonlegal professional service firm for the purpose of offering to the public, on a systematic and continuing basis, legal services performed by the lawyer or law firm as well as other nonlegal professional services, notwithstanding the provisions of Rule 1.7(a), provided that:

(1)    the profession of the nonlegal professional or nonlegal professional service firm is included in a list jointly established and maintained by the Appellate Divisions pursuant to Section 1205.3 of the Joint Appellate Division Rules;

(2)    the lawyer or law firm neither grants to the nonlegal professional or nonlegal professional service firm, nor permits such person or firm to obtain, hold or exercise, directly or indirectly, any ownership or investment interest in, or managerial or supervisory right, power or position in connection with the practice of law by the lawyer or law firm, nor, as provided in Rule 7.2(a)(1), shares legal fees with a nonlawyer or receives or gives any monetary or other tangible benefit for giving or receiving a referral; and

**(3)**　the fact that the contractual relationship exists is disclosed by the lawyer or law firm to any client of the lawyer or law firm before the client is referred to the nonlegal professional service firm, or to any client of the nonlegal professional service firm before that client receives legal services from the lawyer or law firm; and the client has given informed written consent and has been provided with a copy of the "Statement of Client's Rights In Cooperative Business Arrangements" pursuant to section 1205.4 of the Joint Appellate Divisions Rules.

**(b)**　For purposes of paragraph (a):

**(1)**　each profession on the list maintained pursuant to a Joint Rule of the Appellate Divisions shall have been designated sua sponte, or approved by the Appellate Divisions upon application of a member of a nonlegal profession or nonlegal professional service firm, upon a determination that the profession is composed of individuals who, with respect to their profession:

**(i)**　have been awarded a bachelor's degree or its equivalent from an accredited college or university, or have attained an equivalent combination of educational credit from such a college or university and work experience;

**(ii)**　are licensed to practice the profession by an agency of the State of New York or the United States Government; and

**(iii)**　are required under penalty of suspension or revocation of license to adhere to a code of ethical conduct that is reasonably comparable to that of the legal profession;

**(2)**　the term "ownership or investment interest" shall mean any such interest in any form of debt or equity, and shall include any interest commonly considered to be an interest accruing to or enjoyed by an owner or investor.

**(c)**　This Rule shall not apply to relationships consisting solely of non-exclusive reciprocal referral agreements or understand-

**ings between a lawyer or law firm and a nonlegal professional or non-legal professional service firm.**

**Comment**

**Contractual Relationships Between Lawyers and Nonlegal Professionals**

[1]     Lawyers may enter into interprofessional contractual relationships for the systematic and continuing provision of legal and nonlegal professional services, provided the nonlegal professional or nonlegal professional service firm with which the lawyer or law firm is affiliated does not own, control, supervise or manage, directly or indirectly, in whole or in part, the lawyer's or law firm's practice of law. The nonlegal professional or nonlegal professional service firm may not play a role in, for example, (i) deciding whether to accept or terminate an engagement to provide legal services in a particular matter or to a particular client, (ii) determining the manner in which lawyers are hired or trained, (iii) assigning lawyers to handle particular matters or to provide legal services to particular clients, (iv) deciding whether to undertake pro bono and other public-interest legal work, (v) making financial and budgetary decisions relating to the legal practice, and (vi) determining the compensation and advancement of lawyers and of persons assisting lawyers on legal matters.

[2]     The contractual relationship permitted by this Rule may include the sharing of premises, general overhead or administrative costs and services on an arm's length basis. Such financial arrangements, in the context of an agreement between lawyers and other professionals to provide legal and other professional services on a systematic and continuing basis, are permitted subject to the requirements of paragraph (a) and Rule 7.2(a). Similarly, lawyers participating in such arrangements remain subject to general ethical principles in addition to those set forth in this Rule including, at a minimum, Rule 1.7, Rule 1.8(f), Rule 1.9, Rule 5.7(b) and Rule 7.5(a). Thus, the lawyer or law firm may not, for example, include in its firm name the name of the nonlegal professional service firm or any individual nonlegal professional, enter into formal partnerships with non-lawyers, or practice in an organization authorized to practice law for a profit in which nonlawyers own any interest. Moreover, a lawyer or law firm may not enter into an agreement or arrangement for the use of a name in respect of which a nonlegal professional or nonlegal professional service firm has or exercises a proprietary interest if, under or pursuant to the agreement or arrangement, that nonlegal professional or firm acts or is entitled to act in a manner inconsistent with paragraph (a)(2) or Comment

[1]. More generally, the existence of a contractual relationship permitted by this Rule does not by itself create a conflict of interest in violation of Rule 1.8(a). Whenever a law firm represents a client in a matter in which the nonlegal professional service firm's client is also involved, the law firm's interest in maintaining an advantageous relationship with a nonlegal professional service firm might, in certain circumstances, adversely affect the professional judgment of the law firm.

[3]     Each lawyer and law firm having a contractual relationship under paragraph (a) has an ethical duty to observe these Rules with respect to the lawyer's or law firm's own conduct in the context of that relationship. For example, the lawyer or law firm cannot permit the obligation to maintain client confidences, as required by Rule 1.6, to be compromised by the contractual relationship or by its implementation by or on behalf of nonlawyers involved in the relationship. In addition, the prohibition in Rule 8.4(a) against circumventing a Rule through actions of another applies generally to the lawyer or law firm in the contractual relationship.

[4]     The contractual relationship permitted by paragraph (a) may provide for the reciprocal referral of clients by and between the lawyer or law firm and the nonlegal professional or nonlegal professional service firm. When in the context of such a contractual relationship a lawyer or law firm refers a client to the nonlegal professional or nonlegal professional service firm, the lawyer or law firm shall observe the ethical standards of the legal profession in verifying the competence of the nonlegal professional or nonlegal professional services firm to handle the relevant affairs and interests of the client. Referrals should be made only when requested by the client or deemed to be reasonably necessary to serve the client. Thus, even if otherwise permitted by paragraph (a), a contractual relationship may not require referrals on an exclusive basis. *See* Rule 7.2(a).

[5]     To ensure that only appropriate professional services are involved, a contractual relationship for the provision of services is permitted under paragraph (a) only if the nonlegal party thereto is a professional or professional service firm meeting appropriate standards regarding ethics, education, training and licensing. The Appellate Divisions maintain a public list of eligible professions at 22 N.Y.C.R.R. § 1205.5. A member of the nonlegal profession or a professional service firm may apply for the inclusion of particular professions on the list or professions may be added to the list by the Appellate Divisions sua sponte. A lawyer or law firm not wishing to affiliate with a nonlawyer on a systematic and continuing

basis, but only to engage a nonlawyer on an ad hoc basis to assist in a specific matter, is not governed by this Rule when so dealing with the nonlawyer. Thus, a lawyer advising a client in connection with a discharge of chemical wastes may engage the services of and consult with an environmental engineer on that matter without the need to comply with this Rule. Likewise, the requirements of this Rule need not be met when a lawyer retains an expert witness in a particular litigation.

[6]    Depending upon the extent and nature of the relationship between the lawyer or law firm, on the one hand, and the nonlegal professional or nonlegal professional service firm, on the other hand, it may be appropriate to treat the parties to a contractual relationship permitted by paragraph (a) as a single law firm for purposes of these Rules, as would be the case if the nonlegal professional or nonlegal professional service firm were in an "of counsel" relationship with the lawyer or law firm. If the parties to the relationship are treated as a single law firm, the principal effects would be that conflicts of interest are imputed as between them pursuant to Rule 1.10(a) and that the law firm would be required to maintain systems for determining whether such conflicts exist pursuant to Rule 1.10(f). To the extent that the rules of ethics of the nonlegal profession conflict with these Rules, the rules of the legal profession will still govern the conduct of the lawyers and the law firm participants in the relationship. A lawyer or law firm may also be subject to legal obligations arising from a relationship with nonlawyer professionals, who are themselves subject to regulation.

# RULE 6.1

## VOLUNTARY PRO BONO SERVICE

Lawyers are strongly encouraged to provide pro bono legal services to benefit poor persons.

(a)     Every lawyer should aspire to:

(1)     provide at least 50 hours of pro bono legal services each year to poor persons; and

(2)     contribute financially to organizations that provide legal services to poor persons. Lawyers in private practice or employed by a for-profit entity should aspire to contribute annually in an amount at least equivalent to (i) the amount typically billed by the lawyer (or the firm with which the lawyer is associated) for one hour of time; or (ii) if the lawyer's work is performed on a contingency basis, the amount typically billed by lawyers in the community for one hour of time; or (iii) the amount typically paid by the organization employing the lawyer for one hour of the lawyer's time; or (iv) if the lawyer is underemployed, an amount not to exceed one-tenth of one percent of the lawyer's income.

(b)     Pro bono legal services that meet this goal are:

(1)     professional services rendered in civil matters, and in those criminal matters for which the government is not obliged to provide funds for legal representation, to persons who are financially unable to compensate counsel;

(2)                 activities related to improving the administration of justice by simplifying the legal process for, or increasing the availability and quality of legal services to, poor persons; and

(3)     professional services to charitable, religious, civic and educational organizations in matters designed predominantly to address the needs of poor persons.

(c)     Appropriate organizations for financial contributions are:

(1)     organizations primarily engaged in the provision of legal services to the poor; and

> > **(2)** **organizations substantially engaged in the provision of legal services to the poor, provided that the donated funds are to be used for the provision of such legal services.**

> **(d)** **This Rule is not intended to be enforced through the disciplinary process, and the failure to fulfill the aspirational goals contained herein should be without legal consequence.**

## Comment

[1]    As our society has become one in which rights and responsibilities are increasingly defined in legal terms, access to legal services has become of critical importance. This is true for all people, rich, poor or of moderate means. However, because the legal problems of the poor often involve areas of basic need, their inability to obtain legal services can have dire consequences. The vast unmet legal needs of the poor in New York have been recognized in several studies undertaken over the past two decades. Each lawyer—including members of the judiciary and government lawyers, and regardless of professional prominence or professional work load—is strongly encouraged to provide or to assist in providing pro bono legal services to the poor.

[2]    Paragraph (a) urges all lawyers to provide a minimum of 50 hours of pro bono legal service annually without fee or expectation of fee, either directly to poor persons or to organizations that serve the legal or other basic needs of persons of limited financial means. It is recognized that in some years a lawyer may render greater or fewer hours than the annual standard specified, but during the course of the lawyer's career, the lawyer should render on average per year, the number of hours set forth in this Rule. Services can be performed in civil matters or in criminal or quasi-criminal matters for which there is no government obligation to provide funds for legal representation, such as post-conviction death penalty appeal cases.

[2A]    Paragraph (a)(2) provides that, in addition to providing the services described in paragraph (a), lawyers should provide financial support to organizations that provide legal services to the poor. This goal is separate from and not a substitute for the provision of legal services described in paragraph (a). To assist the funding of civil legal services for low income people, when selecting a bank for deposit of funds into an "IOLA" account pursuant to Judiciary Law § 497, a lawyer should take into consideration the interest rate offered by the bank on such funds.

[2B]   Paragraphs (a)(1) and (a)(2) recognize the critical need for legal services that exists among poor persons. Legal services under these paragraphs consist of a full range of activities, including individual and class representation, the provision of legal advice, legislative lobbying, administrative rulemaking and the provision of free training or mentoring to those who represent poor persons.

[3]   "Poor persons" under paragraphs (a)(1) and (a)(2) include both (i) individuals who qualify for participation in programs funded by the Legal Services Corporation and (ii) individuals whose incomes and financial resources are slightly above the guidelines utilized by Legal Services Corporation programs but nevertheless cannot afford counsel. To satisfy the goal of paragraph (a)(1), lawyers may provide legal services to individuals in either of those categories, or, pursuant to paragraph (b)(3), may provide legal services to organizations such as homeless shelters, battered women's shelters, and food pantries that serve persons in either of those categories.

[4]   To qualify as pro bono service within the meaning of paragraph (a)(1) the service must be provided without fee or expectation of fee, so the intent of the lawyer to render free legal services is essential. Accordingly, services rendered cannot be considered pro bono if an anticipated fee is uncollected, but the award of statutory attorneys' fees in a case originally accepted as pro bono would not disqualify such services from inclusion under this Rule. Lawyers who do receive fees in such cases are encouraged to contribute an appropriate portion of such fees to organizations or projects that benefit persons of limited means.

[5]   Constitutional, statutory or regulatory restrictions may prohibit or impede government and public sector lawyers and judges from performing the pro bono service outlined in paragraph (b)(1). Accordingly, where those restrictions apply, government and public sector lawyers and judges may fulfill their pro bono responsibility by making financial contributions to organizations that help meet the legal and other basic needs of the poor, as described in paragraphs (a)(2), (c)(1) and (c)(2) or by performing some of the services outlined in paragraph (b)(2) or (b)(3).

[6]   [Reserved.]

[7]   In addition to rendering pro bono services directly to the poor and making financial contributions, lawyers may fulfill the goal of rendering pro bono services by serving on the boards or giving legal

advice to organizations whose mission is helping poor persons. While a lawyer may fulfill the annual goal to perform pro bono service exclusively through activities described in paragraphs (a)(1) and (a)(2), all lawyers are urged to render public-interest and pro bono service in addition to assisting the poor.

[8]     Paragraphs (c)(1) and (c)(2) essentially reiterate the goal as set forth in (a)(2) with the further provision that the lawyer should seek to ensure that the donated money be directed to providing legal assistance to the poor rather than the general charitable objectives of such organizations.

[9]     Law firms should act reasonably to enable and encourage all lawyers in the firm to provide the pro bono legal service called for by this Rule.

# RULE 6.2

## [RESERVED]

# RULE 6.3

## MEMBERSHIP IN A LEGAL SERVICES ORGANIZATION

**A lawyer may serve as a director, officer or member of a not-for-profit legal services organization, apart from the law firm in which the lawyer practices, notwithstanding that the organization serves persons having interests that differ from those of a client of the lawyer or the lawyer's firm. The lawyer shall not knowingly participate in a decision or action of the organization:**

**(a)    if participating in the decision or action would be incompatible with the lawyer's obligations to a client under Rules 1.7 through 1.13; or**

**(b)    where the decision or action could have a material adverse effect on the representation of a client of the organization whose interests differ from those of a client of the lawyer or the lawyer's firm.**

**Comment**

[1]    Lawyers should be encouraged to support and participate in legal services organizations. A lawyer who is an officer or a member of such an organization does not thereby have a client-lawyer relationship with persons served by the organization. However, there is potential conflict between the interests of such persons and the interests of the lawyer's clients. If the possibility of such conflict disqualified a lawyer from serving on the board of a legal services organization, the profession's involvement in such organizations would be severely curtailed.

[1A]    This Rule applies to legal services organizations organized and operating on a not-for-profit basis.

[2]    It may be necessary in appropriate cases to reassure a client of the organization that the representation will not be affected by conflicting loyalties of a member of the board. Established, written policies in this respect can enhance the credibility of such assurances.

# RULE 6.4

## LAW REFORM ACTIVITIES AFFECTING CLIENT INTERESTS

**A lawyer may serve as a director, officer or member of an organization involved in reform of the law or its administration, notwithstanding that the reform may affect the interests of a client of the lawyer. When the lawyer knows that the interests of a client may be materially benefitted by a decision in which the lawyer actively participates, the lawyer shall disclose that fact to the organization, but need not identify the client. In determining the nature and scope of participation in such activities, a lawyer should be mindful of obligations to clients under other Rules, particularly Rule 1.7.**

**Comment**

[1]  Lawyers involved in organizations seeking law reform generally do not have a client-lawyer relationship with the organization. Otherwise, it might follow that a lawyer could not be involved in a bar association law reform program that might indirectly affect a client. For example, a lawyer concentrating in antitrust litigation might be regarded as disqualified from participating in drafting revisions of rules governing that subject. In determining the nature and scope of participation in such activities, a lawyer should be mindful of obligations to clients. A lawyer's identification with the organization's aims and purposes, under some circumstances, may give rise to a personal-interest conflict with client interests implicating the lawyer's obligations under other Rules, particularly Rule 1.7. A lawyer is also professionally obligated to protect the integrity of the law reform program by making an appropriate disclosure within the organization when the lawyer knows a private client might be materially affected.

# RULE 6.5

## PARTICIPATION IN LIMITED PRO BONO LEGAL SERVICES PROGRAMS

**(a)** A lawyer who, under the auspices of a program sponsored by a court, government agency, bar association or not-for-profit legal services organization, provides short-term limited legal services to a client without expectation by either the lawyer or the client that the lawyer will provide continuing representation in the matter:

**(1)** shall comply with Rules 1.7, 1.8 and 1.9, concerning restrictions on representations where there are or may be conflicts of interest as that term is defined in these Rules, only if the lawyer has actual knowledge at the time of commencement of representation that the representation of the client involves a conflict of interest; and

**(2)** shall comply with Rule 1.10 only if the lawyer has actual knowledge at the time of commencement of representation that another lawyer associated with the lawyer in a law firm is affected by Rules 1.7, 1.8 and 1.9.

**(b)** Except as provided in paragraph (a)(2), Rule 1.7 and Rule 1.9 are inapplicable to a representation governed by this Rule.

**(c)** Short-term limited legal services are services providing legal advice or representation free of charge as part of a program described in paragraph (a) with no expectation that the assistance will continue beyond what is necessary to complete an initial consultation, representation or court appearance.

**(d)** The lawyer providing short-term limited legal services must secure the client's informed consent to the limited scope of the representation, and such representation shall be subject to the provisions of Rule 1.6.

**(e)** This Rule shall not apply where the court before which the matter is pending determines that a conflict of interest exists or, if during the course of the representation, the lawyer providing the services becomes aware of the existence of a conflict of interest precluding continued representation.

**Comment**

[1]     Legal services organizations, courts, government agencies, bar associations and various non-profit organizations have established programs through which lawyers provide free short-term limited legal services, such as advice or the completion of legal forms, to assist persons to address their legal problems without further representation by a lawyer. In these programs, such as legal-advice hotlines, advice-only clinics or pro se counseling programs, a client-lawyer relationship is established, but there is no expectation that the lawyer's representation of the client will continue beyond the limited consultation. Such programs are normally operated under circumstances in which it is not feasible for a lawyer to utilize the conflict-checking system required by Rule 1.10(e) before providing the short-term limited legal services contemplated by this Rule. *See also* Rules 1.7, 1.8, 1.9, 1.10.

[2]     A lawyer who provides short-term limited legal services pursuant to this Rule must secure the client's informed consent to the limited scope of the representation. *See* Rule 1.2(c). If a short-term limited representation would not be reasonable under the circumstances, the lawyer may offer advice to the client, but must also advise the client of the need for further assistance of counsel. Except as provided in this Rule, these Rules, including Rules 1.6 and Rule 1.9(c), are applicable to the limited representation.

[3]     Because a lawyer who is representing a client in the circumstances addressed by this Rule ordinarily is not able to check systematically for conflicts of interest, paragraph (a) requires compliance with Rules 1.7, 1.8 and 1.9 only if the lawyer knows that the representation presents a conflict of interest for the lawyer, and with Rule 1.10 only if the lawyer knows that another lawyer in the lawyer's firm is affected by these Rules.

[4]     Because the limited nature of the services significantly reduces the risk of conflicts of interest with other matters being handled by the lawyer's firm, paragraph (b) provides that Rules 1.7 and 1.9 are inapplicable to a representation governed by this Rule, except as provided by paragraph (a)(2). Paragraph (a)(2) requires the participating lawyer to comply with Rule 1.10 only when the lawyer knows that the lawyer's firm is affected by Rules 1.7, 1.8 or 1.9.

[5]     If, after commencing a short-term limited representation in accordance with this Rule, a lawyer undertakes to represent the client in the matter on an ongoing basis, Rules 1.7, 1.9(a) and 1.10 become applicable.

# RULE 7.1

## ADVERTISING

(a)    A lawyer or law firm shall not use or disseminate or participate in the use or dissemination of any advertisement that:

(1)    contains statements or claims that are false, deceptive or misleading; or

(2)    violates a Rule.

(b)    Subject to the provisions of paragraph (a), an advertisement may include information as to:

(1)    legal and nonlegal education; degrees and other scholastic distinctions; dates of admission to any bar; areas of the law in which the lawyer or law firm practices, as authorized by these Rules; public offices and teaching positions held; publications of law-related matters authored by the lawyer; memberships in bar associations or other professional societies or organizations, including offices and committee assignments therein; foreign language fluency; and bona fide professional ratings;

(2)    names of clients regularly represented, provided that the client has given prior written consent;

(3)    bank references; credit arrangements accepted; prepaid or group legal services programs in which the lawyer or law firm participates; nonlegal services provided by the lawyer or law firm or by an entity owned and controlled by the lawyer or law firm; the existence of contractual relationships between the lawyer or law firm and a nonlegal professional or nonlegal professional service firm, to the extent permitted by Rule 5.8, and the nature and extent of services available through those contractual relationships; and

(4)    legal fees for initial consultation; contingent fee rates in civil matters, when accompanied by a statement disclosing the information required by paragraph (p); range of fees for legal and nonlegal services, provided that there be available to the public free of charge a written statement

clearly describing the scope of each advertised service, hourly rates, and fixed fees for specified legal and nonlegal services.

(c)    An advertisement shall not:

(1)    include a paid endorsement of, or testimonial about, a lawyer or law firm without disclosing that the person is being compensated therefor;

(2)    include the portrayal of a fictitious law firm, the use of a fictitious name to refer to lawyers not associated together in a law firm, or otherwise imply that lawyers are associated in a law firm if that is not the case;

(3)    use actors to portray a judge, the lawyer, members of the law firm, or clients, or utilize depictions of fictionalized events or scenes, without disclosure of same;

(4)    be made to resemble legal documents.

(d)    An advertisement that complies with paragraph (e) may contain the following:

(1)    statements that are reasonably likely to create an expectation about results the lawyer can achieve;

(2)    statements that compare the lawyer's services with the services of other lawyers;

(3)    testimonials or endorsements of clients, and of former clients; or

(4)    statements describing or characterizing the quality of the lawyer's or law firm's services.

(e)    It is permissible to provide the information set forth in paragraph (d) provided:

(1)    its dissemination does not violate paragraph (a);

(2)    it can be factually supported by the lawyer or law firm as of the date on which the advertisement is published or disseminated; and

(3)    it is accompanied by the following disclaimer: "Prior results do not guarantee a similar outcome"; and

(4)    in the case of a testimonial or endorsement from a client with respect to a matter still pending, the client gives informed consent confirmed in writing.

(f)    Every advertisement other than those appearing in a radio, television or billboard advertisement, in a directory, newspaper, magazine or other periodical (and any web sites related thereto), or made in person pursuant to Rule 7.3(a)(1), shall be labeled "Attorney Advertising" on the first page, or on the home page in the case of a web site. If the communication is in the form of a self-mailing brochure or postcard, the words "Attorney Advertising" shall appear therein. In the case of electronic mail, the subject line shall contain the notation "ATTORNEY ADVERTISING."

(g)    A lawyer or law firm shall not utilize meta-tags or other hidden computer codes that, if displayed, would violate these Rules.

(h)    All advertisements shall include the name, principal law office address and telephone number of the lawyer or law firm whose services are being offered.

(i)    Any words or statements required by this Rule to appear in an advertisement must be clearly legible and capable of being read by the average person, if written, and intelligible if spoken aloud. In the case of a web site, the required words or statements shall appear on the home page.

(j)    A lawyer or law firm advertising any fixed fee for specified legal services shall, at the time of fee publication, have available to the public a written statement clearly describing the scope of each advertised service, which statement shall be available to the client at the time of retainer for any such service. Such legal services shall include all those services that are recognized as reasonable and necessary under local custom in the area of practice in the community where the services are performed.

(k)    All advertisements shall be pre-approved by the lawyer or law firm, and a copy shall be retained for a period of not less than three years following its initial dissemination. Any advertisement contained in a computer-accessed communication shall be retained for a

period of not less than one year. A copy of the contents of any web site covered by this Rule shall be preserved upon the initial publication of the web site, any major web site redesign, or a meaningful and extensive content change, but in no event less frequently than once every 90 days.

(l)     If a lawyer or law firm advertises a range of fees or an hourly rate for services, the lawyer or law firm shall not charge more than the fee advertised for such services. If a lawyer or law firm advertises a fixed fee for specified legal services, or performs services described in a fee schedule, the lawyer or law firm shall not charge more than the fixed fee for such stated legal service as set forth in the advertisement or fee schedule, unless the client agrees in writing that the services performed or to be performed were not legal services referred to or implied in the advertisement or in the fee schedule and, further, that a different fee arrangement shall apply to the transaction.

(m)     Unless otherwise specified in the advertisement, if a lawyer publishes any fee information authorized under this Rule in a publication that is published more frequently than once per month, the lawyer shall be bound by any representation made therein for a period of not less than 30 days after such publication. If a lawyer publishes any fee information authorized under this Rule in a publication that is published once per month or less frequently, the lawyer shall be bound by any representation made therein until the publication of the succeeding issue. If a lawyer publishes any fee information authorized under this Rule in a publication that has no fixed date for publication of a succeeding issue, the lawyer shall be bound by any representation made therein for a reasonable period of time after publication, but in no event less than 90 days.

(n)     Unless otherwise specified, if a lawyer broadcasts any fee information authorized under this Rule, the lawyer shall be bound by any representation made therein for a period of not less than 30 days after such broadcast.

(o)     A lawyer shall not compensate or give anything of value to representatives of the press, radio, television or other communication medium in anticipation of or in return for professional publicity in a news item.

**(p)** **All advertisements that contain information about the fees charged by the lawyer or law firm, including those indicating that in the absence of a recovery no fee will be charged, shall comply with the provisions of Judiciary Law § 488(3).**

**(q)** **A lawyer may accept employment that results from participation in activities designed to educate the public to recognize legal problems, to make intelligent selection of counsel or to utilize available legal services.**

**(r)** **Without affecting the right to accept employment, a lawyer may speak publicly or write for publication on legal topics so long as the lawyer does not undertake to give individual advice.**

**Comment**

**Advertising**

[1]     The need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking assistance, and are able to obtain the services of competent legal counsel. Hence, important functions of the legal profession are to educate people to recognize their problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.

[2]     The public's need to know about legal services can be fulfilled in part through advertising. People of limited means who have not made extensive use of legal services in many instances rely on advertising to find appropriate counsel. While a lawyer's reputation may attract some clients, lawyers may also make the public aware of their services by advertising to obtain work.

[3]     Advertising by lawyers serves two principal purposes: first, it educates potential clients regarding their need for legal advice and assists them in obtaining a lawyer appropriate for those needs. Second, it enables lawyers to attract clients. To carry out these two purposes and because of the critical importance of legal services, it is of the utmost importance that lawyer advertising not be false, deceptive or misleading. Truthful statements that are misleading are prohibited by this Rule. A truthful statement is misleading if it omits a fact necessary to make the lawyer's communication, considered as a whole, not materially misleading. A truthful statement is also misleading if there is a substantial likelihood that it will lead a reasonable person to formulate a specific

conclusion about the lawyer or the lawyer's services, or about the results a lawyer can achieve, for which there is no reasonable factual foundation. For example, a lawyer might truthfully state, "I have never lost a case," but that statement would be misleading if the lawyer settled virtually all cases that the lawyer handled. A communication to anyone that states or implies that the lawyer has the ability to influence improperly a court, court officer, governmental agency or government official is improper under Rule 8.4(e).

[4]     To be effective, advertising must attract the attention of viewers, readers or recipients and convey its content in ways that will be understandable and helpful to them. Lawyers may therefore use advertising techniques intended to attract attention, such as music, sound effects, graphics and the like, so long as those techniques do not render the advertisement false, deceptive or misleading. Lawyer advertising may use actors or fictionalized events or scenes for this purpose, provided appropriate disclosure of their use is made. Some images or techniques, however, are highly likely to be misleading. So, for instance, legal advertising should not be made to resemble legal documents.

[5]     The "Attorney Advertising" label serves to dispel any confusion or concern that might be created when nonlawyers receive letters or emails from lawyers. The label is not necessary for advertising in newspapers or on television, or similar communications that are self-evidently advertisements, such as billboards or press releases transmitted to news outlets, and as to which there is no risk of such confusion or concern. The ultimate purpose of the label is to inform readers where they might otherwise be confused.

[6]     Not all communications made by lawyers about the lawyer or the law firm's services are advertising. Advertising by lawyers consists of communications made in any form about the lawyer or the law firm's services, the primary purpose of which is retention of the lawyer or law firm for pecuniary gain as a result of the communication. However, noncommercial communications motivated by a not-for-profit organization's interest in political expression and association are generally not considered advertising. Of course, all communications by lawyers, whether subject to the special rules governing lawyer advertising or not, are governed by the general rule that lawyers may not engage in conduct involving dishonesty, fraud, deceit or misrepresentation, or knowingly make a material false statement of fact or law. By definition, communications to existing clients are excluded from the Rules governing advertising. A client who is a current client in any matter is an existing client for all purposes of these

Rules. (Whether a client is a current client for purposes of conflicts of interest and other issues may depend on other considerations. Generally, the term "current client" for purposes of the advertising exemption should be interpreted more broadly than it is for determining whether a client is a "current client" for purposes of a conflict of interest analysis.)

[7]    Communications to former clients that are germane to the earlier representation are not considered to be advertising. Likewise, communications to other lawyers, including those made in bar association publications and other publications targeted primarily at lawyers, are excluded from the special rules governing lawyer advertising even if their purpose is the retention of the lawyer or law firm. Topical newsletters, client alerts, or blogs intended to educate recipients about new developments in the law are generally not considered advertising. However, a newsletter, client alert, or blog that provides information or news primarily about the lawyer or law firm (for example, the lawyer or law firm's cases, personnel, clients or achievements) generally would be considered advertising. Communications, such as proposed retainer agreements or ordinary correspondence with a prospective client who has expressed interest in, and requested information about, a lawyer's services, are not advertising. Accordingly, the special restrictions on advertising and solicitation would not apply to a lawyer's response to a prospective client who has asked the lawyer to outline the lawyer's qualifications to undertake a proposed retention or the terms of a potential retention.

[8]    The circulation or distribution to prospective clients by a lawyer of an article or report published about the lawyer by a third party is advertising if the lawyer's primary purpose is to obtain retentions. In circulating or distributing such materials the lawyer should include information or disclaimers as necessary to dispel any misconceptions to which the article may give rise. For example, if a lawyer circulates an article discussing the lawyer's successes that is reasonably likely to create an expectation about the results the lawyer will achieve in future cases, a disclaimer is required by paragraph (e)(3). If the article contains misinformation about the lawyer's qualifications, any circulation of the article by the lawyer should make any necessary corrections or qualifications. This may be necessary even when the article included misinformation through no fault of the lawyer or because the article is out of date, so that material information that was true at the time is no longer true. Some communications by a law firm that may constitute marketing or branding are not necessarily advertisements. For example, pencils, legal pads, greeting cards, coffee mugs, T-shirts or the like with the law firm name, logo, and contact

information printed on them do not constitute "advertisements" within the definition of this Rule if their primary purpose is general awareness and branding, rather than the retention of the law firm for a particular matter.

**Recognition of Legal Problems**

[9]     The legal professional should help the public to recognize legal problems because such problems may not be self-revealing and might not be timely noticed. Therefore, lawyers should encourage and participate in educational and public-relations programs concerning the legal system, with particular reference to legal problems that frequently arise. A lawyer's participation in an educational program is ordinarily not considered to be advertising because its primary purpose is to educate and inform rather than to attract clients. Such a program might be considered to be advertising if, in addition to its educational component, participants or recipients are expressly encouraged to hire the lawyer or law firm. A lawyer who writes or speaks for the purpose of educating members of the public to recognize their legal problems should carefully refrain from giving or appearing to give a general solution applicable to all apparently similar individual problems, because slight changes in fact situations may require a material variance in the applicable advice; otherwise, the public may be misled and misadvised. Talks and writings by lawyers for nonlawyers should caution them not to attempt to solve individual problems on the basis of the information contained therein.

[10]    As members of their communities, lawyers may choose to sponsor or contribute to cultural, sporting, charitable or other events organized by not-for-profit organizations. If information about the lawyer or law firm disseminated in connection with such an event is limited to the identification of the lawyer or law firm, the lawyer's or law firm's contact information, a brief description of areas of practice, and the fact of sponsorship or contribution, the communication is not considered advertising.

**Statements Creating Expectations, Characterizations of Quality, and Comparisons**

[11]    Lawyer advertising may include statements that are reasonably likely to create an expectation about results the lawyer can achieve, statements that compare the lawyer's services with the services of other lawyers, or statements describing or characterizing the quality of the lawyer's or law firm's services, only if they can be factually supported by the lawyer or law firm as of the date on which the advertisement is published or disseminated and are accompanied by the following disclaimer: "Prior

results do not guarantee a similar outcome." Accordingly, if true and accompanied by the disclaimer, a lawyer or law firm could advertise "Our firm won 10 jury verdicts over $1,000,000 in the last five years," "We have more Patent Lawyers than any other firm in X County," or "I have been practicing in the area of divorce law for more than 10 years." Even true factual statements may be misleading if presented out of the context of additional information needed to properly understand and evaluate the statements. For example, a truthful statement by a lawyer that the lawyer's average jury verdict for a given year was $100,000 may be misleading if that average was based on a large number of very small verdicts and one $10,000,000 verdict. Likewise, advertising that truthfully recites judgment amounts would be misleading if the lawyer failed to disclose that the judgments described were overturned on appeal or were obtained by default.

[12]   Descriptions of characteristics of the lawyer or law firm that are not comparative and do not involve results obtained are permissible even though they cannot be factually supported. Such statements are understood to be general descriptions and not claims about quality, and would not be likely to mislead potential clients. Accordingly, a law firm could advertise that it is "Hard-Working," "Dedicated," or "Compassionate" without the necessity to provide factual support for such subjective claims. On the other hand, descriptions of characteristics of the law firm that compare its services with those of other law firms and that are not susceptible of being factually supported could be misleading to potential clients. Accordingly, a lawyer may not advertise that the lawyer is the "Best," "Most Experienced," or "Hardest Working." Similarly, some claims that involve results obtained are not susceptible of being factually supported and could be misleading to potential clients. Accordingly, a law firm may not advertise that it will obtain "Big $$$," "Most Money," or "We Win Big."

**Bona Fide Professional Ratings**

[13]   An advertisement may include information regarding bona fide professional ratings by referring to the rating service and how it has rated the lawyer, provided that the advertisement contains the "past results" disclaimer as required under paragraphs (d) and (e). However, a rating is not "bona fide" unless it is unbiased and nondiscriminatory. Thus, it must evaluate lawyers based on objective criteria or legitimate peer review in a manner unbiased by the rating service's economic interests (such as payment to the rating service by the rated lawyer) and not subject to improper influence by lawyers who are being evaluated. Fur-

ther, the rating service must fairly consider all lawyers within the pool of those who are purported to be covered. For example, a rating service that purports to evaluate all lawyers practicing in a particular geographic area or in a particular area of practice or of a particular age must apply its criteria to all lawyers within that geographic area, practice area, or age group.

## Meta-Tags

[14]    Meta-tags are hidden computer software codes that direct certain Internet search engines to the web site of a lawyer or law firm. For example, if a lawyer places the meta-tag "NY personal injury specialist" on the lawyer's web site, then a person who enters the search term "personal injury specialist" into a search engine will be directed to that lawyer's web page. That particular meta-tag is prohibited because Rule 7.4(a) generally prohibits the use of the word "specialist." However, a lawyer may use an advertisement employing meta-tags or other hidden computer codes that, if displayed, would not violate a Rule.

## Advertisements Referring to Fees and Advances

[15]    All advertisements that contain information about the fees or expenses charged by the lawyer or law firm, including advertisements indicating that in the absence of a recovery no fee will be charged, must comply with the provisions of section 488(3) of the Judiciary Law. However, a lawyer or law firm that offers any of the fee and expense arrangements permitted by section 488(3) must not, either directly or in any advertisement, state or imply that the lawyer's or law firm's ability to advance or pay costs and expenses of litigation is unique or extraordinary when that is not the case. For example, if an advertisement promises that the lawyer or law firm will advance the costs and expenses of litigation contingent on the outcome of the matter, or promises that the lawyer or law firm will pay the costs and expenses of litigation for indigent clients, then the advertisement must not say that such arrangements are "unique in the area," "unlike other firms," available "only at our firm," "extraordinary," or words to that effect, unless that is actually the case. However, if the lawyer or law firm can objectively demonstrate that this arrangement is unique or extraordinary, then the lawyer or law firm may make such a claim in the advertisement.

**Retention of Copies; Filing of Copies; Designation of Principal Office**

[16]    Where these Rules require that a lawyer retain a copy of an advertisement or file a copy of a solicitation or other information, that obligation may be satisfied by any of the following: original records, photocopies, microfilm, optical imaging, and any other medium that preserves an image of the document that cannot be altered without detection.

[17]    A law firm that has no office it considers its principal office may comply with paragraph (h) by listing one or more offices where a substantial amount of the law firm's work is performed.

# RULE 7.2

## PAYMENT FOR REFERRALS

(a)     A lawyer shall not compensate or give anything of value to a person or organization to recommend or obtain employment by a client, or as a reward for having made a recommendation resulting in employment by a client, except that:

(1)     a lawyer or law firm may refer clients to a nonlegal professional or nonlegal professional service firm pursuant to a contractual relationship with such nonlegal professional or nonlegal professional service firm to provide legal and other professional services on a systematic and continuing basis as permitted by Rule 5.8, provided however that such referral shall not otherwise include any monetary or other tangible consideration or reward for such, or the sharing of legal fees; and

(2)     a lawyer may pay the usual and reasonable fees or dues charged by a qualified legal assistance organization or referral fees to another lawyer as permitted by Rule 1.5(g).

(b)     A lawyer or the lawyer's partner or associate or any other affiliated lawyer may be recommended, employed or paid by, or may cooperate with one of the following offices or organizations that promote the use of the lawyer's services or those of a partner or associate or any other affiliated lawyer, or request one of the following offices or organizations to recommend or promote the use of the lawyer's services or those of the lawyer's partner or associate, or any other affiliated lawyer as a private practitioner, if there is no interference with the exercise of independent professional judgment on behalf of the client:

(1)     a legal aid office or public defender office:

(i)     operated or sponsored by a duly accredited law school;

(ii)     operated or sponsored by a bona fide, non-profit community organization;

(iii)     operated or sponsored by a governmental agency; or

(iv)    operated, sponsored, or approved by a bar association;

(2)    a military legal assistance office;

(3)    a lawyer referral service operated, sponsored or approved by a bar association or authorized by law or court rule; or

(4)    any bona fide organization that recommends, furnishes or pays for legal services to its members or beneficiaries provided the following conditions are satisfied:

(i)    Neither the lawyer, nor the lawyer's partner, nor associate, nor any other affiliated lawyer nor any nonlawyer, shall have initiated or promoted such organization for the primary purpose of providing financial or other benefit to such lawyer, partner, associate or affiliated lawyer;

(ii)    Such organization is not operated for the purpose of procuring legal work or financial benefit for any lawyer as a private practitioner outside of the legal services program of the organization;

(iii)    The member or beneficiary to whom the legal services are furnished, and not such organization, is recognized as the client of the lawyer in the matter;

(iv)    The legal service plan of such organization provides appropriate relief for any member or beneficiary who asserts a claim that representation by counsel furnished, selected or approved by the organization for the particular matter involved would be unethical, improper or inadequate under the circumstances of the matter involved; and the plan provides an appropriate procedure for seeking such relief;

(v)    The lawyer does not know or have cause to know that such organization is in violation of applicable laws, rules of court or other legal requirements that govern its legal service operations; and

> **(vi)** Such organization has filed with the appro-
> priate disciplinary authority, to the extent required by
> such authority, at least annually a report with respect to
> its legal service plan, if any, showing its terms, its sched-
> ule of benefits, its subscription charges, agreements with
> counsel and financial results of its legal service activities
> or, if it has failed to do so, the lawyer does not know or
> have cause to know of such failure.

## Comment

### Paying Others to Recommend a Lawyer

[1] Except as permitted under paragraphs (a)(1)–(a)(2) of this Rule or under Rule 1.17, lawyers are not permitted to pay others for recommending the lawyer's services or for channeling professional work in a manner that would violate Rule 7.3 if engaged in by a lawyer. *See* Rule 8.4(a) (lawyer may not violate or attempt to violate a Rule, knowingly assist another to do so, or do so through the acts of another). A communication contains a recommendation of it endorses or vouches for a lawyer's credentials, abilities, competence, character, or other professional qualities. Paragraph (a), however, does not prohibit a lawyer from paying for advertising and communications permitted by these Rules, including the costs of print directory listings, online directory listings, newspaper ads, television and radio airtime, domain name registrations, sponsorship fees, Internet-based advertisements, search engine optimization, and group advertising. A lawyer may also compensate employees, agents and vendors who are engaged to provide marketing or client development services, such as publicists, public-relations personnel, marketing personnel, business development staff, and web site designers. Moreover, a lawyer may pay others for generating clients leads, such as Internet-based client leads, as long as (i) the lead generator does not recommend the lawyers, (ii) any payment to the lead generator is consistent with Rules 1.5(g) (division of fees) and 5.4 (professional independence of the lawyer), (iii) the lawyer complies with Rule 1.8(f) (prohibiting interference with a lawyer's independent professional judgment by a person who recommends the lawyer's services), and (iv) the lead generator's communications are consistent with Rules 7.1 (Advertising) and 7.3 (Solicitation and Recommendation of Professional Employment). To comply with Rule 7.1, a lawyer must not pay a lead generator that states, implies, or creates a reasonable impression that it is recommending the lawyer, or making the referral without payment from the lawyer, or has analyzed a person's

legal problems when determining which lawyer should receive the referral. *See also* Rule 5.3 (Lawyer's Responsibility for Conduct of Nonlawyers).

[2]    A lawyer may pay the usual charges of a qualified legal assistance organization. A lawyer so participating should make certain that the relationship with a qualified legal assistance organization in no way interferes with independent professional representation of the interests of the individual client. A lawyer should avoid situations in which officials of the organization who are not lawyers attempt to direct lawyers concerning the manner in which legal services are performed for individual members and should also avoid situations in which considerations of economy are given undue weight in determining the lawyers employed by an organization or the legal services to be performed for the member or beneficiary, rather than competence and quality of service.

[3]    A lawyer who accepts assignments or referrals from a qualified legal assistance organization must act reasonably to ensure that the activities of the plan or service are compatible with the lawyer's professional obligations. *See* Rule 5.3. The lawyer must ensure that the organization's communications with potential clients are in conformity with these Rules. Thus, advertising must not be false or misleading, as would be the case if the organization's communications falsely suggested that it was a lawyer referral service sponsored by a state agency or bar association. Nor could the lawyer allow in-person, telephonic or real-time interactive electronic contacts that would violate this Rule.

[4]    A lawyer also may agree to refer clients to another lawyer or a nonlawyer in return for the undertaking of that person to refer clients or customers to the lawyer. Such reciprocal referral arrangements must not interfere with the lawyer's professional judgment as to making referrals or as to providing substantive legal services. *See* Rules 2.1, 5.4(c). Except as provided in Rule 1.5(e), a lawyer who receives referrals from a lawyer or nonlawyer must not pay anything solely for the referral, but the lawyer does not violate paragraph (a) by agreeing to refer clients to the other lawyer or nonlawyer so long as the reciprocal referral agreement is not exclusive and the client is informed of the referral agreement. A lawyer may enter into such an arrangement only if it is nonexclusive on both sides, so that both the lawyer and the nonlawyer are free to refer clients to others if that is in the best interest of those clients. Conflicts of interest created by such arrangements are governed by Rule 1.7. A lawyer's interest in receiving a steady stream of referrals from a particular source must not undermine the lawyer's professional judgment on behalf of clients. Recip-

rocal referral agreements should not be of indefinite duration and should be reviewed periodically to determine whether they comply with these Rules. This Rule does not restrict referrals or divisions of revenues or net income among lawyers within firms comprising multiple entities.

[5]     Campaign contributions by lawyers to government officials or candidates for public office who are, or may be, in a position to influence the award of a legal engagement may threaten governmental integrity by subjecting the recipient to a conflict of interest. Correspondingly, when a lawyer makes a significant contribution to a public official or an election campaign for a candidate for public office and is later engaged by the official to perform legal services for the official's agency, it may appear that the official has been improperly influenced in selecting the lawyer, whether or not this is so. This appearance of influence reflects poorly on the integrity of the legal profession and government as a whole. For these reasons, just as the Code prohibits a lawyer from compensating or giving anything of value to a person or organization to recommend or obtain employment by a client, the Code prohibits a lawyer from making or soliciting a political contribution to any candidate for government office, government official, political campaign committee or political party, if a disinterested person would conclude that the contribution is being made or solicited for the purpose of obtaining or being considered eligible to obtain a government legal engagement. This would be true even in the absence of an understanding between the lawyer and any government official or candidate that special consideration will be given in return for the political contribution or solicitation.

[6]     In determining whether a disinterested person would conclude that a contribution to a candidate for government office, government official, political campaign committee or political party is or has been made for the purpose of obtaining or being considered eligible to obtain a government legal engagement, the factors to be considered include (a) whether legal work awarded to the contributor or solicitor, if any, was awarded pursuant to a process that was insulated from political influence, such as a "Request for Proposal" process, (b) the amount of the contribution or the contributions resulting from a solicitation, (c) whether the contributor or any law firm with which the lawyer is associated has sought or plans to seek government legal work from the official or candidate, (d) whether the contribution or solicitation was made because of an existing personal, family or non-client professional relationship with the government official or candidate, (e) whether prior to the contribution or solicitation in question, the contributor or solicitor had made comparable

contributions or had engaged in comparable solicitations on behalf of governmental officials or candidates for public office for which the lawyer or any law firm with which the lawyer is associated did not perform or seek to perform legal work, (f) whether the contributor has made a contribution to the government official's or candidate's opponent(s) during the same campaign period and, if so, the amounts thereof, and (g) whether the contributor is eligible to vote in the jurisdiction of the governmental official or candidate, and if not, whether other factors indicate that the contribution or solicitation was nonetheless made to further a genuinely held political, social or economic belief or interest rather than to obtain a legal engagement.

# RULE 7.3

## SOLICITATION AND RECOMMENDATION OF PROFESSIONAL EMPLOYMENT

**(a)** A lawyer shall not engage in solicitation:

(1) by in-person or telephone contact, or by real-time or interactive computer-accessed communication unless the recipient is a close friend, relative, former client or existing client; or

(2) by any form of communication if:

(i) the communication or contact violates Rule 4.5, Rule 7.1(a), or paragraph (e) of this Rule;

(ii) the recipient has made known to the lawyer a desire not to be solicited by the lawyer;

(iii) the solicitation involves coercion, duress or harassment;

(iv) the lawyer knows or reasonably should know that the age or the physical, emotional or mental state of the recipient makes it unlikely that the recipient will be able to exercise reasonable judgment in retaining a lawyer; or

(v) the lawyer intends or expects, but does not disclose, that the legal services necessary to handle the matter competently will be performed primarily by another lawyer who is not affiliated with the soliciting lawyer as a partner, associate or of counsel.

**(b)** For purposes of this Rule, "solicitation" means any advertisement initiated by or on behalf of a lawyer or law firm that is directed to, or targeted at, a specific recipient or group of recipients, or their family members or legal representatives, the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain. It does not include a proposal or other writing prepared and delivered in response to a specific request.

(c)     A solicitation directed to a recipient in this State shall be subject to the following provisions:

(1)     A copy of the solicitation shall at the time of its dissemination be filed with the attorney disciplinary committee of the judicial district or judicial department wherein the lawyer or law firm maintains its principal office. Where no such office is maintained, the filing shall be made in the judicial department where the solicitation is targeted. A filing shall consist of:

(i)     a copy of the solicitation;

(ii)     a transcript of the audio portion of any radio or television solicitation; and

(iii)     if the solicitation is in a language other than English, an accurate English-language translation.

(2)     Such solicitation shall contain no reference to the fact of filing.

(3)     If a solicitation is directed to a predetermined recipient, a list containing the names and addresses of all recipients shall be retained by the lawyer or law firm for a period of not less than three years following the last date of its dissemination.

(4)     Solicitations filed pursuant to this subdivision shall be open to public inspection.

(5)     The provisions of this paragraph shall not apply to:

(i)     a solicitation directed or disseminated to a close friend, relative, or former or existing client;

(ii)     a web site maintained by the lawyer or law firm, unless the web site is designed for and directed to or targeted at persons affected by an identifiable actual event or occurrence or by an identifiable prospective defendant; or

        **(iii)**    **professional cards or other announcements the distribution of which is authorized by Rule 7.5(a).**

        **(d)**    **A written solicitation shall not be sent by a method that requires the recipient to travel to a location other than that at which the recipient ordinarily receives business or personal mail or that requires a signature on the part of the recipient.**

        **(e)**    **No solicitation relating to a specific incident involving potential claims for personal injury or wrongful death shall be disseminated before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.**

        **(f)**    **Any solicitation made in writing or by computer-accessed communication and directed to a pre-determined recipient, if prompted by a specific occurrence involving or affecting a recipient, shall disclose how the lawyer obtained the identity of the recipient and learned of the recipient's potential legal need.**

        **(g)**    **If a retainer agreement is provided with any solicitation, the top of each page shall be marked "SAMPLE" in red ink in a type size equal to the largest type size used in the agreement and the words "DO NOT SIGN" shall appear on the client signature line.**

        **(h)**    **Any solicitation covered by this section shall include the name, principal law office address and telephone number of the lawyer or law firm whose services are being offered.**

        **(i)**    **The provisions of this Rule shall apply to a lawyer or members of a law firm not admitted to practice in this State who shall solicit retention by residents of this State.**

**Comment**

**Solicitation**

    [1]    In addition to seeking clients through general advertising (either by public communications in the media or by private communications to potential clients who are neither current clients nor other lawyers), many lawyers attempt to attract clients through a specialized category of advertising called "solicitation." Not all advertisements are solicitations within the meaning of this Rule. All solicitations, however,

are advertisements with certain additional characteristics. By definition, a communication that is not an advertisement is not a solicitation. Solicitations are subject to all of the Rules governing advertising and are also subject to additional Rules, including filing a copy of the solicitation with the appropriate attorney disciplinary authority (including a transcript of the audio portion of any radio or television solicitation and, if the solicitation is in a language other than English, an accurate English language translation). These and other additional requirements will facilitate oversight by disciplinary authorities.

[2]    A "solicitation" means any advertisement: (i) that is initiated by a lawyer or law firm (as opposed to a communication made in response to an inquiry initiated by a potential client), (ii) with a primary purpose of persuading recipients to retain the lawyer or law firm (as opposed to providing educational information about the law, *see* Rule 7.1, Comment [7]), (iii) that has as a significant motive for the lawyer to make money (as opposed to a public-interest lawyer offering pro bono services), and (iv) that is directed to or targeted at a specific recipient or group of recipients, or their family members or legal representatives. Any advertisement that meets all four of these criteria is a solicitation, and is governed not only by the Rules that govern all advertisements but also by special Rules governing solicitation.

## Directed or Targeted

[3]    An advertisement may be considered to be directed to or targeted at a specific recipient or recipients in two different ways. First, an advertisement is considered "directed to or targeted at" a specific recipient or recipients if it is made by in-person or telephone contact or by real-time or interactive computer-accessed communication or if it is addressed so that it will be delivered to the specific recipient or recipients or their families or agents (as with letters, emails, express packages). Advertisements made by in-person or telephone contact or by real-time or interactive computer-accessed communication are prohibited unless the recipient is a close friend, relative, former client or current client. Advertisements addressed so that they will be delivered to the specific recipient or recipients or their families or agents (as with letters, emails, express packages) are subject to various additional rules governing solicitation (including filing and public inspection) because otherwise they would not be readily subject to disciplinary oversight and review. Second, an advertisement in public media such as newspapers, television, billboards, web sites or the like is a solicitation if it makes reference to a specific person or group of

people whose legal needs arise out of a specific incident to which the advertisement explicitly refers. The term "specific incident" is explained in Comment [5].

[4]    Unless it falls within Comment [3], an advertisement in public media such as newspapers, television, billboards, web sites or the like is presumed not to be directed to or targeted at a specific recipient or recipients. For example, an advertisement in a public medium is not directed to or targeted at "a specific recipient or group of recipients" simply because it is intended to attract potential clients with needs in a specified area of law. Thus, a lawyer could advertise in the local newspaper that the lawyer is available to assist homeowners in reducing property tax assessments. Likewise, an advertisement by a patent lawyer is not directed or targeted within the meaning of the definition solely because the magazine is geared toward inventors. Similarly, a lawyer could advertise on television or in a newspaper or web site to the general public that the lawyer practices in the area of personal injury or Workers' Compensation law. The fact that some recipients of such advertisements might actually be in need of specific legal services at the time of the communication does not transform such advertisements into solicitations.

## Solicitations Relating To a Specific Incident Involving Potential Claims for Personal Injury or Wrongful Death

[5]    Solicitations relating to a specific incident involving potential claims for personal injury or wrongful death are subject to a further restriction, in that they may not be disseminated until 30 days (or in some cases 15 days) after the date of the incident. This restriction applies even where the recipient is a close friend, relative, or former client, but not where the recipient is a current client. A "specific incident" is a particular identifiable event (or a sequence of related events occurring at approximately the same time and place) that causes harm to one or more people. Specific incidents include such events as traffic accidents, plane or train crashes, explosions, building collapses, and the like.

[6]    A solicitation that is intended to attract potential claims for personal injury or wrongful death arising from a common cause but at disparate times and places, does not relate to a specific incident and is not subject to the special 30-day (or 15-day) rule, even though it is addressed so that it will be delivered to specific recipients or their families or agents (as with letters, emails, express packages), or is made in a public medium such as newspapers, television, billboards, web sites or the like and makes reference to a specific person or group of people, *see* Comments [3]–[4].

For example, solicitations intended to be of interest only to potential claimants injured over a period of years by a defective medical device or medication do not relate to a specific incident and are not subject to the special 30-day (or 15-day) rule.

[7]    An advertisement in the public media that makes no express reference to a specific incident does not become a solicitation subject to the 30-day (or 15-day) rule solely because a specific incident has occurred within the last 30 (or 15) days. Thus, a law firm that advertises on television or in newspapers that it can "help injured people explore their legal rights" is not violating the 30-day (or 15-day) rule by running or continuing to run its advertisements even though a mass disaster injured many people within hours or days before the advertisement appeared. Unless an advertisement in the public media explicitly refers to a specific incident, it is not a solicitation subject to the 30-day (or 15-day) blackout period. However, if a lawyer causes an advertisement to be delivered (whether by mail, email, express service, courier, or any other form of direct delivery) to a specific recipient (i) with knowledge that the addressee is either a person killed or injured in a specific incident or that person's family member or agent, and (ii) with the intent to communicate with that person because of that knowledge, then the advertisement is a solicitation subject to the 30-day (or 15-day) rule even if it makes no reference to a specific incident and even if it is part of a mass mailing.

### Extraterritorial Application of Solicitation Rules

[8]    All of the special solicitation rules, including the special 30-day (or 15-day) rule, apply to solicitations directed to recipients in New York State, whether made by a lawyer admitted in New York State or a lawyer admitted in any another jurisdiction. Solicitations by a lawyer admitted in New York State directed to or targeted at a recipient or recipients outside of New York State are not subject to the filing and related requirements set out in Rule 7.3(c). Whether such solicitations are subject to the special 30-day (or 15-day) rule depends on the application of Rule 8.5.

### In-Person, Telephone and Real-Time or Interactive Computer-Accessed Communication

[9]    Paragraph (a) generally prohibits in-person solicitation, which has historically been disfavored by the bar because it poses serious dangers to potential clients. For example, in-person solicitation poses the risk that a lawyer, who is trained in the arts of advocacy and persuasion,

may pressure a potential client to hire the lawyer without adequate consideration. These same risks are present in telephone contact or in real-time or interactive computer-accessed communication. These same risks are also present in all other real-time or interactive electronic communications, whether by computer, phone or related electronic means—*see* Rule 1.0(c) (defining "computer-accessed communication")—and are regulated in the same manner. The prohibitions on in-person or telephone contact and the prohibitions on contact by real-time or interactive computer-accessed communication do not apply if the recipient is a close friend, relative, former or current client. Communications with these individuals do not pose the same dangers as solicitations to others. However, when the special 30-day (or 15-day) rule applies, it does so even where the recipient is a close friend, relative, or former client. Ordinarily, email communications and web sites are not considered to be real-time or interactive communication. Similarly, automated pop-up advertisements on a web site that are not a live response are not considered to be real-time or interactive communication. However, instant messaging ("IM"), chat rooms, and other similar types of conversational computer-accessed communications—whether sent or received via a desktop computer, a portable computer, a cell phone, or any similar electronic or wireless device, and whether sent directly or via social media—are considered to be real-time or interactive communication.

# RULE 7.4

## IDENTIFICATION OF PRACTICE AND SPECIALTY

(a)   A lawyer or law firm may publicly identify one or more areas of law in which the lawyer or the law firm practices, or may state that the practice of the lawyer or law firm is limited to one or more areas of law, provided that the lawyer or law firm shall not state that the lawyer or law firm is a specialist or specializes in a particular field of law, except as provided in Rule 7.4(c).

(b)   A lawyer admitted to engage in patent practice before the United States Patent and Trademark Office may use the designation "Patent Attorney" or a substantially similar designation.

(c)   A lawyer may state that the lawyer has been recognized or certified as a specialist only as follows:

(1)   A lawyer who is certified as a specialist in a particular area of law or law practice by a private organization approved for that purpose by the American Bar Association may state the fact of certification if, in conjunction therewith, the certifying organization is identified and the following statement is prominently made: This certification is not granted by any governmental authority."

(2)   A lawyer who is certified as a specialist in a particular area of law or law practice by the authority having jurisdiction over specialization under the laws of another state or territory may state the fact of certification if, in conjunction therewith, the certifying state or territory is identified and the following statement is prominently made: ''This certification is not granted by any governmental authority within the State of New York.''

(3)   A statement is prominently made if:

(i)   when written, it is clearly legible and capable of being read by the average person, and is in a font size at least two font sizes larger than the largest text used to state the fact of certification; and

(ii)   when spoken aloud, it is intelligible to the average person, and is at a cadence no faster, and a level

> **of audibility no lower, than the cadence and level of audibility used to state the fact of certification.**

**Comment**

[1]     Paragraph (a) permits a lawyer to indicate areas of practice in which the lawyer practices, or that his or her practice is limited to those areas.

[2]     Paragraph (b) recognizes the long-established policy of the Patent and Trademark Office for the designation of lawyers practicing before the Office.

[3]     Paragraph (c) permits a lawyer to state that the lawyer specializes or is certified as a specialist in a field of law if such certification is granted by an organization approved or accredited by the American Bar Association or by the authority having jurisdiction over specialization under the laws of another jurisdiction provided that the name of the certifying organization or authority must be included in any communication regarding the certification together with the disclaimer required by paragraph (c).

# RULE 7.5

## PROFESSIONAL NOTICES, LETTERHEADS AND NAMES

(a)     A lawyer or law firm may use internet web sites, professional cards, professional announcement cards, office signs, letterheads or similar professional notices or devices, provided the same do not violate these Rules or any statute or court rule.

(b)     (1)     A lawyer or law firm in private practice shall not practice under:

(i)     a false, deceptive or misleading a trade name;

(ii)     a false, deceptive, or misleading domain name; or

(iii)     a name that is misleading as to the identity of the lawyer or lawyers practicing under such name.

(2)     Specific Guidance Regarding Law Firm Names

(i)     Such terms as "legal aid," "legal service office," "legal assistance office," "defender office," and the like may be used only by bona fide legal assistance organizations.

(ii)     A law firm name, trade name, or domain name may not use the terms "non-profit" or "not-for-profit" unless the law firm qualifies for those designations under applicable law.

(iii)     A lawyer or law firm in private practice may not include the name of a nonlawyer in its firm name.

(iv)     The name of a professional corporation shall contain "PC" or such symbols permitted by law.

(v)     The name of a limited liability company or limited liability partnership shall contain "LLC," "LLP" or such symbols permitted by law.

   **(vi)** **A lawyer or law firm may utilize a telephone number that contains a trade name, domain name, nickname, moniker, or motto that does not otherwise violate these Rules.**

   **(3)** **A lawyer or law firm that has a contractual relationship with a nonlegal professional or nonlegal professional service firm pursuant to Rule 5.8 to provide legal and other professional services on a systematic and continuing basis may not include in its firm name the name of the nonlegal professional service firm or any individual nonlegal professional affiliated therewith.**

   **(4)** **A lawyer who assumes a judicial, legislative or public executive or administrative post or office shall not permit the lawyer's name to remain in the name of a law firm or to be used in professional notices of the firm during any significant period in which the lawyer is not actively and regularly practicing law as a member of the firm and, during such period, other members of the firm shall not use the lawyer's name in the firm name or in professional notices of the firm.**

  **(c)** **Lawyers shall not hold themselves out as having a partnership with one or more other lawyers unless they are in fact partners.**

  **(d)** **A partnership shall not be formed or continued between or among lawyers licensed in different jurisdictions unless all enumerations of the members and associates of the firm on its letterhead and in other permissible listings make clear the jurisdictional limitations on those members and associates of the firm not licensed to practice in all listed jurisdictions; however, the same firm name may be used in each jurisdiction.**

**Comment**

**Professional Affiliations and Designations**

 [1] A lawyer's or law firm's name, trade name, domain name, web site, social media pages, office sign, business cards, letterhead, and professional designations are communications concerning a lawyer's services and must not be false, deceptive, or misleading. They must comply with this Rule and with Rule 7.1.

[2]     A lawyer or law firm may not use any name that is false, deceptive, or misleading. It is not false, deceptive, or misleading for a firm to be designated by the names of all or some of its current members or by the names of retired or deceased members where there has been a continuing line of succession in the firm's identity. A lawyer or law firm may practice under a trade name or domain name if it is not false, deceptive, or misleading. A lawyer or law firm also may practice under a distinctive website address, social media username, or comparable professional designation, provided that the name is not false, deceptive, or misleading.

[3]     By way of example, the name of a law firm in private practice is deceptive or misleading if it implies a connection with (i) a government agency, (ii) a deceased or retired lawyer who was not a former member of the firm in a continuing line of succession, (iii) a lawyer not associated with the firm or a predecessor firm, (iv) a nonlawyer, or (v) a public or charitable legal services organization. A lawyer or law firm may not use a name, trade name, domain name, or other designation that includes words such as "Legal Services," "Legal Assistance," or "Legal Aid" unless the lawyer or law firm is a bona fide legal assistance organization.

[4]     It is misleading to use the name of a lawyer holding a public office in the name of a law firm, or in communications on the law firm's behalf, during any substantial period in which the lawyer is not actively and regularly practicing with the firm.

[5]     Lawyers may not imply or hold themselves out as practicing together in one firm when they are not a "firm" as defined in Rule 1.0(h), because to do so would be false and misleading. In particular, it is misleading for lawyers to hold themselves out as having a partnership with one or more other lawyers unless they are in fact partners. It is also misleading for lawyers to hold themselves out as being counsel, associates, or other affiliates of a law firm if that is not a fact, or to hold themselves out as partners, counsel, or associates if they only share offices. Likewise, law firms may not claim to be affiliated with other law firms if that is not a fact.

**Professional Web Sites, Cards, Office Signs, and Letterhead**

[6]     A lawyer or law firm may use internet web sites, social media pages, professional cards, professional announcement cards, office signs, letterheads or similar professional notices or devices, provided they do not violate any statute or court rule and are in accordance with Rule 7.1. Thus, a lawyer may use the following:

(i)     a professional card identifying the lawyer by name and as a lawyer, and giving addresses, telephone numbers, the name of the lawyer's law firm, the names of the law firm's members, counsel, and associates, and any information permitted under Rule 7.2(c);

(ii)     a professional announcement card stating new or changed associations or addresses, change of firm name, or similar matters pertaining to the professional offices of a lawyer or law firm or any nonlegal business conducted by the lawyer or law firm pursuant to Rule 5.7. It may state biographical data, the names of members of the firm, counsel, and associates, and the names and dates of predecessor firms in a continuing line of succession. It may state or describe the nature of the legal practice to the extent permitted under Rule 7.2(c);

(iii)     a sign in or near the office and in the building directory identifying the law office and any nonlegal business conducted by the lawyer or law firm pursuant to Rule 5.7. The sign may state the nature of the legal practice to the extent permitted under Rule 7.2(c);

(iv)     a letterhead identifying the lawyer by name and as a lawyer, and giving addresses, telephone numbers, the name of the law firm, and any information permitted under Rule 7.2(c). A letterhead of a law firm may also give the names of members, associates, and counsel, names and dates relating to deceased and retired members, and the names and dates of predecessor firms in a continuing line of succession; and

(v)     internet web sites or social media pages or sites that comply with these Rules.

**Professional Status**

[7]     To avoid misleading clients, courts, and the public, lawyers should be scrupulous in representing their professional status. For example:

(i)     A lawyer or law firm may be designated "Counsel," "Special Counsel," "Of Counsel," and the like on a letterhead or professional card if there is a continuing relationship with another lawyer or law firm other than as a partner or associate;

(ii)    A lawyer or law firm may be designated as "General Counsel" or by similar professional reference on stationery of a client if the lawyer or law firm devotes a substantial amount of professional time to representing that client;

(iii)    To alert clients, the public, and those who deal with a lawyer or law firm about possible limitations on liability, the name of a professional corporation shall contain "PC" or such symbols permitted by law, and the name of a limited liability company or limited liability partnership shall contain "LLC," "PLLC," "LLP" or such symbols permitted by law;

(iv)    A law firm name, trade name, or domain name may not include the terms "non-profit" or "not-for-profit" unless the law firm qualifies for those designations under applicable law, such as the New York Not-for-Profit Corporation Law ("NPCL").

[8]    A law firm with offices in more than one jurisdiction may use the same name or other professional designation in each jurisdiction, but all enumerations of the lawyers listed on the firm's letterhead and in other permissible listings should make clear the jurisdictional limitations on those members, counsel, and associates of the firm not licensed to practice in all listed jurisdictions.

## Trade Names and Domain Names

[9]    Some lawyers and law firms may prefer to practice under trade names and/or domain names to make it easier for clients to remember or locate them. A lawyer may practice under a trade name or domain name that is not false, deceptive, or misleading. Provided a lawyer or law firm uses a name otherwise complying with these Rules, it is proper to practice under the lawyer's or law firm's own name, initials, trade name, domain name, abbreviations, areas of practice, variations of the foregoing, or a combination of those features, among other things.

[10]    For example, with respect to trade names, a law firm whose practice includes real estate matters may use and practice under a name such as AbleBaker Real Estate Lawyers, A&B Real Estate Lawyers, or Dirt Lawyers. Likewise, a law firm may use and practice under a trade name such as Albany Personal Injury Lawyers if the firm practices in Albany and its practice includes personal injury law. With respect to domain names, if the law firm of Able & Baker practices real estate law, the firm may use and practice under a descriptive domain name such as

www.realestatelaw.com or www.ablerealestatelaw.com, or under a collo-
quial domain name such as www.dirtlawyers.com, as long as the name is
not false, deceptive, or misleading.

[11]   Neither trade names nor domain names may be false, decep-
tive, or misleading. A law firm may not use a trade name such as "Win
Your Case," or a domain name such as www.winyourcase.com because
those names imply that the law firm can obtain favorable results regard-
less of the particular facts and circumstances. In all events, neither a trade
name nor a domain name may be false, deceptive, or misleading or violate
Rule 7.1 or any other Rule.

**Telephone Numbers**

[12]   A lawyer or law firm may use telephone numbers that spell
words or contain a trade name, domain name, nickname, moniker, or
motto that does not otherwise violate these Rules. As with domain names,
lawyers and law firms may always properly use telephone numbers con-
sisting of (i) their own names or initials, or (ii) combinations of names,
initials, numbers, and words. For example, the law firm of Red & Blue
may properly use phone numbers such as RED-BLUE, 4-RED-LAW, or
RB-LEGAL. By way of further example, a personal injury law firm may
use the numbers 1-800-ACCIDENT, 1-800-HURT-BAD, or 1-800-
INJURY-LAW, but may not use the numbers 1-800-WINNERS, 1-800-
2WIN-BIG, or 1-800-GET-CASH. (Phone numbers with more letters than
the number of digits in a phone number are acceptable as long as the
words do not violate a Rule.)

# RULE 8.1

## CANDOR IN THE BAR ADMISSION PROCESS

**(a)    A lawyer shall be subject to discipline if, in connection with the lawyer's own application for admission to the bar previously filed in this state or in any other jurisdiction, or in connection with the application of another person for admission to the bar, the lawyer knowingly:**

**(1)    has made or failed to correct a false statement of material fact; or**

**(2)    has failed to disclose a material fact requested in connection with a lawful demand for information from an admissions authority.**

**Comment**

[1]    If a person makes a material false statement in connection with an application for admission, it may be the basis for subsequent disciplinary action if the person is admitted and in any event may be relevant in a subsequent admission application. The duty imposed by this Rule applies to a lawyer's own admission as well as that of another.

[2]    This Rule is subject to the provisions of the Fifth Amendment to the United States Constitution and corresponding provisions of state constitutions. A person relying on such a provision in response to a question, however, should do so openly and not use the right of nondisclosure as a justification for failure to comply with this Rule.

# RULE 8.2

## JUDICIAL OFFICERS AND CANDIDATES

**(a)    A lawyer shall not knowingly make a false statement of fact concerning the qualifications, conduct or integrity of a judge or other adjudicatory officer or of a candidate for election or appointment to judicial office.**

**(b)    A lawyer who is a candidate for judicial office shall comply with the applicable provisions of Part 100 of the Rules of the Chief Administrator of the Courts.**

**Comment**

[1]    Assessments by lawyers are relied on in evaluating the professional or personal fitness of persons being considered for election or appointment to judicial office. Expressing honest and candid opinions on such matters contributes to improving the administration of justice. False statements of fact by a lawyer can unfairly undermine public confidence in the administration of justice.

[2]    When a lawyer seeks judicial office, the lawyer may engage in constitutionally protected speech, but is bound by valid limitations on speech and political activity.

[3]    To maintain the fair and independent administration of justice, lawyers are encouraged to continue traditional efforts to defend judges and courts unjustly criticized.

# RULE 8.3

## REPORTING PROFESSIONAL MISCONDUCT

**(a)     A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.**

**(b)     A lawyer who possesses knowledge or evidence concerning another lawyer or a judge shall not fail to respond to a lawful demand for information from a tribunal or other authority empowered to investigate or act upon such conduct.**

**(c)     This Rule does not require disclosure of:**

**(1)     information otherwise protected by Rule 1.6; or**

**(2)     information gained by a lawyer or judge while participating in a bona fide lawyer assistance program.**

## Comment

[1]     Self-regulation of the legal profession requires that members of the profession initiate disciplinary investigation when they know of a violation of the Rules of Professional Conduct. Lawyers have a similar obligation to cooperate with authorities empowered to investigate judicial misconduct. An apparently isolated violation may indicate a pattern of misconduct that only a disciplinary investigation can uncover. Reporting a violation is especially important where the victim is unlikely to discover the offense.

[2]     A report about misconduct is not required where it would result in violation of Rule 1.6. However, a lawyer should encourage a client to consent to disclosure where prosecution would not substantially prejudice the client's interests.

[3]     If a lawyer were obliged to report every violation of the Rules, the failure to report any violation would itself be a professional offense. Such a requirement existed in many jurisdictions, but proved to be unenforceable. This Rule limits the reporting obligation to those offenses that a self-regulating profession must vigorously endeavor to prevent. A measure of judgment is therefore required in complying with

the provisions of this Rule. The term "substantial" refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware. A report should be made to a tribunal or other authority empowered to investigate or act upon the violation.

[3A]  Paragraph (b) requires a lawyer in certain situations to respond to a lawful demand for information concerning another lawyer or a judge. This Rule is subject to the provisions of the Fifth Amendment to the United States Constitution and corresponding provisions of state law. A person relying on such a provision in response to a question, however, should do so openly and not use the right of nondisclosure as a justification for failure to comply with this Rule.

[4]  The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question. Such a situation is governed by the Rules applicable to the client-lawyer relationship.

[5]  Information about a lawyer's or judge's misconduct or fitness may be received by a lawyer in the course of that lawyer's participation in a bona fide assistance program for lawyers or judges. In that circumstance, providing for an exception to the reporting requirements of paragraphs (a) and (b) encourages lawyers and judges to seek assistance and treatment through such a program. Without such an exception, lawyers and judges may hesitate to seek assistance and treatment from these programs, and this may result in additional harm to their professional careers and additional injury to the welfare of clients and the public.

# RULE 8.4

## MISCONDUCT

A lawyer or law firm shall not:

**(a)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

**(b)** engage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer;

**(c)** engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

**(d)** engage in conduct that is prejudicial to the administration of justice;

**(e)** state or imply an ability:

**(1)** to influence improperly or upon irrelevant grounds any tribunal, legislative body or public official; or

**(2)** to achieve results using means that violate these Rules or other law;

**(f)** knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law;

**(g)** unlawfully discriminate in the practice of law, including in hiring, promoting or otherwise determining conditions of employment on the basis of age, race, creed, color, national origin, sex, disability, marital status, sexual orientation, gender identity, or gender expression. Where there is a tribunal with jurisdiction to hear a complaint, if timely brought, other than a Departmental Disciplinary Committee, a complaint based on unlawful discrimination shall be brought before such tribunal in the first instance. A certified copy of a determination by such a tribunal, which has become final and enforceable and as to which the right to judicial or appellate review has been exhausted, finding that the lawyer has engaged in an unlawful discriminatory practice shall constitute prima facie evidence of professional misconduct in a disciplinary proceeding; or

**(h)     engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.**

**Comment**

[1]     Lawyers are subject to discipline when they violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another, as when they request or instruct an agent to do so on their behalf. Paragraph (a), however, does not prohibit a lawyer from advising a client concerning action the client is legally entitled to take.

[2]     Many kinds of illegal conduct reflect adversely on fitness to practice law. Illegal conduct involving violence, dishonesty, fraud, breach of trust, or serious interference with the administration of justice is illustrative of conduct that reflects adversely on fitness to practice law. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

[3]     The prohibition on conduct prejudicial to the administration of justice is generally invoked to punish conduct, whether or not it violates another ethics rule, that results in substantial harm to the justice system comparable to those caused by obstruction of justice, such as advising a client to testify falsely, paying a witness to be unavailable, altering documents, repeatedly disrupting a proceeding, or failing to cooperate in an attorney disciplinary investigation or proceeding. The assertion of the lawyer's constitutional rights consistent with
Rule 8.1, Comment [2] does not constitute failure to cooperate. The conduct must be seriously inconsistent with a lawyer's responsibility as an officer of the court.

[4]     A lawyer may refuse to comply with an obligation imposed by law if such refusal is based upon a reasonable good-faith belief that no valid obligation exists because, for example, the law is unconstitutional, conflicts with other legal or professional obligations, or is otherwise invalid. As set forth in Rule 3.4(c), a lawyer may not disregard a specific ruling or standing rule of a tribunal, but can take appropriate steps to test the validity of such a rule or ruling.

[4A]   A lawyer harms the integrity of the law and the legal profession when the lawyer states or implies an ability to influence improperly any officer or agency of the executive, legislative or judicial branches of government.

[5]     Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers. The same is true of abuse of positions of private trust such as trustee, executor, administrator, guardian, agent and officer, director or manager of a corporation or other organization.

[5A]    Unlawful discrimination in the practice of law on the basis of age, race, creed, color, national origin, sex, disability, marital status, or sexual orientation is governed by paragraph (g).

# RULE 8.5

## DISCIPLINARY AUTHORITY AND CHOICE OF LAW

    **(a)**     **A lawyer admitted to practice in this state is subject to the disciplinary authority of this state, regardless of where the lawyer's conduct occurs. A lawyer may be subject to the disciplinary authority of both this state and another jurisdiction where the lawyer is admitted for the same conduct.**

    **(b)**     **In any exercise of the disciplinary authority of this state, the rules of professional conduct to be applied shall be as follows:**

    **(1)**     **For conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice (either generally or for purposes of that proceeding), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise; and**

    **(2)**     **For any other conduct:**

    **(i)**     **If the lawyer is licensed to practice only in this state, the rules to be applied shall be the rules of this state, and**

    **(ii)**     **If the lawyer is licensed to practice in this state and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices; provided, however, that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct.**

**Comment**

**Disciplinary Authority**

    [1]     It is longstanding law that the conduct of a lawyer admitted to practice in this state is subject to the disciplinary authority of this state, regardless of where the conduct occurs.

**Choice of Law**

[2]    A lawyer may be potentially subject to more than one set of rules of professional conduct, imposing different obligations. The lawyer may be licensed to practice in more than one jurisdiction with differing rules, or may be admitted to practice before a particular court with rules that differ from those of the jurisdiction or jurisdictions in which the lawyer is licensed to practice. Additionally, the lawyer's conduct may involve significant contacts with more than one jurisdiction.

[3]    Paragraph (b) seeks to resolve such potential conflicts. Its premise is that minimizing conflicts between rules, as well as uncertainty about which rules are applicable, is in the best interest of clients and the profession (as well as the bodies having authority to regulate the profession). Accordingly, it takes the approach of (i) providing that any particular conduct of a lawyer shall be subject to only one set of rules of professional conduct, and (ii) making the determination of which set of rules applies to particular conduct as straightforward as possible, consistent with recognition of appropriate regulatory interests of relevant jurisdictions.

[4]    Paragraph (b)(1) provides that as to a lawyer's conduct relating to a proceeding pending before a court before which the lawyer is admitted to practice either generally or for purposes of that proceeding, the lawyer shall be subject only to the rules of the jurisdiction in which the court sits unless the rules of the court, including its choice-of-law rules, provide otherwise. As to all other conduct, paragraph (b)(2) provides that a lawyer shall be subject to the rules of the admitting jurisdiction in which the lawyer principally practices or, if the predominant effect of the conduct clearly is in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to the conduct. In the case of conduct in anticipation of a proceeding that is likely to be before a court, the predominant effect of such conduct could be where the lawyer principally practices, where the conduct occurred, where the court in which the proceeding is ultimately brought sits, or in another jurisdiction.

[5]    When a lawyer is licensed to practice in New York and another jurisdiction and the lawyer's conduct involves significant contacts with more than one jurisdiction, it may not be clear whether the predominant effect of the lawyer's conduct will occur in an admitting jurisdiction other than the one in which the lawyer principally practices. For conduct governed by paragraph (b)(2), as long as the lawyer's conduct conforms

to the rules of the jurisdiction in which the lawyer principally practices, the lawyer should not be subject to discipline unless the predominant effect of the lawyer's conduct will clearly occur in another admitting jurisdiction.

[6]     If two admitting jurisdictions were to proceed against a lawyer for the same conduct, they should, applying this Rule, identify the same governing ethics rules. They should take all appropriate steps to see that they do apply the same rule to the same conduct, and in all events should avoid proceeding against a lawyer on the basis of two inconsistent rules.

[7]     The choice-of-law provision applies to lawyers engaged in transnational practice, unless international law, treaties or other agreements between or among competent regulatory authorities in the affected jurisdictions provide otherwise.

# INDEX

## <u>A</u>

Acceptance of Employment. *See* Employment, acceptance of.
Acquiring interest in litigation. *See* Adverse effect on professional
  judgment, interests of lawyer.
    Address change, notification of, Rule 7.5(a)(2).
    Administrative agencies and tribunals.
    former employee, rejection of employment by, Rule 1.11(a)(2).
    improper influences on, Rule 3.5(a)(1).
    non-adjudicative matters, Rule 3.9.
    representation of client before, generally, Rule 3.5.
Admission to practice
    requirements for, Rule 8.1.
Advancing funds to clients, Rule 1.8(e).
    court costs, Rule 1.8(e)(1).
    investigation expenses, Rule 1.8(e)(1).
    litigation expenses, Rule 1.8(e)(1).
    pro bono cases, Rule 1.8(e)(2).
Adversary system, duty of lawyer to, Rule 3.3.
Adverse legal authority, duty to reveal, Rule 3.3(a)(2).
Adverse effect on professional judgment of lawyer
    desires of third persons, Rule 1.7.
    interests of former clients, Rule 1.9.
    interests of lawyer, Rule 1.7.
    interests of other clients, Rule 1.7.
    law reform activities, Rule 6.4.
    organization as client, Rule 1.13.
Advertising, *See also* Name, use of.
    announcement of change of association, Rule 7.5(a)(2).
    announcement of change of firm name, Rule 7.5(a)(2).
    announcement of change of office address, Rule 7.5(a)(2).
    announcement of establishment of law office, Rule 7.5(a)(2).
    announcement of office opening, Rule 7.5(a)(2).
    broadcast
        approval by lawyer, Rule 7.1(k).
        fee information, lawyer bound by, Rule 7.1(l), (m).
        retention of recording, Rule 7.1(k).
    building directory, Rule 7.5(a)(3).
    cards
        announcement, professional, Rule 7.5(a)(2).

    professional, Rule 7.5(a)(1).

compensation for, Rule 7.2.

deceptive, Rule 7.1(a)(1).

defined, rule 1.0(a).

directories

    building, Rule 7.5(a)(3).

    generally, Rule 7.5(a)(3).

false, Rule 7.1(a)(1).

fee information, Rule 7.1(b)(4), (l), (m).

filing

    mailing list, retention of, Rule 7.3(c)(3).

    public inspection of filing, Rule 7.3(c)(4).

    when required Rule 7.3(c)(1).

information contained in

    permissible, Rule 7.1(b).

    prohibited, Rule 7.1(c).

jurisdictional limitations of members of firm, required notice of, Rule 7.5(d).

law office, establishment, Rule 7.5(a)(4).

law office, identification of area of practice, Rule 7.4.

legal assistance organization, Rule 7.2.

legal publications, Rule 7.1.

legal notices, Rule 7.5.

letterheads

    of law firm, Rule 7.5(a)(4).

    of lawyer, Rule 7.5(a)(4).

limited practice, Rule 7.4.

magazine, Rule 7.1.

misleading, Rule 7.1(a)(1).

name, Rule 7.5(b). *See also* Name, use of,

newspaper, Rule 7.1.

news story, Rule 7.1.

non-legal services, Rule 7.1(a)(3).

office address change, Rule 7.5.

office building directory, Rule 7.5.

office, identification of, Rule 7.5.

office sign, Rule 7.5.

partnership, Rule 7.5 (a)-(d).

promoting use of lawyer's services, Rule 7.3. *See also* Recommendation of professional employment.

publications, Rule 7.1, 7.5.

publicity, Rule 7.1, 7.5.

    published, lawyer bound by fee information, Rule 7.1(l), (m).
    qualified legal assistance organization, Rule 7.2.
    radio, Rule 7.1.
    required contents, Rule 7.1.
    specialization, Rule 7.4.
    television, Rule 7.1.
    website, Rule 7.1(g), (k), 7.5(e).
Advice by lawyer to secure legal services
    client, former or regular, Rule 7.3.
    close friend, Rule 7.3.
    employment resulting from, Rule 7.3.
    relative, Rule 7.3.
    within permissive legal service programs, Rule 7.2.
Advisor, lawyer as, Rule 2.1.
Affiliated lawyer, Rule 7.5(a)(4), (b).
Age discrimination. *See* Discrimination.
Aiding unauthorized practice of law, Rule 5.5.
Announcement card. *See* Advertising, cards, announcement.
Appearance of lawyer. *See* administrative agencies, representation of
  client before; Courts, representation of client before; Legislature,
  representation of clients before; Witness, lawyer acting as.
Applicant for bar admission. *See* admission to practice.
Arbitrator
    former, Rule 1.12.
    lawyer acting as, Rule 2.4.
Arbitration, fee disputes, Rule 1.5.
Argument
    before jury, Rule 3.3, 3.5.
    before legislature, Rule 3.9.
    before tribunal, Rule 3.3.
Associates of lawyer
    duty to control, Rule 5.1.
    responsibility for conduct of, Rule 5.1.
Association of counsel. *See also* Co-counsel; Division of legal fees.
    client's suggestion of, Rule 1.5.
    lawyer's suggestion of, Rule 1.5.
Assumed name. *See* Name, use of, assumed name.
Attempts to exert personal influence on tribunal, Rule 3.3.
Attorney-client privilege. Rule 1.6. *See also* Confidential information.
Attorney's lien. *See* Fee for legal services, collection of.

# B

Bank accounts for clients' funds, Rule 1.15.

Bar applicant. *See* Admission to practice.

Bar associations

    Law reform activities, Rule 6.4

    legal service programs, Rule 7.2.

Bank accounts, Rule 1.15.

Bank charges on clients' accounts, Rule 1.15.

Belief, defined, Rule 1.0(b).

Bequest by client to lawyer, Rule 1.8.

Bias. *See* Discrimination.

Bookkeeping. *See* Records.

Bounds of law, Rule 3.3

Bribes. *See* Gifts to tribunal officer or employee by lawyer.

Broadcast. *See* Advertising, broadcast.

Building directory. *See* Advertising, building, directory.

Business card. *See* Advertising, cards, professional.

# C

Calling card. *See* Advertising, cards, professional.

Candidate. *See* Political activity.

Card. *See* Advertising, cards.

Change of office address. *See* Advertising, announcement of change of office address.

Change of association. *See* Advertising, announcement of change of association.

Change of firm name. *See* Advertising, announcement of change of firm name.

Charitable organizations, representation of, Rule 1.13, 6.3.

Class action. *See* Advice by lawyer to secure legal services, parties to legal action.

Clients. *See also* Employment; Adverse effect on professional judgment of lawyer; Fee for legal services; Indigent parties, representation of; Unpopular party, representation of.

    appearance as witness for, Rule 3.7.

    attorney-client privilege, Rule 1.6.

    commingling of funds of, Rule 1.15(a).

    confidential information of, Rule 1.6.

    counseling, Rule 1.2, 1.4, 1.13, 1.14, 2.1.

    diminished capacity of, Rule 1.14.

    gifts from, Rule 1.8(c).

intent or motive of, Rule 1.16(b), (c).

property, protection of, Rule 1.15.

right to decide, Rule 1.2.

Co-counsel. *See also* Association of counsel.

division of fee with, Rule 1.5(g).

inability to work with, Rule 1.16(c)(8).

Commercial publicity. *See* Advertising, commercial publicity.

Commingling of funds, Rule 1.15(a).

Communications with

client, rule 1.4.

judicial officers, Rule 3.5(a).

jurors, Rule 3.5.

opposing party, Rule 4.2, 4.3.

members of the venire, Rule 3.5.

witnesses, Rule 3.4(b).

Compensation for recommendation of employment, prohibition against, Rule 7.2.

Competence, Mental. *See* Instability, mental or emotional; Mental competence of client, effect on representation.

Competence, professional, Rule 1.1.

Computer-accessed communication, defined, Rule 1.0(c).

Confidential information, Rule 1.0(d), 1.6.

Conflicting interests. *See* Adverse effect on professional judgment of lawyer.

Consent of client, requirement of

acceptance of employment though interests conflict, Rule 1.7, 1.8.

acceptance of value from third person, Rule 1.8.

aggregate settlement of claims, Rule 1.8(g).

association of lawyer, Rule 1.5(g).

foregoing legal action, Rule 1.2, 1.16.

informed consent, defined, Rule 1.0(j).

multiple representation, Rule 1.7.

representation when lawyer related to opposing counsel, Rule 1.7.

use of client's confidential information, Rule 1.6.

withdrawal from employment, Rule 1.16.

Consent of tribunal to lawyer's withdrawal, requirement of, Rule 1.16(d).

Contingent fee

propriety of

in civil actions, Rule 1.5(c).

in criminal actions, Rule 1.5(d).

in domestic relations cases, Rule 1.5(d).

requirement of writing, Rule 1.5(c).

Continuing legal education programs, Rule 1.1.
Contract of employment
    fee provisions, desirability of writing, Rule 1.5.
    restrictive covenant in, Rule 5.6.
Controversy over fee, avoiding, Rule 1.5.
Corporation, lawyer employed by, Rule 1.13.
Corporation, professional legal. *See* professional legal corporation.
Counsel, designation as
    "General Counsel" designation, Rule 7.5(a)(4).
    "Of Counsel" designation, Rule 7.5(a)(4)
Counseling. *See* Client, counseling.
Courts. *See also* Consent of tribunal to lawyer's withdrawal, requirement
  of; Evidence, conduct regarding; Trial tactics.
    courtesy, known customs of, Rule 1.2.
    representation of client before, Rule 3.3, 3.4.
Court rules. *See* Advertising, court rules.
Criminal conduct
    as basis for discipline of lawyer, Rule 8.4.
    duty to reveal information as to, Rule 1.6(b), 3.3(b), 8.3.
Criminal prosecution, Rule 3.4, 3.6, 3.8
Criticism of judges and administrative officials, Rule 8.2.
Cross-examination of witness. *See* Witnesses, communications with.

## D

Deceased lawyer
    disposition of files on death, Rule 1.15.
    payment to estate of, Rule 5.4.
    use of name by law firm, Rule 7.5.
Decision to be made by
    client, Rule 1.2.
    lawyer, Rule 1.2.
 "Defender office", Rule 7.2.
Defender, public. *See* Public defender office, working with.
Defense against accusation by client, privilege to disclose confidential
  information, Rule 1.6.
Definitions, Rule 1.0.
Delay of litigation, Rule 3.2.
Delegation by lawyer of tasks, Rule 5.1, 5.3.
Desires of third parties, duty to avoid influence of, Rule 1.8.
Differing interests, Rule 1.0(f), 1.7(a). *See also* Adverse effect on
  professional judgment of lawyer.

Diligence, Rule 1.3.

Diminished capacity of client, Rule 1.14.

Directory listing. *See* Advertising, directories.

Disciplinary procedures, Rule 8.3, 8.4.

Disciplinary sanction, Scope.

Discipline of lawyer, grounds for

　advancement of funds to client improper, Rule 1.8.

　advertising, improper, Rule 7.1.

　associates, failure to exercise reasonable care toward, Rule 5.1.

　circumvention of rule of professional conduct, Rule 8.4.

　clients' funds, management of, Rule 1.15.

　communication with adverse party, improper, Rule 4.2, 4.3.

　communication with jurors, improper, Rule 3.5.

　confidential information, disclosure of, Rule 1.6.

　conflicting interests, representation of, Rule 1.7, 1.8, 1.9, 1.10, 1.11, 1.12, 1.13.

　criminal conduct, Rule 8.4.

　differing interests, improper representation of, Rule 1.7.

　discrimination, Rule 8.4(g).

　disregard of tribunal ruling, Rule 3.4.

　division of fee, improper, Rule 1.5(g), 5.4.

　employees, failure to exercise reasonable care toward, Rule 5.1, 5.3.

　evidence, false or misleading, use of, Rule 3.3.

　extra judicial statement, improper, Rule 3.6.

　failure to act competently, Rule 1.1.

　failure to disclose information concerning another lawyer or judge, Rule 8.3.

　failure to disclose information to tribunal, Rule 3.3.

　false accusations, Rule 8.2.

　false statement in bar application, Rule 8.1.

　fees

　　charging contingent fee in criminal case, Rule 1.5.

　　charging illegal or excessive, Rule 1.5

　　failure to return unearned, Rule 1.16.

　further application of unqualified bar applicant, Rule 8.1.

　guaranty of financial assistance, Rule 1.8(e).

　holding out as a specialist, Rule 7.4.

　illegal conduct, Rule 8.4.

　improper argument before tribunal, Rule 3.3.

　institution of criminal charges, Rule 3.4(e).

　investigation of jurors, Rule 3.5.

　penalties imposed, Scope.

publicity, improper, Rule 3.6, 7.1.

public office, improper use of, Rule 1.12.

recommendation of professional employment, prohibited, Rule 7.2, 7.3.

restrictive covenant, entering prohibited, Rule 5.6.

solicitation of business, Rule 7.3.

specialization, notice of, Rule 7.4.

suggestion of need of legal services, prohibitions, Rule 7.2, 7.3.

unauthorized practice of law, Rule 5.5.

unauthorized practice of law, aiding laypersons in, Rule 5.5.

violation of rule of professional conduct, Rule 8.4.

withdrawal, improper, Rule 1.16.

Disclosure of improper conduct

of another lawyer, Rule 8.3.

of judge, Rule 8.3.

of person within corporation or similar entity, Rule 1.13(c).

toward juror or member of venire, Rule 3.5.

Discrimination

as basis for discipline, Rule 8.4.

tribunal, requirement to bring complaint before, Rule 8.4.

types covered

age, Rule 8.4.

color, Rule 8.4.

creed, Rule 8.4.

disability, Rule 8.4.

marital status, Rule 8.4.

national origin, Rule 8.4.

race, Rule 8.4.

sex, Rule 8.4.

sexual orientation, Rule 8.4.

Discussion of pending litigation with news media. *See* Trial publicity.

Diverse interests. *See* Adverse effect on professional judgment of lawyer.

Division of legal fees.

consent of client, when required for, Rule 1.5(g).

joint responsibility for representation, Rule 1.5(g).

reasonableness of total fee, requirement of, Rule 1.5(g).

with estate of deceased lawyer, Rule 5.4.

with laypersons, Rule 5.4.

Document, inadvertent transmission of, Rule 4.4(b).

Domestic relations matter, Rule 1.0(g), 1.5(d), 1.8(j).

# E

Education
    Continuing legal education programs, Rule 1.1.
    of laypersons to recognize legal problems, Rule 7.1.
    of laypersons to select lawyers, Rule 7.1.
Elections. *See* political activity.
Emotional stability. *See* Instability, mental or emotional.
Employees of lawyer.
    delegation of tasks, Rule 5.1, 5.3.
    duty of lawyer to control, Rule 5.1, 5.3.
    hiring or promoting. *See* Discrimination.
    supervision of, Rule 5.1, 5.3.
Employment. *See also* Advice by lawyer to secure legal services;
  Recommendation of professional employment.
      acceptance of
      by or on recommendation of legal service organization, Rule 7.2.
      indigent client, on behalf of, Rule 6.1, 6.5.
      instances when improper, Rule 1.7 – 1.13.
      instances when improper for partner or associate, Rule 1.10.
      member or beneficiary of legal service program, on behalf of, Rule
        6.5, 7.2.
      when unable to render competent service, Rule 1.1.
    contract of
      desirability of, Rule 1.5.
      restrictive covenant in, Rule 5.6.
    public, retirement from, Rule 1.11, 1.12.
    rejection of, Rule 1.1, 1.3, 1.7.
    withdrawal from
      generally, Rule 1.16.
      harm to client, avoidance of, Rule 1.16(c), (e).
      mandatory withdrawal, Rule 1.16(b).
      permissive withdrawal, Rule 1.16(c).
      refund of unearned fee paid in advance, requirement of, Rule
        1.16(e).
      tribunal, consent required, Rule 1.16(d).
    when arbitrator or mediator, Rule 2.4.
Escrow accounts, Rule 1.15.
Estate of deceased lawyer. *See* Division of legal fees, with estate of
  deceased lawyer.
Evaluation, use by third party, Rule 2.3.
Evidence
    conduct regarding, Rule 3.3.

false, Rule 3.3(a).

Excessive fee. *See* Fee for legal services, amount of, excessive.

Ex parte proceeding, Rule 3.3(d).

Expenses of client, advancing or guaranteeing payment of, Rule 1.8(e).


# F

Fee for legal services
    advertisement of, *See* Advertising, fee information.
    agreement as to, Rule 1.5.
    amount of
        excessive, Rule 1.5.
        reasonableness, desirability of, Rule 1.5.
    collection of
        avoiding litigation with client, Rule 1.5.
        client's confidential information, use of in collecting or establishing, Rule 1.6(b).
        liens, use of, Rule 1.8(i).
        missing client, procedure for collection from, Rule 1.15.
    contingent fee, Rule 1.5(c).
    contract as to, desirability of written, Rule 1.5(b).
    court rule, applicability of, Rule 1.5(f).
    determination of, factors to consider
        ability of lawyer, Rule 1.5(a).
        amount involved, Rule 1.5(a).
        customary, Rule 1.5(a).
        effort required, Rule 1.5(a).
        employment, likelihood of preclusion of other, Rule 1.5(a).
        experience of lawyer, Rule 1.5(a).
        fee customarily charged in locality, Rule 1.5(a).
        labor required, Rule 1.5(a).
        nature of employment, Rule 1.5(a).
        question involved, difficulty and novelty of, Rule 1.5(a).
        reputation of lawyer, Rule 1.5(a).
        results obtained, Rule 1.5(a).
        skill requisite to services, Rule 1.5(a).
        time required, Rule 1.5(a).
        type of fee, fixed or contingent, Rule 1.5(a).
    disputed, Rule 1.5(f).
    division of, Rule 1.5(g)
    establishment of fee, use of client's confidential information, Rule 1.6(b).

excessive fee, Rule 1.5(a).

explanation of, Rule 1.5(b).

illegal fee, prohibition against, Rule 1.5(a).

payment by legal assistance organization, Rule 7.2.

persons able to pay reasonable fee, Rule 1.5.

persons only able to pay a partial fee, Rule 1.5.

persons without means to pay a fee, Rule 1.5.

reasonable fee, rationale against over-charging, Rule 1.5.

refund of unearned portion to client, Rule 1.5, 1.16.

written statement, when required, Rule 1.5(b).

Fee of lawyer referral service, propriety of paying, Rule 7.2.

Felony. *See* Discipline of lawyer, grounds for, illegal conduct.

Firm name. *See* Name, use of, firm name.

Framework of law. *See* Bounds of law.

Fraud, defined, Rule 1.0(i).

Frivolous position, avoiding, Rule 3.1.

Funds of client, protection of, Rule 1.15.

Future conduct of client, counseling as to. *See* Clients, counseling.

## G
====

"General counsel" designation, Rule 7.5.

Gift to lawyer by client, Rule 1.8(c).

Gifts to tribunal officer or employee by lawyer, Rule 3.5.

Government lawyer, Rule 1.11, 1.12, 3.8.

Grievance committee. *See* bar associations, disciplinary authority, assisting.

Group legal service. *See* Qualified legal assistance organization.

Guaranteeing payment of client's costs and expenses, Rule 1.8(e).

## H
====

Harassment, duty to avoid litigation involving, Rule 3.1.

Holding out

as limiting practice, Rule 7.4.

as partnership, Rule 7.5.

as specialist, Rule 7.4.

## I
====

Identity of client, duty to reveal, Rule 1.6, 1.17,

Illegal conduct, as cause for discipline, Rule 8.4.

Impartiality of tribunal, aiding in the, Rule 3.5.

Improper influences

    gift or loan to judicial officer, Rule 3.5.

    on judgment of lawyer. *See* Adverse effect on professional judgment of
      lawyer.

Improvement of legal system, Preamble.

Incompetence, mental. *See* Instability, mental or emotional; Mental
  competence of client.

Incompetence, professional. *See* Competence, professional.

Independent professional judgment, duty to preserve, Rule 5.4.

Indigent parties

    liability for costs and expenses, Rule 1.8(e).

    provision of legal services to, Rule 6.1, 6.3

    representation of, Rule 6.1, 6.3.

Inquiry from client, duty to respond, Rule 1.3, 1.4.

Instability, mental or emotional, Rule 1.14

Integrity of legal profession, maintaining, Preamble.

Intent of client, as factor in giving advice, Rule 1.2.

Interests of lawyer. *See* Adverse effect on professional judgment of
  lawyer, interests of lawyer.

Interests of other client. *See* Adverse effect on professional judgment of
  lawyer, interests of other clients.

Interests of third person. *See* Adverse effect on professional judgment of
  lawyer, desires of third persons.

Intermediary, prohibition against use of, Rule 4.2, 7.2, 7.3, 8.4(a).

Interstate law practice

    partners licensed in different jurisdictions, Rule 7.2.

    territorial limitations affecting right of lawyer to serve client, Rule 5.5.

Interview

    with opposing party, Rule 4.2, 4.3.

    with news media, Rule 3.6.

    with witness, Rule 3.6.

Investigation expenses, advancing or guaranteeing payment, Rule 108.

## <u>J</u>

Judges

    candidate for judicial office, Rule 8.2.

    false statements concerning, Rule 8.2.

    former, Rule 1.12.

    improper influences on

      gifts to, Rule 3.5.

private communications with, Rule 3.3, 3.5.
misconduct toward
    criticisms of, Rule 8.2.
    disobedience of orders, Rule 3.4.
    false statement regarding, Rule 8.2.
name in partnership name, use of, Rule 7.5(b).
retirement from bench, Rule 1.12.
selection of, Rule 8.2.
Judgment of lawyer. *See* Adverse effect on professional judgment of lawyer.
Jury
    arguments before, Rule 3.3, 3.4, 3.5.
    investigation of members, Rule 3.5.
    misconduct of, duty to reveal, Rule 3.5.
    questioning members of after their dismissal, Rule 3.5.

## K

Know, defined, Rule 1.0(k).
Knowledge of intended crime, revealing, Rule 1.6.

## L

Law firm. *See also* Partnership.
    conformity to Rules of Professional Conduct, measures giving reasonable assurance of, Rule 5.1.
    defined, Rule 1.0.
    supervision of employees, responsibility for, Rule 5.1, 5.3.
Law office. *See* Partnership.
Law reform activities, Rule 6.3, 6.4.
Law school, working with legal aid office or public defender office sponsored by, Rule 7.2.
Lawyer assistance program, Rule 8.3.
Lawyer-client privilege. *See* Attorney-client privilege.
Lawyer referral service.
    fee for listing, propriety of paying, Rule 7.2.
    request for referrals, propriety of, Rule 7.2.
    working with, Rule 7.2.
Laypersons. *See also* Unauthorized practice of law.
    need of legal services, Rule 7.1.
    recognition of legal problems, need to improve, Rule 7.1.
    selection of lawyer, need to facilitate, Rule 7.1.

Legal aid offices, Rule 6.1, 6.3, 6.5, 7.2, 7.5.

"Legal Assistance office," Rule 7.5(b).

Legal assistance organization. *See* Lawyer referral service; Legal aid office; Military legal assistance office; Public defender office; Qualified legal assistance organization.

"Legal clinic", Rule 7.5(b).

Legal corporation. *See* Professional legal corporation.

Legal documents of clients, duty to safeguard, Rule 1.15.

Legal education programs. *See* Continuing legal education programs.

Legal problems, recognition of by laypersons, Rule 7.1.

Legal service organization, membership in, Rule 6.3. *See also* Lawyer referral service; Legal aid office; Military legal assistance office; Public defender office; Qualified legal assistance organization.

Legal system, duty to improve, Preamble.

Legislature
   improper influence upon, Rule 1.11.
   representation of client before, Rule 1.11, 3.9.
   serving as member of, Rule 1.11.

Letterhead. *See* Advertising, letterheads.

Liability to client, Rule 1.8(h).

Licensing of lawyers
   false statements, Rule 8.1

Liens, attorneys', Rule 1.8(i).

Limited practice, holding out as having, Rule 7.4.

Litigation
   acquiring an interest in, Rule 1.8(i).
   delay of, Rule 3.2.
   expenses of, advancing or guaranteeing payment of, Rule 1.8(e).
   pending, media discussion of, Rule 3.6.
   responsibility for conduct of, Rule 1.2.
   to harass another, duty to avoid, Rule 3.1.
   to maliciously harm another, duty to avoid, Rule 3.1.

Living expenses of client, advances to client of, Rule 1.8(e).

Loan to judicial officer, Rule 3.5.

Lump-sum settlements, Rule 1.8.

## <u>M</u>

Malpractice claim, settlement of, Rule 1.8(h).

Mandatory withdrawal. *See* Employment, withdrawal from, mandatory.

Matter, defined, Rule 1.0(f).

Mediator, lawyer serving as, Rule 1.12, 2.4.

Medical expenses, Rule 1.8(e).

Mental competence of client, effect on representation, Rule 1.14.

Military legal assistance office, working with, Rule 7.2.

Misappropriation

    Confidential information of client, Rule 1.6.

    property of client, Rule 1.15.

Misconduct. *See also* Discipline of lawyer.

    of client Rule 1.2, 1.16, 3.3.

    of juror, Rule 3.5(d).

    of lawyer, duty to reveal to proper officials, Rule 8.3.

Misleading advertisement or professional notice, prohibition of, Rule 7.1(a).

Multiple clients, representation of, Rule 1.7.

# N

Name. *See also* Advertising, name.

    use of

    assumed name, Rule 7.5(b).

    deceased partner's, Rule 7.5(a), (b).

    firm name, Rule 7.5(b).

    misleading name, Rule 7.5(b).

    non-lawyer's name, Rule 7.5(b).

    partners who hold public office, Rule 7.5(b).

    predecessor firms, Rule 7.5(a).

    proper for law firm, Rule 7.5(b).

    proper for lawyer in private practice, Rule 7.5(b).

    retired partner, Rule 7.5(a), (b).

    trade name, Rule 7.5(b).

    withdrawn partner's, Rule 7.5(b).

Need for legal services, suggestion of. *See* Advice by lawyer to secure legal services.

Negligence of lawyer, Rule 1.1, 1.8(h).

Negotiations with opposite party, Rule 4.2, 4.3.

Neighborhood law offices, working with, Rule 7.2.

Newspapers

    advertising in, Rule 7.1.

    news item, compensation for professional publicity, Rule 7.2.

    news releases in, during or pending trial, Rule 3.6.

Non-adjudicative matters, Rule 3.9.

Non-lawyers, Rule 5.4, 5.8.

Non-legal services, Rule 5.7.

Non-meritorious position, duty to avoid, Rule 3.1.
Non-profit organization, legal services of, Rule 6.3, 7.2.
Notices. *See* Advertising.


## O

Objectives of client, duty to seek, Rule 1.2, 1.3.
"Of Counsel" designation, Rule 7.5(a).
Offensive tactics by lawyer, Rule 1.2, 3.1.
Office building directory. *See* Advertising, building directory.
Office sign, Rule 7.5(a).
Opposing counsel, Rule 1.2(g), 3.2, 3.3(f).
Opposing party, communications with, Rule 4.2, 4.3.


## P

Partner, defined, Rule 1.0(m).
Partnership
    advertisement of. *See* Advertising, partnership.
    conflicts of interest, Rule 1.10.
    deceased member.
        payments to estate of, Rule 5.4(a).
        use of name, Rule 7.5(a), (b).
    dissolved, use of name of, Rule 7.5(b).
    holding out as, falsely, Rule 7.5(c).
    members licensed in different jurisdictions, Rule 7.5(d).
    member as witness for one other than client, Rule 3.7.
    name, Rule 7.5.
    nonexistent, holding out falsely, Rule 7.5(c).
    non-lawyer, with, Rule 5.4(b).
    recommending professional employment of, Rule 7.2.
    supervision of employees, Rule 5.1, 5.3.
Payment to obtain recommendation of employment
    fees or dues to qualified legal assistance organization, Rule 7.2.
    prohibition against, Rule 7.2.
Pending litigation, discussion of in media, Rule 3.6.
Perjury, Rule 3.3.
Person, defined, Rule 1.0(n).
Personal injury matter, Rule 4.5.
Personal interests of lawyer. *See* Adverse effect on professional judgment of lawyer, interests of lawyer.
Personal opinion of client's cause, Rule 1.2(b).

Political activity, Rule 1.11, 8.2.

Political considerations in selection of judges, Rule 8.2

Potentially differing interests. *See* Adverse effect on professional judgment of lawyer.

Practice of law, unauthorized, Rule 5.5.

Prejudice to right of client, duty to avoid, Rule 1.1.

Prepaid legal service. *See* Qualified legal assistance organization.

Preservation of confidential information of client, Rule 1.6.

Pressure on lawyer by third person. *See* Adverse effect on professional judgment of lawyer.

Privilege, attorney-client. *See* Attorney-client privilege.

Pro bono legal service
    duty to render, Rule 6.1.
    liability of client for costs and expenses, Rule 1.8.
    limited pro bono legal services, Rule 6.3.

Procedures, duty to help improve, Preamble.

Professional card of lawyer. *See* Advertising, cards, professional.

Professional judgment, duty to protect independence of, Rule 1.7, 1.8(f), 5.4, 5.8.

Professional legal corporations, Rule 1.0(o).

Professional notices. *See* Advertising.

Professional status, responsibility not to mislead concerning, Rule 7.5.

Profit-sharing with lay employees, authorization of, Rule 5.4(a).

Promoting use of lawyer's service, Rule 7.2, 7.3. *See also* Advertising.

Property of client, handling, Rule 1.15.

Prosecuting attorney, duty of, Rule 3.8.

Public defender office, working with, Rule 7.2.

Public employment
    duty of employee, Rule 1.11.
    retirement from, Rule 1.11, 1.12.

Public interest legal service, duty to render, Rule 6.1.

Public office, duty of holder, Rule 1.11(f).

Public prosecutor. *See* Prosecuting attorney, duty of.

Publication of articles for lay press, Rule 1.0(a), 7.1, 7.3.

Publicity. *See also* Advertising; Trial publicity.
    by legal assistance organization. *See* Qualified legal assistance organization.
    commercial, Rule 1.0(a), 7.1.
    for partners, associates or affiliated lawyers, Rule 7.1, 7.3, 7.5.
    generally, Rule 7.1, 7.3, 7.5.
    through public communication, Rule 7.1, 7.3, 7.5.

# Q

Qualified legal assistance organization. *See also* Lawyer referral service;
  Legal aid office; Military legal assistance office; Public defender office.
    bona fide organization furnishing, recommending or paying lawyers,
      Rule 7.2.
    cooperation with, Rule 7.2.
    definition of, Rule 1.0(p).
    employment by or on recommendation of, Rule 7.2.
    furnishing, recommending or paying lawyers, Rule 7.2.
    independence of professional judgment, Rule 7.2.
    legal services organization, membership in, Rule 6.3.
    member or beneficiary of
      acceptance of employment from, Rule 7.2.
      as client, Rule 1.13, 6.3.

# R

Racial discrimination. *See* Discrimination.
Radio broadcasting. *See* Advertising, radio.
Reasonable, defined, Rule 1.0(q).
Reasonable belief, defined, Rule 1.0(r).
Reasonable fee. *See* Fee for legal services, amount of.
Reasonably should know, defined, Rule 1.0(s).
Recognition of legal problems, aiding laypersons in, Rule 7.1.
Recommendation of professional employment, Rule 7.2.
Records of funds, securities and properties of clients, generally, Rule
  1.15.
    availability, Rule 1.15(i).
    production in investigation or disciplinary proceeding, Rule 1.15(i).
    required records, Rule 1.15(d).
    retention, Rule 1.15(d).
Referral service. *See* Lawyer referral service.
Refund of unearned fee when withdrawing, duty to give to client, Rule
  1.16(e).
Regulation of legal profession, Preamble.
Representation of multiple clients. *See* Adverse effect on professional
  judgment of lawyer, interest of other clients.
Reputation of lawyer, Rule 1.5(a).
Requests for recommendation of employment, Rule 7.2.
Restrictive covenant, Rule 5.6.
Retention of employment. *See* Employment.
Retention of records. *See* Records.

Retirement. *See also* Name, use of, retired partner.
    from judicial office, Rule 1.12.
    from public employment, Rule 1.11.
    plan for lay employees, Rule 5.4(a).
Revealing of confidential information, Rule 1.6.
Revealing to tribunal
    Client's criminal or fraudulent conduct, Rule 3.3(b)
    jury misconduct, Rule 3.5(d).
    representative capacity in which appearing, Rule 3.9.


## S

Sale of law practice, Rule 1.17.
Sanction for violating disciplinary rules, Rule 8.4.
Screening
    defined, Rule 1.0(t).
    of disqualified lawyer, Rule 1.11, 1.12, 1.18.
Secrets of client, *see* Confidential information.
Selection of lawyer, Rule 7.1.
Selection of judges, duty of lawyers, Rule 8.2.
Self-interest of lawyer. *See* Adverse effect on professional judgment of
  lawyer, interests of lawyer.
Settlement agreement, Rule 1.2(a), 1.8(g), (h).
Sex discrimination. *See* Discrimination.
Sexual relations
    defined, Rule 1.0(u).
    prohibited, Rule 1.8(j), (k).
Solicitation of business, Rule 7.3. *See also* Advertising; Recommendation
  of professional employment.
    personal injury matters, Rule 5.4.
Specialist, holding out as, Rule 7.4.
Specialization
    holding out as having, Rule 7.4.
Speeches to lay groups, Rule 7.1.
State, defined, Rule 1.0(v).
State of mind of client, effect of in advising client, Rule 1.14.
State's attorney. *See* Government attorney, Prosecuting attorney.
"Stirring up litigation." *See* Advertising; Advice by lawyer to secure legal
  services; Recommendation of professional employment.
Stockholders of corporation, corporate counsel's allegiance to, Rule 1.13.
Suggestion of need for legal services. *See* Advice by lawyer to secure
  legal services.

Suit to harass another, duty to avoid, Rule 3.1.

Suit to maliciously harm another, duty to avoid, Rule 3.1.

Supervisory lawyer, responsibilities of, Rule 5.1.

Suppression of evidence, Rule 3.3.


# T

Telephone directory. *See* Advertising, directories.

Television and radio programs. *See* Advertising, radio; Advertising, television.

Termination of employment. *See* Confidences of client; Employment, withdrawal from.

Third persons, rights of, Rule 4.4.

Threatening criminal process, Rule 3.4(e).

Trade name. *See* Name, use of, trade name.

Trial publicity, Rule 3.6.

Trial tactics, Rule 3.3, 3.4.

Tribunal
    disrupting, Rule 3.3(f).
    need for determination in making charge of misconduct based on unlawful discriminatory practice, Rule 8.4(g).
    representation of client before, Rule 3.3.
    what constitutes, Rule 1.0(w).

Trust accounts, Rule 1.15.

Trustee, client naming lawyer as, Rule 1.8.


# U

Unauthorized practice of law. *See also* Division of legal fees; Partnership, non-lawyer, with.
    aiding a layperson in the prohibited, Rule 5.5(b).
    distinguishing from delegation of tasks to sub-professionals, Rule 5.3, 5.5.
    functional meaning of, Rule 5.5.

Unlawful conduct, aiding client in, Rule 1.2.

Unlawful discriminatory practice. *See* Discrimination.

Unpopular party, representation of, Rule 1.2(b).

Unreasonable fees. *See* Fee for legal services, amount of.

Unsolicited advice. *See* Advice by lawyer to obtain legal services.

# V

Varying interests of clients. *See* Adverse effect on professional judgment
  of lawyer, interest of other clients.
Venire, members of. *See* Jury.
Violation of rule of professional conduct as cause for discipline, Rule 8.4.
Violation of law as cause for discipline, Rule 8.4.
Voluntary gifts by client to lawyer, Rule 1.8(c).
Volunteered advice to secure legal services. *See* Advice by lawyer to
  secure legal services.

# W

Waiver of position of client, Rule 1.2.
Will of client, gift to lawyer in, Rule 1.8(c).
Withdrawal. *See* Employment, withdrawal from.
Witness
    communications with, Rule 3.4.
    false testimony by, Rule 3.3.
    lawyer acting as, Rule 3.7.
    payment to, Rule 3.4.
Writing
    confirmed in writing, defined, Rule 1.0(e).
    defined, Rule 1.0(x).
    for lay publication, avoiding appearance of giving general solution,
        Rule 7.1.

SINGLE-USER LICENSE FOR:

# *NEW YORK RULES OF PROFESSIONAL CONDUCT (2021)*

Copyright 2021
New York State Bar Association

**WARNING:** *This product is protected by copyright law and is intended for single-user use. Unauthorized reproduction or distribution of this product, or any part thereof, may result in civil and criminal penalties, and will be prosecuted to the maximum extent of the law.*

New York State Bar Association Continuing Legal Education products are intended to provide current and accurate information to help attorneys maintain their professional competence. Products are distributed with the understanding that NYSBA does not render any legal, accounting, or other professional service. Attorneys using products or orally communicated information in dealing with a specific legal matter should also research original sources of authority.

While it is our hope that this information will be extremely helpful to all attorneys, it must be stressed that the content contained herein should be considered only as a starting point. All contracts must be tailored to meet the needs of the client for a particular transaction and researched to ensure they are current and not in violation of any statute or regulation.

# EXHIBIT 17

Case 5:20-cv-09340-NC Document 160-1 Filed 09/27/22 Page 665 of 675



Sign In

Get started



**Kyle Roche**  Follow

Aug 29 · 2 min read · ▶ Listen



# My Response

A posting on the recently launched anonymous Crypto Leaks website about me, my firm, and Ava Labs contains numerous unsourced false statements and illegally obtained, highly edited video clips that are not presented with accurate context. These videos were recorded without my consent during private meetings with Christen Ager-Hanssen, whom I now know works for Dominic Williams, the creator of ICP Token, and the defendant in a high-profile securities fraud litigation my firm brought against him.

Mr. Ager-Hanssen requested a meeting with me under the false pretense of venture capital investment in a technology startup, but his real motives are now clear: to deceive and entrap me. When I agreed to the meeting, I was unaware that Mr. Ager Hanssen specializes in what he calls "conflict management" for "eccentric billionaires" like Mr. Williams where he uses illegal and underhanded means through "covert recordings" and "social

 579 |  20

Case 5:20-cv-09340-NC Document 160-1 Filed 09/27/22 Page 666 of 675



Sign In    Get started

Link to Financial Post Story.

My firm has represented Ava Labs since 2019. Contrary to what is presented in the recent unsourced posting by Crypto Leaks, there is not, and never has been, a "secret pact" between my firm and Ava Labs. We vigorously deny any allegations of impropriety. Our work with Ava Labs is focused on defense side cases typical of any large corporation. Ava Labs has had no input, control, or insight into any of our firm's plaintiff-side class action cases and we have never filed a class action on their behalf or at their request. Statements in the video to the contrary are false, and were obtained through deceptive means, including a deliberate scheme to intoxicate, and then exploit me, using leading questions. The statements are highly edited and spliced out of context. What the posting fails to note is that our firm's plaintiff side practice has remained a source of disagreement in our relationship with Ava Labs, and they have criticized our pursuit of many such cases.

In all of my dealings with Emin Gün Sirer and the rest of the Ava Labs team, they have always acted with the highest integrity. They have never asked that I do anything underhanded, illegal or of questionable ethics, and I never would.

  

9/19/22, 10:15 AM



Sign In    Get started

defending ourselves against their underhanded, false and deceptive tactics against us.

About    Help    Terms    Privacy

        

# EXHIBIT 18

Case 5:20-cv-09340-NC Document 160-1 Filed 09/27/22 Page 669 of 675

 

Sign In     Get started



Emin Gün Sirer   Follow

Aug 29 · 3 min read ·  Listen

# My Statement about the Crypto Leaks lies

Ordinarily, we would not make a statement about a scurrilous hit-piece on disreputable websites like Cryptoleaks. To dignify such an obvious fraud on us with a response usually makes no sense. Everyone should be able to see right through it.

I am disheartened to see people in the crypto space pay any attention to such obvious nonsense. These claims evidently came about when Kyle Roche, a lawyer at a firm we retained in the early days of our company, tried to impress a potential business partner by making false claims about the nature of his work for Ava Labs.

Let me tell you the truth about the lies that stood out the most to me:

The allegations on this site are _____e. Ava Labs believes in

 2.5K    17

      



Sign In    Get started

Neither I, nor anyone else at Ava Labs ever directed Roche in his selection of cases. We do not receive materials or information from him, and we do not entrust our legal affairs to him. Roche himself confirmed <u>this in a public statement</u>. He has only represented Ava Labs in a defensive capacity in a couple run-of-the-mill corporate contract disputes and myself in a libel case. His firm is one of more than a dozen law firms we employ for matters relating to tax, corporate, regulatory, and human resources.

Roche has filed all their lawsuits independently of us. For instance, we learned about the Solana lawsuit only through the press, were livid that he was suing another project, and attempted to persuade him to drop the case. Ava Labs' General Counsel went the extra mile to write an <u>article</u> debunking Roche's lawsuit as meritless.

Roche is not responsible for regulatory matters for Ava Labs. We independently have good relationships with the regulatory community, with policymakers and with law enforcement. We hold ourselves to high standards and believe they recognize that.

Roche is not on our executive team, and we do not look to him for advice

  



Sign In    Get started

anything to do with the Avalanche protocol. He has handled only a few cases of minor importance for us in his area of competence.

Let me be absolutely clear: we do not engage in or support any underhanded tactics suggested in the article or the video clips. We believe in what we are building and do not need secret pacts or behind-the-scenes intrigue.

It is telling that the allegations surfaced on a disreputable website, as the third article in a series where the first article alleges a grand conspiracy by The New York Times against a crypto project, and the second alleges a multi-billion dollar price-fixing scheme by FTX against the same project's token.

We will carry on building and otherwise working hard for the blockchain community. We encourage everyone to put aside pettiness, personal attacks, and fraudulent lies. Let's keep building together.

Sincerely,

Emin Gün Sirer

        



Sign In     Get started

with his stepping down as outside counsel and the redemption of his ownership stake in Ava Labs.

The donation will become part of the general funds of the Avalanche Foundation, which uses its resources to support the Avalanche public blockchain and its ecosystem through a series of grants, investments and services agreements.

In recognition of Mr. Roche's donation, Roche Freedman LLP also announced a donation to the Avalanche Foundation's general fund.

Ava Labs and Mr. Roche confirmed that he will no longer act as counsel to Ava Labs or the Avalanche Foundation. His equity interest in Ava Labs also will end.

Mr. Roche wants the Avalanche community to know that he apologizes for the situation that arose recently and hopes his gesture will help the ecosystem become stronger and achieve great things in the years to come.







Sign In

Get started

About    Help    Terms    Privacy







Craig A. Hansen (SBN 209622)
   Email: craig@hansenlawfirm.net
Philip E. Yeager (SBN 265939)
   Email: phil@hansenlawfirm.net
Collin D. Greene (SBN 326548)
   Email: collin@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1150
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Jingjing Ye (Admitted Pro Hac Vice)
YE & ASSOCIATES, PLLC
3400 N. Central Expy, #500
Plano, TX 75080

Attorneys for Temujin Labs Inc., a Delaware
Corporation, Temujin Labs Inc., a Cayman Islands
Corporation, Lily Chao, Damien Ding, and
Discreet Labs Ltd.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SANTA CLARA

| | |
|---|---|
| TEMUJIN LABS INC., a Delaware corporation and TEMUJIN LABS INC., a Cayman Islands corporation, <br><br> Plaintiffs, <br><br> v. <br><br> ARIEL ABITTAN, BENJAMIN FISCH, CHARLES LU, and DOES 1-10, inclusive, Defendants. <br><br> Defendants. | Case No.: 20CV372622 <br><br> **DECLARATION OF LILY CHAO** <br><br><br><br><br><br><br> Date: <br> Time: <br> Dept.:        1 <br> Judge:      Hon. Sunil Kulkarni |

I, Lily Chao, declare as follows:

1.       I have personal knowledge of the matters stated in this Declaration and, if called upon as a witness, would competently testify to them.

2.       I utilize the name Lily Chao.

3.       In approximately September or October of 2020, I spoke with Ariel Abittan.  Ariel Abittan indicated that unless the ongoing dispute with him was settled on his terms, he would report me to the Chinese government authorities.

4.       In approximately November or December of 2020, I spoke with Charles Lu and Benjamin Fisch.  During the conversation, they indicated that unless Temujin Labs Inc., a Delaware Corporation (hereinafter "Temujin"), withdrew its Complaint against them, they would report me to the media.  They indicated that the blockchain business was illegal in China and that they would expose my identity and impact me in many ways.  I refused their demand.

5.       Not long after my refusal to accept Charles Lu and Benjamin Fisch's demand, an anonymous exposè about me, Temujin, and the Findora Project was published on Chinese website Zhihu.com, in which I was personally attacked.

6.       I plan on traveling to China soon.  I fear that if my Chinese legal name was exposed to the Chinese authorities, that exposure could endanger my legitimate business and financial interests in China, as well as potentially subject my friends/family/business partners to criminal prosecution, harassment, persecution, house arrest, property seizure, and/or other persecution, due to my involvement in the crypto field.

I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct to the best of my knowledge and belief, and that this Declaration was signed on September 21, 2022.



Lily Chao